UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| DARTMOUTH-HITCHCOCK CLINIC AND | : | |
| MARY HITCHCOCK MEMORIAL HOSPITAL, | : | |
| D/B/A DARTMOUTH-HITCHCOCK, ELLIOT | : | |
| HEALTH SYSTEM, ELLIOT HOSPITAL OF | : | |
| THE CITY OF MANCHESTER, ELLIOT | : | CIVIL ACTION No. |
| PHYSICIAN NETWORK, ELLIOT | : | |
| PROFESSIONAL SERVICES NETWORK, INC., | : | |
| CATHOLIC MEDICAL CENTER, | : | |
| WENTWORTH-DOUGLASS HOSPITAL, | : | |
| WENTWORTH-DOUGLASS PHYSICIAN | : | |
| CORPORATION, EXETER HEALTH | : | |
| RESOURCES, INC., EXETER HOSPITAL, | : | |
| INC., CORE PHYSICIANS, LLC, EXETER | : | |
| HEALTHCARE, INC., ROCKINGHAM VNA & | : | |
| HOSPICE, SOUTHERN NEW HAMPSHIRE | : | |
| HEALTH SYSTEM, SOUTHERN NEW | : | |
| HAMPSHIRE MEDICAL CENTER, | : | |
| FOUNDATION MEDICAL PARTNERS, INC., | : | |
| ST. JOSEPH HOSPITAL OF NASHUA, N.H., | : | |
| LRGHEALTHCARE D/B/A LAKES REGION | : | |
| GENERAL HOSPITAL, CHESHIRE MEDICAL | : | |
| CENTER, FRISBIE MEMORIAL HOSPITAL, | : | |
| and JOHN DOE. | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| NICHOLAS A. TOUMPAS, in his official | : | |
| capacity as Commissioner of the New Hampshire | : | |
| Department of Health and Human Services, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Dartmouth-Hitchcock Clinic and Mary Hitchcock Memorial Hospital, d/b/a

Dartmouth-Hitchcock; Elliot Health System and its subsidiaries, Elliot Hospital of the City of

Manchester, Elliot Physician Network, and Elliot Professional Services Network, Inc.; Catholic

Medical Center; Wentworth-Douglass Hospital and its subsidiary, Wentworth-Douglass

Physician Corporation; Exeter Hospital, Inc., and its subsidiaries, Core Physicians, LLC, Exeter

Healthcare, Inc., and Rockingham VNA & Hospice; Southern New Hampshire Health System

and its subsidiaries, Southern New Hampshire Medical Center and Foundation Medical Partners,

Inc.; St. Joseph Hospital of Nashua, N.H.; LRGHealthcare d/b/a Lakes Region General Hospital;

Cheshire Medical Center; Frisbie Memorial Hospital, (collectively, "Provider Plaintiffs"); and

John Doe ("Patient Plaintiff") (together with Provider Plaintiffs, "Plaintiffs"), by and through

their attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendant

Nicholas A. Toumpas, Commissioner of the New Hampshire Department of Health and Human

Services and allege as follows:

## INTRODUCTORY STATEMENT

A foundational principle of the Medicaid program is to ensure adequate access to its

beneficiaries, primarily low-income women and children.  Earlier this year, the New Hampshire

Department of Health and Human Services ("DHHS") – the state agency charged with

implementing the Medicaid program – warned that elimination of so-called disproportionate

share ("DSH") funding as part of the reimbursement system for New Hampshire hospitals would,

in fact, have a significant adverse impact on hospitals and, therefore, limit access by

beneficiaries to hospital services:  "Elimination of [DSH] funding will have a significant fiscal

impact on hospitals in that it will downshift the financial responsibility to the hospitals . . . .

There is a strong possibility that this [DSH] reduction could result in a hospital's inability to

sustain operations and therefore closure."

The State's recently enacted budget effectively eliminates disproportionate share funding

for the Provider Plaintiffs.  This is contrary to the express requirements of federal law, and the

equally unambiguous concerns of Congress which motivated it to establish disproportionate

funding thirty years ago:

> [W]hile the Committee recognizes that in this time of economic
> constraint and reductions in Federal funds for Medicaid, States
> must be given the flexibility necessary to improve the Medicaid
> reimbursement mechanism, the Committee does not want such
> policies to result in arbitrary and unduly low reimbursement levels
> for hospital services.  In several states, a significant differential
> exists between the Medicaid payment level for physicians and the
> rate paid by Medicare and private individuals for physician
> services.  As a result, many physicians now refuse to treat
> Medicaid patients.  The Committee is very concerned that a similar
> situation not develop with respect to hospital care.

H.R. Rep. No. 97-158, at 294 (1981). As alleged in detail below, the State's budgetary decisions

for the just-commenced State Fiscal Year ("SFY") will lead to precisely these results.  The

effects will be greatly compounded because of New Hampshire's troubled history in

implementing its Medicaid program.

For eighteen years, the State's hospitals were used as a conduit in a scheme under which

the State taxed them under the so-called Medicaid Enhancement Tax ("MET") for the express

purpose of securing matching federal funds.  The matching funds were then placed in the State's

general fund.  At the time this scheme was designed and implemented, State officials assured

hospitals that they would only be a conduit and would be held harmless: "[w]e appreciate the fact

that hospitals would prefer not to be subject to taxation but we all know that ongoing cooperation

is essential for maintenance of this critical revenue source . . . . [s]hould Federal

Disproportionate Share funds become unavailable, we would no longer require the State revenue

and we would recommend the rate of taxation drop to zero."  Letter from Commissioners Harry

H. Bird, M.D. and Stanley Arnold to then president of the New Hampshire Hospital Association

Gary Carter, Feb. 25, 1993.  As evidence of its hold-harmless commitment, for eighteen years

since 1991, on the same day the State collected the MET, it almost simultaneously paid the same amount back to each hospital as a DSH payment.  After yielding some $1.8 billion to the general fund over the ensuing years, a 2007 audit by federal officials has ended the practice of hold-harmless payments.

Contrary to its 1991 assurances, in the recently adopted biennial budget for SFY 2012 and 2013, the State continues to assess and collect the MET on the hospitals and use those matching funds for non-Medicaid purposes.  The imposition of the tax and the elimination of DSH funding completely subverts the purpose of the DSH program:  to help hospitals serving the State's neediest citizens.  Instead, the State's actions threaten irreparable harm to hospitals, physicians, and their Medicaid-eligible patients.  The threat is compounded by a series of actions taken over the last three years that have drastically reduced Medicaid reimbursement rates paid to hospitals for their provision of services to Medicaid beneficiaries.

To ensure that the foundational principle of healthcare access by beneficiaries is achieved, the Medicaid Act imposes certain procedural and substantive requirements on participating states.  Federal courts around the country have concluded that, when states act in a manner inconsistent with those requirements, Medicaid providers and beneficiaries have standing to seek redress in the form of injunctive and declaratory relief.  This Complaint seeks precisely such relief on behalf of ten integrated health systems and, John Doe, a Medicaid recipient and Plaintiff hospital patient.  As set forth in detail below, because New Hampshire has violated the requirements of the Medicaid Act, the Court should enjoin Nicholas A. Toumpas, Commissioner of Health and Human Services from, *inter alia*, implementing illegally imposed rates and making inadequate payments.

4

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action and the parties thereto pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## PARTIES

3.      Plaintiff John Doe is an adult male resident of New Hampshire.  He was diagnosed with rectal cancer in 2010.  He has received ongoing treatment.  He is a Medicaid beneficiary and, as such, has received healthcare services from physicians at Lakes Region General Hospital.  The name and address of John Doe are disclosed in the Declaration of John Doe filed under seal on this date.

### Dartmouth-Hitchcock

4.      Plaintiffs Dartmouth-Hitchcock Clinic ("DHC") and Mary Hitchcock Memorial Hospital ("MHMH"), doing business as "Dartmouth-Hitchcock," ("D-H") are New Hampshire not-for-profit corporations and healthcare charitable trusts, each with a principal place of business located at One Medical Center Drive, Lebanon, New Hampshire.  Dartmouth Hitchcock Medical Center ("DHMC") consists of Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital and Dartmouth College/Dartmouth Medical School, and is New Hampshire's only academic medical center.  Internationally renowned, nationally ranked, and regionally respected, D-H integrates high-quality patient care, advanced medical education and translational research to provide a full spectrum of health care.  DHC is a network of 936 primary and specialty care physicians located throughout New Hampshire and Vermont.  D-H operates MHMH, which has 353 patient beds and is the only teaching hospital in New Hampshire and serves as a major

tertiary care referral site for northern New England.  MHMH is designated as a rural referral

hospital and a sole community hospital.  MHMH provides a full range of patient services in

acute and critical medicine, surgery, psychiatry and rehabilitation for adults, infants, and

children.  In addition, MHMH is an accredited children's hospital, known as the Children's

Hospital at Dartmouth ("CHaD") and also has the capacity to accommodate short-term acute

psychiatric patients.  As the tertiary care center for New Hampshire, D-H is responsible for a

number of programs that serve the entire state.  These include the Norris Cotton Cancer Center,

the CHaD, the State HIV center, Neonatal Transport, Level I Trauma and centers for the

treatment of hemophilia and cystic fibrosis, and Dartmouth-Hitchcock Advanced Response

Team ("DHaRT").   D-H's mission is to advance health through research, education, clinical

practice and community partnerships, providing each person the best care, in the right place at

the right time, every time.

5.      Pursuant to provider agreements with DHHS, DHC and MHMH provide services

to Medicaid beneficiaries.

**Elliot Health System**

6.      Plaintiff Elliot Health System ("EHS") is a New Hampshire not-for-profit

corporation and a healthcare charitable trust with its principal place of business located at One

Elliot Way, Manchester, New Hampshire.  EHS is the largest provider of comprehensive

healthcare services in Southern New Hampshire. EHS is a health system parent entity.

7.      The cornerstone of EHS is its subsidiary, Elliot Hospital of the City of

Manchester ("Elliot Hospital"), a 296-bed acute care facility located in Manchester, New

Hampshire's largest city.  Elliot Hospital is the region's only Trauma Center – a hospital

equipped to provide comprehensive emergency medical services to patients suffering traumatic

injuries, requiring specialized and experienced multidisciplinary treatment and specialized resources, as regulated and designated by the State of New Hampshire.  Elliot Hospital's mission is to provide patients with excellent services offered with dignity, caring, and respect.

8.      Elliot Hospital has two other subsidiaries:  Elliot Physician Network ("EPN") and Elliot Professional Services Network, Inc. ("EPS").  EPN and EPS, which employed 207 full-time equivalent physicians for the year ending June 30, 2011, provide primary and specialty professional services to the greater Manchester community.  The principal place of business of Elliot Hospital, EPN and EPS is One Elliot Way, Manchester, New Hampshire.  They are New Hampshire not-for-profit corporations.

9.      In addition to the Elliot Hospital and its subsidiaries, EPN and EPS, EHS have other subsidiaries that provide services to Medicaid patients.  The Visiting Nurse Association of Manchester and Southern New Hampshire, Inc. provides home care, hospice and child care services to Medicaid recipients. Elliot 1 Day Surgery Center, LLC, provides ambulatory surgery services to residents of the greater Manchester area.

10.     EHS is therefore comprised of the following Medicaid-approved subsidiaries: Elliot Hospital of the City of Manchester, EPN, EPS, The Visiting Nurse Association of Manchester and Southern New Hampshire, Inc., and Elliot 1 Day Surgery Center, LLC.

11.     Pursuant to its provider agreements with DHHS, EHS provides services to Medicaid beneficiaries through its subsidiaries.

**Catholic Medical Center**

12.     Plaintiff Catholic Medical Center ("CMC") is a New Hampshire not-for-profit corporation and a healthcare charitable trust with its principal place of business at 100 McGregor Street, Manchester, New Hampshire.  CMC is a licensed 330-bed full service acute care hospital

located in Manchester, New Hampshire's largest city. CMC offers cardiac and general surgical capabilities, comprehensive programs for high acuity patients, and both inpatient and outpatient rehabilitation programs, as well as inpatient psychiatric services. CMC cares for some of the most acutely ill patients in the state as demonstrated by its high case mix index. CMC operates a full spectrum of acute care and specialty care services, with a particular emphasis on cardiology.

13.     CMC is a voluntary not-for-profit healthcare charitable trust under New Hampshire law.

14.     CMC is a part of CMC Healthcare System, a supporting organization and public juridic person within the Roman Catholic Church.

15.     Pursuant to a provider agreement with DHHS, CMC provides services to Medicaid beneficiaries.

**Wentworth-Douglass Hospital**

16.     Plaintiff Wentworth-Douglass Hospital ("Wentworth-Douglass") is a New Hampshire not-for-profit corporation and healthcare charitable trust, with its principal place of business located at 789 Central Avenue, Dover, New Hampshire. It is an independent acute care hospital which offers a full range of services typical of a community hospital, as well as several notable specialty services characteristic of a regional hospital.

17.     Wentworth-Douglass has three wholly-owned subsidiary corporations: (1) Wentworth-Douglass Physician Corporation ("WDPC"), a not-for-profit New Hampshire corporation which owns and operates primary care and specialty care physician practices; (2) Wentworth-Douglass Hospital and Health Foundation (the "Foundation"), a not-for-profit New Hampshire corporation established for the purpose of securing philanthropic gifts to support the needs of the Hospital; and (3) Wentworth-Douglass Community Health Foundation ("WDCHC")

13479950.18

8

d/b/a The Works Family Health and Fitness Center, a for-profit New Hampshire corporation

which operates a health club in Somersworth.  WDPC's principal place of business is 789

Central Avenue, Dover, New Hampshire.

18.     Pursuant to provider agreements with DHHS, Wentworth-Douglass provides

services to Medicaid beneficiaries itself and WDPC.

**Exeter Health Resources, Inc.**

19.     Plaintiff Exeter Health Resources, Inc. ("EHR") is a New Hampshire not-for-

profit corporation and a healthcare charitable trust, with its principal place of business located at

Five Alumni Drive, Exeter, New Hampshire.  EHR is the health system parent entity.  EHR's

Medicaid Providers are Exeter Hospital, Inc.; Core Physicians, LLC; Exeter Healthcare, Inc.; and

Rockingham VNA & Hospice.  The EHR system includes several other organizations, such as a

medically-based health and fitness organization, which are not Medicaid providers.

20.     EHR and its Medicaid Providers are exempt from federal income taxation under

26 U.S.C. § 501(c)(3), and are New Hampshire charitable trusts. Exeter Hospital, Inc. is a 100-

bed community-based acute care hospital that provides a wide range of medical and surgical

services, birthing and reproductive care, emergency services, comprehensive medical and

radiological cancer care, and community outreach programs.  Its principal place of business is

Five Alumni Drive, Exeter, New Hampshire.  Exeter Healthcare, Inc. is a 27- bed sub-acute care

facility that cares for ventilator-dependent and medically complex patients, in addition to

providing inpatient rehabilitation.  Its principal place of business is Four Alumni Drive, Exeter,

New Hampshire.  Core Physicians, LLC operates a multi-specialty medical group practice with

approximately 115 primary care and specialty physicians and other practitioners in 20 locations

throughout the Seacoast area.  Its principal place of business is 7 Holland Way, Exeter, New

Hampshire.  Rockingham VNA & Hospice is a provider of home care and end-of-life care.  Its principal place of business is 137 Epping Road, Exeter, New Hampshire.

21.     EHR is therefore comprised of the following Medicaid-approved subsidiaries: Exeter Hospital, Inc.; Core Physicians, LLC; Exeter Healthcare, Inc.; and Rockingham VNA & Hospice.

22.     Pursuant to provider agreements with DHHS, EHR provides services to Medicaid beneficiaries through its subsidiaries.

### Southern New Hampshire Health System

23.     Plaintiff Southern New Hampshire Health System ("SNHHS") is a New Hampshire not-for-profit corporation, with its principal place of business located at 8 Prospect Street, Nashua, New Hampshire.

24.     SNHHS is the parent company of the Southern New Hampshire Medical Center ("SNHMC" or "Medical Center") and Foundation Medical Partners ("FMP," and together with SNHHS and the Medical Center, the "Health System").

25.     SNHHS is a not-for-profit New Hampshire corporation qualified as a charitable organization under 26 U.S.C. § 501(c)(3), and thus exempt from federal income taxation pursuant to Section 501(a) of the Internal Revenue Code of 1986, as amended. SNHHS is the sole member of SNHMC and FMP.

26.     The Health System's mission includes a commitment to improve the health of its community.  Acting as a catalyst for healthy change, the Health System sponsors several programs and community projects, and develops new services. In fiscal year 2006, the Health System provided $11.5 million of financial support to the community, including charity care and subsidized health services.

27.     The Medical Center is a 501(c)(3), not-for-profit New Hampshire corporation that is a community hospital providing emergency care, acute care, specialty services, ambulatory care, and rehabilitation services. The Medical Center currently staffs 158 acute care beds and 30 psychiatric beds totaling 188.  The Medical Center operates a licensed 188-bed hospital in Nashua, on both its Main Campus, predominantly located at 8 and 10 Prospect Street, Nashua, New Hampshire (the "Main Campus"), and its West Campus, located at 29 Northwest Boulevard, Nashua, New Hampshire (the "West Campus"), with other satellite facilities in Nashua and its surrounding communities.

28.     FMP is a 501(c)(3), not-for-profit New Hampshire corporation that is a multi-specialty physician group, which as of December 31, 2006 employed 115 physicians, and has a total complement of 143 physicians.  FMP provides care at the Medical Center and at 12 other sites in the Medical Center's service area.  Its principal place of business is 8 Prospect Street, Nashua, New Hampshire.

29.     SNHHS is therefore comprised of the following Medicaid-approved subsidiaries: SNHMC and FMP.

30.      Pursuant to provider agreements with DHHS, SNHHS provides services to Medicaid beneficiaries through its subsidiaries.

**St. Joseph Hospital**

31.     Plaintiff St. Joseph Hospital of Nashua, N.H. ("St. Joseph") is a New Hampshire not-for-profit corporation and a healthcare charitable trust that is referred to as St. Joseph Hospital or St. Joseph Healthcare, with its principal place of business located at 172 Kinsley Street, Nashua, New Hampshire.

32.     St. Joseph is organized as a voluntary corporation under N.H. RSA Chapter 292. It is a Catholic facility that is tax exempt under 26 U.S.C. § 501(c)(3) and is designated as a New Hampshire Charitable Trust as defined by NH RSA § 7:21.

33.     St. Joseph is sponsored and controlled by Covenant Health Systems, Inc., a Massachusetts not-for-profit corporation based in Tewksbury, Massachusetts.

34.     St. Joseph is designated as a Prospective Payment System ("PPS") hospital. It has two units that are treated as separate and distinct from the rest of the inpatient units within the hospital. These are the Senior Adult Mental Health Unit, which is a psychiatric unit for senior aged adults, and the Inpatient Rehabilitation Unit.

35.     The mission of St. Joseph is to provide compassionate care that contributes to the physical, emotional, and spiritual well-being of its community of patients, family, friends and neighbors as inspired by the healing ministry of Jesus.

36.     St. Joseph is also comprised of two Medicaid-approved subsidiaries: Rockingham Regional Ambulance, Inc. and Granite State Mediquip, Inc.

37.     Pursuant to provider agreements with DHHS, St. Joseph Hospital provides services to Medicaid beneficiaries itself and through its subsidiaries.

**LRGHealthcare**

38.     Plaintiff LRGHealthcare ("LRG") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with its principal place of business located at 80 Highland Street, Laconia, New Hampshire. LRG owns and operates Lakes Region General Hospital ("LRGH"), which is a 137-bed acute care facility that also provides a full healthcare system for New Hampshire's Lakes Region residents, offering a range of medical, surgical, psychiatric, diagnostic, and therapeutic services, wellness education, support groups, and other community

outreach services.  LRGH also maintains swing beds. Swing beds are acute care licensed beds that can be used as nursing home beds which provide LRGH with additional reimbursement for their senior or other long-term care patients.

39.     In addition to LRGH, LRG maintains the Laconia Clinic, P.C., (the "Clinic"), a 28-physician provider-based department (under Medicare) of LRGH. The Clinic and LRGH operating agreements benefit the community by preserving and enhancing access to a broad range of benefits and medical services. The major components of the Clinic consist of a two-operating room ambulatory surgical center and ancillary services including laboratory, x-ray and physical therapy.

40.     LRG also maintains Hillside Ambulatory Surgical Center, LLC, ("ASC") at Hillside Medical Park, approximately 1.4 miles from the LRGH campus, which is 70 percent owned and operated by LRGH.  ASC provides an alternate location for patients requiring one-day orthopedic surgeries, as well as pain management services. The services offered by ASC are designed to complement the broader range of inpatient and outpatient surgical services available to LRGH.

41.     LRG d/b/a Lakes Region General Hospital is therefore comprised of the following Medicaid-approved subsidiaries: (1) Laconia Clinic, P.C.; and (2) Hillside ASC, LLC.

42.     Pursuant to provider agreements with DHHS, LRG provides services to Medicaid beneficiaries itself and through its subsidiaries.

**Cheshire Medical Center**

43.     Plaintiff Cheshire Medical Center (the "Medical Center") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with its principal place of business located at 580 Court Street, Keene, New Hampshire.

44.     The Medical Center is a New Hampshire voluntary corporation, qualified as a charitable organization under 26 U.S.C. § 501(c)(3), which operates a 169-licensed bed, private, acute care, not-for-profit, community hospital in Keene, New Hampshire.  Located near Route 101 in the southwestern portion of the State, the Medical Center is approximately 80 miles northwest of Boston and 43 miles southwest of Concord, New Hampshire.

45.     The Medical Center has received designation as a Rural Referral Center and Medicare Dependent Hospital.  These designations and the associated reimbursement benefits are subject to annual review during the Federal budget process.  As one of only three federally designated Rural Referral Centers in New Hampshire, the Medical Center offers a number of specialty medical services including oncology, physical rehabilitation services and mental health services for both adolescents and adults.

46.     The Medical Center has provided a diversified range of services to the community for many years. As a result of a partnership with the Dartmouth Hitchcock Clinic, the Medical Center has increased physician coverage in many specialties, including: general surgery, orthopedic surgery, urology, hematology/oncology, gastroenterology, and geriatrics.  Primary care coverage includes a full time hospitalist service and board-certified emergency room physician coverage.  The Medical Center continues to offer inpatient acute psychiatric and rehabilitation services.

47.     Pursuant to a provider agreement with DHHS, the Medical Center provides services to Medicaid beneficiaries.

**Frisbie Memorial Hospital**

48.     Plaintiff Frisbie Memorial Hospital ("FMH") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with a principal place of business located at 11 Whitehall Road, Rochester, New Hampshire.

49.     FMH is a 112 bed (licensed) acute-care community-based hospital, with a specialty inpatient unit for Geriatric Psychiatry, with about 87 staffed beds, an emergency department, an intensive care unit, a coronary care unit, a medical surgical unit, a women's and children's unit, surgical services and geriatric psychiatric services. FMH operates 14 physician practices, and offers extensive outpatient services.

50.     Its mission is to excel at caring for the community by providing healthcare services that are safe, effective, efficient, equitable, timely and patient centered and to ally with other community healthcare providers to enhance the ability to improve the health of our community and the quality of life for the people FMH serves.

51.     FMH is also the parent corporation of the following Medicaid-approved subsidiaries: (1) the Frisbie Foundation; (2) Stafford Health Alliance; and (3) Seacoast Business and Health.

52.     Pursuant to provider agreements with DHHS, FMH provides services to Medicaid beneficiaries itself and through its subsidiaries.

53.     The Provider Plaintiffs in this case are integrated healthcare delivery systems comprised of an acute-care hospital with inpatient and outpatient services and employed physicians in multi-specialty physician practices.

54.     Defendant Nicholas A. Toumpas is the Commissioner of the New Hampshire Department of Health and Human Services.  Commissioner Toumpas is sued in his official

capacity only. Commissioner Toumpas's business address is 129 Pleasant Street, Concord, New

Hampshire. As Commissioner of the New Hampshire Department of Health and Human

Services, Commissioner Toumpas heads the New Hampshire Department of Health and Human

Services, the single agency designated to supervise the administration of the Medicaid program

in New Hampshire, *see* 42 U.S.C. § 1396a(a)(5), and is therefore responsible for implementing

and enforcing the state legislation at issue here.

## **FACTUAL BACKGROUND**

### A. **The Medicaid Program Generally**

55. Medicaid is a voluntary, jointly funded federal-state program authorized by Title

XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (2011) (the "Medicaid Act"). It is a

cooperative federalism program that authorizes the federal government to provide funds to states

that provide medical assistance to individuals "whose income and resources are insufficient to

meet the costs of necessary medical services." 42 U.S.C. § 1396.

56. The primary purpose of the Medicaid program is "to assist the poor, elderly, and

disabled in obtaining medical care." *Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50,

51 (1st Cir. 2004). The Medicaid program is voluntary, but once a state elects to participate, it

must comply with the Medicaid Act's provisions and regulations. *See Wilder v. Virginia Hosp.

Ass'n*, 496 U.S. 498, 502 (1990).

57. In order to participate in Medicaid, a state must submit a state plan for medical

assistance to the Centers for Medicare & Medicaid Services ("CMS"), the federal agency

charged with administering the Medicaid Act. 42 U.S.C. § 1396a.

58. The state plan, which allows CMS to ensure the state's compliance with the

Medicaid Act, describes the nature and scope of the state's Medicaid program, including the

policies and methods the state will use to set reimbursement rates for services provided by Medicaid participating health care providers.  42 C.F.R. §§ 430.10 and 447.201(b).

59.      Under the state plan, the state must provide "the categorically needy" with the following mandatory services: (1) inpatient and outpatient hospital care; (2) physician's services; (3) medical and surgical dentist's services; (4) nurse midwife services; (5) pediatric and family nurse practitioner services; (6) federally qualified health center services; (7) laboratory and x-ray services; (8) rural health clinic services; (9) prenatal care; (10) family planning services; (11) skilled nursing facility services for person over age 21; (12) home health care services for persons who are over age 21 and eligible for skilled nursing services; (13) early and period screening, diagnosis, and treatment for persons under age 21; and (14) vaccines for children.  42 C.F.R. § 440.210.

60.      The state may also provide services to the "medically needy."  If it does, the state plan must provide, at a minimum, reimbursement for the services detailed in 42 C.F.R. § 440.220.

61.      States may also determine their own Medicaid eligibility standards for optional populations and may decide what optional services to cover, what payment levels to set, and what administrative and operative procedures to apply.

62.      The federal government and the states share responsibility for financing the Medicaid program.  The federal government matches state Medicaid spending at rates that vary by state per capita income.

63.      The states' Medicaid programs reimburse health care providers directly for covered services.  42 C.F.R. § 430.0.  States establish rates for reimbursement subject to the rate-setting requirements of the Medicaid Act.

64. The Medicaid Act requires, among other things, that a state plan include both procedural and substantive elements for setting rates and provides: "(A) for a public process for determination of rate of payment under the plan for hospital services . . . under which (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published, (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications, (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and (iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1396r-4 of this act) the situation of hospitals which serve a disproportionate number of low-income patients with special needs. . . ." 42 U.S.C. § 1396a(a)(13)(A). Thus, the Medicaid Act requires that the state plan must not only provide substantive standards for setting rates, but it must also provide for procedural protections in the rate-setting process.

65. States must also comply with 42 C.F.R. § 447.205, a companion regulation to 42 U.S.C. § 1396a(a)(13)(A). That regulation requires public notice of any significant proposed change in the methods and standards for setting payment rates for Medicaid services. *See N.C., Dep't of Human Resources, Div. of Med. Assistance v. United States Dep't of Health & Human Servs.*, 999 F.2d 767, 771 (4th Cir. 1993) ("The public notice requirements mandated by 42 C.F.R. §[] 447.205 . . . [are] not burdensome and provide important procedural protections to providers and beneficiaries under the Medicaid program.").

66. The Medicaid Act further requires that a state plan "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency,

economy, and quality of care and are sufficient to enlist such providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."  42 U.S.C. § 1396a(a)(30)(A); *see also* 42 C.F.R. § 447.204.

67.     Additionally, CMS has proposed to amend 42 C.F.R. § 447.203-.204 to require states to consider the following before changing their reimbursement rates for healthcare providers or rate-setting methodology: (1) "the extent to which enrollee needs are met"; (2) "the availability of care and providers"; (3) "changes in beneficiary utilization of covered services"; and (4) "input from beneficiaries and affected stakeholders in determining the extent of beneficiary access to the affected services and the impact the proposed rate change will have, if any, on continued services access."

### B.     Medicaid's Upper Payment Limit

68.     Federal regulations provide a means for states to supplement reimbursement rates paid to healthcare providers.  So-called Upper Payment Limit ("UPL") regulations under the Medicaid Act allow states to reimburse hospitals "to an amount equal to the payment the Medicare Program would have paid for the same service."  *United States ex rel. Black v. Health Hosp. Corp. of Marion County*, RDB-08-0390, slip op. at 4 (D. Md. March 28, 2011); *see Alaska Dep't of Health & Social Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 935-36 (9th Cir. 2005).

69.     "The UPL concept has not always been part of the Medicaid program."  *Ashley Cty. Med. Ctr. v. Thompson*, 205 F. Supp. 2d 1026, 1032 n.7 (E.D. Ark. 2002).  "Prior to 1981, Medicaid employed a 'reasonable cost' methodology of reimbursing hospitals for their costs of serving Medicaid beneficiaries."  *Id.*  "In 1980 and 1981, however, Congress amended the

Medicaid statute to allow States greater flexibility in establishing reimbursement methodologies." *Id.* (citing Omnibus Budget Reconciliation Act of 1980, Pub.L. 96-499 94 Stat. 2599; Omnibus Budget Reconciliation Act of 1981, Pub.L. 97-35, § 2173, 95 Stat. 357).

70.     "In recognition of this greater flexibility, [the United States Department of Health and Human Services] enacted regulations setting upper payment limits on reimbursement in 1981."  *Id.* (citing Medicaid Program: Payment for Long-Term Care Facility Services and Inpatient Hospital Services, 46 Fed.Reg. 47964 (Sept. 30, 1981); 48 Fed.Reg. 56046 (Dec. 19, 1983)).

71.     "The purpose of the UPLs is to ensure that payments 'are consistent with efficiency, economy, and quality of care,' as mandated by 42 U.S.C. § 1396a(a)(30)(A)." *Id.*

72.     In other words, UPL payments are designed to help states set reimbursement rates that meet the requirements of 42 U.S.C. § 1396a(a)(30)(A) and fill in the gap between the price Medicaid would pay for a given service and the price Medicare would pay.

C.     **Medicaid's Disproportionate Share Hospital Program**

73.     The Omnibus Budget Reconciliation Act of 1981 ("OBRA") established the DSH program.

74.     In passing the OBRA, the United States House of Representatives Committee on the Budget recognized the economic hardships many states were facing in 1981 and that the states required flexibility to improve Medicaid their reimbursement mechanisms, but did not "want such policies to result in arbitrarily and unduly low reimbursement levels for hospital services." H.R. Rep. No. 97-158, at 294 (1981).

75.     The committee further stated that "[i]n several States, a significant differential exists between the Medicaid payment level for physician services and the rate paid by Medicare

and private individuals for physician services. As a result, many physicians now refuse to treat Medicaid patients. The Committee is very concerned that a similar situation not develop with respect to hospital care." *Id.*

76.     The OBRA therefore directed States "to set Medicaid payment rates that take into account 'the situation of hospitals which serve a disproportionate number of low-income patients with special needs.'" *Ashley Cty. Med. Ctr.*, 205 F. Supp. at 1031 (quoting 42 U.S.C. § 1396a(a)(13)(A)(iv)).

77.     The OBRA also authorized DSH payments.  DSH payments are supplemental payments "designed to assist hospitals [that serve a large number of low-income Medicaid and uninsured patients] in making up for high levels of uncompensated care."  *Id.*  Thus, the DSH program helps establish reimbursement rates sufficient to assure access to efficient, economical, quality care and services by preserving the financial stability of "disproportionate share" hospitals.  *See* 42 U.S.C. § 1396a(a)(13)(A)(iv).

78.     The federal government distributes federal DSH funds to each state based on a statutory formula.  In order to qualiSFY for federal matching funds, the state's DSH payment methodology must meet certain federal criteria and be approved by CMS.

79.     The Medicaid Act further requires that a state's definition of a disproportionate share hospital include, at a minimum, all hospitals that have: (i) a Medicaid inpatient utilization rate in excess of one standard deviation or more above the mean for all hospitals in the state; or (ii) a low-income utilization rate exceeding 25%. 42 U.S.C. § 1396r-4(b)(1).  However, a state may include other hospitals within its definition of a DSH hospital as long as all designated DSH hospitals have a Medicaid utilization rate of at least one percent, 42 U.S.C. § 1396r-4(d)(3), and

the state includes a description of the criteria it used to designate DSHs and the formulas it used to calculate DSH payments in its state plan.

80.     State Medicaid DSH programs and payments vary considerably by state, as the Medicaid Act grants states the discretion to determine which hospitals get DSH payments, and how much each hospital will receive.

81.     Generally, under the DSH program, a state generates funding either through general appropriations or a health care provider tax or assessment.

82.     When determining the methods and procedures for setting Medicaid reimbursement rates, however, a State must take into account, among other factors, the situation of DSHs, 42 U.S.C. § 1396a(a)(13)(A)(iv), and consider the effect such a rate reduction will have on efficiency, economy and quality of care, and whether the methods, procedures, and payments rates are sufficient to enlist enough providers to ensure access to health care services, 42 U.S.C. § 1396a(a)(30)(A).

83.     "Because the states are responsible for funding a share of DSH payments, Congress assumed their generosity to DSH hospitals would be tempered by fiscal realities." *Ashley Cty. Med. Ctr.*, 205 F. Supp. at 1031.  "Thus, DSH payments originally had no ceiling and were not subject to the 'upper payment limits' that applied to other Medicaid payments." *Id.* (citing 42 C.F.R. § 447.272(c)(2)).

84.     "This flexibility, however, resulted in what has been referred to as a 'loophole' in the DSH program that allowed states to increase their receipt of federal matching funds without a corresponding increase in state expenditure." *Id.* at 1032.

85.     "Thus, states could make virtually unlimited DSH payments and, in the process, earn [federal matching] dollars while requiring DSH hospitals to transfer back to the states most of the DSH payments that the state had provided [through a Medicaid provider tax]."  *Id.*

86.     "Congress addressed this problem in the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991."  *Protestant Mem'l Med. Ctr. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006).

87.     "Through this legislation, Congress instructed the Secretary to reduce federal matching funds to a state by the amount of any revenue received from a health care related tax that 'hold[s] harmless' the health care provider upon whom the tax falls." *Id.* (quoting 42 U.S.C. § 1396b(w)(1)(A)(iii)).

**D.     New Hampshire's Medicaid Program**

88.     New Hampshire participates in the Medicaid program and has designated DHHS as the "single State agency" responsible for administering New Hampshire's Medicaid program under 42 U.S.C. § 1396a(a)(5).

89.     The average number of Medicaid enrollees statewide has increased sharply over the past several years.  According to DHHS's latest annual report on New Hampshire's Medicaid program, "[i]n 2009, monthly enrollment in Medicaid trended upward from 117,810 to 129,071, an increase of almost 10%."  Further, New Hampshire is one of only thirteen states to have experienced double digit growth in enrollment during 2009.  Among other factors, the economic recession put added strain on the program.

90.     In SFY 2009, state and federal Medicaid expenditures accounted for the highest percentage of New Hampshire state budget expenses, at 27.5%.

91.     In order to participate in New Hampshire's Medicaid program, providers must complete an enrollment application and sign a provider agreement with DHHS.

92.     The provider agreement constitutes a contract pursuant to which the provider agrees to provide care and services to Medicaid-eligible individuals in exchange for reimbursement by DHHS as required by Title XIX of the Social Security Act. *See Bel Air Assocs. v. N.H. Dep't of Health & Human Servs.*, 158 N.H. 104, 108 (2008) (finding provider agreement with DHHS constitutes a contract).

93.     The New Hampshire Supreme Court has further held that these Medicaid provider agreements incorporate the requirements of Title XIX into them by reference. *Id.*

94.     Under the current state plan, DHHS represents that it "has in place a public process which complies with the requirements of Section [1396a](a)(13)(A) of the Social Security Act," but fails to describe the process in any detail.

95.     New Hampshire's twenty-six acute-care hospitals provide Medicaid services. Thirteen of those hospitals are designated as "critical access hospitals."  "Critical access hospitals" are smaller, mostly rural hospitals.

96.     The current state plan purports to detail the rate-setting methodology DHHS uses to reimburse hospitals and make DSH payments.

97.     As participants in New Hampshire's Medicaid program, Plaintiff Providers are reimbursed by the State for the provision of hospital services to New Hampshire's Medicaid recipients through different methods.

98.     For inpatient hospital services, the State reimburses Plaintiff Providers on a diagnosis-related group ("DRG") basis.  This means that Plaintiff Providers are reimbursed from

the State on a per-episode basis based on the State's established payment rate for that particular patient's diagnosis.

99.     Plaintiff Providers are generally reimbursed on a cost basis – or reimbursed based on the hospital's charges reduced to cost by multiplying by a costs-to-charge ratio – for most outpatient hospital services, including emergency room visits, observation stays, and ambulatory services.  However, for hospital services such as laboratory, imaging, and therapy services, Plaintiff Providers are reimbursed on a professional fee schedule that compensates hospitals on a per-unit of service basis.  Outpatient payments are made on an interim basis subject to a "settlement" process under which hospitals submit cost reports for a determination of whether they were overpaid or underpaid for the provision of outpatient services.

100.     The federal government matches one federal dollar for every state dollar New Hampshire spends.  In 2009, the State paid New Hampshire hospitals $45,239,271 for inpatient services and $53,107,065 for outpatient services.

101.     New Hampshire's Medicaid per-episode reimbursement rates are far below the costs actually incurred by hospitals in providing care to Medicaid patients.  In 2009, the reimbursement rates for all hospitals and all services were approximately 50% of total costs.  For some services, the reimbursement rates were much lower.

102.     In 2008 and 2010, DHHS prepared a so-called "benchmark report" which attempted to compare Medicaid rates with rates of other payers for similar services.  Based on the 2010 report, DHHS concluded that, "[i]n almost every case[, the] Medicaid [rates were] significantly lower than Medicare, NH commercial insurance and other Medicaid programs," the difference over two years "between NH Medicaid rates and other payers has grown," and there is

a "[g]rowing potential that if trends continue, patient access to services will become increasingly more difficult."

    **E.**    **Hospital Reimbursement Rate Reductions**

    1.    Reduction to Reimbursement for Outpatient Services

103.    Over the last several years, Medicaid reimbursement rates paid to New Hampshire hospitals have been driven sharply downward as a result of budgetary considerations.

104.    In 2005, the New Hampshire Legislature amended RSA 126-A:3 to allow adjustment of Medicaid reimbursement rates for hospital outpatient services solely for budgetary reasons.  RSA 126-A:3, VII(a) now provides, in relevant part:  "If expenditures are projected to exceed the annual appropriation, the department may recommend rate reduction for providers to offset the amount of any such deficit."

105.    Under this statute, to reduce the reimbursement rates paid to hospitals for outpatient services, DHHS need only to submit the proposed rates to the legislative fiscal committee and the house and senate finance committees and obtain the legislative fiscal committee's approval.

106.    DHHS did not amend the state plan to reflect this modification to the State's methodology and procedures for determining reimbursement rates for hospitals.

107.    Additionally, RSA 126-A:3, VII(a) does not afford hospitals or Medicaid recipients a public notice and comment process before it allows the State to alter its reimbursement rates or methodologies as required by 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan.

108.    In fact, the State has used RSA 126-A:3, VII(a) in a manner inconsistent with 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan to make significant rate

reductions since 2008 without providing Plaintiffs with notice or a reasonable opportunity to review and comment on proposed rate changes.

109.    In a letter dated October 30, 2008, DHHS wrote to the Fiscal Committee of the General Court ("legislative fiscal committee") seeking to "revise the [Medicaid] reimbursement rate paid to non-critical access hospitals for outpatient services from 81.24 percent of Medicare allowable costs to 54.04 percent of Medicare allowable costs effective retroactive to July 1, 2008," pursuant to RSA 126-A:3, VII.  The stated reason, according to DHHS, was solely budgetary.  The change was needed to "bring expected expenditures in line with appropriations for SFY 2009" and reduced the outpatient reimbursement rate by 33.48%.

110.    DHHS further stated that the "budget [was] not adequate to meet projected outpatient hospital expenditures for three primary reasons."  First, Medicaid enrollment and utilization was higher than was assumed when the budget had been developed.  Second, expenditures grew due to an increase in the number of Medicaid patients using outpatient services.  Finally, outpatient cost settlement payments were $4.5 million higher compared to those made in SFY 2008.

111.    In testimony before the joint fiscal committee, Kathleen A. Dunn, DHHS's Medicaid Director, explained DHHS's methodology behind the proposed rate reduction:

> How [DHHS] arrived at the [54.4 percent of Medicare allowable costs figure] was looking at what [DHHS's] current outpatient reimbursement is which is based on cost based reimbursement and at the time it was 81.24 percent.  And [DHHS] projected out utilization, our growing caseload, and predicted to the end of the year what it was [DHHS] was expecting to have to expend.  And based upon that, in order to stay within the budget appropriated to [DHHS], [DHHS] needed to reduce the reimbursement down to 54 percent.

112.    During testimony on DHHS's proposal, the following exchange occurred:

> SEN. KELLY:  . . . you made a decision on that particular amount, that percentage, so that you would balance the budget on that line item.
>
> MS. DUNN:   That is correct.

113.    On November 21, 2008, the legislative fiscal committee approved the rate change set forth in the October 30, 2008 letter for budgetary reasons ("October 30, 2008 rate reduction") without providing Plaintiffs with notice or a reasonable opportunity for review or comment on proposed rate reductions.

### 2.    Reduction to Reimbursement for Inpatient Services

114.    The State implemented another rate reduction that failed to comply with federal law on November 21, 2008, when Governor Lynch issued Executive Order 2008-10.  Executive Order 2008-10 effected a 10% rate reduction in Medicaid inpatient hospital reimbursement rates for non-critical access hospitals.  Executive Order 2008-10 was issued pursuant to RSA 9:16-b, and was submitted to the legislative fiscal committee for approval.

115.    Specifically, Executive Order 2008-10 reduced the price point for diagnostic-related groups ("DRGs") from $3,147.61 to $2,832.86 ("Price Point"), effective December 1, 2008.

116.    Under the state plan, the Price Point is the building block to determine reimbursement rates for a particular inpatient service. The state plan provided that the price point shall be determined by taking the "current DRG price per point(s) and inflate each by the same percent as the Medicare market basket estimated increase for prospective payment hospitals minus any Medicare or state Medicaid defined budget neutrality factors and other generally applied Medicare adjustments appropriate to Medicaid."

117.    The history of the DRG Price Point is as follows:  1990:  $2,998.00; 1991: $2,971.45; 1992:  $2,695.00; 1993:  $2,664.85; 1994:  $3,140.04; 1995:  $3,184.00; 1996: $3,024.71; 1997: $3,022.67; 1998:  $3,037.78; 1999:  $3,037.78.

118.    In 2000, the DRG Price Point was set at $3,147.61, where it remained until the 2008 reduction.

119.    After Executive Order 2008-10's rate reduction, the DRG price point dropped to a level comparable to the rate in 1990.

120.    This 10% inpatient rate reduction was presented to and approved by the legislative fiscal committee on November 21, 2008.  At the committee's hearing held that day, Governor Lynch stated:  "We are proposing reducing certain provider rates on December 1st and reducing inpatient hospital rates, except for critical access hospitals.  These are not easy decisions and I recognize that, but they are necessary to protect other important services and to ensure that we end the year with a balanced budget."

121.    At the hearing, the following colloquy took place between Representative Neal Kurk and DHHS's Medicaid Director, Kathleen Dunn:

> REP. KURK:  . . .  This statutory requirement in the budget that if there isn't enough money to pay the bill you cutback on the rate, it's what's another version of what we call budget neutrality.  Is that something that requires modification to the State Plan and if so, has that been obtained?
>
> MS. DUNN:   It does not require State Plan amendment.

122.    Contrary to the DHHS's determination, the State's changes to its payment methodology and reimbursement rate for inpatient and outpatient hospital services required the submission of a state plan amendment to CMS for CMS's approval and, at the very least, required the State to provide Plaintiffs with notice and a reasonable opportunity for review and comment on the proposed rate changes.

123.    The State did not amend the state plan to incorporate the October 30, 2008 outpatient rate reduction or the November 21, 2008 rate reduction effected by Executive Order 2008-10 or provide Plaintiffs with notice or a reasonable opportunity for review and comment on either rate reduction.

124.    In sum, the October 30, 2008 outpatient rate reduction and the November 21, 2008 inpatient rate reduction implemented by Executive Order 2008-10 were made solely for budgetary reasons.  The State did not consider whether these rate reductions would assure payments consistent with efficiency, economy, and quality of care, and equal access to care and services before enacting them.

        3.      Other Medicaid Rate Reductions

125.    The inpatient and outpatient hospital rate reductions that occurred on October 30, 2008 and November 21, 2008 were assumed and carried forward by the legislature without hearing or debate in the State's 2009-2010 biennial budget.

126.    Interim payments for outpatient services reflecting these new rates were made to hospitals, subject to a final settlement process.  The majority of hospitals have not received settlement payments for SFY 2009 and SFY 2010.

127.    In fact, in 2009, 2010, and 2011, DHHS suspended all outpatient settlement payments to hospitals.  For affected hospitals, the suspension of these settlement payments constitutes a further reduction in rates.

128.    During the same period, the State also acted unilaterally to eliminate or suspend other payments to hospitals.  Specifically, on February 5, 2010, Commissioner Toumpas reported to the legislative fiscal committee that the State had denied hospitals the ability to charge technical component fees for hospital-owned physician practices.  He also stated that the

Department intended to act, without legislative approval, to suspend payments to hospitals for certain catastrophic cases, to eliminate or suspend settlement payments to hospitals, and to reduce outpatient radiology reimbursements.

129.     The State did not provide Plaintiffs with notice or a reasonable opportunity to review and comment on these proposed reductions.

130.     These reductions were made solely for budgetary reasons.  They were not made in a manner consistent with efficiency, economy, and quality of care nor were they sufficient to assure equal access to care and services under the state plan.

131.     In sum, since 2008, the State has enacted the following reimbursement rate reductions: (1) the October 30, 2008 outpatient rate reduction effected by Executive Order 2008-10 and carried forward into SFY 2010-2011 and SFY 2012-2013; (2) the November 21, 2008, inpatient rate reduction effected by Executive Order 2008-10 and carried forward into SFY 2010-2011 and SFY 2012-2013; (3) the suspension of all outpatient settlement payments for 2009, 2010, and 2011 (and carried forward without hearing or debate into SFY 2012-2013); (4) the denial of hospitals' ability to charge technical component fees for hospital-owned physician practices in 2010 and 2011 (and carried forward without hearing or debate into SFY 2012-2013); (5) suspension of payments to hospitals for certain catastrophic cases in 2010 and 2011 (carried forward without hearing or debate into SFY 2012-2013); and (6) DHHS's decision to reduce outpatient radiology reimbursements in 2010 and 2011 (carried forward without hearing or debate into SFY 2012-2013) (collectively "Rate Reimbursement Enactments").

F.      **New Hampshire's UPL History**

132.    New Hampshire has used UPL payments only once: in SFY 2011 when it received $10,395,813 in so-called "enhanced" Federal Medical Assistance Percentages ("FMAP") funds from the federal government.

133.    The UPL payment helped increase the reimbursement rate for Medicaid providers in SFY 2011, but has been eliminated for SFY 2012 and SFY 2013, effecting another significant reimbursement rate decrease.

134.    The purpose of UPL payments is to help ensure compliance with 42 U.S.C. § 1396a(a)(30)(A).  Thus, New Hampshire's failure to provide for UPL payments over the next two years establishes that New Hampshire's reimbursement rates are insufficient to assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services.

G.      **New Hampshire's DSH Program**

135.    In 1991, the New Hampshire Legislature created an uncompensated care ("UCC") fund.  *See* RSA 167:63-67.  The Medicaid Enhancement Tax (the "MET"), authorized by RSA chapter 84-A, has been the source of state funding for the UCC fund. Prior to New Hampshire Laws of 2011, Chapter 224, the MET was generated by an assessment upon all New Hampshire hospitals that receive Medicaid DRG reimbursement.[1] New Hampshire Laws of 2011, Chapter 224 subsequently amended the MET making it applicable to all hospitals providing inpatient and outpatient hospital services.

---

[1] Several of the Provider Plaintiffs have filed a challenge to the constitutionality of the MET with the New Hampshire Department of Revenue Administration and are currently pursuing their remedies regarding the MET through the state administrative and judicial appeal process.  This action does not include a challenge to the constitutionality of the MET and is brought without prejudice to the Provider Plaintiffs' state claims.

136.    At present, the MET is assessed at 5.5 percent of net patient service revenue, which means that all New Hampshire Medicaid-participating hospitals are required to pay into the UCC fund 5.5 percent of the hospital's net patient services revenue.

137.    In 1991, New Hampshire began exploiting the "loophole" created in the federal DSH program.

138.    The State would levy the MET on hospitals participating in the Medicaid program and place the money into the UCC fund.  The State would allocate the MET to DSH payments to determine the amount of the federal matching contribution.  After receiving the matching funds, the State would collect the MET and immediately return the exact amount of MET paid to the hospitals in the form of DSH payments.  As evidence of the State's assurance that the hospitals would have no net tax liability and would be only a conduit, each hospital's DSH payment was identical to the amount of MET that the hospital paid and was made to the hospital on the same day that the hospital made the MET payment.

139.    Instead of paying the totality of the federal Medicaid funds to the State's hospitals, as intended by the Medicaid Act, New Hampshire paid these funds to the State's general fund beginning in 1991 and started using them to fund other parts of State government and to balance the State's budget.

140.     In a February 25, 1993 letter to the then-president of the New Hampshire Hospital Association, the then-DHHS Commissioner, Dr. Harry H. Bird and the then-Commissioner of Revenue Administration, Stanley Arnold, said:  "We appreciate the fact that the hospitals would prefer not to be subject to taxation but we all know that ongoing cooperation is essential for maintenance of this critical State revenue source."

141.     In that letter, Commissioners Bird and Arnold also stated:  "It is our intent that, should Federal Disproportionate Share funds become unavailable, we would no longer require the State revenue and would recommend that the rate of taxation drop to zero."

142.     From 1991 through 2009, approximately $1.8 billion in federal matching funds were generated from the federal DSH program "loophole" and placed in the general fund.

143.     In 2007, the U.S. Department of Health and Human Services Office of Inspector General ("OIG") released a report on New Hampshire's DSH payments during federal fiscal year 2004.  The OIG concluded that New Hampshire did not follow federal guidelines in implementing the MET and distributing DSH payments.   Consequently, $35,325,468 in federal matching funds was deemed unallowable and subject to recoupment by the federal government. The State is seeking reconsideration of the federal government's decision.

144.     As a result of the OIG report, the federal government required New Hampshire to modify its DSH program to comply with federal regulations.

145.     The legislature amended RSA 167:64, the statute governing the UCC fund, in 2009.

146.     In 2009, the State continued to levy a 5.5 percent MET on hospitals under the former version of RSA 84-A:1, III.

147.     Once raised, the State deposited the MET into the UCC fund.

148.     Under former RSA 167:64, I(a), "[n]o less than 50 percent of the moneys paid into the [UCC] fund" could be used "to support uncompensated care in hospitals in accordance with rules adopted by the commissioner, pursuant to RSA 541-A."

149.    Former RSA 167:64, I(b) also authorized and directed the commissioner "to develop and implement a schedule of payments of reimbursement of [UCC] costs of those hospitals that are subject to [the MET] and that participate in the state Medicaid program."

150.    Former RSA 167:64, I(b) also required the UCC fund to be:

> structured in a manner that: (i) reduces to the greatest extent practicable the disproportionate impact among hospitals of uncompensated care costs; (ii) permits maximum available federal financial participation for these payments in accordance with Title XIX of the Social Security Act; and (iii) is consistent with all federal laws and regulations governing Title XIX disproportionate share hospital payment adjustments and permissible sources of state financial participation as provided for under 42 C.F.R. part 433.

151.    Former RSA 167:64, I(d) further required the DHHS commissioner to distribute UCC funds in the following order of priority: (1) to reimburse critical access hospitals and rehabilitation hospitals for their UCC costs at a rate of 100 percent of the DSH payment limit as determined by the commissioner consistent with 42 U.S.C. § 1396r-4(g); and (2) to reimburse non-critical access hospitals "at the highest uniform percentage of each hospital limit as the funds made available under this section permit."

152.    Finally, former RSA 167:64, I(d) granted the commissioner discretion in "creating additional categories of need and [to] make further reasonable distinctions among hospitals when determining the methodology for payments under this section, as necessary, to ensure that no hospital is unduly burdened by the fiscal effect of uncompensated care costs."

153.    Notably, however, in 2009, the legislature did not change one provision. The legislature continued to permit up to one-half of the MET funds deposited into the UCC be diverted for other purposes under former RSA 167:64, I(a).

154.    Under this statutory scheme, Commissioner Toumpas sent a letter to the New Hampshire legislative fiscal committee on November 9, 2010 recommending a schedule of

payments for reimbursement of UCC costs for SFY 2011, ending June 30, 2011.  The legislative fiscal committee subsequently approved the Commissioner's schedule on November 15, 2010.

155.     Under the approved schedule, the Commissioner estimated that the MET would generate $186,972,752.  The Commissioner recommended that the State deposit half of the MET (or $93,463,876) into the unrestricted revenue account of the State's general fund.

156.     The Commissioner recommended directing the remaining $93,463,876 into the UCC fund.  Of that, the Commissioner recommended using $59,045,903 to secure the same amount in federal DSH matching funds and combining the remaining $34,417,967 with $10,385,428 in one-time enhanced FMAP funds to secure $44,803,401 in regular federal Medicaid matching funds.  Thus, the total funds available in the UCC fund for distribution was $207,698,609.

157.     The approved schedule distributed all of the $207,698,609 as follows: (1) a $1,860,777 supplemental payment to the Upper Connecticut Valley Hospital and the HealthSouth Rehabilitation Hospital; (2) $55,933,731 in UPL payments for inpatient care; (3) $31,812,294 UPL payments for outpatient care; (4) $37,217,162 in DSH payments to twelve critical access hospitals and Northeast Rehabilitation Hospital; and (5) $80,874,645 in DSH payments to the thirteen remaining, non-critical access hospitals.

158.     According to DHHS, New Hampshire hospitals incurred uncompensated care costs in the amount of $299,144,830 for SFY 2011.  Of that amount, $148,992,266 constituted losses from Medicaid services and $150,152,573 constituted losses from services delivered to individuals with no insurance.

159.     Thus, even after the payment of $207,698,609 from the UCC fund, New Hampshire hospitals lost $91,446,231 delivering uncompensated care for SFY 2011.

Additionally, for the first time since the creation of the uncompensated care fund in 1991, nine hospitals paid more in MET than they received in UCC payments.

160.    Consequently, the State failed to compensate hospitals adequately for the amount of care and services they provided to uninsured and Medicaid patients in SFY 2011, thus defeating the federal government's purpose in enacting the DSH program.

**I.      Enactment of the New Hampshire Budget Bill for State Fiscal Years 2012-2013**

161.    Despite the fact that hospitals lost nearly $100 million delivering uncompensated care in SFY 2011, the State nonetheless proposed to reduce further Medicaid funding for SFY 2012 and 2013.

162.    In his February 15, 2011 budget address, Governor Lynch stated:

> As we worked to reduce general fund costs, <u>we considered eliminating Medicaid optional services for adults, seniors and people with disabilities</u>. But at the end of the day, I don't believe there is anything really optional about prescription drugs for seniors, nursing services, or wheelchairs. <u>Cutting Medicaid optional services would hurt more than 40,000 people</u>. It would result in sicker people, and even, potentially, deaths. It would drive up our health care costs. <u>Without access to prescription drugs or other so-called optional services, people would end up using more expensive health care – ambulances, emergency rooms and long-term hospital stays</u>.

(emphases added).

163.    The Governor's budget estimated that the MET would generate approximately $180,795,738 in SFY 2012.  It proposed depositing $100,500,000 (or 55.59 percent) of the total MET into the general fund.  The Governor recommended placing the remaining $80,295,758 into the UCC fund, which would generate a match at $80,366,022.  Thus, the UCC fund would have received $160,651,758 for SFY 2012, a 23 percent reduction from SFY 2011.  Additionally, the Governor did not propose making any UPL payments to hospitals.  Hospitals would continue to

be paid at the rates approved on November 21, 2008.  Consequently, the Governor's budget

constitutes a year-over-year reduction in Medicaid rate reimbursements to hospitals.

164.    As budget deliberations proceeded in the legislature, DHHS presented data and

budget options for legislators to consider.  On March 9, 2011, DHHS submitted budget options

to the House Finance Committee division with jurisdiction over its budget.  Among those options

was eliminating UCC funding altogether.  With respect to this option, DHHS stated:

> Uncompensated care payments are made to hospitals to provide
> some compensation for inpatient and outpatient services provided
> to our State's uninsured.  Last year the hospitals provided $299M
> of uncompensated care and were reimbursed $207M leaving $92M
> worth of care uncompensated.
>
> Elimination of this funding will have a significant fiscal impact on
> hospitals in that it will downshift the financial responsibility to the
> hospitals.  Presumably the hospitals will pass some of these costs
> onto the privately insured through their contracts negotiated with
> the insurance companies thus resulting in a cost shift and increase
> in commercial health insurance premiums.  However, not all
> hospitals have the capability to shift costs to the commercially
> insured due to the population that utilizes their services.  There is a
> strong possibility that this reduction could result in a hospital's
> inability to sustain operations and therefore closure.
>
> Should this budget reduction be included in the House budget,
> $80,285M of federal DSH funds will be lost in SFY 2012 and
> $86,708 [sic] in SFY 2013.  There is no ability to bring these
> federal funds into the state for any other purpose other than DSH
> payments.  In essence, the MET becomes a state tax on the
> hospitals with all proceeds going to the general fund and
> presumably appropriated to DHHS to reduce the need for general
> funds.

(emphases added).

165.    This statement alone reflects the fragility of New Hampshire's Medicaid program

and the fact that reimbursement rates for providers are too low to assure efficiency, economy,

quality of care, and equal access to care and services.

166.    As alleged above, DSH payments are additional payments made to DSHs to help

them remain financially stable.  If the financial health and solvency of the State's Medicaid

program requires most, if not all, New Hampshire hospitals to receive DSH payments in order to

continue to provide Medicaid services and remain open, then the reimbursement rates set by the

State are not sufficient to assure efficiency, economy, quality of care, and equal access to care

and services.

167.    Furthermore, in materials presented to the Senate on April 7, 2011, DHHS

addressed Medicaid reimbursement rates in New Hampshire and described New Hampshire's

biennial "benchmark report" for SFY 2012-2013.

168.    DHHS described the results as follows: (1) "[i]n almost every case Medicaid

significantly lower than Medicare, NH insurance and other Medicaid programs"; (2)

"[c]ompared with other reports (for SFY 10 and 11): the difference between NH Medicaid rates

and other payers has grown"; and (3) "[g]rowing potential that if trends continue, patient access

and services will become increasingly more difficult."

**J.  Execution of the New Hampshire State Budget for State Fiscal Years 2011-2012**

169.    New Hampshire Laws of 2011, Chapters 223 and 224 became law on June 28,

2011.

170.    Chapter 223 (or House Bill 1-A) is the state budget. Chapter 224 (or House Bill 2-

FN-A-L) is the rider or companion bill to the state budget.

171.    Chapter 223 significantly underfunds the state's Medicaid program, eliminates

UPL payments, eliminates DSH funding for non-critical access hospitals, and generates a net

flow of funds from the MET to the general fund.

172.    Chapter 224 amends RSA 167:64, the UCC fund, in order to make it possible for the State to underfund the Medicaid program, to eliminate UPL payments, to eliminate DSH funding for non-critical access hospitals, and to generate a net flow of funds from the MET to the general fund.

173.    First, RSA 167:64, as amended by Chapter 224, eliminates the requirement that "no less than 50 percent of the moneys paid into the [UCC] fund . . . be utilized to support uncompensated care in hospitals . . . ."  RSA 167:64, I(a).

174.    Second, it eliminates the requirements that the Commissioner structure UCC payments "in a manner that . . . reduces to the greatest extent practicable the disproportionate impact among hospitals of uncompensated care costs . . . [and] . . . permits maximum available federal financial participation for these payments in accordance with Title XIX of the Social Security Act."  RSA 167:64, I(b)(i-ii).

175.    Third, it requires the Commissioner to spend UCC funds in the following order:

(a) To support medical provider payments <u>as budgeted</u> in each year of the biennium;

(b) To ensure that critical access hospitals receive reimbursement for reported uncompensated care costs at a rate of 100 percent of the individual hospital limit or at the highest uniform percentage that available funding would permit should funds be inadequate to cover 100 percent of the hospital limit for disproportionate share payments as determined by the commissioner consistent with the provisions of 42 U.S.C. section 1396r-4(g) and any relevant federal regulations promulgated thereunder;

(c) To support the state's Medicaid enhancement tax unrestricted revenue account <u>as budgeted</u> in each year of the biennium; and

(d) If authorized, to reimburse non-critical access hospitals at the highest uniform percentage of each hospital's disproportionate share hospital payment limit as the funds made available under this section permit and are consistent with the requirements of 42 U.S.C. section 1396r-4(g) and any relevant federal regulations promulgated thereunder.

(emphases added).

176.    RSA 167:64, as amended by Chapter 224, also provides that the Commissioner "may provide reimbursement for [UCC] costs in accordance with the approved schedule of payments through either Medicaid rate adjustments or disproportionate share hospital payment adjustments, or a combination thereof."

177.    The above changes to RSA 167:64 will allow the State to generate a net flow of funds into the general fund from the Medicaid program for SFY 2012 and SFY 2013 while leaving all hospitals with inadequate reimbursement rates and non-critical access DSH hospitals with no funding.

178.    According to Chapter 223, the MET will generate approximately $197,000,000 for SFY 2012.  This estimate is inaccurate.  CMS has recently suggested that New Hampshire's definition of certain MET components is overbroad.  Accordingly, the MET is likely to generate substantially less than the $197 million the State has estimated.

179.    Under Chapter 223 and RSA 167:64, I(a)(1), as amended, the legislature has budgeted $75,896,942 to support regular medical provider payments.  The State will combine this amount with $81,175,788 from the general fund and $157,260,746 in federal matching funds.  These funds will be used for fee-for-service payments to Medicaid providers, such as lab, x-ray, physical therapy and clinic services, in addition to hospitals.

180.    Under Chapter 223 and RSA 167:64, I(a)(3), as amended, the legislature has budgeted $97,000,000 of the total MET be directed into general fund for SFY 2012.  For SFY 2013, $104,000,000 of the total MET has been budgeted to be directed into the general fund.

181.    Chapter 223 contemplates placing $24,617,736 of MET revenue into the State's DSH program to receive federal matching dollars in the amount of $24,642,354 for a total $49,260,090.  However, there is a substantial likelihood that the MET will not generate sufficient

funds for any DSH payments in light of diminished MET receipts and after the two "budgeted" payments are made.

182.    Under no circumstances will non-critical access DSH hospitals receive DSH funding for SFY 2012.  This will amount to an $80,874,645 decrease in DSH payments from the previous year.

183.    New Hampshire hospitals received a total of $207,698,608 in UCC funding in SFY 2011 and still experienced uncompensated care losses of nearly $100 million.  In SFY 2012, New Hampshire hospitals will receive only $49,260,090 in uncompensated care funding, a 76.26% decrease from SFY 2011.  Assuming UCC costs remain the same for SFY 2012 as they did for SFY 2011 (approximately $299,144,830), New Hampshire's hospitals can expect to lose approximately $249,884,740 treating uninsured and Medicaid patients for SFY 2012.

184.    Absent significant DSH funding, the State's Medicaid reimbursement rate to hospitals is not sufficient to assure that hospitals can continue to provide Medicaid-covered care and services to Medicaid recipients.  This is strong evidence that the State's reimbursement rates are too low to assure efficiency, economy, quality of care, and equal access to care and services for Medicaid recipients in accordance with 42 U.S.C. § 1396a(a)(30)(A).

185.    Moreover, such losses are unsustainable and, as DHHS itself has stated, threatens Provider Plaintiffs ability to provide Medicaid care and services to Medicaid beneficiaries.

**K.  Adverse Impact of the New Hampshire Budget Upon Hospitals and their Patients**

186.    As described above, the State's actions have effectively set reimbursement rates so low that the State will not be able to assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services in compliance with the Medicaid Act.

187.    The Provider Plaintiffs estimate that the financial impacts resulting from the

circumstance referenced above during the next 12 months to be at least the following:

| Providers | Uncompensated Medicaid Care | MET | Total |
|---|---|---|---|
| Dartmouth-Hitchcock | $48 million | $47 million | $95 million |
| The Elliot Heath System | $18.2 million | $14.6 million | $32.8 million |
| Catholic Medical Center | $10.2 million | $11.8 million | $23 million |
| Wentworth Douglass Hospital | $6.7 million | $10 million | $16.7 million |
| Exeter Health Resources Inc. | $9.8 million | $9.6 million | $19.4 million |
| So. New Hampshire Health System | $12.6 million | $10.4 million | $23 million |
| St. Joseph Hospital of Nashua | $5.4 million | $9.6 million | $15 million |
| LRGHealthcare | $9.2 million | $10 million | $19.2 million |
| Cheshire Medical Center | $4.9 million | $7.9 million | $12.8 million |
| Frisbie Memorial Hospital | $6.4 million | $3.8 million | $10 million |
| **Total** | **$131.4 million** | **$134.7 million** | **$266.1 million** |

188.    As a direct result of the State's reductions in Medicaid reimbursement rates and

changes to its reimbursement methodologies, several Provider Plaintiffs intend to close or are

considering closing their affiliated physician practices to new Medicaid patients.  Other Provider

Plaintiffs intend to terminate or are considering terminating their physician practices' Medicaid

contract with the State altogether.  Effectively, this means that Medicaid patient access to

hospital-affiliated physician practices will be severely curtailed denying equal access to

Medicaid patients.

189.     As a direct result of the State's reductions in Medicaid reimbursement rates and changes to its reimbursement methodologies, certain Provider Plaintiffs intend to close or are considering closing or suspending operations for unique care facilities and patient services, including the neonatal intensive care unit at Dartmouth-Hitchcock's Children's Hospital; the helicopter rescue program at Dartmouth-Hitchcock; and Exeter Health Resources, Inc.'s Exeter Healthcare center, New Hampshire's only sub-acute rehabilitative care facility that accepts long-term ventilator-dependent patients. These programs all provide considerable services to Medicaid patients.  Reductions to these programs will necessarily reduce access to Medicaid patients.

190.     As a direct result of the State's reductions in Medicaid reimbursement rates and changes to its reimbursement methodologies, certain Provider Plaintiffs intend to eliminate or are considering eliminating their provision of funding for community-based programs  Several of these community-based programs provide health and wellness services to predominantly Medicaid and Medicaid-eligible patients. The elimination of this financial support will further curtail services to Medicaid and Medicaid-eligible patients.

191.     As a direct result of the State's reductions in Medicaid reimbursement rates and changes to its reimbursement methodologies, several Provider Plaintiffs intend to reduce or are considering reducing staffing levels. Staff reductions will result in decreased access to care for Medicaid patients and in fewer hospital services and programs for Medicaid patients.

192.     Patient Plaintiff John Doe will suffer irreparable harm as a result of the actions Plaintiff Providers must take in response to the State's changes in its Medicaid reimbursement rates and changes to its reimbursement methodologies.  Specifically, because of actions

necessitated by the State's actions, John Doe's continued access to healthcare services is threatened.

## CAUSES OF ACTION

## COUNT I

### Supremacy Clause, 42 §1396a(a)(30)(A), Procedural Violation
### RSA 126-A:3, VII(a), Rate Reimbursement Enactments, New Hampshire Laws of 2011, Chapters 223 and 224

193.    Plaintiffs specifically incorporate and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

194.    The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treatises made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of the any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2.

195.    As a voluntary participant in the federal Medicaid program, the State must comply with the Medicaid Act and its implementing regulations.

196.    The Medicaid Act requires that States "provide such methods and procedures relating to . . . the payment for[] care and services available under the [State Plan] as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the [State Plan] at least to the extent that such care and services are available to the general population in the geographic area."  42 U.S.C. § 1396a(a)(30)(A).

197.    Thus, when a state decides to change its reimbursement methodology by significantly reducing its Medicaid reimbursement rate, the state must assure that the resulting

reimbursement rates will assure payments consistent with efficiency, economy, and quality of care, and equal access to care and services. A state's decision that Medicaid reimbursement rates will meet the requirements of 42 U.S.C. § 1396a(a)(30)(A) can be sustained only if the state has considered and made determinations regarding such rates on an objective, reasonable, and principled basis prior to enacting them.

198.    Consequently, a state's decision to reduce its reimbursement rates or change its reimbursement methodology solely for budgetary reasons does not meet the procedural requirements of 42 U.S.C. § 1396a(a)(30)(A).

199.    In enacting RSA 126-A:3, VII(a), the State changed its reimbursement methodology to allow DHHS to reduce reimbursement rates solely for budgetary reasons.

200.    In doing so, the State failed to consider whether such a reimbursement methodology would assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services as set forth in 42 U.S.C. § 1396a(a)(30)(A).

201.    In promulgating the Rate Reimbursement Enactments at issue in this case, the State failed to consider in each instance whether such reductions to the Medicaid reimbursement rate would assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services as set forth in 42 U.S.C. § 1396a(a)(30)(A).

202.    In enacting N.H. Laws of 2011, Chapters 223 and 224, the State underfunded the Medicaid program, eliminated UPL payments, eliminated DSH payments for non-critical access hospitals, and significantly altered its rate-setting methodology by amending RSA 167:64, all solely for budgetary reasons. In doing so, the State failed to consider whether these changes would assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services as set forth in 42 U.S.C. § 1396a(a)(30)(A).

203.     Rather than using an objective, reasonable, and principled basis to reduce the reimbursement rate and change the reimbursement methodology in each instance, the State reduced the reimbursement rate and changed the reimbursement methodology solely for budgetary reasons.

204.     Thus, because RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, directly conflict with and stand a an obstacle to the accomplishment and execution of the full purposes and objectives of the procedural requirements of 42 U.S.C. § 1396a(a)(30)(A), the Medicaid Act preempts RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224.

205.     Accordingly, RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, are each null, void, and unenforceable.

206.     As a consequence of the foregoing illegal and unenforceable rate reductions and methodology changes, Plaintiffs have been and will continue to be irreparably harmed.

## COUNT II

### Supremacy Clause, 42 U.S.C. § 1396a(a)(30)(A), Substantive Violation
### New Hampshire Laws of 2011, Chapters 223 and 224

207.     Plaintiffs specifically incorporate and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

208.     In order to ensure that the substantive requirements of 42 U.S.C. § 1396a(a)(30)(A) are met, the State's rate reimbursement methodology must realize the goals of efficiency, economy, and quality of care, and equal access to care and services.

209.     Prior to N.H. Laws of 2011, Chapters 223 and 224, Provider Plaintiffs were

already receiving such low Medicaid reimbursement rates that their ability to provide efficient, economical, and quality care, and equal access to care and services was greatly compromised.

210.    In enacting N.H. Laws of 2011, Chapters 223 and 224, however, the State finally broke New Hampshire's hospital system.  In addition to the numerous rate reductions and the 5.5 percent MET already in place, the State used Chapters 223 and 224 to underfund the Medicaid program, eliminate UPL payments, eliminate DSH payments for Provider Plaintiffs, and significantly alter the reimbursement methodology by amending RSA 167:64. The State further used N.H. Laws of 2011, Chapters 223 and 224, to generate a net flow of funds from the MET to the general fund for SFY 2012-2013 while leaving Provider Plaintiffs with multi-million dollar net losses for those years.

211.    Such a payment system for hospitals is unsustainable and threatens immediate and irreparable injury to the public. It compromises Provider Plaintiffs' ability to remain financially stable and to provide important Medicaid services to Patient Plaintiff.  Consequently, the State's reimbursement methodology and payment structure no longer assures reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to inpatient and outpatient care, physician services, and specialty services.

212.    Specifically, Medicaid beneficiaries are likely to experience a reduced ability to: (1) schedule appointments with primary care and specialty providers, including after-hours appointments; (2) find providers within a reasonable distance from where they live; and (3) schedule timely appointments with outpatient providers as follow-up to an emergency visit or inpatient hospital stay.  The number of providers with open Medicaid panels (providers accepting new Medicaid patients) will also decrease significantly.

213.    In underfunding the Medicaid program, eliminating UPL payments, eliminating

DSH funding to Provider Plaintiffs, and significantly altering the reimbursement methodology, the State did not create a reimbursement methodology and payment structure sufficient to assure reimbursement rates consistent with efficiency, economy, and quality of care, and equal access to care and services.

214.     Rather, the State created a reimbursement methodology and payment structure that underfunds the Medicaid program, eliminates UPL payments, eliminates DSH payments for Provider Plaintiffs, and overtaxes provider hospitals solely for budgetary reasons. The result is that hospitals will likely have to cut services to Medicaid recipients and the uninsured in order to sustain their operations. Such a payment structure is insufficient to realize the goals of efficiency, economy, quality of care, and equal access to care and services.

215.     Thus, because N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended, directly conflict with and stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the substantive requirements of 42 U.S.C. § 1396a(a)(30)(A), the Medicaid Act preempts N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended.

216.     Accordingly, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended, are null, void, and unenforceable.

217.     As a consequence of the foregoing acts, Plaintiffs will be irreparably harmed.

## COUNT III

**Supremacy Clause, Facial Challenge, 42 U.S.C § 1396a(a)(30)(A),
RSA 126-A:3, VII(a) and RSA 167:64, as amended by New Hampshire Laws of 2011,
Chapter 224**

218.     Plaintiffs specifically incorporate and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

219.    In a facial challenge to legislation, Plaintiffs must establish that no set of circumstances exists under which the legislation would be valid. *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st Cir. 2001). "'The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute.'" *Id.* (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)).

220.    42 U.S.C. § 1396a(a)(30)(A) requires States to implement reimbursement methodologies that produce reimbursement rates greater than or equal to an amount sufficient "to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." (emphasis added).

221.    The plain meaning of the word "assure" is "to make sure of something," "to make (a doubtful thing) certain; guarantee," and "to make safe or secure." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 86 (4th Ed. 2000).

222.    Thus, a reimbursement methodology capable of producing reimbursement rates substantially below the statutorily-required minimum does not assure, make certain, or guarantee payments consistent with efficiency, economy, and quality of care, and equal access to care and services.

223.    RSA 126-A:3, VII(a) directly conflicts with, and stands as an obstacle to the accomplishment and execution of, 42 U.S.C. § 1396a(a)(30)(A) and is facially preempted by it because RSA 126-A:3, VII(a) is not limited by the requirements set forth in 42 U.S.C. § 1396a(a)(30)(A).

224.    Rather, RSA 126-A:3, VII(a) permits DHHS, with the approval of the legislative

fiscal committee, to reduce provider reimbursement rates for reasons wholly inconsistent with 42 U.S.C. § 1396a(a)(30)(A) (i.e., "if [DHHS's] expenditures are projected to exceed [its] annual appropriation") without regard to whether such reductions will assure payments consistent with efficiency, economy, and quality of care, and equal access to care and services.

225.     RSA 167:64, as amended, permits the State to budget any amount of UCC funds for the general fund and to leave no money to fund the Medicaid or DSH programs.  It therefore provides the State with the ability to underfund the Medicaid and DSH programs and effectively set Medicaid reimbursement rates at amounts insufficient to assure payments consistent with efficiency, economy, and quality of care, and equal access to care and services, as it has done in this case.

226.     These methodologies are not limited by the requirements set forth in 42 U.S.C. § 1396a(a)(30)(A) nor are they capable of assuring payments consistent with efficiency, economy, and quality of care, and equal access to care and services. Consequently, RSA 126-A:3, VII(a) and RSA 167:64, as amended by Chapter 224, allow the State to set reimbursement rates that fall substantially below the statutorily-required minimum and therefore do not assure payments consistent with efficiency, economy, and quality of care, and equal access to care and services.

227.     The plain language of 42 U.S.C. § 1396a(a)(30)(A) forbids such methodologies.

228.     Accordingly, because RSA 126-A:3, VII(a) and RSA 167:64, as amended, directly conflict with and stand as an obstacle to the accomplishment and execution of the full purposes of 42 U.S.C. § 1396a(a)(30)(A), the Medicaid Act facially preempts it.

## COUNT IV

**Supremacy Clause, 42 U.S.C. § 1396a(b) and 42 C.F.R. § 430.12**
**RSA 126-A:3, VII(a), Rate Reduction Enactments, and New Hampshire Laws of 2011,**
**Chapters 223 and 224**

229.    Plaintiffs specifically incorporate and reallege the allegations asserted in each of
the preceding paragraphs, as if fully set forth herein.

230.    "A preemption analysis requires an examination of congressional intent, and
federal regulations have no less preemptive effect than federal statutes." *Community Pharms. of
Indiana, Inc. v. Indiana Family & Social Servs. Administration*, Case No. 1:11-cv-0893-TWP-
DKL, slip op. at 5 (S.D. Ind. July 8, 2011) (citing *Fidelity Federal Savings & Loan Ass'n v. de la
Cuesta*, 458 U.S. 141, 152-53 (1982)).

231.    42 U.S.C. § 1396a(b) and 42 C.F.R. § 430.12 require amendments to the State's
Medicaid plan to be submitted and approved by CMS before going into effect.

232.    42 C.F.R. § 430.12 states in relevant part that: "The [state] plan must provide that
it will be amended whenever necessary to reflect . . . (ii) Material changes in State law,
organization, or policy, or in the State's operation of the Medicaid program."

233.    New Hampshire's state plan includes this requirement.

234.    Moreover, courts have held that  "[t]he state plan must be amended to reflect
changes in federal law or policy or material changes in state law, organization, policy, or
operation of the state Medicaid program, and the amendments also must be submitted for [CMS]
approval." *Oregon Ass'n of Homes for Aging, Inc. v. Oregon by & through Dep't of Human
Resources*, 5 F.3d 1239, 1241 (9th Cir. 1993) (citing 42 C.F.R. § 430.12(c)); *see Community
Pharms. of Indiana, Inc.*, Case No. 1:11-cv-0893-TWP-DKL, slip op. at 5 (finding that State's
conduct in implementing fee reduction prior to HHS's approval to be "premature and

irreconcilable with federal Medicaid law and . . . therefore preempted by the Supremacy Clause of the United States Constitution").

235.    "A law that effects a change in payment methods or standards without [CMS] approval is invalid." *Oregon Ass'n of Homes for Aging, Inc.*, 5 F.3d at 1241.

236.    RSA 126-A:3, VII(a) effects a material change in the State's operation of the Medicaid program because it allows the State to reduce reimbursement rates solely for budgetary reasons. Accordingly, RSA 126-A:3, VII(a) constitutes a state plan amendment.

237.    Each Rate Reduction Enactment effected a material change in the State's operation of the Medicaid program because it significantly reduced the reimburse rate for Provider Plaintiffs and had a significant fiscal impact on them. Accordingly, each Rate Reduction Enactment constituted a state plan amendment.

238.    N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, effect material changes in State law and in the State's operation of the Medicaid program because they allow the State to underfund the Medicaid program, eliminate UPL payments, eliminate DSH payments to non-critical access DSH hospitals, and effectively reduce reimbursement rates solely for budgetary reasons. Accordingly, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended, constitute a state plan amendments.

239.    Because RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, qualiSFY as state plan amendments, the State was required to obtain CMS approval before utilizing them.

240.    On information and belief, the State has never submitted RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, to CMS for approval as state plan amendments.

241.     Accordingly, RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, are unenforceable and of no force and effect until they have been submitted to CMS as state plan amendments and CMS approves them. *See Oregon Ass'n of Homes for Aging, Inc.*, 5 F.3d at 1241; *Community Pharms. of Indiana, Inc.*, Case No. 1:11-cv-0893-TWP-DKL, slip op. at 5.

242.     As a consequence of the foregoing acts, Plaintiffs have suffered and will continue to suffer irreparable harm.

## COUNT V

### 42 U.S.C. § 1983, 42 U.S.C § 1396a(a)(13)(A) and 42 C.F.R. § 447.205
### Rate Reduction Enactments

243.     Plaintiffs specifically incorporate and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

244.     Section 1396a(a)(13)(A) and 42 C.F.R. § 447.205 confer rights, privileges, or immunities on Medicaid-participating hospitals and Medicaid recipients that are enforceable under 42 U.S.C. § 1983.

245.     Section 1396a(a)(13)(A) of the Medicaid Act requires States to provide "a public process for determination of rates of payment under the [state] plan for hospital services . . . under which: (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published; (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications; (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published; and (iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1396r-4 of this title) the situation of hospitals which serve a

disproportionate number of low-income patients with special needs . . . ."

246.    42 C.F.R. § 447.205 further requires public notice of any significant proposed change in the methods and standards for setting payment rates for Medicaid services. The content of the notice must: (1) describe the proposed change in methods and standards; (2) give an estimate of any expected increase or decrease in annual aggregate expenditures; (3) explain why the agency is changing its methods and standards; (4) identiSFY a local agency in each county where copies of the proposed changes are available for public review; (5) give an address where written comments may be sent and reviewed by the public; and (6) if there are public hearings, give the location, date and time for hearings or tell how this information may be obtained. The notice must then: (1) be published before the proposed effective date of the change; and (2) appear as a public announcement in one of the following publications: (i) the State register; (ii) the newspaper of widest circulation in each city with a population of 50,000 or more; or (iii) the newspaper of the widest circulation in the State, if there is no city with a population of 50,000 or more.

247.    Under the state plan, the State further assured CMS that it had in place a public process that satisfied the above notice and comment requirements.

248.    Nonetheless, the State promulgated the Rate Reduction Enactments at issue in this case in violation of 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan.  First, the State did not publish the proposed rate reductions and justifications for them prior to enacting them.  Second, the State did not provide Plaintiffs with notice of the proposed rate reductions or a reasonable opportunity to review and comment on them. Third, in enacting each rate reduction, the State did not publish each rate reduction in accordance with 42 C.F.R. § 447.205(d). Fourth, the State did not consider or take into account the situation of disproportionate share hospitals in

enacting each rate reduction.

249.     Rather, the Rate Reduction Enactments became law often on the same day they were proposed and effected significant reductions in reimbursement rates without affording Plaintiffs their rights under 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan.

250.     Thus, the State's failure to comply with the requirements of U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan renders the Rate Reduction Enactments unenforceable and of no force and effect.

251.     As a consequence of the foregoing acts, the Plaintiffs will be irreparably harmed.

## COUNT VI

### 42 U.S.C. § 1983, 42 U.S.C § 1396a(a)(13)(A) and 42 C.F.R. § 447.205
### New Hampshire Laws of 2011, Chapters 223 and 224

252.     Plaintiffs specifically incorporate and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

253.     The State promulgated N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended, in violation of 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan. First, the State did not publish its justifications for proposing to cut UPL payments (effecting a rate reduction) and changing its rate-setting methodology. Second, the State did not provide Plaintiffs with notice of the proposed rate reductions and methodology changes or a reasonable opportunity to review and comment on how such changes would effect them and the care and services they provide. Third, the State did not publish the approved rate reduction and methodology changes in accordance with 42 C.F.R. § 447.205(d). Fourth, the State did not take into account the situation of disproportionate share hospitals in enacting N.H. Laws of 2011, Chapters 223 and 224, and amending RSA 167:64.

254.     Rather, N.H. Laws of 2011, Chapters 223 and 224 and RSA 167:64, as amended,

became law without affording Plaintiffs their rights under 42 U.S.C. § 1396a(a)(13)(A), 42

C.F.R. § 447.205, and the state plan.

255.     Thus, the State's failure to comply with the requirements of 42 U.S.C. §

1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan renders N.H. Laws of 2011, Chapters

223 and 224 and RSA 167:64, as amended, unenforceable and of no force and effect.

256.     As a consequence of the foregoing acts, Plaintiffs will be irreparably harmed.

## COUNT VII

### Declaratory Relief under 22 U.S.C. § 2201

257.     Plaintiffs specifically incorporate and reallege the allegations asserted in each of

the preceding paragraphs, as if fully set forth herein.

258.     As demonstrated by the foregoing allegations, an actual controversy of sufficient

immediacy and concreteness between the Plaintiffs and the Defendant exists.

259.     The harm to the Plaintiffs as a direct and indirect result of the State's actions are

sufficiently real and imminent to warrant declaratory relief.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

1.     Provide for expeditious proceedings in this action;

2.     Declare that the appropriations, rate reductions, and rate reimbursement

methodologies established by RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws

of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, conflict with and

stand as an obstacle to the accomplishment and execution of the full purposes of 42 U.S.C. §

1396a(a)(30)(A), of the Medicaid Act and are therefore null and void under the Supremacy

Clause of the United States Constitution;

3.      Declare that the appropriations, rate reductions, and rate reimbursement methodologies established by RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, conflict with and stand as an obstacle to the accomplishment and execution of the full purposes of 42 U.S.C. § 1396a(b), and 42 C.F.R. § 430.12 of the Medicaid Act and are therefore unenforceable and of no force and effect under the Supremacy Clause of the United States Constitution until CMS reviews them and approves them as part of the state plan;

4.      Declare that the State failed to honor the requirements 42 U.S.C. § 1396a(a)(13)(A), 42 C.F.R. § 447.205, and the state plan in promulgating each of the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224, and that those laws are therefore unenforceable, null, and void;

5.      Preliminarily and permanently enjoin Commissioner Toumpas, his agents, servants, employees, successors and assigns from implementing and enforcing the Medicaid rate reductions and methodology changes effected by RSA 126-A:3, VII(a), the Rate Reduction Enactments, N.H. Laws of 2011, Chapters 223 and 224, and RSA 167:64, as amended by Chapter 224;

6.      Declare that, when setting Medicaid payment rates for hospitals, Commissioner Toumpas, his agents, servants, employees, successors and assigns must consider factors relating to efficiency, economy, and quality of care, and equal access to care and services;

7.      Declare that Medicaid reimbursement rates for Plaintiff Providers are not consistent with efficiency, economy, and quality of care, and equal access to care and services;

8.      Order Commissioner Toumpas to comply with his federal duty to create a reimbursement methodology sufficient to assure reimbursement payments consistent with

efficiency, economy, and quality of care, and equal access to care and services;

9. Award Plaintiffs their costs and attorneys' fees incurred in this action; and

10. Award such other relief as the Court may deem just and proper.

Respectfully submitted,

**PROVIDER PLAINTIFFS**,

By Their Attorneys,

**NIXON PEABODY LLP**

Dated: July 25, 2011        /s/ W. Scott O'Connell
W. Scott O'Connell, Esquire
N.H. Bar No. 9070
Gordon J. MacDonald, Esquire
N.H. Bar No. 11011
Emily P. Feyrer, Esquire
(Petition for Admission Pending)
N.H. Bar No. 20434
900 Elm Street, 14th Floor
Manchester, NH  03101-2031
(603) 628-4000
soconnell@nixonpeabody.com
gmacdonald@nixonpeabody.com
efeyrer@nixonpeabody.com
**OF COUNSEL:**


/s/ John E. Friberg, Jr.
John E. Friberg, Jr., Esquire
N.H. Bar No. 11287
Elliot Health System
One Elliot Way, Suite 303
Manchester, NH 03103
(603) 663-8940
jfriberg@Elliot-HS.org

/s/ Constance Sprauer
Constance Sprauer, Esquire
N.H. Bar No. 16879
Exeter Hospital
5 Alumni Drive
Exeter, NH 03833
(603) 742-5252
csprauer@ehr.org


/s/ Erica Bodwell
Erica Bodwell, Esquire
N.H. Bar No. 8915
Southern New Hampshire Medical Center
8 Prospect Street
Nashua, NH 03061
(603) 577-2677
erica.bodwell@snhmc.org


/s/ Mitchell Jean
Mitchell Jean, Esquire
N.H. Bar No. 1261
LRGHealthcare
80 Highland Street
Laconia, NH 03246
(603) 524-2890
mjean@lrgh.org


**JOHN DOE**,

By his attorney,

**ORR & RENO, P.A.**


/s/ William L. Chapman
William L. Chapman, Esquire
N.H. Bar No. 397
One Eagle Square
Concord, NH  03302
(603) 224-2381
wchapman@orr-reno.com