# Declaration of Emily Feyrer
# EXHIBIT E

## JOINT FISCAL COMMITTEE
Legislative Office Building, Rooms 210-211
Concord, NH
Friday, November 21, 2008

## **MEMBERS PRESENT**:

Rep. Marjorie Smith (Chairman)
Rep. Neal Kurk
Rep. Mary Jane Wallner
Rep. Kenneth Weyler
Rep. Peter Franklin
Rep. Daniel Eaton
Rep. Fran Wendelboe
Sen. Lou D'Allesandro
Sen. Harold Janeway
Sen. Molly Kelly
Sen. Ted Gatsas
Sen. John Gallus

<u>CHAIRMAN SMITH:</u> Good morning. I'd like to call to order the November 21st meeting of the Fiscal Committee and Governor, like to recognize you. And the first order of business will be to hear from the Governor of the State. Welcome.

<u>HON. JOHN LYNCH, Governor, State of New Hampshire</u>: Thank you. Thank you very much and good morning everybody. Good morning, Madam Chair, and Senator D'Allesandro, and Members of the Committee. And thank you very much for giving me the opportunity to appear before you today and for working with me to guide our state through very difficult times.

I do want to take a moment to recognize the commissioners and the agency representatives who are here today and many of them are here and standing in the back of the room. As a group, they have all been very willing to look beyond their own agencies and to address the larger needs of state government and our people. This truly has been a team effort and they have

worked hard with me and with each other to focus on solutions to get us through this very difficult challenge, and I want to publicly thank them for their efforts.

We are in the midst of an unprecedented global economic crisis. When we crafted this budget 18 months ago, no one could have predicted the depths to which our nation's economy would sink. This crisis has led to a $700 billion rescue of financial institutions, put the American auto industry on the verge of bankruptcy, and set the stock market on a wild course of swings. It has lead to job losses and uncertainties for our families. This crisis has also led to budget shortfalls in states all across the country. And while we are better positioned than most states, New Hampshire is not immune to the global economic conditions.

The challenge before us is very real and very significant. Fortunately, because of our work together in the past three years, we are better prepared than most states to address the challenges that we face. Our unemployment rate remains among the lowest in the nation and we built our Rainy Day Fund together from $17 million to a record $89 million. As of now we are projecting a $250 million revenue shortfall for Fiscal Year 2009 which ends June 30th. The actions we took together last spring, however, reduced that amount by $100 million, leaving us with $150 million revenue shortfall.

Today I am presenting to you the next two steps in our efforts to address this shortfall and to ensure that we end this biennium with a balanced budget. The first is Executive Order 2008-10 cutting $53.6 million in executive branch spending. In making these cuts, we sought to minimize the impact on services for our most vulnerable citizens and on public safety. Unlike most states, we have kept significant portions of our budget off the table, including adequate education grants to communities. We are not proposing any lay-offs at this time, but that made some of the remaining choices even that much more difficult. These decisions are painful and I recognize how painful they are. We're not cutting fat, instead we are making the tough decisions to defer worthy programs, some new, some existing, until better

*Joint Fiscal Committee*

*November 21, 2008*

times.

While I asked all agencies to present me with proposals for reducing their budgets, these are not across the board percentage reductions. We worked hard to target our reductions in order to spare as much as possible services to our most vulnerable citizens and also to protect public safety.

The Department of Environmental Services, for example, will defer awarding any grants until the next biennium for a savings of $3.3 million. The Land and Community Heritage Investment Program will not enter into any new commitments for 2009 and will repay the general fund $3 million of 2008 Fiscal Year funds. The University System of New Hampshire and the community college systems both agree to pay their 8 percent reduction targets without increasing tuition.

Some of the toughest choices were in health and human services. We will need to fully defer implementation of the cancer plan, whereas we had hoped to be able to go forward with at least a piece of it. We are proposing reducing certain provider rates on December 1st and reducing inpatient hospital rates, except for critical access hospitals. These are not easy decisions and I recognize that, but they are necessary to protect other important services and to ensure that we end the year with a balanced budget.

I'm also presenting today Executive Order 2008-11 that implements additional steps across state government. I'm directing agencies to limit over time wherever possible, to ensure that all state vehicles are parked overnight at state offices, unless absolutely necessary for state employees to carry out their job responsibilities. To limit mileage reimbursement by requiring employees to car pool and use pooled state vehicles wherever possible. To print all publications exclusively online wherever possible. To retain only essential consulting services and to terminate existing consulting contracts where feasible. To cancel subscriptions for books, newspapers, and periodicals wherever possible. To undertake a reduction in their telephone land lines where possible, a move that is saving the Judicial

*Joint Fiscal Committee*

*November 21, 2008*

Branch $10,000, and to reduce mobile cell phone use and encourage the pooling of cell phones.

In addition, we will not authorize any tuition reimbursements without a waiver for the remainder of this Fiscal Year.  We estimate that this Executive Order will save an additional three to $5 million.

In addition, I've been in discussions with the legislative leadership about the need for legislation that I am currently estimating will allow us to reduce our shortfall by another $20 million.  It would include legislative and judicial branch reductions, and an additional lapse from the retirement system valued at about $2.6 million.  Authorize the highway fund to repay $5 million in general funds, to sweep about $10 million from existing dedicated funds, and to make two to $3 million in additional agency reductions that would require full legislative approval.

We are also recommending the deferral of pay increases for non-classified and unclassified employees, which would save $500,000.  We will continue discussions with representatives of employee unions about deferring pay increases across state government, although any changes would need to be agreed to as part of the collective bargaining agreement.

As you know, there have been proposals at the federal level to provide relief to states.  While I believe that would be a wise step, I do not believe we can count on those funds or should we commit to spending those funds in any particular manner given the uncertainty of the economy.  However, if it were possible, my priority would be preventing additional reductions to health and human services or restoring funding to that department. With these executive orders and the proposed legislation, our revenue shortfall target will be reduced from the original $250 million to about $75 million.    We've made significant progress but we still must work together to address these challenges.

I have further asked revenue producing agencies, such as lottery and liquor, to look at ways to continue to maximize their

*Joint Fiscal Committee*

*November 21, 2008*

revenue, and I'm absolutely open to hearing your ideas and thoughts about how we address this challenge together.  And while we do have $89 million in the Rainy Day Fund, I believe that these funds should be used only as a last resort.

These are tough times for New Hampshire families and New Hampshire businesses.  The global economic situation continues to be volatile, and we must continue to carefully watch revenues closely and take the necessary steps to manage the budget.  I am committed to ensuring that we remain fiscally responsible and end the biennium with a balanced budget.  And I know that you share in this commitment with me.  So thank you, Madam Chair, for allowing me to come before you this morning.

CHAIRMAN SMITH: Thank you very much, Governor Lynch, and would you like to introduce your colleagues?

GOVERNOR LYNCH: I certainly would.  You all know Linda Hodgdon who's the Commissioner of Administrative Services.  And Kristyn McLeod who is the Governor's Budget Director.

CHAIRMAN SMITH: Thank you.  Would you be willing to answer any questions, Governor?

GOVERNOR LYNCH: Sure.

CHAIRMAN SMITH: Are there any questions for the Governor at this time?  Obviously, Governor, you gave a very complete -- not quite complete presentation.

REP. KURK: Madam Chairman, I was being differential to my colleagues on the Committee by allowing them to go first, but they're apparently more differential than I am.  Good morning, Governor.

GOVERNOR LYNCH: Good morning, Representative Kurk.

REP. KURK: I thank you for the exceptionally conscientious effort that was made to produce these executive

orders and I understand the difficulty in doing this. I have a couple of general questions and these are questions I ask every time --

GOVERNOR LYNCH: Hm-hum.

REP. KURK:   -- one of these orders comes along and I'm sure Miss Hodgdon can anticipate it. In 2008 when you came forward with your Executive Order, you assured this Committee that the order would be in addition to the lapses that had already been figured into the budget. Did that, in fact, turn out to be the case for Fiscal 2008?

LINDA HODGDON, Commissioner, Department of Administrative Services: May I answer that?

GOVERNOR LYNCH: Sure, go ahead.

MS. HODGDON: Yes. We actually lapsed almost $80 million in State Fiscal Year '08 which allowed us to end the year with a $17 million surplus. When the Committee of Conference did their budget, they had forecasted an $18 million surplus. We were within $1 million of that.

REP. KURK: Follow-up, Madam Chairman?

CHAIRMAN SMITH: Certainly.

REP. KURK: So in addition to the $38 million that we had estimated for lapses, the recisions and reductions added $42 million approximately to that to come up with the 80 and that 42 million was roughly equal to the amount that the Governor had expected through his Executive Order. Is that clear?

MS. HODGDON: It was very close. There was actually about a five or $6 million piece of that Executive Order that didn't go forward from Fiscal that had to do with health and human services. So absent that, yes.

REP. KURK: Thank you. Further question, Madam

*Joint Fiscal Committee*

*November 21, 2008*

Chairman?

CHAIRMAN SMITH: Certainly.

REP. KURK: Are you -- do you believe that the same thing will be true with respect to Fiscal '09? That is to say, this Executive Order will be in addition to the $38 million of lapses that are included in the budget?

MS. HODGDON: Do you want me to answer that question?

GOVERNOR LYNCH: Sure. Go ahead.

MS. HODGDON: When we looked at the $250 million shortfall, the overall package, we did anticipate that there would be a shortfall in some of the lapse dollars and that has been accounted for in our overall package.

REP. KURK: Thank you. Thank you, Madam Chair.

CHAIRMAN SMITH: Certainly. Are there any other questions? Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman; and good morning, Governor.

GOVERNOR LYNCH: Good morning, Senator Gatsas.

SEN. GATSAS: I notice that almost every department in the state participated. The only one that I see didn't participate is the legislative side, the House and Senate. The last time we had discussions, there was about $4 million in excess money being held in those accounts. Is there a reason why leadership hasn't volunteered some of that to reduce the funding problem that we have in the state?

GOVERNOR LYNCH: Well, as you know, Senator Gatsas, those legislative reductions can't be accomplished through an executive order. That requires legislation, both for legislative reductions and judicial reductions, and we've been working with

legislative leadership to address those issues, and at the appropriate point they'll come forward with proposed reductions.

SEN. GATSAS: Thank you.  Follow-up question.

CHAIRMAN SMITH: Certainly.

SEN. GATSAS: In regard to the cuts, can we get into that?

Ms. Hodgdon, can you tell me, I notice on here that there is a $2.8 million reduction in the self-insured health plan.  I think I sent you correspondence a few weeks ago in regards to that same problem when we took 9 million and 3 million that those monies as they come in, first dollars in are usually employees' dollars for their contributions to the medical plan to take care of benefits.  Is there a reason why they have not been restored at the same level as they paid them in?

MS. HODGDON: The earlier reductions that were taken from the self-insurance fund in '08 and formerly were at times when the state employees had not participated in the self-insurance fund.  The reduction that was done in '08 for '09, the $3 million and there's $2.7 million, the state employees will benefit from that reduction.  They will actually -- there will be fewer reductions from their paycheck when we actually implement those savings.  They have not yet been implemented in '09.  We will do them together.

SEN. GATSAS: Thank you.

CHAIRMAN SMITH: Any other questions, Senator?

SEN. GATSAS: Yes.  Thank you.  The -- in education it shows one point million in catastrophic aid.  Is that a reduction on the percentage that communities will be seeing?

GOVERNOR LYNCH: It is a prorated reduction, Senator Gatsas, from 88.7 percent down to 85.6 percent.

SEN. GATSAS: Same question on the building aid.

GOVERNOR LYNCH: The building aid is currently at 98.2 percent.  The prorated reduction will result in a 94.6 percent percentage.

SEN. GATSAS: This being the first time I've seen this document.  I guess my next question would be rooms and meals, the surplus.  Can somebody explain why that hasn't been distributed to the communities throughout the state as it normally is?

MS. HODGDON: The rooms and meals budget that is in Treasury that goes back to the cities and towns is based on the actual revenue received and because the rooms and meals revenue is down slightly, the amount that was budgeted is actually surplus to our needs.

SEN. GATSAS: Can I get a clearer understanding of that, please?

MS. HODGDON: The payment back to the cities and towns from rooms and meals is based on actual revenue received.  The money that's in the budget is a forecasted number so there is a higher appropriation in the budget than what is actually needed because the revenue is coming in a little bit lower than had been anticipated.

SEN. GATSAS: Follow-up.  But doesn't this say surplus?

MS. HODGDON:  Surplus dollars.  It's actually a surplus of an appropriation.

SEN. GATSAS: I guess not a question but certainly a comment.  I certainly appreciate the cuts that you've brought forward, Governor, but I think that based on where I've been in the past saying that 424 people should be making these decisions and not 10, obviously having the opportunity for people to weigh in on what they think is fair and unfair so that we all hear that discussion, 'cause there are some cuts in here that I see that go to the juveniles and I really have a problem with that when you

look at a cut and I'm not sure what it does to the TANF fund, how much is left in that TANF fund. Can somebody answer that question? 'Cause we are taking dollars from the general funds from the TANF fund.

MS. HODGDON: I don't know can answer that question. Nick.

GOVERNOR LYNCH: Commissioner Toumpas is here and he's certainly willing to address that, Senator Gatsas.

SEN. GATSAS: The juvenile justice placements, there's a reduction there. Certainly, with that reduction people can say that they are going to have a problem with that and it's certainly something that we need to talk about juveniles. It's a serious problem. But again, I think that 424 people should be making these decisions and not 10 of us up here.

GOVERNOR LYNCH: Okay. Thank you for your comment.

CHAIRMAN SMITH: Thank you, Senator Gatsas. Senator D'Allesandro.

SEN. D'ALLESANDRO: Thank you very much, Madam Chair. To address my colleague, the people of the State of New Hampshire elect the Governor. The Governor has to make decisions at certain times. I think it's -- it's really very generous of the Governor to come during this interim period and bring these items before us so that we can have that discussion.

This is happening in 41 states in the United States of America. Our colleagues in the State of Massachusetts, the Governor of the State of Massachusetts had to reduce his budget by over a billion dollars. The legislature is not in session. The Governor has to make decisions and inform people. I give you great credit for doing that, Governor. I think it's the responsible way to do it. This is the way we have done it in New Hampshire for a long period of time. We are at an intersession. We have a new legislature coming. I think to delay this action would really

*Joint Fiscal Committee*

*November 21, 2008*

be unconscionable in terms of what's going on in the world and what's going on in the country.  Look at what happened yesterday in the global markets.  So I applaud the Governor for his action, his action taking place when deemed appropriate in bringing that information to us and I think it's a collegial relationship.  The Governor works very closely with the legislature, has worked very closely with the legislature.  I've been around this legislative hall since 1972.  I don't think we have had a Governor who's worked more closely with the legislature than the current chief administrative officer.  I think we should applaud him for that and not chastise him.

GOVERNOR LYNCH: Thank you, Senator D'Allesandro.  The other point I would make is we obviously will not get the full year impact from many of these cuts.  So we need to take the cuts as quickly as possible.  And my instructions to the department heads were to propose cuts that could be implemented as of December 1st.  Because although we can't get the full year impact, we need to approach this with a sense of urgency to get as much of a four-year benefit as possible.  The longer we delay, the more cuts we'll have to take.

CHAIRMAN SMITH: Representative Kurk.

REP. KURK: Thank you, Madam Chairman.  I'd like to add something to the prior discussion.  There is a statute that authorizes the Governor to do this under the circumstances that exist today and that authorize the Fiscal Committee to approve those.  So I think the legislature has recognized that there are exigent circumstances that require this kind of action and they have delegated that authority to this Committee for this relatively limited purpose.  The question I have is this.  I heard before in response to Senator Gatsas' question something that I found a little bit troubling, and that was we were reducing the amount of state contribution to building aid from roughly 98 percent to 94 percent.  Could you tell us if that and anything else in these proposed reductions will effectively require -- well, I guess the language is, is any of this downshifting the burden to local communities?  I think the answer is yes as far as the first item I just mentioned, but are there other things as well that will

*Joint Fiscal Committee*

*November 21, 2008*

result in a downshift of financial responsibility from the state to local taxpayers?

GOVERNOR LYNCH: There are examples and then I'll ask Commissioner Hodgdon to address this as well where payments -- the expected payments would be delayed or deferred as opposed to occurring in this Fiscal Year. DES grants are a good example where the expectation would be that grants would be delayed or deferred until the next Fiscal Year rather than this Fiscal Year. You want to --

MS. HODGDON: Well, you know, we certainly were very, very sensitive to trying not to do that in all cases where we could not downshift as you refer to it, but you can't do this in a vacuum. Local government is too intertwined with state government. So we were very, very sensitive to that. We absolutely minimized it. I can't sit here and name every situation for you but we'd be happy to answer any follow-up questions you have after you've reviewed the materials.

REP. KURK: Follow-up.

CHAIRMAN SMITH: Certainly.

REP. KURK: You don't have a sense of a total dollar figure?

MS. HODGDON: I don't have a sense of a total dollar figure and I don't know.

GOVERNOR LYNCH: I think it's de minimus though, Representative Kurk. Because we have been very sensitive to just not shift cost. Because ultimately then the taxpayer obviously continues to pay for that. So I'm very, very aware of that. You know, as a state we contribute about $550 million during the course of a biennium which is money that goes back to the cities and towns. That's quite apart from Adequacy Education grants. And we have been very, very careful to not just go after that pot of money and reduce it. Because, again, all we are doing is cost-shifting. So I believe it's been de minimus

in terms of what has occurred there.

REP. KURK: Thank you.  Thank you, Madam Chairman.

CHAIRMAN SMITH: Thank you.  Are there any other questions?  Senator Gallus.

SEN. GALLUS: Thank you, Madam Chair.  Good morning, Governor.

GOVERNOR LYNCH: Good morning.

SEN. GALLUS: My question is, you know, it took us some time to get to the paper to do this particular cut and we have been in this situation for quite sometime.  In the course of your deliberations on these cuts, it appears that there's another $75 million.  Have you -- do we know where we are going next?  Are there additional cuts coming?  How we addressing this $75 million hole?  Rainy Day Funds or anything coming forward, you know, in the immediate future?

GOVERNOR LYNCH: That's a good question.  First of all, I think we made significant progress when we first identified a revenue shortfall of $250 million to now be at the point where the gap appears to be $75 million I think is extraordinary progress.  But we need to continue to work together, working with the department heads and the department heads are collaborating together to address this issue and we need to continue to work, Governor's Office with legislative leadership to address how we are going to eliminate that gap.  And that said, I'm absolutely committed to a balanced budget in the Fiscal Year.

SEN. GALLUS: Are there -- which direction are we going to find that 75 million?  I mean, if we are in a bare bones situation now where we are making some massive cuts in certain departments, is there anything left that we can look at that's not on the table today?

GOVERNOR LYNCH: Department heads are working

together to identify where they can collaborate to generate greater efficiencies, and I think we'll see that. As I mentioned also, we are also talking with the revenue generating departments to determine where, albeit in the short period of time, we can generate additional revenue for the state.

CHAIRMAN SMITH: Senator.

SEN. GALLUS: These are real trying times and this is a real trying situation for everybody. One of the issues I have is that this is the first we've seen of this particular, you know, budget cut. I think I would ask that, you know, the next time we do this or something that we do have some lead time to at least review these figures. I don't think anyone at the table doesn't think that something has to be done, but it's just very quickly, you know, the first time I've seen these figures are this morning. And so I would appreciate if perhaps the next time around, Madam Chair, we could probably get some at least advance notice of it.

CHAIRMAN SMITH: Governor -- oh, did you want to say something?

SEN. GALLUS: Thank you.

GOVERNOR LYNCH: Thank you.

SEN. D'ALLESANDRO: From the Senate side as the Chair of the Finance Committee I take full responsibility. Apologetic to you, Senator Gallus. I wasn't in yesterday morning when these became available. So I apologize to you and Senator Gatsas. You should have had these sooner, and I will make sure that that never happens again.

SEN. GALLUS: Thank you, Senator.

CHAIRMAN SMITH: Thank you very much. And although I am Chair of the Fiscal Committee, I have full respect for the independence of the Senate and the House. And the House members were all given copies at the moment that the Governor

released to us a not quite final version, but I did not feel I had authority to distribute them more fully. Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman. Governor, in your first Executive Order you talked about $33 million in surplus that came from the 2007 budget and that it would be held in emergency fashion or it would be held for emergencies. Can you tell me in the $17 million surplus for the '08 budget, is that $33 million, was that used or was it carried forward to '09?

MS. HODGDON: The 33 million was part of closing out '08, which because of the timing of when that money came in, absolutely should have been part of what rolled forward. So that has already been accounted for when the state closed their books at the end of '07 and then on into '08.

SEN. GATSAS: So I guess that brings me to the question of, if I may Madam Chairman, where Representative Kurk was with the lapses. Was that money used for supplanting lapses with the 33 million, because according to the Executive Order was going to be used for emergency basis.

MS. HODGDON: It was not used to supplant the lapses and I would be happy to sit down with you and go over details of the lapse information. I believe I did send you something via letter several months ago, but I'd be happy to sit down and review that with you as well as our state surplus statement that is -- I expect to be pretty close to what will come out of the final CAFR.

SEN. GATSAS: Follow-up.

CHAIRMAN SMITH: Certainly.

SEN. GATSAS: Did all agencies pay their bills in '08 that were due in '08 and didn't carry anything forward to the '09 budget?

MS. HODGDON: There are always agencies that have accounts payable at the end of the year. It's just a normal course of the way business is done. And in all cases where we knew

about that, where the agencies identified that, we do account for that when we close our books.  It's the normal GAAP accounting process.

SEN. GATSAS: Thank you.

CHAIRMAN SMITH: Certainly.

REP. KURK: Thank you, Madam Chairman.  Governor, I wonder if you could explain to us how the bonding authority were given with respect to Pease and building aid figured into the $250 million and now the $75 million?

GOVERNOR LYNCH: Well, we fully expect to get the $10 million from Pease, which was part of the agreement and we expect to use the $40 million of bonding aid in this current Fiscal Year.

REP. KURK: So if I may, Madam Chair?

CHAIRMAN SMITH: Certainly.

REP. KURK: So the figures we see here, the 75 million is net of that.  That's already been taken into consideration.

GOVERNOR LYNCH: That's correct, that's correct.  That's correct, Representative.

CHAIRMAN SMITH: I'd also like to note that the CAFR in response perhaps to a question you were asking, Senator, the CAFR is almost but not quite ready to be released and it is likely that at the organization day and a new Fiscal Committee is formed that by the end of the year or at the latest the very beginning of January we would be able to receive the CAFR and release it and then have all that data well in hand before we begin the process of the 10-11 budget.  I think that will help give you some of the data that you're particularly interested.

Are there any other questions for the Governor or Miss Hodgdon or Miss McLeod?  I think that it's important that we

*Joint Fiscal Committee*

*November 21, 2008*

have all questions.  I am -- I hope it would be Senate agrees that Representative Kurk without having to move will leave the Fiscal Committee for the moment and his place would be taken by Representative Wendelboe who has a question.  Would that be acceptable?

SEN. D'ALLESANDRO: Yes.

CHAIRMAN SMITH: Thank you very much. Representative Wendelboe.

REP. WENDELBOE: Thank you, Madam Chair.  Actually, I have two questions.  Governor, there are two items on your list. One deals with the nursing home money which was covered in House Bill 721.

GOVERNOR LYNCH: Hm-hum.

REP. WENDELBOE:  And I guess my question is how that can be taken for a credit for health and human services to give that money up when there was specific statutory language that required the payment of those funds to the nursing homes?

MS. HODGDON: Can I answer that?

GOVERNOR LYNCH:  Yes, that's 721.

MS. HODGDON:  My understanding is that we don't have CMS approval of payment of those funds and the House Bill 721 was about $8.8 million, 2.2 of which was general fund money. So we really can't pay the general fund piece without the federal share which is 50 percent of that.  And we do not have CMS approval for that payment.

REP. WENDELBOE: Follow-up?

CHAIRMAN SMITH: Certainly.

REP. WENDELBOE: My understanding that that money was to be carried forward until the next budget year to allow

*Joint Fiscal Committee*

*November 21, 2008*

more time for that process to be ironed out.  So that was another piece of specific legislation granting the additional time for that to be facilitated.  So again, there's legislative statutory action that I question an Executive Order could set aside.

MS. HODGDON:  There was legislative action that carried that through till the end of '09, June 30th of '09, but I don't know where -- Commissioner Toumpas isn't here, but my understanding is if we don't have an answer from CMS, we're close to having an answer from CMS and that's not something that they were going to support.

REP. WENDELBOE: Second question.

GOVERNOR LYNCH:  It becomes surplus funds I believe, Representative.

REP. WENDELBOE: June 30th of '09, but not now.

MS. HODGDON:  If we have an answer from CMS earlier than that that they are not going to participate, then I think we have our answer.

REP. WENDELBOE:  Second question.

CHAIRMAN SMITH: Certainly.

REP. WENDELBOE:  Thank you, Madam Chair.  I see some of the areas there are 125 percent agencies and the 25 percent is income.  So by cutting budgets in the budget process we lose money by cutting budgets.  Once the budgets are established you then create more surplus.  But there's also statutory language that requires them not to be a money-making agency other than that 25 percent cream that we take.  So are we violating the concept of these agencies who administer licensing, now making money off of licensees instead of just raising enough money to pay for the cost of that operation?

GOVERNOR LYNCH: I don't believe we are.  I think it is important that all of the different departments and agencies

*Joint Fiscal Committee*

*November 21, 2008*

participate in this cost reduction effort.  And they have come forward, the reductions that we've taken, I believe, allow them to continue operating and completing their mission and doesn't jeopardize their day-to-day operations.  So I don't believe we are doing that.

REP. WENDELBOE: Thank you.

CHAIRMAN SMITH: I believe there's one final question. Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman.  Governor or Linda, can you tell me, there's been an item that's been sitting on the table in this Committee since 7/24/07.  And it's going to generate about a $3 million savings to HHS if we implement it. We heard that from the previous commissioner and the current commissioner.  Has that, the Granite Care Selective Contracting Program, is that anywhere in your discussions or savings that you have on the table or would your suggestion be that you give the commissioner of HHS every tool that we can give him to find savings in his department, this would be one of them?

CHAIRMAN SMITH: I believe that -- if I could answer that question because I've been in regular conversations with the Commissioner about this.  I think many of you know that the Commissioner has been working with -- I believe it's four groups of stakeholders, I think that's the current language -- in a number of different areas taking a very serious look at how to make basic changes in the structure of the Department and how the programs are delivered in order to increase the ability to meet the identified needs of the citizens of the state in the most appropriate way.  In part of that analysis the Department and the stakeholders have looked at the Granite Care suggestions and believe that as circumstances have changed over time, there are more appropriate ways that they would like to bring forward, perhaps in the next budget cycle, to achieve some of the savings. But that the savings that were predicted when this was first put on the table a year and a half ago do not appear to be as solid as the then commissioner thought they would be.  So that I think you raising the question is -- it's a very important question to

raise, and the issue shouldn't be ignored, and I believe that the Commissioner and this very large group of stakeholders, of people actually involved in the delivery of these services, are trying to reshape.

The Commissioner will be appearing before us later on a number of other issues. I'm sure some of the commissioners who are here will rush out the door immediately after the Governor leaves and you will miss all the exciting things that will happen next, but Commissioner Toumpas gets to stay. So there will be an opportunity, I think, if you want to raise that question.

SEN. GATSAS: Then I can ask him about his testimony that he gave us back in May.

CHAIRMAN SMITH: Senator Gatsas, I have never known you to hold back.

SEN. GATSAS: Thank you.

CHAIRMAN SMITH: And I'm sure that the Commissioner's looking forward. I mean, he actually -- he's almost coordinated his tie color with yours today. Not quite, but close.

SEN. GATSAS: We talked this morning.

CHAIRMAN SMITH: I imagine you did, Senator. Why should today be different? Senator D'Allesandro, do you have a motion?

**     SEN. D'ALLESANDRO: Thank you, Madam Chairman. I move approval of Executive Order 2008-10.

CHAIRMAN SMITH: Do you want to do the orders separately? Is that appropriate? And Representative Kurk seconds.

REP. KURK: I second the motion.

CHAIRMAN SMITH: Is there any further discussion? Not

*Joint Fiscal Committee*

*November 21, 2008*

hearing any, the Chair calls for a vote.

SEN. GATSAS: Roll call.

CHAIRMAN SMITH: And a roll call has been requested.
And I'm sure Representative Kurk was ready for that.  And the
motion is to accept to 2008-10.

REP. KURK: To approve.

CHAIRMAN SMITH: To approve, I'm sorry.  And the clerk
may read the roll.

REP. KURK: Representative Smith.

CHAIRMAN SMITH: Yes.

REP. KURK: Representative Kurk.  Yes.  Representative
Weyler.

REP. WEYLER: Yes.

REP. KURK: Representative Franklin.

REP. FRANKLIN: Yes.

REP. KURK: Representative Eaton.

REP. EATON: Yes.

REP. KURK: Senator D'Allesandro.

SEN. D'ALLESANDRO: Yes.

REP. KURK: Senator Janeway.

SEN. JANEWAY:  Yes.

REP. KURK: Senator Kelly.

SEN. KELLY: Yes.

REP. KURK: Senator Gatsas.

SEN. GATSAS: No.

REP. KURK: Senator Gallus.

SEN. GALLUS: No.

REP. KURK: Eight to two in favor, Madam Chairman.

CHAIRMAN SMITH: Thank you.  The motion being eight to two, it carries.

***   {MOTION ADOPTED}

CHAIRMAN SMITH:  Senator D'Allesandro.

**   SEN. D'ALLESANDRO: Thank you, Madam Chair.  I move approval of Executive Order 2008-11.

CHAIRMAN SMITH: It has been moved by Senator D'Allesandro and seconded by Representative Kurk.  Is there a request for roll call?

SEN. GATSAS: Is that the one that is talking about changes --

CHAIRMAN SMITH: Well, take your time, Senator, to make sure you see what it is.

SEN. D'ALLESANDRO: This is the order directing executive branch spending reductions.

SEN. GATSAS: Thank you.

CHAIRMAN SMITH: Not hearing a request for a roll call, all in favor?  And opposed?  The motion carries unanimously.

\*\*\*   {MOTION ADOPTED}

CHAIRMAN SMITH:  Thank you very much, Governor, for giving us all this time.  We hope that there might be a different reason for you to come before us next time, but we appreciate your candor.

GOVERNOR LYNCH: Thank you, Madam Chair.  Thank you all very much.  Thank you.

CHAIRMAN SMITH: We will now move to the previously scheduled agenda and the first item that does not appear on the agenda, and I ask you all to be quiet as you leave because we are conducting business here.  We'll take a minute break.

(Short recess)

(Reconvened)

## (1)  Acceptance of Minutes of the October 22, 2008 meeting

CHAIRMAN SMITH:  We'll now go back into session and the very first item that I want to mention is that after 30 years of incredible service to the legislature and the State of New Hampshire, Michael Buckley has submitted his resignation, a copy of which is in our book, and according to appropriate procedures Jeff Pattison, who is the Deputy LBA, will be a assuming all of the responsibilities of the legislative budget analyst as of this morning.  And it is the intention -- a new -- a new -- I'm sorry, I'm going to start this again.

A new Fiscal Committee will be formed in the very first opportunity after organization day on December 3rd and one of the very first items of business of the new Fiscal Committee will be to appoint a new LBA and we look forward to that day, but that cannot happen until after organization day.  So, Mr. Pattison, we are delighted to see you here this morning, having new responsibilities, along with all of your own responsibilities.

I move to Item (1), acceptance of the minutes of the

October 22nd meeting.  Is there a motion?

**    <u>REP. EATON:</u>  So move.

<u>SEN. D'ALLEANDRO:</u> Second.

<u>CHAIRMAN SMITH:</u> Moved by Representative Eaton and seconded by Senator D'Allesandro.  Any discussion?  Not hearing any, all in favor?  Opposed?  The motion carries.

***   {MOTION ADOPTED}

**(2)  <u>Old Business</u>**

<u>CHAIRMAN SMITH:</u>  Under item (2), Old Business.  Does anyone want to remove any item from Old Business?  Senator Janeway.

**    <u>SEN. JANEWAY:</u> Thank you, Madam Chair.  I'd like to move 08-288, Post-Secondary Education Commission to act on a replacement.

<u>CHAIRMAN SMITH:</u> A motion has been made to remove 08-288 from the table.  Is there a second?

<u>SEN. D'ALLESANDRO:</u> Second.

<u>CHAIRMAN SMITH:</u> Seconded by Senator D'Allesandro.

<u>REP. KURK:</u> Question.

<u>CHAIRMAN SMITH:</u> Yes.

<u>REP. KURK:</u> If this is removed from the table, is this the point where the replacement item could be discussed or is the replacement item a separate item in the agenda?

<u>CHAIRMAN SMITH:</u> I believe that we -- this would be replaced and then will be discussed.  All in favor of removing Item 08-288 from the table, signify by saying aye?  And

opposed?  The motion passes.  And Senator Janeway.

SEN. JANEWAY: Now I have to find the replacement. There's a letter from Katherine Dodge explaining what this is all about.

CHAIRMAN SMITH: It's my understanding that at our request Miss Dodge approached the federal grant makers, expressing the interest in the Fiscal Committee to have as much money as possible be directed towards financial aid for students and the federal authority, while not out of comport with that desire, were very clear in reporting back to Commissioner Dodge that only $20,000 of the -- of the grant could be changed since the purpose of the grant was something other than direct financial aid to students, but rather to try to generate a variety of programs and other supports to encourage young people being able to move into college.  Understanding our desire to increase the financial aid money, Katherine Dodge took the $20,000, which was the only flexibility that she was given by the federal authority, and pulled that from the Department of Education for something that had been itemized in the grant and moved it into the appropriate financial aid line.  That constitutes the change in the proposal as it came to us last month.  And so what we would be asked to do today is to vote on that proposal with the one change being that the Department of Education would not get the $20,000, but instead that money would go into the appropriate line in the Post-Secondary Education Commission for financial aid.  And I believe that's -- is that the summary?

SEN. JANEWAY: That is, yes.  I just only met this the other day and it's towards the back of Tab 2.  If you go to Tab 3 and then backup a couple of letters the explanation is there.

REP. KURK: This is the Item (3)?

REP. WEYLER: It's right in front of the other one.

CHAIRMAN SMITH:  It's right in front.  The whole item is there.

*Joint Fiscal Committee*

*November 21, 2008*

REP. WEYLER: It says "Replacement".

CHAIRMAN SMITH: So is there a motion to accept 08-288 as amended?

**    SEN. D'ALLESANDRO: I would move approval.

CHAIRMAN SMITH: Senator D'Allesandro moves approval and --

SEN. EATON: Second.

CHAIRMAN SMITH: Representative Eaton seconds.  Is there any discussion?  Not hearing any, I call for the vote.  All in favor?  Opposed?

SEN. GATSAS: Opposed.

CHAIRMAN SMITH: There was one voice in opposition.  The motion passes.  Thank you very much.

***  {MOTION ADOPTED}

**(3)  RSA 9:16-a, Transfers Authorized:**

CHAIRMAN SMITH:  We now move to item number (3), which is -- involves transfers authorized on the Consent Calendar.  Does anyone want to remove any of the items?

SEN. KELLY: Madam Chair, I would just like to remove Item (8).  I just have a few questions on that item.

REP. KURK: Which item?

CHAIRMAN SMITH:  Wait.  No, we're on item number (3) on the agenda.

SEN. KELLY:  Oh, I'm sorry.

CHAIRMAN SMITH: Consent Calendar.  Starting the

bottom of page one.

SEN. KELLY: I got you -- I'm looking at the second Consent Calendar.  There are two Consent Calendars?

CHAIRMAN SMITH: There are a lot of Consent Calendars. There are three Consent Calendars.  The Consent Calendars are organized according to the RSA under which the Fiscal Committee is given authority to act.  And so we separate them so as to be clear about what authority we are using.  So as to item number --

SEN. KELLY: I'll withhold my request till later.

CHAIRMAN SMITH: Well, we'll look forward to it when the time comes.

SEN. KELLY: Thank you.  Thank you.

CHAIRMAN SMITH: Item number (3), is there a motion?

**   REP. EATON: Move approval.

CHAIRMAN SMITH: Moved by Representative Eaton and seconded by --

SEN. D'ALLESANDRO: Second.

CHAIRMAN SMITH: -- Senator D'Allesandro.  Any discussion?  I'll call for a vote.  All in favor?  And opposed? The motion carries.

***   {MOTION ADOPTED}

**(4)  RSA 14:30-a, VI Fiscal Committee Approval Required for Acceptance and Expenditure of Funds Over $50,00 from any Non-State Source**

CHAIRMAN SMITH:  We now move to item number (4) on the agenda.  Does anyone want to remove anything from item

*Joint Fiscal Committee*

*November 21, 2008*

28

number (4)?  Not seeing any --

**      REP. EATON: Move approval.

CHAIRMAN SMITH: -- I call for a motion.
Representative Eaton moves.

SEN. D'ALLESANDRO: Second.

CHAIRMAN SMITH: And Senator D'Allesandro seconds.
Any discussion?  Call for a vote.  All in favor?  And opposed?
The motion carries.

***  {MOTION ADOPTED}

**(5)  RSA 124:15 Positions Restricted:**

CHAIRMAN SMITH:  Now to item number (5) on the
agenda.  This has to do with positions restricted.  Is there a
motion?

SEN. KELLY: Madam Chair, I'm going to request to make
sure I'm on the right calendar, would this be the time that I
would request that Item (8), 08-325 be removed for questions?

CHAIRMAN SMITH: Not quite.

SEN. D'ALLESANDRO:  Just raise your hand.

CHAIRMAN SMITH: We are only up to Item (5) right now.

SEN. KELLY: Excuse me.

CHAIRMAN SMITH:  I think it's very important that we
anticipate what we want to do so we don't miss the opportunity.

**      SEN. D'ALLESANDRO: Move approval.

CHAIRMAN SMITH: Item --

*Joint Fiscal Committee*

*November 21, 2008*

REP. EATON: Second.

CHAIRMAN SMITH: -- has been moved by Senator D'Allesandro, seconded by Representative Eaton.  Any discussion?

REP. WEYLER: Question.

CHAIRMAN SMITH: A question.  Representative Weyler has a question.  Is there someone here from the Department of Environmental Services?  Good morning.

SUSAN CARLSON, Chief Financial Officer, Department of Environmental Services:  Good morning, Madam Chairman, Members of the Committee.  For the record, my name is Susan Carlson with the Department of Environmental Services.

CHAIRMAN SMITH: Thank you, Ms. Carlson. Representative Weyler has a question for you.

REP. WEYLER: Thank you, Madam Chair.  Thank you, Ms. Carlson.  I note that the last audit of the retirement system that in a ten year period the number of employees it increased 22 percent which appears to me also to come in through these grants which pay for an employee for a period of time after which what happens to the employees is never disclosed.  What I would like is for this Committee when it's reconstituted to have a report, perhaps a five-year window, showing which employees were brought on board by grants and what happened to them after the grants expired, whether they continued on or were, in fact released.  Or were they continued on in some other position.  I think it's important because in the budgeting process we don't really add employees but somehow we've had 22 percent increase in ten years.  Thank you.

CHAIRMAN SMITH: Thank you very much for making what's a very important point, Representative Weyler.  It's probably not actually directed specifically --

REP. WEYLER: I will try to make it to all the departments

*Joint Fiscal Committee*

*November 21, 2008*

that come forward with positions.

CHAIRMAN SMITH: It's not directed specifically at Ms. Carlson, but the general point that Representative Weyler I think is making is as we read these grants it always says that if the grant money ends the particular personnel involved will not continue as state employees but somehow we're not really sure that that happens. And so I think that you probably at this point don't have to respond except to know that when we see you again working on the budget that question will be asked and forewarned is forearmed.

MS. CARLSON: Thank you very much.

CHAIRMAN SMITH: Representative Kurk.

REP. KURK: Thank you, Madam Chairman. I take it there is additional grant money to support the cost of the extra six months?

MS. CARLSON: Yes.

REP. KURK: Is this person currently receiving retirement benefits? Is this person, in other words, a member of the retirement system?

MS. CARLSON: Hum -- this person -- yes. When we bring a person on as a full-time, contributions to the retirement system begin at that point. It's only part-time people that -- and temporary people that don't, like interns and seasonal that do not contribute.

REP. KURK: So -- if I may?

CHAIRMAN SMITH: Certainly.

REP. KURK: So if this person continued under grant status for the full 30 year term, assuming it's a Group I individual, that person would retire with a pension from the New Hampshire Retirement System, the cost of which would have been paid for

presumably through the grant.

<u>MS. CARLSON:</u> Yes.

<u>REP. KURK:</u> Follow-up?

<u>CHAIRMAN SMITH:</u> Certainly.

<u>REP. KURK:</u> Of all of the people that you've hired through these grants, can you think of any who didn't stick around after the grant expired and some other source was found to pay them? This is really a general answer to the question that Representative Weyler didn't ask.

<u>REP. WEYLER:</u> Thank you.

<u>MS. CARLSON:</u> I can't -- I have no knowledge of that. I really can't answer that. Nothing comes to mind.

<u>REP. KURK:</u> Thank you. Thank you, Madam Chair.

<u>CHAIRMAN SMITH:</u> Thank you very much. Do we have a motion on this?

<u>SEN. D'ALLESANDRO:</u> Yes.

<u>REP. KURK:</u> Yes.

<u>CHAIRMAN SMITH:</u> Is there any further discussion? I call for a vote. All in favor? Opposed? The motion carries.

***   {MOTION ADOPTED}

**(6)** <u>**RSA 14:30-a, VI Fiscal Committee Approval Required for Acceptance and Expenditure of Funds Over $50,000 from any Non-State Source and RSA 124:15 Positions Restricted**</u>:

<u>CHAIRMAN SMITH:</u> We move now to item number (6) and while conscious of Representative Weyler's concern, is there

*Joint Fiscal Committee*

*November 21, 2008*

a motion?

**     REP. EATON: Move approval.

CHAIRMAN SMITH: Moved by Representative Eaton and
seconded by Senator D'Allesandro.  Is there any discussion?

REP. WEYLER: Is there someone from the Department of
Safety that heard my earlier request so I don't have to repeat it?

CHAIRMAN SMITH: The question is a question that as
people come to work on grants and as the form always says that
when the grant money ends, you know, this person will
disappear.  Since we're not in Harry Potter's world, in fact,
people don't disappear.  And the question is who is the -- do you
have this person, is this person getting benefits, is the
expectation the person will end up staying on the payroll?

PAM URBAN-MORIN, Grant Administrator, Department of
Safety:  Good morning.  We are pitch hitting for Director Colby
and Commissioner Barthelmes.  I'm Pam Urban-Morin from the
Commissioner's Office, the Grant Administrator.

STEVE KIANDER, Administrator II, Business Office,
Department of Safety:  For the record, Madam Chairperson, my
name is Steve Kiander and I'm an Administrator at Safety.

CHAIRMAN SMITH: Glad to have you here.

MS. WARREN:  The question I believe is, is this person
going to be coming full-time a state employee and the answer is
yes.  This is the J-1 Grant Program which we've been here
several times amending the grant and extending the grant over
the years.  It's federal funds in three separate federal grants.
And the grant funds for this position will carry us through, I
believe it says in the record, through the end of the next Fiscal
Year, at which time we are -- the position has been put in to be a
permanent state position.  There will be additional federal funds
in the open grant period that may be accessed with federal grant
approval or we would explore, obviously, other options if the

*Joint Fiscal Committee*

*November 21, 2008*

position is still valued in the process.

I would also offer the J-1 Project by hiring this position, we are replacing a significant amount of consulting dollars that we are using now with the Justice Works Program at UNH.  So it's actually a cost savings to the federal grant dollars from that perspective and it's keeping in the vein of reducing our consulting costs to the state.

CHAIRMAN SMITH: Thank you.  Are there any other questions?  There's been a motion.  Any further discussion?  All in favor?  Opposed?  The motion carries.  Thank you very much.

\*\*\*  {MOTION ADOPTED}

### (7)  RSA 12-G:42, XI Pease Development Authority, Adoption of Rules:

CHAIRMAN SMITH:  We now move to item number (7), and Senator Kelly's in the wings.

SEN. D'ALLESANDRO: Senator Kelly, she's ready.

CHAIRMAN SMITH: Mr. Marconi, I believe you have a report to give us as to what the Pease Board --

GENO MARCONI, Director, Division of Ports and Harbors, Pease Development Authority:  Yes, Madam Chair.

CHAIRMAN SMITH: It's not that we are working this under the wire here, Mr. Marconi, but.

MR. MARCONI:  I appreciate, Madam Chair, Members of the Committee, I appreciate your indulgence with this matter because of the timing situation.  I received the end of the year financials from the PDA finance department in September and under the Code of Administrative Rules I'm required once a year to review those financials, how they are relative to the mooring fee structure that we manage through the Division of Ports and

Harbors.  The process is quite lengthy where we are required to advertise it and post it 30 days' comment period and then another 30 days to go to the PDA Board of Directors for adoption of the initial request for fees -- excuse me -- and then we are required to come to Fiscal Committee for action and then we have to go back to the Pease Development Authority Board of Directors for final adoption of the mooring fee structure, all within the time period where we are required under the Code of Administrative Rules on or before January 15th of each year to mail out the applications for those mooring permits.  So everything gets compressed from the end of the Fiscal Year to January 1st.  So I appreciate your indulgence with this, Madam Chair.  Jeff has passed around the certified Board motion which was approved yesterday at the PDA Board of Directors authorizing me to come here today with this request.

CHAIRMAN SMITH: Thank you very much.  I note that present in the room the Chair of the House ED&A Committee, and Mr. Marconi one of the first things I would be most interested in is whether between now and the middle of next week it would be possible to develop an LSR that removed the Fiscal Committee from this process, because I don't actually think there's any reason for you to have to jump through these hoops or for us to have to jump through these hoops in terms of setting the schedule of mooring fees.  And I say that as someone who lives on the seacoast.

MR. MARCONI: I can only give you the history that I have on how this precipitated.

As you know, back in 2000 there was an audit that was done of the Old Port Authority which was not very complimentary to the agency at that time.  Ergo, the agency was merged with the Pease Development Authority and became the Division of Ports and Harbors.  The responsibility for managing the mooring permits in RSA 12-G requires us to go through the 541 rules, administrative rules adoption process, which is itself quite lengthy.  Because of the financial structure that the legislature was looking at at the time, it's my understanding that this was a more direct route for getting the mooring fee structure

adjusted on a year to year basis as the -- as the finances of that -- of that section of my department called for.  Otherwise, the statute calls for us where we would have to go through the 541 process to have any changes to the rules done.  That's my understanding of it, Representative.  I could be wrong, but having sat in on all of those hearings that was the testimony that I heard at the time.

CHAIRMAN SMITH: Thank you.  I find it very depressing that this is the more efficient way to go.  I can only imagine how it could be more difficult.  But having vented on that, and I thank you for letting me vent, is there a motion?

** SEN. D'ALLESANDRO: Move approval.

CHAIRMAN SMITH: Moved by Senator D'Allesandro and seconded by Representative Weyler.  Is there any discussion?

REP. WEYLER: Discussion.

SEN. D'ALLESANDRO:  I just have one question.

CHAIRMAN SMITH: Yes, Representative Weyler has a question, I think, and then Senator D'Allesandro.

REP. WEYLER: Thank you, Madam Chair.  Mr. Marconi, two questions actually.  When was the last time we increased the mooring fees?

MR. MARCONI:  Four years ago.

REP. WEYLER: And what -- where do we stand with other comparable states for mooring fees?

MR. MARCONI:  It's difficult to compare those, Representative, because we are the only state that I'm aware of, at least on the East Coast, where the state itself controls the mooring program.  In other states, our neighbors on either side and all the way down the coast, they are done by the municipalities.  For example, Kittery Point has their own harbor

master.  Kittery has its own harbor master.  The Town of Eliot has its own harbor master.  Because they're very well-defined areas within those municipalities where the State of New Hampshire our mooring areas touch on multiple communities. For example, in Little Harbor down between Newcastle and Rye, the moorings, some of them are in Rye, some of them are in Portsmouth.  I mean, excuse me, Newcastle.  So back in 1957, I believe, when the legislature established the Port Authority and established the mooring permits system, it was taken over by the state.  Before that it was go put your mooring in the water and that's it.

REP. WEYLER: Thank you very much.  Thank you, Madam Chair.

CHAIRMAN SMITH: Certainly.  Senator D'Allesandro.

SEN. D'ALLESANDRO: Thank you.  While we have you here, Geno.  The progress on the pier, has the pier been completed?

MR. MARCONI:  I'm very glad to tell you, Senator, that yesterday was a rather historic occasion where I had the opportunity to walk out on the new dock.  It's not completed. Monday they will be pouring the final skim coat of concrete on the top of the deck, but structurally the facility is there and now we are -- we are fine tuning putting the equipment back on.  I would like to, knock on wood, say that the guys will be moving there officially by Christmas.

SEN. D'ALLESANDRO:  Thank you.

CHAIRMAN SMITH: Thank you.  We have a motion?  We don't have a motion.

**     SEN. D'ALLESANDRO: I move the item.

REP. WEYLER: Yes, we did.

REP. KURK: Pease?  I'm sorry.  Yes, I was one ahead.

Senator D'Allesandro moved, and Representative Weyler seconded approval.

CHAIRMAN SMITH: Is there any further discussion?  Not hearing any, all in favor?  And opposed?  The motion carries and thank you again very much.

*** {MOTION ADOPTED}

MR. MARCONI:  Thank you, Madam Chairman, Members of the Committee.

**(8)  RSA 126-A:3, VII Medicaid Hospital Outpatient Services; Designation in Operating Budget:**

CHAIRMAN SMITH: We now move to item number (8), that's item number (8) on the agenda and the Chair recognizes Senator Kelly.

SEN. KELLY: Well, thank you.  I hope I remember my questions.

CHAIRMAN SMITH:  I see the Commissioner here and I'm not sure who else the commissioner would like to have join him. This is the issue relating to the reimbursement rate paid to non-critical access hospitals.  Good morning, Commissioner.

NICHOLAS TOUMPAS, Commissioner, Department of Health and Human Services:  Good Morning, Madam Chair.  For the record, Nick Toumpas, Department of Health and Human Services.  And with me is Katie Dunn, Medicaid Director of the Department.

CHAIRMAN SMITH: Good morning.  We are very glad to have you.  And Senator Kelly has a question.

SEN. KELLY: Thank you, Madam Chair, and welcome and thank you for taking my questions.  Just had a few questions on this particular item.  The big one here just to begin with are broad is the purpose and then how you arrived at that figure 54.4

*Joint Fiscal Committee*

*November 21, 2008*

percent.

MR. TOUMPAS: You want to try?

SEN. KELLY: Go for it.

KATIE DUNN, Medicaid Director, Department of Health and Human Services: Sure. So the purpose of this reduction, the outpatient hospital reduction, is to allow the Department to bring that specific line item which has its own line item in the provider payments budget within the budget that was provided to the Department. How we arrived at that was looking at what our current outpatient reimbursement is which is based on cost base reimbursement and at the time it was 81.24 percent. And we projected out utilization, our growing caseload and predicted to the end of the year what it was we were expecting to have to expend. And based upon that, in order to stay within the budget appropriated to the Department, we needed to reduce the reimbursement down to the 54 percent.

SEN. KELLY: Follow-up?

CHAIRMAN SMITH: Certainly.

SEN. KELLY: What I understand is that on that particular line item --

MS. DUNN: Hm-hum.

SEN. KELLY: -- you made a decision on that particular amount, that percentage, so that you would balance the budget on that line item.

MS. DUNN: That is correct.

SEN. KELLY: And has that ever happened before?

MS. DUNN: Yes, it has, although not to this degree. We -- a number of years ago reimbursement was at 91.27 percent and during the last biennium, again, outpatient hospital costs used to

actually be buried in the larger provider payments budget but because we were seeing such a huge growth in that line item during the 08-09 biennium budget process, the decision was made to pull that out as a separate line item so that we could track it closer.  And I might have that wrong.  It might have been 06-07 that we actually pulled that out.  So there was also a budget footnote that basically told the Department, and you'll see it in the fiscal item, that we had to maintain and have the end of the year finish based upon the amount of money appropriated by the legislature.

SEN. KELLY: Follow-up?  Just when you mention growth, and you also mentioned that it was based on previous years, so is this a cost here that you see is a projected growth based on figures or is it based on what happened in the past?

MS. DUNN: It's based upon what we are currently seeing. So in the past when the reimbursement was at 91.27 percent, we monitor our budget on a weekly basis.  And we saw that outpatient services were increasing in terms of utilization and caseload was going up, and at that time we brought a fiscal item forward and Fiscal Committee approved reducing reimbursement down to the 81.24 percent.  We have always excluded the critical access hospitals from that reduction so they remain at the 91 plus percent.

What is happening now is that -- and I don't think anyone could have ever predicted the economic turndown that happened -- but we are seeing a huge growth in our caseload. Outpatient services continue to grow.  More stuff is moving from the inpatient to the outpatient setting.  And based upon what we are seeing in that caseload growth, we are projecting the deficit that you see in the item.

SEN. KELLY: Another follow-up.  I think my question, my concern is that if there's a growth of need --

MS. DUNN: Hm-hum.

SEN. KELLY: -- and we see then the cost go up --

*Joint Fiscal Committee*

*November 21, 2008*

MS. DUNN: Hm-hum.

SEN. KELLY: -- and we are going to then limit the reimbursement --

MS. DUNN: Hm-hum.

SEN. KELLY: -- the people who are being served, I guess it's two questions, how do we serve those people and the second question is what are we asking of the hospitals?

MS. DUNN: And I would respond that that's a quandary all the healthcare providers are finding themselves in, not just the hospitals.  Medicaid enrollment is off the charts.  The number of applications that are coming in from higher income families that we never saw before is also staggering.  So when you are looking at the need to balance your budget based upon what you're appropriated by the legislature, the tool that I have before me at the moment is to reduce rates in order to come into compliance with state law.

SEN. KELLY: I'm sorry, but I do have one follow-up.

CHAIRMAN SMITH: Certainly.

SEN. KELLY: So you're saying this growth and this need that you see is a reflection or a consequence of the economy nationally?

MS. DUNN: I think it's a combination of a number of things.  First, in terms of the current budget '08 and '09, when the Department was appropriated its amount of funds, the growth assumptions that were used in the final determination of our budget were less than what the agency had put forward for request.  That's the first issue.

The second issue is more and more services are being shifted to the outpatient setting.  More and more hospitals are purchasing physician practices.  We are seeing those physician

*Joint Fiscal Committee*

*November 21, 2008*

practices become departments of hospitals. Therefore, we are seeing an increase in the number of claims for facility fees.

Third, because of the turndown in the economy, yes we are seeing a growth in our caseload and that just brings with it its own demand. Not just for hospitals, it's for all healthcare providers.

SEN. KELLY: And follow-up?

CHAIRMAN SMITH: Certainly.

SEN. KELLY: I also see in this item that there's an exception for critical care designated hospitals. How were those designated?

MS. DUNN: Critical access hospitals are designated by the Center for Medicare and Medicaid Services or CMS. It's actually a process that allows them to meet certain criteria to receive an enhanced Medicare reimbursement for inpatient services, where they have to meet certain criteria. Their numbers of beds are limited. The number of bed days are limited. The State -- the State's role in that process is to help be the eyes of CMS in terms of going through the certification process. Any hospital that's designated a critical access hospital has demonstrated that their financial status is not as in good a shape as some other hospitals and, therefore, looking at the State of New Hampshire, looking at where our critical access hospitals are, taking for instance the situation in the North Country with their own separate economic problems long before this national economy, we have historically exempted them from these rate decreases because the thought is, if they do close, there isn't another hospital around as opposed to if you looked at the southern part of the state.

SEN. KELLY: Thank you, Madam Chair. Thank you.

MS. DUNN: You're welcome.

CHAIRMAN SMITH: Certainly. Senator D'Allesandro.

*Joint Fiscal Committee*

*November 21, 2008*

<u>SEN. D'ALLESANDRO:</u> Thank you, Madam Chairman. Thank you, Katie. Nice to see you. Thank you very much Commissioner for coming. The problem that I see is the activity is growing dramatically in the southern tier.

<u>MS. DUNN:</u> Hm-hum.

<u>SEN. D'ALLESANDRO:</u> The southern tier hospitals are really going to get hit by this reduction. Those southern tier hospitals happen to be in my district and in Senator Gatsas's district. The outpatient services there are growing dramatically; dramatically. And I would think as we move forward is there anything being contemplated to deal with this in a different manner? Because we can't keep reducing the rate. I mean, even if you appropriate huge sums of money, it's -- it's the amount of activity that's taking place is the killer. And that activity because of the items that you mentioned is growing quite dramatically. Hospitals are buying up physicians. More and more of this activity is taking place on an outpatient basis. There's something going wrong here that we have to address in a much broader -- much broader manner.

<u>MS. DUNN:</u> I agree with you. And I would actually let -- ask the Commissioner to speak to this. It's one of the reasons why he's taken the lead on bringing the stakeholder councils together to look at transformation. Even if the Federal government comes through with enhanced Medicaid match it is not going to solve our problem. We will be right back here a year from now. So we do need to look at some transformative plans to change how healthcare is delivered in this state and not just for Medicaid. It's across the Board.

<u>MR. TOUMPAS:</u> We believe, Senator, that we have a -- a serious issue. As Katie has indicated, the issue that we are bringing forth here regarding the hospitals is no different from community health centers, from the nursing homes, from every other service provider that is feeling -- feeling the pressure in terms of some of the rising costs and so forth. So we believe very strongly that in the midst of this crisis that we have at a fiscal level, nationally and at the state, it's an unprecedented

*Joint Fiscal Committee*

*November 21, 2008*

opportunity to look and gather people together and to talk about transformation because as we've indicated, business as usual and just staying with the same models is just not going to work. There's no amount of money that would be able to come up with in order to be able to deal with that. So we have pulled together people so that we are having -- beginning the dialogue regarding this on some transformative type of issues that we'll do in the health and medical area, long-term care, as well as the human services segments of our operation.

SEN. D'ALLESANDRO: If I may?

CHAIRMAN SMITH: Certainly.

SEN. D'ALLESANDRO: I think it's important for us to recognize that. Your key statement was no matter how much money you pump into it, it will never be enough if we continue to practice as it is now.

MR. TOUMPAS: With the growth of the population, with the aging of the population, with the rise -- with the rising cost of cost across the Board, not just in healthcare, but in other areas, again, it's just not a sustainable model. As we've indicated, if you were looking at it from the business standpoint, if I were designing my distribution system to be able to put services out into the market that I'm serving, what we have today would not be what a thoughtful group of people would come up with. So it's there, we can't just hit the reset button, start with a blank sheet of paper and start over again. So it really is getting people together and understanding what we have at a system level problem and then engaging in some constructive dialogue to figure out what are some options. And there are some things that we could do, but given the -- given the urgency of the moment in terms of where we are, this is the only mechanism that we have and recognize -- we acknowledge the difficulty this causes for the hospitals, but as Katie has indicated, this is by no means limited to the hospitals. Were we not to do this today, we will run out of appropriation, probably in the March or April time frame, and by when we do that, that will -- that will impact not only the hospitals that are subject to this reduction but also

the critical access hospitals.

SEN. D'ALLESANDRO: Thank you, Madam Chair.

CHAIRMAN SMITH: Certainly.  Senator Janeway.

SEN. JANEWAY: Thank you, Madam Chair.  I do applaud you for the transformative effort, that's obviously what's needed; but in the meantime, I have a couple of more detailed questions. The first on the retroactivity, back five months.  Is that legal? Will it be challenged?

MS. DUNN: Yes, it is legal to do that.  It is -- and it is something that the State has done in the past.  If we don't make it retroactive, thinking quickly on the top of my head, patient reimbursement would probably drop to somewhere between 10 and 20 percent instead of the 54 percent.

SEN. JANEWAY: Follow-up?

CHAIRMAN SMITH:  Certainly.

SEN. JANEWAY: I suppose you could ask the hospitals this, the donor hospitals as I call them, but what effect does this likely have on their pricing in terms of cost-shifting in your view?

MS. DUNN: I think that the hospitals are already facing the whole issue of cost-shifting.  In discussions with the hospitals, they know they're cost-shifting to the insured population and that's not unique to New Hampshire, certainly not New Hampshire Medicaid.  So that's why I said in my earlier comments, whatever is going to be done around healthcare delivery in New Hampshire isn't just Medicaid.  It's going to be a much broader discussion because whether we are cost-shifting to the insured or the counties or the towns, we are also being cost-shifted to by the federal government.  CMS, despite the fact that we have a new administration coming in, has already is in the process of finalizing two rules, one of them having to do with the definition of outpatient hospital services, despite state Medicaid

*Joint Fiscal Committee*

*November 21, 2008*

director's request to please stop forcing through federal regulations at a time when there's an administrative change.

SEN. JANEWAY: One more.

CHAIRMAN SMITH: Certainly.

SEN. JANEWAY: Presumably there's going to be some -- perhaps a series of fiscal stimulus -- federal fiscal stimulus programs --I'm grasping at straws -- but shouldn't there be some understanding that to the extent there is additional federal stimulus that it stays within this program to help alleviate that and doesn't get steered to the general fund or something else?

MS. DUNN: Well, that would be on my wish list. I just would caution with two statements or three things. One is that we have to be really careful. There's four proposals out there right now for increasing the federal match on Medicaid. And the devil's always in the detail.

One of the proposals calls for an 8 percent increase in federal match, which is worth a considerable amount of money for this state. One calls for 5 percent. The big part that's unknown is that in the past the states -- all the states receive the same amount of money. What we are hearing now is that they will -- CMS will pro-rate, so New Hampshire may not get a full 8 percent or 5 percent. It would be based upon number of Medicaid eligibles and different demographic factors. So even if Congress decides to pass 8 percent, we have to see what CMS does in terms of implementation and what final negotiations are made.

The second comment is just that the Governor had said earlier that his priority would be to restore some funding back to the department, and I think I'll let Commissioner speak to that.

MR. TOUMPAS: What I -- I also wanted to just put a price tag, if you will, on if the 8 percent enhancement were to come through, we estimate that would be about $125 million over five quarters. All right. So, again, in the overall scheme of things, it

*Joint Fiscal Committee*

*November 21, 2008*

is not -- I mean, it clearly would help, but it is not -- it is not going to be a savior for everything, number one; and number two is we, as Katie had indicated, first off, there's no sure thing in terms of what the federal government is going to do and then as she puts it, the devil is in the detail.

CHAIRMAN SMITH: Representative Kurk.

REP. KURK: Thank you, Madam Chairman. Commissioner, it seems from the information we've given and from information that's been presented to the Committee before, that a good part of this problem is due to the change in practices of hospitals in acquiring physician practices and engaging in some creative billing which is much more expensive than it otherwise would have been.  Of the additional $25 million that you think this account will cost us, beyond what's been appropriated, how much of that is due to the hospitals' changes that I've just described, the 510 billing entry.

MR. TOUMPAS: I'm going to address it at one level and then I'm going to turn it over to Katie.  The issue of hospitals acquiring physician practices is a national phenomenon.  It's by no means limited to New Hampshire.  And in talking with the Hospital Association, we do understand that some of those physician practices do have some financial challenges to begin with and hence, that's one of the reasons why they're acquiring them.  The use of the Code 510, the revenue Code 510, has accelerated over the past year.  We estimate that right now I believe the total would be -- total dollars to be about $5 million a year.  Total dollars.

REP. KURK: Of the 25?

MR. TOUMPAS: Yes.

MS. DUNN: And if I may just add?  The Commissioner's correct about the issue of some of the primary care and specialty practices being in trouble financially.  I would add to that that we have our whole workforce issue around being able to recruit and retain primary care and specialty physicians.  So for some

hospitals, in order to retain those providers in their community, the providers are saying, you know, buy my practice. I don't want to be dealing with the billing hassles any more. I want to do my clinical work and leave all the administrative stuff to you. The outpatient rule that's currently in final form from CMS changes the definition of outpatient services and we are in the process of working through that rule right now and putting together a impact paper for New Hampshire and we'll be scheduling a meeting with the Hospital Association and hospital representatives to talk about how to roll out a plan to come in compliance. The due date for compliance is actually December 8th despite Medicaid directors letting CMS know that publishing a rule with a 30-day window seems a bit ridiculous. So that will, I think, have some impact on the 510 Code issue, sir.

REP. KURK: Follow-up? Would you care to tell us which way it's going to have an impact?

MS. DUNN: I think it's going to limit hospitals' ability to bill for a facility fee for certain services provided within the physician office.

REP. KURK: Thank you. Follow-up of an additional question? This statutory requirement in the budget that if there isn't enough money to pay the bill you cutback on the rate, it's what's -- another version of what we call budget neutrality. Is that something that requires modification to the State Plan and if so, has that been obtained?

MS. DUNN: It does not require State Plan amendment.

REP. KURK: Okay. And the next question then is let's assume that your estimates are incorrect. Instead of $91 million, the total cost is $87 million. There's a $4 million surplus. What will happen to that money?

MS. DUNN: Hum -- at that point because outpatient line item is a specific line item, I believe it would be the Department's responsibility to come back and report that to Fiscal and then a decision needs to be had -- I mean a discussion

needs to be had regarding whether we restore any of those rates or not.

REP. KURK: Follow-up?  So the issue, so we don't -- so we avoid the nursing home contretemps, the concept is that you're not going to make that decision.  The legislature through Fiscal is going to make that decision as to what to do with any surplus?

MS. DUNN: I believe that is what should happen because of the sensitivity around the fact that we are drastically reducing outpatient hospital rates and that would be my recommendation to the Commissioner not to say, oh, just use that surplus someplace else.  As you know, provider payments has its own issues outside of just outpatient hospital services.  I think it would be the Department's responsibility to come back and bring that to the Fiscal Committee.  That's the requirement we've been under for a number of years now.

REP. KURK: Follow-up?  Isn't the language of the budget reasonably clear that you shouldn't, in fact, be coming back to Fiscal if you need to raise the rates again, but that you should be doing it automatically?  In other words, on June 30th the $4 million would be encumbered and there would be a retroactive rate increase, because that would comply with the basic concept that this is supposed to be a self-sustaining budget neutral kind of action.  I'm suggesting that because I'm trying to avoid another one of these nursing home situations.

MS. DUNN: I understand that, sir.  The reason I'm saying that as the State Medicaid Director is, again, hospitals are not the only provider in this that have a stake in this particular process.  And I believe that it is the responsibility of the Department if we don't ask for permission that we at least inform you of what it is that we are going to do so that we are being responsive to all of the Medicaid providers who are all being impacted by the current executive order and just ongoing low Medicaid reimbursement rate.

REP. KURK: So you're telling me that the Department will make a decision and let us know about it, but will not request

*Joint Fiscal Committee*

*November 21, 2008*

permission as you're now requesting permission under the statute to reduce the rates?

MS. DUNN: What I'm telling you is that if we are in the envious position of having surplus money --

REP. KURK: In this line.

MS. DUNN: -- we will make a decision at that time and look at the language that's specifically in the budget.

REP. KURK: Thank you.  Thank you, Madam Chairman.

CHAIRMAN SMITH: Are there any other questions? Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman.  I just have a couple, I guess, Commissioner.  I'll come back to the sobering statement you just made that said that if the utilization is increased above where we are seeing it today, that you could be out of money in March or April.

MR. TOUMPAS: No.  If this is not -- if we do not do this today, if the Fiscal Committee chooses not to act on this item today, come the March or April time frame, given the projections that we've made in terms of utilization, and again, we put this -- we put this item together back several weeks ago and the economic situation continues to deteriorate.  If anything, I'm not sure we are looking at a surplus.  I think we are looking at additional challenges in this particular area.  But should we not be able to act on this right now, we would run out of money in this particular -- this particular appropriation somewhere in the March or April time frame.  And at that point we would begin pending payments, not only to the hospitals that are affected directly by this item, but also to all the critical access hospitals, as well, because now they're part of that -- they are part of that appropriation as well.

SEN. GATSAS: Follow-up?

MR. TOUMPAS: So it compounds our problem.

SEN. GATSAS: So I'm looking at the page three.

MR. TOUMPAS: Page?

SEN. GATSAS:  Page three of the item.  And I look in '07 the outpatient growth and the '08 outpatient growth, but I don't see a number for '09.  I think you may have provided one for the Legislative Budget Office yesterday.

MR. TOUMPAS: Do you have that Marilyn?  Excuse me one second.  We did provide that.  Yeah.  What we provided to in response to the LBA was we took the budget projections and showed a projection for state fiscal -- for State Fiscal Year '08, first quarter of '08 to first quarter of '09 and showed the increases.  That's being passed out, that Mike is passing out right now.

SEN. GATSAS: So those percentages -- if I may, Madam Chairman?

CHAIRMAN SMITH: Certainly.

SEN. GATSAS: Those percentages cost per patient basis looks like they're increasing at 19 percent rather than 8 percent?

MR. TOUMPAS: What we have before us is the earlier projection that we made on quarter to quarter.  The first quarter projection for '08 to the first quarter of '09.  We don't have the full year that Mike is passing out.  So if you hold on one second we'll grab that.

SEN. GATSAS: I think it's just to confirm Representative Kurk's idea that there's going to be a surplus.  I think there's going to be a much larger shortfall.

MR. TOUMPAS: I believe the item that you have before you says FYTD 9/30/07.  That should read 9/30/08 and the other one should read 9/30/09.

*Joint Fiscal Committee*

*November 21, 2008*

CHAIRMAN SMITH: This is as to question two.

MS. DUNN: Right, answer to question two.

CHAIRMAN SMITH: Okay.

SEN. GATSAS: If I may, Madam Chair?

CHAIRMAN SMITH: Certainly.

SEN. GATSAS: Didn't I just hear your testimony that that really wasn't the accelerated use but that it's even higher in this quarter since we are seeing a downturn?

MS. DUNN: What we are seeing, Senator, is on a monthly basis our caseloads are starting to climb. New Hampshire does run a little bit behind in terms of when unemployment hits on a national level. New Hampshire's behind anywhere from 6 to 12 months. We are starting to see our caseloads just go up now. So on a weekly basis we are going to be monitoring this and we'll be doing new projections, basically on a week by week basis. Because it's too -- at this point we don't know when the bottom is going to finally hit on what's going on economically. What this tells you is that based upon the best information we have right now this is what we are predicting.

SEN. GATSAS: Follow-up, Madam Chairman?

CHAIRMAN SMITH: Certainly.

SEN. GATSAS: If I take a look at page two and look at the bottom the budgeted amount is 69 million. The expenditures are 95 million in the letter.

MR. TOUMPAS: What page you on, Senator?

SEN. GATSAS: On page two. I'm sorry, at the bottom.

MR. TOUMPAS: Page two of the --

*Joint Fiscal Committee*

*November 21, 2008*

SEN. GATSAS: Of the item.

MS. DUNN: Yes.

SEN. GATSAS: And if I --

MS. DUNN: Right.

SEN. GATSAS: If I took a look at these projections, it looks like the 21 million in the first quarter is going to be accelerated from there.

MS. DUNN: It could be that we end up having, as you were saying to the Representative, not a surplus but even a greater -- a greater hole in the budget.  But I can't tell you exactly how much or when that would happen.

I would also add that the Department in looking at all of its provider payments accounts looks to try to balance any deficits internally and so we've been under a significant personnel freeze, any Class 20 monies, spending freezes, travel freezes, I mean in-state, not even out-of-state, and we are doing everything we can to not have to impact the providers.  Because we know even the smallest impact to providers is going to ultimately impact Medicaid recipients, and we are really trying not to do that.

SEN. GATSAS: Follow up, Madam Chair?

CHAIRMAN SMITH:  Certainly.

SEN. GATSAS: There is a reason why I'm questioning this because I go back to the document that we were given for budget cuts and in that document it says outpatient costs settlements?

MS. DUNN:  Yes.

SEN. GATSAS: Of 2.2 million.

MS. DUNN: Yes.

SEN. GATSAS: Is that number based before the 54 percent reduction or after?

MS. DUNN: Those outpatient costs settlements are based upon -- are from previous fiscal years. So the 2.2 million that we are expecting in settlements from the hospital from previous fiscal years we knew would be revenue coming in this Fiscal Year and so we put that towards the original 31.7 million that the Department was to identify in cuts for '09.

SEN. GATSAS: So it's not a 54 percent cut because those were settlements that the hospitals were expecting back.

MS. DUNN: No, that's money that the State overpaid the hospitals.  See what happens --

SEN. GATSAS: That's money the State would have paid the hospitals.

SEN. KELLY:  No, overpaid.

SEN. GATSAS: Or overpaid.

MS. DUNN: Right, because they receive an interim rate and because outpatient services are based on cost-based reimbursement, which is the bane of my existence and want to move away from that system, they get an interim rate.  Then they submit all of their costs to our fiscal intermediary which for the CMS in this region is Anthem.  They do -- they go through all the costs and then they come out at the end of the report and say either hospital you owe the state this much or state you owe the hospital.  In this case we were anticipating 2.2 million coming back to the State.

CHAIRMAN SMITH: Representative Kurk.

REP. KURK: Thank you, Madam Chairman.  My prior comments, questions about a surplus were not -- should not be taken to mean that I'm that kind of an optimist, but just to

*Joint Fiscal Committee*

*November 21, 2008*

make the point --

MS. DUNN: Understood.

REP. KURK: -- that we are creating another problem for ourselves with another budget neutrality without rules which could get us into significant additional legal problems. The question is -- I guess is this: I believe each of the hospitals who are -- who will be affected by this reduction generated a surplus for '08 or a profit if they were a "for-profit" hospital. Is the amount of this cut going to reduce that surplus and what might be carried forward to '09, such that they would be incurring losses? In other words, the suggestion was made that one of the ways that this -- this reduction would be dealt with by the hospitals is to cost-shift it onto insurers. But there is another way. The hospitals could absorb this out of their surplus. So the question I'm asking is do we know if the hospitals have sufficient surplus to absorb this kind of a cut or will they, in fact, have to cost-shift it just to maintain at least for the non-profit corporations, at least a break-even financial position?

MR. TOUMPAS: We don't have -- we don't have projections on a hospital by hospital basis in terms of what this would mean to their -- to their operating margin from the past year. That's a question that's probably better addressed to the hospitals or each individual hospitals. We don't have that information.

REP. KURK: Thank you.

CHAIRMAN SMITH: Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman. Commissioner, let's assume the utilization grew to the point that in April or March you're out of money.

MR. TOUMPAS: Could you repeat that?

SEN. GATSAS: Let's assume that utilization grew to a point that you're out of money in March or April. What do we

tell the hospitals?

MR. TOUMPAS: Basically what we are doing, Senator, is we are pending the payments.  So we are shifting the liability.  So it causes a cash flow issue for the hospitals.  Again, both the southern tier hospitals that are subject to this as well as the critical access hospitals.  And it is -- it is shifting a liability, a deficit into the next Fiscal Year because we would not be able to pay this.

SEN. GATSAS: I think the question -- maybe I need to make it clearer.  You said that if utilization goes up, you may not be able to make payments.

MR. TOUMPAS: No, no.  Based on -- based on the projections that we have when this item was put together, we would have the $25 million deficit.  What we don't know with the current -- as you can see here, with the -- our analysis that we did here on the quarter to quarter, that it could be -- it could be worse by the end -- by the end of the year.  But when we put this item together, it was based on the information and the projections that we had at that time.

SEN. GATSAS: Right.  And if it is worse, would you have to cut outpatient hospital payment even greater than the 54 percent and make it retroactive?

MS. DUNN: The answer would be yes.  It's either that or pend payments sooner.  When the account runs out of money we cannot pay anymore bills.  That's why it's so imperative that we are monitoring our budget on a week by week basis.

CHAIRMAN SMITH: I think it's clear that this is not a situation that anyone is happy about.  It's one of the reasons why we very much would have hoped that we could take some of our limited state dollars and put them into prevention programs.  It's why we are so encouraged the possibility that the Department of Health and Human Services, which is responsible for half basically of the budget --

*Joint Fiscal Committee*

*November 21, 2008*

MS. DUNN: Hm-hum.

CHAIRMAN SMITH: -- might actually find a way to get the Department and relevant stakeholders to sit down at the table and say in a real world how can we best structure what we do to deliver essential services at a price that is manageable?  What we are facing today is a reality that if we do nothing, we know that disaster is only four months down the road.  If we do this, while other efforts continue for longer term adjustments, at least we might be able to hang on by our fingernails.

So I don't think anyone thinks this is the most wonderful thing -- item that we can consider, but I have not yet heard anyone offer an alternative suggestion.  And certainly if there were an alternative suggestion, I'm sure everyone starting with the Commissioner would be there.  So I think we have probably discussed this as much as makes sense, unless it just makes us feel better to keep on talking about it.  And unless anyone objects, I would -- I would ask for a motion.

SEN. GATSAS: I have one more question.

CHAIRMAN SMITH: Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman. Commissioner, if we had instituted the cut in April that you came to us with, the 61 percent, would that affected the amount of money that for the reduction that we are putting in place now?

MS. DUNN: Yes.  It would have been about a third.  So instead of the 20 -- sorry.  Instead of the $28 million that we are looking at it would have been more like $9 million, but that didn't happen.

SEN. GATSAS:  So how much would the percentage of outpatient reduction been from 81 percent would have been to 54 or less than that?

MS. DUNN: 62.8.

SEN. GATSAS: So let me make sure I understand.  If we had instituted the reduction that you came to this Committee with in April, then we wouldn't have had to make as drastic a cut right now to do that?

MR. TOUMPAS: That's correct.

CHAIRMAN SMITH: Thank you very much.  Is there a motion?

**     SEN. D'ALLESANDRO: Move the item.

CHAIRMAN SMITH: Moved by Senator D'Allesandro and seconded by Representative --

REP. KURK:  Kurk.

CHAIRMAN SMITH:  -- Kurk.  Is there any further discussion?  All in favor?  Opposed?  The motion passes.  Thank you very much.

***  {MOTION ADOPTED}

**(9)** **Chapter 42, Laws of 2006, as amended by Chapter 87, Laws of 2008 State Matching Funds for Federal Emergency Management Agency Disaster; Assistance Grants:**

CHAIRMAN SMITH:  We now move to item number (9) on the agenda.  Is there a motion?

**     SEN. D'ALLESANDRO: Move.

CHAIRMAN SMITH: Moved by Senator D'Allesandro.

REP. EATON: Second.

CHAIRMAN SMITH: Seconded by Representative Eaton. Is there any discussion?  Not hearing any, all in favor?  And opposed?  The motion carries.

*Joint Fiscal Committee*

*November 21, 2008*

\*\*\*  {MOTION ADOPTED}

**(10)  Chapter 263:28, II, Laws of 2007, Department of Health and Human Services; Program Eligibility; Additional Revenues; Transfer Among Accounts:**

CHAIRMAN SMITH: I move to item number (10) on the agenda.  Is there a motion?

\*\*  SEN. D'ALLESANDRO: Move.

CHAIRMAN SMITH: Moved by Senator D'Allesandro.

REP. EATON: Second.

CHAIRMAN SMITH: Seconded by Representative Eaton. Is there any discussion?  Not hearing any, I call for the question. All in favor?  And opposed?  The motion carries.

\*\*\*  {MOTION ADOPTED}

**(11)  Chapter 334, Laws of 2007, as amended by Chapter 87, Laws of 2008 State Matching Funds for Federal Emergency Management Agency Disaster Assistant Grants:**

CHAIRMAN SMITH: I move to item number (11).

\*\*  REP. EATON: Move approval.

SEN. D'ALLESANDRO: Second.

CHAIRMAN SMITH: Moved by Representative Eaton and seconded by Senator D'Allesandro.  Is there any discussion?  I call for the question.  All in favor?  And opposed?  The motion carries.

\*\*\*  {MOTION ADOPTED}

*Joint Fiscal Committee*

*November 21, 2008*

**(12)  Miscellaneous:**

CHAIRMAN SMITH:  At this point the Chair would recognize LBA, Mr. Pattison, for a request.

JEFFRY PATTISON, Deputy Legislative Budget Assistant, Office of Legislative Budget Assistant:  With the retirement of Mike Buckley, our office now has a vacancy, and as is the procedure we come to the Fiscal Committee to ask permission to fill that vacancy and that's what I would request from you this morning.

CHAIRMAN SMITH: Thank you very much, Mr. Pattison. Is there a motion?

**     SEN. D'ALLESANDRO: Move approval.

REP. EATON:  Moved

CHAIRMAN SMITH: Moved by Senator D'Allesandro and seconded by Representative Eaton.  Is there any discussion?  Call for a question.  All in favor?  And opposed?

***   {MOTION ADOPTED}

CHAIRMAN SMITH:  Mr. Pattison, is there any other business that you're aware of.

MR. PATTISON: None that I'm aware of.

CHAIRMAN SMITH: Thank you.  Does anyone have any comments or questions on informational materials?  Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman.  There's an item here that talks about the audits.  If I can just find it.

CHAIRMAN SMITH: Yes, are you referring to the exchange, it would be 335?

*Joint Fiscal Committee*

*November 21, 2008*

SEN. GATSAS: 335, you're correct, Madam Chairman.

CHAIRMAN SMITH: Yes. I would like to -- I was told this morning that you had a question about that. I had not known that in advance or I would have responded immediately to your question.

In point of fact, the Department of Administrative Services has not been conducting meaningful follow-up reports of the LBA audits. They, although there is a staff there, they have responded in 90 days without in any way having an appropriate time to get any information. Mostly they haven't done anything at all. And one of the real concerns that the Joint Legislative Performance Audit Committee has -- it took me a lot to get the title but I got it -- has spoken about is that there has been no meaningful follow-up on the audits.

I can speak only for the House. Of course, I cannot speak for the Senate. But because this was of very real concern, the House has begun doing several things and I'm sorry now that Chairman Irwin isn't in the room. But we have taken every audit that has been accepted by the Fiscal Committee, and as usual forwarded to all the relevant committees. But on the House side at least, we have been holding follow-up sessions where the Performance Audit staff has been invited to come to the -- to participate, to present in more detail the findings of the audit and the policy committees have been taking action following up on what legislative action needs to be taken, getting reports from the agencies as to what they are or are not doing. And in case after case, really for the first time in the dozen years that I've been here, the audits have now not been put on the shelf but are being acted on. It is within the House rules, generally speaking, now that -- that committees are to carry out oversight responsibilities.

Talking with Commissioner Hodgdon about the fact that there were people supposedly doing this and not doing it and at the same time within the Department of Administrative Services they had not taken any action to follow-up on their own audits about what was happening in the Department. The Commissioner

*Joint Fiscal Committee*

*November 21, 2008*

felt that she could use the people in her employ to do what is necessary to make the Department of Administrative Services function at a higher level, and that by making this change we were losing nothing in terms of any meaningful review of audits on the part of Administrative Services, and increasing the clarity of the responsibility of the legislature to provide oversight to the agencies through the existing policy committees. And that is the background on that.

I do see the head of the Audit Division here and I don't know if he has anything to add, or if you would like to hear from him.

SEN. GATSAS: The only question I have, Madam Chairman, I apologize that you didn't hear about it because I brought it up in pre-Fiscal on Wednesday.

CHAIRMAN SMITH: But, Senator Gatsas, I'm not privy to what happens to Pre-Fiscal on the Senate side. I'm only privy what happens on the House side.

SEN. GATSAS: Sometimes we as Senators aren't privy to what happens in pre-Fiscal.

CHAIRMAN SMITH: That's why I love it in the House, Senator Gatsas, and we'd be happy to have you join us.

SEN. GATSAS: Madam Chairman, I think the discussion certainly is a valid one; but if we are going to spend two hours or if the Fiscal Committee is going to spend two hours listening to audits that come before us, you know, I would think that that being policy, and the executive branch does what they have to do, I would think that to come back to this Committee to say here are the changes we are looking to implement in the next 90 days because of that awful audit that we just had, I would think this Committee would hear it rather than looking at the next audit that comes three years later and comes before this Committee in its -- you go to that back page and you see all those blank boxes that nothing was done about the recommendations that they made.

*Joint Fiscal Committee*

*November 21, 2008*

CHAIRMAN SMITH: I couldn't agree with you more, Senator Gatsas. But I would then ask you to go back in your experience on the Fiscal Committee and you tell me the last time that you received a meaningful, substantive, partially helpful report from the Department of Administrative Services as to their follow-up on it so that in the best of all possible worlds, wouldn't that be wonderful. But, in fact, the follow-up is going to have to take place in the agency and what we are trying to do is to say if you have -- if you have something that is not giving us what we need, let's see what we can do to get what we need. I think that's the same approach Commissioner Toumpas is trying to take in saying is there a better way to organize the department. And why should we keep on doing things the same way if we end up not getting anything meaningful. So we get 90 days later something that doesn't tell us a thing that has any substance.

The Board of Medicine came to the first meeting of the policy committee's review kicking and screaming, and they left at the end with a very positive feeling that, in fact, the legislature was listening to the problems, was working with them. There's now been the start of the same process with the parks people.

Again, one of the most notable audits recently, one very important audit, where the relevant people up until now have continued to resist cooperating with the legislature is the Secretary of State who so far has refused to agree to meet with the appropriate legislative committees, but we hope we will be able to be convincing enough to encourage that Department's cooperation.

As you well know, there is legislation on the books now which exempts the Secretary of State from performance audit reviews. It was a financial audit that came forward that was presented which raised some very serious questions and there are things that perhaps the legislature is doing to help the Secretary of State carry out his responsibilities. We ought to know what that is and we ought to move to do a better job and we certainly

hope that we'll be able to do that.  But in just those three examples in the last six months, I think we might be actually moving the audit process into the 21st Century.

SEN. JANEWAY: May I?

CHAIRMAN SMITH:  Certainly.

SEN. JANEWAY:  Thank you, Madam Chair.  As outgoing Chair of that Committee, I think the House solution, if I could call it that, is appropriate.  And I think having these committees, the relevant committees given the responsibility is right and also adds to their understanding and it's the appropriate place.  And the fact that it's not being done at Administrative Services we might as well recognize and see that it is done where audit is done.

CHAIRMAN SMITH: Thank you very much, Senator Janeway.  Does anyone have anything else to add to the deliberations of the Fiscal Committee?

REP. KURK:  Question.

CHAIRMAN SMITH: Certainly.

REP. KURK: The last item, something that I haven't seen before, and I don't know if it requires our action or not.  This is the information item 08- 347, where the Performance Audit Committee is saying they're going to discontinue an audit that was previously approved.  Is this something that we need to act on by statute or is this something they can do and this is simply a courtesy notice?

CHAIRMAN SMITH: Thank you very much.  The Chair recognizes Mr. Mahoney who is the head of the Audit Division.

RICHARD MAHONEY, Director of Audits, Office of Legislative Budget Assistant: Thank you, Madam Chairman. Good morning, Members of the Committee.  For the record, my name is Richard  Mahoney.  I'm the Director of Audits for the

Office of Legislative Budget Assistant.

Representative Kurk, I am not aware of any statute that requires this Committee's approval to discontinue an audit that this Committee has previously approved; but I believe the statute is silent in that regard.

REP. KURK: Thank you.  Thank you, Madam Chair.

CHAIRMAN SMITH: I would like to -- thank you very much.  I think that's it.

I would like to add, barring something not anticipated, this is the last meeting of this Fiscal Committee.  A new Fiscal Committee will be formed at the organization day, and I would like to personally, you know, thank everyone for working on some very difficult and complicated issues.  I'd like to acknowledge that two of our most helpful members will not be back in the legislature next term and that is Representative Ken Weyler and Representative Peter Franklin and like to thank them for their very fine work here at Fiscal Committee.  I think each of them will see in the future some results of their concerns. And, of course, after ten years we will now have seen the end of the service of, I guess, the first, second, third legislative budget analyst.  Have I left anyone out?

MR. PATTISON: I think historically there have been five LBAs held that position.

CHAIRMAN SMITH: Oh, dear, I have left people out. Well, okay.  And for the last ten years we have been -- this body, the Fiscal Committee, the finance committees, and the legislature, have been served in the most exemplary way by Michael Buckley.  I refer to him as the poster child for succession planning because one of the things that Mr. Buckley has done so phenomenally well is make sure that every person who comes in to his division is trained, is professional, has the highest standards of integrity, function in a non-partisan way, and Mr. Buckley all along was helping to develop and increase the skills and the ability of the members of the LBA staff so that

we will be able to move on to the next LBA without a wrinkle. And if only every agency could follow that pattern, we would have a very finely tuned state operation.  But I will both personally and professionally miss the wise counsel and advice of Mr. Buckley, and I feel confident that I'm speaking for everyone when I -- we all wish him well and look forward to seeing what the next chapter will bring.

   SEN. D'ALLESANDRO: Madam Chair, if I just might. Acquiesce your sentiments with regard to Mr. Buckley and the great work he's done, but our colleagues that aren't coming back have just been terrific members, not only in this Committee but have been friends throughout this process and have worked collaboratively on many things.  And Ken Weyler's been just a great person to work with and I appreciate all of the work he's done for the State and for me personally.

   Representative Franklin, certainly appreciate the work that you've done for this Committee and the State and it's not easy to do this work, but they do it so well and that collegial relationship that we hope is established here, I hope it carries on. We provide that as an example for future legislators.  Thank you very much, both of you, for your great work.

   REP. KURK: Madam Chairman.

   CHAIRMAN SMITH: Thank you very much. Representative Kurk.

   REP. KURK: Thank you.  I echo your -- I also echo your statements about Mike Buckley.  He provided some extraordinary nuanced and helpful, politically savvy, economically savvy, and budgetarily savvy advice to many members of this Committee, and I hope his successor will be able to continue that practice.

   I do have one comment that I'd like to make for our departing colleagues and this is aimed at Representative Weyler and perhaps some agency heads who are not here.  Each of us seems to take a bite out of a particular kind of problem that comes before this Committee and Representative Weyler has

*Joint Fiscal Committee*

*November 21, 2008*

made himself known and feared far and wide among commissioners for his concern about the use of our automobile fleet.

Now, it's true that he won't be around next term and I don't want commissioners in any way to become somewhat self-satisfied and not think there's a problem because either in your dreams or in reality, Representative Weyler will be back and this will be on the table either by him or by others. So thank you very much, Ken. We really appreciate your help in that area and so many others. And I among many other people really, really, will miss you.

CHAIRMAN SMITH: Senator Gatsas.

SEN. GATSAS: Thank you, Madam Chairman. Certainly, I want to echo everybody's sentiments about Mr. Buckley. That department has absolutely shown that it's non-partisan. They have worked with everybody in a very fair manner. And also, Madam Chairman, I want to thank you for allowing us to express our opinions, making transparency something that is obvious to everybody, and certainly for your guidance and issues that sometimes may have been very painless.

CHAIRMAN SMITH: Thank you very much, Senator Gatsas. Your kind words mean a lot to me. Anything else to come before us? I guess we will adjourn at the call of the Chair in the unlikely event we might need to meet again and with that motion, I didn't wait for one.

REP. KURK: Fine.

CHAIRMAN SMITH: We are adjourned.

(MEETING CONCLUDED)

*Joint Fiscal Committee*

*November 21, 2008*

# C E R T I F I C A T I O N

      I, Cecelia A. Trask,  a Licensed Shorthand Court Reporter, do hereby certify that the foregoing transcript is a true and accurate transcript from my shorthand notes taken on said date to the best of my ability, skill, knowledge and judgment.

_____

Cecelia A. Trask, LSR, RMR, CRR
State of New Hampshire
License No. 47

