**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-20-2011

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
DARTMOUTH-HITCHCOCK CLINIC,     *
ET AL                           *   11-CV-358-SM
                                *   December 8, 2011
          v.                    *   9:45 a.m.
                                *
NEW HAMPSHIRE DEPARTMENT OF     *
HEALTH AND HUMAN SERVICES,      *
COMMISSIONER                    *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:


For the Plaintiffs:        William L. Chapman, Esq.
                           Orr & Reno, P.A.

                           W. Scott O'Connell, Esq.
                           Gordon J. MacDonald, Esq.
                           Emily Pudan Feyrer, Esq.
                           Anthony Galdieri, Esq.
                           Nixon Peabody, LLP


For the Defendant:         Nancy J. Smith, Esq.
                           Jeanne P. Herrick, Esq.
                           Office of the Attorney General
                           Civil Bureau


Court Reporter:            Susan M. Bateman, LCR, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

2

1                    P R O C E E D I N G S

2            THE CLERK:  Court is in session and has for

3    consideration a motion hearing in Dartmouth-Hitchcock

4    Clinic, et al, versus New Hampshire Department of

5    Health and Human Services, Commissioner, civil case

6    number 11-CV-358-SM.

7            THE COURT:  Now, as I recall -- Ms. Smith,

8    how are you doing?

9            MS. SMITH:  Good.

10            THE COURT:  As I recall our discussion in

11    chambers, you're just going to argue the law today and

12    present evidence in January.

13            MS. SMITH:  Correct.

14            THE COURT:  All right.  So far we're on the

15    same page.

16            And then my law clerk and I had a little bit

17    of a disagreement about Mr. MacDonald.  I think I said

18    to you 30(A) is up at the Supreme Court, let's wait

19    and see what the Supreme Court says about it, and you

20    agreed or disagreed?

21            MR. MACDONALD:  Disagreed.

22            THE COURT:  That's what he said.  Okay.  So

23    you're going to argue 30(A) as well?

24            MR. MACDONALD:  Yes, your Honor.

25            THE COURT:  Okay.  Attorney Smith, good

1   morning.

2           MS. SMITH:  My understanding -- that's how I

3   was going to start was by defining the scope of the

4   hearing today.  My understanding is we're presenting

5   our arguments on the motion to dismiss, which is why

6   I'm standing up here first, which is the 30(A)

7   arguments, as well as the arguments we had on 13(A),

8   which is in our objection to the preliminary

9   injunction.  And so both of those go to whether

10  there's a cause of action.

11          MR. MACDONALD:  So may I, your Honor?

12          THE COURT:  You're lead counsel, Mr.

13  MacDonald.  Are you splitting it up or what?

14          MR. O'CONNELL:  We are splitting it up.  I

15  will be arguing the 30(A) issues and MacDonald 13(A)

16  and Chapman irreparable harm.

17          THE COURT:  All right.

18          MR. MACDONALD:  Just so I understand it on

19  the 13(A) piece of this, we're presenting our

20  arguments about whether Section 1983 provides a cause

21  of action or not.

22          MS. SMITH:  Correct.

23          MR. MACDONALD:  Okay.

24          MS. SMITH:  Just so we're clear on what the

25  scope of the hearing is, there were some other legal

1    arguments raised in the preliminary injunction issues

2    and the preliminary injunction objection and replies.

3    I'm prepared to address those today, but if the Court

4    just wants to focus on the cause of action arguments

5    we can do that and save the other legal arguments

6    raised in the preliminary injunction for later.

7              THE COURT:  It's up to you.

8              Mr. O'Connell, you are going to argue 30(A)

9    but not the supremacy 1983 issue?

10             MR. O'CONNELL:  Correct.  Well, 1983 -- to

11   the extent it's argued in the preliminary injunction,

12   Attorney MacDonald is covering it.

13             THE COURT:  All right.  Attorney Smith.

14             MR. MACDONALD:  And just -- sorry, your

15   Honor.

16             THE COURT:  It's all right.

17             MR. MACDONALD:  Just so we get the terms, I

18   think it will benefit the Court, there was one other

19   issue we discussed in chambers, your Honor, that we

20   take up today.  Mr. Chapman is prepared to take up the

21   legal standard governing irreparable harm.

22             MS. SMITH:  And we're prepared to address

23   that.  If you want me while I'm up here to address all

24   three of them, I'm prepared to go ahead and go first.

25   And then there are a couple of other legal issues that

1  we'll save until we see whether or not we're having a

2  further hearing.

3          THE COURT:  All right.  Now I'm concerned

4  about the court stenographer.  What's your time

5  estimation?

6          MS. SMITH:  It depends on how many questions

7  you have, your Honor.

8          THE COURT:  Try to keep it to a minimum.

9          MS. SMITH:  I don't think I have more than 20

10  to 30 minutes.

11          THE COURT:  Okay.  All right.

12          MS. SMITH:  Turning first to the 30(A)

13  Supremacy Clause issues regarding the first four

14  counts of the plaintiffs' complaint which we address

15  in both our motion to dismiss and our objection to the

16  plaintiffs' preliminary injunction.

17          The plaintiffs concede that 30(A) -- and just

18  to be clear, I'm going to refer -- that stands for

19  42 U.S.C, 1396(a)(30)(A), which we abbreviate to refer

20  to as 30(A).

21          They agree that 30(A) as well as 1396a(b) and

22  42 C.F.R. 430.12 do not create a private cause of

23  action.  Rather, they argue solely that they have

24  brought an Ex parte Young action, arguing that the

25  state's actions taken for budgetary reasons violate

1  the Medicaid statute on their face and are therefore

2  preempted by the Supremacy Clause.

3          Turning to the Ex Parte Young issue, the line

4  of cases allowing parties to seek injunctions under Ex

5  parte Young we submit depends on the nature of the

6  action that the plaintiffs are seeking to prevent

7  being a regulatory or statutory obligation imposing

8  affirmative obligation on the plaintiffs that they are

9  seeking to avoid.

10         That's the distinction between what they are

11 attempting to do here and the pharmaceutical case

12 versus Concannon, which was 249 F.3d 66, which was

13 affirmed by the United States Supreme Court where

14 there's no new affirmative obligation that the

15 plaintiffs are seeking to avoid.

16         It's also significant in the Concannon case

17 that the Court went on to find -- specifically find

18 that there was no preemption under the Medicaid

19 statute, and I'll talk about that more in my second

20 part of this argument.

21         But Ex parte Young -- it's important to

22 remember that Ex parte Young is a vehicle for creating

23 an exception to sovereign immunity -- to the Eleventh

24 Amendment sovereign immunity for the state, and it

25 doesn't really create a cause of action in its own

1  right.  And that was discussed in a case called -- it

2  was Virginia Office of Protection and Advocacy versus

3  Stewart, 131 Supreme Court 1632.  It's a 2011 case.

4  And they were very clear there that Ex parte Young is

5  jurisdictional.

6        It doesn't really answer the question of

7  whether there is a cause of action, and the Supreme

8  Court just affirmed -- reaffirmed in that case that Ex

9  parte Young does not apply where it would require --

10 where the result would be to have an impact itself on

11 the state treasury or where it would interfere with

12 public administration -- with the public

13 administration of a program.

14        So those are some very -- and the recent

15 Douglas versus Independent Living case up at the

16 Supreme Court.  If you read the transcript of the oral

17 argument, it's very clear that the Court was

18 struggling with the distinction between the Young line

19 of cases and their jurisdiction prudence on

20 requiring -- where there's an implied cause of action

21 in trying to make those two bodies of law consistent.

22        We submit that these --

23        THE COURT:  One of the questions was if you

24 don't have a private cause of action but you have a

25 Supremacy Clause 1983, then how can you not have a

8

1   private cause of action.

2          MS. SMITH:  But you only -- let me go into

3   those appointments because that's what I'm about to

4   launch into in my next comments.

5          When there is a -- just one final point on Ex

6   parte Young about the distinction between this being a

7   regulatory or enforcement action that I think may help

8   the Court understand that distinction is a concept

9   that we came across that applies to commerce clause

10  preemption cases where they talk about the concept of

11  market participation.  And that says that preemption

12  doesn't apply to the state where it is acting as a

13  market participant.  In other words, where it is

14  purchasing services rather than regulating.  And

15  that's another way to look at the distinction that

16  we're drawing that may help clarify that distinction.

17         And some of those market participation cases

18  are Department of Revenue of Kentucky versus Davis,

19  553 U.S. 328, a 2008 case.

20         So going back to Ex parte Young and the

21  Supremacy Clause, what the plaintiffs are seeking to

22  do here is to do an end run around a need for there

23  being a cause of action.  Because there's a number of

24  cases that we have pointed out in our brief that say

25  the Supremacy Clause itself --

1              THE COURT:  You mean a private right of

2   action.

3              MS. SMITH:  A private right of action.  The

4   Supremacy Clause itself does not create a cause of

5   action.  You have to look at the underlying statute to

6   see -- for there to be a cause of action.  So they are

7   expressly trying to do an end run around that very

8   pointed lack of authority, which they concede.  And as

9   the Supreme Court pointed out in the Astra case that

10  we cite, the absence of a private cause of action

11  would be rather meaningless if they could simply do an

12  end run around the need for a cause of action by

13  recasting their claim as something else.

14              Going back to that point about the Supremacy

15  Clause itself not creating -- being different than

16  other constitutional claims where the Court has found

17  that if there's a preemption claim that you

18  automatically can bring this Ex parte Young claim.

19  The Supremacy Clause is different than other

20  constitutional provisions, such as due process, equal

21  protection or the commerce clause because those

22  clauses -- the right is under the constitutional

23  provision itself.  The Supremacy Clause is in a

24  different section of the Constitution, and it is not a

25  substitute provision.  It's a jurisdictional

1  provision.

2          And again, for there to be Ex parte Young it

3  creates an exception to the state's Eleventh Amendment

4  to sovereign immunity and the question of whether

5  preemption goes to the underlying statute.

6          So turning to the preemption issue -- and we

7  present the preemption issue more in our objection to

8  the preliminary injunction if you're looking for the

9  section of our pleadings that brief that issue.  But

10  many of the cases relied on by the plaintiff for there

11  being preemption, such as the Local 12004, or the

12  Golden case, arise in the field of labor relations.

13          And there's a very large body of precedent on

14  a national labor relations field that says that labor

15  relations are uniquely suited for the purposes of

16  federal preemption.  And therefore we would submit

17  that those cases really have little value outside of

18  the realm of the National Labor Relations Act.

19          Secondly, the plaintiffs cite case law that

20  points out that preemption is not to enforce

21  litigants' private rights; yet we submit that is

22  exactly what the plaintiffs are seeking to do here.

23  They are very much seeking to force the state to pay

24  them more money prospectively.  They are not seeking

25  to restore the balance of power that the Supremacy

1   Clause is concerned with between the federal

2   government and the state, but they are seeking to

3   protect their own body of law.

4           Going to the analysis of whether or not there

5   is preemption, there are several different kinds of

6   preemption that the cases talk about.  The first is

7   express preemption.  And we would -- reviewing all of

8   the pleadings, it doesn't appear that plaintiffs are

9   claiming that there's any sort of express preemption.

10  At most they rely on the standard preemption that's

11  referred to as implied preemption.  And there are two

12  flavors to implied preemption.

13          The first is what's called field preemption.

14  And in the Pharmaceutical Research Manufacturers

15  Association versus Concannon, that's the 249 F.3d 66

16  First Circuit case which was also affirmed on appeal

17  at 538 U.S. 64, the First Circuit explicitly found no

18  field preemption intended by Medicaid laws in that

19  case pointing out that very large areas of

20  implementation of Medicaid law are very specifically

21  left to the discretion of states and that the purpose

22  of the Medicaid statutes are to advance a cooperative

23  federalism between the federal government and the

24  states, and that the purpose of Congress -- it was

25  explicitly the purpose of Congress in leaving out a

1   wide range of permissible phrases to the states.

2          And they also went on in a Massachusetts case

3   that we cite.  In Re: Pharmaceutical Industry Average

4   Wholesale Prices also points out that medical fee

5   related regulations have traditionally been a field

6   occupied by the states.

7          In the preemption strand -- that leaves the

8   only basis for their claim of preemption being their

9   claim that the various state actions obstruct federal

10  purpose.  And we submit that that simply doesn't carry

11  the day for them either.

12         There is no conflict between the purpose of

13  the Medicaid statute, which is to help low income or

14  disabled people get medical care, and the state's

15  interest in controlling costs so that it can continue

16  to provide the broadest coverage of services possible

17  and that controlling costs helps advance the purpose

18  of the Medicaid statute without cutting services, and

19  therefore it is consistent with the purpose of the

20  Medicaid statute.

21         Going back to the discussions around repeal

22  of the Boren Amendment, there was a lot of discussion

23  that private lawsuits were driving up the costs of

24  Medicaid.  And I think there were some estimates in

25  there that private lawsuits cost states over -- at

1   that point in time over a billion dollars and that

2   also the private lawsuits interfered with the

3   administrative process between CMS and the states.

4          For example -- and again, going back to the

5   Concannon First Circuit case, that case found that

6   Maine's prior authorization requirement did not

7   conflict with the purpose of Medicaid even if it

8   failed to advance the purpose of the federal program.

9          And turning to a case that I'm sure the

10   plaintiffs will bring up, the recent Indiana lawsuit.

11   In September of 2011 that District Court in Indiana

12   vacated its prior TRO and denied a preliminary

13   injunction basically finding that there was no

14   conflict -- that there was no preemption under the

15   Supremacy Clause.  And that case involved an attempt

16   to block the 38 percent rate reduction on broad

17   dispensing fees.

18          Again, the case law on preemption repeatedly

19   says that congressional intent is paramount.  There's

20   a recent case in 2009 that makes that point again, the

21   Wyeth versus Levine case.  That's at 555 U.S. 555, and

22   those numbers are the same.

23          So when you look at the congressional

24   intent -- and we're essentially right back at whether

25   Congress intended there to be private rights of action

1  under 30(A).  And the intent was that there not be was

2  to put an end to provider suits.  And again, that's

3  clearest in the repeal of the Boren Amendment in which

4  there were a number of statements that that was

5  Congress's intent.

6           But it is also demonstrated by the language

7  in 30(A) itself and the legislative history of 30(A)

8  which requires that states' rates promote efficiency

9  and economy, and that is to preserve states'

10 flexibility to control costs.

11          And the legislative history of 30(A) -- it

12 goes back to 1967, and there was actually -- and I

13 didn't have all of this history cited in

14 our pleadings, and I apologize for that, but the State

15 of California in their brief in the Douglas case did

16 do a legislative history of 30(A), and it goes -- as

17 they state, that it goes back to 1967 and it was

18 implemented as a cost saving measure to require states

19 to safeguard against unnecessary utilization and

20 therefore to help control federal costs.

21          So when you're looking at the purpose that

22 30(A) was initially adopted for, it was very much

23 to --

24          THE COURT:  But your argument isn't -- I

25 didn't think your argument was we can just ignore the

1  federal statutory mandate in setting rates, we can

2  just ignore all of the factors we're supposed to

3  consider, and we can set rates based on our own fiscal

4  convenience.

5          I thought your argument was if we violated

6  the federal law in the sense that we didn't properly

7  consider the factors we're supposed to consider, well,

8  that's up to the Secretary to enforce.

9          MS. SMITH:  That's also part of our argument.

10          THE COURT:  It kind of has to be your

11  argument, doesn't it?

12          MS. SMITH:  Yes.

13          THE COURT:  I assume -- you're not in here to

14  say, look, we get to set the rates for our own fiscal

15  convenience and that's the end of it, right?  Are you

16  arguing that?

17          MS. SMITH:  Yes.

18          THE COURT:  You are?  Seriously?

19          MS. SMITH:  We are arguing that rates --

20          THE COURT:  The federal law is clear, right?

21  I mean, the State of New Hampshire said, yes, we'll

22  participate in this program and we'll do it under the

23  rules that you set down.  The rules you set down are

24  we are going to consider a number of factors.  We're

25  going to balance the law of interests here.

1         You can't seriously come in and say, we said

2    that we would do that but we don't really have to, and

3    in fact we're not.

4         MS. SMITH:  But within those factors we

5    can still be --

6         THE COURT:  I mean, if you stand here and

7    argue, we have the power to set rates based upon our

8    own fiscal interests, and the federal government, you

9    know, be darned, we're not doing what we said we would

10   do, then aren't you compelling the Secretary -- if

11   there is no private cause of action, aren't you really

12   compelling the Secretary to step in and say, oh, no,

13   you're not?

14        I mean, how can you make that argument under

15   the statute as its written?  You're sort of daring the

16   Secretary to step in and say, no, you really aren't

17   free to do whatever you please.  You've made a

18   commitment under the law to do it a certain way.  You

19   can't stand up and say, look, but we're not going to

20   do it and nobody can do anything about it.

21        MS. SMITH:  I think we would agree that the

22   Secretary can do something about it.

23        THE COURT:  Okay.  So the second half of the

24   question is:  Are you really telling the Secretary

25   that we're setting these rates based on our own fiscal

1  convenience and for no other reason?  Is that the

2  judicial admission you're making this morning?

3         MS. SMITH:  Budgetary reasons were certainly

4  a factor, but the choices that were made taking into

5  account all of the --

6         THE COURT:  But the argument the plaintiffs

7  are making is, it wasn't a factor.  It was the only

8  factor.  It wasn't a factor among many.  It was the

9  factor.

10         MS. SMITH:  As long -- it can be -- we would

11  contend that it can be the sole factor but that it

12  would be up to the Secretary to tell us --

13         THE COURT:  Since we're on a roll, are you

14  saying it was the sole factor?

15         MS. SMITH:  We're not agreeing with that

16  contention.

17         THE COURT:  I don't know about that

18  contention.  This is the contention.  Are you saying

19  it was the sole factor?

20         MS. SMITH:  No.

21         THE COURT:  Okay.  And what evidence is there

22  that some other factor was considered?

23         MS. SMITH:  That critical access hospitals

24  rates were not reduced.  And that was based on the

25  fact -- that a number of these actions that they

1  complain about were -- critical access hospitals were

2  exempted from them.  And that was based on an

3  evaluation of the financial stability of those

4  hospitals, as well as a number of other factors about

5  access, which shows that we were considering the

6  factors that the federal program -- that the federal

7  government says we were supposed to consider.  That

8  they had information about the financial stability of

9  the hospitals before they made these decisions.  That

10  those were considered about whether or not this would

11  have -- these changes would be so severe that they

12  would have an adverse impact on access.

13       So there are a number -- that gets into the

14  facts.  I'm not saying those are all of the factors.

15  Those are the things that we would be presenting in

16  the evidentiary hearing.  I think we covered a lot

17  more of them in our pleadings, but those are the ones

18  that come to mind today.

19       Did I address your question, your Honor?

20       THE COURT:  You did.

21       MS. SMITH:  Okay.

22       THE COURT:  But we don't have to spend a lot

23  of time on it.  Well, it's up to you.  But your

24  position here is 30(A) doesn't create a private cause

25  of action?

1          MS. SMITH:  Right.

2          THE COURT:  Section 1983, the Supremacy

3   Clause, who knows.  The Supreme Court is going to

4   decide that this term.

5          MS. SMITH:  Correct.

6          THE COURT:  Do you want to move on to notes?

7          MS. SMITH:  We hope they're going to decide

8   it.  If they decide it on extremely narrow factual

9   grounds unique to the California case, there is the

10  possibility that -- it depends on how the case

11  comes -- you know, what they decide -- the facts that

12  they say are controlling in that decision.

13          So to wrap up the Supremacy Clause issue --

14  and again, I will just -- to shorten the argument, the

15  State of California in their brief to the Supreme

16  Court in the Douglas case laid out the history -- the

17  legislative history of 30(A) at page 29 to 30 of their

18  brief, and we submit that when you look at the

19  intent -- preemption looks at the intention of

20  Congress, and the intent of 30(A) itself was to help

21  the federal government and states control costs.  So

22  that's another factor, as the Court pointed out.

23          So we submit that there is not a private

24  cause of action, and that's distinct from the

25  jurisdictional question.  And I think that was a

1  distinction that got lost in the Douglas argument,

2  that whether there's a cause of action is distinct

3  from whether the federal court has jurisdiction.  And

4  I think the Solicitor General in the Douglas argument

5  tried to focus on that.

6          THE COURT:  Really?  I didn't think that was

7  an issue. I looked at the transcript of that oral

8  argument.  There's no question it's a federal question

9  jurisdiction.  But that's not the issue.  The question

10  is, do you have a private right of action.

11          MS. SMITH:  Right.  Ex parte Young, though,

12  is jurisdictional.  And that's why I think there was

13  some confusion in crossing those lines.  Ex parte

14  Young gives the Court jurisdiction where it wouldn't

15  have it under the Eleventh Amendment.

16          THE COURT:  Right.  But that's not an issue

17  here, is it?

18          MS. SMITH:  Correct.  But that's why -- I'm

19  just saying Ex parte Young doesn't answer the question

20  of whether there's a cause of action.

21          THE COURT:  Okay.  I think I follow that.

22          MS. SMITH:  So turning to the 13(A)

23  argument --

24          THE COURT:  You're saying Ex parte Young

25  doesn't give rise to some freestanding private cause

1  of action?

2          MS. SMITH:  Right.

3          THE COURT:  1983 is just a vehicle.  The

4  Supremacy Clause you say doesn't give rise to a

5  freestanding cause of action?

6          MS. SMITH:  Correct.

7          THE COURT:  The Supreme Court will decide

8  that.

9          MS. SMITH:  Correct.

10          THE COURT:  And 30(A) you're saying doesn't

11  give rise to a statutory freestanding private cause of

12  action?

13          MS. SMITH:  Right.  And we believe they can

14  keep it that way.  They haven't argued that 30(A)

15  gives rise to a statutory cause of action.

16          So I think that frames the 30(A) argument,

17  unless you have other questions, your Honor.

18          THE COURT:  No.

19          MS. SMITH:  So turning to the 13(A) argument,

20  which is in our objection to the preliminary

21  injunction.  And they argue that 13(A) gives them a

22  cause of action under Section 1983.

23          It's interesting that 13(A) -- whether

24  there's a cause of action under the Blessing/Gonzaga

25  test is actually a more straightforward question

1   today.  I'm aware that test is somewhat convoluted,

2   but given the complexity of the 30(A) issues, the

3   13(A) question is a little bit more straightforward,

4   or at least more well-trodden ground.

5           And we submit that the Blessing test as

6   refined by the Supreme Court in Gonzaga indicates that

7   there is not a private cause of action for either the

8   providers or beneficiaries under Section 13(A).  That

9   it doesn't meet either of the first two prongs of that

10  test where Congress has said that -- the courts have

11  said that Congress has to have intended to benefit an

12  individualized plaintiff.  And what they've looked at

13  is whether the -- it was referred to in the statute as

14  an aggregate group or individualized rights.

15          And here in 13(A) when they're talking about

16  the public process the group is indicated as

17  providers, beneficiaries, or any other interested

18  person.  So it's really hard to think of any more

19  aggregate group since that would be potentially

20  everyone in society.

21          And the second part of the test is whether

22  the public process -- whether what's being required by

23  the statute is so vague and amorphous that courts

24  would have difficulty crafting standards to enforce

25  it.

1            And again, the public process leaves large

2    amounts of discretion to the state.  It's a flexible

3    standard, and it does fit within that definition of

4    being so vague and amorphous that it was not intended

5    to create a private cause of action.

6            Looking at the case law since Gonzaga that

7    has addressed this issue specifically, two circuits

8    have addressed it, the Second Circuit and the Third

9    Circuit.  In New York Association of Homes versus

10   DeBonis and Children's Seashore House, I think I've

11   got those names correct, and both of those cases have

12   rejected there being a cause of action under 13(A).

13           The only case that we are aware of that says

14   there could be a private cause of action is from one

15   district in Maine, and that's The American Society of

16   Pharmacists versus Concannon found that there was a

17   claim.  That was not addressed in the Long Term Care

18   First Circuit case.

19           THE COURT:  I was going to ask you about

20   that.  I thought Judge Boudin in Long Term Care -- and

21   my memory is fading now, but I thought the First

22   Circuit just assumed that there was a 13(A) private

23   cause of action.

24           MS. SMITH:  Correct.  They assumed it because

25   they had an alternate basis which was much easier for

1  saying they didn't have a claim because pharmacists

2  were not within -- they said pharmacists were not

3  within 13(A) anyway, so they didn't have to do the

4  analysis.

5          THE COURT:  Well, they were saying

6  pharmacists weren't within 30(A).

7          MS. SMITH:  Right.

8          THE COURT:  They weren't within 30(A).  And

9  then they said, this isn't like 13(A), where of course

10 you would have a cause of action under 13(A).  But not

11 under 30(A) because you're once removed from a --

12 wasn't that it -- you're once removed from a direct

13 provider?

14         MS. SMITH:  Correct.

15         THE COURT:  You're a supplier to a provider.

16 The statute doesn't address suppliers to providers.

17         MS. SMITH:  Correct.  But they just assumed

18 that --

19         THE COURT:  It would seem to be that if you

20 were a provider that would be different.  You would

21 have a 13(A) cause of action.

22         MS. SMITH:  They didn't do the analysis to

23 decide whether or not a provider would have 13(A).

24 They just assumed for the sake of the argument that

25 there may be a 13(A) claim.

1        THE COURT:  Well, obviously I'll go back and

2    read it again, but my memory was it was a little bit

3    more than sort of off the cuff.

4        MS. SMITH:  They didn't go through the

5    Gonzaga analysis to determine whether or not --

6        THE COURT:  Well, I think he did, actually.  I

7    think Judge Boudin made a point of saying that the

8    problem that the closed pharmacies had in that

9    situation was that the Supreme Court in Gonzaga had

10   already tightened it up and said, don't come in here

11   just saying somebody violated some federal law.

12   That's not going to be good enough.  You've got to

13   come in here saying somebody violated a private cause

14   of action that you are entitled to that we can listen

15   to.  That's 30(A).

16        This isn't like 13(A).  13(A), that would be

17   different.  If you were a provider, you would have a

18   13(A) cause of action.  You probably wouldn't even

19   have a 30(A) cause of action if you were a provider.

20   Wasn't that the analysis?

21        MS. SMITH:  We submit that they did not

22   actually decide that.

23        THE COURT:  Well, sure, you know, dicta

24   holding, all of that, but the assumption was anybody

25   analyzing this situation under Gonzaga would say, even

1  if you were a provider you didn't have a 30(A) cause

2  of action.  You're not even a provider.  13(A), that

3  would be different, but you're not a provider.

4          MS. SMITH:  We submit they didn't answer the

5  question of whether there was a 13(A) claim.

6          THE COURT:  Okay.  Do you think they hinted?

7          MS. SMITH:  They hinted, but they didn't

8  address it and they didn't go through the full

9  analysis.  And two other circuits since then have and

10 have rejected that.

11         THE COURT:  But of course the First Circuit

12 is where I take my primary guidance, right?

13         MS. SMITH:  That's correct.  We understand

14 that.

15         So we submit that under the circuits that

16 have directly addressed the issue there is not a 13(A)

17 claim and that that claim -- so there would not be a

18 likelihood of success on the merits of that claim,

19 either.

20         THE COURT:  Not that it's critical, but do

21 you happen to know, are either of those up on cert

22 petitions?

23         MS. SMITH:  I don't believe either of those

24 circuit decisions have gone to the Supreme Court.  Was

25 that your question?

1          THE COURT:  Uh-huh.

2          MS. SMITH:  I don't believe either of them

3    have been appealed.

4          Turning to the last issue that the plaintiffs

5    indicated they wanted to address that Mr. Chapman was

6    going to talk about, the presumption of irreparable

7    harm.

8          We briefed that in our surreply on the

9    preliminary injunction.  As I understand the argument,

10   which was whether -- if you get to analyzing the

11   equitable requirements for issuing a preliminary

12   injunction, they claim that when you're trying to

13   enforce a statute you don't have to show an

14   irreparable harm.  And we submit that the Supreme

15   Court has indicated that even where you're trying to

16   enforce a statute that traditional equitable

17   principles apply, and we cited authority for that in

18   our surreply.

19         I would also just point out that in the oral

20   argument before the Supreme Court in the Douglas case

21   the plaintiffs there were arguing that they had shown

22   irreparable harm.  So they certainly weren't raising a

23   claim that they didn't have to meet that prong of

24   equitable jurisprudence in a similar claim, either.

25         THE COURT:  So the irreparable harm for Mr.

1  Chapman's clients is fairly self-evident, isn't it?

2          MS. SMITH:  That's getting into the facts,

3  and we weren't going to argue the facts today.

4          THE COURT:  As a matter of law, isn't it

5  self-evident that Mr. Chapman's clients could

6  establish irreparable harm?

7          MS. SMITH:  No.  We believe they still --

8          THE COURT:  I am severely ill.  I could get

9  treatment but for your actions.  Because of your

10  actions I can't get treatment.  Money isn't going to

11  fix that.  I'm going to suffer some loss that's going

12  to be irreparable.  Why isn't that self-evident?

13          MS. SMITH:  We are not aware of any

14  allegations that Mr. Chapman's client has not been

15  able to get treatment.  It's just a conjectural

16  possibility that has not materialized.

17          THE COURT:  You're saying if he had a client

18  that fit that description that would be different, but

19  all he's got is a theory?

20          MS. SMITH:  There are many doctors that will

21  accept Medicaid.  If the one that he has been seeing

22  specifically won't, we will find him one that does.

23  There are hospitals -- the Lakes Region Hospital --

24          THE COURT:  That's an interesting point.  Can

25  you blunt irreparable harm by volunteering to

1  remediate it?  I'm not sure you can, but maybe you

2  can.  I suppose if you're willing to do it then

3  there's no irreparable harm, right?  That's a pretty

4  broad category of volunteerism.

5           MS. SMITH:  The issue was whether or not -- a

6  doctor is one issue, but what we're talking about

7  here --

8           THE COURT:  We're talking about patients.

9           MS. SMITH:  And there's no allegation that he

10  cannot be seen at the hospital that he's been going

11  to.  That hospital is the sole exception to Medicaid.

12  If he needs to --

13          THE COURT:  Right.  We discussed that in

14  chambers, right.  You're saying it's a vote with your

15  feet situation, and they're not voting with their feet

16  yet.

17          MS. SMITH:  Correct.

18          THE COURT:  What if they vote with their

19  feet?  Then is there irreparable harm?  Is then the

20  argument, well, but there's some other hospital you

21  can go to within some distance?

22          MS. SMITH:  Medicaid doesn't require that

23  every provider be enrolled in Medicaid.

24          THE COURT:  No.  Of course not.  But to a

25  Medicaid patient, as I understand it, you're supposed

1  to be setting the rates and managing the system in

2  such a way that reasonable medical services are

3  available for people that otherwise couldn't afford

4  them.

5          So you can't shut the system down and say,

6  well, you know, Arkansas has hospitals, why don't you

7  go to Arkansas, right?  You can't do that.  It's got

8  to be in New Hampshire and it's got to be services

9  reasonably available  and the system has to be

10 operating in such a way that that's a reality, right?

11         MS. SMITH:  Yes.

12         THE COURT:  So at some point I guess the

13 reality is there is irreparable harm because a patient

14 can't get medical services and would suffer losses

15 that money is not going to compensate for.

16         MS. SMITH:  At some point there certainly

17 could be.

18         THE COURT:  And what you're saying is right

19 now he doesn't have a client that fits that profile.

20         MS. SMITH:  Correct.

21         THE COURT:  Okay.

22         MS. SMITH:  And I think I concluded my

23 primary presentation.  And depending on any arguments

24 that are presented that I haven't anticipated, I guess

25 I would like an opportunity to --

1          THE COURT:  Yes.  Certainly.  Absolutely.

2   Thank you, Attorney Smith.  I appreciate it.

3          MR. O'CONNELL:  Good morning, your Honor.

4   Scott O'Connell.

5          THE COURT:  Good morning, Mr. O'Connell.  How

6   are you doing?

7          MR. O'CONNELL:  Thank you for the opportunity

8   to argue the 30(A) issue.  I would limit my comments

9   to that.

10          Three principle points.  The state relies on

11   arguments that have been tried recently in three

12   different forums and rejected.  And they've been

13   rejected because the notion -- or the construction of

14   Ex parte Young that the state wants to rely on is just

15   not supported by law, and it's based on a fundamental

16   misapprehension of what this case is about.

17          It is not a cause of action for money

18   damages.  And throughout the state's papers you will

19   look at that stalking horse argument and try to take

20   our case -- and I'll describe our case in a minute --

21   and turn it into something it's not.

22          There is a piece of our case that Mr.

23   MacDonald will argue, and that is the private cause of

24   action.  But the first four claims deal with the

25   supremacy of federal law and constrictions and

1  restrictions on the State of New Hampshire to comply

2  with that law.

3          And it's our contention that by passing law

4  RSA 126 that provides for the changes to the Medicaid

5  reimbursement program for the financial convenience of

6  the state is in violation of federal law.

7          And we don't argue for a second -- and I just

8  want to clarify a couple of things because I think

9  these concepts get muddied through the pleadings.  Ms.

10 Smith is correct.  We are not claiming that our ten

11 possible provider clients have a private cause of

12 action under 30(A).  Let's just get that out of the

13 case right now.  That's not what we're here to say.

14         We are here to say that for more than a

15 hundred years it has been the law of this country

16 under Ex parte Young that when a state tries to

17 contravene by its laws federal supreme law of the

18 land, then an Ex parte Young action exists.  And it

19 exists as a matter of affirmative law or defensive

20 law.  And I can go through that.  It's in our papers.

21         But let me address the first issue you put on

22 the table which is --

23         THE COURT:  It's an interesting argument, but

24 isn't one of the major flaws that the federal law that

25 you're talking about is a federal law that says, and

1  if you don't comply the Secretary will make a decision

2  as to what sanctions to impose, and you know, may kick

3  you out, may stop funds, may do all kinds of other

4  things in an effort to try to work this out and make

5  this system go?

6          MR. O'CONNELL:  Yes.

7          THE COURT:  And so that's the remedy and

8  that's the law.  So incorporated in the law is this

9  notion that it's not just, you must do this.  It's a

10  combination of things.  You must do this or the

11  Secretary might do that.  And you're in here saying,

12  no, no, no.  It's just a you must do this, and I'm

13  here as a citizen with an Ex parte Young injunctive

14  cause of action to make you do what you said you would

15  do.

16          But what the state said they would do is,

17  we'll do this and we'll suffer the consequences that

18  the Secretary might decide to impose if he or she

19  doesn't like what we're doing, and you're forgetting

20  that part of it, it seems to me.

21          MR. O'CONNELL:  Not forgetting it.  We

22  recognize it, but that is not the case.  There is no

23  suggestion that that's an exclusive remedy in the

24  regulations or the law, so that needs to be

25  acknowledged in the beginning.  You're absolutely

1  right.

2          THE COURT:  I mean, I know you've thought of

3  this so I can't wait to hear your answer.  The

4  Secretary decides, you know, it's an election year.

5  New Hampshire has got a primary.  I don't think I want

6  to get up there and start pushing New Hampshire around

7  over these things.  Let's see if we can't mediate and

8  cogitate and discuss and work it out, and you know,

9  maybe come 2013 we'll talk about it in serious terms.

10          And in comes Scott O'Connell and says, well,

11  that might be okay for the administration of the

12  federal government, but I want to enforce this mandate

13  right this second.  That kind of messes up the

14  congressional intent on federal comity and let's work

15  together and let's not get ugly with each other if we

16  don't have to.

17          So why would Congress want that to be the end

18  result?  And why would Ex parte Young say whatever

19  Congress wants, so what, Scott O'Connell gets to do

20  that?

21          MR. O'CONNELL:  I'm sure they weren't

22  thinking about Scott O'Connell.  That's for sure.

23          THE COURT:  Well, as a representative of the

24  litigant.

25          MR. O'CONNELL:  I do recognize that, your

1  Honor.

2          A couple points in response, because we have

3  thought about this at great length.  There are very

4  limited remedies under the CMS regulation.  One is to

5  just stop the funding of the so-called nuclear option.

6  That effectively does a body blow to the entire

7  healthcare system of the state.  It's been invoked

8  once that we know about in Missouri.  Not a very

9  effective vehicle for the type of mediation and

10  control that you're talking about, point one.

11          Point two is that at the very primal level

12  here, in order to get some type of oversight by your

13  regulator, you have to submit yourself, your plans and

14  your methodologies to the regulator.

15          The record before you is replete.  And I

16  think this starts to feel like the injunction

17  argument.  I will address it now, but I think Mr.

18  MacDonald will address it as well in some fashion.

19          The state has taken the position since 2008

20  that no plan amendments that detail the change in

21  state law that conflicts with federal law needs to be

22  given to the administrator.  So they have created a

23  closed loop ecosystem where they make the rules.

24  They're not accountable to me under the hypothetical

25  we're talking about on behalf of the providers.  And

1  they're not accountable to the regulator because they

2  haven't told the regulator they changed the rules.

3  That's a pretty good system.

4          So I guess there is a set of facts that we

5  could contemplate.  And these were some of the

6  arguments that the Supreme Court had colloquy on in

7  the Douglas case, which is there is a rule for

8  deference to the administrator, absolutely, and that

9  is the federal system here.  And that has been charged

10  with the relevant information and expertise to make

11  some of the judgments I think that are built into your

12  hypothetical, but necessarily they've got to bring

13  those plan evidence forward so that the regulator's

14  jurisdiction is invoked.  They haven't done that.

15          The changes that are imbedded in RSA 126

16  which talk about balancing the budget and making

17  reimbursement changes to meet that financial

18  convenience have never been tendered to CMS.

19          And so we are left with the Ex parte Young

20  vehicle, which I'll note for the Court the Douglas

21  case found this cause of action.  The Rell case in

22  Connecticut found this cause of action.  That went up

23  to the Second Circuit and got dismissed because it

24  was found in that case -- and I just want to note the

25  distinction there.  If you read it, you'll see there

1  was no procedural violation of 30(A) found in the

2  Second Circuit, and that's the conflict between the

3  Ninth Circuit and the Second Circuit on the procedural

4  issue, part of which will be decided by the Supreme

5  Court.

6          But it got to the Second Circuit because they

7  found an Ex parte Young cause of action.  And most

8  recently in Indiana the same issue.  The Court

9  there -- and we've cited this in our papers but I'll

10  paraphrase -- said, we know the Supreme Court is

11  taking up this issue, but it would be a gross

12  departure of a hundred years of law to deny these

13  providers the cause of action for declaratory relief.

14  And until the Supreme Court tells me otherwise, I'm

15  going to proceed and make a decision.

16          So I guess if we had a different set of facts

17  and we had a state that was fully transparent on what

18  it was doing with its regulator there might be an

19  argument, but that's not our case.

20          So in this set of circumstances where the

21  state has not amended its plan there is no regulatory

22  oversight to be deferential to.  And so we get back to

23  what is this case about.  It's not a cause of action

24  for damages.  It's saying, State of New Hampshire,

25  apply federal law.  It is the law of the land.  You

1  are a voluntary participant in this federal program.

2  For every dollar you raise and spend you get a federal

3  dollar, and you've got to comply with the rules.  And

4  one of the rules you paraphrased.  You've got to

5  ensure a delivery system that ensures equal access to

6  those in the Medicaid plan and you have to think about

7  that when you make changes.  And if you don't think

8  about that, that's a violation of law.

9        And all we are saying -- and again, getting

10  the stalking horse issue out of here -- is don't write

11  a check to any of our ten clients because we're

12  showing you a damages claim.  We're simply saying,

13  you've got to throw that law out to the extent it is

14  preempted by federal law.  And let me get into

15  preemption for one minute.

16        THE COURT:  Well, you're not saying -- well,

17  maybe you are.  You're not saying that 126 is

18  preempted.

19        MS. SMITH:  Yes.

20        THE COURT:  You're saying the content of 126

21  wasn't submitted to the regulator as a plan amendment.

22        MR. O'CONNELL:  We're saying both.  Well,

23  we're saying three things.  On its face 126 is

24  preempted because it conflicts with federal law

25  because it doesn't mirror the federal requirements.

1  For example --

2          THE COURT:  Why doesn't it?  It's a very

3  narrow focused factor, if you will.  As Attorney Smith

4  argued, it's a factor among many.  It's not

5  necessarily the factor.

6          MR. O'CONNELL:  If you read 126, I would

7  submit to you it's the factor -- the only factor the

8  state considers.

9          THE COURT:  You would read it in connection

10  with the state's Medicaid plan and in connection with

11  federal law that requires the plan to consider a

12  certain amount of factors.  Wouldn't you read it all

13  together?  It wouldn't be in isolation.

14          MR. O'CONNELL:  Yes, I guess.  But under

15  normal statutory construction you want to rationalize

16  the whole constellation of relevant laws.  You're

17  absolutely right.  However, if you read it, it says

18  that the commissioner of HHS if they need to balance

19  the budget can make changes and submit it to Joint

20  Fiscal.  None of the 13(A) arguments need to be

21  complied with going with notice and compliance, and

22  they can just balance the budget based on that.

23          So I would submit -- and when we get to the

24  evidence in the injunction -- and again, here we are

25  on a motion to dismiss.  So fortunately for the state

1    the Court is going to assume that we plead this

2    accordingly, but the facts you will hear is that the

3    only thing the state considered was balancing the

4    budget.  The only thing.  They did not look at the

5    delivery system.  They did not look at the impact and

6    access issues.  It's just an absolutely vacant record.

7           So if we're right about that -- if the

8    evidence is going to be that, we've at least got an as

9    applied challenge to 126 as being preempted.  We think

10   there's a direct facial challenge and you cannot

11   reconcile the limitation of that language with the

12   30(A) ending.

13          It's possible that without following the

14   strictures of 126 they could ultimately comply with

15   30(A), but that's by accident, not by design.

16          THE COURT:  I apologize for going back, but

17   you made an interesting point.  Would you change your

18   view if 126 was made known to the regulator, the

19   federal regulator, saying, oh, by the way, we're going

20   to amend our state claim and note in our state claim

21   that we have RSA 126, and on occasion RSA 126 may

22   dictate the rate changes.  Then would you agree it's

23   kind of up to the Secretary at that point?  There's no

24   federal preemption because all federal law requires is

25   that you note the elements of your plan so the

1   Secretary can make sure they conform and take

2   appropriate action if the Secretary thinks that they

3   don't.

4         MR. O'CONNELL:  A couple things are buried in

5   that hypothetical that I will just squirrel out.

6         THE COURT:  It's interesting.  It's unique,

7   obviously, in respect to you don't usually have a

8   state saying we have a plan and we're going to do all

9   these things, but we have a side deal just among

10  ourselves that we're not -- but if you tell the

11  regulator, oh, by the way, our plan is we'll do all

12  these things, except which we don't.

13        Isn't it then up to the Secretary to decide,

14  is that consistent, is that inconsistent, what

15  sanctions, what actions should I take in terms of

16  enforcement?  You wouldn't then have an Ex parte Young

17  challenge, right?

18        MR. O'CONNELL:  We wouldn't have an Ex parte

19  Young challenge on the fact that this conflicts with

20  federal law in this respect.

21        Let me back up for one second.  126 has been

22  disclosed to the Secretary but the changes --

23        THE COURT:  Well, you know, of course it's

24  public law.  Everybody is instructively aware of it.

25        MR. O'CONNELL:  Right.  There's that, okay,

1   and there's this reference in the state plan to a

2   prior version.

3           The problem is it was amended to allow for

4   this budgetary driven end result, which is if you

5   don't have enough money you can make the changes for

6   the convenience of the state to balance the books.

7           THE COURT:  I take your point, but as I said,

8   it's kind of unique.  But assume the state plan is --

9   it's the state plan.  But the last element of our

10  state plan, Mr. Secretary and Ms. Secretary, is when

11  we want to for budgetary reasons, and solely for those

12  reasons, we will reduce the rates, and that's our

13  plan.

14          MR. O'CONNELL:  If that had happened and if

15  the state had -- if CMS had passed on that without any

16  guidance.  The way that process works is you tender it

17  and CMS usually says, we'll agree to that as a ground

18  rule, or no, it's not acceptable.

19          If we had those sets of facts, then the next

20  stage we would be at is, okay, when you did your

21  budgetary changes did you also comply with the other

22  requirements of 30(A).

23          It's one thing to disclose it to the

24  Secretary and say, we're not going to do this, and

25  say, okay, we think under certain circumstances that's

1 okay, but have you done the analysis and have you on a

2 substantive basis ensured that whatever changes you

3 make will provide equal access to Medicaid patients,

4 and that still is a cause of action that's very much

5 alive in this case.

6          And at the end of it, it is our burden to

7 prove that substantive case.  That's not what we're

8 here to do today.  The question is what's the cause of

9 action.

10          THE COURT:  Before I confuse myself -- I know

11 I'm not going to please you, but before I confuse

12 myself, what you're saying now is the basic problem

13 here is the state plan does not admit of RSA 126.

14 It's an off the reservation controlling factor.

15          MR. O'CONNELL:  Absolutely.

16          THE COURT:  And, therefore, there might be Ex

17 parte Young injunctive cause of action with respect to

18 that statute.

19          MR. O'CONNELL:  Absolutely.  Absolutely.  So

20 let's build out that hypothetical some more.  126 gets

21 amended.  It says that we can take these actions.  We

22 have one bucket of money, but if we have more claims

23 than necessary we're not going to worry about what the

24 services are that we're going to deliver.  We're just

25 going to cut that pie into really small pieces.  And

1   so you don't get 50 cents on a dollar as a provider.

2   You get 30 cents on a dollar.

3          The question is, what does that do to the

4   delivery system.  Can you vote with your feet?  And is

5   that the policy choice that the state is making?

6          I'll submit when you hear the injunctive

7   relief one of the providers did vote with their feet,

8   told the state that they were not going to be

9   accepting Medicaid patients, and the state responded

10  by asking the attorney general to investigate whether

11  or not the healthcare system was complying with its

12  mission.

13         So it's really a false choice.  Vote with

14  your feet, but we're going to come after you and

15  investigate you and bring the full force of the state

16  against you.  That's a Hobson's choice.  That's not an

17  acceptable choice.

18         So voting with your feet given that reaction

19  that's happened in the context of this case, together

20  with how the requirements work, you know, protecting

21  life and limb in emergent situations, make it very

22  complex.  I think a fair minded person would say no

23  healthcare system can simply vote with their feet.

24  There are many strings that are attached to this.  But

25  again, that's for the injunctive argument.

1          Coming back to your very important questions

2    about the law here.  So if we have a 126 which says

3    that a factor could be the budget convenience, okay,

4    we still have a cause of action if substantively the

5    state hasn't done an analysis to determine what the

6    impact would be, or we can show through John Does or

7    through other evidence that we bring forward that the

8    choices made are not complying on a substantive basis

9    with 30(A), and those are the two pieces of this case.

10          We realize that's our burden.  We have to

11   bring that forward and we'll do that, but that is not

12   the issue today.  The issue is whether there's a cause

13   of action.

14          And the three cases -- again, I referenced

15   this before -- have already decided this.  And I'll

16   point you to the First Circuit, too.  One of the

17   arguments that you didn't hear from Ms. Smith a moment

18   ago, but it's in her papers, is that Ex parte Young

19   only applies in a defensive circumstance when the

20   state is coming after you, and that's just not the

21   law.  Local Union, a 2004 case, makes quite plain, a

22   claim that a state regulation is preempted by a

23   federal statute need not always arise as a defense

24   when injunctive relief is sought against state

25   officials.

1          So it is an equitable remedy that is to

2   ensure that federal law when it's being transcended in

3   a conflict situation will apply.

4          So I guess I would submit in answer to the

5   question that you gave me about 15 minutes ago:  Mr.

6   O'Connell, do you have the ability to come here and

7   make these arguments under Ex parte Young?  I would

8   say yes.  To the extent that state law as written or

9   as applied conflicts with any federal law, Scott

10  O'Connell, Gordon MacDonald, anybody in this courtroom

11  has the ability to come in here and say, Judge, please

12  look at the conflict here and determine that the state

13  law is inappropriately being applied, transcends into

14  supreme law of the land, and make it null and void.

15  And that's what our cause of action is.

16          THE COURT:  Thank you.  I appreciate it.

17          MR. O'CONNELL:  Thank you, your Honor.

18          THE COURT:  Mr. MacDonald.

19          MR. MACDONALD:  Good morning, your Honor.

20  Thanks for your time today.  I'm here to talk about

21  Counts 5 and 6 of the plaintiff's complaint.  Those

22  raise -- those counts seek to enforce the plaintiff's

23  rights under Section 13(A) of the Medicaid Act.

24          And I know the Court is very familiar with

25  Gonzaga/Blessing, and I think, your Honor, I would

 1    just like to pick up on your colloquy with Attorney

 2    Smith with respect to the state of the law,

 3    particularly in this circuit.  And it's obvious that

 4    the Court has read the First Circuit's opinion in the

 5    Long Term Care case.  Chief Judge Boudin -- chief

 6    judge at the time.  Judge Boudin, Judge Lynch and

 7    Judge Lipez were on that panel.  And the Court is

 8    absolutely right that that case came up to the First

 9    Circuit presenting both 13(A) and 30(A) claims.  And

10    the actual holding in the case is that the 30(A) claim

11    did not give rise to a cause of action under Section

12    1983.  This is a post-Gonzaga case.  And in that

13    holding the circuit had to overrule its prior case in

14    the Bullen case.

15            The second part of the case dealt with

16    Section 13(A), and the Court was -- your Honor is

17    absolutely right.  The distinction there is that the

18    plaintiff in the case, a set of closed pharmacies,

19    were not covered under Section 13(A).  Section 13(A)

20    grants rights to hospitals and nursing care

21    facilities, and Judge Boudin ultimately held that a

22    closed pharmacy, even one serving a nursing care

23    facility, did not have rights under --

24            THE COURT:  That was not a nursing home.

25            MR. MACDONALD:  Exactly.  But the case

48

1    warrants very careful attention.  And your Honor said,

2    well, the First Circuit gave us some hints.  And if I

3    may, your Honor, I think the hints are overwhelming.

4           Judge Boudin wrote, "Broadly speaking,

5    subsection 13(A) requires something on the order of

6    notice and comment rulemaking for states in their

7    setting of rates for reimbursement of hospital

8    services, nursing facility services, and services of

9    intermediate care facilities for the mentally retarded

10   provided under the Medicaid Act".

11          Another quote, "Subsection 13(A) does provide

12   notice and comment rights as to rates set for nursing

13   facility services".  And as we know under Gonzaga,

14   that is the touchstone; does the statute create a

15   right.

16          Judge Boudin, another section of the case,

17   "Subsection 30(A), unlike subsection 13(A), has no

18   "rights creating language" and identifies no discrete

19   class of beneficiaries".  And this goes to the point

20   you were making with Attorney Smith.

21          Another part of the case -- in making the

22   distinction between providing notice and comments for

23   rates as to nursing facilities and not pharmacies, the

24   panel observed that Congress "could have thought that

25   embattled care facilities like hospitals and nursing

1  homes needed special protection from arbitrary rates

2  but that ordinary pharmacies did not".

3           And finally, your Honor, in this case,

4  "It is easy to imagine why Congress wanted special

5  protection for care facilities.  Their sunk-cost

6  structure makes them especially vulnerable to slow

7  destruction by long-term underfunding; by contrast,

8  the market reaction is likely to be quick and decisive

9  if the Commonwealth seeks to underpay for drugs".

10          One other case that's very important for the

11 Court's consideration, another First Circuit case both

12 parties cited, is the Rio Grande versus Rullan case.

13 It's a case that came up from Puerto Rico.  It dealt

14 with interpreting another section of the Medicaid Act

15 and ultimately concluded that another section of the

16 Medicaid Act dealing with reimbursements for federally

17 qualified health centers did give rise to a Section

18 1983 cause of action.  That decision written by Chief

19 Judge Lynch.  And Judge Howard and Judge Campbell were

20 on that panel.

21          I would direct the Court's attention to --

22 she does a survey of the law post-Gonzaga in the

23 Medicaid context in this circuit, and she notes the

24 Long Term Care.  She notes another case called

25 Brighton (ph.) which dealt with another section of the

1   Medicaid Act.  But in talking about Long Term Care --

2   and this is footnote 11, your Honor -- she says, "In

3   the same opinion --", referring to Long Term Care.

4   "In the same opinion, however, the Court assumed that

5   a different provision, Section 13(A), was enforceable

6   under Section 1983 because it contained "rights

7   creating language" and was narrowly written with a

8   discrete class of beneficiaries in mind."

9           So Attorney Smith properly points out to the

10  Court that this is dicta, and certainly I would

11  acknowledge that, but I would respectfully suggest to

12  the Court that there may be degrees of dicta and here

13  we have four of the --

14          THE COURT:  Only if you want to use it, I

15  suppose.

16          MR. MACDONALD:  Well, as a practical matter,

17  you have four of the six active judges essentially

18  acknowledging that Section 13(A) creates rights

19  creating language and is narrowly tailored and speaks

20  to an individualized rather than an aggregate class of

21  beneficiaries.  And those are two of the three prongs

22  that Judge Lynch lays out in the Rio Grande case.

23          The third prong, and this is something that

24  Attorney O'Connell --

25          THE COURT:  Is there much law out there on

1   the difference between aggregate and individualized

2   beneficiaries?

3          MR. MACDONALD:  It's a gloss that Judge

4   Lynch -- you know, I first saw --

5          THE COURT:  What does it mean, I guess?

6          MR. MACDONALD:  I think as a practical matter

7   it is --

8          THE COURT:  If you say all firemen, is that

9   aggregate of all firemen?

10          MR. MACDONALD:  Well, let's just take it in

11   the context of this case.  The State's argument is

12   that the language of Section 13(A) suggests

13   aggregation because it applies to --

14          THE COURT:  Well, any interested party.

15          MR. MACDONALD:  -- any interested party.  On

16   that point, your Honor, I would point the Court to the

17   Concannon case, the case decided by Judge Singal in

18   Maine, and he directly addresses this.  It's a very

19   interesting case.  It came literally weeks after

20   Gonzaga.  And he said, no, you can't read the other

21   interested citizens to mean everyone in the state.  It

22   is modified by the language before it.

23          In other words, we're talking about rights

24   going to providers, beneficiaries, their

25   representatives, and other interested parties in the

1   state.  I'm not quoting it exactly, but that's the

2   essence of the language.  And the district court in

3   Maine said --

4           THE COURT:  Meaning somebody like a provider.

5           MR. MACDONALD:  Exactly.  Exactly.  And I

6   would submit that's the guidance for this Court on

7   that issue.

8           In any event, you know, I think you have this

9   fairly compelling description of --

10          THE COURT:  The easy answer is that's not us

11  anyway.

12          MR. MACDONALD:  Right.  I mentioned the

13  Concannon case.  One other case that's very worth the

14  time to take a look at is the underlying district

15  court case of Long Term Care.  Judge Tauro granted an

16  injunction.  Interesting facts.  The Mass Department

17  of HHS noticed on their website an intent to reduce

18  certain pharmacy rates on March 17th, effective April

19  1st, and Judge Tauro applied the Concannon case and

20  ultimately determined that there was a cause of action

21  obviously under Section 1983 for both 13(A) and 30(A).

22          The facts though -- and then he went on to

23  reach and grant an injunction.  And the facts there

24  are interesting, which are that he granted the

25  injunction on the basis that an emergency rule was

1  insufficient to meet the requirements of Section

2  13(A), and he went on to note that the statute

3  requires the ability of the protected parties to have

4  an opportunity to review and comment rates before they

5  go into effect.  And obviously it was that decision

6  that went on up to the First Circuit and was reversed.

7          But I would submit those four cases from this

8  circuit should guide your determination of the issue

9  under Section 1983.

10          Attorney Smith is quite right, there is a

11  line of cases arising from the Second Circuit which

12  reaches a contrary conclusion.  I would invite the

13  Court to look at the -- do the forensics on it, go

14  back to the first case under that line that was

15  decided, it's a case out of the northern district, and

16  you will not see a really meaningful analysis under

17  Gonzaga.  And the district court judge there really

18  does not apply the Gonzaga analysis.  With respect,

19  it's sort of a cursory determination.

20          That goes up and its affirmed in three

21  paragraphs by the Second Circuit.  No meaningful

22  analysis.  And then two other district courts in the

23  Second Circuit, one in Vermont, and the Rell case

24  which Attorney O'Connell referred to sort of summarily

25  apply their circuit law, as abbreviated and cursory as

1  it was.

2          Getting to the application of the test:  Does

3  Section 30(A) have rights creating language?  I think

4  Judge Boudin and Judge Lynch are absolutely correct.

5  It does.  It provides very specifically and in clear,

6  understandable and, very importantly, enforceable

7  terms what needs to happen.  It needs to be a public

8  process.  The state needs to publish rates.  It needs

9  to publish the methodology and it needs to publish the

10  justifications.  Then providers, beneficiaries, other

11  interested parties, need to have the opportunity for

12  reasonable comment -- a reasonable opportunity for

13  comment.

14          Then the state needs to republish the final

15  rates, republish the methodology, and republish the

16  justifications presumably based on the information

17  they've gotten from the comment.

18          THE COURT:  If the state were to -- if I were

19  to hold, you're absolutely right, they've got to do

20  that, injunctive relief issues until it's done, and

21  they do it and what they say is, these are the rates,

22  the methodology is RSA 126, this is what we're going

23  to do, let's have your comments.  You comment and you

24  say, oh, boy, that would be contrary to the

25  requirements of federal law.  You say thank you very

1  much.  Here's the rate.  Then you don't have a 13(A)

2  cause of action at all, right, because the process has

3  been satisfied?

4          MR. MACDONALD:  I would agree with the Court.

5          THE COURT:  Okay.

6          MR. MACDONALD:  But they have not.  The state

7  simply has not done that.  And very importantly, your

8  Honor, Section 13(A) has a specific requirement for

9  hospitals, as opposed to nursing care and intermediate

10  area care facilities.  They need to articulate how the

11  rates serve those hospitals which provide a

12  disproportionate share of care to the needy -- the low

13  income population.

14          We've talked about -- so the tests are rights

15  creating language, very clear and, importantly,

16  enforceable.  Courts do this all the time.  This is in

17  the realm of a due process, APA type remedies.  Was

18  there -- did they publish the rates?  Did they publish

19  the justifications or not?  I mean, it's clearly

20  enforceable.

21          THE COURT:  You know, I'm probably jumping

22  ahead, but just because I'll forget, why don't we do

23  it now.  Did we agree that we were going to hear legal

24  arguments on the motions to dismiss?  We're going to

25  defer evidence on the preliminary injunction till

1  later, but did I understand that there's really no

2  dispute about the facts relating to the 13(A) claims?

3           MS. SMITH:  They claim no notice.  We claim

4  there was notice.  So, yes, there's a dispute.

5           THE COURT:  Okay.

6           MR. MACDONALD:  I would suggest, your Honor,

7  that I think that we could work together to come up

8  with a stipulated record about what actually happened

9  and sort of -- and hopefully cut down on sort of the

10  tedious evidence with respect to that.

11           THE COURT:  I was just asking procedurally.

12  That's deferred to January?

13           MR. MACDONALD:  Yes, your Honor.

14           THE COURT:  Hopefully you can work it out,

15  but if you can't you will put on evidence on what

16  notice was given, if any.

17           MR. MACDONALD:  Exactly, your Honor.

18           THE COURT:  Okay.

19           MR. MACDONALD:  So rights creating language,

20  individualized versus aggregate, and finally, is there

21  an effective enforcement mechanism.  And again, this

22  is something that Attorney O'Connell got into.

23           There are two enforcement mechanisms as a

24  practical matter under the Medicaid Act.  One is to

25  disapprove a state plan, and two is to cut off

1    funding.  Neither apply in this situation.

2            The state has claimed that as to a vast

3    majority of the rates at issue in this case they don't

4    need to submit a state plan amendment to CMS.  That

5    it's perfectly -- they're perfectly authorized to do

6    so under the existing state plan.

7            And as Attorney O'Connell suggested, the

8    second remedy, cutting off funds, is so blind as to be

9    meaningless.  I mean, it puts the federal government

10   in a position of cutting off care as an effective

11   matter to the entire Medicaid population.

12           So this statute is uniquely enforceable to

13   Section 1983.  And indeed its purpose is so important

14   that to cut off an enforcement through 1983 would

15   really be undermining what was clearly --

16           THE COURT:  But you're talking about judicial

17   remedies here.  The cut-off of funds is a remedy

18   reserved for the Secretary.

19           MR. MACDONALD:  Correct.  But part of the

20   test under Gonzaga is an analysis -- or at least under

21   Judge Lynch's gloss under Gonzaga is what other

22   enforcement mechanisms exist, and so I'm just -- what

23   other enforcement mechanisms did Congress contemplate.

24   And I'm saying here that they are ineffective.

25           THE COURT:  Oh, I'm sorry.  Ineffective.

1          MR. MACDONALD:  Ineffective.  As a practical

2   matter, just so the Court knows, CMS would know one

3   way or another whether the rates have been published

4   and all of the hoops you have to jump through for

5   Section 13(A) have happened or have not happened.

6          THE COURT:  Why?  I mean, why?  It seems to

7   me the Secretary at any time could step in and say,

8   gee, I noticed you've published this statute, and I

9   can't help but notice that it seems to be facially

10  contrary to the federal requirements of the Medicaid

11  program.  What do you have to say for yourself?

12         MR. MACDONALD:  That could happen.  But I'm

13  saying there's no affirmative obligation on behalf of

14  a state to tell CMS every time that it's going to

15  adjust rates that we've noticed it and we've met all

16  of the requirements of Section 13(A).

17         THE COURT:  I missed that.  All right.  You

18  better do that again.  I missed that -- that point.

19  You're saying the state does not have an obligation?

20         MR. MACDONALD:  That's correct.  Under 13(A)

21  it doesn't have an obligation to tell CMS that, for

22  instance, we are deciding to reduce inpatient rates by

23  ten percent.

24         THE COURT:  Right.

25         MR. MACDONALD:  We've duly noticed --

 1          THE COURT:  You're saying under the statute

 2    that the state has enacted the state thinks it doesn't

 3    have an obligation.  Is that what your argument is?

 4          MR. MACDONALD:  No.  I'm saying just as a

 5    practical matter under existing CMS statutes and

 6    regulations there's no obligation for the state to

 7    tell CMS, to my knowledge, that it has published the

 8    rates and it's provided the methodology.  In other

 9    words, it's completely self-enforcing.  I mean, it's

10    an obligation that the state takes on, but it's in no

11    way meaningfully monitored by CMS.  That's my point.

12    Do you understand?

13          THE COURT:  No.

14          MR. MACDONALD:  Okay.

15          THE COURT:  What's your -- your procedural

16    argument, as I understand it, is that they are

17    obligated to give notice.  Anything that amends the

18    plan or the effective enforcement of the plan that

19    would be qualified as an amendment must be noticed.

20    You've got to tell CMS so they can decide whether it's

21    okay or not.

22          MR. MACDONALD:  Correct.  The state says that

23    in reducing these rates they don't need to do that.

24          THE COURT:  Oh, okay.  You're not conceding

25    they don't.

1          MR. MACDONALD:  Absolutely not.

2          THE COURT:  It sounded like you were

3  conceding they had no obligation to.

4          MR. MACDONALD:  I'm sorry, your Honor, but

5  they don't.  There's nothing that requires just think

6  narrowly on 13(A) and the requirements of 13(A),

7  providing notice and all of the different hoops that

8  the state has to jump through before reducing or

9  making adjustments on rates.  The state is not

10  obligated to tell CMS that in each individual instance

11  it has done that.

12          THE COURT:  Okay.

13          MR. MACDONALD:  So CMS would have no

14  knowledge whether the state is or is not complying

15  with the public process requirements.  That's simply

16  my point.

17          So CMS is in a vacuum with respect to the

18  13(A) obligations, and therefore --

19          THE COURT:  You're just saying that just adds

20  to the notion of ineffective remedy -- the

21  administrative remedy.

22          MR. MACDONALD:  Exactly.  Exactly.

23          The state makes a brief argument in its

24  papers at least -- Attorney Smith didn't mention it

25  but I'll mention it while I'm up here -- that somehow

1    the repeal of the Boren Amendment precludes a cause of

2    action here.  And I just -- I think that's an issue

3    that was effectively addressed by Judge Boudin in

4    Long Term Care.  Whatever the repeal of the Borne

5    Amendment did doesn't touch the rights -- the newly

6    created rights under Section 13(A).

7              And the reference to the committee report

8    language -- House Committee report language really

9    doesn't support what the state is saying at all.

10             I would also respectfully suggest that the

11   statute rather than the report language -- and the

12   statute as interpreted by the First Circuit would

13   control over the report language in any event.

14             But the point that I would leave the Court

15   with is the architecture of what's supposed to happen

16   here, which is the state decides it wants to make a

17   change to the rates.  13(A) says we want to front-end

18   that process.  We want the state to reach out there

19   and tell people what they're going to do and why

20   they're doing it and receive data back so that they

21   can make -- the state can make an informed decision.

22   That's important to the process.

23             THE COURT:  Well, that's what happened to

24   Long Term Care.  They adjusted the rate change that

25   they were going with.

1          MR. MACDONALD:  That's right.  And it's so

2     important to the process and underscores really the

3     remedy we're asking for here, because absent this

4     remedy that part of the process can't take place.

5     There's no meaningful enforcement.

6          Attorney O'Connell described sort of the

7     closed loop system that the state is trying to create

8     here.  They can raise or lower the rates, not tell

9     CMS, not provide meaningful opportunity for notice and

10    comment to providers, and not be subject to -- at

11    least under 13 on either decision -- any meaningful

12    judicial review.  That is a complete closed loop, and

13    that cannot be the law.

14         With that, your Honor, I thank you for your

15    time.

16         THE COURT:  I appreciate it.  Thank you, Mr.

17    MacDonald.  Attorney Smith, any rebuttal?

18         MS. SMITH:  Pardon?

19         THE COURT:  You reserved time to -- oh, I'm

20    sorry.  Mr. Chapman.  I'm sorry.

21         MS. SMITH:  I was going to wait for Attorney

22    Chapman to finish.

23         THE COURT:  Thank you.  I appreciate it.

24    Sorry.

25         MR. CHAPMAN:  Thank you, your Honor.  May it

1    please the Court.  The state in responding to the

2    irreparable harm argument that is in our reply in

3    support of the motion for preliminary injunction

4    characterized it as a presumption of irreparable harm

5    for lack of notice.

6            This morning in court the state characterized

7    the argument as a presumption of irreparable harm for

8    violation of a statute.  That's not our argument.

9            In Long Term Care, the lower court decision

10   that Attorney MacDonald referred to, the Court found

11   that a violation of the federal Medicaid Act

12   necessarily inflicts irreparable harm upon the persons

13   that the act was designed to protect.  And the Court

14   cited the Virgin Island case, a Third Circuit case

15   that talked about the body of law that provides that a

16   violation of a statute that harms the public is a

17   violation for which the Court can find irreparable

18   harm.

19           And here we clearly have a program that

20   Congress intended benefit the most needy people in the

21   country who need medical care, the Medicaid program.

22   This is a public statute that protects the public.

23   It's the kind of statute that the Third Circuit was

24   talking about in the Virgin Island case.

25           Now, in response the state cites the Romero

1  case and the Village of Gambell case.  Neither -- the

2  latter of those cases, Village of Gambell, comes after

3  the Virgin Island case.  It says nothing about the

4  Virgin Island case, so it's silent on that point.

5          This Court in a decision in the Nationwide

6  Mutual Insurance, which we cite in our brief at page

7  18, footnote 15, commented on Virgin Island and the

8  Long Term Care case as standing for the proposition

9  that a violation of a statute that protects the public

10  interest is irreparable harm.

11          The other point that I want to bring out --

12  and it's not briefed, and I have the cases for the

13  Court and for the parties because we didn't know the

14  State's position on the two Supreme Court cases.  And

15  what I've done is I've given the Court the Sierra Club

16  v. Marsh, which relies in part on the Commonwealth of

17  Massachusetts v. Watt.  Both of these cases were

18  authored by then Judge Breyer.

19          And I've highlighted for the Court's benefit,

20  since we didn't discuss it in our brief, the sections

21  of the case -- of the Sierra Club case that I think

22  bear directly on the argument that the state was

23  making, and it really is a supplementary argument that

24  we made.

25          Essentially what Judge Breyer said is to

 1  determine what harm is you need to look at the nature

 2  and the structure and the purpose of a statute.

 3           And in the village of -- or excuse me.   In

 4  Sierra Club he was dealing with the National

 5  Environment Protection Act, and he characterized that

 6  act as an act intended to ensure that decision makers,

 7  the administrators, have a sufficient amount of

 8  information before making a decision, before starting

 9  a chain of actions that would be hard to stop once

10  they started.

11           That's the kind of statute that we're dealing

12  with here, as Attorney MacDonald talked about.   13(A)

13  is a process statute to ensure that state

14  administrators are informed of the relevant

15  information before they make an adjustment to the

16  Medicaid rates.   And failing to follow that procedure

17  means that the administrators necessarily are not

18  making an informed decision.

19           And almost as though he anticipated a case

20  like this, in Sierra Club Judge Breyer talked about

21  the state not spending a sufficient amount of money to

22  do something and then trying to stop that process once

23  it gets started.   Here, by not following the process

24  and by making a decision that has had the kind of

25  fiscal impact on both the hospitals and potentially on

1   the Medicaid recipients, what happens?  The hospitals

2   begin a series of actions to try to adjust that are

3   very hard to unwind.  The state gets accustomed to a

4   level of revenue that is very hard -- particularly in

5   certain political circumstances -- to unwind.

6            That's the irreparable harm here.  The

7   failure to follow a process to lead to an informed

8   decision.  Thank you.

9            THE COURT:  Thank you.  I appreciate it, Mr.

10  Chapman.  Attorney Smith.

11           MS. SMITH:  Just a couple of points.  It is

12  apparent from what has been said here today that the

13  argument about irreparable harm that Attorney Chapman

14  has just made only applies to their 13(A) claims, not

15  the 30(A) claims.  At least that was the argument that

16  I just heard.

17           THE COURT:  He probably disagrees.

18           MS. SMITH:  I'm just going on what I just

19  heard because he said it's about the process, and that

20  is the 13(A) argument, not the 30(A) argument.  So

21  there's still on that argument definitely -- if we get

22  to that point -- the need to show irreparable harm

23  regarding the 30(A) claims.

24           On the 13(A) issues -- I have not had a

25  chance to look at these.  This is something that was

1  raised in the reply to the objection on the

2  preliminary injunction, so we addressed what we

3  thought the argument was.

4          If we come -- rather than having another

5  round of briefings, I would suggest that we would like

6  an opportunity to respond to these cases, if we have

7  to come back in January, at that hearing rather than

8  have another round of briefings.

9          THE COURT:  That's fine.  Actually, if you

10 just want to be prepared in January, that's fine, too.

11 I don't want to impose on you anymore writing than

12 you've already undertaken.

13         MS. SMITH:  I would propose that is the way

14 you respond to these rather than doing it today on the

15 irreparable harm argument.

16         THE COURT:  I'll give you a chance to say you

17 disagree.

18         MS. SMITH:  Just to go back and pick up on a

19 couple of points, Attorney O'Connell made the

20 representation to the Court that RSA 126-A:3 is not in

21 any way reflected in the state plan, and we contend

22 that is not correct.

23         If there's an inpatient section of the state

24 plan and an outpatient section of the state plan,

25 sometimes they get -- I get them reversed, but in

1  1999 -- ever since 1999 I believe it was the inpatient

2  section has contained in that section -- after they go

3  through and talk about the whole DRG coding, DRG

4  analysis that the price per point is based on, and

5  then at the end it says that after you figure that out

6  then what is paid is then subject to both a federal

7  budget neutrality factor and a state budget neutrality

8  factor.

9          And in 2006 there was a state plan amendment

10  submitted regarding the outpatient piece, which is

11  state plan 06-008, I believe, in our attachments.

12  That says that outpatient rates are to be paid on a

13  percentage of charges on an interim basis and that

14  there are final payments based on a percentage of

15  cost, and then it says that the department determines

16  the percentage that will be paid.

17          So that leaves -- that inserted into the

18  state plan what is in 126-A:3, that the payments will

19  be based on a percentage that may fluctuate.  So we

20  submit that the state plan does reflect 126-A:3.

21          Another issue on that point -- and I think

22  this was more -- Attorney Gordon said that the state

23  doesn't tell CMS anything, you know, basically about

24  what it's doing about rates and there's no obligation

25  to do that.  And in our surreply, page 11, we went

1  through an analysis of the federal regulations about

2  requiring -- whether rates themselves are required to

3  be in the state plan and pointed out the distinction

4  between the requirement of what's in the state plan

5  for the methods and procedure for determining the

6  rates and the rates themselves.

7          And then what's significant in that is that

8  the federal regulations set out a process for the

9  state to be advising CMS of what it's actually doing

10  as far as fluctuation in rates.  And that's in --

11  Section 447.255 requires that with assurances about

12  whether or not access is still being provided -- and

13  this is something that's being done on an annual

14  basis -- that the Medicaid agency must submit the

15  amount by which the estimated average rate increased

16  or decreased relative to the average payment rate and

17  in fact for each type of provider for the immediately

18  preceding rate period.

19          And going forward, I know that in the

20  preliminary injunction that the proposed CMS

21  regulations that are not in effect yet have been

22  submitted that would give further definition to this

23  reporting process and what's expected of states in the

24  future, but we pointed out that -- and the department

25  does annual reports, and in each of those annual

1   reports there's an appendix that has indicated the

2   changes, including each percent -- you know, like the

3   2008 changes in the percentage of rates.  Those were

4   in the annual reports, and those are certainly made

5   available to CMS.

6           So the idea that the department is hiding

7   what they have done as far as applying these factors

8   from CMS so that the Secretary couldn't come back and

9   say, we think you have a problem, you know, it just

10  doesn't square with the regulations or with what has

11  been done -- the reporting that has been done.

12          On the Long Term Care case I would just go

13  back and point the Court to one sentence in that case

14  at page 54.  This is where it starts talking about

15  13(A) and it says after the -- it is a paragraph that

16  starts, "broadly speaking".  The last sentence in that

17  paragraph says that the Commonwealth, the state of

18  Massachusetts, assumes that if Long Term's members are

19  providing nursing facility services such numbers

20  represented by Long Term are entitled to sue as

21  providers in federal court to enjoin violations of

22  Section 13(A) that affect their interests.

23          Therefore, the State of Massachusetts didn't

24  raise the issue of whether or not 13(A) provided a

25  cause of action.  They assumed that it would if they

1  were providers.  That's why Long Term Care didn't

2  really decide that question.

3          THE COURT:  Well, I think everybody agrees

4  it's not, strictly speaking, a law school holding of

5  the case.  Were you briefing it in an appropriate law

6  school class you would not write, holding, 13(A)

7  provides -- but the question is does it?  And you're

8  saying everybody thinks so, but it doesn't.

9          MS. SMITH:  What we are pointing out is --

10          THE COURT:  Everybody in the First Circuit

11  thinks so, but it doesn't.

12          MS. SMITH:  They've never been asked to

13  address that question.

14          THE COURT:  I understand.  No.  That's not

15  true.  They've addressed the question.  It just isn't,

16  strictly speaking, a holding as a law student and a

17  lawyer and a judge would understand the term holding.

18  It's a term of art.  As a term of art, you're quite

19  correct, it is not a holding of the case.

20          Okay.  Now the question remains, is there a

21  cause of action created?  Well, has anybody ever

22  spoken about the issue, discussed it?  Yes.  As a

23  matter of fact, the First Circuit has discussed it.

24  Gee, what did they say?  They said it does.  Is that a

25  holding binding on me?  No.  Is it persuasive that

1  they think it does?  A little bit.  Could I say, well,

2  it may be what you think, but it's not a holding and I

3  think differently?  Yes, I could do that.  But I think

4  Mr. MacDonald's point was, but it might be persuasive.

5        MS. SMITH:  We would respectfully submit that

6  if they went through the analysis and were asked to

7  really determine whether there are rights they may not

8  have --

9        THE COURT:  Well, do you disagree that you

10  are obligated to give notice and discuss what you plan

11  to do with regard to rates and the methodology and

12  reason why and then publish the rates and explain the

13  methodology behind them?  If you're required to do all

14  of that and you didn't do it -- I know you say we did,

15  but if you didn't do that, don't you agree that there

16  would be a cause of action under 13(A) by a hospital

17  to come forward and say, wait a minute, the procedural

18  requirements have not been followed.  I at least get

19  to come into court and say that, don't I?

20        MS. SMITH:  The Second and Third Circuits

21  have said no.

22        THE COURT:  I understand.  So you disagree?

23        MS. SMITH:  We claim there's not a cause of

24  action for it.  They could certainly have -- as they

25  have done -- raised it with CMS.  The hospitals have

1    raised these issues with CMS, came back and asked us

2    what we did.  So there's certainly notice to the

3    Secretary.  And the process -- the agreement between

4    the state and the federal government is that CMS can

5    certainly come back and tell the state you need to do

6    something else.

7         THE COURT:  And if there's some unholy

8    alliance between the state and the Secretary, too bad

9    for the providers?

10        MS. SMITH:  If CMS is satisfied that the

11   notice we gave was adequate --

12        THE COURT:  No.  I'm saying assume that the

13   Secretary and the department on a federal level and

14   the Secretary and the department on a state level over

15   a cup of coffee decide, you know what, pure fiscal,

16   that's the only concern, good enough, we're going to

17   wink at that and let that go.  The hospitals have no

18   recourse.  The enforcer has decided that that's okay,

19   and there's no recourse by a provider?  There's

20   nowhere they can go?  There's no court that that can

21   be heard in to say that's not what Congress provided

22   in the law, that's not the law of the land and the

23   parties are not observing the law, and there's no

24   court in this land that can do anything about it?

25   That just seems to be an odd perception.

1        MS. SMITH:  There is not always a causative

2  action for everything.

3        THE COURT:  Well, Marvin versus Madison kind

4  of suggested that there should be.

5        MS. SMITH:  There is a process.  The

6  providers would have other avenues to try and address

7  this.  They can certainly lobby with the legislatures,

8  which they do, for a different --

9        THE COURT:  But how does that help?  The

10  legislature says, yes, consider these other factors,

11  and the administrations on both the federal and state

12  level say, well, thanks for your advice, but I don't

13  think so.

14        MS. SMITH:  I'm hesitating because I know

15  that when -- and the CMS process in regard to state

16  plan amendments -- and I'm hesitating because I don't

17  know if there are other ways to do that, but the

18  providers can intervene in the process at CMS where a

19  state plan amendment is disapproved.  If the state

20  appeals with CMS then --

21        THE COURT:  No.  I'm just talking about just

22  a rank, blank failure, refusal to comply with the law

23  as written.  We're just not going to do that.  We are

24  not going to consider the effects on the delivery of

25  Medicaid services in determining this rate setting.

1  We're just not going to do it.  We're not doing it.

2  We didn't do it.  We're proud of the fact that we

3  didn't do it.  And you're saying hospitals have no

4  place to go because the regulator and the state have

5  winked at each other and decided that's okay.

6          You seem to be saying, well, there's still no

7  cause of action.  There's no Ex parte Young.  There's

8  no nothing.  Too bad.

9          Because Congress would be upset about that

10  theoretically, right?  Congress would say, these

11  aren't letters to our friends.  These are laws.  We

12  expect people to comply with them.  If they don't

13  comply with them, there's a mechanism.  You get

14  prosecuted.  You get sued.  You go to court.  The

15  courts establish what the problem is.  The courts

16  issue a remedy.  It gets enforced by the executive.

17  There's a system.  It works.  But it doesn't work if

18  there's no place to go and nobody has standing.

19          MS. SMITH:  Where Congress has designated

20  CMS, the Secretary, as being the enforcing mechanism

21  and the remedy, then that is the sole remedy that

22  Congress set out.

23          THE COURT:  You may be right.  It just

24  strikes me as an odd perception.

25          All right.  I promised Mr. Chapman I would

1  give him -- unless you're -- are you done?

2       MS. SMITH:  No.  That was my last point.

3       THE COURT:  Mr. Chapman, I assume you

4  disagree.

5       MR. CHAPMAN:  Thank you, your Honor.  I just

6  want to make clear that although I talked about 13(A),

7  the irreparable harm argument about decision makers

8  having the necessary information to come to the right

9  decision in the first instance applies to 30(A).  And

10 the reason it applies to 30(A) is that it's our

11 position that 30(A) has a procedural component to it.

12      And if you look at part of 30(A) -- Attorney

13 Smith talked about 30(A) was enacted to give the

14 states more flexibility and to ensure or safeguard

15 against unnecessary utilization, and it does say that.

16 It also talks about unnecessary utilization that are

17 consistent with efficiency, economy, quality of care,

18 and sufficient to enlist enough providers to service

19 the Medicaid population.

20      Now, how's the state going to get that

21 information?  CMS -- and this is referred to on page

22 33 of our opening memo in support of the preliminary

23 injunction.  CMS takes the position that the state

24 needs to get the input of Medicaid beneficiaries and

25 Medicaid stakeholders, i.e., hospitals, to ensure that

1  a rate change will still permit the necessary services

2  to be provided.

3           So, yes, indeed our irreparable harm argument

4  applies to 30(A), as well.

5           THE COURT:  Great.  Thank you.  Anything

6  else?  Attorney Smith?  Attorney MacDonald?  Attorney

7  O'Connell?  All right.  Thank you very much.  I

8  appreciate it.

9           (Conclusion of Hearing at 11:20 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate

6     transcription of the within proceedings, to the best of

7     my knowledge, skill, ability and belief.

8

9

10    Submitted: 12-21-11          *Susan M. Bateman*
                                   **SUSAN M. BATEMAN, LCR, RPR, CRR**
11                                 LICENSED COURT REPORTER, NO. 34
12                                 STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25