**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4-23-2012


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                                *
                                *
DARTMOUTH-HITCHCOCK CLINIC, ET  *
AL                              *  11-CV-358-SM
                                *  January 10, 2012
          v.                    *  9:40 a.m.
                                *
NEW HAMPSHIRE DEPARTMENT OF     *
HEALTH AND HUMAN SERVICES,      *
COMMISSIONER                    *
                                *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF EVIDENTIARY HEARING
MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


APPEARANCES:


For the Plaintiff:          William L. Chapman, Esq.
                            Orr & Reno

                            W. Scott O'Connell, Esq.
                            Gordon J. MacDonald, Esq.
                            Emily Pudan Feyrer, Esq.
                            Anthony Galdieri, Esq.
                            Nixon Peabody, LLP


For the Defendants:         Nancy J. Smith, Esq.
                            Jeanne P. Perrick, Esq.
                            Laura Lombardi, Esq.
                            Office of the Attorney General
                            Civil Bureau


Court Reporter:             Susan M. Bateman, LCR, RPR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1453

2

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| HENRY LIPMAN: | | | | |
| By Mr. O'Connell | 05 | | 122 | |
| By Ms. Smith | | 78 | | |

EXHIBITS:

| PLAINTIFF'S: | IN EVD |
|---|---|
| 63. | 36 |
| 64. | 43 |
| 79. | 60 |

| DEFENDANT'S: | |
|---|---|
| 198. | 87 |
| 190. | 90 |
| 146. | 92 |

```
1                P R O C E E D I N G S

2              THE CLERK:  Court is in session and has

3  for consideration a hearing on a motion for

4  preliminary injunction in Dartmouth-Hitchcock

5  Clinic, et al, versus New Hampshire Department of

6  Health and Human Services, civil case

7  number 11-CV-358-SM.

8              THE COURT:  All right.  Good morning.  It

9  must be an interesting case.  Plaintiffs.

10             MR. O'CONNELL:  Good morning, your Honor.

11             THE COURT:  Are you ready to go?

12             MR. O'CONNELL:  We are.

13             THE COURT:  All right.

14             MR. O'CONNELL:  The plaintiffs call Henry

15  Lipman to the stand.

16             THE COURT:  Mr. O'Connell, I haven't

17  looked at your request for findings of facts.  I

18  was just told it was 84 pages or something.

19             MR. O'CONNELL:  Yes, it is, your Honor.

20             THE COURT:  I'll take a look at it.

21  What's your anticipated time?

22             MR. O'CONNELL:  For this witness or for

23  the whole case?

24             THE COURT:  No.  For your witnesses.

25             MR. O'CONNELL:  Our plan was to be done by
```

4

1   midday tomorrow, if possible.

2           THE COURT:  Try the end of the day today.

3           MR. O'CONNELL:  Really?

4           THE COURT:  Yeah.  We're not going to be

5   too repetitive, right?

6           MR. O'CONNELL:  We're going to do

7   everything we can to move this along.

8           THE COURT:  I'll help you move along.

9           MR. O'CONNELL:  I have no doubt.

10          There are also a number of state witnesses

11  who were not alerted to be here today that we

12  would call tomorrow, and Dr. Butterly from

13  Dartmouth-Hitchcock we've asked to be here

14  tomorrow.  He didn't cancel his rounds today.  We

15  scheduled him for first thing tomorrow.  So we can

16  take him out of order.

17          THE COURT:  All right.

18                      HENRY LIPMAN

19     having been duly sworn, testified as follows:

20          THE CLERK:  Would you please state your

21  name for the record and spell your last name

22  please?

23          THE WITNESS:  It's Henry.  Middle initial

24  D, as in David.  L-I-P-M-A-N, Lipman.

25          MR. O'CONNELL:  Please be seated, Mr.

1   Lipman.

2                   DIRECT EXAMINATION

3   BY MR. O'CONNELL:

4        Q.   Where do you live, sir?

5        A.   I live in Laconia, New Hampshire.

6        Q.   How long have you lived in Laconia?

7        A.   23 years.

8        Q.   Are you married?

9        A.   Yes, I am.

10       Q.   Do you have children?

11       A.   Two children.

12       Q.   Are you currently employed?

13       A.   I am.

14       Q.   Where are you employed, sir?

15       A.   At LRG Healthcare.

16       Q.   What is LRG Healthcare, please?

17       A.   LRG Healthcare is a two-hospital group,

18   Lakes Region General Hospital in Laconia and

19   Franklin Regional Hospital in Franklin, New

20   Hampshire.

21       Q.   Will you tell us a little bit more about

22   Lakes Region Hospital?  How many beds does it

23   have?

24       A.   Lakes Region is licensed for 137 beds.

25       Q.   And Franklin Hospital?

1        A.   It's a 25-bed critical access hospital.

2        Q.   What is your position?

3        A.   I'm the Senior Vice President for

4   Financial Strategies and External Relations.

5        Q.   Would you tell the Court what your

6   responsibilities include with that role?

7        A.   I oversee the finances of the group of

8   hospitals and our provider practices, as well as

9   external relations, public policy.

10       Q.   Are you familiar with the financial

11  operations of LRG Healthcare?

12       A.   Absolutely.

13       Q.   Are you responsible for those issues with

14  regard to that corporation?

15       A.   Yes, I am.

16       Q.   Would you summarize your education,

17  please?

18       A.   I have a Bachelor of Science in health

19  management and policy from the University of New

20  Hampshire.  I graduated 1981.  An MBA from Boston

21  University with a healthcare management

22  concentration.  I graduated in 1985.

23       Q.   How long have you been employed in

24  healthcare administration?

25       A.   A little over 30 years.

1      Q.  I would like to talk with you in some

2  detail now about the LRG health system.  Would you

3  please tell the Court what its mission is?

4      A.  Our mission is to provide quality and

5  compassionate healthcare services to strengthen

6  our community.

7      Q.  How long has that been the mission of the

8  hospitals?

9      A.  LRG Healthcare was formed in July of 2002.

10  Recently we did make a change in our mission.  It

11  used to read:  To provide accessible quality and

12  compassionate care.  We dropped the word

13  accessible.

14      Q.  Why did you make that change?

15      A.  Because of the financial strings that

16  we're under as a result of the state change in the

17  commitment to the Medicaid program, as well as

18  other financial challenges that have been

19  generated by the economy at large.

20      Q.  So what are the implications of the change

21  of your mission as you've just described it with

22  regard to Medicaid patients?

23      A.  That the access that we have historically

24  provided for the life of the organization is at

25  risk, and we've had to take actions to limit it to

1   some extent.

2       Q.  Would you summarize for the Court the

3   actions that you've taken at the Lakes Region

4   General Hospital to deal with the financial

5   circumstances of the state's recent decisions?

6       A.  I kind of describe it as sort of we have

7   kind of four buckets to work with.

8           The first bucket is the bucket of

9   profitability.  And to a large extent operating in

10  the red there's nothing more to have there.

11          The second bucket we can work on is sort

12  of productivity, which is trying to increase the

13  efficiencies and the economies of the

14  organization.  We've improved that by tens of

15  millions of dollars.  We continue to work on that.

16          The third area that we could work on is

17  cost shifting.  But with the way health insurance

18  premiums are in New Hampshire and the position of

19  insurers, we can no longer do much of anything

20  there.

21          And the last one which we've heretofore

22  never had to address is access.

23      Q.  Has Lakes Region General ever had to

24  consider the payer status of a patient at the time

25  it was going to administer services?

1      A.  No.

2      Q.  Has that changed?

3      A.  Yes.

4      Q.  In what way has it changed?

5      A.  We have started to do a few things.  The

6  first which we implemented was discharging from

7  our primary care practices Medicaid patients.  We

8  have modified our financial and charitable systems

9  programs, and we are also working on implementing

10  the concept of limiting elective -- what we call

11  avoidable elective care.

12      Q.  And why are you implementing those changes

13  now?

14      A.  Well, the overwhelming impact of the state

15  budget change in terms of the pulling out of for

16  us a year over year change of 10 million, 130

17  million affecting the ten hospitals, and the

18  compounding of that from the preexisting rate

19  cuts, which through the biennium will be somewhere

20  around $11.6 million.

21      Q.  Lakes Region is a plaintiff in this

22  lawsuit?

23      A.  We certainly are.

24      Q.  What was the reason that Lakes Region

25  brought suit now with the other plaintiffs?

1       A.  We're just in such a compromised position

2  in terms of meeting our community needs that we

3  see no choice.

4       Q.  What relief do you seek from the Court by

5  this action?

6       A.  We're looking for an injunction to have

7  the state fulfill its responsibility under the

8  Medicaid Act, to assess what the impacts are on

9  access, as well as to make sure that the impact on

10  patients themselves, that they have a say in

11  what's gone on.

12       Q.  Let's talk a little bit further about your

13  health system and focus on the hospitals.  Lakes

14  Region, does it have any certain designations that

15  it operates with?

16       A.  Yes, we do.

17       Q.  Would you summarize those for the Court,

18  please?

19       A.  We have a sole community hospital status.

20       Q.  What does that mean, sole community

21  hospital status?

22       A.  Medicare looks at certain hospitals

23  because of their geographic location and the

24  dependency of the population in that area on that

25  particular institution.  That they make certain

1    adjustments in the payment system to make sure

2    that access isn't compromised, and we're one of

3    two sole community hospitals in New Hampshire.

4         Q.  Does the case before the Court involve

5    Medicare at all?

6         A.  Not directly, but the Medicaid program is

7    overseen by CMS, Centers for Medicaid and Medicare

8    Services.

9         Q.  When we talk about the financial issues,

10   they pertain to Medicaid specific decisions; is

11   that right?

12        A.  Correct.

13        Q.  In addition to the designation you just

14   described and the purpose for it, what other

15   designations does Lakes Region have?

16        A.  It's a rural referral center under

17   Medicare as well.

18        Q.  What does that mean?

19        A.  Which, again, is part geography and part

20   reflects a certain size and intensity of service

21   that we provide the population.  That the

22   population somewhat depends on, if you will, the

23   secondary services that we would provide.  We're

24   one of three in New Hampshire.

25        Q.  As a practical matter, what is the

 1  significance of those designations with regard to

 2  the patients that you serve?

 3       A.  I think they're reflective that there's a

 4  high dependency in our service area on our

 5  institution for hospital services and that the

 6  socio-demographics of the area are more adverse

 7  than you might otherwise expect.

 8       Q.  In what way is Franklin Hospital different

 9  than Lakes?

10       A.  Franklin Hospital is a critical access

11  hospital.

12       Q.  And what does that mean?

13       A.  A critical access hospital is, again, a

14  Medicare designation.  The Medicare designation is

15  provided to address a couple of issues.  One is,

16  again, geographic.  A second aspect of this is

17  socio-economic and healthcare needs of a

18  population.  And the third is fundamentally

19  dealing with financial actuarial risk.  Because of

20  the size of these hospitals, that their ability to

21  absorb certain financial risks under the payment

22  system that the larger hospitals take is more

23  limited because they don't have the volume to

24  offset the actuarial variability.

25       Q.  Which of the institutions, Lakes Region or

1   Franklin, has been more directly impacted by the

2   Medicaid changes?

3         A.   Lakes Region.

4         Q.   Systemwide how many employees does LRG

5   Healthcare have?

6         A.   We have approximately 1,200 FTEs, which is

7   about 1,600 persons.

8         Q.   FTEs?

9         A.   Full-time employees.

10        Q.   And the number of people who actually show

11   up from time to time is what number?

12        A.   Approximately 1,600.

13        Q.   Can you describe for the Court what your

14   primary service area is for Lakes Region?

15        A.   Generally, it's the central part of the

16   state, which is described generally as the Lakes

17   Region, and the Twin Rivers area.   More

18   specifically, the service area is generally the

19   area where we serve a community.   The majority or

20   plurality of volume comes from there to our

21   hospital.

22             There are other definitions that are used.

23   It's not a single standard.

24        Q.   Does every hospital, at least the

25   plaintiffs in this case, have a primary service

1  area?

2         A.  Absolutely.

3         Q.  Are you familiar with the Medicaid

4  population as it exists in your primary service

5  area?

6         A.  I am.

7         Q.  I would like you to look, sir, at what's

8  been marked as a full exhibit, Plaintiff's Exhibit

9  50.  Sir, do you recognize that document?

10        A.  I do.

11        Q.  What is it?

12        A.  It's the New Hampshire Medicaid annual

13 report for state fiscal year 2010.

14        Q.  Is that a report you're familiar with?

15        A.  This report I am.

16        Q.  How often is it produced?

17        A.  Each fiscal year there's a report, to my

18 understanding.

19        Q.  Would you turn your attention to page 11?

20 Do you see the graphic known as figure 10?

21        A.  Yes, I do.

22        Q.  There's a reproduction of that on the

23 board in front of you?  I'm sorry, would you

24 answer audibly?

25        A.  Yes.  I'm sorry.

1      Q.   Thank you.  Would you identify on that

2   map, sir, where your service area is located?

3      A.   It's the service area of Laconia and

4   Franklin, which is sort of an orange color to the

5   center of the state -- a darker orange.

6      Q.   And this chart contained in the state's

7   report says it's the Medicaid enrollees as a

8   percent of total population; is that correct?

9      A.   It does.  Yes.

10      Q.   What is the Medicaid percent of population

11   for the Laconia service area referenced on this

12   chart?

13      A.   13 percent.

14      Q.   And what is the total number as counted by

15   the state?

16      A.   6,372.

17      Q.   For Franklin what is the percent of

18   population that is Medicaid enrolled?

19      A.   16 percent.

20      Q.   And what is the number there?

21      A.   2,773.

22      Q.   Is it a fair summary, sir, that those two

23   populations added together constitute the Medicaid

24   population you try to serve in your primary

25   service area?

```
 1        A.  Yes, it does.

 2        Q.  Do you serve Medicaid patients from

 3   outside your primary service area?

 4        A.  We do.

 5        Q.  How does that occur?

 6        A.  For certain services that other

 7   hospitals -- particularly in our area critical

 8   access hospitals that don't provide something like

 9   vascular surgery might come to our hospital

10   because there isn't a source in their local

11   community.

12        Q.  So it's not an exclusive primary service

13   area, and you will treat Medicaid patients that

14   come from other parts of the state?  Is that true?

15        A.  Right.  That is true.

16        Q.  Just to summarize the data from this chart

17   for some of the other plaintiffs in this case, do

18   you see the Lebanon area?

19        A.  I do.

20        Q.  Is that where Dartmouth-Hitchcock has its

21   primary service area?

22        A.  Yes.

23        Q.  What percentage does it have of

24   population?

25        A.  7 percent.
```

1          MR. O'CONNELL:  I have another copy that

2   the Court might find more useful than the chart.

3   The defendants already have it.  I'll give the

4   witness a copy of something that might be a little

5   more readable.

6          Q.  So, I'm sorry, I was asking you about

7   Dartmouth-Hitchcock.  You said 7 percent?

8          A.  Yes.

9          Q.  And the actual number for that area?

10         A.  4,527.

11         Q.  Does Dartmouth-Hitchcock have a role

12   beyond its primary service area that is recognized

13   by the other hospitals like Lakes Region?

14         A.  Yes, they do.

15         Q.  What is their role?

16         A.  Their role is really as the only statewide

17   tertiary center in the state.  They provide

18   certain services that aren't available elsewhere

19   that otherwise you might have to go to another

20   state to find.

21         Q.  When you say tertiary care center, can you

22   describe what that means?

23         A.  Actually, tertiary refers to a complexity

24   and intensity of services.  Like an example that

25   might be common would be open heart surgery, which

1    isn't necessarily exclusively at Dartmouth, but

2    there may be certain research.  And there's

3    another term called cortenary services, which is

4    even higher, the types of things you expect to

5    find in a teaching institution where they do

6    research.

7         Q.  Are you familiar with the term safety net

8    hospital?

9         A.  I am.

10        Q.  What does that mean?

11        A.  It means that it's a hospital that has a

12   role of providing access where there may be no

13   other source to.  And for us there are times when

14   Dartmouth serves that purpose for our community.

15        Q.  Would you look at the area on figure 10 of

16   Exhibit 50 for Keene?  Do you see that reference?

17        A.  I do.

18        Q.  Is one of the plaintiff hospitals located

19   in Keene?

20        A.  Yes.

21        Q.  Which one is that?

22        A.  That's Cheshire Medical Center.

23        Q.  What is the percent of population of

24   Medicaid enrollment for Keene?

25        A.  11 percent.

1          MS. SMITH:  Your Honor, this is outside

2   his personal knowledge.  He can testify to what

3   the page says, but I don't know that he has

4   personal knowledge.

5          THE COURT:  I agree.

6          MR. O'CONNELL:  I'm just trying to set it

7   up to move it --

8          THE COURT:  I know, but you can cover in

9   one question probably ten minutes all of this.

10         Does that chart fairly represent the

11  percentage of Medicaid patients by geographic

12  distribution as depicted?

13         THE WITNESS:  Yes.

14         THE COURT:  Super.

15         MR. O'CONNELL:  Thank you.

16     Q.  Sir, have you tried to for purposes of

17  this case calculate the portion of revenue that

18  Lakes Region -- LRG Healthcare, the system,

19  derives from Medicaid services?

20     A.  Yes.

21     Q.  And where did you perform that calculation

22  or where is that calculation located?  Is that in

23  an affidavit that you prepared?

24     A.  It is in the affidavit that we submitted.

25     Q.  I turn your attention and the Court's

 1  attention to Exhibit 76.

 2          THE COURT:  If it's easier for you, Mr.

 3  O'Connell, I can see it.

 4          MR. O'CONNELL:  You can?  Thank you, your

 5  Honor.  We weren't confident we could get the

 6  technology right so we have paper, too.  Thank

 7  you.

 8      Q.  Mr. Lipman, is this a copy of a

 9  declaration that you prepared and submitted in

10  connection with this case?

11      A.  Yes.

12      Q.  Does it contain true and accurate

13  calculations that you prepared concerning this

14  case?

15      A.  It does.  With the supplemental affidavit

16  submitted, 2 and 3.

17      Q.  You have submitted two other declarations

18  in this case?

19      A.  Yes.

20      Q.  We'll talk about that.  Together those

21  three declarations you believe are accurate?

22      A.  Yes.

23      Q.  Okay.  Would you turn your attention, sir,

24  to the calculations contained in table 1 on page

25  5?  Did you perform these calculations, or were

1   they done under your instruction?

2        A.   I supervised.

3        Q.   Okay.   Would you summarize for the Court

4   the amount of revenue that is generated on an

5   annual basis through Medicaid services at Lakes

6   Region as of last year?

7        A.   10.31 percent.

8        Q.   And how has that changed from the prior

9   four years represented on the chart?

10       A.   It's increased from 8.15 percent in 2006

11   to 10.31 percent in 2010.

12       Q.   You can put that aside for the moment.

13   Can you summarize for the Court the nature of the

14   Medicaid program as it relates between the state

15   and the federal government, just generally?

16       A.   It's a partnership between the state and

17   the federal government which has funding coming

18   from both the state and the federal government.

19   It has a categorical approach as serving certain

20   distinct populations, some based on finances in

21   terms of their poverty level, and some based on

22   certain categories, like women and children, the

23   blind, disabled.

24       Q.   The state provides some of the funding for

25   the Medicaid program; is that right?

1       A.   They do.

2       Q.   And what has traditionally been the source

3  of that funding?

4       A.   A large portion has been the Medicaid

5  enhancement tax.

6       Q.   And who is responsible for paying the

7  Medicaid enhancement tax?

8       A.   Hospitals.

9       Q.   Does the federal government provide any

10  funding for the state's -- New Hampshire's

11  Medicaid program?

12       A.   It does.

13       Q.   Generally speaking, what is the nature of

14  that funding?

15       A.   It's a matching, generally.

16       Q.   When you say matching, would you describe

17  what that means?

18       A.   The money that would be put up on behalf

19  of the state, whether it came from Medicaid

20  enhancement tax or what have you, would be matched

21  generally on a 50/50 basis between the state and

22  federal government in our instance.

23       Q.   Who administers the Medicaid program in

24  New Hampshire?

25       A.   The Department of Health and Human

1  Services.

2      Q.  Does the federal government have any role

3  in administering the program?

4      A.  Yes.  They supervise the operation of the

5  program, and it generally is done through what's

6  called state plan amendments or SPAs.

7      Q.  What is the division of the federal

8  government that has responsibility for overseeing

9  the Medicaid program in New Hampshire?

10      A.  Centers of Medicaid --

11          MS. SMITH:  Objection.  It calls for a

12  legal conclusion.

13          MR. O'CONNELL:  I'll withdraw it.

14          THE COURT:  Oh, heavens.  Everybody

15  understands it anyway.

16          MR. O'CONNELL:  Okay.

17      Q.  We use the term CMS.  That's Center for

18  Medicaid Services?

19      A.  That's right.

20      Q.  All right.  Are you familiar, sir, with

21  the requirements of how the state is to set

22  reimbursement rates for Medicaid?

23      A.  In terms of -- yes.  I guess in terms of

24  the process that is supposed to take place there's

25  a standard which relates to economy, efficiency,

1   quality and access.

2      Q.  I would like you, sir, to turn your

3   attention to Exhibit 49, which I will put in front

4   of you in a second.  I just need to confirm

5   whether this is a full exhibit because it's not

6   marked as such.  Yes, it is.  Would you identify

7   that document, sir?

8      A.  It's titled The New Hampshire Department

9   of Health and Human Services Office of Medicaid

10   Business Policy, Orientation to Medicaid and CHIP

11   Program, State Fiscal Year 2012-2013 Budget

12   Presented to Sante Fe's Medicaid Overview April 7,

13   2011.

14      Q.  Would you turn your attention to page 13,

15   please?  Do you have that in front of you, sir?

16      A.  I do.

17      Q.  Have you seen this document before today?

18      A.  I have.

19      Q.  Do you see that there's a reference to 42

20   CFR 447.252(b)?

21      A.  Yes.

22      Q.  Does this placard accurately represent

23   what your understanding is, sir, for what is to be

24   included in a state plan --

25      A.  It does.

1       Q.  -- for Medicaid?

2       A.  It does.

3           MS. SMITH:  Objection.  It calls for a

4   legal conclusion and it's leading.

5           THE COURT:  Overruled.

6       Q.  The first point, sir, says:  Must allow

7   all parties to understand the rate setting

8   process, the items and services that are paid for

9   these rates; is that correct?

10      A.  Yes.

11      Q.  That's what it says.  Is that your

12  understanding of how the state has compiled a

13  state plan?

14      A.  No.

15      Q.  In what way has the state deviated from

16  that based on your personal knowledge?

17      A.  The methodologies both pre and post

18  regulations have not been publicly provided.

19      Q.  The third bullet, sir, says:  Section

20  1902(a)(30) requires payments for services to be

21  consistent with efficiency, economy and quality of

22  care.  Do you see that reference?

23      A.  I do.

24      Q.  With regard to the implementation of the

25  rates for this state's fiscal year, are you aware

1  of any effort by the state to maintain efficiency,

2  economy and quality of care at Lakes Region?

3       A.  No.

4       Q.  There's a reference in the fourth bullet

5  to the upper payment limit, the UPL.  Do you see

6  that reference?

7       A.  I do.

8       Q.  What is that, sir?

9       A.  Upper payment limit is a method of

10 enhancing the Medicaid rates that are paid.  It

11 allows the state to increase the Medicaid rate up

12 to as high as Medicare.

13      Q.  So can you generally describe the way that

14 that payment is determined?

15      A.  They would look at -- each individual

16 institution would have its own, if you will,

17 limits based on what it received in payments and

18 how that would be under the Medicare amount if it

19 was paid under Medicare.

20      Q.  The next bullet says that:  Section

21 1902(a)(2) provides that the lack of adequate

22 funds from state and local resources will not

23 result in lowering the amount, duration, scope or

24 quality of care and services available.  Do you

25 see that reference?

1        A.  I do.

2        Q.  Was there any process which you were aware

3   this year which looked at whether or not the funds

4   provided from state local resources would

5   result -- or not result in the lowering in the

6   amount of duration, scope or quality of care?

7        A.  No.

8        Q.  Would you turn your attention to page 14

9   of this exhibit, please?  You referred to state

10   plan amendments a moment ago, sir.  What's your

11   understanding of what a state plan amendment is?

12        A.  It's a communication from the state to the

13   Centers of Medicare and Medicaid Services

14   explaining what the change or the proposal would

15   be to provide payment for Medicaid services.

16        Q.  The first reference underneath that says

17   public process requirements.  Do you see that?

18        A.  I do.

19        Q.  Sir, were you aware of any notice to Lakes

20   Region General Hospital before the implementation

21   of this year's budget which contained Medicaid

22   reductions?

23        A.  Not -- no.  Not related to the

24   requirements as I understand them for Medicaid.

25        Q.  What do you understand the requirements to

1  be, sir?

2      A.  That there be an opportunity -- as

3  similarly described earlier, that there be an

4  opportunity for there to be a notice of what the

5  change is going to be.  That the methodology that

6  is going to be changed or adopted, that we see

7  what that be.  That there would be a chance for

8  comment.  That that methodology and whatever

9  comments would be, that you would see what the

10  final would be.  There would be an assessment of

11  what the impact would be to beneficiaries in terms

12  of access both pre and post.  That there would be

13  an assessment against the ability of an

14  economically -- reasonably economically efficient

15  provider to be able to provide the services for

16  the rates that are being published.

17      Q.  So let me ask:  Were there any public

18  notices of which you were aware before the

19  enactment of this budget, July 1st of 2011, that

20  provided you notice of what was going to change

21  with regard to your Medicaid reimbursements?

22      A.  No.

23      Q.  Were you given any time to provide written

24  input to the decision makers at the Department of

25  Health and Human Services about the intended

1   changes?

2        A.  No.

3        Q.  Do you see the next bullet there that says

4   assurance requirements regarding access to care?

5        A.  I'm sorry?

6        Q.  The second item underneath the state plan

7   amendments.

8        A.  Yes.

9        Q.  Do you see the reference to assurance

10  requirements regarding access to care?

11       A.  Yes.

12       Q.  Were you aware of any inquiry by the

13  Department of Health and Human Services prior to

14  the enactment of this budget that looked at the

15  implications of access to care to Medicaid

16  patients by this budget?

17       A.  No.

18       Q.  Do you see the next reference, sir, about

19  CMS?

20       A.  Yes.

21       Q.  And the state's document says CMS:  What

22  impact does proposed SPA have on the ability and

23  access to the service?  Do you see that reference?

24       A.  I do.

25       Q.  Do you see the bullet underneath that:

1   Will reduction in rates allow the state to comply

2   with 1902(a)(30)?  Do you see that?

3        A.  Yes.

4        Q.  Are you aware of anything provided at

5   Lakes Region, any communication from the

6   Department of Health and Human Services to CMS

7   that did an assessment about the availability and

8   access to service of Medicaid patients that would

9   result by the reductions of this budget?

10       A.  No.

11       Q.  The next bullet talks in terms of:  How

12  did the state determine that the Medicaid provider

13  payments are sufficient to enlist enough providers

14  to assure access to care and services in Medicaid

15  at least to the extent that care and services are

16  available to the general population in the

17  geographic area?  Do you see that reference?

18       A.  I do.

19       Q.  Are you aware, sir, of any study done by

20  the Department of Health and Human Services to

21  determine whether the new budget implemented this

22  year would enlist enough providers to assure

23  access to care?

24       A.  No.

25       Q.  In fact, with regard to access to care,

1   what has Lakes done because of the financial

2   implications at its hospital?

3       A.  Thus far, we have sent a letter to 3,000

4   patients who were in our primary care practices,

5   adults, notifying them following the AMA

6   guidelines for discharging separation from a

7   practice, and we excluded from that pediatric,

8   children, and pregnant women, and have effected

9   that policy change of not accepting existing

10   patients or new patients into those practices.

11        We have adopted a policy to reduce our

12   charitable assistance to the community, and we

13   have started to implement a process to restrict

14   what we are terming avoidable elective care to the

15   people in our community.

16       Q.  And the point of those actions are to do

17   what, sir?

18       A.  It's to try to reflect the reality of the

19   economic conditions that have been pushed on us by

20   the adoption of this budget.  That we have to make

21   adjustments so that we continue to make sure that

22   the facility is -- the facilities and services are

23   available to the community to the best extent

24   possible.  That what we've been used to providing

25   to the community for access is no longer

 1  sustainable based on the economics.

 2      Q.  The last bullet of this Exhibit 49, sir --

 3  I'm sorry, the second to the last:  How were

 4  providers, advocates and beneficiaries engaged in

 5  the discussion around rate modifications?  Were

 6  there concerns?  How did the state respond?  Do

 7  you see that reference?

 8      A.  Yes.

 9      Q.  Was Lakes Region engaged in any

10  discussions concerning access issues or the

11  implications on care because of the state's

12  budget?

13      A.  No.

14      Q.  The last bullet references:  How does the

15  state intend to monitor impact of new rates and

16  implement remedy should rates be insufficient to

17  guarantee required access levels?  Do you see that

18  reference?

19      A.  Yes.

20      Q.  Are you aware of any actions by the

21  Department of Health and Human Services to monitor

22  the impacts to access as a result of the new

23  budget that has been implemented?

24      A.  No.

25      Q.  I would like to turn your attention to

1   Exhibit for ID 63.  Sir, do you recognize this

2   document?

3        A.  I do.

4        Q.  What does it represent?

5        A.  It represents the transaction for state

6   fiscal year 2011 with respect to the MET, the UPL

7   and the DSH, and the impact related to

8   uncompensated care.

9        Q.  Do you know the source of this data?

10       A.  It's the state's, Department of Health and

11   Human Services, charts that they published

12   associated with the transaction.

13       Q.  To your knowledge does this accurately

14   compile the state's data in just this format for

15   presentation here?

16       A.  It does.

17       Q.  Would you please, sir, tell us what the

18   first line represents -- the first column, excuse

19   me, MET.

20       A.  That's the Medicaid enhancement tax.

21       Q.  And that's for Lakes Region in fiscal year

22   2011 with what amount, sir?

23       A.  $5,756,123.

24       Q.  The next column references what, sir?

25       A.  The inpatient UPL payment.

1      Q.   Again, UPL was -- you define UPL.   What is

2  inpatient UPL?

3      A.   In it's simplest form, it would be what

4  the state was able to pay in additional dollars

5  above the preliminary Medicaid rates, but not more

6  than Medicare.

7      Q.   And that second column represents for

8  inpatient Medicaid services?

9      A.   Correct.

10     Q.   Would you look at the third column, sir?

11     A.   Yes.

12     Q.   What does that number with regard to

13  outpatient UPL payments represent?

14     A.   Similar to the inpatient setting, it

15  represents on the outpatient setting those dollars

16  that could be paid that were less than Medicare,

17  or not to exceed Medicare.

18     Q.   And in 2011 that number for outpatient UPL

19  was what?

20     A.   1,478,477.

21     Q.   The next column is under something called

22  DSH, D-S-H.   What is DSH?

23     A.   It stands for disproportionate share.

24     Q.   And what does a DSH payment represent,

25  generally?

1       A.   It generally represents a supplemental

2   payment to reflect the hospital's share of low

3   income Medicaid and uninsured patients that a

4   hospital might serve.

5       Q.   And what number is that for Lakes last

6   year?

7       A.   2,965,187.

8       Q.   So if you add those columns together under

9   inpatient UPL, outpatient UPL and DSH for Lakes,

10   the payment last year was what?

11       A.   7,064,268.

12       Q.   And if you were to compare that against

13   the MET, were you a net payer or receiver of funds

14   say for the year 2011?

15       A.   A net receiver under the net payment

16   column of 1,308,145.

17       Q.   So that was money that Lakes got in the

18   last budget?

19       A.   Correct.

20       Q.   What is the next column, sir?  It says

21   "uncomp care".

22       A.   It's a total calculation of uncompensated

23   care which reflects the cost -- on a cost basis,

24   meaning that it's brought down and evaluated at

25   the true cost to the facility for treating

1  Medicaid patients as well as the uninsured?

2      Q.  And that number for state fiscal year 2011

3  at Lakes was what number?

4      A.  11,113,652.

5      Q.  Does the state generally track your

6  uncompensated care?

7      A.  In terms of the recent transactions, yes.

8      Q.  So if you were to take the net payments

9  for UPL and DSH against your uncompensated care,

10  what was the impact in state fiscal year 2011 for

11  Lakes Region?

12      A.  Lakes Region was left to absorb $9,805,507

13  of uncompensated care.

14          MR. O'CONNELL:  Your Honor, I would offer

15  this as a compilation, the source data, as a full

16  exhibit.

17          THE COURT:  Any objection?

18          MS. SMITH:  I would object to it.

19          THE COURT:  ID may be stricken on Exhibit

20  63.

21          (Plaintiff's Exhibit No. 63 Admitted)

22      Q.  Can you just summarize for the Court --

23  this summarizes the total impact of the ten

24  plaintiffs in this lawsuit in that last column.

25  Just for the record, would you read what that

1  number is?

2      A.  You're referring to the total UCC payments

3  or total impact?

4      Q.  Total impact.

5      A.  Total impact is 196,467,712.

6      Q.  And just to be clear, the math for the

7  total impact is done how?  Which columns are taken

8  into consideration for total impact?

9      A.  The MET, which is column 1; the total UCC

10 payments, which is column 4; and then the

11 uncompensated care column, which is the second to

12 the last column, net to the total impact of 196.

13     Q.  It says total UCC payments.  In the

14 parlance of what we're talking about, what does

15 UCC stand for?

16     A.  It's uncompensated care, which is really

17 the summary of the three columns preceding it.

18 The 130 million was the number that I was

19 referring to earlier, which is why we're here

20 bringing the litigation is because that number

21 doesn't get paid to the ten plaintiffs in 2012.

22     Q.  This is just the number for the ten

23 plaintiffs, not all hospitals in the state,

24 correct?

25     A.  Correct.

1      Q.  Would you turn your attention to Exhibit

2   64, which I will put in front of you?  Do you

3   recognize Exhibit 64 marked for ID?

4      A.  I do.

5      Q.  Would you describe what that document is,

6   sir?

7      A.  It describes the New Hampshire state

8   fiscal year 2012 transaction.  It's the same setup

9   as the previous chart we looked at.  It

10   describes -- for the ten hospitals it shows for

11   UPL, whether it be inpatient, outpatient or DSH,

12   zeros, which means there's a $130 million

13   difference between 11 and 12.

14      Q.  Do you know the source of the data for

15   Exhibit 64?

16      A.  It's data published by the state supplied

17   in support of a DSH transaction that has partially

18   taken place in 2012.

19      Q.  Is this a summary of that data issued by

20   the state?

21      A.  It is for the ten hospitals.

22      Q.  Is this exhibit calculated in the same

23   fashion as Exhibit 63?

24      A.  It is.

25      Q.  None of the ten hospitals in state fiscal

    1   year 2012 received any inpatient UPL payments; is

    2   that what it represents?

    3        A.   Yes.

    4        Q.   Is it the same for outpatient UPL, sir?

    5        A.   Yes.

    6        Q.   And for the DSH payment, also true?

    7        A.   Yes.

    8        Q.   The total UCC payments for the ten

    9   hospitals was zero in state fiscal year 2012?

   10        A.   Yes.

   11        Q.   The state still collected the Medicaid

   12   enhancement tax for the ten hospitals in state

   13   fiscal year 2012?

   14        A.   The hospitals have paid, yes.

   15        Q.   And that left column represents what?

   16        A.   The projected MET payments as calculated

   17   by the Department of Health and Human Services

   18   based on a form that was provided to the providers

   19   to complete and submit to the Department of Health

   20   and Human Services.

   21        Q.   And the total of MET projected by the

   22   state for the ten hospitals is what number on this

   23   chart?

   24        A.   124,522,691.

   25        Q.   And the net payment column is just a

1    carry-over of the projected MET; is that right?

2         A.  Correct.

3         Q.  The next column represents what

4    information, sir?

5         A.  It represents the uncompensated care

6    calculation for Medicaid loss and uninsured losses

7    as calculated by the department using the

8    information supplied by hospitals on their

9    Department of Health and Human Services input

10   form.

11        Q.  The same uncompensated care that you

12   described, except in a different year?

13        A.  Yes.  Correct.

14        Q.  And so the total impact for state fiscal

15   year using the state's source data is what for

16   fiscal year 2012?

17        A.  The ten plaintiff hospitals are to absorb

18   $302,015,867 in uncompensated care.

19        Q.  So if state fiscal year 2011 has a

20   baseline of 196 million, what is the net impact to

21   the ten hospitals in state fiscal year 12?

22        A.  They will have to absorb another

23   105,548,155.

24        Q.  Now, with regard to those changes, the

25   reduction of inpatient UPL at Lakes is a zero.

1  Was there any public notice of that to Lakes

2  Region?

3       A.  No.

4       Q.  Was Lakes Region provided any opportunity

5  to provide written input to the Commissioner of

6  Health and Human Services about the impact of that

7  decision?

8       A.  Not before it was implemented.

9       Q.  So after the fact the state has asked for

10  that information; is that true?

11       A.  Correct.

12       Q.  How about with outpatient UPL, the same,

13  any opportunity before the budget was implemented

14  to provide written comments to the commissioner

15  about the impacts?

16       A.  It's the same everywhere.

17       Q.  No opportunity?

18       A.  No opportunity, no.

19       Q.  And with regard to DSH payments, were you

20  provided at Lakes an opportunity to provide input

21  to the commissioner before the implementation of

22  the budget?

23       A.  No, we weren't.

24       Q.  Were you asked by the commissioner or any

25  of his staff to assess the impact of not receiving

1    UPL or DSH payments in state fiscal year 2012?

2        A.  No, we weren't.

3        Q.  Are you aware of any analysis done by the

4    state to determine what impacts would occur at

5    Lakes Region because of no UPL payments and no DSH

6    payments?

7        A.  I'm not.

8        Q.  Sir, have there been other rate reductions

9    that Lakes has experienced since 2008?

10       A.  Yes.

11       Q.  Did you compile some data from Lakes in

12   your declaration concerning the impacts of that?

13       A.  I did.

14       Q.  Would you look at your affidavit, Exhibit

15   76, please?  While you're pulling it out --

16           MR. O'CONNELL:  Your Honor, I would offer

17   Exhibit 64 as a compilation of state data under

18   1006.

19           THE COURT:  Any objection?

20           MS. SMITH:  I don't think you've

21   identified the source of the state data.

22           MR. O'CONNELL:  Oh, okay.

23       Q.  Would you identify for the Court the

24   source data for Exhibit 64, please?

25       A.  It's the New Hampshire Department of

1  Health and Human Services New Hampshire hospital

2  disproportionate share payments program interim

3  payment plan, December 2011, and the other exhibit

4  is from the Department of Health and Human

5  Services -- New Hampshire Department of Health and

6  Human Services model.  It appears to be dated

7  11-4-10.

8      Q.  And is that information that was provided

9  to the hospitals from the Department of Health and

10  Human Services?

11      A.  Yes.

12          MR. O'CONNELL:  I would offer it again,

13  your Honor.

14          MS. SMITH:  I'm not going to object to it.

15          THE COURT:  The ID may be stricken on

16  Exhibit --

17          MR. O'CONNELL:  That's 64.

18          THE COURT:  -- 64.

19          (Plaintiff's Exhibit 64 Admitted)

20      Q.  Now, looking at --

21          THE COURT:  I'm sorry to interrupt, but

22  just so -- as I understand from 64, in fiscal 2012

23  for these ten hospitals there will be no DSH

24  payments?

25          THE WITNESS:  That is correct.  There is a

1   footnote, your Honor, that talks about the state

2   is withholding a total of 500,000 for payment to

3   deemed hospitals.  The state hasn't announced

4   which of the hospitals are deemed yet, so I think,

5   other than $500,000, at this point there is no

6   money expected to be potentially distributed to

7   the ten.

8           THE COURT:  Just because I'll forget if I

9   don't ask it now, in the Hood case -- I'm sure

10  you're familiar with it -- there was a provision

11  for, as I understand it, DSH reimbursement

12  payments that covered up to 70 percent of the

13  reduction in the rate, but that's not the case

14  here?

15          MR. O'CONNELL:  Correct.

16          THE COURT:  So here you're demonstrating

17  that not only were their rates reduced but their

18  DSH payments were also reduced.  So there's no

19  recovery of any part of the reduction in rates

20  through DSH payments.  In fact, the DSH payments

21  were reduced as well.

22          MR. O'CONNELL:  Your last comment you made

23  is right, and that is our position.

24          THE COURT:  What was the last comment I

25  made?

1          MR. O'CONNELL:  The last comment that no

2    DSH payments are being made against the losses

3    that they've suffered.

4          THE COURT:  So if you get a rate

5    reduction, you also have a DSH reduction.

6          MR. O'CONNELL:  Correct.

7          THE COURT:  No percentage of the rate

8    reduction is covered under a DSH payment, and in

9    fact the DSH payments were reduced as well or

10   eliminated in 2012.

11         MR. O'CONNELL:  That's correct.

12      Q.  For the record, let's make this clear.

13   Over here the total UCC payments in 2011 to the

14   ten hospitals is what?

15      A.  130 -- the difference in the total UCC is

16   130,121,922.

17      Q.  And the only caveat is there's $500,000

18   being held aside for some deemed hospitals to be

19   determined?

20      A.  Correct.

21      Q.  It's not 500,000 per.  It's a total

22   amount.

23      A.  Correct.

24      Q.  So just to do the math, it would be a

25   $130 million difference year over year and does in

1  fact go with the $500,000, a little lower?

2      A.  It potentially could be that lower budget

3  amount.

4      Q.  Thank you.

5          THE COURT:  But overall, it's a high

6  percentage reduction.

7          MR. O'CONNELL:  Correct.

8      Q.  And this happened in one year?

9      A.  Correct.

10     Q.  You were given -- strike that.

11         THE COURT:  Since I'm interrupting anyway,

12  you seem to be conflating notice of legislation

13  with notice of rate reduction.  Why?

14         I mean, one might argue -- I'm not sure

15  the state does, but one might argue, of course

16  everybody has notice of pending legislation.

17  Everybody has notice of what the legislature does

18  and the government decides and so forth.  Is that

19  what you're addressing?

20         MR. O'CONNELL:  No.

21         THE COURT:  Because they don't relate, do

22  they?

23         MR. O'CONNELL:  They do, but they're not

24  the same thing, so I'll clarify.

25     Q.  With regard to the implementation of a UPL

1  reduction, what do you believe the state needs to

2  do with regard to CMS?

3          THE COURT:  Well, I can figure that out.

4  What do you mean by they didn't get any notice?

5          THE WITNESS:  That's a question to me?

6          THE COURT:  Uh-huh.

7          THE WITNESS:  In terms of the standard

8  that is required under the Medicaid Act, that was

9  not followed.

10          THE COURT:  You never got any notice of

11  rate reduction or DSH payment reductions?

12          THE WITNESS:  No more than the

13  methodologies.  In fact --

14          THE COURT:  I understand all of that

15  but -- all right.  Obviously everybody has notice

16  of what the legislature is up to.

17          MR. O'CONNELL:  That's correct.  If I

18  conflated it, it was not by design.

19      Q.  The state plan was not amended prior to

20  the enactment of the budget on these issues, was

21  it?

22      A.  Correct.  It was attempted to be amended

23  afterwards.

24          THE COURT:  Attorney Smith, I gather it's

25  not the State's position that notice of the budget

1  legislation is somehow notice of the state plan

2  amendment proposal?

3          MS. SMITH:  No.  Because obviously the

4  state plan can't be amended to reflect a change in

5  the budget until the budget is done.

6          THE COURT:  Right.  Okay.  But I mean it's

7  not your position, you're aware of the budget, you

8  were aware of the reduction contained in the

9  budget, therefore you're aware of the impact on

10  rates because you're aware of the budgetary

11  action.  That's not your argument in this case?

12          MS. SMITH:  No.  To the extent budget

13  action requires the state plan amendment, we'll

14  show that the state plan amendment was

15  subsequently done.

16          THE COURT:  We all agree that for an

17  adequate state plan amendment you have to comply

18  with the applicable federal regulations.

19          MS. SMITH:  Correct.

20          THE COURT:  Okay.

21      Q.  While you may not have had information

22  about the pending legislation before it was

23  enacted, sir, did you have any information as to

24  how the commissioner intended to change the state

25  plan and how it would affect, therefore, payments

49

1   to Lakes?

2       A.  No.

3       Q.  Would you turn your attention to your

4   declaration, Exhibit 76, and specifically table 2?

5   Did you try -- well, strike that.

6           Before the year over year impact we've

7   just discussed, from 2011 to 2012, can you

8   summarize for the Court the types of other rate

9   reductions that apply to Medicaid reimbursement

10  from 2008 forward?  Can you summarize that please?

11      A.  In dollars, it was approximately

12  through -- projecting to the end of the biennium,

13  it's about $11.6 million for Lakes Region.

14      Q.  By category?

15      A.  By category there was a reduction in

16  inpatient rates.  There was a reduction in

17  outpatient rates.  There was a reduction in the

18  radiology rates.  There was a reduction in

19  catastrophic rates.  There was a reduction in the

20  payment of cost settlements.  That's what I'm

21  referring to in my $11.6 million number.  That's

22  based on that.

23      Q.  And let me ask you to look at Exhibit 79

24  marked for ID.  What is this document, sir,

25  Exhibit 79?

      1       A.  It's a summary of rate reductions by

      2  category for Lakes Region General Hospital for

      3  fiscal years 2008 to 2013.

      4       Q.  And what is your complaint about the way

      5  inpatient rates were reduced during that time

      6  period?

      7       A.  They were reduced with no notice.  It was

      8  done by an executive order and implemented a ten

      9  percent reduction.

     10       Q.  Do you know the timeline in which the

     11  executive order was issued and it was ultimately

     12  approved by the legislature?

     13       A.  It was a matter of days -- or a day.

     14       Q.  Was there any public notice before the

     15  implementation of the inpatient rate reductions

     16  which you're aware of?

     17       A.  No.

     18       Q.  Did you have an opportunity to comment on

     19  the imposition of this rate reduction in Lakes

     20  Region?

     21       A.  No.

     22       Q.  With regard to outpatient rates, what is

     23  your complaint with regard to the way they were

     24  reduced?

     25       A.  They were not only reduced but they were

1  reduced retroactively.

2      Q.  When was the reduction announced by the

3  state?

4      A.  It was announced in November of 2008

5  retroactive to July 1st of 2008.

6      Q.  Do you know the process under which that

7  enactment happened?

8      A.  It went through similarly to -- it went

9  through the fiscal committee as a proposal and was

10  adopted.

11      Q.  Was there any public notice of this

12  reduction from the department?

13      A.  No.

14      Q.  Before it was implemented, I should ask?

15      A.  No.

16      Q.  And were you given an opportunity to

17  comment on the impact that it would have on Lakes

18  if implemented?

19      A.  No.

20      Q.  With regard to the inpatient rates, you've

21  calculated a number from 2008 to 2013.  Do you see

22  that?

23      A.  I do.

24      Q.  What is that summary?

25      A.  1,015,000.

1      Q.  Why have you included that number for 2012

2  and 2013?

3      A.  Because it continues in effect through the

4  biennium.

5      Q.  You haven't experienced those numbers

6  actually yet, though.  Is that a fair statement?

7      A.  Right.  They're estimates.

8      Q.  Unless something changes, you're

9  anticipating that that will be in effect, or

10  something else?

11      A.  Correct.  These are estimates based on

12  holding volume constant.

13      Q.  The outpatient rates reduction from 2008

14  to 2013 is what number, sir?

15      A.  Is $4,136,928.

16      Q.  The third item listed on this chart is Rev

17  Code 510.  What is that reference, sir?

18      A.  It refers to a policy change by the

19  department to no longer recognize, as Medicare

20  recognizes, what might be known as clinic or

21  facility-based services, also known as provider

22  based type payments.

23      Q.  Did that have an impact on the amount of

24  reimbursement that Lakes received by that change?

25      A.  It did.

1        Q.  Do you know when that change was enacted?

2        A.  It was enacted in 2010.

3        Q.  Do you know the process by which it was

4   enacted?

5        A.  It went through an announcement by the

6   department -- just a notice through fiscal

7   committee type of process similar to the other

8   transactions that occurred.  We did receive a

9   letter outlining it from the department.

10       Q.  When did you get that letter, sir?  Before

11  or after enactment?

12       A.  I guess we got it before actually the

13  payments were reduced.  I guess from a legislative

14  history standpoint there was an attempt to

15  eliminate that in a prior year legislatively

16  through the legislative process, but effectively

17  we received a notice after the policy decision was

18  already made.

19       Q.  Were you given a 30-day opportunity to

20  provide written commentary as to the impacts of

21  this change at Lakes Region?

22       A.  No.

23       Q.  The next item is -- oh, sorry.  The amount

24  that you have calculated for the period 2008

25  through 2013 is what, sir?

1        A.  4,213,492.

2        Q.  The next item is outpatient radiology.  Do

3   you see that reference?

4        A.  Yes.

5        Q.  What is the change that you reference in

6   there?

7        A.  The state implemented a change -- it was

8   in common with the 510 code change -- that advised

9   us that they would no longer pay a percentage of

10  cost as defined under what we call a cost report,

11  but rather they would pay us off a fee schedule.

12       Q.  How were you provided notice of that

13  change?

14       A.  The same process as the 510.

15       Q.  Were you given a 30-day opportunity to

16  provide written comments to the commissioner about

17  the impacts of that change?

18       A.  No.

19       Q.  Were you aware of any assessment done by

20  the Department of Health and Human Services

21  concerning the impact at Lakes for that change?

22       A.  No.

23       Q.  How about with regard to the other three

24  items that we just described, any assessment by

25  the department as to the impact at Lakes?

1       A.  No.

2       Q.  And the total for the outpatient radiology

3   impact for the period 2008 to 2013 is what, sir?

4       A.  $497,049.

5       Q.  Have you -- can you describe the next

6   item, which is referred to as catastrophic

7   payments?  What does that refer to?

8       A.  It's a policy where the normal inpatient

9   payment would be so below what the actual charges

10  were.  There's a certain set of criteria that when

11  the payment was so extraordinarily small that

12  there would be a small supplemental payment.  It's

13  also sometimes known as kind of like an outlier

14  payment.  And the last time we received those was

15  the figures that are on the chart here.

16      Q.  What is the process by which that change

17  was implemented?

18      A.  It follows a similar pattern as the

19  others.  It's basically a policy decision brought

20  through the legislature.  But we didn't get to

21  participate in any process that conforms with the

22  Medicaid requirements.

23      Q.  Were you given a 30-day notice to provide

24  written comments?

25      A.  No.

1        Q.   Were you aware of any assessment done by

2   the department as to the impacts of this change at

3   Lakes?

4        A.   No.

5        Q.   And the total for that catastrophic

6   payment reduction for the period 2008 to 2013 is

7   what?

8        A.   446,032.

9        Q.   The last item refers to outpatient

10  settlements.   What is the issue with regard to

11  outpatient settlements?

12       A.   The hospitals file a report called a cost

13  report and that defines the costs that we've

14  incurred in treating Medicaid patients using a

15  methodology that CMS uses to define Medicare cost.

16  And on an interim basis the state pays hospitals a

17  percentage of what they bill, and then there's

18  sort of what we call a true-up where they compare

19  what they paid versus what would be a percentage

20  of cost, which is currently for the ten hospitals

21  at 54.04 percent of cost.   So they compare what

22  they paid on an interim basis with what that 54.04

23  percent of cost is as defined under the cost

24  report, and if there's a balance that's owed to

25  the provider, which is the case with Lakes, that

1   money is supposed to be what we call settled or

2   paid to the provider.

3           Conversely, if a provider -- if they've

4   paid the provider too much, the provider would owe

5   money back to the state.

6       Q.  And do you have any commitment from the

7   state as to when those outpatient settlements will

8   be paid to Lakes?

9       A.  As I understand the budget that was just

10  adopted, they talked about paying it in some

11  future fiscal year with no commitment as to when

12  it would be.

13      Q.  So as you sit here today, do you know when

14  you will get that cost settlement from the state?

15      A.  We do not.

16      Q.  What is the impact of that administration

17  of that issue with regard to outpatient

18  settlements?

19      A.  Effectively, we're loaning the state,

20  according to my chart, about $1.26 million.

21      Q.  What was the process by which that cost

22  settlement process was changed?

23      A.  The process wasn't in effect changed.  It

24  was suspended.  In other words, whereas they

25  ordinarily would pay out the settlements or

1  receive the payments, that to my understanding any

2  cost reports that are sort of '09 forward aren't

3  going to -- haven't been settled.

4       Q.  Were you provided any notice of the

5  suspension of that administration?

6       A.  No.

7       Q.  Were you given an opportunity to comment

8  as to what the impacts would be on Lakes?

9       A.  No.

10      Q.  Did the commissioner or anyone on his

11 staff inquire of Lakes before the implementation

12 as to the impact at Lakes?

13      A.  No.

14      Q.  And the total for these category rate

15 reductions for the period 2008 through 2013 is

16 what number, sir?

17      A.  $11,570,022.

18      Q.  How does that relate to the numbers that

19 you're describing with regard to Exhibit 64?

20      A.  Well, Exhibit 64 magnifies the impact of

21 these compounding rate cuts.

22      Q.  So the numbers that are referenced on 79

23 are independent of the rate cuts referenced in

24 Exhibit 64?

25      A.  At the totals line level, yes.

1      Q.   There's a reference on Exhibit 79 to the

2  upper payment limit?

3      A.   Correct.

4      Q.   That was actually covered in Exhibit 64;

5  is that right?

6      A.   Correct.

7      Q.   What was the source of the data from which

8  you compiled this chart?

9      A.   A number of internal sources.  Do you need

10  me to walk through each of them or just the

11  general --

12      Q.   Just generally.  Was it done under your

13  supervision, sir?

14      A.   It was done under my supervision using

15  either, in the case of like inpatient rates, the

16  rate in effect times the number of discharges that

17  we had in a particular year.

18      Q.   Is it based on Lakes Region data?

19      A.   It's based on Lakes Region specific data

20  and Lakes Region cost report information.

21      Q.   Do you believe it's accurate?

22      A.   I do believe it's a reasonable estimate,

23  yes.

24          MR. O'CONNELL:  I would ask that Exhibit

25  79 have the ID stricken, your Honor.

1          THE COURT:  Any objection?

2          MS. SMITH:  I'm sorry.  I'm having trouble

3  hearing him.

4          MR. O'CONNELL:  Oh, I'm sorry.  I would

5  like to strike the ID from Exhibit 79.

6          MS. SMITH:  I'm not going to stipulate to

7  the accuracy, but I will not object to the

8  document coming in.

9          THE COURT:  ID may be stricken on

10  Plaintiff's 79.

11          (Plaintiff's Exhibit 79 Admitted)

12          MR. O'CONNELL:  One second, your Honor.

13      Q.  Mr. Lipman, I would like to change your

14  attention to Exhibit 79, outpatient radiology line

15  item.  There was a development last week on that

16  subject, wasn't there?

17      A.  Yes, there was.

18      Q.  Would you describe what happened last

19  week, please, for the Court?

20      A.  The hospitals' CEOs received a letter from

21  commissioner -- from the Commissioner of Health

22  and Human Services advising that they had been in

23  discussions with CMS about SPAs, state plan

24  amendments, that had previously been filed which

25  was not approved by CMS and were advised that it

1  was never the state's intent to convert it to a

2  fee schedule now that they understand that by

3  doing so would mean that those dollars weren't

4  subject to taxation for the MET matching program,

5  the Medicaid enhancement tax.

6          THE COURT:  No hope.

7          MR. O'CONNELL:  No.

8      Q.  Yeah, I don't think we need that level of

9  detail, Mr. Lipman.  Let me ask you another

10  question.

11          Has the state taken a position as to

12  whether the outpatient radiology reductions are

13  still in effect?

14      A.  They've taken a position that they're

15  going to reverse them.

16      Q.  Do you know when you will receive the

17  payments that are referenced on Exhibit 79?

18      A.  There was an indication of it being a six

19  to eight week type of time frame.

20      Q.  So at least with regard to that item

21  there's been a change in the way it's being

22  administered by the state, true?

23      A.  Yes.

24          THE COURT:  Outpatient radiology?

25          MR. O'CONNELL:  Correct.

1      Q.  And so if it is in fact reversed at

2   sometime in the future, you would need to reduce

3   this chart, Exhibit 79, by the amount for

4   outpatient radiology for it to be accurate,

5   correct?

6      A.  Correct.  By $497,049.

7      Q.  But as you sit here now, you don't have

8   that money and it's been administered this way

9   since 2008?

10      A.  Correct.

11      Q.  Does Lakes generally receive full

12   reimbursement for the Medicaid services that it

13   provides to patients?

14      A.  No.

15      Q.  Have you calculated what actual cost

16   ratios Lakes has received, or LRG Healthcare

17   generally, for the types of services it provides?

18      A.  Yes.

19      Q.  Is that information contained in your

20   declaration, which is marked as Exhibit 76 for ID?

21      A.  Yes.

22      Q.  Okay.  Would you look at table 2 on page

23   6, please?  Would you describe for the Court what

24   is calculated here?

25      A.  It's simply looking at the costs that we

1  incurred in providing care, comparing it to the

2  payments, looking at that net difference and

3  calculating what we would call a payment to cost

4  ratio.

5      Q.  And so in 2006 for inpatient services what

6  was that cost ratio?

7      A.  We received -- our payment was worth about

8  49.8 percent of our actual cost.

9      Q.  So is it fair to say that would be 49.8

10  cents on every dollar of cost?

11     A.  Correct.

12     Q.  And for 2007 what happened to that rate

13  reimbursement for inpatient services?

14         THE COURT:  Why is that relevant?  I mean,

15  inflated costs, you know, nobody pays that.

16         MR. O'CONNELL:  Reduction over time, your

17  Honor.  And I believe the state's position is

18  going to be that these are institutions that can

19  afford to absorb the cost.  If that's not going to

20  be the legal analysis this Court applies, I can

21  move on.

22         THE COURT:  Well, but it's all related to

23  the reduction in the rates.  I assume the starting

24  presumption is things were fine the way they were.

25  It's the change that's unacceptable.

 1          MR. O'CONNELL:  And it's been changing

 2  over time.  That's the only point I --

 3          THE COURT:  But the change is a function

 4  of this is what we used to reimburse.  This is

 5  what we do now.  That's not acceptable.  The

 6  starting point is it was acceptable, right?

 7          So what difference does it make what

 8  somebody says it costs to give you a bandage.  Ten

 9  dollars for the Band-Aid.  Well, maybe it is.

10  Maybe it isn't.  What difference does it make?

11  You got reimbursed three dollars for it.  Now

12  you're getting 50 cents.  That's the issue, isn't

13  it?

14      Q.  Mr. Lipman, is it fair to say, as the

15  Court has summarized --

16      A.  No, it's not.  It's a common misconception

17  in the public.

18          What we're really talking about here is

19  the true cost.  So whatever our acquisition costs

20  were for the people that we paid out, the actual

21  cost of the Band-Aid, not any -- what we're

22  talking about here is --

23          THE COURT:  I've paid for a lot of

24  expensive Band-Aids.

25      A.  But what we're talking about here is not

1    the standard comparing it to what would be like

2    published retail rates but actually to the true

3    accounting costs as defined by the federal

4    government in terms of what are allowable costs.

5           So it reflects our -- when you look at any

6    expense item, like labor, it reflects what we paid

7    people in their weekly paychecks.  It reflects

8    what we paid Public Service of New Hampshire for

9    electricity.  It reflects true costs, not what

10   would be, you know, when you shop or look for --

11          THE COURT:  No.  I understand, but there's

12   all kinds of indirect overhead that's factored in,

13   and flowers on Secretary's Day gets factored in,

14   and every expense that you can put in there and

15   amortize and all of that.  I understand all of

16   that.

17          But here -- isn't the issue here that you

18   were getting a particular Medicaid reimbursement

19   rate, and that was fine, and now you're getting a

20   particular lower Medicaid reimbursement rate and

21   you're claiming that that's not fine because we

22   can't live with it, right?

23          But whether what you claim is your actual

24   cost, factoring in every cost you can possibly

25   assign to a particular Band-Aid, that's not really

1  relevant here, is it?

2          THE WITNESS:  Well, I think it is

3  actually, your Honor, because I think -- as I

4  understand how CMS evaluates and monitors the

5  adequacy of the reimbursement rates is that they

6  have to have some relationship to cost and --

7          THE COURT:  I thought the claim here was

8  we never got that far.  I thought that was your

9  claim, we never got the opportunity to make the

10  case.  So whatever the case is is sort of

11  irrelevant, isn't it?  It's we never got to make

12  the case.

13          MR. O'CONNELL:  I will accept that.  And

14  when the state tries to offer information about

15  the ability of these hospitals to fund these

16  reductions, I'll get up on my feet and object

17  because that's the flip side of this issue,

18  whether they have the ability to establish margin

19  to be absorbing these losses on a year over year

20  basis.  That's the issue I --

21          THE COURT:  I know.  I take your point.

22  It never occurred to me that we were going to be

23  litigating whether or not they actually have the

24  ability to absorb the cost.

25          MR. O'CONNELL:  We don't think we should

1  be, your Honor.  We've just seen it in the papers

2  and are prepared to address those issues, but we

3  could call Mr. Lipman back and --

4          THE COURT:  I'm not sure how we could

5  litigate that on a preliminary injunction hearing

6  anyway.  That would take a long time.

7          MR. O'CONNELL:  That would take a long

8  time, your Honor.  I believe that's true.

9          One issue that just was addressed by the

10  Court that I would like to clarify with this

11  witness --

12      Q.  Is there a difference between what you

13  described as cost and charges?

14      A.  Yes.

15      Q.  Would you please describe that for the

16  Court?

17      A.  The charges are developed to above the

18  costs that create an opportunity to make a margin,

19  and so if you only --

20          THE COURT:  I think at Concord Hospital I

21  paid $38 or something once when I was in there

22  overnight for a cup of mushroom soup.  Now, is

23  that a charge or is that a cost?

24          THE WITNESS:  That's a charge.  And it

25  might reflect that ten people before you weren't

1  able to pay anything for their soup so they have

2  to set the rate to recover it.

3          THE COURT:  And what you're talking about

4  here -- you're saying the costs.

5          THE WITNESS:  Correct.

6          THE COURT:  As opposed to charges.

7          THE WITNESS:  Correct.

8      Q.  So that wouldn't include the example the

9  Court gave of flowers that would get amortized for

10  the Secretary.  That's not a cost, is it?

11      A.  Medicare has a definition of what are

12  allowable costs, and it typically would exclude

13  things that are not considered important to

14  delivering patient care.

15      Q.  Okay.  I would like to turn your attention

16  to the last topic.  Once you learned of the

17  financial impacts that you would be dealing with

18  as a result of the budget change and the over time

19  changes, what process did you go through at Lakes

20  to determine how to deal with it?

21      A.  Well, we -- I guess, in summary form, we

22  looked at a number of different options that we

23  could potentially consider on a management team

24  level first.

25          So, for example, obstetrics is a service

1   that we provide to our community.  We're one of

2   the last remaining -- we're the only source of

3   obstetrics care in Belknap County, and within our

4   region one of the last to be providing obstetrics,

5   delivering babies.  And that service runs anywhere

6   from 50 to 60 percent of our patients are

7   Medicaid, and for each Medicaid delivery we lose

8   approximately $7,000 over our cost for each baby

9   that we deliver.

10           We considered whether we could do that but

11   ruled that out because there is no option in our

12   community if we no longer do that.

13      Q.  What did you actually -- after you did the

14   consideration that you described, what did you

15   decide to do at Lakes to meet the financial

16   circumstances that confronted you?

17      A.  We did three things.  One has been

18   implemented, one's in the process of being

19   implemented, and another is in development to be

20   implemented.

21           The discharging of adult Medicaid patients

22   from our practices, the adjustment to our

23   charitable care program and the addressing

24   elective -- or avoidable elective care.

25           But just to put it in context, it goes

1   back to the four buckets I talked about earlier.

2   You know, we've exhausted reduction in

3   profitability because we're running in the red.

4   We've pretty much exhausted what we can do in

5   terms of cost shifting.  The largest payer in the

6   state has taken a position that they won't absorb

7   any of these Medicaid losses.  We've worked with

8   other hospitals to try to improve our

9   efficiencies, and internally ourselves, and we've

10  been left to deal with access as being really the

11  remaining area to try to help overcome the large

12  deficits that we're under.

13      Q.  With regard to the closure of the primary

14  practices to Medicaid patients, what do you

15  believe the total impact will be in numbers for

16  the Medicaid population?

17      A.  The number of letters that we sent out was

18  3,000, approximately, and we have approximately 87

19  percent of communities' primary care providers are

20  associated with LRG Healthcare.  We would expect

21  some percentage of those patients, as well as --

22  you know, we saw earlier there are 9,000 people

23  that are kind of rolling in on Medicaid.  That

24  there will be increasing challenge in terms of

25  establishing a regular source of primary care.  I

1    think that's --

2         Q.  What do you believe the impacts would

3    be -- what are you planning for the impacts to be

4    at Lakes because Medicaid patients will no longer

5    be treated by your primary care physicians?

6         A.  Well, in terms of how it will affect the

7    institution?  Is that your question?

8         Q.  Yes.

9         A.  By adjusting the volumes -- we basically

10   are able to provide those services by

11   cross-subsidizing from plus margin services.  By

12   reducing the utilization rates we hope to be able

13   to readjust our operations to be able to effect

14   our cost structure.

15        Q.  What do you anticipate the impacts will be

16   with regard to the Medicaid patients that will not

17   be seen?

18        A.  I think the Medicaid patients in our

19   community are now at higher risk for morbidity and

20   mortality because you can't go from a primary care

21   base of 40 something to maybe six and that there

22   not be any impact in terms of the timeliness of

23   preventative monitoring of services, trying to

24   affect the incidence and prevalence of chronic

25   disease, what have you.  I think that our

1  population is at higher risk in our community now

2  for morbidity and less well-functioning

3  disability.  And ultimately when chronic

4  conditions are not well managed it can shorten

5  someone's life expectancy.

6        THE COURT:  40 to six what?

7        Q.  Could you please explain to the Court what

8  that 40 to six reference was?

9        A.  Within our LRG Healthcare structure we

10  have 40 primary care providers, internists, family

11  practitioners, nurse practitioners, who were

12  serving the population that were discharged from

13  the practices.

14        Outside of that, there are six people who

15  are, if you will, in independent practice.  And I

16  would add that that constitutes two family

17  practitioners that are in separate locations.  If

18  you want me to get into the details of it --

19        Q.  Okay.  Thank you, Mr. Lipman.  The state

20  has taken a position -- and finally to close out

21  here -- that it's your choice to limit these

22  services.  The phrase they have used in the

23  pleadings in this case is "vote with your feet".

24  Has that been the experience that you have had at

25  Lakes Region after you announced these changes?

1        A.  No.

2        Q.  What has your experience been?  Please

3   describe that for the Court.

4        A.  The Governor made a public statement that

5   could be characterized as criticizing our board of

6   trustees and hospital management for abandoning

7   its mission.  He asked that the Attorney General's

8   Office investigate our charitable status, which

9   has been initiated.  There were also other

10  interaction of public officials in our community

11  with community leaders trying to get people to

12  apply pressure to us to reverse -- or just plain

13  put pressure on us.

14       Q.  With all that, Mr. Lipman, why are you

15  taking the actions of limiting care as you

16  described them?

17       A.  Because we have to.  Ultimately it's -- it

18  comes down to this.  We have our operating margin,

19  our resources, to serve our community.  We've been

20  operating in the red.  We finished fiscal year 10

21  $2.2 million in the red.

22            THE COURT:  I'm sorry.  Fiscal year what?

23            THE WITNESS:  Fiscal year 2010.

24            THE COURT:  When was the last time the

25  hospital made a profit?  Well, if you could just

1   cover that briefly.  What's the fiscal year?  How

2   do you account for the profit?  When was the last

3   time you were profitable?  What was it?  What's

4   the history?

5        Q.  What's the hospital's fiscal year?

6        A.  It's the same as the federal fiscal year,

7   so it goes from 10-1 to 9-30.

8            THE COURT:  September to October?

9            THE WITNESS:  Yeah.

10       Q.  It's different than the state's fiscal

11  year?

12       A.  The state's fiscal year goes July 1

13  through June 30th.

14       Q.  The Court asked when was the last year you

15  had an operating profit.

16       A.  Fiscal year 2000.

17       Q.  And what is the current deficit you're

18  dealing with?

19       A.  We haven't completed our fiscal year 11.

20           THE COURT:  I'm sorry.  Fiscal year 2000?

21  2000?

22           THE WITNESS:  No.  2009.

23           THE COURT:  2009.

24           THE WITNESS:  It was approximately

25  $1 million.

1        A.  If I could, just to take the --

2        Q.  Please describe it.

3        A.  Before the rate cuts came into effect, the

4   hospital had approximately a 2.2 percent operating

5   margin, which was approximately $4 million in

6   2008.

7           In 2009 it dropped to approximately a

8   million dollars, which can't be fully attributable

9   to the Medicaid cuts, but when you look at the

10   year over year impact and the rate reductions --

11          THE COURT:  I'm only asking because it

12   goes to counsel's point about the ability to

13   absorb.

14       A.  Sure.  So then in fiscal year 10 we ran a

15   $2.2 million operating loss.  In fiscal year 11,

16   which is not subject -- it hasn't -- the audit

17   hasn't been completed so --

18          THE COURT:  Well, operating loss -- you

19   know, when you get into these accounting terms you

20   can get into the woods here.

21          Using the same uniform standard, give me

22   the numbers as you report to your board, for

23   example.

24          THE WITNESS:  Sure.  Net income line --

25   income from operations is the statistic I'm using,

1    and net income would be familiar to the Court.

2             THE COURT:  Net income is an arguable

3    concept as well, but what do you report to your

4    board?  Hey, we did well this year.  We're in the

5    black.  What number is that?

6             THE WITNESS:  We report two numbers.

7    There's two indicators.  One indicator is what we

8    call operating margin.  And the other indicator is

9    called total margin, okay?

10            For the year that we completed in 2010,

11   the operating margin was a negative 2.2.  The

12   total margin was actually about a $13 million

13   negative number, okay?

14            And in fiscal year 11 we're projecting

15   that due to some one-time situation that we may

16   actually do a little bit better than fiscal year

17   10.  But our structural deficit for fiscal year 11

18   operating margin is approximately about $4

19   million.

20            And our projection for fiscal year 12 is

21   that we're dealing with an operating margin

22   deficit somewhere between 8 and 12 million that

23   we're trying to adjust for.

24            THE COURT:  Thank you.

25            MR. O'CONNELL:  One second, your Honor.

1  Thank you, your Honor.  Nothing further at this

2  time.

3         THE COURT:  All right.  Thank you, Mr.

4  O'Connell.

5         Attorney Smith, maybe we should take a

6  break.

7         MS. SMITH:  Maybe we should take a short

8  break?

9         THE COURT:  Take a short break, yeah.

10        (RECESS)

11        MR. O'CONNELL:  Your Honor, briefly before

12  we begin, an internal issue.

13        THE COURT:  Sure.

14        MR. O'CONNELL:  The state and -- Ms. Smith

15  and I talked about exhibits.  We're going to

16  move -- stipulate to admission of all of the

17  affidavits and declarations that are before the

18  Court.  We'll take care of that administratively

19  off the record.  I was going to ask for an

20  opportunity to do that with Mr. Lipman, but it's

21  unnecessary.  Thank you.

22        MS. SMITH:  Yeah, we're just going to

23  stipulate that all of our declarations submitted

24  for the preliminary injunction are marked in full,

25  as are all of theirs.

 1          THE COURT:  All right.

 2                    CROSS-EXAMINATION

 3   BY MS. SMITH:

 4        Q.  Good morning, Mr. Lipman.

 5        A.  Good morning.

 6        Q.  I'm Nancy Smith from the Attorney

 7   General's Office.

 8            You talked to Attorney O'Connell about

 9   actions LRG has taken dismissing some Medicaid

10   patients from your primary care practices,

11   correct?

12        A.  Correct.

13        Q.  Now, these are doctors' offices, correct?

14        A.  Correct.

15        Q.  And these are practices that LRG owns,

16   correct?

17        A.  Correct.

18        Q.  At the department's request after you had

19   taken that action you sent a list of the actual

20   LRG practices that LRG was dismissing Medicaid

21   clients from to the department.  Are you aware of

22   that?

23        A.  Yes.

24        Q.  And there's a container of notebooks up

25   there on the witness stand with you.  If you could

1    look at Exhibit 198?  We're also going to pull it

2    up onto the screen, but since it's a multipage

3    document it might be easier for you to take a look

4    at in the notebook.

5         A.  It's listed as Exhibit 198?

6         Q.  Pardon?

7         A.  Tab 198?

8         Q.  198.  And have you found Exhibit 198, sir?

9         A.  I have.

10        Q.  Is that the list of practices that LRGH

11   sent to the department as being those that were

12   letting Medicaid clients go?

13        A.  It's both the practices and the providers

14   identified, yes.

15        Q.  And that's in the chart that is attached,

16   correct?

17        A.  Correct.

18        Q.  So looking at that chart -- as you said,

19   this is primary care only, correct?

20        A.  Correct.

21        Q.  And are you aware that Medicaid recipients

22   don't have to designate a primary care doctor?

23        A.  Yes.  But I think it's -- as any patient

24   under many insurance plans, people do tend to

25   choose a regular source of their primary care.  So

1    I think that's fairly common practice.

2        Q.  And to the extent that LRGH owns

3    specialist practices, those can still accept

4    referrals for Medicaid patients, correct?

5        A.  Yes.  However, as I testified earlier, as

6    it relates to specialty care one of the other

7    aspects that we're looking to implement is a

8    limitation on what we're calling avoidable

9    elective procedures.

10       Q.  And is that -- so the office visits to

11   these primary care practices that have taken this

12   action, those would have been billed as

13   fee-for-service doctors' offices visits, correct?

14       A.  Correct.

15       Q.  So those are not on the inpatient rates

16   list we're talking about here, correct?

17       A.  That is correct.  However, I think the

18   important point to note here is that our name, LRG

19   Healthcare, connotes a system and that we

20   cross-subsidize physician care based on positive

21   margin services and the hospital system itself.

22       Q.  But the doctors' offices fees are not on

23   the inpatient rates that we're talking about or

24   the outpatient rates, correct?

25       A.  That is correct.

1      Q.  So you've dismissed patients from -- your

2  Honor?

3          THE COURT:  I thought what he was saying

4  was, if you reduce our income in these areas to

5  this degree we can't support Medicaid patients in

6  our primary care practices.

7      Q.  But the rates that are paid to these

8  physicians are not the rates that you're

9  complaining about having been reduced, correct?

10         A.  That is correct.  Those are the --

11         THE COURT:  No.  He's saying it's an

12  impasse.  In other words, we no longer are able

13  to -- I think we're all getting a little too far

14  down the road on the merits of whether or not this

15  is a good change or not, I suppose.  The issue

16  really -- well, I suppose it's a 30(a) claim,

17  isn't it?

18         MR. O'CONNELL:  It is, your Honor.

19         THE COURT:  But I think that was the

20  point.  We can't do it.  You haven't taken into

21  account the fact that a substantial amount of the

22  Medicaid patient population will be

23  disenfranchised from the services if these rates

24  are in effect.  I think that was the point.

25         THE WITNESS:  Yes.

1          MS. SMITH:  We'll be discussing that in

2    just a second.

3          Q.  LRG -- did you participate in providing a

4    letter to your LRG practices that they were going

5    to send out?  Have you seen that letter?

6          A.  Yes, I have.

7          Q.  And if you can turn to Exhibit 181?  It

8    should also be on the monitor in front of you.

9    This is a one-page document, so maybe that would

10   be easier.

11         A.  Yes.

12         Q.  This isn't addressed to any specific

13   person, but have you -- do you agree that this is

14   an example of the letters that LRGH sent out to

15   its 3,000 Medicaid clients?

16         A.  Yes.  It's the template version of what we

17   sent out.

18         Q.  And in this you list four practices that

19   you know were still accepting Medicaid clients

20   that are also primary care, correct?

21         A.  Correct.

22         Q.  And two of those, Westside and Newfound

23   Family Practice, are owned by LRGH, correct?

24         A.  Correct.  They're owned by LRGH, and they

25   also have the distinction of being classified as

1    rural health clinics, which is a distinction

2    reflecting a certain uniqueness with respect to

3    how they're reimbursed to ensure access.

4        Q.  And so those two practices get reimbursed

5    at a much higher rate, correct?

6        A.  That is correct.

7        Q.  And those two practices still had capacity

8    to accept patients?

9        A.  Some capacity, yes.

10       Q.  And the other two practices, the Health

11   First facilities that you list here, are you aware

12   that those also have a designation as -- or have a

13   designation as a federally qualified health

14   center?

15       A.  Correct.

16       Q.  And all four of those are required in

17   order to have those designations and get those

18   higher rates that they accept all Medicaid

19   patients, correct?

20       A.  Within the capacity of their provider

21   panel size, yes.

22       Q.  And are you aware that Lakes Region's CEO,

23   Mr. Claremont, is also treasurer of the healthcare

24   corporation?

25       A.  Yes.  As well as Lakes Region General

1   Hospital, or LRG Healthcare, provides

2   approximately a 220,000 a year subsidy to help

3   Health First exist, and that was one of the issues

4   that we considered in terms of the options is

5   whether to eliminate that or not.

6        Q.  If you could look at Exhibit 190, are you

7   familiar with press coverage of LRGH's actions

8   after those actions were announced?

9        A.  Yes.

10       Q.  And this appears to be an article that was

11  posted on citizens.com that appeared in a Laconia

12  newspaper, correct?

13       A.  Correct.

14       Q.  And your CEO, Mr. Claremont, if you go

15  down to the bottom part of this, is quoted as

16  saying, "There is capacity in the general area

17  for affected Medicaid patients to get the services

18  they required, said Claremont, and LRGH has been

19  steering patients into it", correct?

20       A.  It does say that.  I think it would also

21  be fair to say that the executive director of

22  Health First said they had a capacity at the time

23  of approximately 600 patients and that the two

24  centers, excuse me, the rural health clinics had

25  some capacity as well, but probably less than

1   that, and that we were trying to help people to

2   the best that we could to get a source of primary

3   care where it was available.  But that only takes

4   into account the people who are currently now

5   enrolled.  It doesn't take into account those to

6   be enrolled in the future.

7        Q.  Going back to your declaration,

8   actually -- I'm sorry to be skipping around from

9   documents, but that's Exhibit 77 and it's in

10   paragraph 5 of your November declaration.  That's

11   not going to be in ours.  We'll pull it up on the

12   screen for you.  It's one of the plaintiff's

13   exhibits.

14            MS. SMITH:  If I can approach, your Honor?

15            THE COURT:  Anytime, Attorney Smith.

16        Q.  So if you can go to -- I believe it's

17   paragraph 5 of that document.

18        A.  Yes.

19        Q.  You've indicated that in deciding who to

20   send this letter to you reached back three years

21   and seven months?

22        A.  That corresponded with a computer system

23   conversion for us in terms of our physician

24   practices, and we wanted -- not having a way to

25   know who is currently eligible on Medicaid in any

1    administratively efficient way, we identified

2    those patients who have been on Medicaid within

3    those practices for that time period.

4        Q.  So you would agree, wouldn't you, that

5    this may have gone to a lot of people who were no

6    longer on Medicaid?

7        A.  I would say that there's some that

8    wouldn't be.  I honestly can't estimate whether

9    it's -- what percentage it would be.

10       Q.  So if the department was -- and you

11   actually provided a list of names of who you sent

12   the letters to, correct?

13       A.  We did.  To the commissioner.

14       Q.  If the department was able to take that

15   list and cross reference it against currently

16   enrolled Medicaid folks and determined that

17   somewhere maybe in the range of a thousand people

18   out of your list of 3,000, over 3,000, were

19   currently on Medicaid, you were overinclusive by

20   two-thirds, correct?

21       A.  I don't agree with the characterization of

22   overinclusive because of the substandard nature of

23   the communication that we would rather

24   over-communicate than under-communicate, but the

25   fact that the state may have found fewer than the

1  3,500 is not entirely surprising, correct.

2      Q.  But if the department's research indicated

3  it was something around a thousand or less, you

4  have no basis for disputing that, correct?

5      A.  I do not have a basis for disputing that.

6  I would like to add, though, that even if a person

7  didn't have a change -- I mean, if they would have

8  to change a position, which is also an impact that

9  goes beyond just even not having a position.

10         MS. SMITH:  Do you have any objection to

11  striking the ID on Exhibit 198?

12         MR. O'CONNELL:  No objection on 198, your

13  Honor.

14         THE COURT:  ID may be stricken on

15  Defendant's 198.

16         (Defendant's Exhibit 198 Admitted)

17         MS. SMITH:  Do you have any objection on

18  striking the identification on Exhibit 181?

19         MR. O'CONNELL:  It's a full exhibit

20  already.

21         MS. SMITH:  It's full already.

22      Q.  And you're aware that there's a John Doe

23  plaintiff in this lawsuit as a Medicaid

24  recipient --

25      A.  Yes.

1        Q.  -- who has received services at LRGH?

2        A.  Yes.

3        Q.  And I would like you to look at what we've

4   marked for identification as Exhibit 197, which

5   only identifies him as John Doe.  Have you ever

6   seen claims data from the department before?

7        A.  I don't typically deal with that level,

8   but I have in my career, yes.

9        Q.  Okay.  I'll represent to you that this is

10  claims data from the John Doe plaintiff in this

11  lawsuit and it lists a couple of -- several

12  providers on the first page of this.

13           And if you could look at that list and

14  compare it to the provider list that LRGH sent us,

15  which is Exhibit 198, isn't it fair to say that

16  the providers that he is listed as having seen are

17  not any of the providers that dismissed patients,

18  except for one entry for a nurse practitioner at

19  Belknap Family Practice, correct?

20       A.  That would be correct.

21       Q.  And I may mispronounce the names, but the

22  doctors that he's seen on -- apparently seen on a

23  regular basis, Dr. Mahadevan and Dr. Friedlander,

24  are not on your list of practices that have

25  dismissed patients?

1      A.  Dr. Friedlander is listed here as internal

2  medicine.  He's actually a hematologist,

3  oncologist.  Dr. Mahadevan doesn't practice at our

4  facility.

5      Q.  So he's an independent?

6      A.  I suspect he's at another facility not

7  associated with us at all.

8      Q.  So to your knowledge the John Doe

9  plaintiff has not been dismissed from his

10  physician practices, correct?

11      A.  He has -- with respect to treatment --

12  that there's a continuation of treatment for

13  specialty care for all patients.

14      Q.  So the answer to my question is he hasn't

15  been dismissed from the physicians he's listed

16  here as having seen at Lakes Region, correct?

17      A.  Correct.

18      Q.  Going back to one other exhibit you looked

19  at, Exhibit 190, which is the press release.

20          MS. SMITH:  Do you have any objection to

21  striking the ID on that?

22          MR. O'CONNELL:  It's not a press release.

23  It's a news article.  And it's hearsay and we

24  object.

25      Q.  You don't have any basis for disputing

1  that your CEO, Mr. Claremont, made the statements

2  listed in this document as quoting him, do you?

3      A.  The answer I would say is no, but it's

4  also fair to say that I don't know that these

5  quotes are verbatim.

6          MS. SMITH:  I would move to have it

7  admitted -- the ID stricken as a party admission.

8          THE COURT:  Objection?

9          MR. O'CONNELL:  Objection, your Honor.

10  It's hearsay.

11          THE COURT:  Objection overruled.  It's an

12  admission by a party opponent.  ID may be stricken

13  on Exhibit 190.

14          (Defendant's Exhibit 190 Admitted)

15      Q.  And as the chief financial officer of

16  Lakes Region, are you familiar with how much Lakes

17  Region claims on -- you file tax reporting forms

18  with the IRS every year, correct?

19      A.  Yes, the 990.

20      Q.  And they're called 990s?

21      A.  Yes.

22      Q.  And you're familiar with those forms?

23      A.  Generally, yes.

24      Q.  Your name appears on them?

25      A.  I sign them, yes.

1          Q.  If you could look at Exhibit 146, do you

2    have that in front of you?

3          A.  I do.

4          Q.  And is this the most recent 990 that Lakes

5    Region has filed?

6          A.  Correct.

7          Q.  And this is listed as the IRS year 2009,

8    correct?

9          A.  Correct.

10         Q.  But it covers the period October 1, 2009

11   to September 30, 2010?

12         A.  Correct.

13         Q.  And going down to the bottom, you

14   submitted this -- did you sign this document?

15         A.  I did.

16         Q.  And you submitted it on August 15, 2011?

17         A.  I did.

18         Q.  And to the best of your knowledge are the

19   figures related to the financial status of Lakes

20   Region Hospital that you represent in this

21   correct?

22         A.  Yes, but only insofar that it should be

23   acknowledged that the 990 does not follow

24   generally accounting -- GAAP principles.  So there

25   are variations between what you would find in an

1  audit report and here based on how the IRS asks

2  for us to complete information, but the

3  information that's contained in here is from our

4  audit reports.

5          MS. SMITH:  I would ask that the ID be

6  stricken.

7          MR. O'CONNELL:  Objection.  Relevance,

8  your Honor.

9          THE COURT:  Overruled.  The ID may be

10  stricken on 146.

11          (Defendant's Exhibit 146 Admitted)

12      Q.  Going to I believe it's page 10, it's part

13  number 9, and I believe it's line 11(d), does

14  that -- do I have the right page?

15      A.  11(d) would be the lobbying line.  Is that

16  what you're referring to?

17      Q.  Yes.

18      A.  Yes.

19      Q.  I'm just trying to catch up with you on my

20  computer.  Does that show a figure that Lakes

21  Region claims it spent in this fiscal year -- the

22  fiscal reporting year for lobbying expenses?

23          MR. O'CONNELL:  Objection.  Relevance.

24          THE COURT:  Well, you know, I think we're

25  going to spend a lot of time on the 30(a) claims

1  we probably shouldn't spend.  But it's relevant,

2  is it not, if -- and I think the state's position

3  is you can absorb these costs.  Isn't that your

4  position?

5          MS. SMITH:  It also goes to the notice

6  issue, as they claim they didn't have opportunity

7  to comment and they're spending very large sums of

8  money on lobbying at various levels.  So I think

9  it's very relevant to the notice issues and their

10  claims that they had no opportunity to comment.

11          THE COURT:  I'm not sure it's relevant for

12  that.  I mean, they're lobbying all kinds of

13  issues.  I thought it was going toward their

14  ability to absorb the rate reduction.

15          MS. SMITH:  I understand they have two

16  baskets of claims.  If I'm wrong and there's only

17  one issue here --

18          THE COURT:  To the extent it goes to the

19  notice, inadequate foundation, objection

20  sustained.

21          If you're offering it as some sort of

22  evidence that requisite notice was given of the

23  rate reductions, the objection is sustained.

24  There's inadequate foundation.  I mean, generic

25  lobbying on behalf of a hospital?

1          MS. SMITH:  Well, I planned on asking him

2     more questions about --

3          THE COURT:  We call that a foundation.  If

4     you lay a foundation, we'll think about it again.

5          MS. SMITH:  All right.

6          THE COURT:  But not lobbying off a form in

7     a generic sense.

8          Q.  Does Lakes Region use lobbying?

9          A.  I think the expenses that you're seeing

10    reflected here are primarily those portions of our

11    American Hospital Association and New Hampshire

12    Hospital Association dues which for reporting

13    purposes have to be classified as lobbying.

14          I do not recall in that fiscal year that

15    we had a separate lobbyist beyond that.  If we

16    did, it was not material.

17          Q.  So you are a member of the New Hampshire

18    Hospital Association?

19          A.  Yes.

20          Q.  And does the hospital association speak on

21    your behalf in various venues?

22          A.  They do.

23          Q.  And they're authorized to do that?

24          A.  Yes.

25          Q.  And they show up at legislative hearings

1    and say they're representing all of the hospitals?

2        A.   They do.   But I would comment that with

3    respect to the 2008 outpatient reduction -- as an

4    example, we got an e-mail from the president of

5    the hospital association advising us that they

6    were completely surprised by the rate reduction

7    that was implemented.

8        Q.   We'll come back to that.

9        A.   Okay.

10       Q.   And we'll give you more opportunity to

11   talk about that.

12            Just looking at another -- so part of what

13   you claimed was lobbying does support the New

14   Hampshire Hospital Association and their going to

15   various venues and making comments on your behalf

16   about various proposed rate reductions?

17       A.   Yes.   I think in general, but to represent

18   the impacts on our particular community I think

19   they would need to involve us in that

20   specifically.

21            MS. SMITH:   Okay.   All right.   I think

22   we've laid a foundation that the lobbying expenses

23   they claim are at least partially attributable to

24   the carving process, and I would ask that the ID

25   be stricken.

1           MR. O'CONNELL:  Objection, your Honor.

2           THE COURT:  Sustained.  Not from this

3   witness.  I think he just said the opposite.

4           MS. SMITH:  Okay.  All right.

5      Q.  In addition to the $1,006 on page 10 in

6   Schedule C of your 990 --

7      A.  What page is that?

8      Q.  I believe it's on page 17 of 76.

9           MR. O'CONNELL:  I'm sorry.  Can you tell

10  me where the page reference is?

11          MS. SMITH:  Pardon?

12          MR. O'CONNELL:  Where is the page

13  reference, Ms. Smith?  I'm not sure I'm following

14  you.  Can I look at what you're looking at?

15          MS. SMITH:  If you look at the computer,

16  it has the total number of pages.

17          THE COURT:  Just going back to what I

18  asked you a while ago, I thought it was not your

19  position that notice of the legislative process,

20  or the budgetary bill that was going through the

21  legislature, that didn't constitute -- that

22  wouldn't constitute notice as required under the

23  Medicaid Act.

24          MS. SMITH:  Well, he testified that they

25  had no opportunity to comment before the budget

1   got passed and --

2           THE COURT:  No, no.  Again, you're both

3   conflating the budgetary process with what the

4   federal Medicaid statute and implementing

5   regulations require.

6           In my mind they're two completely

7   different things.  They may be joined at the hip

8   in functional ways, but I thought we agreed

9   earlier in the morning that it was not the state's

10  position that knowledge of the budgetary process,

11  the legislative effort and the impact that would

12  have, that doesn't constitute notice of a plan

13  amendment.

14          MS. SMITH:  Of a plan amendment, no.

15          THE COURT:  Or a proposed plan amendment.

16          MS. SMITH:  But it does constitute notice

17  of the planned reductions because the reductions

18  are set out in the budget process and then they --

19          THE COURT:  But how does that help you?

20  How does that help you if that's not adequate

21  notice under the statute or the implementing

22  regulations?

23          MS. SMITH:  It goes to his testimony that

24  they have had no opportunity to provide comment

25  about the affect --

1          THE COURT:  Yes, but it's, I had no

2    opportunity to provide comment as provided for by

3    the federal statute in implementing regulations

4    which requires prior notice of an intent to reduce

5    the rates which triggers an opportunity to

6    comment.

7          And you seem to be falling back to, well,

8    you knew the budget was in process.  You knew the

9    budget impact would be X.  Of course you could

10   have commented.

11         Yeah, I guess you could in space or in

12   public venues or write letters to the editor or

13   whatever, but that's not the kind of comment we're

14   talking about here, is it?

15         MS. SMITH:  On something -- I think we

16   have to distinguish between actions.  On some

17   actions for which there needed to be SPAs, state

18   plan amendments, then there was a separate notice

19   period specifically for the state plan amendment.

20         For something that we think we arguably

21   didn't have to take the state plan amendment that

22   had an affect on rates but they were within the

23   current methodology -- because the methodology is

24   in the state plan, not specific rates.

25         So we contend that the legislative

1   process -- and that's not the same notice process

2   as required for SPAs, and we do contend that the

3   legislative process can provide adequate notice

4   under the federal regulations for a rate change

5   that doesn't require a SPA because it's within the

6   current methodology.

7        THE COURT:  All right.  That clarifies

8   what I thought we had agreed to earlier, which was

9   different, but okay.

10        MS. SMITH:  I understood the earlier

11   questions to be focused on the recent budget cycle

12   in 2011 about the changes to DSH and UPL, and

13   there have been SPAs about both of them.

14        THE COURT:  Okay.

15        MS. SMITH:  So I would like to proceed

16   with this line of questioning.

17        THE COURT:  Certainly.

18   Q.  The page that I directed you to in the

19   990, which I believe is page 17 out of 76, in

20   Schedule C, II(a), and this page is about the

21   lobbying expenses by LRG, correct?

22   A.  Correct.

23   Q.  Could you explain what other lobbying

24   expenses, other than the 106,000 that we talked

25   about before, LRG is also indicating it had on

1    this page?

2              MR. O'CONNELL:  Objection.  Relevance,

3    your Honor.

4              THE COURT:  Overruled.

5         A.  What is being calculated here is a

6    limitation by the IRS as to what can be excluded

7    for purposes of falling below the threshold.  In

8    other words, I guess what we're documenting here

9    is that LRG Healthcare didn't spend an amount on

10   lobbying that would exceed the threshold where we

11   would have to pay a tax on it.  That's what I

12   think we're looking at here.

13             This is just a formula for the deriving --

14   the amounts that would be nontaxable we could have

15   spent a million in each of the '06 through '09

16   years.

17        Q.  So you're not -- just so I'm clear, this

18   does not indicate that you spent additional monies

19   over and above the 106,000 in lobbying expenses?

20        A.  That's my understanding of it, yes.

21        Q.  And are you listed in this 990 as being

22   one of the highest paid officials at LRGH?

23        A.  Yes.

24        Q.  And it lists your salary as being in total

25   just short of $270,000, correct?

1       A.  That's total compensation, yes.

2       Q.  Going to your first declaration -- just

3  let me find the exhibit number on that.  I believe

4  it's Exhibit No. 76.  That wouldn't be in those

5  white binders.  Those are our exhibits.  This is a

6  plaintiff's exhibit.

7          MR. O'CONNELL:  Yes, it's 76.

8          THE COURT:  Just for your planning, I

9  thought we would go to 12:30, if that's all right,

10  and then we'll resume again at 1:30.

11          MS. SMITH:  Sure.

12      Q.  Do you have a copy of it?

13      A.  Yes.

14      Q.  In table 1 of that document you indicate

15  that the total Medicaid revenue in 2010 was

16  $43 million, correct?

17      A.  I do in 2010.

18      Q.  Let me just catch up to you, sir.  If you

19  look at table 2, let me just move some of these

20  exhibits.  So looking at table 1, you say -- total

21  Medicaid in 2010, table 1 says the total is 43.3

22  million, right?

23      A.  Yes.

24      Q.  And in table 2 you indicate the total

25  Medicaid payments for inpatient in the same year

1   was 1,757,000, correct?

2        A.   Correct.

3        Q.   That's the figure you gave us, 1,757,331

4   in table 2?

5        A.   Correct.

6        Q.   For Medicaid payments for inpatient?

7        A.   Correct.

8        Q.   And in table 3 you indicate that

9   outpatient Medicaid payments for the same year

10  were 3,501,676, correct?

11       A.   679.

12       Q.   679?

13       A.   Yes.

14       Q.   Okay.  And in table 4 you indicate that

15  your physicians' Medicaid payments were 2,680,985;

16  is that correct?

17       A.   Yes.

18       Q.   So these total up to 7,939,995, I believe.

19       A.   That's close -- pretty close.

20       Q.   Does that look about right?

21       A.   Pretty close.

22       Q.   Do you want to do the math?  Go right

23  ahead.

24       A.   Yes, I agree with the figure.

25       Q.   And so you got paid 35 million more in

1  Medicaid revenue than your Medicaid payments,

2  correct?  That's what you said by your tables.

3      A.  No, I didn't, actually.  I think that with

4  respect to the payments the 7,939,995 is what we

5  received in cash payments from Medicaid.

6          With respect to totally Medicaid revenue,

7  that represents the gross charges that were billed

8  to Medicaid.  It doesn't -- it's a concept of, if

9  you will, what our published charges were.  That's

10 what that total is.

11     Q.  So when you say your business revenue,

12 you're not being accurate, correct?

13     A.  No, I am being accurate.  There's net

14 revenue as opposed to gross revenue.  We're

15 talking about gross revenue here.

16     Q.  So your gross revenue would include monies

17 by insurance companies that you don't get paid

18 because they don't pay you the full charges billed

19 either, correct?

20     A.  Well, I think we've got to take a minute

21 to get the concept of revenues down.  There's

22 gross revenue which is -- so that we have a

23 uniform rate to value what is provided.  And then

24 there are net revenues, which are what we talked

25 about.  It would be what the insurance company

1  pays us and what Medicaid and what people don't.

2       Q.  You just told us that table 1 in your

3  declaration, as far as revenue figures, are gross

4  figures, right?

5       A.  I said they're gross revenue figures, yes.

6       Q.  So those don't actually have any relation

7  to what you actually received in payments.

8       A.  They're, I think, a common industry

9  standard with respect to identifying what is

10  activity.  Because to do otherwise you would have

11  to pay all sorts of different rates and you

12  couldn't evaluate what relative percentage of

13  business or service is being provided to a

14  particular payer.  You do it on a net basis.

15          THE COURT:  Gross revenue is not actually

16  revenue?

17          THE WITNESS:  Gross revenue is, if you

18  will, a statistic.  Gross revenue isn't actual

19  revenue unless we collect the full amount, which I

20  think one point is that we don't collect the full

21  amount and on very rare occasions.  But in terms

22  of -- without getting into a large explanation of

23  it, I think we have to have a common basis in

24  which we're billing out at -- what we accept as

25  payment will vary based on the payer source.

1           So Medicaid will tell us what they're

2    going to pay us.  Medicare will tell us what

3    they're going to pay us.  But we negotiate with

4    others against a -- if you will, when you're

5    buying a car there's a sticker price and --

6           THE COURT:  Sure, but most people think of

7    revenue as income.

8           THE WITNESS:  Well, in terms of GAAP, the

9    way a CFO thinks about it, would not be

10   actually -- net revenue would be --

11          THE COURT:  So when you say gross revenue,

12   you're talking about what, the cost of all of the

13   services provided?

14          THE WITNESS:  The gross billings

15   associated -- so, for example, if somebody had an

16   appendectomy, it would be the gross charge that

17   would appear.

18          THE COURT:  The charge?

19          THE WITNESS:  The gross charge.

20          THE COURT:  The highest soup cost.

21          THE WITNESS:  Right.

22          THE COURT:  But not who paid what for it.

23          THE WITNESS:  Correct.

24          THE COURT:  So it really represents what

25   you would say is the charges they would like to

1  charge and collect for all of the services that we

2  provide.

3          THE WITNESS:  An oversimplification, yes.

4          THE COURT:  You've got to deal with that.

5          THE WITNESS:  Yes.

6          THE COURT:  So it's not income.

7          THE WITNESS:  It's not income, no.

8          THE COURT:  Do you have a number that

9  reflects what you actually took in?

10          THE WITNESS:  Well, in terms of the net

11  payments on Medicaid, it would be the 7.9 million

12  for physician services, hospital services, and in

13  and outpatient hospital services.  So that would

14  be net revenue to us, if you will.

15          And then you would subtract expenses from

16  that to figure out what your -- what it cost to

17  figure out your profitability.

18          THE COURT:  From?

19          THE WITNESS:  From any source.

20          THE COURT:  No, but subtract what from

21  what?

22          THE WITNESS:  Well, if we're talking about

23  Medicaid, as an example --

24          THE COURT:  I'm just having trouble trying

25  to figure out, did you do well or didn't you do

1  well?

2          THE WITNESS:  We did poorly.  Very poorly.

3          THE COURT:  We would have charged

4  $43 million if we -- I mean, that's what we

5  charged, $43 million for the services we provided.

6  We collected 7 million.  That's not too good.

7          THE WITNESS:  No.  It's not very good at

8  all.

9          THE COURT:  Now, of that 43.3 I assume,

10  from what you said earlier, that's some number

11  under GAAP.

12          THE WITNESS:  Yes.

13          THE COURT:  And it reflects what?  Actual

14  cost plus a margin?

15          THE WITNESS:  No.  Well, the pricing

16  reflects what we -- taking into account discounts

17  and what we ultimately get paid, how high we have

18  to set the rates, given that some people will pay

19  us nothing.  Some people will pay us, you know, 10

20  percent.  Some people will pay us 90 percent.

21          THE COURT:  To me that sounds like it

22  really costs us 43.3 million in charges minus some

23  amount, and we really have to cover that number.

24          THE WITNESS:  My recollection for Medicaid

25  costs was that that 7.9 million, when you take

1   into account what we were being paid before, was

2   approximately 19 million in costs associated with

3   that 43 million, leaving us with like a $9 million

4   hit and then --

5          THE COURT:  In other words, charge 43.3,

6   our value of the services we provided that we

7   should be charging you for, but we know we're not

8   going to collect that kind of money.

9          THE WITNESS:  Correct.

10          THE COURT:  But it really cost us

11   9 million.  We have to collect that amount of

12   money.

13          THE WITNESS:  We actually --

14          THE COURT:  Or 19 million.  I'm sorry.

15          THE WITNESS:  19 million.

16          THE COURT:  19 million.  It really did

17   cost us that.  We have to collect that, and we

18   only got 7.

19          THE WITNESS:  Correct.

20          THE COURT:  Okay.

21      Q.  Allow me to just cover that, Mr. Lipman.

22   The 19 million figure that you've thrown out as

23   being your true cost, that's based on a Medicare

24   cost formula, correct?

25      A.  It is for the hospital inpatient, the

1  hospital outpatient, based on the Medicare cost

2  report.  As you know, there are certain

3  services -- like if you're familiar with the cost

4  report, like laboratory services which don't flow

5  through that and physician services which don't

6  flow through that.  So there are other estimates

7  to develop those costs.

8        Q.  But what you are claiming as your true

9  cost is based on a formula set by Medicare?

10       A.  Predominantly, yes, if we're following

11  what Medicare defines as a full cost.

12            THE COURT:  These are the services we

13  provided.  This is what Medicare says we can

14  charge for that to Medicare.

15            THE WITNESS:  No.  We would say Medicare

16  has defined using -- it would be what Medicare

17  says.  Based on what you've spent, this is what

18  the cost would be.

19            I think we're conflating two issues here.

20  One is a Medicare standard with respect to what's

21  an efficient and economical provider versus what

22  we actually experienced.

23            THE COURT:  What you actually experienced,

24  yeah.  All right.

25       Q.  So the Medicare allowable cost doesn't

1   really answer the question of whether you could

2   perform those same services more economically,

3   does it?

4       A.   Well, I would say that the answer to that

5   question is that that's never been evaluated.   Our

6   contention is that the process of going through a

7   proper amendment would be that that would have to

8   be evaluated, and the adequacy of rates prior --

9   as I understand the Medicare standard, it's that

10  rates are supposed to be set for the efficient and

11  economical providers.

12          So this concept of absorbing losses is I'm

13  not sure the standard that we're supposed to be

14  evaluated against.   I think it's the standard

15  against an efficient and economical provider.   At

16  least that's in part.   And the adequacy of rates

17  at any given point in time -- I mean, if you look

18  at the rates prior to these cuts, you know,

19  there's a lot that's changed in the world that

20  would make a rate that was adequate at one point

21  in time totally inadequate given the meltdown in

22  our economy we've had since 2008.

23      Q.   In the Medicare allowable costs you get to

24  include, you know, if you made capital expansions,

25  new equipment, if you want to offer new services.

1   Are all of those things factored into how much

2   money you spend to determine your allowable costs?

3        A.  Here again I think that the costs --

4   capital costs are in that, but we don't -- New

5   Hampshire does not have a standard as to what is

6   an acceptable level of expenditure.

7            We would contend that what we've spent is

8   in the efficient and economical category, but we

9   haven't had a chance to make that case.

10       Q.  And Medicaid is not the only source of

11  what you've identified as being this total huge

12  number of uncompensated care that you weren't paid

13  for, is it?

14       A.  Correct.

15       Q.  And that includes all of your charity care

16  to the uninsured, correct?

17       A.  Correct.

18       Q.  And you also claim on your 990 that you

19  were losing money providing services on Medicare;

20  isn't that correct?

21       A.  That's correct, but a much lower number.

22       Q.  Is that also included in your

23  uncompensated care?

24       A.  No.  Medicare is not in that.

25       Q.  And so prior to the recent budget session

1   in 2011 -- or let me just ask you that in a

2   different way.

3          So what you're really complaining about

4   here is that with the changes in the 2011 budget

5   regarding not receiving DSH or UPL payments that

6   is what has broken the camel's back -- the straw

7   that broke the camel's back, correct?

8      A.  That is correct, but I think the adequacy

9   of rates in prior periods given the changes in the

10  economy and the changes in our economic condition

11  are a real issue that we've never really had a

12  chance to put input on.

13     Q.  You could have -- you weren't complaining

14  before the recent budget session.

15     A.  We have complained in the public policy

16  arena for a long time.  We are a community, in

17  particular, that has a more challenging

18  socio-demographic population than the state at

19  large by a good factor.

20     Q.  And you testified earlier that the New

21  Hampshire Hospital Association does speak on your

22  behalf, correct?

23     A.  They do.

24     Q.  And in regards to -- take a look at

25  Exhibit 154.  That's back in the white notebooks.

1  Before we talk about that specific document, I

2  have some foundational questions.

3         You testified about outpatient and

4  inpatient reductions at fiscal committee meeting

5  in November of 2008.  Do you recall that

6  testimony?

7     A.  I do.

8     Q.  Now, were you aware that those were only

9  effective for the rest of that biennium?

10     A.  I would like you to repeat your question.

11     Q.  Were you aware that the actions taken by

12  fiscal were only effective for the rest of that

13  state biennium, and that if those rates -- let me

14  just add a little bit more -- and that if those

15  rates were going to be carried forward something

16  else had to happen?

17     A.  I would say that with respect to the fact

18  they were carried forward I am not aware that

19  there was an opportunity to participate in a

20  process that follows Medicaid statutes with

21  respect to commenting on future years.

22     Q.  And so if those rates were part of the

23  2010 and 11 budget that started in early 2009, if

24  those, the rates being carried forward, were part

25  of that, you weren't aware that you have an

1   opportunity to comment for the budget cycle?

2       A.  Well, I think -- as your Honor, the

3   honorable judge, had said earlier, I think there's

4   a distinction between the budget process and what

5   we're coming forward with with respect to what's

6   required under the Medicaid statute.  And in none

7   of those processes did we get to have an

8   opportunity to look at before and after type of

9   rates and methodology adjustments, how it would

10  affect us as an economical or efficient provider,

11  how did that rate compare to that.  We never got a

12  chance to talk about specific beneficiary

13  implications of that.  We never got a context of

14  how that rate going into future years would affect

15  access given changes in the economy and other

16  things affecting us.

17          I mean, I think, you know, to say that the

18  budget process was a lot in the open, we're not

19  arguing that point.  We're arguing the point with

20  respect to what's required under the Medicaid Act,

21  that that wasn't followed, and it still hasn't

22  been.

23      Q.  If you could just go to page 3 of the

24  exhibit that I just showed you, which is

25  testimony -- which appears to be House division

1  finance testimony on page 3, testimony by Leslie

2  Melby.  Does that appear to be correct?

3      A.  That is labeled House Finance Committee

4  testimony on March 17, 2009.

5      Q.  And page 3 is testimony by Leslie Melby,

6  correct?

7      A.  Correct.

8      Q.  Do you know who Leslie Melby is?

9      A.  I do.

10      Q.  Who is he?

11      A.  Leslie is the Vice President of State

12  Affairs, I believe is her title -- of State

13  Governmental Affairs.

14      Q.  And when she appeared on March 17, 2009,

15  at the first paragraph, who did she say she was

16  there representing?

17      A.  I guess, to be directly responsive to your

18  question, she was representing the acute care

19  hospitals of the state.

20      Q.  And you're one of those.

21      A.  We are.

22      Q.  And so she was there representing you?

23      A.  In the budget process.  It's distinct from

24  the Medicaid regulatory requirement process.

25      Q.  And in the second paragraph she indicates

1  that the budget was carrying forward the November

2  2008 rate changes, correct?

3       A.  I'm sorry.  Which page are you on?

4       Q.  That's still on page 3.

5       A.  And what paragraph again, please?

6       Q.  I believe it's the second paragraph down.

7       A.  She's relating in that paragraph trends

8  that are occurring between '99 and 2006, if that's

9  what you're referring to.

10      Q.  And in about the middle of that paragraph

11 she indicates that HB-1 freezes current provider

12 reimbursement rates, which means the 2009 cuts

13 will be carried forward into the next biennium,

14 correct?

15      A.  I don't see that on the page you're

16 referring to.

17      Q.  It's in about the middle of the paragraph.

18      A.  That's on page 2.

19      Q.  Oh, I'm sorry.

20      A.  I think.  If it's the paragraph you're --

21 you've got that up on the screen.  The paragraph

22 I'm reading here talks about 15 years of -- the

23 rate hasn't been updated for 15 years.  That's not

24 what I think you're referring to.

25      Q.  No.  It's the paragraph --

 1          MS. SMITH:  If I could approach, your

 2  Honor?

 3          THE COURT:  Anytime, Attorney Smith.

 4      Q.  It's at the bottom of the page.  If you

 5  could go back to the first page of her testimony

 6  and about the middle of this paragraph.

 7      A.  Okay.

 8      Q.  Where it says HB-1 freezes?

 9      A.  Yeah.  I see that.

10      Q.  Okay.  So I read that correctly?

11      A.  Yes, you have.

12      Q.  And then she goes on to talk about the

13  negative impact on the hospitals, doesn't she?

14      A.  She does.  But in respect to the standard

15  and being able to do the facility and geographic

16  specific aspect, that's not in there, and I don't

17  think it would completely satisfy the Medicaid

18  regulations.

19      Q.  And going forward, if you would look at

20  Exhibit 156.  This appears to be testimony to the

21  senate finance committee in February of 2009

22  regarding the uncompensated care funds and the MET

23  tax, correct?

24      A.  Yes.

25      Q.  And that's submitted by Mr. Ahnen from the

1   hospital association, correct?

2      A.  Yes.

3      Q.  And he was there representing the state's

4   32 acute care hospitals, right?

5      A.  That's what it says here.  It says

6   community and specialty action.

7      Q.  So there's some more facilities included

8   in the hospital association other than just acute

9   care hospitals, correct?

10     A.  There's two rehab hospitals, to my

11  understanding, and one psychiatric hospital.

12     Q.  So before the budget was passed he was

13  there providing testimony on behalf of the

14  hospitals about the proposed changes to DSH and

15  MET, correct?

16     A.  Yes.

17     Q.  And if you look at Exhibit 158, this is

18  dated April 21, 2011, and again, this appears to

19  be written testimony by the hospital association

20  submitted to the legislature during the budget

21  process.  Is that a fair characterization?

22     A.  It's a fair characterization, yes.

23     Q.  And they were there representing, again,

24  the state's 32 acute care community and specialty

25  hospitals, correct?

1      A.  Correct.

2      Q.  And one of those is LRGH?

3      A.  Correct.

4          MS. SMITH:  I have just a few more

5  questions comparing his more recent declaration to

6  his original declaration, but it might be more

7  than a minute or two.

8          THE COURT:  Well, why don't you go ahead.

9          MS. SMITH:  Pardon?

10         THE COURT:  Go ahead.

11     Q.  Do you have all three of your declarations

12  there in front of you?

13     A.  I do not.  I have Exhibit 76, which I

14  believe is the initial one.

15     Q.  Your most recent one is Exhibit 78, that's

16  that one, and your second one is here, and I

17  believe you have the first one.

18     A.  Correct.

19     Q.  And in the table that you have -- in

20  Exhibit 78 in table 5 you indicate that the

21  cumulative total of what you are claiming as the

22  impact of the rate reductions is $19,000,768,

23  correct?

24     A.  That's correct.  Because we're excluding

25  upper payment limit as compared to the earlier

1  testimony, yes.

2       Q.  Okay.  And that was a figure -- and going

3  back to your first declaration, which I believe is

4  this one, which is 76?

5       A.  Yes.

6       Q.  And in table 5 of Exhibit 76 you had

7  initially claimed that your cumulative loss was

8  $33,670,000, correct?

9       A.  That's what's there, yes.

10      Q.  And the only change you say between your

11  third declaration and your first declaration is

12  that the upper payment limit has been taken out of

13  your 2010; is that correct?

14      A.  Not exactly.

15      Q.  Or 2011.  Excuse me.

16      A.  That's one factor.  The other one is that

17  this is specific to Lakes Region General Hospital.

18      Q.  So table 5 is just Lakes Region General

19  Hospital; whereas table 5 in your initial

20  declaration included outpatient and physician?  Is

21  that what you're saying?

22      A.  Let me restate that.  It's inpatient,

23  outpatient and physician for Lakes Region General

24  Hospital.

25      Q.  If you could clarify for me which one

1  you're talking about?

2      A.  The most -- the one in 78 with the ID.

3      Q.  78?

4      A.  78.

5      Q.  Is all of them?

6      A.  78 is the Lakes Region General Hospital

7  physician, inpatient and outpatient hospital.

8      Q.  That's all of them?

9      A.  That's all of them.

10      Q.  And the original was just Lakes Region?

11      A.  No.  That is LRG Healthcare, which is

12  Lakes Region, Franklin and Alton.

13      Q.  And Franklin is a critical care

14  hospital -- is a critical access hospital that's

15  not a plaintiff in this lawsuit, correct?

16      A.  It is correct that Franklin Hospital is

17  not here.  We're one corporation though.

18      Q.  And the rates that you complained about

19  about the 2008 inpatient and outpatient reductions

20  have not been applied to Franklin, correct?

21      A.  The radiology was.  The cost report

22  settlement was.

23      Q.  But can you answer my question?  The

24  inpatient and outpatient rate reductions were not

25  applied to Franklin, correct?

1      A.  That's correct.

2      Q.  And Franklin has received a DSH payment

3  this year, correct?

4      A.  It has.

5      Q.  How much money did Franklin receive?

6          MR. O'CONNELL:  Objection, your Honor.

7          THE COURT:  Sustained.

8      Q.  But it has received a DSH payment?

9      A.  It has.

10     Q.  So LRGH has received a DSH payment because

11  of Franklin?

12         MR. O'CONNELL:  Objection.

13         THE COURT:  I guess it has.  It's one

14  corporation.

15         MR. O'CONNELL:  Withdrawn.  I didn't hear

16  her say LRG Healthcare.

17         MS. SMITH:  I don't believe I have any

18  further questions.

19         THE COURT:  Any redirect, Mr. O'Connell?

20         MR. O'CONNELL:  Briefly, your Honor.  Two

21  questions.

22                REDIRECT EXAMINATION

23  BY MR. O'CONNELL:

24     Q.  Mr. Lipman, you were asked about the 3,000

25  patients that were notified.

```
 1       A.  Yes.

 2       Q.  Those were historic patients over

 3  approximately a three-year window, correct?

 4       A.  Yes.

 5       Q.  Have you tried to figure out on a going

 6  forward basis the number of Medicaid patients that

 7  will not be seen who would otherwise come to the

 8  practice?

 9       A.  We did make an estimate in my affidavit.

10       Q.  What is your estimate?

11       A.  I would have to reference it.

12       Q.  Please do.

13       A.  That based on the state's analysis of what

14  they see as the use rates in the report that we

15  looked at earlier, which is Plaintiff's Exhibit

16  50, applying the factors there, that ultimately we

17  would expect in our service area 6,731 patients to

18  access physician services.

19       Q.  That would not have that opportunity?

20       A.  That may not have that opportunity,

21  correct.

22       MR. O'CONNELL:  Thank you.  Nothing

23  further, your Honor.

24       THE COURT:  All right.  Thank you.

25  Anything else?
```

1          MS. SMITH:  No recross.

2          THE COURT:  Mr. Lipman, you may step down.

3    You're excused.  I appreciate it.

4          Just by way of going forward, I understand

5    you want to put on evidence of the 30(a) claims,

6    and I understand the state probably does, as well,

7    but I gather it's going to be somewhat cumulative,

8    right?

9          MR. O'CONNELL:  Yes, your Honor.

10         THE COURT:  So maybe we can just hit the

11   highlights of the 30(a) substantive requirements.

12         MR. O'CONNELL:  Your Honor, may I ask --

13   when you say 30(a), are you speaking about only

14   the procedural side of it or the substantive

15   impacts?

16         THE COURT:  Both.

17         MR. O'CONNELL:  We will hit the

18   highlights.  We will hit the specific numbers.  We

19   will not be redundant with numbers.  You will not

20   see --

21         THE COURT:  Great, great.  And of course,

22   as I've probably made clear at the last hearing,

23   I'm particularly interested in the 13(A) issues.

24   That's what I'm really particularly interested in.

25         I really doubt that I'm going to jump the

1  Supreme Court's claim on the 30(a) issues.  I've

2  been looking into it and I've been thinking about

3  it quite a bit, and there's precedent in the First

4  Circuit that basically says that's not a great

5  thing to do when there's a case pending in the

6  Supreme Court that's been submitted on briefs,

7  been fully argued, and is pending resolution.  So

8  I doubt that's going to happen.

9          Well, I'll give you the chance to argue

10 it.  I'm just trying to be candid so we can

11 fashion the presentation of the hearing.  Because

12 obviously at this rate you're going to take a

13 week, not two days.

14          MR. O'CONNELL:  We're still going to try

15 to be done by the middle of tomorrow.

16          THE COURT:  And I'm trying to help you.

17          MR. O'CONNELL:  Yeah, I know you are, your

18 Honor.

19          On the 30(a) issues, though, there is a

20 procedural one, and that's before the Supreme

21 Court.  And I understand your analysis to us on

22 that posture, but the substantive issue is not

23 before the Supreme Court.

24          THE COURT:  No, I understand.  But you're

25 not even going to get there -- if the procedural

 1   issue fails, right, you're not going to get there?

 2           MR. O'CONNELL:  That's not true, actually.

 3   At end of the day -- they may comply with the

 4   procedural requirements, but at the end of the day

 5   they are substantive impact issues.

 6           THE COURT:  I guess I don't deem the

 7   procedural issue as, did you even have standing to

 8   be in here complaining about 30(a) issues.  If the

 9   answer from the Supreme Court is, no, you don't,

10   that's the end of that.

11           MR. O'CONNELL:  I understand.  Yes, your

12   Honor.  I understand.  Thank you.

13           THE COURT:  But I understand your desire

14   to put on a merits record just in case.  I mean,

15   they may come out next week and say you certainly

16   do.  Who knows.

17           But by way of streamlining it -- to the

18   extent you're going to hit the same points, I

19   gather -- we don't need to go through all of the

20   background of, you know, where did you go to

21   school and where do you live and all of that.

22           MR. O'CONNELL:  I will not.  What time

23   does the Court intend to proceed to today?

24           THE COURT:  I usually go to 4:30, quarter

25   of 5:00, unless that's a problem with any of you

1  or with any of your witnesses.

2          MS. SMITH:  We had understood, I think,

3  that we had three days this week.

4          THE COURT:  You did?

5          MS. SMITH:  Yes.

6          THE COURT:  I have two days on my

7  calendar.

8          MR. O'CONNELL:  Yeah, we were noticed for

9  three.

10          THE COURT:  Noticed by whom?

11          MR. O'CONNELL:  Actually, didn't we find

12  out we have three days on the calendar?

13          THE COURT:  Today is Tuesday.  Isn't it

14  two days?  We have it for two.  It's on the docket

15  as two.  Other than my patience, it's not

16  critical.  I think Thursday -- what do we have?

17          THE CLERK:  I think you're available

18  Thursday.

19          THE COURT:  I think Thursday is sort of

20  okay.

21          MR. O'CONNELL:  That would explain the

22  disconnect, your Honor.  We were planning for

23  three, both sides.

24          MS. SMITH:  Right.  I was just hearing two

25  days, and I just wanted to clarify that we had

1   notice that it was Tuesday, Wednesday and Thursday

2   this week.

3           THE COURT:  Well, you understood

4   differently from what I understood.  My docket is

5   marked out for two days, and I thought that was a

6   little much, frankly.  I mean it's -- you know,

7   it's an evidentiary hearing on preliminary

8   injunctive relief.  We're not going to try the

9   merits of the case.  It's very likely to succeed.

10  What's the deal?  I can't imagine that you need

11  three days.

12          I understand everybody has been designated

13  and probably wants to have their ten minutes, but

14  the facts aren't really that disputed, are they?

15          MS. SMITH:  I think the adequacy of the

16  notice is very much disputed and the access issue

17  is --

18          THE COURT:  Sure.  That's just a matter of

19  putting people up there on the stand to say, what

20  notice did you give, what form did it take, how

21  was it disseminated, who did it, who received it,

22  that sort of thing, as opposed to $106,000 for

23  lobbying on your tax return, let's kind of define

24  what that might have been for.  We don't need

25  that.  Not to be highly critical of you, Nancy,

1  but we need to be moving along.

2          THE CLERK:  Thursday is not a good day.

3          THE COURT:  It's not a good day?

4          THE CLERK:  You're available Friday, but

5  Thursday you have sentencings and tons of stuff.

6          THE COURT:  Well, let's see how we do.  I

7  mean, I think if you get together -- I imagine a

8  lot of this is the same testimony with just

9  different numbers, right?

10          MR. O'CONNELL:  Correct, your Honor.

11          THE COURT:  Okay.  Again, what I'm really

12  interested in is any factual disputes that are

13  material regarding the notice requirement for the

14  13(A) issues.  If there's any evidence on that,

15  that's what I really want to hear.  I don't want

16  to miss that, so flag that for me.

17          The 30(a), likely to be deferred until the

18  Supreme Court decides the procedural posture.  I

19  understand you still want to build a record, but

20  if we can try to do it in an efficient and

21  effective way, that would be good.  All right.

22  See you at 1:30.

23          (LUNCH RECESS)

24

25

1                  C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify

5     that the foregoing transcript is a true and

6     accurate transcription of the within proceedings,

7     to the best of my knowledge, skill, ability and

8     belief.

9

10    Submitted: 1-23-1

11                          **SUSAN M. BATEMAN, LCR, RPR, CRR**
                            LICENSED COURT REPORTER, NO. 34
12                          STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25