**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4-23-2012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
                                *
DARTMOUTH-HITCHCOCK CLINIC, ET  *
AL                              *  11-CV-358-SM
            v.                  *  January 11, 2012
                                *  1:40 p.m.
NEW HAMPSHIRE DEPARTMENT OF     *
HEALTH AND HUMAN SERVICES,      *
COMMISSIONER                    *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF EVIDENTIARY HEARING
AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiffs:        William L. Chapman, Esq.
                           Orr & Reno, P.A.

                           W. Scott O'Connell, Esq.
                           Gordon J. MacDonald, Esq.
                           Emily Pudan Feyrer, Esq.
                           Anthony Galderi, Esq.
                           Nixon Peabody, LLP


For the Defendant:         Nancy J. Smith, Esq.
                           Jeanne P. Herrick, Esq.
                           Laura Lombardi, Esq.
                           Office of the Attorney General
                           Civil Bureau


Court Reporter:            Susan M. Bateman, LCR, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

2

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| KATHLEEN DUNN: | | | | |
| By Mr. MacDonald | 03 | | | |
| By Ms. Smith | | 94 | | |
| | | | | |
| KEITH HEARLE: | | | | |
| By Ms. Smith | 36 | | 89 | |
| By Mr. O'Connell | | 59 | | 92 |

EXHIBITS:

| DEFENDANT'S: | | IN EVD |
|---|---|---|
| 195. | | 13 |
| 196. | | 16 |

| PLAINTIFF'S: | | |
|---|---|---|
| 62. | | 34 |

3

```
 1                 P R O C E E D I N G S
 2          THE COURT:  Mr. MacDonald, whenever you're
 3  ready.
 4      CONTINUED DIRECT EXAMINATION OF KATHLEEN DUNN
 5  BY MR. MACDONALD:
 6      Q.  Good afternoon, Ms. Dunn.  Before we broke we
 7  were talking about a series of rate reductions which
 8  were presented by Commissioner Toumpas to the joint
 9  fiscal committee on February 5, 2010, and we've
10  covered -- before the break we covered two of them,
11  one of them relating to outpatient radiology and the
12  second to what's called revenue code 510.  I would now
13  like to turn to the issue of outpatient cost
14  settlement.
15          As I understand the way it works, outpatient
16  services are paid on a cost basis, is that correct,
17  for the most part, with some exceptions?
18      A.  Correct.
19      Q.  And the actual costs are subject to an audit
20  or a review by a fiscal intermediary?
21      A.  That's correct.
22      Q.  Is that correct?
23      A.  That is correct.
24      Q.  And after the intermediary's work is done,
25  then a final cost settlement is made; is that correct?
```

4

```
1        A.  Correct.  The state compares the amount of

2   reimbursement that the hospital has already received

3   through interim payments as compared to what the

4   fiscal intermediary determined, and the delta between

5   the two is the cost settlement payment.

6        Q.  Okay.  And if a hospital has been underpaid,

7   after the settlement process the state will pay the

8   difference --

9        A.  Correct.

10       Q.  -- of the underpayment; is that correct?

11       A.  Correct, sir.

12       Q.  And as I understand it, if the state -- if

13  the hospital has been overpaid, the hospital needs to

14  pay back the state the amount of the overpayment; is

15  that correct?

16       A.  That's correct.

17       Q.  Okay.  So the issue that the commissioner

18  presented to joint fiscal on February 5th dealt with

19  the former situation.  In other words, where the

20  hospitals were owed money after the cost settlement

21  process; is that right?

22       A.  That's correct.

23       Q.  Okay.  And we took a look before the break at

24  your March 1, 2010 letter to Mr. Ahnen, and it's

25  helpful because you describe in there what public
```

1  process and state plan amendments are required for the

2  various rate reductions that were presented by the

3  commissioner on February 5th.

4          And I would like to go to the second page of

5  your letter and take a look at the chart, and the

6  second line up is the issue we're dealing with and it

7  says:  Delay Medicaid outpatient cost settlement

8  payments.  And then you say that a public notice and

9  state plan amendment are planned.

10         Now, did the -- I think it's accurate to say

11  that a state plan amendment with respect to outpatient

12  cost settlements was never fought; isn't that correct?

13      A.  I don't believe that's correct.

14      Q.  Okay.  You have the outpatient pages in front

15  of you.  Why don't you go through and tell me which

16  state plan amendment authorized the delay of

17  outpatient cost settlements and was filed in -- let me

18  put it this way.  Do you agree a state plan amendment

19  was necessary?

20      A.  At the time this was a delay there was a

21  possibility that we would still be able to make

22  payments.  And in fact in state fiscal year, later in

23  the year, we were able to make payments -- the cost

24  settlement payments for those hospitals whose cost

25  settlement process had been completed.

6

1      Q.  I understand.  My question is:  If the cost

2  settlements are going to be delayed, that required a

3  state plan amendment, didn't it?

4      A.  Not a delay.  It would have to be paid within

5  the state -- the Medicaid state rate year.  If we were

6  not going to pay those cost settlements, then a state

7  plan amendment would be required.

8          At the time of this March 1st letter I did

9  not know that we were going to have funds later in

10 2010 to actually make the 2010 payments.

11     Q.  But you told CMS the state plan amendment was

12 required, didn't you?

13     A.  We told CMS at the time that we were planning

14 on putting a state plan amendment forward and if in

15 the course of business we find out that it's not

16 needed, then we don't pursue it.

17     Q.  Does the state -- has the state continued its

18 policy of delaying outpatient cost settlements?

19     A.  Yes, it has, sir.

20     Q.  And it's extended into this biennium, in

21 other words, fiscal 12 and 13; isn't that right?

22     A.  That is correct.

23     Q.  Okay.  And no state plan amendment was filed;

24 isn't that right?

25     A.  I need to actually look at this, and it might

1   be more efficient to ask one of my colleagues who is

2   more familiar with the state plan.  But I thought that

3   if we were not going to pay those payments we would

4   have included it in a state plan amendment, sir.

5        Q.  I'm sorry.  I did not hear that answer.

6            THE COURT:  She doesn't know, but someone

7   else knows.

8        A.  I'm sorry.  I'm trying to rifle through this

9   very quickly and be efficient.  I would expect that if

10  we were not going to make those payments that we would

11  submit a state plan amendment, sir.

12       Q.  Okay.  And a state plan amendment hadn't been

13  filed with -- strike that.  In recommending the -- or

14  in notifying the joint fiscal committee that the

15  department was going to be delaying outpatient cost

16  settlements the department didn't undertake any

17  analysis with respect to its effect on beneficiaries

18  or providers or cost of care or access to care; isn't

19  that right?

20       A.  I believe we did.

21       Q.  The action was taken in response to a need to

22  cut the budget; isn't that right?

23       A.  Yes, sir.

24       Q.  Okay.  Now, let's go on to catastrophic

25  payments.  And again, these cuts, like delaying

1  outpatient cost settlements, were driven by the need

2  for the department to cut its budget; isn't that

3  right?

4          A.  Yes, sir.

5          Q.  And was a state plan amendment required to

6  delay Medicaid catastrophic payments?

7          A.  For a delay of the catastrophic payments --

8          Q.  I mean to suspend.  To no longer pay

9  catastrophic payments.  I'm sorry.

10         A.  I believe it was.

11         Q.  And was one cut?

12         A.  I believe it was.

13         Q.  Okay.  And was there public notice?

14         A.  As part of the state plan process?  Yes, sir.

15  If we filed a state plan amendment, we automatically

16  would do the public notice.

17         Q.  I just show you Exhibit 36.  Do you recognize

18  Exhibit 36?

19         A.  Yes, I do.

20         Q.  Paragraph 2, I believe, addresses

21  catastrophic payments?

22         A.  Yes, it does, sir.

23         Q.  And the public notice was published on

24  February 26, 2010, and it asks for comments by March

25  15, 2010; is that right?

1      A.  I'm going to say yes on the March 15th

2  because I'm not going to read this fast enough.  So,

3  yes, comments were requested.

4      Q.  Okay.  Let's move to the topic of UPL

5  payments which has been discussed quite a bit during

6  this case, and can we agree that UPL payments are

7  authorized under the Medicaid Act and they're intended

8  to fill the gap between the rate that providers are

9  paid and a ceiling set under the Medicare Act?  Is

10 that a fair representation?

11     A.  Yes, sir.

12     Q.  Okay.  And in 2010 the state paid hospital

13 providers upper limit payments on both inpatient and

14 outpatient services; isn't that right?

15     A.  Yes.

16     Q.  And as you know, the plaintiffs in this case

17 have said that the -- let me ask you this.  That

18 payment occurred in fiscal -- occurred in calendar

19 2010, fiscal 2011; is that right?

20     A.  Correct.

21     Q.  And in fiscal 2012, calendar 2011, there was

22 no such upper payment limit payment; is that correct?

23     A.  That's correct.

24     Q.  And my understanding of the state's position

25 in the case is that the -- and let's just use fiscal

1  year just to be clear.  That the UPL in fiscal 11 --

2  that payment was a one-time payment; is that right?

3      A.  That is correct.

4      Q.  Okay.  And I will assume, because the state

5  takes that position, that it did none of the analysis

6  required under the Medicaid Act in terms of analyzing

7  whether withdrawing UPL payments were consistent with

8  its obligations under the Medicaid Act; is that

9  correct?

10     A.  That's correct.  It was not required.

11     Q.  And because it was a one-time payment the

12  state didn't need to undertake anything with respect

13  to Section 13(A); is that correct?

14     A.  No.  That's not correct.

15     Q.  How is that incorrect?

16     A.  Because, sir, the reason the state for the

17  very first time in state fiscal year 11 did that UPL

18  payment was to take advantage of an enhanced match

19  that was available under the American Recovery and

20  Reinvestment Act.  In fact, it was a recommendation

21  that came from the consultant, Health Management

22  Associates, that the hospital association had engaged.

23          When we did the state plan amendment to

24  include it as part of uncompensated care payments, we

25  made a point of leaving it in the state plan just in

1  case.  So at that point there were rumors that ARRA

2  was going to be extended.  And if it was going to be

3  extended, then we would take advantage of it the

4  following year.  It turned out ARRA wasn't extended

5  and as a result, in making the change for this state

6  fiscal year we have in fact filed a state plan

7  amendment following appropriate procedure.

8       Q.  Okay.  Because when the UPL payments were

9  made in fiscal 2011 --

10       A.  Yes, sir.

11       Q.  -- a state plan amendment was required,

12  correct?

13       A.  That's correct.

14       Q.  Because the methodology was changing?

15       A.  The entire DSH and uncompensated care

16  methodology changed.

17       Q.  And that's when you filed a state plan.  And

18  let's take a look at 4 -- in Exhibit 2, 4.19 B, page

19  1, the reimbursement page, and let's look at

20  transmittal number 10-014.

21          So again, transmittal number 10-014, this was

22  submitted in calendar 2010 to facilitate the UPL

23  payment in fiscal 2011; is that right?

24       A.  That's correct, sir.

25       Q.  And it has an effective date of November 19,

12

1  2010?

2       A.  Yes, it does, sir.

3       Q.  And the redline -- this is a redline version,

4  and it shows the change that's made on this page as

5  compared to the previously affected page; is that

6  correct?

7       A.  Yes, it is, sir.

8       Q.  Okay.  So let's look at the third sentence --

9  or actually, let's start at the beginning:  For

10 outpatient services provided in calendar year 2010 an

11 annual Medicaid payment adjustment shall be made.

12          Then the third sentence:  This annual

13 calendar year adjustment payment will be made in the

14 final calendar quarter of each year until such time as

15 it may be amended under the state plan.

16          So this was not a one-time payment.  The

17 state plan provided for annual UPL payments, didn't

18 it?

19      A.  No.  I disagree, sir.  It says:  Until such

20 time as it may be amended under the state plan.

21          It was always clear to the department and the

22 plaintiffs what we were doing, why we did it.  If we

23 had not put this language in, sir, if ARRA had passed,

24 it would have delayed our ability to make UPL payments

25 in the current fiscal year.

1      Q.  Well, in order to -- and obviously you're

2  able to talk about -- well, strike that.

3          In order to accommodate the state's lack of

4  payment of the UPL in calendar 2011, fiscal 2012, the

5  language before you had to be changed, didn't it?

6      A.  It did because of the methodology changing.

7      Q.  And, in fact, I'll give you Defendant's 195.

8          MR. MACDONALD:  It's ID, but we'll stipulate

9  to its admission.

10          THE COURT:  195, any objection?

11          MS. SMITH:  No.  I agree it can be full.

12          THE COURT:  ID may be stricken on Defendant's

13  195.

14          (Defendant's Exhibit 195 Admitted)

15      Q.  Now, do you recognize this document?

16      A.  Yes, I do.

17      Q.  And what is it?

18      A.  This is a transmittal notice for a state plan

19  amendment filed in 2011.  It is a companion piece to a

20  different state plan that both speak to how

21  uncompensated care payments were going to be made

22  under the state plan amendment.

23      Q.  Okay.  And the --

24      A.  State plan.

25      Q.  I'm sorry.  The companion state plan

14

1   amendment deals with inpatient services.   This deals

2   with outpatient services.

3        A.   Outpatient, right.   You have to file two

4   separate ones.

5        Q.   Okay.   Thank you.   So we see here on this

6   transmittal notice there's a proposed effective date

7   of December 14, 2011.   And then let's scroll down to

8   the redline version of page 1.   There you go.   Okay.

9             Now, we see a couple of things going on here.

10  But if you look at the first sentence we see that --

11  of paragraph 3, we see that the words "in annual" are

12  stricken; is that correct?

13       A.   That's correct.

14       Q.   And then if we look at the third sentence we

15  see that "annual" is stricken and "each year" is

16  stricken, and the rest of that sentence is stricken in

17  lieu of the words calendar year 2011.

18            THE COURT:   10.

19       Q.   10.   I'm sorry.   So the state plan had to be

20  amended to strike out the words "annual", didn't it?

21       A.   Yes, it did.

22       Q.   Okay.   Now, I would like you to take a look

23  at the, while we're on this page, the redline --

24  redlining of the paragraph above that.

25            Now, that's the language, isn't it, that the

1  state had relied on with respect to both revenue code

2  510 and outpatient radiology; isn't that right?

3       A.   Initially, yes.

4       Q.   Okay.  And that language is now out of the

5  state plan, correct?

6       A.   That is correct.

7       Q.   And if we remember the commissioner's letter

8  of last week, he promised that that state plan would

9  be withdrawn, and it looks like the state actually had

10 done that effective December 14th.  Am I reading that

11 correctly?

12      A.   No, sir.  I'm sorry.  You're not.  The

13 effective date of December 14th is the date that we

14 would want CMS, once they approved this page, to go

15 back to.  That date is important because December 15th

16 is the day we made DSH payments to the critical access

17 hospitals.

18           This particular paragraph, which goes back to

19 the rev code 510 issue, CMS informed us as part of

20 their process of working with the state that the

21 08-017 state plan amendment was not needed for two

22 reasons.  One, the 510 billing was never allowed in

23 the first place under the state plan, and the issue

24 with the outpatient radiology I believe I explained.

25 We thought we could be -- we could implement the fee

1   schedule, make the program more efficient.

2          After the financial management folks at CMS

3   looked at it they asked the benefits folks to look --

4   excuse me -- the benefits staff at CMS to look at it.

5   It was not until that point, which was very recent,

6   that we understood that they would not approve the fee

7   schedule for outpatient radiology if we wanted to

8   maintain those services as hospital outpatient

9   services.

10         As a result, each of these state plan

11  amendments builds on the other, and so that strikes

12  this language from this specific most recent state

13  plan amendment.

14      Q.  Okay.  I want to show you -- get back to the

15  UPL issue, okay?

16      A.  Sure.

17      Q.  Let me show you what's been identified as 196

18  for ID.  That's Defendant's Exhibit 196.

19          MS. SMITH:  You can strike the ID.

20          THE COURT:  The ID may be stricken on

21  Defendant's 196.

22          (Defendant's Exhibit 196 Admitted)

23      Q.  Now, these are a series -- they appear to be

24  a collection of public notices, and I would like to go

25  to the one dated November 24, 2011.

1          Okay.  In the package are a series of public

2    notices, including the one on the screen now which was

3    published on November 24, 2011, in the Nashua

4    Telegraph.  And the next page is one that appears to

5    have been published on November 28th in the Union

6    Leader.

7          And in the public notice -- it's a bit hard

8    to read, but if you go down -- go down a little bit

9    more.  Okay.

10          Here we see that the state is saying:

11   Additionally, the state plan will be amended to --

12   it's in the first full paragraph on the screen, last

13   sentence:  Additionally, the state plan will be

14   amended to remove the upper payment limit, UPL,

15   language that is no longer relevant as described in

16   the October 31, 2011 notice.

17          And if we scroll down to the end we see that

18   the copies of draft state plan pages will be on file

19   at the department, and the draft pages are expected to

20   be available on December 1.  Once they become

21   available, comments will be accepted for two calendar

22   weeks after the date of availability.

23          When were the state plan amendment pages

24   available?

25      A.  I believe they were available December 1st.

18

1        Q.   Okay.  And so anyone interested in commenting

2   on the elimination of the language with respect to UPL

3   had two calendar weeks, which would take you to

4   December 15th, which was a day after it became

5   effective, is that right -- the state plan amendment

6   changes became effective?

7        A.   Yes, sir.

8        Q.   Okay.  Now, let's go back -- since this

9   notice references an October 31st notice, let's go and

10  take a look at that.  Let's go to the one in the

11  Telegraph again.  It's a bit easier to read.  The last

12  paragraph on the portion that's -- well, go down.

13  There you go.  This public notice generally discusses

14  changes -- by the way, strike that, what was the

15  effective date of the budget this year for fiscal 12?

16       A.   July 1 of 2011.

17       Q.   Okay.  Going back to the notice, the 2010 UPL

18  payment was not anticipated to be made in years other

19  than 2010, and therefore there is no fiscal impact

20  associated with this.

21            The notice then goes on to describe fiscal

22  impacts amounting to $158 million.  Is it your

23  testimony that the elimination of UPL payments

24  resulted in no fiscal impact of the state?

25            A.   No.  Excuse me.  Yes, it is.  The UPL

1  payments in 2010 generated $20 million extra that went

2  out to the hospitals.

3        In 2011 the aggregate amount of money

4  available to make DSH payments was going to be the

5  same regardless of whether we did UPL payments or DSH

6  payments.

7        Q.  But you are telling the public that as a

8  result of the budget cuts there will be an estimated

9  decrease in annual aggregate expenditures of

10  $158,963,135 in federal fiscal year 2012; is that

11  correct?

12       A.  That's correct.  Because the funds would not

13  be on the UPL side of the payment methodology, and

14  therefore, relative to that specific change, that's

15  how much money was impacted.

16       Q.  Okay.  Do you know Keith Hearle?

17       A.  I have just met the gentleman, yes.

18       Q.  Who is he?

19       A.  I know that he is a consultant that was

20  retained by the Department of Justice and has

21  expertise in hospital finances.

22       Q.  Did you meet with him?

23       A.  No, I did not meet with him.  I had a

24  conference call with him.

25       Q.  Who else was on the conference call?

1        A.   Nobody.   The two of us.

2        Q.   So you had a telephone call with him.

3        A.   I'm sorry.   When we -- I was traveling at the

4   time so I used a conference call number.

5        Q.   I see.

6        A.   I had a telephone call with Mr. Hearle.

7        Q.   And what did you discuss with Mr. Hearle?

8        A.   I recall that Mr. Hearle was asking me some

9   background questions on the state Medicaid program and

10  then asked questions relative to how we had redesigned

11  our DSH program, asked me questions about the rate

12  reductions.   It was all background information.

13       Q.   How long did the telephone call last?

14       A.   That phone call lasted somewhere between a

15  half hour and an hour.   I don't recall, sir, the exact

16  amount of time.

17       Q.   Did you have any other communication in any

18  form with Mr. Hearle?

19       A.   None whatsoever.

20       Q.   Did you tell Mr. Hearle that it was the

21  intent of the state to make UPL payments only once?

22       A.   Yes, I did.   And I explained why.

23       Q.   So you felt comfortable speaking on behalf of

24  the state in expressing what the intent of the state

25  was?

1        A.  Yes, sir.

2        Q.  You had felt comfortable expressing the

3   opinion of the Governor and the legislature and 424

4   members of the state legislature, I take it?

5        A.  No.  I felt comfortable responding to those

6   questions as medicaid director for the state with the

7   understanding of how I thought the program was going

8   to be implemented in this current state fiscal year.

9        Q.  Did you tell Mr. Hearle that a state plan

10   amendment would be required to change the UPL

11   methodology?

12        A.  I believe -- if he asked that question, then

13   I would have answered yes.

14        Q.  Did you tell him that, though?

15        A.  I don't recall, sir.

16        Q.  Okay.  Let's take a look at Exhibit 45.

17   Exhibit 45 appears to be another PowerPoint

18   presentation, or a series of slides, this time

19   presented to the house finance -- Division III of the

20   House Finance Committee; is that right?

21        A.  Yes, sir.

22        Q.  And Division III deals with the Department of

23   HHS; is that correct?

24        A.  Yes, sir.

25        Q.  And this is dated February 7, 2011.  And did

1  you help prepare this?

2       A.  Yes, I did, sir.

3       Q.  And did you actually appear before Division

4  III on February 7, 2011?

5       A.  Yes, I did.

6       Q.  I would ask you to look at page 7, please.

7  What was the purpose of your presentation to Division

8  III?

9       A.  Well, similar to the one in Senate, we had a

10  group of new legislators so we did an educational

11  session with both bodies.  After the first -- there

12  were three educational sessions with the House.  After

13  the first one we came back on this date to do some

14  follow-up.

15          On the previous date when we were there we

16  didn't have a chance to talk about disproportionate

17  share payments, so we did this presentation, and

18  subsequently they asked us to actually do a much

19  longer presentation.

20       Q.  Thank you.  So here you are presenting to

21  Division III some background on the disproportionate

22  share hospital program, otherwise known as DSH, and

23  the first bullet point says that DSH payments provide

24  financial assistance to qualifying safety net

25  hospitals that serve a large number of low income

23

1  patients, such as possible with Medicaid and the

2  uninsured.  It's existed since 1981.  And then the

3  second dash down says:  Medicaid is included in

4  uncompensated care because payments frequently do not

5  cover the costs of care provided.  And that's an

6  accurate statement, isn't it?

7       A.  Yes.  It's often referred to as Medicaid

8  losses.

9       Q.  Now, the next bullet point:  Over the years

10  national policymakers have grappled with a variety of

11  issues regarding Medicaid DSH.  And you recite a rapid

12  growth in spending.  I take it that's on a national

13  basis.

14       A.  Yes, sir.

15       Q.  And it says that there is concern with

16  inappropriate targeting and use of DSH funds.  What

17  are the concerns or the issues surrounding the

18  inappropriate targeting and use of DSH?

19       A.  In this specific context it had to do with

20  the fact that the ACA was looking at -- excuse me.  I

21  should use the whole acronym.  The Patient Affordable

22  Care Act has language in it that requires the

23  Secretary to actually do a significant reduction in

24  the DSH program.

25            And one of the questions New Hampshire

24

1    received was did we -- they wanted us to tell them why

2    we had designated all of our hospitals as DSH

3    hospitals.  That's not a common practice.  And we were

4    asked that inquiry.  And then we got into the

5    conversation with them that went on to talk about what

6    New Hampshire specifically was being looked at back in

7    2004.

8         Q.  And the DSH program was under intense

9    scrutiny by CMS; is that right?

10        A.  Yes, sir.

11        Q.  In New Hampshire?

12        A.  In New Hampshire.  Other states as well, but

13   I can only speak to New Hampshire.

14        Q.  Okay.  Let's go to slide 12.  Slide 12 says:

15   Up until October 2010, a hospital's DSH payment for

16   uncompensated care provided equal the MET paid by an

17   individual hospital.

18        A.  That's correct.

19        Q.  And the MET is the Medicaid enhancement tax

20   payments that hospitals are required to make under

21   state law; is that right?

22        A.  That's correct.

23        Q.  And then you describe a major effort to

24   reform the DSH program, and you cite to an OIG audit

25   of 2004.  And there was an OIG audit of New

1  Hampshire's Medicaid program; is that right?

2      A.  That's correct, sir.

3      Q.  And what was the result of that audit?

4      A.  The results of that audit were that the

5  Office of the Inspector General's opinion provided to

6  CMS was that the state had overpaid hospitals -- had

7  overpaid in DSH payments to the hospitals, and that in

8  doing so we owed -- the state owed the federal

9  government $35 million in a disallowance.  That report

10 went to CMS, and then it becomes CMS's responsibility

11 to decide what action to take after that.

12     Q.  Okay.  Let's go to slide 17.  This is

13 captioned "The Uncompensated Care Calculation".

14     A.  Uh-huh.

15     Q.  And DHHS can only reimburse up to the amount

16 of a hospital-specific DSH limit.  And that's based on

17 the cost of inpatient and outpatient services provided

18 by each hospital, and it includes Medicaid losses?

19     A.  Uh-huh.

20     Q.  Which is the difference between Medicaid

21 loss, cost, minus what hospitals get paid; is that

22 correct?

23     A.  Yes, it is, sir.

24     Q.  Let's go to slide 19.  Now, this is a little

25 bit hard to read, but this shows the history of the

1   DSH program in New Hampshire in terms of DSH payments

2   made, tax payment, meaning the payments made by the

3   hospitals under the MET, and then what was generated

4   for the general fund; is that correct?

5       A.  That's correct.

6       Q.  And if you look at the subtotal as of

7   November 19, 2010, it's almost $1.8 billion.

8           MS. SMITH:  I just don't know where we're

9   going with this.  I don't know how it's relevant to

10  any decrease in DSH or MET that's at issue in this

11  lawsuit.

12          THE COURT:  Well, I agree.  I can't help you

13  with -- Mr. MacDonald, why is it relevant?

14          MR. MACDONALD:  I'll move on.

15      Q.  Let's take a look at Exhibit 47.  Do you

16  recognize this document?

17      A.  Yes, sir.

18      Q.  What is it?

19      A.  It's a document that the Department of Health

20  and Human Services utilizes as a reference document

21  with the legislature when they are considering our

22  budget.

23      Q.  Okay.  And it says -- it's another

24  presentation to Division III, and it says on the front

25  page that HHS was requested to present to Division III

1  various options to reduce general fund demand for

2  fiscal years 12 and 13, and that this -- by up to

3  $200 million; is that right?

4      A.  That's correct, sir.

5      Q.  And that's -- the purpose of this document is

6  to present some options; is that correct?

7      A.  This document was married to a spreadsheet

8  very similar to the one -- oops, I'm sorry.  I just

9  spilled the water there.  Very similar to -- I'm

10 sorry -- very similar to exhibit what was 199.  It was

11 married to a spreadsheet like that.

12          And so what this larger document did, sir,

13 No. 47, was to -- why don't I fix that.  I'm sorry.  I

14 apologize.

15          MS. SMITH:  Why don't you just take a break

16 and deal with that.

17          THE WITNESS:  I almost have it.  Thank you.

18 I'm very sorry, counsel.  I'm very sorry.

19          THE COURT:  It's not a problem.  Don't worry

20 about it.

21      A.  So I was saying that this is a companion

22 document to that spreadsheet so that -- what the House

23 had requested was they wanted to be able to have a

24 reference document that they could look up a

25 particular budget reduction and use it as part of

1  their decision making process.

2       Q.  Okay.  Let's scroll through this document,

3  and you've got the physical document in front of you.

4       A.  Yes.

5       Q.  And do you see the spreadsheet you're talking

6  about, pages 2, 3 and 4?

7       A.  Yes, sir.

8       Q.  Okay.  So that's the spreadsheet on the

9  screen.  I would like to go to the first page of text.

10  It's page 8 of 84, and is this part of the -- I assume

11  you did not -- you did not yourself create the

12  entirety of Exhibit 47.

13      A.  No, sir.  I didn't.

14      Q.  Did you participate in any of the preparation

15  of this document?

16      A.  Yes, I did, sir.

17      Q.  And did you participate in the preparation of

18  page 8 of 84, which is now --

19      A.  I did, sir.

20      Q.  Okay.  And did you actually write this text?

21      A.  No.  It was drafted by one of my staff

22  members.  I reviewed it and approved it.

23      Q.  Okay.  And here we have a summary of a

24  proposal, as I understand it, to eliminate

25  uncompensated care funding all together; is that

1  correct?

2      A.  That's correct.

3      Q.  And it gives a brief summary of what the

4  Governor had proposed in his budget.

5      A.  Uh-huh.

6      Q.  And then it describes this reduction as

7  essentially directing all of the MET revenue to the

8  general fund and eliminating the non-federal match

9  required for the disproportionate hospital payments.

10  And the effect would be essentially that the hospitals

11  would continue to pay the MET but not get the DSH

12  payments back; is that correct?

13      A.  That's correct.

14      Q.  Okay.  And if we could just take a quick look

15  at Exhibit 62, and here I would like to use the

16  document camera.  I'm presenting you with the actual

17  Exhibit 62.  Do you recognize Exhibit 62?

18      A.  I do, sir.

19      Q.  And what is it?

20      A.  This was a spreadsheet that my office created

21  in order to calculate -- not just calculate but also

22  to share information with the hospitals in terms of

23  the DSH payments that were made to the critical access

24  hospitals in December.

25      Q.  Okay.  The spreadsheet, or at least the copy

1  we have, is a little hard to read, but let's just walk

2  through it together.

3          Right here we have hospital name, and you

4  would agree that those are the 26 acute care hospitals

5  in the state of New Hampshire?

6      A.  It also, I believe, includes two rehab

7  hospitals.  So it's the 26 plus the two rehabs.

8      Q.  Okay.  And the -- you're right, and I'm

9  sorry.  And the hospitals listed at the top of the

10 page are the critical access hospitals; is that

11 correct?

12     A.  Yes, sir.

13     Q.  And the hospitals at the bottom of the page

14 are the non-critical access hospitals, correct?

15     A.  Yes, sir.

16     Q.  And they include the ten plaintiffs in this

17 case?

18     A.  Yes, sir.

19     Q.  Okay.  The next column is DSH category, and

20 CAH means critical access hospital, correct?

21     A.  Yes, sir.

22     Q.  And for the non-critical access hospitals it

23 says deemed TBD.

24     A.  That's correct.

25     Q.  And I believe that goes to an issue that came

1  up earlier today, and we'll get to that.

2      A.  Okay.

3      Q.  The next column is uncompensated uninsured

4  care costs, and that, I take it, represents the

5  state's data gathered from the individual hospitals

6  about what their uncompensated care is for the

7  uninsured.  Is that a fair statement?

8      A.  One slight clarification, if I may, counsel.

9  It's the data that was reported to us by the

10 hospitals, and we have summarized it on this

11 spreadsheet.

12     Q.  Okay.  And the next column summarizes data

13 about uncompensated Medicaid; is that right?

14     A.  Yes, sir.

15     Q.  Okay.  And then the next column is total

16 uncompensated care.  Then the next column is DSH

17 payment, and then the next column is the projected

18 payment under the Medicaid enhancement tax; is that

19 right?

20     A.  No.  Column G --

21     Q.  Yes.

22     A.  -- is the data that was gathered from the

23 hospitals in terms of their reporting of their

24 projected tax liability, their tax payment, and that's

25 done by the Department of Revenue Administration.

1        Q.   Okay.   Thank you.   And then the final column

2    is captioned, Projected Net Position Based on Reported

3    NPSR, and NPSR is net patient service revenue?

4        A.   Correct.

5        Q.   And this spreadsheet reflects DSH payments

6    going out to critical access hospitals in the amount

7    of $48,735,473; is that right?

8        A.   That's correct.

9        Q.   And those payments were actually made on or

10   about December 15th of 2011?

11       A.   Yes, sir.

12       Q.   And then immediately below that you see that

13   no DSH payments were made to the non-critical access

14   hospitals, correct?

15       A.   That's correct, sir.

16       Q.   Subject to a holdback, it looks like, of

17   $500,000; is that right?

18       A.   That's correct, sir.

19       Q.   And that $500,000 will be distributed to

20   hospitals which are so-called deemed status hospitals;

21   is that right?

22       A.   That's correct, sir.

23       Q.   So that the net is that that $500,000 will be

24   distributed among some but probably not all of the

25   critical access hospitals?

1      A.  I would say it will be very few, actually,

2  will meet the criteria.

3      Q.  And that's a criteria set forth in CMS

4  regulations; is that right?

5      A.  Yes, sir.

6      Q.  And the net position, the column on the far

7  right, reflects the DSH payment less the amount that

8  the hospital is paid in MET; is that right?

9      A.  Yes, sir.

10      Q.  Okay.  And so the net for the critical access

11  hospitals is roughly $25 million?

12      A.  Yes, sir.

13      Q.  You go down to the net for the non-critical

14  access hospitals, it says it's zero, but I think we

15  could agree that it's really a substantial number in

16  the negative, isn't that right, because they are not

17  receiving any DSH payments but are continuing to pay

18  the MET?

19      A.  For net position, yes, that would be true,

20  sir.

21      Q.  And I'll just represent to you, having done

22  the math, and I won't spend the time on it, that as to

23  the ten plaintiffs that number instead of zero should

24  be $127,494,293.

25          MR. MACDONALD:  And I believe -- has the

1  state agreed to this exhibit?

2          MS. SMITH:  Yes.  We stipulated to that

3  exhibit.

4          MR. MACDONALD:  Okay.

5          THE COURT:  What's the number?

6          MR. MACDONALD:  62.

7          THE COURT:  ID may be stricken on 62.

8          (Plaintiff's Exhibit 62 Admitted)

9          MR. MACDONALD:  Okay.  Can we go back to

10  Exhibit 47 and the page we were on.

11          THE COURT:  Again, I'm just confused about

12  the MET.  It's a tax imposed by the state that

13  collects it, right?  That's not an issue here?

14          MR. MACDONALD:  No.  I'm getting to it.

15          THE COURT:  Okay.

16      Q.  The proposal that you were discussing to the

17  House Finance Committee, Division III, was to pay the

18  MET but not get the DSH.  And we see, if you scroll

19  down, there's a section called Estimated Impact to

20  Clients, Providers and Communities, and it says:

21  Uncompensated care payments made to hospitals to

22  provide compensation for inpatient and outpatient

23  services provided to our state's uninsured.  Last year

24  the hospitals provided $299 million of uncompensated

25  care and we were reimbursed $207 million, leaving

1   $92 million worth of care uncompensated.  Elimination

2   of the DSH funding will have a significant fiscal

3   impact on hospitals in that it will downshift the

4   financial responsibilities to the hospitals.

5   Presumably the hospitals will pass some of these costs

6   on to privately insureds through their contracts

7   negotiated with insurance companies, thus resulting in

8   a cost shift and increasing commercial health

9   insurance premiums.  However, not all hospitals have

10  the capability to shift costs to commercially insureds

11  due to the population that utilizes their services.

12  There is a strong possibility that this reduction

13  could result in a hospital's inability to sustain

14  operations and therefore close; is that correct?

15       A.   That's correct.

16       Q.   And that's what you told the House Finance

17  Committee?

18       A.   That's what we told the House Finance

19  Committee when they asked us about this particular

20  option within the budget; yes, sir.

21            MR. MACDONALD:  Your Honor, I pass the

22  witness.

23            THE COURT:  All right.  Who is taking the

24  witness?  Attorney Smith?

25            MS. SMITH:  We have one witness that we have

1  to get done today.  We had agreed to start him at

2  3:00, and it's almost that.  So rather than do 20

3  minutes of Ms. Dunn, I would prefer to call Mr. Hearle

4  and then go back to Ms. Dunn when we get done.

5         THE COURT:  That's fine with me if it's okay

6  with you.

7         MR. O'CONNELL:  It's all right.

8         THE COURT:  Sorry, Ms. Dunn.  We keep

9  interrupting you.

10        THE WITNESS:  That's okay.  Should I just

11 leave these here?

12        THE COURT:  Oh, please.

13        MS. SMITH:  The state calls Keith Hearle.

14                    KEITH HEARLE

15        having been duly sworn, testified as follows:

16        THE CLERK:  Would you please state your name

17 and spell your last name for the record, please.

18        THE WITNESS:  Keith W. Hearle, H-E-A-R-L-E.

19                 DIRECT EXAMINATION

20 BY MS. SMITH:

21    Q.  Mr. Hearle, could you please tell the Court

22 what you do for a living?

23    A.  I have a consulting firm based in Alexandria,

24 Virginia, that focuses in on hospital finance,

25 healthcare policies as it relates to hospitals, the

1  community benefit obligations/expectations of

2  hospitals that are tax exempt, and those types of

3  matters.

4      Q.  And were you retained in this case to look at

5  information related to the complaint of the hospitals

6  in this lawsuit?

7      A.  I was.

8      Q.  And have you prepared a report that you

9  provided to the state?

10     A.  I did.

11     Q.  And there are some white notebooks back

12  there, and we'll also get it on the screen in front of

13  you.  Is your report what we've marked for

14  identification as Exhibit 200?

15     A.  Yes.  That's the one.

16     Q.  Maybe I can shorten the questioning a little

17  bit.  The first four pages of your report summarize

18  your qualifications, correct?

19     A.  They do.

20         MS. SMITH:  And is the plaintiff going to

21  have any objection to Mr. Hearle being qualified as an

22  expert?

23         MR. O'CONNELL:  We have no objection to him

24  being qualified.  We only reserve rights to object to

25  some opinions.

1          THE COURT:  All right.

2     Q.  And what were you asked to look at and what

3  were you asked to provide opinions on in this case?

4     A.  I was asked to review certain financial

5  information contained in declarations provided by the

6  hospitals, other financial information that is

7  publicly available, to review other documents, certain

8  testimony, to interview Ms. Dunn, and to prepare the

9  report.

10     Q.  And did you provide in your report a list of

11  all of the things that you looked at that went into

12  forming your opinions?

13     A.  I did.  That is listed in Exhibit A to the

14  report.  However, I also have looked at some recently

15  submitted information, supplementary declarations,

16  those types of things.

17     Q.  What are the conclusions -- did you state in

18  your report the conclusions that you have reached as a

19  result of the work that you performed?

20     A.  I did.  Those conclusions are summarized on

21  page 8 of the report.  The first conclusion is

22  regarding some of the values reported in the

23  declarations.

24          There are numbers regarding Medicaid payment,

25  Medicaid cost reported by each of the hospitals, and I

1   spent some time trying to validate those numbers by

2   comparing them to similar numbers reported in other

3   data sources.  And the first conclusion is that it was

4   difficult to validate those numbers that were filed

5   with the original declarations.

6       Q.  We talked about some of this -- you talked

7   about some of the specifics that you looked at further

8   in the report, correct?

9       A.  I do.

10      Q.  Okay.  We'll come back to that.  I just want

11  to get the general conclusions out first.

12          What was the next conclusion you reached as a

13  result of the information you reviewed?

14      A.  The second -- when I was reviewing the

15  original declarations, I was uncomfortable with the

16  way that the rate impact information was presented,

17  specifically with respect to the upper payment limit

18  funding not being shown as an offset to some of the

19  other rate actions that the state implemented, and

20  then how it was reported in years when it no longer

21  became available.

22      Q.  And what other conclusions did you reach?

23      A.  I compared the profit levels of hospitals in

24  New Hampshire to profitability of hospitals in other

25  states and found that historically the hospitals in

1  New Hampshire have been more profitable than others in

2  New England.

3           MR. O'CONNELL:  Your Honor, we object to that

4  opinion and would ask that it be stricken.  It has no

5  relevance to the analysis before the Court.  The Court

6  has heard about what the standard is for 30(a), 13(A),

7  and profitability is not among those standards, and a

8  comparison to hospitals outside of New Hampshire has

9  no relevance on your analysis of this case.

10           THE COURT:  Well, I think it actually is

11  relevant.  It goes back I think to your own contention

12  that these rates are violative of 30(a) in that they

13  aren't sufficient to provide access to available

14  medical services and so forth.  And your position is,

15  sure they are if they use their profits to subsidize

16  them, right?

17           MS. SMITH:  That's correct.

18           THE COURT:  Objection overruled.

19           MS. SMITH:  And also testimony that the

20  department did consider the impact on access by

21  looking at the hospital's profitability.  It validates

22  that.

23           THE COURT:  I mean, New Hampshire hospitals

24  in gross versus Massachusetts' hospitals in gross

25  isn't particularly persuasive evidence, but to the

1  extent it's relevant, it's relevant.

2      Q.  And what other conclusions did you review --

3  reach as far as the hospitals' sources of losses?

4          THE COURT:  When you say the hospitals, who

5  are you talking about, these plaintiffs as compared

6  to --

7          MS. SMITH:  The plaintiffs' sources of

8  losses.

9          MR. O'CONNELL:  Well, that's not actually

10  what the report says, your Honor, but I can take that

11  up on cross-examination.

12      A.  I concluded that the hospitals in New

13  Hampshire on average have fewer Medicaid patients in

14  their payer mix, but that also the hospitals are

15  struggling both with Medicare losses in addition to

16  Medicaid losses.  So financial challenges are not only

17  associated with Medicaid.

18      Q.  And I think the last conclusion that you

19  stated in your report was in relation to community

20  benefits, correct?

21      A.  It is.

22      Q.  Do you have a particular expertise regarding

23  the community benefits field?

24      A.  I do.  I participated in work with the

25  Catholic Health Association in the late 1980s to

1  develop the first accounting and reporting framework

2  for community benefit.

3          If you fast forward to the most recent

4  periods, I've been working directly with the IRS on

5  how to report community benefit in what's known as IRS

6  form 990, Schedule H.  I've worked with them on

7  instructions to that form, have worked with Senate

8  Finance Committee staff as they've considered the

9  evolving standards that hospitals need to meet --

10  exempt hospitals need to meet at a federal level to

11  keep qualifying for that exempt status.

12      Q.  And what was your conclusion regarding --

13  what conclusions did you reach regarding these

14  hospitals' actions in relation to their community

15  benefit reporting?

16      A.  The conclusion is that tax exempt hospitals

17  like the plaintiffs have an expectation that they

18  provide community benefits, and that expectation is at

19  a state level and at a federal level.  The amounts to

20  be provided have not been specified anywhere in

21  federal law or regulations.  However, there is a

22  presumption that to be tax exempt in return for those

23  tax benefits, not paying income tax, property tax,

24  those types of things, certain community benefits are

25  to be provided, and those include providing Medicaid

43

1   services at a loss, providing charity care that is not

2   fully reimbursed, those types of activities.

3        Q.   Okay.  Going to the specifics, supporting

4   those conclusions, don't you lay those out in the rest

5   of your report, correct?

6        A.   I do.

7        Q.   Turning to the first of those, which is your

8   analysis regarding -- looking at the financial -- was

9   that in regard to financial declarations that were

10  given to you that the plaintiffs had submitted in

11  support of their pleadings for the summary injunction?

12       A.   That's correct.  I believe those were filed

13  in July, August 2011, something like that.

14       Q.   And you've been provided the subsequent

15  declarations that have been filed since then?

16       A.   I have.

17       Q.   What did you do to try to validate those

18  declarations?

19       A.   The first thing was to enter all the numbers

20  into a spreadsheet and then to pull together

21  comparative information from three sources.

22            The first being IRS form 990, Schedule H,

23  which I know quite well having done as much as I have

24  with the Service on that particular reporting

25  framework.

1          The second is community benefit reports that

2    the hospitals file with the state of New Hampshire.

3          And the third is Medicare cost report

4    information that the hospitals file with the state to

5    claim Medicaid outpatient reimbursement.

6          So I organized all those three resources

7    together and looked to see if the numbers originally

8    filed aligned with those other data sources.

9      Q.  And what are your conclusions?

10     A.  The conclusions are that there are some

11   differences, there are some variances between the data

12   sources, and the variances would be easier to

13   understand if the methodologies for putting costs to

14   Medicaid services -- the sources of the information

15   were better disclosed or outlined in the original

16   declarations.

17     Q.  Did you set forth your comparison in various

18   tables in the report?

19     A.  I did.

20     Q.  Can you go through those tables and tell us

21   what they are and what conclusions you drew from each

22   of those tables?

23     A.  Table 1 contains values from the original

24   declarations.  We have Medicaid cost for each of the

25   hospitals for 2009 and 2010, the Medicaid payments for

1  those same two fiscal periods.  The difference being

2  the reported Medicaid loss in the declarations for all

3  of the different categories that have been discussed,

4  inpatient, outpatient, psych ward, that was in, all

5  the different categories that are covered in the

6  declarations.

7          One conclusion from this table is that

8  hospitals are losing money on their Medicaid rates.  I

9  didn't put totals in this table.  If I had, the

10 Medicaid cost numbers would be roughly 220 million for

11 2009, 250 million for 2010.  The Medicaid payment

12 numbers are roughly a hundred million in each of those

13 two years, and so the difference is a loss that the

14 hospitals incur when they serve Medicaid patients and

15 get reimbursed based on rates in the state.  So those

16 are conclusions from table 1.

17         Table 2 compares Medicaid losses -- presents

18 Medicaid losses as reported in most recent IRS form

19 990, Schedule H filings by hospital.  And what we see

20 here is that the losses and the declarations for I

21 believe seven of the ten hospitals are greater than

22 the losses reported in Schedule H.  For three of the

23 hospitals the losses are lower in the declarations

24 than what appears in Schedule H.

25         And I'll just give you some examples.  The

1  loss for Mary Hitchcock Memorial Hospital, 52 million

2  for 2009, 71 million for 2010.  When we go to Schedule

3  H, that number is roughly 39 million for its fiscal

4  2010.

5          Now, there are some reasons why a variance

6  like this might occur relating to the organization

7  that's actually filing the 990.  It may be that the

8  physician group is outside of that 990.  But again,

9  these are explanations that could be better laid out

10  in the information submitted by the plaintiffs.

11      Q.  And did you actually look at Southern New

12  Hampshire to see whether the losses it claimed from

13  other parts of its organization accounted for that

14  variance?

15      A.  I did.  When we looked back at table 1 for

16  Southern New Hampshire, the loss reported for 2010 is

17  12.6 million.  When we go to Schedule H, it's 7.7

18  million.  So I wonder, well, is it the physician

19  practice that might account for the difference.  And I

20  could not account for the entire difference in that

21  one category of Southern New Hampshire's activities,

22  but it did explain a big chunk of the variance.

23      Q.  And I think -- what did you look at that you

24  refer to in table 3?

25      A.  Table 3 summarizes what the hospitals

1    submitted to the state in their community benefits

2    reporting forms, and we see similar variances between

3    the declaration information and those community

4    benefit forms as well.

5         Mary Hitchcock, for example, 2010 the loss is

6    at 62.5 million.  Going back to the declaration, it's

7    71.2 million.  Again, there could be differences in

8    what activities are covered by both reports, but the

9    variances are not explained.

10        Q.  And was there a trend in which direction the

11   variances were -- which source of information claimed

12   greater losses?

13        A.  In general, the declarations reported the

14   highest losses of any of these other sources.  There

15   is a significant difference for Southern New

16   Hampshire.  If we look at table 3, the reported loss

17   is 2 million.  The declaration is again 7.7 million.

18        Q.  So these weren't just a few dollars off, some

19   of them were millions of dollars off?

20        A.  That's correct.

21        Q.  And the fourth table you looked at Medicaid

22   outpatient cost records?

23        A.  I did.  I requested data from the department

24   which would be the actual Medicare cost report filings

25   submitted to the department to claim the Medicaid

1  outpatient reimbursement.  It is that Medicare cost

2  report, plus another schedule, that gets submitted for

3  that purpose.

4          And here on table 4 I'm comparing the

5  outpatient cost figure reported in the declarations

6  for Medicaid to the filings that are on file at the

7  department used to actually claim the reimbursement.

8  And some of them are very much right on the money, so

9  it's clear that the hospitals relied on their cost

10  report filings for that data source.  But there are a

11  few where we do see variances, such as Southern New

12  Hampshire again, 5.3 million is the amount of cost in

13  the declaration, where the cost report that was used

14  to claim the reimbursement said 4.6.

15      Q.  And you said you were asked to look at the

16  supplemental declarations that have been submitted,

17  correct?

18      A.  Yes.

19      Q.  I'm going to ask you to look at the ones

20  regarding Mr. Lipman from LRGH.  I think that's

21  Exhibit 76 through 78.  And if you can look at -- I

22  think it's table 5 in the original declaration, which

23  is 76, and how have the numbers in that changed in the

24  declarations, and can you tell us any conclusions that

25  you draw based on those changes?

1      A.   Table 5 in Exhibit 76 portrays the originally

2  estimated impact of rate reductions on Lakes Region

3  Hospital.  The amount when you tally it up across the

4  2008 through 2013 time frame adds up to 33.7 million.

5           When I saw this portrayal of the impact and

6  saw this as a similar analysis across all of the

7  hospitals, it raised that second concern that I

8  mentioned at the beginning of my comments with respect

9  to how the upper payment limit funds were reported.

10           That UPL funding of 4.6 million is presented

11  in 2011 as a negative number when in fact it was a

12  positive revenue source that came in during that one

13  fiscal year for the organization.  So that raised that

14  as a concern in this part of the assessment.

15      Q.   And how would you -- how do you think it

16  should have been characterized?  Should it have been

17  characterized differently to be more accurate?

18      A.   I would have characterized -- made two

19  changes.  The first is to reverse the sign on the UPL

20  dollars for 2011, which of course swings that

21  $33.6 million impact by $9 million.

22           The second I would do is to take the negative

23  numbers in 2012 and 2013 and make them zero.  What

24  happens here is we have a positive amount of revenue

25  coming into the organization in 2011.  Then in 2012

1   and 2013 that positive revenue no longer is present.

2   So you've reduce the positive impact to zero in those

3   two years, and that's a fairer way to present the

4   impact of the state's rate decisions.

5       Q.  And comparing that initial declaration to the

6   subsequent ones, what do the subsequent -- what impact

7   do the subsequent declarations have on the conclusions

8   that you've stated?

9       A.  Looking at Exhibit 77, which I see was filed

10  in November -- I don't believe this has the specific

11  table that --

12      Q.  Okay.  I apologize.  I have the numbers

13  written as 76, 78 and 79 that I need to show you.  I

14  may have given you the wrong ones.  If you could look

15  at 78?

16      A.  So looking at 78 --

17      Q.  Does that have the revised declaration?

18      A.  It does.  It's a revised table 5.  This table

19  shows the UPL dollars for 2011 no longer being

20  negative.  It shows that as being zero.  The total

21  impact is reduced from 33.7 million from the previous

22  table to 17.8 million.

23      Q.  Let me show you what they have marked as

24  Exhibit 79, which they've represented is a chart of

25  Lakes Region's claimed losses.  How does that differ

1  from Exhibit 78?

2      A.  So in Exhibit 79 the upper payment limit

3  dollars now are not negative.  They are not zero.

4  It's a positive 4.1 million.  We still have negative

5  numbers in for 2012 and 2013.  I would argue that the

6  impact on Lakes Region was positive 4.1 in 2011 and

7  then zero in 2012 and 2013.  So the bottom right-hand

8  corner number would be the 11.6 million associated

9  with the other rate reductions minus the benefit of

10 the UPL funds for that one year, or roughly 7.5

11 million.

12         So the Lakes Region impact would go from 33.7

13 to 19 something to 15.7, and I would argue to 7.5 if

14 this were portrayed in the way that I would view as

15 more reasonable.

16     Q.  Okay.  So I think we've also covered your --

17 just to move this discussion along, we've also covered

18 your conclusions regarding how the upper payment limit

19 should have been portrayed on the financial

20 declarations, correct?

21     A.  Yes.

22     Q.  Are you familiar with how UPL and DSH are

23 paid in other states across the country?

24     A.  Somewhat familiar.  Not every state and not

25 in great detail, but yes, I am.

1      Q.  You've heard testimony I think that UPL is to

2  fill the entire gap between what Medicaid pays and the

3  upper payment limit.  Is that what happens across the

4  country, to your knowledge?

5      A.  That is the maximum amount of payment that

6  can be made by a state to bring the Medicaid rates up

7  to the level of Medicare rates for similar services.

8  So the upper payment limit is the Medicare rates.  The

9  amount that a state can provide for hospitals varies

10  depending on the particular program and budget

11  circumstances.

12      Q.  And did you present a table where you portray

13  what you think an alternate portrayal of the rate

14  reduction should be in your report, and can you just

15  point us to where that is?

16      A.  I did.  Table 5 of the report summarizes what

17  was in the original declarations in terms of the rate

18  reductions and the financial impact on the hospitals.

19  It shows numbers ranging from 6 million for 2008 up to

20  99 million on an annual basis in 2013.

21          The upper payment limit number in 2011 is

22  negative.  Even though it was a positive revenue

23  stream that came into the hospitals in that year, the

24  numbers for 2012 and 13 are still negative.  So I

25  restated these numbers to reflect the concerns that

1    I've raised in table 6.  Over time that takes the

2    cumulative value of the numbers from what was stated

3    as 310 million across the declarations to something

4    more like 83 million.

5           The other observation I would have is I

6    almost wish I had put a solid line in between 2011 and

7    2012.  2008 through 11, we can view that as history.

8    And if we look at the cumulative numbers only through

9    2008 and 2011, I believe when you add in table 6, the

10   negative 6, negative 17, negative 28, positive 34, all

11   together we end up with a negative 17 million as the

12   impact from 2008 through 2011.

13          Then upon thinking about it more, 2012 and 13

14   are projected numbers projected by the hospitals.  All

15   of these would be impacted if all of the patients

16   remained in fee-for-service Medicaid.  Many of them

17   would not be going into managed Medicaid.

18          So there's a question that came into my mind

19   about what happens when New Hampshire implements

20   Medicaid managed care sometime in 2012, what kind of

21   rates the plans will actually be negotiating with the

22   hospitals and would those rates be based at all on the

23   fee-for-service rates that are in question here.

24       Q.  You opined that based on the information you

25   have reviewed that the financial health of New

1   Hampshire hospitals was better than other national

2   hospitals or similarly situated hospitals?

3       A.   Yes.   The Medicare cost report includes

4   income statements and balance sheets for every

5   hospital that files a Medicare cost report, and that's

6   publicly available through CMS.   So I downloaded all

7   the cost reports for all of the hospitals in the

8   country and summarized their financial information

9   here on table 7.

10          What we have here is the total margin, the

11  net income for each hospital aggregated to a state

12  level.   What this shows is that in 2009 New Hampshire

13  hospitals had a total margin of approximately 5.1

14  percent.   That compares to a New England average of

15  1.6 percent including New Hampshire, 1.3 percent

16  excluding New Hampshire.   So on that basis I concluded

17  that historically the hospitals have been more

18  profitable than neighboring hospitals in this part of

19  the U.S.

20          Across the U.S. the overall total margin

21  averaged around 6 percent.   So slightly less than the

22  U.S. average but healthier than other facilities in

23  New England.

24      Q.   And in table 8 you also looked at another

25  source of information about hospital profitability?

1      A.  I did.  I reviewed audited financial

2  statements filed with I believe it's charitable trusts

3  in the Attorney General's Office and summarized

4  operating revenue and operating income for each of the

5  systems or organizations that are part of this

6  complaint here in table 8.

7           So in 2009 we see that all -- each of the

8  organizations did have a positive operating income

9  reported.  Overall, around $101 million of operating

10  income.  That's a different number than the net

11  income.  The difference being non-operating items,

12  interest earnings and other categories of items.  But

13  the operating income was roughly 2.9 percent across

14  the hospitals and healthcare systems in 2009.

15           In 2010 Lakes Region did report a negative

16  operating income of 2.3, and two of the organizations

17  had not yet filed the audited financials with the

18  state.

19           Again, as I think about these numbers and I

20  think about the DSH resource that may go to zero, if

21  that truly is $130 million impact on the

22  organizations, we put that in context with these

23  operating income numbers and it clearly would be a

24  significant impact on the hospitals in terms of their

25  financial well-being.

1      Q.  But this shows that up through 2010 at least

2  almost all of the hospitals still -- just on their

3  operating budget -- and they have other sources of

4  income, as well, right?

5      A.  Non-operating sources, correct.

6      Q.  But just on their operating budget they were

7  still generating a profit on their operating margins

8  even after it went to these reductions that we've been

9  talking about?

10      A.  That's correct.  These are after the rate

11  reductions that have been discussed.  So those rate

12  reductions were, many of them, in effect in 2009 and

13  in 2010.

14      Q.  And you also talked about whether or not

15  Medicaid was the only source of losses to the

16  hospital.  What did you review in that respect?

17      A.  The community benefit filings -- the

18  community benefit reports filed by the hospitals also

19  include information about Medicare revenues and costs

20  in addition to Medicaid revenues and costs.  So table

21  11 summarizes what the hospitals submitted to the

22  state in terms both of Medicaid and Medicare.

23          We've aggregated here -- it's one year of

24  information for each hospital, different fiscal

25  periods depending on the most recently filed

57

1   information.  So the most recent information, whether

2   it's fiscal 2011 or fiscal 2010, indicates that the

3   hospitals collectively would have lost around 215

4   million from Medicare, around 136 million in Medicaid.

5        Q.  So do I understand correctly that your review

6   of the data that they have reported indicates that

7   they are losing a lot more money from Medicare than

8   they are from Medicaid?

9        A.  That's correct.  And the report explains one

10  reason why that's the case.  Medicare is a much larger

11  payer for the hospitals in terms of patient population

12  than is Medicaid.  Medicare more like 43 percent.

13  Medicaid more like 11 or 12 percent of the patient

14  mix.

15       Q.  Based on your experience with healthcare

16  finance, does that size of Medicare losses raise any

17  concerns in your mind?

18       A.  It does raise a question, which is about the

19  efficiency of the hospitals.  Generally when --

20  Medicare is viewed as a reasonably accurate payer.

21  Across the United States all hospitals collectively

22  lose something like 7 or 8 percent on Medicare, but

23  it's viewed as a more accurate payer than Medicaid is

24  in terms of its allignment with the actual cost of

25  organizations.

1          I noticed that the declarations included

2    really no information on efficiency of the hospitals,

3    which means that the claims are about the payment side

4    of the equation, not so much the cost side of the

5    equation.

6          Q.   And your final conclusion related to the

7    community benefits requirement.  What are your

8    conclusions and what are their bases in that regard?

9          A.   The conclusions are that federal and state

10   policies expect that tax exempt hospital organizations

11   should provide community benefit, with community

12   benefit defined as providing access to care, access to

13   services, to help enhance public health, to help

14   advance generalized knowledge, which is where health

15   professionals education and research comes into the

16   equation, and also to relieve government burden to

17   improve health.

18          And I'm quoting text from the IRS Schedule H

19   instructions where community benefit is defined at a

20   federal level.  It's well understood that providing

21   charity care at some level of loss, providing Medicaid

22   services at some level of loss, are important

23   components of that community benefit.

24          When we look at the IRS form 990, Schedule H,

25   there's a table that lays out all these categories of

1    community benefit, and these are the first two rows of

2    that table, charity care and Medicaid services.  So

3    they're clearly important components of the community

4    benefit that tax exempt hospitals provide.

5              And the expectation is that hospitals will

6    provide these benefits in return for not paying

7    property tax, federal income tax, sales tax, and they

8    also enjoy other benefits like receiving charitable

9    donations that are deductible to the donor and the

10   ability to issue tax exempt debt, which is preferred.

11             Increasingly through time the expectations of

12   organizations to provide these types of benefits have

13   been increasing, which is why we now have the Schedule

14   H and additional standards being offered at a federal

15   level.

16             MS. SMITH:  Thank you.  I have no further

17   questions.

18             THE COURT:  Thank you, Attorney Smith.  Mr.

19   O'Connell.

20             MR. O'CONNELL:  Yes.  Thank you.

21                       CROSS-EXAMINATION

22   BY MR. O'CONNELL:

23        Q.  Good afternoon, Mr. Hearle.

24        A.  Good afternoon.

25        Q.  Did I understand your conclusion with regard

1   to table 1 is that the plaintiff hospitals are losing

2   a lot of money on Medicaid?

3        A.   That is one of the conclusions, yes.

4        Q.   Losing a lot of money, but your point of

5   differentiation is maybe not as much as represented in

6   the declarations?

7        A.   Yes.  If we were to redo this table based on

8   alternative data sources, the hospitals still would be

9   shown as losing money but the amount would be

10  different.

11       Q.   Okay.  Let's talk about those alternative

12  data sources for a moment.  You know that, for

13  example, Dartmouth is a health system, right?

14       A.  I do.

15       Q.   And you were in the courtroom when we talked

16  about Southern New Hampshire being a system with an

17  affiliated medical physician practice, correct?

18       A.  Yes.

19       Q.   Lakes Region, same thing, true?

20       A.  That's what I understand, yes.

21       Q.   And you were in the courtroom when Exeter

22  Healthcare talked about its program, which is also an

23  affiliate of a hospital, correct?

24       A.  I believe so, yes.

25       Q.   Isn't it true that all of the additional data

1  sources you looked at are hospital only data sources?

2      A.  Not entirely correct.  The 990 is filed on an

3  EIN -- by an EIN basis.  EIN means employer

4  identification number.  And there are hospital

5  organizations that include in their EIN non-hospital

6  activities, like physician groups, like foundations,

7  like ambulatory care surgery centers.  It's probable

8  that we have some non-hospital operations in some of

9  the Schedule Hs that I reviewed.

10     Q.  Did you ever look to find out if that was the

11 case?

12     A.  I did not go through that level of

13 assessment.

14     Q.  So you don't know as you sit here today

15 whether Exeter, for example, includes the loss

16 associated with Exeter Healthcare, its ventilator

17 program, do you?

18     A.  I wouldn't know that.

19     Q.  In fact, wouldn't you agree that the better

20 way to do the analysis that you tried to do for this

21 Court was to look at the source data from the

22 declarants?

23     A.  I did look at the source data.

24     Q.  The source data was the declaration, right?

25     A.  Correct.

62

1      Q.  But you're sitting here today and you don't

2  know what assumptions they made or what data they

3  used, correct?

4      A.  That's because that information was not

5  disclosed or included in the declarations themselves.

6      Q.  Did you ever ask for it from the state?  Did

7  you ever ask to get that source data so that you could

8  do your analysis?

9      A.  I didn't know to ask the state for the

10  information because the state wasn't cited as the

11  source of the information in the declarations.

12      Q.  Well, let me ask you it this way.  If you

13  were to do this as a consulting undertaking, you would

14  agree that starting with the source data to determine

15  what the ground rules were would be a more accurate

16  way to determine whether there are problems with the

17  data represented, wouldn't you agree?

18      A.  I would want to start with the most accurate

19  and complete source of information, and one of those

20  sources is the cost of Medicaid.  And there are

21  different methodologies for cost accounting those

22  activities.  I would want to understand exactly what

23  methodologies were used to assign costs.

24      Q.  So you would like to know how the CFOs who

25  prepared these declarations relied on their numbers,

1   how they got to their numbers, right?

2       A.  I would like to know that, yes.

3       Q.  But you went to other data sources that may

4   not include the same data information to make their

5   opinions here today.  Isn't that true?

6       A.  I went to the alternative sources to see if I

7   could validate the numbers reported by the hospitals

8   in their declarations and reached my conclusions after

9   conducting that work.

10      Q.  And you never did the level of analysis to

11  know whether any of the ten plaintiffs' Schedule Hs

12  that you looked at included their non-hospital

13  Medicaid revenues or losses, did you?

14      A.  I did not figure out if the systems had

15  activities -- if they filed more than one 990 that

16  captured other activities outside the ones that I

17  reviewed.

18      Q.  So there could be a pretty simple explanation

19  for the discrepancies, a non-nefarious explanation,

20  which is the hospitals just included more data than

21  you had available to you from these other sources.

22  Isn't that possible?

23      A.  That's possible.

24      Q.  By the way, on your Exhibit A you only

25  reference looking at one of the Schedule Hs, that's

1  for Dartmouth.  Is it your testimony you looked at

2  others?

3       A.  I looked at all of the Schedule Hs for all of

4  the organizations.

5       Q.  Is there a reason you didn't disclose that in

6  your report?

7       A.  I believe the "et al" after

8  Dartmouth-Hitchcock -- the "et al" was meant to

9  capture all of the other hospitals that I reviewed.

10      Q.  Okay.  Thank you for that clarification.

11          One of the reports that you relied on was

12  generated by Steve Norton from the New Hampshire

13  Center for Public Policies Studies here in New

14  Hampshire; is that right?

15      A.  I believe, yes, it was a cost shift report

16  that has been issued more than once.

17      Q.  And in fact his data, the information he

18  relies on for that report, is based on the hospital

19  systems, not just the hospitals.  Isn't that true?

20      A.  I believe that's true.

21      Q.  And it's fair to say, too, is it not, that

22  hospital systems, at least as they exist in 2012 in

23  New Hampshire, subsidize unprofitable lines of

24  business?  Isn't that true?

25      A.  The report indicates that there is cost

1  shifting from the Medicare program and the Medicaid

2  program.  Except for the critical access hospitals

3  that have those costs reimbursed by virtue of their

4  special status, those costs are -- those losses are

5  shifted to the commercial payers.  I believe the

6  number reported in the 2011 report was something like

7  $800 million worth of cost shift.

8      Q.  Well, there are a couple different kinds of

9  cost shift.  There's the one you just described, which

10  is trying to get the commercial payers to pay more

11  than the cost.  That's one, isn't it?

12     A.  It is.

13     Q.  But within the system itself there's the

14  ability to take profits generated off of certain kinds

15  of services with margin and subsidize other services

16  that have a negative margin.  Isn't that true?

17     A.  That's very true.  There's also a category of

18  community benefit called subsidized health services,

19  and basically the IRS would view those types of

20  cross-subsidized services, like the Exeter unit that

21  was discussed yesterday, that $3 million loss, that

22  could be reported on Schedule H as a community benefit

23  provided by that organization, if I understand the

24  details of that program.

25     Q.  So that's not a surprising or a new

1   revelation.  That's just the way healthcare systems

2   run.

3        A.   It's a basic part of hospital finance.  You

4   take services where you make money, that may be

5   cardiac care, and you use those profits to fund other

6   services that the community needs.

7        Q.   And so it's also true and well-known, is it

8   not, Mr. Hearle, that if you take money out of a

9   system and reduce the margin, the ability of a health

10   system to subsidize a losing program is diminished?

11   Isn't that true?

12        A.   In a circumstance where a hospital has

13   reduced reimbursement there are a range of actions

14   that a hospital can take to address that change in

15   their circumstances.  One of them is to become more

16   efficient, and many of the statements yesterday

17   indicated that the hospitals were working to reduce

18   staff, to do various things to become more efficient.

19   They have the opportunity to reduce services, such as

20   those that were discussed, different methodologies for

21   addressing the reduction.  Another is simply to accept

22   a lower margin and to continue to operate on that

23   basis.

24        Q.   At some point a lower margin, if it's

25   negative, is not sustainable.  Isn't that true?

1        A.   I would agree with that.

2        Q.   So you heard a lot of testimony over the past

3   two days about the efforts in efficiency, like

4   layoffs, like voluntary retirements, like freezing of

5   executive benefits, those type of things.  Is that

6   what you consider efficiencies?

7        A.   Those are the types of things, yes.

8        Q.   And at some point you reach the end of what

9   you can do in order to get the benefit of more

10  efficiencies.  Isn't that also true?

11       A.   I believe that's true at some point.

12       Q.   At some point you push it too far and you

13  don't have enough resources to do what you need to do.

14  Fair statement?

15       A.   That's a fair statement.

16       Q.   So another option would be the cost shift,

17  which we talked about, either internally from positive

18  margin service lines or externally to the private

19  payers, correct?

20       A.   Correct.

21       Q.   Now, as part of your undertaking in this

22  matter have you reviewed any of the contracts that the

23  ten plaintiff hospitals have here with any of their

24  commercial insureds?

25       A.   I have not.

1    Q.  So that's an unknown to you as you sit here

2  today, right, the ability to cost shift to the private

3  payers, because you haven't done that analysis?

4    A.  I haven't done that analysis specifically in

5  New Hampshire, but cost shifting is a well-established

6  phenomenon within hospital finance documented in those

7  two reports here in New Hampshire, and it's known to

8  be a way that unprofitable services are paid for, that

9  impacts on rates are addressed, those types of things.

10    Q.  Indeed, New Hampshire has something of a

11  reputation on its ability to do cost shifting.  Isn't

12  that true?

13    A.  I haven't heard of that.

14    Q.  Don't you remember Mr. Norton's reference to

15  the fact that New Hampshire has engaged in effective

16  cost shifting in ways that other states have only

17  recently become aware of?

18    A.  In my experience cost shifting happens in

19  every state.  Every state -- Medicaid programs

20  generally pay less than cost in every state, and cost

21  shifting is a way that hospitals in every state

22  address those types of concerns.

23    Q.  But you would agree with me that that's also

24  a finite resource that can contribute to the problem.

25  At some point cost shifting is no longer possible,

1    correct?

2        A.  Who knows.  Hospitals negotiate with managed

3    care plans and attempt to maximize their revenue.  I

4    don't know if New Hampshire has reached that point.  I

5    don't know if any hospital has reached that point.

6    It's a negotiated outcome that is impossible to

7    predict.

8            And looking at contracts, that would be for a

9    specific time period.  These discussions happen at the

10   point when you have a new contract up for negotiation.

11   That's when the rates would make a -- the rate changes

12   would make a difference.

13       Q.  In any event, that wasn't part of your

14   assignment and you haven't done that work with regard

15   to the hospitals that are in this case, correct?

16       A.  Correct.

17       Q.  Now, with regard to services, there is some

18   point at which the deprivation of funds puts services

19   at risk.  Isn't that true?

20       A.  That's true.

21       Q.  In fact, when you've been an expert in other

22   proceedings in other states you've observed that

23   because of the mission of some hospitals their

24   financial condition can be much more dire or worse

25   before they eliminate services because care is central

1  to their mission.  Isn't that an observation you've

2  made in other cases?

3       A.  I believe so, yes.

4       Q.  So it's a fair statement that the deprivation

5  of funds alone is not the only sign of distress --

6  strike that.

7            The deprivation of funds can be causing

8  significant harm to a health system long before they

9  reach the point of closure.  Isn't that true?

10      A.  That's true if that organization has not

11  implemented efficiencies or made other changes to

12  manage through those problems; that's correct.

13      Q.  Now, the plaintiffs contend in this case that

14  by changes in UPL and DSH $130 million in payments on

15  a year over year basis have been taken from them that

16  would otherwise be used to supplement their Medicaid

17  services.  You understand that, right?

18      A.  I understand that the reduction on this chart

19  to revenue would be 130 million.  Whether or not those

20  are actually used specifically for Medicaid services

21  is another question.  It's just one other part of the

22  revenue base of a health system used for whatever

23  purposes.  It's not restricted to be used for Medicaid

24  or any specific purpose.

25      Q.  Okay.  But a dollar is a dollar.

```
 1              THE COURT:  But it's tied to Medicaid, right?
 2        Q.  It starts from a Medicaid based service,
 3   isn't that the case?  UPL starts from a Medicaid based
 4   service?
 5        A.  It's generated by Medicaid utilization,
 6   right, and to the extent to which the Medicaid
 7   payments are lower than the Medicare rates for a
 8   similar service.
 9        Q.  It's basically a gap filler.  Isn't that
10   right?
11        A.  It is a mechanism to provide revenue to
12   hospitals up to the amount that Medicare would pay for
13   similar services.  The difference between what -- I
14   mean, the maximum payment under a UPL mechanism would
15   be the base Medicaid payment plus an amount that could
16   bring it up to what Medicare would pay for a similar
17   service.
18              THE COURT:  Maybe it's a little late for this
19   question, but is it a rate?
20        Q.  Isn't it true that UPL is based on the
21   differential, the rate that is paid through Medicaid
22   up to the rates that would get paid by Medicare?  It's
23   a rate gap filler.  Isn't that the case?
24        A.  I would think of it as a bucket of money that
25   is calculated based on the average Medicaid rate and
```

1   the average Medicare rate.  It's not a --

2           THE COURT:  Let me ask you this.  If I said

3   it's a Medicaid rate; is it or is it not?

4           THE WITNESS:  It's a Medicaid resource.  It's

5   a Medicaid revenue.

6           THE COURT:  It's a Medicaid apple.  It's a

7   Medicaid orange.  Whatever.  Is it a Medicaid rate?

8           THE WITNESS:  I would say, no, it's not a

9   Medicaid rate.

10      Q.  And of course the state desperately does not

11  want it to be a rate in this case because then they

12  have a real problem with the notice they provided.

13  Isn't that true?

14      A.  I would not know that.

15      Q.  Okay.  At the end of the day -- let's be

16  clear about the UPL.  It starts with a Medicaid

17  service to someone who comes in and is provided that

18  service, and the hospital or the system gets some

19  portion of reimbursement for that service, correct?

20      A.  Correct.

21      Q.  Okay.  Now, the hospital takes the

22  difference -- or they report that amount that they've

23  gotten for the Medicaid service, they put it in their

24  cost accounting reports, and it goes into some system,

25  and there's a delta calculated between what's being

1  reimbursed for that Medicaid service and what Medicare

2  would pay.  Isn't that right?

3       A.  There's a what if analysis on the total

4  bucket of activity.  What if these services had been

5  paid for at Medicare rates?  What would the dollar

6  value of that delta be in total?  That's the --

7       Q.  But you're right.  Medicare is the higher

8  payer in this transaction.  Isn't that the case?

9       A.  It is.  And the fact that upper payment limit

10  dollars were available shows that Medicaid rates have

11  been lower than Medicare rates.  That's true.

12       Q.  And the Medicare program, that's all set by

13  the federal government, correct?

14       A.  It is.

15       Q.  And the Medicaid reimbursement, the DRG,

16  that's set at the state level, correct?

17       A.  It is.

18       Q.  Just to get back to the point, I don't know

19  if we agree on this or not, and I just want to be

20  clear if we don't.  After that service is provided

21  there's a delta that UPL allows the state to use to

22  make up that rate differential between Medicaid and

23  Medicare, true?

24       A.  I would say it's a dollar differential

25  between the value of the services at Medicaid rates

1  and the value of the services at Medicare rates.

2      Q.  It's reimbursement for services, though.

3  Isn't that the case?

4      A.  It is.

5      Q.  Okay.  No one can just say give me UPL if

6  they haven't provided a Medicaid service that they got

7  reimbursed for.  Isn't that true?

8      A.  Correct.

9      Q.  As opposed to DSH, which may be based on

10  uncompensated care, which is different.  Isn't that

11  true?

12      A.  It is.

13      Q.  Okay.  So Medicaid absolutely starts with a

14  Medicaid service.  And if anyone tries to get a UPL

15  when they haven't provided a Medicaid service, they

16  can't get it, true?

17      A.  True.  It's designed to supplement Medicaid

18  payments.

19      Q.  Now, the second conclusion of your report has

20  to do with the UPL being a one-time event roughly,

21  true?

22      A.  True.

23      Q.  That's your second conclusion.  And the sole

24  basis according to your report for that conclusion is

25  a discussion you had with Kathleen Dunn.  Isn't that

1  right?

2       A.  That's correct.

3       Q.  Now, you were in court when Mr. MacDonald was

4  showing the state plan amendments, Exhibit 1 and

5  Exhibit 2, to Ms. Dunn, weren't you?

6       A.  I was.

7       Q.  Now, you hadn't seen those before today, had

8  you?

9       A.  I had not.  I saw them yesterday.

10      Q.  You didn't see them before you finalized your

11 report, I guess.  Isn't that true?

12      A.  That's correct.

13      Q.  By the way, your report is dated January 4th,

14 right?

15      A.  Yes.

16      Q.  Is that when you finished it?

17      A.  Yeah, it is.

18      Q.  And up to January 4th you hadn't looked at

19 the state plan amendments to verify what you were told

20 by Ms. Dunn about upper payment limit being a one-time

21 deal?

22      A.  Her explanation was that the UPL program was

23 proposed by the hospital association who had a

24 consultant, Health Management Associates, propose the

25 idea that the ARRA program, the American Recovery and

1    Reinvestment Act, provided an opportunity to take

2    advantage of a higher matching rate which was part of

3    a stimulus package to help the state with economic

4    recovery.  And the idea was to continue that UPL

5    program as long as that higher matching rate was

6    available, and that struck me as a logical comment on

7    her part.

8         Q.  And that's where your inquiry ended until

9    yesterday when you saw the state plan amendment that

10   had some different language.  Isn't that true?

11        A.  I didn't see anything inconsistent in the

12   state plan amendments -- anything inconsistent with

13   what Ms. Dunn communicated to me.

14        Q.  Sir, you don't think it was inconsistent for

15   the state plan to be filed that said that there would

16   be an annual Medicaid payment?

17        A.  No.

18        Q.  Do you think annual means only one year?

19        A.  The state hoped to continue the UPL payments

20   as long as the ARRA funds, the stimulus funds, were

21   available that may have crossed fiscal periods, which

22   may have meant more than one year.

23             When it became clear that the ARRA funds were

24   going to terminate, the state put together a new state

25   plan amendment that clarified that this was an annual

1  one-time resource.

2      Q.  Well, I understand that that's what Ms. Dunn

3  told you, but can you show me where that explanation

4  shows up in the state plan amendment, that anybody who

5  wanted to know what the rules of the game were would

6  find out that it was a one year commitment?  Can you

7  point that out, or is it only what Ms. Dunn said to

8  you?

9      A.  Well, it's what Ms. Dunn said to me, and it

10  states here in the state plan amendment that it's an

11  annual payment adjustment.

12      Q.  Annual.  And then it goes on to say that --

13  sorry, my glasses are at home:  This payment

14  adjustment is made in addition to all other categories

15  of inpatient services reimbursement otherwise made

16  under the provisions of Section 4.19 A, items 1

17  through 9.  This annual calendar year adjustment

18  payment will be made in the final calendar quarter of

19  each year.  Each year.

20      A.  I believe it goes on -- the amendment goes on

21  to say for -- it's time limited.  There's something --

22  I can't remember the exact language but --

23      Q.  Let me put it in front of you so you can see

24  the language that you think is time limiting.

25      A.  Until such time as it may be amended under

1   the state plan.  That's the language.  So it was then

2   amended by subsequent state plan amendments.

3        Q.  There was an amendment that turned out it

4   made it one year, but the plan itself gave the state

5   the option to make plans in each year, did it not?

6            In fact, put it this way -- let me ask

7   another question, Mr. Hearle.  If the state decided to

8   make a UPL payment in 2012, they're covered by this

9   SPA that I've just been showing you.  Isn't that the

10  case?

11       A.  That SPA has been superseded by a second

12  state plan amendment that would make that not doable.

13       Q.  Okay.  So assume that second one wasn't in

14  there.  It strikes out all of that annual language and

15  the stuff.  The one I'm showing you right now, if this

16  were in place today, if this were the state plan the

17  state would be able to make an upper payment limit and

18  there would be no need for an amendment.  Isn't that

19  true?

20       A.  If this were the state plan language in

21  effect, if it hadn't been superseded by a second plan

22  amendment, then yes, they would have had the ability

23  to continue making those payments.

24       Q.  You did some triangulation of data from the

25  hospitals on Medicare cost reports.  Sir, you don't

1   know, like you didn't know with the Schedule Hs,

2   whether the non-hospital affiliated numbers were

3   included in those Medicare cost reports, do you?

4        A.   I know that they were not because the cost

5   reports are filed only by the hospital operations, the

6   provider numbers for each hospital.

7        Q.   So there's an easy explanation.  We've got

8   hospital systems here for the most part that are

9   plaintiffs, and you know just by definition that the

10  numbers that you are trying to triangulate don't have

11  their non-hospital affiliate numbers in it, true?

12       A.   That's true.  I'm comparing one set of

13  numbers that are specifically mentioned in the

14  declarations, the hospital outpatient cost numbers,

15  with other hospital cost report numbers that were

16  filed with the state.  So it is apples and apples

17  based on the way it was described.

18       Q.   When do hospitals file their cost reports, on

19  their own fiscal year or on a set schedule?

20       A.   I believe it's on their own fiscal year.

21  Within 90 days of the end of that year.  And then

22  there's a process of having them reviewed and audited

23  by intermediaries.

24       Q.   Going back to UPL for a second, you suggested

25  that the hospitals -- some of the tables you were

1  looking at -- I think you might have one in front of

2  you.  I don't mean to look over your shoulder.

3        MS. O'CONNELL:  Would you pull Exhibit 79 up?

4        Q.  Would you look at that for a minute?

5        A.  Yes.

6        Q.  You suggested that this table improperly

7  carries some UPL references for 12 and 13.  Do you see

8  that?

9        A.  I do.

10       Q.  All right.  Now, you had some criticisms in

11  your report of last Friday, some of which are

12  addressed by Exhibit 79.  Isn't that true?

13       A.  That's true.  The UPL number in 2011, which

14  was a negative number in the original declarations,

15  then became a zero in the second -- in the

16  supplementary declarations is not now positive in this

17  exhibit.

18       Q.  So that is reflecting in this example an

19  upper payment limit payment in 2011 to Lakes Region

20  General, and that's offsetting the other expenses

21  listed above, true?

22       A.  That's the way I would think about it.

23       Q.  Okay.  That's consistent with your analysis.

24  That's how you would recommend somebody carry that if

25  they're going to represent that number, true?

1     A.  If I were reviewing a summary of rate

2   reductions and included upper payment limit, that

3   resource in that table, then yes, I would put them all

4   together in this way.

5     Q.  Okay.  Now, your quarrel is that because of

6   your understanding that it was a one year situation

7   and that the state had no obligations under a state

8   plan to do an amendment, or any of those types of

9   things, it shouldn't be carried in 12 and 13; is that

10   right?

11     A.  It shouldn't be carried as a negative number.

12   In my career I've done hundreds of hospital financial

13   models for feasibility studies for different types of

14   assessments.  And if I were modeling out the net

15   impact of these changes on an organization what I

16   would do is have the upper payment limit revenue come

17   in as a positive in 2011 and then come in as a zero in

18   2012 and 2013.

19     Q.  Well, okay.  What if you're a hospital

20   plaintiff in this case and you read the state plan

21   amendment that said UPL is going to get an annual

22   payment, the language I just showed you, wouldn't it

23   be reasonable and prudent to include it in your

24   assessment until there's a state plan amendment filed

25   to remove it, or should we rely on, you know, the

1    comments of the director informally to a witness like

2    you?

3         A.  Can you restate that, please?

4         Q.  Sure.  If you're a hospital plaintiff in this

5    case, isn't it reasonable, looking at a state plan

6    amendment that says annual UPL payments will be made

7    until such time as they are amended and taken out, I'm

8    paraphrasing, isn't it reasonable to model that in the

9    financial impacts?

10        A.  The way I would then model it is to have the

11   4.1 million in as a revenue in each of these three

12   years.  And if I thought it was going away, then I

13   would have the number backed out.  So I would have the

14   4.1 positive, 4.1 positive, 4.1 positive, and then

15   show the negative 4.1, in the event it would be lost,

16   so the net effect would be zero.  That's how I would

17   describe it in the table.

18        Q.  But that assumes a payment in the reduction,

19   not the loss of a payment.

20             THE COURT:  That's what the state did in

21   reverse with the tax.

22             MR. O'CONNELL:  I'll move on.

23             THE COURT:  His point is, if you're not going

24   to get it, you don't count it as having gotten it and

25   then offset it out for not getting it.  You just say

1  you didn't get it, right?

2          THE WITNESS:  Right.

3          THE COURT:  But this isn't to show what your

4  financial projection is.  This is to show an impact

5  that you didn't expect to have.

6          MR. O'CONNELL:  Just impact.  Impact.

7      Q.  You didn't understand this to be a damage

8  claim, did you, Mr. Hearle?

9      A.  I understood this to be an impact.  So as I

10  project out -- if I were CFO and I projected out the

11  impact of these on my revenue stream, I would say I

12  had a positive event in 2011 and a zero event in 2012

13  and 13.

14      Q.  That's how you would do it?

15      A.  That's how I would do it.

16      Q.  Okay.  You talked about the wherewithal of

17  New Hampshire hospitals because of positive margin,

18  and you had a number and a table that Ms. Smith asked

19  you about.  Do you remember that, generally?

20      A.  I'm sorry?

21      Q.  You were asked questions about hospital

22  margins by Ms. Smith.

23      A.  I was.

24      Q.  That's another example, is it not, where you

25  looked just at the data of hospitals and not the

1  health system, true?

2       A.  I looked at both.  The audited financial

3  statements are for the systems.  That includes all the

4  activities included in those audited financials.

5       Q.  And that's table 8?

6       A.  It is.

7       Q.  Okay.  And that's half the margin from what

8  you report in table 7?

9       A.  For 2009, yes.  That's correct.

10       Q.  Would you tell me, sir -- you've done a lot

11  of work on assessment of reimbursement rates to comply

12  with Medicaid.  Isn't that true?

13       A.  I have assessed Medicaid payment issues in

14  several states, yes.

15       Q.  You've been an expert retained to do that and

16  provide advice?

17       A.  I've been an advisor to state hospital

18  associations on that topic, yes.  Not in litigation.

19       Q.  You did an assessment for Oregon?

20       A.  Correct.

21       Q.  You did an assessment for Massachusetts?

22       A.  Yes.  For the Governor's office.

23       Q.  In connection with those assessments you

24  didn't include any analysis of the profitability of

25  hospitals or health systems to assess the adequacy of

1  Medicaid funding.  Isn't that true?

2      A.  I believe I did project out the impact of

3  Medicaid payment on the hospitals' margins in those

4  states.  It's been several years since I did those

5  studies.

6      Q.  Fair enough.  If we need to look at them, we

7  will, but let me ask you this.  The point of your

8  analysis wasn't to suggest that hospitals could pay

9  and subsidize the Medicaid.  You were simply modeling

10  the impacts over time of different types of

11  reimbursements.  Isn't that fair to say?

12     A.  Correct.

13     Q.  So this is a different exercise than you did

14  for Massachusetts and Oregon, stating a proposition

15  that, well, hospitals have a positive margin and they

16  can afford to subsidize Medicaid.  It's different here

17  than there; isn't that right?

18     A.  I'm not sure how.

19     Q.  Well, your point of view is that hospitals

20  are in a better position to absorb Medicaid losses

21  than other states.

22     A.  The point of view is that historically the

23  hospitals have been more profitable in New Hampshire

24  than hospitals in other states, and that is after many

25  of these rate reductions already were implemented.

1      Q.  Well, my question is on 30(a), that you're

2  familiar with from all this work that you've done.

3  Where does 30(a) allow this Court, or CMS, or anybody

4  who is going to look at the adequacy of rates, to look

5  at the financial margin of the provider?

6      A.  I'm actually not familiar with --

7          MS. SMITH:  I'm going to object.  That calls

8  for a legal conclusion.  He's not here as a legal

9  expert.

10         THE COURT:  I agree.  Sustained.

11     Q.  I will withdraw it and ask:  Are you

12  familiar, sir, with -- in any circumstance in which

13  you've provided counseling, Oregon, Massachusetts,

14  where the standard that you're trying to meet was the

15  profitability of a hospital to absorb more Medicaid

16  losses?

17     A.  I'm familiar with assessing the impact of

18  Medicaid payment on hospital margins.  I'm also

19  familiar that state Medicaid agencies do consider the

20  financial performance of providers when they consider

21  rate issues.

22     Q.  You've said before that the point of the

23  Medicaid program in evaluating the equity and

24  performance of a payment system, such as Medicaid,

25  that the payment rates are high enough to encourage

1    payment participation by efficient providers, true?

2        A.  Yes, I believe I said that.

3        Q.  Ensure access to beneficiaries/enrollees in

4    all markets and to the general population in local

5    markets, true?

6        A.  If you're reading from one of my reports that

7    probably is ten years old.

8        Q.  Sure.

9        A.  I probably did say those things.

10        Q.  One second.

11        A.  Which report is it?

12        Q.  Oregon.  February 26, 2003.  Is this your

13    report, sir?

14        A.  It's a report prepared by the Lewin Group.  I

15    was the lead analyst working on the report, yes.

16        Q.  And you remarked in that context that the

17    payment system should do what I was just describing,

18    among other things.  Let me show you the language just

19    so you can verify it.

20            THE COURT:  Is this all heading to his

21    opinion on whether or not profitability should be

22    considered?

23            MR. O'CONNELL:  Yes.  Okay.  I'll move on.

24            THE COURT:  Do you have much more to go?

25            MR. O'CONNELL:  No.

```
 1          THE COURT:  Because I assume you have a plane
 2    to catch, Mr. Hearle.
 3          THE WITNESS:  I do, yes.
 4          THE COURT:  The court reporter has been kind
 5    of going along for more than two hours, which is
 6    probably against the union.
 7          MR. O'CONNELL:  I understand, your Honor.
 8      Q.  The last point, charitable benefits.  These
 9    ten hospitals provided, based on the state's own
10    numbers, 177 million in uncompensated care in fiscal
11    year 2012; is that right?
12      A.  That's what the exhibit shows, yes.
13      Q.  Do you have any reason to doubt that?
14      A.  No.
15      Q.  That's a lot of community benefit, isn't it?
16      A.  Typically to figure out if it's a lot you
17    denominate it by the total expenses of the
18    organization.  So it's a percent of the expense, what
19    percent of the budget is being used for those
20    purposes, and that's not portrayed here.
21      Q.  So you don't know?  You don't have an opinion
22    on that?
23      A.  I don't have the denominators to say if
24    that's a lot compared to other standards that I'm
25    aware of.
```

1          MR. O'CONNELL:  One second.  I have no

2    further questions, your Honor.  Thank you.

3          THE COURT:  Any redirect?

4          MS. SMITH:  Just a few.  First I want to ask

5    Attorney O'Connell if you will agree to strike the ID

6    on Mr. Hearle's report.

7          MR. O'CONNELL:  Oh, I will not.  It's got a

8    lot of hearsay.  I think he's testified to the tables,

9    and there's a lot of things in there that are

10   objectionable.

11                     REDIRECT EXAMINATION

12   BY MS. SMITH:

13      Q.  Just to get back to a couple of the questions

14   that Attorney O'Connell asked you.  He asked you a lot

15   of questions about why didn't you review source data

16   from the hospital.

17          Did you understand that at this point we were

18   in a preliminary injunction stage and we have not

19   conducted discovery, therefore the state has just had

20   no opportunity to ask for that data yet?

21      A.  I understand that, yes.

22      Q.  And is that -- strike that.  In regards to

23   these total numbers that Attorney O'Connell was

24   talking about the affect of the 2011 changes, you

25   understand that DSH includes not just the Medicaid

1   losses but also uninsured?

2        A.  I do.

3        Q.  And if you could, from the white notebooks

4   behind you and what's being put up on the screen, look

5   at Exhibit 120?

6        A.  Which binder might it be in?

7        Q.  It's probably either 2 or binder 3.  It's

8   binder No. 2.

9        A.  There's no 120 in here.

10       Q.  I have it.  Here.  Let me just hand you a

11  paper copy of it.

12       A.  Thank you.

13       Q.  Were you provided a complete set of the

14  exhibits that had been attached by the defendant to

15  the preliminary injunction motion?

16       A.  I'm not sure if I was.

17       Q.  Can you just look at that and tell me if you

18  recall seeing it before?

19       A.  I do recall seeing this, yes.

20       Q.  Okay.  So this is one of the documents that

21  you had reviewed?

22       A.  Yes.

23       Q.  And you remember that you said that Ms. Dunn

24  had told you that the UPL was a one-time payment that

25  had been suggested by the hospital association's

91

1  consultant?

2      A.  That's what I recall, yes.

3      Q.  If you can look at that, is that the hospital

4  association's consultant that she was telling you

5  about?

6      A.  Yes.  Health Management Associates.

7      Q.  And in that does the hospital consultant

8  recognize that this UPL payment is a one-time thing?

9      A.  The paper speaks to the enhanced Medicaid

10  matching rate on page 2.  It says:  While the enhanced

11  Medicaid matching rate provided through the stimulus

12  bill is set to expire December 31, 2010, the House

13  healthcare reform bill included an extension.  If

14  that's included, so and so.

15      Q.  And then below that does it say:  But this is

16  a one-time event?

17      A.  Yes.  I do see below that it speaks to it

18  being a one-time solution:  It is important to note

19  that all of the approaches described above represent

20  one-time solutions for the funding shortfall.

21      Q.  So in the question that Attorney O'Connell

22  asked you about, if the hospital CEO could reasonably

23  have expected UPL, do you think it was reasonable to

24  expect UPL to continue when their own consultant had

25  suggested it as a one-time solution?

1      A.  If the CEO had read this report, then I would

2  assume not.

3          MS. SMITH:  I don't have any further

4  questions.

5          THE COURT:  All right.  Thank you.

6          MR. O'CONNELL:  I do.

7          THE COURT:  All right.

8          MR. O'CONNELL:  Thank you, your Honor.

9                      RECROSS-EXAMINATION

10  BY MR. O'CONNELL:

11      Q.  Would you keep that document in front of you,

12  sir?  This document where it says it's a one-time

13  solution is directly under a heading that says

14  Enhanced Medicaid Matching Rate.  Do you see that?

15      A.  I do.

16      Q.  That's not UPL.  That was special to the

17  stimulus plan in that year.  Isn't that true?

18      A.  It is.  But it provided the opportunity to

19  engage in the one-time solution.

20      Q.  There's nothing that stopped the state of New

21  Hampshire from paying UPL this year except an

22  appropriation for it.  Isn't that true?

23      A.  I don't know the answer to that.

24          MR. O'CONNELL:  Thank you.  Nothing further,

25  your Honor.

1        THE COURT:  Thank you, sir.  You can step

2   down.  You're excused.  And why don't we take a ten

3   minute break.

4        (RECESS)

5        THE COURT:  All right.  Where were we, Ms.

6   Smith?

7        MS. SMITH:  Attorney MacDonald had finished

8   his testimony with Ms. Dunn, and I was going to start

9   mine.

10        THE COURT:  All right.  I assume you want to

11   go Friday?  I assume you wish to resume Friday?

12        MR. MACDONALD:  Yes.

13        MS. SMITH:  Yes.

14        THE COURT:  9:00 o'clock?

15        MS. SMITH:  Yes.

16        THE COURT:  Just a few hours?

17        MR. O'CONNELL:  Yes.

18        MS. SMITH:  We're assuming we have all day on

19   Friday?

20        THE COURT:  Do you really need it?  Well,

21   I'll see.  We'll see.

22        MS. SMITH:  We still have a number of

23   witnesses that haven't been called.

24        THE COURT:  I'll at least give you all the

25   time that I've used up myself.  Let's do it that way.

1                CROSS-EXAMINATION OF KATHLEEN DUNN

2  BY MS. SMITH:

3        Q.  Ms. Dunn, you've been asked a lot of

4  questions in the last couple of days about various

5  state plan amendments that have been submitted.  And

6  let me bring up to you to show you so that we can be

7  looking at the same page, it's Exhibit 173, and the

8  defendant's exhibit which is the same one the

9  plaintiffs have marked as well.

10            Looking at the front of this, this is the

11  composite section of the state plan that is 4.19 B,

12  and that deals with outpatient services, correct?

13        A.  Yes, it does.

14        Q.  Okay.  When you submit a state plan, is there

15  some lag time usually before it's approved by CMS?

16        A.  Yes, there is.  CMS has 90 days to review the

17  submittal, and at that time they have to either

18  approve the state plan amendment or send a request for

19  additional information back to the state.

20        Q.  And then what happens in that process after

21  they send the request for additional information back

22  to the state?

23        A.  CMS starts a 90-day clock, and it requires

24  the state to provide answers to the questions.  If the

25  request for additional information -- during that

1   time -- I'm sorry -- during that time you answer

2   questions from CMS even by phone, et cetera, e-mails

3   they'll send us, and if CMS believes that we're going

4   to go past the 90-day clock, they will pull the state

5   plan amendment what they call off the clock.  And at

6   that point they want to work with the state in order

7   to resolve whatever issues need to be resolved.  It

8   goes back on the clock and gets approved.

9        Q.  So what is the ability -- can the state

10  implement a proposed state plan before CMS approves

11  it?

12       A.  Yes, except in one instance.  And that is if

13  you're going to implement Medicaid managed care, you

14  have to have your state plan approved before you can

15  actually roll the program out.  Otherwise your state

16  plan amendment has to be filed by the last day of the

17  quarter which you wanted the state plan to be

18  effective.

19       Q.  And in regards to some of these state plans

20  that we see in Exhibit 173, and I'm going to take you

21  to I believe it's page 12 of 57 in that document as

22  just an example, how long did it take to get that

23  state plan approved through CMS?

24       A.  This was submitted in 2007.  It's 07-010 at

25  the bottom.  It was finally approved by CMS on June

1  24th of 2010.

2      Q.  So it took over three years for that one?

3      A.  It did.

4      Q.  And how does -- let me just ask regarding a

5  specific state plan.  We looked before at state plan

6  06-008 and we were on page 1, and this is page 6 of 57

7  in Exhibit 173.  Is that state plan still pending with

8  CMS?

9      A.  Yes, it is.

10     Q.  And I think you were asked questions either

11 earlier today or yesterday about when this page was

12 first submitted and you were shown what has been

13 marked as --

14         MR. MACDONALD:  Plaintiff's 92.

15         MS. SMITH:  Pardon?

16         MR. MACDONALD:  Plaintiff's 92.  I'm sorry.

17 96.

18         MS. SMITH:  It's Plaintiff's Exhibit 96.

19     Q.  Do you remember looking at that earlier

20 today?

21     A.  Yes, I do.

22     Q.  I believe that Mr. MacDonald told you that

23 the first time -- that when this page 1 that we're

24 looking at in Exhibit 173 was submitted in response to

25 request for admissions -- not request for admissions,

1  I'm sorry -- the RAIs, the request for additional

2  information, this was submitted by the department to

3  CMS in a transmittal that's in that document on

4  November 20, 2008, correct?

5      A.  Yes.  This was responding to the request for

6  additional information on that 06-008.

7      Q.  And so this page had been submitted to CMS --

8  had this page been submitted to CMS before the

9  November 21, 2008, fiscal committee meeting?

10     A.  Yes.

11     Q.  And what is your understanding as to whether

12 or not you could operate under the language that was

13 in paragraph 1 in this page on November 21, 2008?

14     A.  It was my understanding that -- because we

15 had a pending state plan amendment, that until it is

16 disapproved by CMS that we were able to operate

17 underneath it.

18     Q.  And was this same language that was in

19 paragraph 1 submitted as part of subsequent SPAs that

20 also affected that page?

21     A.  Yes.

22     Q.  And can you look through this and tell me if

23 that language is still in the page 1 that is currently

24 pending for review before CMS?

25         THE COURT:  Which language is this related

1  to?

2          MS. SMITH:  I'm looking specifically at the

3  first paragraph of page 1 and 4.19 B, first paragraph

4  of paragraph 1.

5          THE COURT:  Is it here?  No, it's not.

6          MR. O'CONNELL:  We have a technology issue,

7  your Honor.  We are running it currently.  Oh, you've

8  got it, okay.  No?  96?

9          MS. SMITH:  We're on Exhibit 173.

10          MR. O'CONNELL:  I'm sorry.  I think we solved

11  it.

12          THE COURT:  Okay.  Thanks.

13      A.  On the page of the exhibit at the top

14  right-hand corner it's labeled page 2 of 57.  It is

15  transmittal number 10-014, a state plan amendment

16  submitted in 2010, and the -- if you look at number 1

17  where it says Outpatient Hospital Services, the first

18  paragraph looks to be exactly the same from the

19  06-008.

20      Q.  And going back to the prior SPA that we were

21  talking about that you may be withdrawing that was

22  08-017, that also contained the same language in the

23  first paragraph of paragraph 1, correct?

24      A.  It did.

25      Q.  And there's actually been -- has there been a

1  subsequent page of this filed more recently than

2  what's in here?

3      A.  Yes.  We had to file a state plan amendment

4  to be able to meet the changes in the DSH program so

5  that we could make payments in December to the

6  critical access hospitals.  So the prefix starts with

7  an 11.

8      Q.  It's in the notebooks behind you I believe as

9  Exhibit 194 or 195.  Actually, it's 195.

10     A.  Yes.

11     Q.  So that same language that we saw starting

12  back in 06-008 in paragraph 1 that was discussed as

13  being a clarification of the existing methodology has

14  continued in each of the SPAs that have been submitted

15  down to this one, which is 11-007?

16     A.  Correct.

17     Q.  And what is the methodology described in that

18  paragraph as far as setting outpatient rates?

19     A.  The current -- the 11-007 says that an

20  interim payment shall be made based on percent of

21  charges.  Final payment is made in accordance with the

22  percent of costs.  An audit of each hospital's actual

23  costs eligible for reimbursement shall be performed by

24  the fiscal intermediary in accordance with federal

25  Medicare requirements.  The department shall determine

1   the percent of actual costs to be reimbursed.   And

2   then payments made to the hospital in the previous

3   year shall be cost settled using the percent

4   determined by the department and the actual cost data

5   audited by the fiscal intermediary.

6        Q.   What does that language provide as far as the

7   department's ability to adjust the percentage applied

8   to cost reimbursement if your budget is insufficient

9   to cover the services?

10       A.   I believe the language provides that the

11  department will determine what the percent of actual

12  costs are to be paid -- excuse me -- to be reimbursed.

13  And so ultimately the department's determination is

14  based upon the funding made available by the

15  legislature.

16       Q.   At what page -- what version of this page,

17  which has been referred to as the reimbursement page,

18  do you believe you had the right to operate under on

19  November 21, 2008?

20       A.   I believe that I had the ability to operate

21  under the very first one, the 06-008.

22            MS. SMITH:   I could probably start another

23  line of questioning, your Honor.   I can do that, or we

24  can break till Friday.

25            THE COURT:   Well, we have to be out before

1  5:00 anyway.  All right.  Why don't we do that.  Why

2  don't we just take a few minutes -- you can step down,

3  if you would like, Ms. Dunn, I appreciate it -- since

4  we have a few minutes.

5           Maybe this already exists somewhere in an

6  exhibit, but I'm starting to get lost about the

7  nefarious rates settled.

8           Outpatient radiology, that's a rate

9  reduction?  That's part of your claim?

10          MR. MACDONALD:  It's a rate reduction.  I

11 believe --

12          THE COURT:  Good.  If you don't know, then I

13 feel better about not knowing.

14          MR. MACDONALD:  It is a rate reduction, yes.

15          THE COURT:  That's part of your claim?

16          MR. MACDONALD:  It is part of the claim, but

17 there was testimony -- I was just going to say there

18 was testimony you heard today from Ms. Dunn which is

19 that they are no longer enforcing that rate reduction

20 and they're going to pay -- refer back to a cost

21 schedule.  I'm just trying to make --

22          MS. SMITH:  And recalculate all of the

23 payments before that.

24          THE COURT:  So that's just an example of --

25 you're just throwing that in as an example of a

1 similar violation.

2          MR. MACDONALD:  Your Honor, we pled that in

3 our complaint filed in July.

4          THE COURT:  They changed their mind.

5          MR. MACDONALD:  They changed their mind in

6 January.

7          THE COURT:  A revenue code 5 payment?

8          MR. MACDONALD:  Yes.

9          THE COURT:  That's a rate reduction that you

10 claim is improper.

11          MR. MACDONALD:  That's correct.

12          THE COURT:  Improperly noticed.  Let's just

13 use this for my benefit.  Let's just think 13(A).

14 Outpatient cost settlement, a claim?

15          MR. MACDONALD:  Rate reduction.

16          THE COURT:  Rate reduction claim?

17          MR. MACDONALD:  Yes.

18          THE COURT:  Inpatient UPL payment?

19          MR. MACDONALD:  Yes.

20          THE COURT:  You claim that's a rate

21 reduction?

22          MR. MACDONALD:  Yes.

23          THE COURT:  So outpatient UPL payment, the

24 same thing?

25          MR. MACDONALD:  Yes.

1          THE COURT:  DSH payment, reduction,

2    eliminate, you claim that's a rate reduction?

3          MR. MACDONALD:  It's a change in the

4    methodology of the state plan.  We cannot claim it's

5    part of the rates.

6          THE COURT:  So how does it come under your

7    claim?  You claim it's a failure to give adequate

8    notice and opportunity to make comment on a change to

9    the state plan, 13(A)?

10          MR. MACDONALD:  Yeah.

11          THE COURT:  And the catastrophic payments?

12          MR. MACDONALD:  That's a rate reduction.

13    Yes, your Honor.

14          THE COURT:  All right.  I'm getting the

15    impression that there is some -- your position is that

16    some of these things were noticed?

17          MS. SMITH:  Correct.

18          THE COURT:  After the fact kind of?

19          MS. SMITH:  Well --

20          THE COURT:  You know, I've been looking at

21    Judge Tauro's case out of Massachusetts and the Hood

22    case out of the Fifth Circuit, and I'm looking at

23    those models as sort of analytical models and they're

24    pretty clear.

25          The first question obviously is:  Do you have

1   to give public notice?  Is it a rate reduction or is

2   it a methodology change?  Do you?  If you did, what

3   did you do?  And are you claiming that some of these

4   changes, amendments -- state plan amendments were

5   noticed and by publication of notices in newspapers?

6          MS. SMITH:  Yes.

7          THE COURT:  Some of these that I've just

8   outlined?

9          MS. SMITH:  Yes.

10         THE COURT:  Okay.  After the fact?  Before

11   the fact?

12         MS. SMITH:  Before the fact.

13         THE COURT:  Okay.  At some point I think I'm

14   going to want a compilation of, here are my claims.

15   These are the improper rate reductions.  This is what

16   we say forms the basis of our claim that they're

17   unlawful.

18         And I would like the state to give me a

19   column that says, this is our claim as to why they

20   were properly noticed or didn't have to be noticed or

21   whatever.  And then I get the impression that your

22   claims are sort of -- I'm not sure what they are.  You

23   seem to have some claims out there -- well, I lost the

24   thought.  Well, you can't help me.

25         MR. MACDONALD:  May I, your Honor?  Just on

1   that list we would also include the outpatient rate

2   reduction.

3            THE COURT:  The outpatient rate reduction,

4   right.

5            MR. MACDONALD:  And the inpatient rate

6   reduction.  So the --

7            THE COURT:  Oh, I'm sorry.  Right, right,

8   right.  Sure.  Yes.  And then that's different because

9   that's -- one is apparently subject to an unchallenged

10  state plan amendment, the inpatient, as I recall, and

11  the question is -- that's what I was thinking.  The

12  question is what does it mean, right?

13           MR. MACDONALD:  That state plan amendment,

14  whether it was sufficient.

15           THE COURT:  Well, in my mind first it's what

16  does it mean, and secondly -- that's what I was

17  thinking.  You have a claim that -- I gather for the

18  inpatient you've got a claim that either it was

19  changed, in which case it wasn't properly noticed, or

20  if you take the state at its word, they just clarified

21  it, they didn't change anything, in which case they

22  didn't apply it properly.

23           MR. MACDONALD:  That's exactly right for

24  outpatient.

25           THE COURT:  Outpatient.  Okay.  I'm sorry.

1  Inpatient is, what does it mean when it says adjust

2  minus state budget neutrality factor, and I suppose

3  then what?  Can you do that?

4            MR. MACDONALD:  And then we showed you an

5  example --

6            THE COURT:  No.  Is that the issue?  Can you

7  do that?

8            MR. MACDONALD:  No, you can't.

9            MR. CHAPMAN:  That's the issue.

10           THE COURT:  This is the one that says, here's

11  the methodology for receiving the rate.  We're going

12  to jump through all these hoops.  We're going to have

13  a very complicated formula.  We're going to assess

14  everything.  Then we're going to set the rate based

15  upon what money we have.  That one?

16           MR. O'CONNELL:  That one, yes.

17           THE COURT:  There's no claim that that was

18  not properly noticed, right?

19           MR. O'CONNELL:  Yes, there is that claim.

20           THE COURT:  Oh, there is?

21           MR. MACDONALD:  That was the -- we're talking

22  about the inpatient rate?

23           THE COURT:  Right.

24           MR. MACDONALD:  That was the rate reduction

25  that took place when the Governor signed the executive

1  order and marched over to the legislative office

2  building and presented it at 9:00 a.m. the same day,

3  and there was no notice whatsoever, and I think Ms.

4  Dunn testified to that.

5          THE COURT:  I got that.  But didn't the state

6  plan provide at that time that the rate would be

7  calculated according to a methodology that included

8  adjusting for state budget neutrality factor?

9          MR. MACDONALD:  That is a legal issue.  We

10 claim --

11         THE COURT:  But that's a yes?

12         MR. MACDONALD:  Yes.

13         THE COURT:  Okay.  So then doesn't the issue

14 really arise as, did they comply with the state plan?

15         What if the state plan properly interpreted

16 says, here's our method, our method is whatever money

17 we have we're going to adjust the rates in order to

18 achieve that goal of spending no more than that?  Can

19 you have a plan that says that?

20         MR. MACDONALD:  I don't believe so, your

21 Honor.  I don't think that's considered --

22         THE COURT:  Because that's far different from

23 a 13(A) claim of I didn't get notice.  That's more a

24 30(a) claim of you're not doing it right.

25         MR. MACDONALD:  Your confusion -- or the

1  confusion around --

2          THE COURT:  Yeah, it's confusion.  It's

3  confusion.

4          MR. MACDONALD:  There are really two notice

5  requirements here.  One is 13(A).

6          THE COURT:  Uh-huh.

7          MR. MACDONALD:  And that deals with rates.

8  And they need to be published and the justifications

9  need to be articulated.

10          The second is, when you change the state plan

11  that's subject to a notice as well.

12          THE COURT:  Uh-huh.

13          MR. MACDONALD:  And so on this particular

14  example the plaintiffs contend that 13(A) could never

15  have been satisfied because the manner in which the

16  rate reduction was effected.  In other words, the

17  Governor signing the executive order, going over to

18  joint fiscal, and getting it approved within minutes.

19  Never noticed.  It just happened.  That's the

20  violation of 13(A).

21          THE COURT:  Why is it if that is what the

22  plan says the proper methodology consists of?

23          MR. MACDONALD:  Because --

24          THE COURT:  Say the plan said the methodology

25  we're going to use is this.  There's going to come a

1  time when the Governor is going to determine how much

2  money to recommend the legislature appropriate, and

3  there's going to come a time the legislature is going

4  to appropriate that amount.  And whatever that amount

5  allows the rate to be, that's going to be the rate.

6          MR. MACDONALD:  Well, I still think the state

7  has an obligation to publish the rates and whatever

8  their justifications are.  That's what 13(A) says.

9  That's what 13(A) says.

10          Now, if I may while we're on this rate

11  reduction, I just want you to understand -- the Court

12  to understand that we also contend that the state plan

13  does not support an across the board rate reduction as

14  it's written.  And our evidence there was pointing to

15  a prior instance where they had to achieve an across

16  the board rate reduction and they sought a state plan

17  amendment to do so.

18          THE COURT:  Oh, sure.  Right, right.  You've

19  offered that just as sort of an example of how it's

20  supposed to be done and an admission that they

21  understood that.

22          MR. MACDONALD:  Exactly.

23          THE COURT:  All right.  Okay.  Any questions

24  for me?  Are we all set?  9:00 o'clock Friday?

25          MS. SMITH:  9:00 o'clock.

1           THE COURT:  Let's try to do it in a half day

2    if we can.  Do you really have a lot?  What are your

3    witnesses going to be?

4           MS. SMITH:  We haven't finished Ms. Dunn yet,

5    who was the last of their witnesses.

6           THE COURT:  Right.

7           MS. SMITH:  We also had just discussed that

8    we will confer tomorrow morning about who else they

9    plan on calling.  They have several other witnesses of

10   ours that are on their list.  If they don't call

11   those, we will then decide which of our witnesses we

12   still have to call after Ms. Dunn.  But we did have

13   the finance director, Marilee Nihan, as well as a

14   couple other witnesses on our list.

15          MR. MACDONALD:  Your Honor, we're very

16   mindful of the principles of the timely efficiency,

17   quality of life, and we'll work together to streamline

18   things.

19          THE COURT:  If you can -- I don't want to put

20   too much more of a burden on you, but I think it will

21   be time well spent -- what I just outlined by way of a

22   chart would be really helpful.  You don't have to do a

23   rendition of all of the -- you know, starting with the

24   Magna Carta and everything, but a chart would be very

25   helpful.

1           MR. MACDONALD:  I actually have a little

2     cheat sheet right here.

3           THE COURT:  Yeah, a chart would be very

4     helpful as to exactly what your claims are with

5     respect to 13(A) particularly and 30(a) somewhat.

6           MR. O'CONNELL:  Would you like that

7     conventionally filed, or do you want it through ECF?

8           THE COURT:  Oh, either one.

9           MR. O'CONNELL:  Just bring it to court?

10          THE COURT:  Sure.  I assume you're on the

11    same page as to who is claiming what and what they're

12    claiming?

13          MS. SMITH:  They have some things on their

14    charts we don't think are in their claim.  As long as

15    they don't put that on their chart, we may be on the

16    same page.

17          THE COURT:  Well, maybe you could do the same

18    thing then.  Again, just a chart.  Not a big memo or

19    anything.  Just a chart saying, you know, this is

20    their 13(A) claim with respect to inpatient rate

21    reduction.  This is why -- this is our notice.  This

22    is where we published.  This is what we published.

23    It's what it says.  Done.

24          MS. SMITH:  We've already discussed working

25    on that tomorrow.

1          THE COURT:  Great.  Thank you very much.  I

2  appreciate it.

3          MR. O'CONNELL:  Thank you, your Honor.

4          THE COURT:  Have a good day.

5          (Conclusion of hearing at 4:55 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113

1                      C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9
     Submitted: 1-23-11          *Susan M. Bateman*
10                               **SUSAN M. BATEMAN, LCR, RPR, CRR**
                                 LICENSED COURT REPORTER, NO. 34
11                               STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25