**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4/26/12

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * *
                              *
DARTMOUTH-HITCHCOCK CLINIC,    *
et al.                         *
                              *   11-cv-358-SM
              v.               *   January 10, 2012
                              *   1:40 p.m.
NEW HAMPSHIRE DEPARTMENT OF    *
HEALTH AND HUMAN SERVICES,     *
COMMISSIONER                   *
                              *
* * * * * * * * * * * * * * * *



Day 1, AFTERNOON SESSION
TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

Appearances:

For the Plaintiff:    W. Scott O'Connell, Esq.
                      Gordon J. MacDonald, Esq.
                      Anthony Galdieri, Esq.
                      Emily Pudan Feyrer, Esq.
                      Nixon Peabody, LLP

                      William L. Chapman, Esq.
                      Orr & Reno, PA

For the Defendant:    Nancy J. Smith, Esq.
                      Laura E.B. Lombardi, Esq.
                      Jeanne P. Herrick, Esq.
                      NH Office of the Attorney General

Court Reporter:       Diane M. Churas, CSR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603) 225-1442

2

1                        I N D E X

2

3

    WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS
4
    FRANCES GAFFNEY
5
    By Mr. O'Connell    3                  24
6   By Ms. Herrick                17

7   PHILIP W. SULLIVAN, MD

8   By Mr. O'Connell    24
    By Ms. Lombardi               40
9
    JILL BATTY
10
    By Mr. O'Connell    44                  58
11  By Ms. Lombardi               54

12  JOHN MARZINZIK

13  By Mr. O'Connell    59
    By Ms. Lombardi               79
14
    KATHLEEN DUNN
15
    By Mr. MacDonald    83
16

17

18

19  EXHIBITS:                        ID.    Evid.

20  Plaintiffs' Exhibit 72                   14
    Plaintiffs' Exhibit 82                   39
21  Plaintiffs' Exhibit 69                   52
    Plaintiffs' Exhibit 75                   83
22

23

24

25

```
 1                      BEFORE THE COURT

 2            THE COURT:  Mr. O'Connell.

 3            MR. O'CONNELL:  Thank you, your Honor.

 4   Plaintiffs are calling Frances Gaffney, please.

 5                      FRANCES GAFFNEY

 6        having been duly sworn, testified as follows:

 7            THE CLERK:  Will you please state your name

 8   for the record and spell your last name.

 9            THE WITNESS:  My name is Frances Gaffney,.

10   G A F F N E Y, Comeau, C O M E A U.

11                    DIRECT EXAMINATION

12   BY MR. O'CONNELL:

13        Q.   Where do you live?

14        A.   I live in Lee, New Hampshire.

15        Q.   Are you currently employed?

16        A.   I am.

17        Q.   Where are you employed?

18        A.   I'm employed at Exeter Healthcare.

19        Q.   And what is Exeter Healthcare?

20        A.   Exeter Healthcare is a 28-bed skilled facility

21   that's located on the campus of Exeter Hospital.

22        Q.   What is your position at Exeter Healthcare?

23        A.   I'm the administrator at Exeter Healthcare.

24        Q.   And what types of services are provided at

25   Exeter Healthcare?
```

4

1          A.    Exeter Healthcare has four basic types of

2     services they provide.  We provide short-term rehab to

3     patients who are leaving the hospital and aren't quite

4     ready to go home either as a result of a surgery or a

5     medical event like a stroke.  We provide treatment for

6     medically complicated patients, those patients who may

7     need to have six weeks of antibiotics that they can't

8     take by mouth at home and have to be administered

9     intravenously.  We have two dedicated rooms for hospice

10    patients so that patients who aren't able to die at home

11    with their family around them can come to Exeter

12    Healthcare and have their family there as opposed to

13    being in the hospital or at a facility further away.

14    And then we have a program for management of patients on

15    ventilators, whether they're on them long-term

16    permanently or short-term as a result of some acute

17    illness.

18         Q.    What is the current status of Exeter

19    Healthcare?

20         A.    On September 14th, 2011, an announcement was

21    made that Exeter Healthcare would be closing no later

22    than September 30th of 2012.

23         Q.    You indicated that Exeter Healthcare has

24    long-term and short-term patients?

25         A.    We do.

1       Q.    What is the Medicaid status of the long-term

2   patients?

3       A.    The long-term patients that are on ventilators

4   we receive inclusive reimbursement of $585 a day.  The

5   patients who are not on ventilators but required

6   long-term --

7       Q.    I asked you a different question.  I'm sorry

8   if I confused you.  But of the long-term patients how

9   many are Medicaid enrolled?

10      A.    We currently have a census of 11 Medicaid

11  patients, one patient that we recently admitted over the

12  last week who's Medicaid pending who had been in the

13  hospital for 77 days and couldn't be accepted by a

14  facility, so in total it's 12.

15      Q.    How many of the 12 are ventilator dependent?

16      A.    Nine.

17      Q.    And when you say long-term, what is the range

18  of time that those patients have been resident at Exeter

19  Healthcare?

20      A.    Anywhere from one year to ten years.

21      Q.    What is the reason that Exeter Healthcare is

22  being closed?

23      A.    Exeter Healthcare runs a deficit margin.  We

24  lose approximately $3 million every year that we're in

25  operation.

1      Q.    And what is the current status of those

2   long-term residents at Exeter Healthcare?

3      A.    All of those residents are currently staying

4   at Exeter Healthcare until facilities are approved by

5   the State of New Hampshire to provide ventilator

6   management or managing long-term complicated Medicaid

7   patients.  So the state is currently trying to identify

8   those providers, and then I guess they'll have to try to

9   negotiate a rate.  But until that's completed they

10  continue to stay with us.

11     Q.    Are you aware of any other programs in the

12  state of New Hampshire that provide the same type of

13  ventilator support for patients as has been the case at

14  Exeter Healthcare?

15     A.    There's one other facility that I'm aware of

16  that has one ventilator dependent patient.  However, the

17  program differs substantially from the program at Exeter

18  Healthcare.

19     Q.    Is there a reason why there are not more

20  providers that provide ventilator services on a

21  long-term basis like Exeter Healthcare?

22     A.    Yes.  There used to be a number of them in the

23  state of New Hampshire but they're very intensive in

24  terms of time, staff expertise, and cost.  And we were

25  the only -- our program started in 1994 and we are the

1    only program that has consistently provided care over

2    that course of time.  All the other programs have ceased

3    to operate.

4         Q.   From where do you draw patients for the 28

5    beds that you have at Exeter Healthcare?

6         A.   Primarily from the state of New Hampshire.  At

7    times we have referrals from the state of Vermont and

8    Vermont Medicaid would pay us for that care.  Southern

9    Maine because of our proximity to the Maine border.

10        Q.   But you do a statewide draw here in New

11   Hampshire?

12        A.   We do.

13        Q.   And you -- are you -- strike that.  What is

14   Exeter Healthcare's association with what you referenced

15   as Exeter Hospital?

16        A.   Exeter Hospital is another organization under

17   the Exeter Health Resource Company, we're a healthcare

18   system, and we're located on the campus across the

19   street from the hospital.

20        Q.   Are there other affiliates of the hospital in

21   addition to Exeter Healthcare?

22        A.   Yes, there are.  There's Rockingham VNA

23   Hospice, Core Physician Services, Exeter Hospital,

24   Exeter Healthcare and Synergy Health and Fitness.

25        Q.   And Core is what?

1       A.   Core is a physician organization.  We employ

2  125 physicians that serve our primary market, our

3  primary service area.

4       Q.   And together those entities that you just

5  described are under what organization?

6       A.   Exeter Health Resources.

7       Q.   What is the status of your employment upon the

8  closure of Exeter Health Resources?

9       A.   I will not be employed.  Once Exeter

10  Healthcare ceases to operate I will no longer have a

11  job.

12       Q.   Are you familiar with the Medicaid

13  reimbursement reductions that occurred in the state from

14  fiscal year 2011 and 2012?

15       A.   I am.

16       Q.   Can you identify for the Court what the

17  year-over-year reduction was in payments that Exeter

18  received in 2011 to 2012?  And let me put that in front

19  of you, Ms. Gaffney.  I'm putting in front of you

20  Exhibit 64.  There is a blowup to your left.

21       A.   Um-hum.

22       Q.   If you look at the total UCC payments, the

23  Court has already heard orientation about this chart,

24  but what is the number for Exeter Hospital total UCC

25  payments last year?

1          A.   $9,889,671.

2          Q.   And payments in fiscal year 2012 are what?

3          A.   Eleven million --

4          Q.   Total UCC payments.

5          A.   Oh, zero.   Sorry.

6          Q.   And the amounts of money that Exeter is hoping

7     to save as a result of the closure of Exeter Healthcare

8     is approximately what?

9          A.   $3 million.

10          Q.   Are you involved in the efforts to try and

11     transfer the long-term patients to new facilities?

12          A.   I am.   As the licensed administrator at Exeter

13     Healthcare, the responsibility is ultimately mine.

14          Q.   And for what period of time have you been

15     involved in trying to find a replacement facility for

16     the long-term Medicaid patients at Exeter Health

17     Resources?

18          A.   We met with representatives from the state

19     prior to the announcement on September 14th, so probably

20     right after Labor Day we started conversations.

21          Q.   So approximately August or September?

22          A.   Yes.

23          Q.   And to date have any resources in state been

24     identified for the placement of your long-term

25     ventilator dependent patients?

1          A.    No, they have not.

2          Q.    If no program can be found in the state of New

3    Hampshire for these ventilator patients, what are their

4    options?

5          A.    Well, since the announcement of Exeter

6    Healthcare being closed has been made and under Medicare

7    law we're required to give a 60-day notice, so my

8    understanding is that that date is firm.  So in the

9    event that we would close and there would be no

10   facility, patients would either have to be placed out of

11   state in, say, Massachusetts or New Jersey where there

12   are facilities or be transferred to hospitals where

13   patients of this type are managed in an intensive care

14   unit because typically you won't find on a regular

15   hospital floor a patient on a ventilator because it is a

16   complicated service.

17         Q.    So in what way would the care change with

18   these ventilator patients from, say, Exeter Health

19   Resources to an ICU or some type of intensive care unit

20   in a hospital?

21         A.    The focus of an acute care hospital is you go

22   in when you're sick and then you want to leave.  The

23   longer you stay there's data that shows the more chance

24   you have to get additional illnesses, whether it's

25   problems with your skin -- ventilator patients are at

1   high risk for developing pneumonia.  So they have their

2   place, but for people who are living, dependent on a

3   ventilator, it's important for them to have daily

4   activities that are rehabilitative in nature, social, so

5   that they can get up and participate in their daily

6   routines, which isn't allowed in an acute care hospital

7   in an ICU.  At Exeter Healthcare if somebody has a dog,

8   many of our patients have family dogs, children, they

9   come in and they visit, dogs get on the bed.  They do

10  what they would do at home.  That could never be allowed

11  in a hospital environment.

12       Q.   Have you had occasion to try and place any of

13  your long-term patients in other facilities in the state

14  of New Hampshire?

15       A.   A couple years ago one of our patients who had

16  originally been on a ventilator and we weaned off the

17  ventilator was transferred to Exeter Hospital for an

18  acute illness, and while he was there the family had

19  requested he be placed closer to them because they live

20  in the western part of the state out by Peterborough,

21  and during the two months that that man was in the

22  hospital he was referred to 59 facilities that would

23  have been closer for the family to go visit and none of

24  them would accept him.  Actually, one did accept him.

25  He went there for one day and his daughter called us

1   saying that he was traumatized, he needed to come back,

2   and so we readmitted him knowing that the burden was on

3   the family to try to continue to visit from that far

4   distance.

5        Q.   Is the patient you just referenced still a

6   resident of Exeter Healthcare?

7        A.   He is.

8        Q.   Have you been able to successfully find a

9   placement for him now given that it's going to be

10  closing?

11       A.   No, we have not.

12       Q.   Can you describe for the Court the economics

13  associated for caring for a ventilator dependent

14  patient.  For example, what are the costs that Exeter

15  Healthcare incurs for daily care?

16       A.   On average the cost, not the charges, are a

17  thousand dollars a day.  We get reimbursed $585 a day.

18       Q.   So there's a $415 difference on a daily basis

19  for these patients?

20       A.   Per patient per day, correct.

21       Q.   How is that difference, that $415 difference

22  per patient per day currently covered at Exeter?

23       A.   The Exeter Health Resource board has

24  year-over-year when they've reviewed budgets decided

25  that the loss of Exeter Healthcare could be offset

1   within the organization from other parts of the

2   organization that had a positive bottom line.  So we

3   basically have been subsidized by Exeter Hospital.

4       Q.   Did the trustees make a different decision

5   given the $9.8 million change in funding for the State

6   of New Hampshire for this fiscal year?

7       A.   They did.

8       Q.   Ms. Gaffney, you were in court this morning

9   when we were talking about other category changes for

10  inpatient, outpatient and those types of reimbursements

11  generally?

12      A.   I was.

13      Q.   Has Exeter gone through a similar exercise as

14  you heard testified to about Lakes to determine what its

15  financial impacts have been by changes in other

16  categories?

17      A.   Yes.

18      Q.   I ask you to look at Exhibit 72 for ID.  Do

19  you recognize that document?

20      A.   I do.

21      Q.   Without asking you to go through all of the

22  categories as we did earlier today with another witness,

23  can you simply verify that this is what the institution

24  believes the financial impact has been for the rate

25  reductions referenced on this page?

1        A.   Yes.

2             MR. O'CONNELL:   I'd offer it at this time,

3   your Honor.

4             THE COURT:   Any objection?

5             MR. O'CONNELL:   I'd offer this exhibit, Ms.

6   Smith.

7             MS. HERRICK:   We have no objection.

8             THE COURT:   ID may be stricken on Plaintiffs'

9   72.

10            (Plaintiffs' Exhibit 72 admitted.)

11       Q.   And just before we put this away, the total

12  financial impact that Exeter is dealing with for the

13  period 2008 through 2013 is what number?

14       A.   $16,089,710.

15       Q.   And that includes the upper pay limit

16  reduction, does it not?

17       A.   Yes.

18       Q.   If we take that number out, what is the total

19  above that?

20       A.   13,065,466.

21       Q.   And that's different than -- or independent I

22  wish to say than the $9.8 million that we talked about

23  earlier in the year-over-year change, is it not?

24       A.   Yes, it is.

25       Q.   In addition to the closure of this ventilator

15

1    dependent program and the program for the medically

2    complex patients you described, what other changes has

3    Exeter Health Resources, the parent organization,

4    implemented to deal with the financial circumstances we

5    have been discussing?

6          A.   Over the past -- well, in September about 70

7    individuals were laid off.  There were 40 positions that

8    were open that were decided not to fill.  There was an

9    adult dental practice that closed.  There was a program

10   in place for directors, managers, vice-presidents,

11   executive personnel where goals were set, and then there

12   was discretionary bonus money that was paid at the end

13   of the year.  This year, although the money was budgeted

14   to be paid, no dollars were paid out to employees and

15   that equaled about $1.2 million.

16         Also the health insurance.  The contribution

17   that the employees have to put in for their health

18   insurance has increased and the benefits have changed in

19   that there are higher deductibles for the employees when

20   they need services.

21         Q.   Has Core Physicians, the physician practice

22   part of Exeter Health Resources, implemented any

23   changes?

24         A.   They had some staff reductions as well as

25   recently making a decision that Medicaid recipients who

1  live beyond their service area will not be accepted as

2  new patients into a Core Physician practice.

3       Q.    What is the Exeter primary service area?

4       A.    It's primarily the seacoast, but it goes as

5  far west as Nottingham down towards Plaistow down the

6  125 corridor.  So although it's primarily seacoast, we

7  do catch a number of surrounding towns.

8       Q.    So for example, if some Medicaid patient from

9  the Lakes Region General Hospital primary service care

10 area tried to be treated by a primary care physician in

11 Exeter, would they be accepted or would they not be

12 accepted?

13      A.    They would not be accepted after February 1st

14 of this year.

15      Q.    Can you tell me with regard to the reductions

16 in UPL and DSH payments this year, was any inquiry made

17 from the Department of Health and Human Services to

18 Exeter or Exeter Healthcare as to what impacts those

19 reductions could have on your ventilator dependent

20 program?

21      A.    No, there were not.

22      Q.    Were you aware of any opportunity to provide

23 public comment on a proposed state plan amendment that

24 was geared to deal with the reductions in the payments

25 referenced in Exhibit 63?

1      A.   No, I am not.

2      Q.   Ms. Gaffney, why is Exeter taking the actions

3 that you've described here this afternoon?

4      A.   Because Exeter is facing a substantial

5 decrease in funds available to support programs to the

6 tune of $10 million to date and Exeter Healthcare,

7 having been subsidized for $3 million every year, they

8 just feel that they can't afford to continue to do that

9 and make the organization, the health system viable for

10 the years to come.

11      Q.   Do you believe that within the state of New

12 Hampshire there exists the capacity to take your

13 long-term ventilator dependent patients from Exeter

14 Healthcare into another program?

15      A.   As of today, no, I do not.

16           MR. O'CONNELL:  One second, your Honor.  I

17 pass the witness.  Thank you, Ms. Gaffney.

18           THE COURT:  Attorney Smith?  I'm sorry,

19 Attorney Herrick.  Sorry.

20                     CROSS-EXAMINATION

21 BY MS. HERRICK:

22      Q.   You've said in your testimony that you have

23 eight ventilator units; is that right?

24      A.   We have nine patients that are reimbursed as

25 ventilator dependent patients.

1     Q.   And you said that your reimbursement rate is

2  $400 short of what it costs you to provide those

3  services?

4     A.   $415 per patient per day.

5     Q.   And when you use the word "costs" what are you

6  referring to?

7     A.   The actual cost of services that are provided.

8     Q.   By my calculation 8 or 9 times 400 times

9  365 days a year would result in about a million-dollar

10  loss; is that right?

11     A.   I haven't done the math.

12     Q.   If I'm correct, you have a $2 million loss or

13  so from the other beds in your facility; right?

14     A.   If your math is correct.

15     Q.   And those beds are not necessarily Medicaid

16  beds, are they?

17     A.   They are all licensed and certified under the

18  Medicaid program.

19     Q.   Many of those patients though are Medicare

20  eligible patients; right?

21     A.   Yes.

22     Q.   And the payment rate for Medicare for your

23  facility changed on October 1st of 2011, didn't it?

24     A.   Correct, it did.

25     Q.   It was reduced about 12 percent or so?

1      A.   The actual reduction to Exeter Healthcare

2  overall was about $25 per patient per day.

3      Q.   Did you tell anyone from the state that the

4  closing of Exeter Healthcare facility was due to the

5  reduction from Medicare?

6      A.   Not that I recall.

7      Q.   Who were you working with at the state in

8  order to place those patients?

9      A.   I spoke last week with Karen Carlton.  There's

10  a man by the name of John Martin who's currently in the

11  role that Bob Allers had fulfilled until he left, and

12  Jonathan McCosh.

13      Q.   Exeter Healthcare doesn't provide any general

14  hospital services, does it?

15      A.   Could you define what you mean by general

16  hospital services?

17      Q.   The ones that would be subject to the

18  inpatient and outpatient rates that are being discussed

19  in this trial.

20      A.   No.

21      Q.   The ventilator patients in particular are

22  paying under an atypical nursing home rate; right?

23      A.   Correct.

24      Q.   And none of the reductions that you discussed

25  with Attorney O'Connell had anything to do with the

1    atypical nursing home rate for ventilator patients, did

2    it?

3         A.   Correct.  Not directly.

4         Q.   How would the rate paid for the atypical

5    nursing home be indirectly?

6         A.   Well, because by the state imposing the MET

7    tax the Exeter Hospital is no longer able to subsidize

8    us and the ventilator rate has not been adjusted since

9    -- it's over three years since that rate has been

10   evaluated and we haven't received any change in

11   reimbursement for care for those patients.

12        Q.   So it's the Medicaid Enhancement Tax that is

13   really your issue?

14        A.   It's the issue for the entire organization

15   trying to figure out which services we can continue to

16   try to support that don't have adequate reimbursement

17   for the services we provide.

18        Q.   Now, Attorney O'Connell showed you information

19   about the losses that the Exeter Healthcare system, the

20   regional healthcare, I forget --

21        A.   Exeter Health Resources.

22        Q.   Exeter Health Resources.  Those numbers are

23   for Exeter Health Resources; right?

24        A.   Which numbers?

25        Q.   The ones that he showed you on -- I believe

1   it's still up, Exhibit 72.  It's on the screen in front

2   of you.  It should be.

3       A.   Um-hum.

4       Q.   Just based on the face of the chart it appears

5   that those are Exeter Health Resources.  They are not

6   Exeter Healthcare numbers, are they?

7       A.   No, they are not.  I believe these are all

8   Exeter Hospital's numbers.

9       Q.   But you don't know for sure, do you?

10      A.   All the services listed are found in an acute

11  care hospital.

12      Q.   You didn't prepare that exhibit?

13      A.   I've reviewed this exhibit with our financial

14  officer and the attorney.

15      Q.   And when you made the decision to close Exeter

16  Healthcare, you anticipated that it would take up to

17  12 months to place the residents there, didn't you?

18      A.   That's what we allowed.  We are required under

19  law to give a 60-day notice.

20      Q.   Have you spoken to anyone at the state about

21  transitioning some of the patients to Genesis

22  Healthcare?

23      A.   No, I have not.

24      Q.   So you're not aware of a plan that would allow

25  them to be transferred to Genesis?

1       A.   I know Genesis expressed interest, but the

2   state has not revealed to me who the approved providers

3   will be.

4       Q.   Has the state discussed with you potential

5   placement at Crotched Mountain?

6       A.   I know that Crotched Mountain, too, has

7   expressed interest, but I don't know that that's where

8   the state is going to approve any of these patients to

9   be transferred to.

10      Q.   It certainly is possible for the state to have

11  that in place before September of 2012, isn't it?

12      A.   It's possible.

13      Q.   Do you know who Mark Whitney is?

14      A.   I do.

15      Q.   Who is he?

16      A.   He's the vice-president of strategic planning

17  at Exeter.

18      Q.   And he often speaks on behalf of Exeter?

19      A.   He does.

20      Q.   Are you aware that Mr. Whitney said that the

21  cutback decisions were driven by two things, first the

22  change in the Anthem rates, and secondly the change of

23  the MET tax?

24      A.   I'm not familiar with the quote.

25           MS. HERRICK:  May I approach, your Honor?

1          THE COURT:  Anytime, feel free.

2          MR. O'CONNELL:  What document are you showing

3    the witness, please?

4          MS. HERRICK:  This is a press release issued

5    on September 15th, 2011.

6          MR. O'CONNELL:  May I review it?

7          (Pause.)

8     A.   I've read the highlighted part.

9     Q.   Do you have any reason to doubt that that's a

10   press release issued by Exeter Healthcare?

11    A.   Exeter Health Resources.

12    Q.   Exeter Health Resources?

13    A.   No, I have no reason to doubt it.

14    Q.   And is it -- on the backside of the page, can

15   you read to me what Mr. Whitney said about the reasons

16   for the cutbacks?

17    A.   The entire quote or the part you have

18   highlighted?

19    Q.   The part I have highlighted, please.

20    A.   Okay.  Facing as a result of new Anthem

21   contract terms with Exeter Hospital and Core Physicians,

22   along with the state's imposition of ten million in net

23   Medicaid taxes on Exeter Hospital this year.

24          MS. HERRICK:  I have nothing further.

25          THE COURT:  Any redirect?

24

1          MR. O'CONNELL:  Very briefly, your Honor.

2                    REDIRECT EXAMINATION

3  BY MR. O'CONNELL:

4      Q.    Ms. Gaffney, with regard to the press release

5  you were just shown, there's a reference to the

6  administration of the MET on a net basis.  For 2012,

7  Exhibit 64 suggests that Exeter is going to be paying a

8  Medicaid Enhancement Tax of what amount of money?

9      A.    $11,173,113.

10      Q.    And there would be no UPL or DSH payments made

11  underneath this budget; correct?

12      A.    Correct.

13          THE COURT:  Anything else?

14          MR. O'CONNELL:  No, your Honor.

15          THE COURT:  Thank you, ma'am, you may step

16  down.  You're excused.  You may call your next witness.

17          MR. O'CONNELL:  Yes.  Dr. Philip Sullivan,

18  please.

19                  PHILIP W. SULLIVAN, MD

20      having been duly sworn, testified as follows:

21          THE CLERK:  Please state your name and spell

22  your last name for the record.

23          THE WITNESS:  Philip with one L, middle

24  initial W, last name Sullivan, S U L L I V A N.

25                    DIRECT EXAMINATION

1    BY MR. O'CONNELL:

2         Q.   Good afternoon, Dr. Sullivan.

3         A.   Good afternoon, Mr. O'Connell.

4         Q.   Where do you live, sir?

5         A.   I live in Amherst, New Hampshire.

6         Q.   Where are you currently employed?

7         A.   I'm employed at Southern New Hampshire Medical

8    Center in Nashua, New Hampshire.

9         Q.   What is your profession?

10        A.   I am a psychiatrist, an M.D., a medical doctor

11   with advanced training in treating psychiatric illness.

12        Q.   And for what period of time have you been a

13   psychiatrist?

14        A.   I finished my residency in 1987, so about

15   25 years.

16        Q.   What is your current role with Southern New

17   Hampshire Medical Center?

18        A.   I serve as the medical director for our

19   inpatient behavioral health unit and oversee clinical

20   care within the behavioral health department for our

21   partial psychiatric day program, for our emergency room,

22   and oversee the other physicians who work within the

23   department.

24        Q.   What is the behavioral health unit as part of

25   Southern New Hampshire Medical Center?

1      A.   It's an acute care psychiatric unit where we

2   evaluate, treat, and undergo discharge planning for

3   seriously psychiatrically ill patients, generally

4   patients who are unable to function at home because of

5   their illness or are unsafe in some way, a danger to

6   themselves or to others because of their illness and

7   cannot function except in a structured inpatient

8   hospital environment.

9      Q.   Starting in 2008, how large -- this is the

10   number of bed count -- was the behavioral health unit?

11      A.   At that time we were a 30-bed unit.

12      Q.   And what is it currently?

13      A.   Ten beds.

14      Q.   And are there any current plans for further

15   reduction?

16      A.   That is still on the table.  When the Medicaid

17   reductions came down in the summer of 2011 the initial

18   plan was to completely close the unit as quickly as

19   possible.  We reduced to ten beds in anticipation of

20   closing.  At this point we're in a holding pattern

21   waiting to see whether that's a viable option.

22      Q.   What were the reasons that caused Southern New

23   Hampshire to reduce the size of the program?

24      A.   Because of the sizable deficit that we

25   experienced because of the reduction in Medicaid

1  payments.

2      Q.   I'd like you to look at what we've been

3  referring to today as Exhibit 63.  Would you indicate

4  for the Court the amount of total UCC payments that

5  Southern New Hampshire received in state fiscal year

6  2011?

7      A.   That's $11,896,946.

8      Q.   And what payments were they to receive, total

9  UCC payments, in 2012?

10     A.   That's zero.

11     Q.   Was the behavioral health unit operating with

12  a positive margin or a negative margin at the time it

13  was reduced?

14     A.    This is not unique to our behavioral health

15  unit.  Generally all behavioral health units run at a

16  substantial deficit.

17     Q.   How were the deficits covered before the

18  decision was made to reduce the size that it currently

19  operates under?

20     A.   Because the hospital was able to maintain a

21  positive margin, they subsidized our services.

22     Q.   And what happened this year that caused a

23  change in that willingness to do the subsidy?

24     A.   The substantial deficit that put the hospital

25  into a negative margin.

1      Q.    Now, what size -- strike that.  What percent

2   census or percent of the population that would

3   historically be admitted to the BHU were Medicaid

4   patients?

5      A.    Medicaid patients and potentially eligible

6   patients eligible for Medicaid range between 35 and

7   40 percent.

8      Q.    Would you describe that last phrase you used,

9   potentially eligible for Medicaid?  What does that mean?

10      A.    Well, it means at the time they have no

11   insurance at all, and usually by virtue of their mental

12   illness they are poor and have no resources.  People who

13   are chronically mentally ill are generally eligible for

14   Medicaid if they are helped with the application

15   process.  Generally chronically mentally ill people have

16   functional impairments which make it difficult for them

17   to apply for Medicaid on their own and many of them fall

18   through the cracks.

19      Q.    So if someone presented without insurance at

20   Southern New Hampshire for admittance into the BHU,

21   would you take certain action with regard to Medicaid

22   status?

23      A.    Whenever we admit an uninsured patient who's

24   chronically mentally ill, we help them with the process

25   of applying for Medicaid during their hospitalization.

1        Q.    Have you, sir, as the director of this program

2   tried to calculate the number of Medicaid patients on an

3   annual basis who will not have access to the BHU now

4   that it's ten beds as opposed to 30 beds?

5        A.    Yes, I have.

6        Q.    What is that number, sir?

7        A.    237 patients per year.

8        Q.    And how is that number calculated?

9        A.    We took the number of admits to the hospital,

10  to the psychiatric unit, multiplied it by the percentage

11  of Medicaid and potentially Medicaid eligible patients

12  for each year, and then subtracted the number for 2012

13  from the number for 2009.

14       Q.    So if one of these 237 potential patients to

15  the BHU presents at Southern New Hampshire, how will

16  they be treated?

17       A.    Well, they will not all be receiving care

18  under our psychiatric inpatient unit.  They will be

19  evaluated in the emergency room, which is a short

20  process which does not involve any treatment and

21  referred either to another hospital, which is difficult

22  because other hospitals are experiencing exactly the

23  same situation and often refuse our patients when we try

24  to refer them, or refer them to outpatient services,

25  which are inadequate to the task of treating a seriously

1   mentally ill individual in a decompensated state, which

2   they are when they come to the emergency room.

3        Q.   The typical Medicaid patient who was formerly

4   treated at the BHU would get comparable care from an

5   emergency department?

6        A.   Absolutely not.

7        Q.   In what ways would it be different?

8        A.   Emergency room care is just that.  It's

9   emergency based.  It's usually over a period of several

10   hours.  It involves acute stabilization to the point

11   where the patient is safe enough to exit the emergency

12   room.  No real care or treatment is provided beyond

13   safety considerations.

14        Q.   With regard to the BHU, what type of care or

15   treatment would you provide that is different than what

16   you just described would happen in an emergency

17   department?

18        A.   Comprehensive care that would include direct

19   one-on-one nursing care, management by nurses of the

20   patient's illness, full psychiatric evaluation, daily

21   meetings with the psychiatrist to provide treatment, and

22   as our process evolves over the course of the stay on

23   the unit, we involve family members through meetings

24   with social workers and psychiatric staff and do

25   comprehensive discharge planning so that the treatment

1   that is put in place during the inpatient stay can be

2   continued on an outpatient basis.

3        Q.   Are there particular challenges in treating

4   those with mental illness?

5        A.   The challenges are many.  Treating someone

6   with a serious mental illness is quite different from

7   treating someone with a medical illness.

8        Q.   In what way?

9        A.   Well, if you're medically ill you generally

10  want to come to the hospital.  You know you have

11  something wrong with you and you are actively engaged in

12  seeking care and accepting the recommendations that are

13  given to you.

14            Just the opposite is true of mentally ill

15  patients.  They often don't believe they have an

16  illness.  They may be psychotic and think that the

17  voices are controlling them or that the FBI is out to

18  get them, paranoid delusions, that sort of thing.  So

19  there's a lot of finesse involved in engaging the

20  patient in the treatment process.  Initially many

21  patients don't accept treatment and we have to convince

22  them that they are ill, hold their hand, teach them

23  about their illness, teach them about the treatment that

24  is going to help them, and then initiate that treatment.

25  And that all takes considerable time.

1    Q.    Have you experienced any difficulties at

2    Southern New Hampshire with mentally ill patients

3    attempting to receive care in the emergency department?

4    A.    Yes, we have, and the difficulties in the

5    emergency room have steadily escalated over the last two

6    or three years.  We have seen increasing -- because of

7    inadequate treatment in patients feeling frustrated by

8    not getting adequate treatment in the emergency room or

9    exiting the emergency room only to return later that day

10   or in the days that follow, we see them becoming

11   increasingly agitated.  We've had a remarkable increase

12   in violence in our emergency room over the last three

13   years.  In fact, just two weekends ago police had to be

14   called to the emergency room, not an uncommon occurrence

15   these days, and when they attempted to subdue an

16   agitated patient they had to use a taser.  The taser hit

17   the wrong individual.  One of our security guards was

18   tasered in the process of police intervening in our ED.

19   Q.    At the time the behavioral health unit was

20   reduced from 30 beds down to ten, what other resources

21   were changed, if any, personnel and physician?

22   A.    Well, the hospital -- reducing the beds on the

23   behavioral health unit, and we also reduced beds on our

24   pediatric unit, reducing those beds was the last resort

25   that the hospital will turn to in an attempt to save

1   money to address the negative operating margin triggered

2   by the Medicaid reductions.  Salaries were frozen.  Our

3   pension plan was frozen.  Vacation time was reduced for

4   employees.  We cut non-clinical programs, funding for

5   the medical library which provides medical resources for

6   our hospital staff, funding to our 55 plus program,

7   which is an outreach program for elderly.  Also the

8   hospital decided it could no longer provide the subsidy

9   for our federally qualified health center in Nashua, the

10  Nashua Area Health Center.  So that $500,000 subsidy was

11  cut.  Only after all of these other measures were taken

12  was consideration given to cutting clinical programs.

13      Q.   And specifically what clinical staff was

14  reduced out of the behavioral health unit?

15      A.   Before we began cutting beds we had a

16  full-time equivalent of 42 individuals working for the

17  psychiatric unit.  That included physicians, nurses,

18  social workers, and mental health associates.  We're now

19  at a full-time equivalent of 23.

20      Q.   If a patient with mental illness is unable to

21  get a bed at Southern New Hampshire in the behavioral

22  health unit and has private insurance, what options do

23  they have in your service area?

24      A.   They have options that range as far as they

25  can drive or be driven, or an ambulance can take them.

1   It is relatively easy to admit a patient with commercial

2   insurance to any community hospital that has a

3   psychiatric unit to the freestanding private psychiatric

4   hospital within the state, Hampstead Hospital, or to

5   similar units in hospitals in neighboring states.  All

6   of those are options for a patient with commercial

7   insurance.

8        Q.    Conversely, what options do Medicaid patients

9   who would formerly be treated at Southern New Hampshire

10  in the behavioral health unit, what options do they

11  have?

12       A.    Realistically they don't have any options.

13  This is a disadvantage to population who have no

14  advocates, they're disenfranchised.  They generally

15  don't have transportation.  They don't have financial

16  resources.  So going to another town to try and get into

17  a unit in another hospital is usually not an option for

18  them, and when we attempt to transfer people from our

19  emergency room to another hospital because these other

20  hospitals are experiencing exactly the same difficulties

21  that we are, they generally tell us their units are

22  full.

23       Q.    Before the state decided to withdraw its

24  $11.8 million reimbursement for fiscal year 2012, were

25  you consulted by anyone at the Department of Health and

1    Human Services about the impacts that would have on the

2    unit of the hospital you had responsibility for?

3          A.    No one consulted me.

4          Q.    Were you aware of any public process involving

5    state plan amendment or an opportunity to be heard by

6    the commissioner of Health and Human Services about the

7    impacts for that reduction?

8          A.    The first I heard of it was from our chief

9    financial officer when he told me we were probably going

10   to have to close the psychiatric unit at the beginning

11   of July 2011.

12         Q.    In any event, you were unaware of any process?

13         A.    Totally unaware.

14         Q.    You referenced during your testimony some

15   action taken with regard to the pediatric unit?

16         A.    That is correct.

17         Q.    What has the hospital done with regard to

18   pediatrics?

19         A.    Pediatrics was a separate freestanding

20   eight-bed unit staffed by specialized pediatric nursing

21   staff.  As with the behavioral health unit, pediatrics

22   is -- the patients are a high percentage of Medicaid or

23   potentially Medicaid eligible people.  So they were

24   running deficits similar to the deficits that we were

25   running on the behavioral health unit.  Decision was

1    made to close that unit and to open two to four

2    pediatric beds on an adult medical/surgical unit, which

3    is arguably a frightening place for a child.

4         Q.   I don't know if you introduced this, but could

5    you describe to the Court what Foundation Medical

6    Partners is?

7         A.   Foundation Medical Partners is the outpatient

8    practice division of Southern New Hampshire Health

9    Services, or Southern New Hampshire Health System.  The

10   hospital is one part of that organization.  Foundation

11   Medical Partners is the outpatient practice which

12   employs physicians to provide services in the Nashua

13   community.

14        Q.   As a result of the change in funding from the

15   state or Medicaid reimbursement from the state, has

16   Foundation Partners implemented any changes to patients

17   that it will care for and how?

18        A.   Yes, it has.  We have not disenrolled all

19   Medicaid patients, but we have decided to close our

20   physician panels to any new Medicaid patients.

21        Q.   How many physicians are currently employed?

22        A.   Over 200.

23        Q.   And so any of those who would have new

24   Medicaid patients would be telling them what?

25        A.   They wouldn't be getting in the door.

1      Q.   And what are the consequences as a general

2   proposition of not -- the Medicaid population not

3   getting that type of preventive care?

4      A.   Well, everyone needs preventive care.  Anybody

5   who goes to their doctor on a yearly basis knows that

6   their doctor is concerned about identifying and treating

7   any number of potentially chronic diseases, like

8   diabetes, asthma, hypertension, high blood pressure,

9   cardiac disease, peptic ulcer disease.  These are all

10  illnesses that have significant morbidity and even

11  mortality associated with them if they are not

12  identified early and treated.  Without access to primary

13  care physicians our Medicaid population will not have

14  these disorders identified early, will not get

15  preventative care, and will end up with more acute

16  illnesses and severe illnesses that may require much

17  more expensive care such as hospitalization.

18     Q.   What options do Medicaid patients have in your

19  primary service area for other primary care that's not

20  associated with the foundation?

21     A.   There is the Dartmouth-Hitchcock Clinic and

22  the practices of St. Joseph's Hospital.  I'm not aware

23  of what their policy is at this point about providing

24  care for Medicaid patients.  We also have a federally

25  qualified health center, the Nashua Area Health Center,

1     within the city of Nashua.

2          Q.   So if those two other entities are unable to

3     take on these Medicaid patients that will no longer be

4     able to get care at Foundation Partners, do they have

5     any other options in the primary service area?

6          A.   Only the Nashua Area Health Center, and they

7     have already had very limited access because of the huge

8     number of patients who are trying to access their

9     services.

10          Q.   When is that limitation on new Medicaid

11     patients being enforced?

12          A.   I believe now.

13          Q.   So if a Medicaid patient in the primary

14     service area makes a call to Southern New Hampshire's

15     Foundation Partners, they will not be seen?

16          A.   Correct.

17          Q.   Would you please look at Exhibit 82 for ID.

18     Dr. Sullivan, do you recognize Exhibit 82?

19          A.   I do.

20          Q.   Would you describe for the Court what it

21     represents?

22          A.   This is a summary of the Medicaid rate

23     reductions which have taken place since 2008 for

24     Southern New Hampshire Medical Center.

25          Q.   These are the same -- generally speaking, the

1    same categories that you've heard testimony about by

2    previous witnesses?

3        A.    That is correct.

4        Q.    And this is the impact on Southern New

5    Hampshire Medical Center?

6        A.    Specifically, yes.

7        Q.    Okay.  And if you look at the total line

8    across from the period 2008 until 2013, what does that

9    total line represent, sir?

10       A.    That represents the --

11       Q.    What is that number?  I'm sorry, just read it

12   for the record.

13       A.    The number $21,218,280.

14       Q.    And that includes the upper payment limit

15   reduction.  What if we were to not count that, what is

16   the number right above that on total?

17       A.    That would bring us down to $15,022,442.

18             MR. O'CONNELL:  Your Honor, I'd offer 82 and

19   ask that the ID be stricken.

20             MS. LOMBARDI:  No objection.

21             THE COURT:  ID may be stricken on Plaintiffs'

22   82.

23             (Plaintiffs' Exhibit 82 admitted.)

24       Q.    Dr. Sullivan, given the implications on

25   patients that you've described today, why are you at

1   Southern New Hampshire taking the actions that you've

2   described?

3       A.   Well, although we are a nonprofit hospital,

4   it's still a business and no business can operate for

5   any length of time with a negative margin.  Services

6   have to be cut or else the hospital can't pay its bills

7   and cannot borrow money because its bond ratings are

8   reduced.

9            MR. O'CONNELL:  Thank you.

10           THE COURT:  Thank you, Mr. O'Connell.

11  Attorney Lombardi, you're taking the witness?

12           MS. LOMBARDI:  Yes.

13                   CROSS-EXAMINATION

14  BY MS. LOMBARDI:

15      Q.   Good afternoon, Dr. Sullivan.  I'm Laura

16  Lombardi.  I have a few questions for you.

17      A.   Good afternoon.

18      Q.   You testified earlier about increasing

19  difficulties in the ER over the last two to three years;

20  correct?

21      A.   That is correct.

22      Q.   And those difficulties occurred before the

23  decision was made to cut the beds, the number of beds in

24  the behavioral health unit; correct?

25      A.   We had already started bed reductions at that

1   point.  We had reduced from 30 beds to 18 beds in the

2   spring of 2009.

3        Q.   And your utilization rates, you testified that

4   you cut your capacity from 28 beds to 10 beds.  So

5   actually now you're saying from 18 beds to 10 beds;

6   correct?

7        A.   The cut was -- in July of 2011 was from 18 to

8   10.  But that was part of a cumulative cut over a period

9   of two years.

10       Q.   So before these changes, you testified the

11  change -- the reductions between 2011 and 2012, you had

12  already cut beds prior to that time; correct?

13       A.   Although this was not the only factor, the

14  rate reductions that Attorney O'Connell just questioned

15  me about had something to do with that.

16       Q.   And Medicaid patients are the smallest

17  population of patients in the behavioral health unit;

18  correct?

19       A.   They're about 25 -- Medicaid is 25 percent and

20  uninsured is about 14 percent.

21       Q.   And the behavioral health unit is still taking

22  Medicaid patients; correct?

23       A.   Of course.  Of course we are.

24       Q.   So if Medicaid beds are available, those

25  patients are not being turned away?

42

1       A.   That is correct.

2       Q.   And if a bed is not available, there are other

3   facilities in the state that have beds available for

4   those patients; correct?

5       A.   Not always.

6       Q.   But you don't know that personally?

7       A.   Well, I know from personal experience as a

8   supervisor for the emergency room the frustration that

9   we experience trying to admit patients to those beds and

10   they are considerable.  Patients -- we often have to

11   work out safety plans for patients to send them home

12   rather than send them to a hospital and hope that they

13   will get the care that they need on an outpatient basis,

14   which is problematic because waiting lists are

15   frequently long for outpatient evaluation and treatment.

16       Q.   But if a patient does need an inpatient bed,

17   generally there is a facility in the state that has a

18   bed available for them; correct?

19       A.   No.

20       Q.   No?  You testified earlier about Foundation

21   Medical Partners closing their panels to any new

22   Medicaid patients; correct?

23       A.   Um-hum.

24       Q.   But there are still primary care physicians in

25   the Nashua area that are still taking Medicaid patients;

1    correct?

2         A.    I don't know the answer to that question.

3         Q.    But there is a federally qualified healthcare

4    center that takes the Medicaid patients?

5         A.    Correct, the Nashua Area Health Center.

6         Q.    And your hospital is a member of the New

7    Hampshire Hospital Association; correct?

8         A.    Yes, it is.

9         Q.    And New Hampshire Healthcare -- I'm sorry, the

10   New Hampshire Hospital Association keeps you informed

11   about upcoming changes to reimbursement rates in terms

12   of budget changes?

13        A.    I believe they inform our administration.

14   They don't inform me personally.

15        Q.    But that association does lobbying on your

16   hospital's behalf?

17        A.    Yes, they do.

18             MS. LOMBARDI:  I have no further questions.

19             THE COURT:  Any redirect?

20             MR. O'CONNELL:  Nothing further, your Honor.

21             THE COURT:  Thank you, Dr. Sullivan.  You're

22   excused.

23             MR. O'CONNELL:  Next witness is Jill Batty,

24   please.

25

44

```
 1                    JILL BATTY
 2           having been duly sworn, testified as follows:
 3           THE CLERK:  Would you please state your name
 4  and spell your last name for the record.
 5           THE WITNESS:  Jill Batty, B A T T Y.
 6                    DIRECT EXAMINATION
 7  BY MS. O'CONNELL:
 8      Q.   Ms. Batty, where do you live?
 9      A.   I live in Keene, New Hampshire.
10      Q.   Where are you employed?
11      A.   Cheshire Medical Center in Keene.
12      Q.   And what's your position with Cheshire?
13      A.   I'm the chief financial officer.
14      Q.   How long have you been the chief financial
15  officer at Cheshire?
16      A.   Seven years.
17      Q.   And how long have you been involved in
18  healthcare administration?
19      A.   25 years.
20      Q.   Would you describe for the Court generally
21  what Cheshire Medical Center is?
22      A.   Cheshire Medical Center is an acute care
23  hospital with 169 licensed beds.  We have acute
24  inpatient and outpatient services and we are working in
25  partnership with Dartmouth-Hitchcock Keene Physician
```

1    Practice under our joint operating agreement, and we are

2    the only provider of acute care services in Cheshire

3    County.

4         Q.    Does that mean you're really the only hospital

5    in Cheshire County?

6         A.    We are the only hospital.

7         Q.    And do you serve Medicaid patients?

8         A.    We do.

9         Q.    Approximately what percent of the Medicaid --

10   strike that.  Would you identify for the Court what the

11   mission of Cheshire Medical Center is?

12        A.    We have a mission of promoting community

13   health in Cheshire County.  We operate under Vision

14   2020, which is about making Cheshire County the

15   healthiest community in the nation by 2020.  That

16   involves providing appropriate acute and preventive

17   services for our population, but also promoting health

18   for the general population.

19        Q.    Do you have any specific designations in the

20   Cheshire Medical Center?

21        A.    We are designated as a world referral center

22   under the Medicare program, which basically represents

23   the fact that we have a specialized medical practice in

24   our community that is unique in a rural environment and

25   offers some special reimbursement opportunities under

1    the Medicare program.  And we're also designated as a

2    Medicare dependent hospital, which means our inpatient

3    volume is highly dependent on Medicare.  Over 60 percent

4    of our new patients are Medicare patients.

5        Q.   What does that mean about the population you

6    serve?

7        A.   Well, we have an elderly population in

8    Cheshire County, and I guess that would summarize it.

9        Q.   Now, do you -- or have you ever under the

10    mission you just described made any distinction on

11    services you would provide based on payer status?

12        A.   No, we have not.

13        Q.   Have you had to confront a change to that

14    policy because of circumstances?

15        A.   We have.  We've always had a very open

16    environment to accept patients in our organization.

17    Because we are responsible for community health and

18    having the services available for our primary service

19    area community, we are limiting access to our services

20    for residents outside of that primary service area.

21        Q.   What specific limitations are you imposing?

22        A.   At present we have closed our physician

23    practices for accepting new -- our primary care

24    practices for accepting new patients who are covered by

25    Medicaid or do not have insurance.  So if they live

1    outside of our primary service area, they cannot begin

2    receiving care from our primary care physicians.

3         Q.    Your primary service area includes what?

4         A.    Cheshire County less the towns of Dublin,

5    Jaffrey and Rindge.  So all Cheshire County except for

6    those three communities.

7         Q.    Are you familiar with the year-over-year

8    financial impact of the state's funding decisions from

9    fiscal year 2011 to 2012?

10        A.    I am.

11        Q.    Would you describe for the Court the impact at

12   Cheshire Medical Center -- strike that out.  What was

13   the total UCC payment that Cheshire received in 2011?

14        A.    $6,454,494.

15        Q.    And in 2012 you received what?

16        A.    Zero.

17        Q.    What in addition to what you've described are

18   you doing at Cheshire Medical Center to deal with that

19   loss of funding year-over-year?

20        A.    Year-over-year not only for this loss of

21   funding but for the rate reductions that I'm sure we'll

22   talk about, we have seen our operating margin decline

23   year-over-year at Cheshire Medical Center.  We've been

24   really focused on trying to be able to maintain our

25   services and meet our mission, so we've accepted

48

1   declines in our operating margin versus cutting back on

2   services.

3            For this particular year our primary focus has

4   been on reducing the costs within our control.  We had

5   no wage increases.  We eliminated our discretionary

6   match on our employees' pension contributions and we

7   eliminated a short-term disability program for

8   employees.

9            And then we've also been very focused on

10  managing our staffing level, making sure that our staff

11  are absolutely as productive as possible.  We've pretty

12  much reached the end of that path.  We are somewhere

13  between the 25th and 30th percentile of expense per

14  case, which means we're very low for organizations of

15  our type.  At this point our only options are service

16  reduction in order to meet these reduced reimbursements.

17       Q.   If the limitations and actions you've

18  described are interdictions during the next 12 months,

19  what other options is Cheshire considering as far as

20  service limitations?

21       A.   We have an inpatient psychiatric unit.  It is

22  18 beds, and that will probably be our next step, is to

23  close that unit similar to this decision by Southern New

24  Hampshire.

25            We are considering limiting access to -- our

1    first line of access has been elimination of new

2    non-primary service area residents to our primary care

3    practices.  We may have to choose to discharge existing

4    patients in our primary care practices who either don't

5    have insurance or covered by Medicaid if they live

6    outside our service area.

7            We've initially taken only approaches with

8    primary care access.  Our next level on that would be to

9    discontinue accepting specialty referrals for residents

10   outside our primary service area.  Particularly in high

11   cost practices that have like high drug cost or high

12   medical intervention practices or oncology practices,

13   both medical and radiation oncology, and rheumatology

14   which is treated with a lot of drug interventions and

15   allergy, are our primary area of focus where we are

16   likely to close access for residents outside our service

17   area.

18       Q.    So with regard to possible changes to service

19   in the future, what do you believe the impact would be

20   on Medicaid patients?

21       A.    In the inpatient psychiatric unit we have

22   about 180 discharges per year that are Medicaid.  For

23   the specialty referrals for Medicaid we have around 75

24   Medicaid patients per year coming from outside our

25   service area, those specific practices, and we currently

1    have 400 Medicaid patients enrolled in our primary care

2    practice who live outside our primary service area.  So

3    it all adds up to be around 625 patients affected.

4         Q.   Is that for things that have been implemented

5    or that could be?

6         A.   No, those will be implemented.  As far as

7    what's been implemented, we've had the policy in place

8    of not accepting the out of area primary care for three

9    months, and at the rate we're going it's about 50

10   patients a year.  Half of those currently have Medicaid,

11   the other half are uninsured.  I'm not certain whether

12   or not they might have been qualified for Medicaid, but

13   they don't have insurance and we're not accepting those

14   either.  So 25 we know are affected.

15        Q.   And that could grow to that 600 number if you

16   implement the changes that you've described that are

17   being considered?

18        A.   Correct.

19        Q.   Were you aware of any process by the

20   Department of Health and Human Services to assess the

21   impact to Cheshire -- actually the Medicaid patients in

22   connection with the reduction of the UPL patient

23   payments?

24        A.   No.

25        Q.   Were you consulted by anyone in the department

1    about what the impacts would be at any time?

2        A.    No.

3        Q.    Are you aware of any state -- public process

4    associated with state plan amendments with regard to the

5    reductions of UPL before they are implemented?

6        A.    No, I am not.

7        Q.    I'd ask you to look at Exhibit 69 marked for

8    ID.  Ms. Batty, do you recognize that exhibit?

9        A.    I do.

10        Q.    What is it?

11        A.    It's a summary of the impact of the rate

12    reductions since 2008 projected forward to 2013 for

13    Cheshire Medical Center.

14        Q.    Did you compile this information?

15        A.    I did.

16        Q.    And similarly, does it capture the rate

17    reductions we've heard other -- impact Cheshire Medical

18    Center for rate reductions by categories listed on the

19    left?

20        A.    Yes.

21        Q.    And what are the total -- what is the total

22    financial impact for the rate reductions for 2008

23    through 2013 without including overpayment amount?

24        A.    $11,910,711.

25        Q.    As a practical matter what does that mean to

1    Cheshire?

2         A.   We're a $150 million organization per year,

3    and if you look at the number there for the most recent

4    -- well, since 2010 that's two and a half million

5    dollars per year reduction in our revenue.  So we've

6    operated with a margin that is less than that for each

7    of those years, and so essentially it has eliminated any

8    opportunity to have an operating margin, which we then

9    -- the operating margin is what we reinvest in our

10   facilities and in our programs and our people, and

11   that's really where the cuts are coming.

12        Q.   With regard to the category cuts referenced in

13   Exhibit 69, were you aware of any public process

14   connected with state plan amendments to effect these

15   changes?

16        A.   No.

17             MR. O'CONNELL:  Your Honor, I'd offer

18   Exhibit 69.

19             THE COURT:  Any objection?

20             MS. LOMBARDI:  No objection.

21             THE COURT:  ID may be stricken on Plaintiffs'

22   69.

23             (Plaintiffs' Exhibit 69 admitted.)

24             MR. O'CONNELL:  I have no further questions.

25             THE COURT:  I have a question.  Is there

1   somewhere an expression of these rate reductions in

2   terms of like percentages and comparatives?

3          MR. O'CONNELL:  Only with regard to inpatient,

4   outpatient and family practice.  Those are in the

5   declarations.  Not for these specific categories, your

6   Honor.

7          THE COURT:  How were they accomplished?  Were

8   they accomplished by percentage rate, reductions of

9   rates?

10          MR. O'CONNELL:  Oh, I'm sorry.  Yes, with

11   regard to -- well, let me turn to my partner, Mr.

12   MacDonald, who knows the details of some of this.

13          MR. MacDONALD:  Your Honor, in the outpatient

14   reduction there was a 33 percent more or less rate

15   reduction which took place in November of 2008.  On the

16   inpatient rates there was a ten percent rate reduction

17   which took place on November 2008.  The other rate

18   reductions in the case are not those kind of

19   across-the-board cuts, but I think you'll hear testimony

20   on what they were as a function of the total amount

21   that's being paid.

22          THE COURT:  Thank you, appreciate it.

23          MR. O'CONNELL:  Your Honor had asked us to pay

24   attention to (13)(A) issues and the witnesses tomorrow

25   will be doing that.  Today they're appearing about

1    impacts.  Unfortunately, that was the way we had

2    organized the day and we will put up some of that

3    tomorrow.

4              THE COURT:  Okay, appreciate it.  Attorney

5    Lombardi?

6                         CROSS-EXAMINATION

7    BY MS. LOMBARDI:

8         Q.   Good afternoon.  I believe you testified that

9    your hospital serves -- approximately 60 percent of the

10   patients are Medicare; is that correct?

11        A.   On the inpatient side, that's correct.

12        Q.   On the inpatient side.  And with regard to

13   Medicaid, your declaration indicates that only

14   5.8 percent of the medical center's total revenue comes

15   from Medicaid; is that correct?

16        A.   I believe it's actually slightly lower than

17   that, but yes, that's right.

18        Q.   And you did not expect to make a profit from

19   treating Medicaid patients; correct?

20        A.   That's correct.

21        Q.   If you could turn to Plaintiffs' Exhibit 69?

22        A.   I have it.

23        Q.   That you just testified to about the losses

24   that you claim that Cheshire Medical Center has

25   experienced.  The third line down, Revenue Code 510, you

1   have that listed as a rate reduction.  That wasn't

2   essentially a rate reduction.  Was it instead a -- it

3   was an improper billing practice that was corrected; is

4   that correct?

5        A.   Well, no, I don't believe so.  It was a change

6   in policy by the Medicaid program as to how they would

7   pay for provider based physician practices.  The

8   hospitals that were affected by this have been following

9   Medicare guidelines about provider based practices.

10   Cheshire was one of those providers, and Medicaid made

11   basically a unilateral change in policy about payment

12   which resulted in this reduction.

13        Q.   And it had to do with the way that you

14   reported, not necessarily a reduction in rates; correct?

15        A.   Well, prior to that we were receiving a higher

16   payment for physician based services that were provided

17   to Medicaid patients and at the end of the change in

18   policy we were receiving a million dollars less.

19        Q.   And you also list the upper payment limit as a

20   rate reduction over the three years of 2011, '12 and

21   '13.  The upper payment limit, wasn't that in fact a

22   one-time payment made based on the fact that there are

23   funds available for a one year's time?

24        A.   The state presented the upper payment limit to

25   the hospitals with the information for us to understand

1    that it was an upper payment limit, payment one time in

2    2010.  We don't know what prior payment -- prior DSH/MET

3    reimbursement payments were based on.  The calculation

4    details were not shared with us.  So I can't speak to

5    whether or not prior period payments were associated

6    with upper payment limits.

7              The administration of the MET/DSH program have

8    put certain requirements on the state as to how the

9    payments are calculated and processed, and we know that

10   in 2010 in order for them to be processed in the way

11   that they were -- they had to include an upper payment

12   limit payment to the different providers.  We would

13   assume that since the payment levels were similar in

14   2010 as the prior years, that the methodology would have

15   included an upper payment limit calculation, but that

16   was not shared with us.

17        Q.   But you're not as familiar with this area.

18   You're not familiar with the difference between DSH

19   payment and upper payment limit?

20        A.   As familiar as -- I'm not sure --

21        Q.   As perhaps other witnesses who could testify

22   to that issue?

23        A.   I don't know.  I feel pretty familiar with it.

24        Q.   But it was a one-time payment.  It was not a

25   DSH payment, it was a one-time upper payment limit

1    payment made in 2010?

2         A.   That's how it's been presented to us recently.

3         Q.   And you testified that physician panels have

4    been closed to new Medicaid patients coming in from

5    outside your service area; is that correct?

6         A.   Correct.

7         Q.   There are other providers in those areas of

8    the state who do still accept Medicaid patients;

9    correct?

10        A.   I don't know that.  Probably.  I don't know.

11   I will just state we don't have a federally qualified

12   healthcare center in the Monadnock Region, so that sort

13   of last safety net provider is not available to the

14   residents of our primary or secondary service area, and

15   the ones that are being refused by Cheshire/

16   Dartmouth-Hitchcock concurrently are in a secondary

17   service area and don't have access to another federally

18   qualified healthcare center.

19        Q.   And your hospital is a member of the New

20   Hampshire Hospital Association?

21        A.   Yes.

22        Q.   And they lobby on your behalf?

23        A.   Yes, they do.

24             MS. LOMBARDI:  I have no further questions.

25             THE COURT:  Any redirect?

1          MR. O'CONNELL:  Yes, your Honor, briefly.

2                    REDIRECT EXAMINATION

3     BY MR. O'CONNELL:

4          Q.   Now, Ms. Batty, you were asked questions about

5     UPL and whether it was a one-time payment or not.  I

6     want to clarify the record.  Are you aware that on --

7     that in 2010 with an effective date of November 19,

8     2010, two years ago, the state issued a state plan which

9     said that the UPL would be an annual payment?  Are you

10    aware of that fact?

11         A.   I have seen that in correspondence from the

12    Hospital Association.

13         Q.   And there was a similar document, SPA, filed

14    with the same effective date for inpatient rates; isn't

15    that true?

16         A.   Yes.

17         Q.   As you sit here today, you haven't seen this

18    to speak about it; is that fair to say?

19         A.   I'm sorry?

20         Q.   You haven't studied this --

21         A.   No, I have not.

22         Q.   -- to give the Court informed testimony about

23    all those details; is that fair to say?

24         A.   No, that's correct.

25         Q.   Okay.  But it is true that if the state amends

1    its state plan amendment to say it's going to make a

2    certain payment, it's got to make that payment unless it

3    amends the plan; isn't that true?

4         A.   It's my understanding.

5              MR. O'CONNELL:  Nothing further.

6              MS. LOMBARDI:  Thank you, ma'am.

7              THE COURT:  Thank you, ma'am.  Why don't we

8    take a brief break.  Ten minutes.

9              (Recess taken.)

10             THE COURT:  Mr. O'Connell.

11             MR. O'CONNELL:  Thank you, your Honor.  We

12   call John Marzinzik.

13                       JOHN MARZINZIK

14        having been duly sworn, testified as follows:

15             THE CLERK:  Would you please state your name

16   and spell your last name for the record.

17             THE WITNESS:  John, J O H N, Marzinzik, M A R

18   Z I N Z I K.

19                    DIRECT EXAMINATION

20   BY MR. O'CONNELL:

21        Q.   Good afternoon, Mr. Marzinzik.

22        A.   Good afternoon.

23        Q.   Where do you live, sir?

24        A.   I live in Elliot, Maine.

25        Q.   Where are you employed?

1     A.   At Frisbie Memorial Hospital in Rochester, New

2   Hampshire.

3     Q.   And what is your position at Frisbie Memorial

4   Hospital?

5     A.   I am the vice president of finance and chief

6   financial officer.

7     Q.   And what do your duties and responsibilities

8   include in that position at Frisbie?

9     A.   I oversee all of the financial applications of

10   the hospital, handle all the bank business, investment

11   portfolios.  I oversee all the facility's plant

12   maintenance, safety.  I'm also corporate compliance

13   officer.

14     Q.   Could you describe Frisbie for the Court?

15     A.   Frisbie is a small acute care general hospital

16   licensed for 112 beds.  We also have a specialty unit

17   for geriatric psychiatry which is a ten-bed unit.

18     Q.   What is its primary service area?

19     A.   Primary service area is the Rochester,

20   Farmington, and Milton area.

21     Q.   And what's its extended primary service area?

22     A.   Through Somersworth, the Berwicks, Barrington.

23     Q.   On the easel in front of you is a table that

24   we used -- we used it once earlier today from

25   Exhibit 50, and it's the state's calculation of the

1    Medicaid population.  Is the area located for Rochester,

2    is that where Frisbie's extended service area is?

3         A.   Yes, it is.

4         Q.   And for the record, what is the percent of the

5    total population that's Medicaid enrolled in Rochester?

6         A.   16 percent.

7         Q.   And the total number is what?

8         A.   7,238 Medicaid patients.

9         Q.   What does that suggest to you about the

10   general demographics of that primary service area?

11        A.   It is very much a blue collar community.  They

12   have been hit by Cabletron leaving, Thompson Center Arms

13   going out.  They have had -- it's a tough economic

14   community.

15        Q.   How long have you been there?

16        A.   I have been there for 19 years in July.

17        Q.   How long have you been involved in healthcare

18   administration?

19        A.   Since '77, so 34 years.  33 years.

20        Q.   What is the mission of Frisbie Memorial

21   Hospital?

22        A.   To provide safe, effective, efficient,

23   equitable, timely patient-centered care to everybody in

24   the community.

25        Q.   Has anything changed or made changes as a

1   result of funding decisions by the State of New

2   Hampshire?

3        A.    Unfortunately, yes, it has.

4        Q.    Would you describe, please, what you're

5   planning for at Frisbie?

6        A.    Because of the cuts that we are now

7   experiencing with Medicaid, specifically the Medicaid

8   Enhancement Tax that we just had to pay our $4 million,

9   we have had to change our charity care policy.

10  Previously it was 300 percent covered in full.  It is

11  now down to 200 percent with a sliding fee scale, which

12  we have never done historically.

13        We have had to change our staffing emergency

14  room which will be effective in March.  We are actually

15  going from having three full-time physicians onboard

16  24 hours down to two.

17        We are capping our primary care adult services

18  on our employed physicians at a seven percent level.

19  We've looked at what we have for volumes in each

20  practice.  We've decided that seven percent is about as

21  high as we can go and still grandfather in existing

22  patients, which means that we are closing six providers

23  in the community leaving only three open for potentially

24  new patients.

25        We have had to make the decision that we

1  cannot -- we can no longer support a thoracic program at

2  the hospital and have notified the physician that we

3  will not be renewing his contract.  So that Medicaid

4  patients seeking thoracic surgery -- or thoracic

5  services in Rochester will now have to seek services

6  somewhere else.

7           We had a -- our oncologist was traveling up to

8  Huggins in Wolfeboro a couple times a month to see the

9  patients up there so they wouldn't have to travel.

10  We've had to stop that as well and he's now home-based

11  at Frisbie.  They will either seek services elsewhere or

12  they'll now have to drive the hour to come down and see

13  the doc down here.

14      Q.   In the 19 years that you've been at Frisbie,

15  have you ever previously determined what services would

16  be provided to a patient based on payer class?

17      A.   When I first got to Frisbie in '93, I was

18  coming over from Exeter Hospital, where I had worked for

19  five and a half years before that.  Frisbie was and

20  still is a very tough community.  It is not well-endowed

21  in many senses.  Working with my staff down in the ED it

22  was pretty obvious that the way that they treated

23  patients was not equitable.  On every patient wristband

24  they had a big mark as to what they had for financial

25  class, and it was not a surprise that Medicaid and

64

1    self-pay patients were treated differently than the

2    others.

3                Within the first week I had those removed.   I

4    had the financial class taken off the patient's sticker

5    which is on the face sheet of all the charts to the

6    chagrin of many of the physicians who didn't like it,

7    but that's because we believed strongly at the time, and

8    still do, that regardless of your ability to pay, you

9    should be treated the same.  And to put hospitals in the

10   position today that we have to start making economic

11   decisions based on whether they have Medicaid or

12   self-pay patients, whether they have any coverage at

13   all, is wrong.  You're hurting patients that you don't

14   see, that you don't hear from, and it's wrong.

15        Q.   Are you familiar with the changes in financing

16   for the State of New Hampshire from state fiscal year

17   '11 to '12?

18        A.   Yes, sir, I am.

19        Q.   Would you summarize for the Court the total

20   amount of UCC payments, uncompensated care payments,

21   that Frisbie Memorial Hospital received in 2011?

22        A.   $8,181,669.

23        Q.   And are you scheduled to get anything in this

24   fiscal year?

25        A.   No, sir, we're not.

1        Q.    What about the next fiscal year?

2        A.    No, sir.

3        Q.    What have you done to deal with that loss of

4   payment in addition to what you've described?

5        A.    We have gone through cost reductions on

6   contracts.  We have outsourced all of our facility

7   maintenance housekeeping staff.  We have reduced the

8   staffing on all of our med/surg floors.  We have changed

9   group buying services from one to the other, which

10  causes some problems internally, but there are some

11  savings that -- enforced savings that will come out of

12  that.  As I mentioned, the killing of the thoracic

13  program.

14       Q.    Can I turn your attention to the capping of

15  the primary care practices that you described?

16       A.    Yes.

17       Q.    Have you tried to calculate the number of

18  Medicaid patients you believe will be impacted by that

19  decision?

20       A.    Looking at just the last six months and trying

21  to identify those adult acute care patients coming in to

22  our primary care practices, we're probably talking about

23  300 new Medicaid patients a year that are going to have

24  to find services elsewhere.

25       Q.    And what specific services will they not be

1   able to get through Frisbie?

2       A.   You get a sore throat, you now end up going to

3   the ED.  You've got an ear infection, it's the ED.  You

4   go in and they're going to treat you as the acute visit

5   that it is.  It's not that they're going to give you a

6   30-day prescription.  They're going to give you enough

7   medication to last you 24, 48 hours with the instruction

8   to go see a primary care physician.  So it's not

9   long-term treatment of an illness, it is the acute

10  episodic illness that they'll treat, and they'll turn

11  them out into the market.

12      Q.   Sir, before the total of uncompensated care

13  payments were taken out of the budget, were you part of

14  any process run by the State of New Hampshire to assess

15  the impacts that that loss of funding would have at

16  Frisbie?

17      A.   No.

18      Q.   Did anybody from the Department of Health and

19  Human Services make an inquiry at Frisbie about what the

20  impacts would be for Medicaid patients by their reduced

21  funding?

22      A.   No, sir.

23      Q.   Are you aware of any analysis done by the

24  State of New Hampshire to determine how access for

25  Medicaid patients would be impacted by the loss of the

1    $130 million for these ten hospitals?

2        A.    No, sir.

3        Q.    Would you look at the exhibit that's in front

4    of you, sir, which has been marked as Exhibit 75 for ID.

5    Do you recognize that document?

6        A.    Yes, I do.

7        Q.    What is it?

8        A.    Those are the reductions by category for

9    Frisbie for years '08 to 2000, projected '13.

10       Q.    There are three categories identified for

11   which there is some financial impact at Frisbie?

12       A.    Yes.

13       Q.    And these are the same categories that have

14   been discussed in other testimony today?

15       A.    Yes.

16       Q.    With regard to the inpatient rates -- well,

17   let me just summarize.  With regard to those three

18   categories identified on this Exhibit 75, what is the

19   total impact for the period 2008 through 2013?

20       A.    Inclusive of the projected upper payment limit

21   it was 15,935,587.

22       Q.    Okay, and if you exclude the upper payment

23   limit which is factored in Exhibit 63 and 64, what is

24   the total impact at Frisbie?

25       A.    $11,611,732.

1        Q.    With regard to these category cuts, were you

2   aware of any public process for state plan amendments to

3   assess the impact of those reductions at Frisbie?

4        A.    Not that I know of.

5        Q.    Were you aware of any assessment by the State

6   of New Hampshire to determine what the impacts would be

7   at Frisbie for those categorical cuts?

8        A.    No.

9        Q.    Mr. Marzinzik, what else is on the table for

10  consideration at Frisbie in the event that changes you

11  have made already are not sufficient to deal with the

12  financial circumstance you've described?

13       A.    We have to go back and look at whether or not

14  we're going to be talking layoffs again.  Whether we

15  will be eliminating more services at the hospital,

16  whether we can afford to keep all practices open, the

17  times we do.  It's a general across-the-board slash and

18  burn at that point.

19            I mean, it is not that we haven't already --

20  when they arbitrarily reduced the rates back in '08,

21  '09, at that point in time when they put us in the

22  position, we had to go borrow money from our line of

23  credit for the first time in 18 years; that we had at

24  that point laid off 25 people, reduced the hours of

25  another 106, froze all wages for over a year.  We

1   stopped the funding of the 403(b), our pension plan, for

2   our staff.  We outsourced people then.

3            We recovered enough over the year to pay our

4   bills.  We were forced -- we went into technical default

5   on our bonds.  We have since over this past year come

6   out of that technical default.  But these payments, we

7   can't afford these kind of -- it will put us back in

8   technical default again.

9        Q.   What are the implications of a technical

10   default?

11       A.   Because of the nature of the bond agreement

12   that we have, it's called a swap agreement, that if we

13   go into technical default, we have to fund what they

14   call the mark to mark, the variability of the bond's

15   collateral if you will.  We will need to put

16   $6.8 million into Bank of America's bank as collateral.

17   By doing that, it takes our ability to use those funds

18   for any emergency that we have out of play.  It is not

19   available to us.

20       Q.   So in addition to the lack of the funding, you

21   have money that you can't touch for servicing

22   obligations; is that a fair statement?

23       A.   That's correct.

24       Q.   Why are you doing all of the things that

25   you've described here today?

1      A.   We feel very strongly about our community.

2   When we did an addition to the building in 2008 to

3   modernize the facilities we offered to the community, we

4   went all private rooms for efficiency reasons, if

5   nothing else, which we do not charge any higher premium

6   for the private room to any patient.  Again, to be

7   treated the same, with the same dignity and respect that

8   we do every day.  And we worked hard at making sure that

9   every patient that comes in our doors are treated the

10   same, the same respect.  We're polite.

11      So that it's an incredibly friendly hospital

12   and that is what we've maintained, and we try to keep it

13   as part of the community so the community feels very

14   welcome, whether they're visiting patients, whether

15   they're coming in for lunch, whether they're just coming

16   in to visit somebody or shop in the gift shop.  We try

17   to make it and be a very interactive part of the

18   community.  We've had those goals.  We've built a strong

19   facility.  We have a check and balance sheet.  We have

20   done some amazing things for our community and we're

21   very dedicated to our community, and that's being torn

22   apart.

23      Q.   What's necessary in order to reverse the

24   decisions that you've made?

25      A.   If the state would adequately fund their share

1 for just their patients.  We no longer have the ability

2 to cost shift.  When the state is paying less than what

3 it costs -- if I buy a pill for a dollar, they're paying

4 me 50 cents.  So somebody else has to pay that extra 50

5 cents.

6     Historically, you go back 10 or 15 years and

7 there was maneuverability within the negotiation of the

8 commercial insurance contracts, who probably paid $1.30

9 for that pill to help fund those patients that couldn't

10 afford it.  It was their way of paying part of your

11 uncompensated care and your bad debts in the community.

12     Contracts today are capped.  So we're allowed

13 maybe a three to a four percent rate increase that we

14 can pass on to the insurance companies.  Anything else

15 we eat.  We have to absorb it into our system.

16     The subsidy that we pay for our employed

17 physicians, we subsidize our employed physicians to --

18 in this past fiscal year ending 9/30/11 some $890,000,

19 and that's not including any fringe benefits for the

20 staff.  That's just direct costs to those practices.

21 That's an $890,000 loss which we absorb and really fund

22 through the hospital.  In the end it's just one pot of

23 money, and however you divide it up and toss it back and

24 forth, the bottom line is the bottom line.

25     MR. O'CONNELL:  I have no further questions.

1           THE COURT:  I have a question.  I'm not sure I

2    can even articulate it properly, but these numbers -- I

3    asked you about the percentage rates, but I assume what

4    you're driving at here is that the reduction in rates

5    applicable to Medicaid patients is causing this problem,

6    but you always throw in the tax, the MET.  That's not

7    technically a Medicaid reimbursement rate, is it?

8           MR. O'CONNELL:  I can address that to the

9    Court --

10          THE COURT:  Please.  Thank you.

11          MR. O'CONNELL:  You're right to observe that

12   they're related, but they are distinct.  The projected

13   MET still has to be paid.  It used to be offset by

14   payments, and so now that's just a revenue payment on

15   the bottom line that's --

16          THE COURT:  It's a tax.

17          MR. O'CONNELL:  It's an old tax.

18          THE COURT:  Used to be reimbursed but now it's

19   collected.

20          MR. O'CONNELL:  It used to be neutral.

21      Q.  In fact, Mr. Marzinzik, would you explain to

22   the Court from 1993 until 2010, what was the impact on

23   hospitals financially for payment of the MET?

24      A.  There was zero impact.

25      Q.  Could you describe why?

1       A.    Certainly.   The way the methodology worked,

2  and it goes back to a letter that the Senate gave to the

3  Hospital Association, said that we have a way of getting

4  additional federal funds on the state budget, but it is

5  our intent to hold you harmless, and I think that letter

6  is public information.

7            The way it would work is they would determine

8  what their tax is going to be and our net patient

9  service revenue, which they very loosely defined in

10  those days.   It didn't matter because we tried to help

11  the state get it as high as possible so they would get

12  more matching funds.   They would tax the hospital in

13  theory, but it always turned out that at the same time

14  once they determined what the tax was going to be, they

15  would make a determination as to what the DSH payment,

16  the disproportionate share payment, was to the hospitals

17  and, lo and behold, they were exactly the same.

18           The way it worked is they would wire the DSH

19  payment into our bank account and we had 15 minutes to

20  turn around and wire it back to the state.   So I believe

21  they funded the first hospital, went through the

22  transfer, second hospital, went through the transfer.

23  So they are using one pot of money to recycle it all the

24  way through so they could turn around to the federal

25  government and receive their matching share.

1           THE COURT:  And you're going to relate that to

2     Medicaid.

3           MR. O'CONNELL:  I'm going to relate that right

4     now.

5        Q.   Can you describe what Exhibit 93 is?

6        A.   That is the history of the MET/DSH payments to

7     the general fund.

8        Q.   Now, the red line on the bottom is a net to

9     hospital that you were just describing.  That's flat

10    from '93 until 2010, when it spikes up, and there is a

11    net payment to the hospital; right?

12       A.   That's correct.

13       Q.   And then it drops to the floor?

14       A.   That's correct.

15       Q.   Now, that happens at the same time -- that gap

16    happens at the same time the state makes the decision

17    not to make UPL or DSH payments; isn't that true?

18       A.   That's correct.

19       Q.   So you have two things that are colliding that

20    affect your bottom line at Frisbie and the other ten

21    hospitals are having at the same time; isn't that true?

22       A.   Yes, sir.

23       Q.   You have a change of administration of a tax

24    that used to be neutral that is no longer neutral; is

25    that fair to say?

 1        A.   That's correct.

 2        Q.   And in fact in 2011 it actually got good for

 3   the hospital.  There was a net payment from the state in

 4   UPL addition $8.2 million.  And that's shown on Exhibit

 5   No. 93 where there's that little blip when things got

 6   better.  True?

 7        A.   Yes, sir.

 8        Q.   And then in 2012 the bottom falls out of this;

 9   is that true?

10        A.   Yes, sir.

11        Q.   Now, that top blue line is the amount that has

12   been moved to the general fund; isn't that true?

13             MS. LOMBARDI:  Objection.  I've let it go for

14   a while, but it's getting very leading.

15             THE COURT:  I'll take it as argument, but just

16   inform me.

17             MR. O'CONNELL:  I would say that the actual

18   numbers are from state's Exhibit 49, and it shows that

19   $1.8 million has been moved from 1991 to 2011 into the

20   general fund.

21             THE COURT:  The first numbers are actually I'm

22   finding a little easier on the issue that I think we're

23   here to decide, and so I mean -- I posit the following

24   argument:  The reduction in Medicaid rates that you're

25   talking about don't give rise to any irreparable injury

1   here that would warrant injunctive relief.  Why?

2   Because that's not the reason that Medicaid services are

3   being curtailed for Medicaid patients.  The reason is

4   because the state's decided to actually collect the tax

5   and not rebate the amount of the tax to make it neutral.

6   And what's your response to that?

7          MR. O'CONNELL:  Yes, your Honor.  Well, the

8   response is that the state absolutely has the right to

9   do that.  It has to go through a public process getting

10   state plan amendment on file where everyone has the

11   opportunity to get their input in and file it and get it

12   approved --

13          THE COURT:  With respect to what?  Not the

14   tax.  The DSH payment maybe.

15          MR. O'CONNELL:  UPL, absolutely.  UPL is a

16   rate subsidy according to Mr. Lipman that is calculated

17   on the amount of services that makes up the difference

18   between what Medicaid pays and what Medicare pays.

19          THE COURT:  All right.  Go back and do that

20   again.

21          MR. O'CONNELL:  Yeah, sure.  Mr. Lipman's

22   testimony was that UPL is a form of rate enhancement.

23   And the way it's calculated is that you are looking at

24   the delta between what Medicaid would pay for the

25   services and what Medicare would, and you can do the

1   enhancement up to what Medicare would pay.  And that's

2   how UPL is determined and it's paid.  And the state

3   offered a plan amendment that said we're going to pay

4   this on an ongoing basis.  Didn't do it for this year,

5   and after they defunded it issued a state plan

6   amendment.  You're going to hear about that from the

7   state witnesses.  They did it after the fact.  No public

8   comment, no (30)(A) issues, no looking at the impact on

9   patients by taking that money, which is rates, away.

10  State says UPL is not rates.  That's going to be a legal

11  question for you to determine.

12          THE COURT:  And the tax is not an issue then

13  in your view.

14          MR. O'CONNELL:  It's just a revenue impact.

15  It's a historical anomaly that happens at the same time

16  these are taken out.  So I will say it this way.  When

17  you're trying to determine whether you're paying a fair

18  wage to enlist enough providers to provide the services

19  in the market, the 38 standard, you've got to look at

20  the impact of your scheme on the providers.  And the

21  state never did a public process to look at the

22  implementation of the MET that historically had been

23  neutral in the change to say how is this going to affect

24  the --

25          THE COURT:  Why does the MET have to go

1   through that process?  The MET is simply an imposition

2   of a state tax.

3           MR. O'CONNELL:  It's just a relevant issue as

4   to what they have -- if they're going to have to pay

5   that, it comes off the bottom line and they can't

6   cross-subsidize, and they're going to take UPL out,

7   well, then you have the circumstance --

8           THE COURT:  You mean they have to consider it

9   in the sense that they're deciding what the UPL will

10  be --

11          MR. O'CONNELL:  Yes.

12          THE COURT:  -- and that's a function of that.

13          MR. O'CONNELL:  It's a function of how they

14  can afford to provide the services and is it sufficient

15  to enlist enough providers to make it equal --

16          THE COURT:  Because under the circumstances

17  that we are going to now collect this tax, now the UPL

18  looks different.

19          MR. O'CONNELL:  Exactly right, thank you.

20  It's relevant only in that respect, your Honor.

21          THE COURT:  Appreciate it.  Thank you.

22          MR. O'CONNELL:  Exhibit 93 is taken from data

23  that is a full exhibit, Exhibit 49, and I'd offer it at

24  this time.

25          THE COURT:  Any objection?

1          MS. LOMBARDI:  Which exhibit?

2          MR. O'CONNELL:  This is the graph.

3          MS. SMITH:  There's been no foundation for it.

4          MS. LOMBARDI:  Yeah, I object.  This witness

5    did not produce this.  Foundation.

6          MR. O'CONNELL:  The data is coming from the --

7    well, okay.  That's fine.  We'll use the state witness

8    then.  Thank you, your Honor.

9          THE COURT:  Thank you.

10          MR. O'CONNELL:  Nothing further from me, your

11   Honor.  Thank you.

12          THE COURT:  Attorney Lombardi?

13                    CROSS-EXAMINATION

14   BY MS. LOMBARDI:

15      Q.   Hi, Mr. Marzinzik.  I hope I got that right.

16      A.   Yes, you did.

17      Q.   If you could please turn to Plaintiffs'

18   Exhibit 75.  I think it might be up there with you?

19      A.   Yes.

20      Q.   You testified about that a few minutes ago?

21      A.   Yes, I did.

22      Q.   And that includes the upper payment limit that

23   was just being discussed?

24      A.   Um-hum.

25      Q.   The 2010 payment of the upper payment -- the

80

1    upper payment limit payment made in 2010, is it your

2    understanding that that was a one-time payment?  It was

3    intended as a one-time payment because the availability

4    of RA funds that year?

5         A.   No, my understanding was that that was

6    something we were going to receive going forward.

7    That's what the state plan amendment said.

8         Q.   That's your understanding?

9         A.   Um-hum.

10        Q.   You also testified about your primary care

11   offices instituting a seven percent cap on Medicaid

12   patients?

13        A.   We are allowing up to seven percent Medicaid

14   patients in a physicians panel.

15        Q.   And how are you going to track that, where

16   Medicaid patients often go on and off of Medicaid?

17        A.   It's just another bookkeeping situation that's

18   been imposed on us that we will count.  We have

19   methodologies.  We have a system already determined and

20   set up to count patients by payer class.  They will be

21   reviewed monthly and they'll be turned on or off at the

22   beginning of every month.

23        Q.   In general, you do not expect to make a profit

24   off of Medicaid patients; correct?

25        A.   No, I do not.  When they only pay 50 percent

1    of cost that would be quite a challenge.

2         Q.    And in fact you lose more on Medicare

3    patients; correct?

4         A.    No.

5         Q.    You do lose on Medicare patients though also;

6    correct?

7         A.    Are you talking inpatient, outpatient or

8    physician practices?

9         Q.    All of the above.

10        A.    There are some situations depending on -- if

11   you're talking annualized in a year, that would be a

12   true statement.  It comes close to covering costs on the

13   physician side.  On the inpatient/outpatient we do lose

14   some margin on Medicare, that's true.  Not to the extent

15   that we lose on Medicare (sic), but it's quite a bit.

16   The loss on Medicaid patients is quite a bit higher than

17   we have in Medicare.

18        Q.    But there are other areas that you have lost,

19   not simply Medicaid?

20        A.    True.

21        Q.    And you testified about a number of changes

22   that might occur in the future.  Are you aware that

23   managed care may be implemented?

24        A.    And that's a problem, that's correct.

25        Q.    But if managed care is implemented, then these

1    rates that we're discussing could change; correct?

2         A.   Well, I have talked with six out of the seven

3    companies that proposed -- that made a proposal to the

4    state to be awarded the contract on receiving the

5    Medicaid managed care program, of which they did not

6    know what the rates were yet.  I believe that the state

7    put into their budget that they hope to save $16 million

8    by outsourcing the Medicaid program to a Medicaid

9    managed care program.  And if they do that, my

10   assumption is that we're not going to be paid more if

11   the state is looking to save $16 million on top of what

12   they're not funding today.  That would be quite a trick.

13        Q.   But you don't know at this point what changes

14   will be made; correct?

15        A.   No.  I don't think the state does either.

16        Q.   And your hospital is a member of the New

17   Hampshire Hospital Association; correct?

18        A.   Yes, it is.

19        Q.   And they lobby on your behalf?

20        A.   Yes, they do.

21             MS. LOMBARDI:  I have no further questions.

22             THE COURT:  Any redirect?

23             MR. O'CONNELL:  I just need to correct the

24   record, your Honor.  I incorrectly referenced the source

25   data in Exhibit 93 for ID is a graph, and the source

1    data is a full Exhibit, 45.  We will take that up later.

2              THE COURT:  Did we strike the ID on 75?

3              MS. O'CONNELL:  If I didn't move to, I would

4    like to move -- I think I did.

5              THE COURT:  Any objection?

6              MS. LOMBARDI:  Which exhibit?

7              THE COURT:  75.

8              MS. LOMBARDI:  75?  No objection.

9              THE COURT:  ID may be stricken on Plaintiffs'

10   75.

11             (Plaintiffs' Exhibit 75 admitted.)

12             MR. O'CONNELL:  Nothing further.

13             THE COURT:  Thank you, Mr. Marzinzik.  You may

14   step down.  I appreciate it.  You're excused.  And you

15   can call your next witness.

16             MR. MacDONALD:  Your Honor, the plaintiffs

17   call Kathleen Dunn.

18                       KATHLEEN DUNN

19        having been duly sworn, testified as follows:

20             THE CLERK:  Would you please state your name

21   and spell your last name for the record.

22             THE WITNESS:  Kathleen Dunn, D U N N.

23                    DIRECT EXAMINATION

24   BY MR. MacDONALD:

25        Q.   Ms. Dunn, good afternoon.  My name is Gordon

84

1    MacDonald.  I represent the plaintiffs in this lawsuit.

2    Could you please tell the Court your current job?  Where

3    do you work?

4         A.   I work for the Department of Health and Human

5    Services for the State of New Hampshire.  I'm the

6    director of the office of Medicaid business and policy.

7         Q.   And you're the state Medicaid director; is

8    that correct?

9         A.   I'm the designated state Medicaid director.

10        Q.   And how long have you been the state Medicaid

11   director?

12        A.   Since 2007.

13        Q.   And what are your duties as state Medicaid

14   director?

15        A.   I oversee a portion of the Medicaid program,

16   predominantly all acute care services, services that are

17   not long-term care related, and within that I'm

18   responsible for preparing budget documents, preparing

19   policy documents, dealing with client service issues,

20   etc.

21        Q.   How long have you been employed at the

22   Department of Health and Human Services?

23        A.   18 years.

24        Q.   And how long have you been involved in the

25   Medicaid program?

1          A.   On and off since the late nineties.

2          Q.   And I understand you're a nurse by training;

3    is that correct?

4          A.   I am.

5          Q.   As part of your duties as the state Medicaid

6    director, do you interact with the state legislature?

7          A.   I do.

8          Q.   And do you prepare testimony and testify

9    before the state legislature?

10         A.   I do.

11         Q.   I'd like to show you what's been marked as

12   Exhibit 49.

13              MR. MacDONALD:  May I, your Honor?

14              THE COURT:  Anytime.

15         Q.   Exhibit 49 appears to be a special -- or

16   Powerpoint presentation that was made to the senate in

17   April of 2011; is that right?

18         A.   That's correct.

19         Q.   And is this a document that you helped

20   prepare?

21         A.   Yes, it is.

22         Q.   And did you give testimony before the senate

23   on or about April 7, 2001?

24         A.   Yes, I did.

25         Q.   Okay.  We've reproduced two of the slides from

1   your testimony, and I'd like to have you either join

2   with me up here or look at the document in front of you.

3   Start with page 13.  And this is a page -- did you

4   prepare this page?

5          A.    I did.

6          Q.    And it is a page describing Medicaid provider

7   reimbursement rate setting and it lists some

8   requirements under a regulation, 42 CFR 447.252, and it

9   says that state plan includes -- include description of

10  the methods and standards used to set payment rates.

11  And is that your testimony today about what a state plan

12  must include?

13         A.    Methods and standards, yes.

14         Q.    And the state plan must allow parties to

15  understand the rate setting process, the items and

16  services that are paid through these rates; is that

17  correct?

18         A.    Yes, it is.

19         Q.    And it must describe how the state's share of

20  each type of payment is funded; is that correct?

21         A.    Yes, it is.

22         Q.    And you say there, e.g., legislative

23  appropriation.  What do you mean by that?

24         A.    Giving an example of the type of funding that

25  the -- concerned as to the state match to the federal

 1    matching dollars.

 2         Q.   Then it says Section 1902(a)(30), and we've

 3    been using the reverse here, (30)(A), requires payments

 4    for services to be consistent with efficiency, economy,

 5    and quality of care.  And you understand that to be the

 6    obligation of the state in reimbursing providers, don't

 7    you?

 8         A.   Yes, I do.

 9         Q.   Okay.  The state plan must include a detailed

10    description of the calculation of upper payment limits;

11    isn't that correct?

12         A.   Yes, it is.

13         Q.   And finally, Section 1902(a)(2) of SSA --

14    which is the Social Security Act; is that correct?

15         A.   Yes, it is.

16         Q.   Which authorizes the Medicaid program,

17    provides that the lack of adequate funds from state and

18    local resources will not result in lowering the amount,

19    duration, scope or quality of care, and service

20    available.  And you understand that to be the obligation

21    of the state, don't you?

22         A.   Yes, I do.

23         Q.   The next page, page 14, captioned, "Medicaid

24    Rate Reductions."  And it says that state plan

25    amendments for rate reductions.  Is a state plan

1     amendment required for a rate reduction?

2          A.   No, it is not.

3          Q.   When is a state plan amendment required?

4          A.   When you are changing the methodology that you

5     are utilizing to make a payment, if you are changing

6     criteria or standards for a provider type, if you are

7     adding or eliminating a benefit.  Those are examples.

8          Q.   If you're changing the methodology that the

9     state is using to pay providers, that requires a state

10    plan amendment, doesn't it?

11         A.   The methodology, yes.

12         Q.   While we're on the subject of plan amendments,

13    I'd like to show you what's been marked as Plaintiffs'

14    3.  I believe it's a full exhibit.  And I'd like to ask

15    you to take a look at the second page of that exhibit.

16    Do you recognize that document?

17         A.   Yes, I do.

18         Q.   And is that part of the New Hampshire state

19    plan?

20         A.   Yes, it is.

21         Q.   Let's just orient ourselves on what the state

22    plan is and what it looks like, if you will.  Let's go

23    to the bottom of the document and start on the left-hand

24    side, and it says TN Number.  T N, N O, period.  Do you

25    see that?

1        A.   Yes, I do.

2        Q.   And that stands for transmittal number; is

3   that correct?

4        A.   That's correct.

5        Q.   And that transmittal number is the number

6   assigned by the state when it submits a state plan

7   amendment to CMS; is that correct?

8        A.   That's correct.

9        Q.   Okay.  And below that it says:  Supersedes TN

10  number, in this instance, 90-11.  So that this document

11  supersedes a prior version of this part of the state

12  plan; is that correct?

13       A.   That is correct.

14       Q.   And then back to the transmittal numbers, that

15  first digit I assume represents the year in which the

16  transmission is made?

17       A.   Yes, it is.

18       Q.   In other words, in this case 1991, and then

19  the number's assigned, the number of the transmission in

20  that year; is that correct?

21       A.   Yes, it is.

22       Q.   Okay.  Then moving in the middle there is an

23  approval date, and in this instance it looks like it's

24  November 27th, 1992; is that right?

25       A.   That's what it says, yes.

1        Q.    Okay.  And the approval date means the date on

2   which CMS approved the state plan amendment; is that

3   correct?

4        A.    That's correct.

5        Q.    All right.  And then on the right-hand side is

6   the effective date, and in this instance it's

7   November 1st, '91; correct?

8        A.    That is correct.

9        Q.    And the effective date is something that the

10   state asks for when it submits a state plan amendment;

11   correct?

12        A.    That is correct.

13        Q.    Now, let's go to the substance of this

14   particular plan amendment.  And it says that the plan

15   will be amended whenever necessary to reflect new or

16   revised federal statutes or regulations or material

17   change in state law, organization, policy, or state

18   agency operation; is that correct?

19        A.    That is correct.

20        Q.    And that is the state's obligation in terms of

21   when it needs to amend the state plan; correct?

22        A.    This is the page that speaks specifically to

23   plan amendments.  I can't speak to whether there aren't

24   other parts of the state plan that also have information

25   regarding plan amendments.

1      Q.   Okay.  But you'd agree with me, wouldn't you,

2   that whenever there's a material change in state law,

3   the state needs to submit -- affecting the Medicaid

4   program, the state needs to submit a state plan

5   amendment; isn't that correct?

6      A.   For a material change in state law, yes.

7      Q.   Okay.  Back to page 14 of your April

8   testimony.  Public process requirements.  There is a

9   requirement under the state plan that there be a public

10   process associated with rate changes; isn't that

11   correct?

12      A.   No, that is not correct.

13      Q.   Okay.

14      A.   If the state plan amendment is submitted,

15   there is a public process.  The rate change does not

16   necessarily mean that you will be submitting -- the

17   state will be submitting a state plan amendment.

18      Q.   Is there a public -- requirement for a public

19   process associated with rate changes?

20      A.   Yes.

21           THE COURT:  He doesn't mean a plan amendment,

22   he means a public process.

23      A.   Yes, there is.

24      Q.   Okay.  Let's take a look at Plaintiffs' No. 7,

25   which actually was an exhibit to your affidavit.  I

1    believe it's a full exhibit.  Ms. Dunn, do you recognize

2    this document?

3         A.   Yes, I do.

4         Q.   It's a letter from Sally K. Richardson, the

5    director of CMS, and it's dated December 10th, 1997, and

6    it appears that it was issued immediately after the

7    repeal of the Borring (ph.) amendment, and when the

8    requirements of what's known as Section (13)(A) of the

9    Medicaid Act came into effect.  Would you agree with

10   that?

11        A.   Yes, I would.

12        Q.   Okay.  Let's take a look at the second

13   paragraph of this letter from Ms. Richardson, and it

14   describes what is required under Section (13)(A).

15   States must use a public process for determining rates.

16   States must publish the proposed and final rates, the

17   methodologies underlying the rates, the justification

18   for the rate.  It must give interested parties a

19   reasonable opportunity to review and comment on the

20   rates, methodologies and justifications, and the rates

21   must take into account the situation of disproportionate

22   share hospitals.  Do you understand that to be the

23   obligation of the state with respect to Section (13)(A)?

24        A.   I understand that that is the obligation as

25   outlined in this letter.

1      Q.   Okay.  Let's take a look at the next

2  paragraph, please.  And I want to pick up on the second

3  sentence of that letter.  It says HCFA -- and HCFA I

4  think we can agree is the predecessor agency to CMS; is

5  that right?

6      A.   Yes.

7      Q.   Okay.  HCFA would consider the state to be in

8  compliance with this provision if it elected to use a

9  general administrative process similar to the federal

10  Administrative Procedure Act that satisfies the

11  requirements for public process in developing and

12  inviting comments.

13          Now, Ms. Dunn, I hope we can agree that by

14  statute New Hampshire, or the legislature by statute,

15  has exempted Medicaid rates from the state

16  Administrative Procedure Act; isn't that correct?

17      A.   Could you please restate that?

18      Q.   Sure.  There is a statute which -- let me ask

19  you this way.

20          THE COURT:  Well, it's a question of law and I

21  understand that to be the case.

22          MR. MacDONALD:  Okay.

23      Q.   Is rate making subject to the state

24  Administrative Procedure Act?

25      A.   I'm sorry, I'm not able to answer that

1    question.

2              THE COURT:  It's no.

3              MR. MacDONALD:  Thank you, your Honor.

4         Q.   So in the instance that it is not, the letter

5    goes on to say that if -- this is the last line in the

6    third paragraph.  If a state public process is not

7    currently being applied to rate setting or does not

8    currently include a comment period, then the rate -- the

9    state would need to modify the process.  Do you see

10   that?

11        A.   Yes, I see it.

12        Q.   And then it turns you to enclosure two for

13   public process options, which are the options endorsed

14   by CMS.  And enclosure two appears on the bottom of page

15   2 of this exhibit.  Are you with me?

16        A.   Yes, I am.

17        Q.   Okay.  Let's just go through it.  States that

18   do not use their existing administrative procedures to

19   satisfy the public process requirement may use at their

20   option one of the public processes established in the

21   Federal Register.  It goes on, this allows the states

22   flexibility to design public process based on examples

23   of what we find acceptable.  Options which HCFA

24   considers acceptable and which states may elect to

25   choose include four options.

1          Now, my question to you is on option one, does

2    the Department of Health and Human Services of the State

3    of New Hampshire hold one or more public hearings at

4    which proposed rates, methodologies, and justifications

5    are described and made available to the public and time

6    is provided during which comments can be received?  Does

7    it hold one or more additional public hearings in which

8    final rates, methodologies, and justifications are

9    described and made available to the public?  My question

10   is whether the department has a procedure similar to

11   option one, and I believe the answer is no; isn't that

12   right?

13        A.   The answer is yes relative to submitting state

14   plan amendments.  In terms of rates, we need to go

15   through each individual rate so that I could respond

16   appropriately.

17        Q.   So your testimony is that there's a public

18   process whereby a state plan amendment is proposed and

19   the Department of Health and Human Services holds a

20   hearing?

21        A.   For state plan amendments, it depends on the

22   particular state plan amendment.  Our state plan does

23   not specify what that public process is.  In fact, CMS

24   has reinforced recently that they have allowed the

25   states to have flexibility in determining that.  In the

1   past --

2           THE COURT:  Just so I don't get confused, and

3   we have a finite amount of time in our lives, I think

4   what he's driving at is with respect to the rate

5   reductions, was there some process that was followed

6   that you're aware of?  Some public process, any public

7   process --

8           THE WITNESS:  Yes, your Honor.

9           THE COURT:  Can you tell me what it was?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  What is it?  What was it?

12          THE WITNESS:  Again, going through each of

13  the --

14          THE COURT:  Take one and just give me an

15  example.  What was the rate reduction, what was the

16  process.  Do you mind?  I know you mind, but I want to

17  cut through it.

18          THE WITNESS:  So you take, for instance, the

19  November 2008 patient reduction, that was actually a

20  rate reduction that had been started -- have

21  conversations about back in the beginning of 2008.

22  There was an exchange of information and letters between

23  the department and the New Hampshire Hospital

24  Association.  The Hospital Association had suggested

25  alternative methods to achieving the savings.  That item

1    -- so that happened in February.

2          In April we brought forward a fiscal committee

3    item to the Joint Legislative Fiscal Committee.  That

4    hearing took place, at which time the item was tabled by

5    the legislators because they wanted the department to go

6    back and try to work with the hospitals, again, to come

7    up with a plan to not have to do the outpatient hospital

8    rate reductions.  There were subsequent conversations

9    between Commissioner Toumpas, the governor, and

10   representatives from the Hospital Association.

11         When the -- at that point -- as we got into

12   the late summer it became clear that there wasn't going

13   to be a resolution.  So we put forward a fiscal item

14   that was heard on November 21st.  Prior to that item

15   going forward, we had communicated with the Hospital

16   Association, who historically has always represented the

17   individual hospitals, to confirm what the reduction was

18   going to encompass and how much it was going to be,

19   given that the item had been delayed from April to

20   November.

21         We then held -- the fiscal meeting was held.

22   There was a lot of conversation about -- questions

23   around rate setting and access.  The item was approved.

24         Following that we published what they call

25   remittance advices.  It's on the -- like the check that

1    goes to the hospital.  It's the remittance, and there's

2    almost like an explanation of benefits on the top of it.

3    We also sent -- I also signed individual letters to

4    every hospital notifying them of what their rate --

5    their new rate was going to be under that reduction.

6              THE COURT:  I'm sorry.  Thank you.

7    Q.    MR. MacDONALD:  What is the process?

8    A.    Pardon me?

9    Q.    What is the department's process?

10   A.    For what, sir?

11   Q.    For rates.  You have an obligation under

12   Section (13)(A) to have a public process.  Where is the

13   process that you have in place published?

14   A.    The rate changes generally are or have been

15   associated with a legislative change.

16   Q.    I'm sorry.  I'm asking about the existence of

17   a public process.  And it is a fact, isn't it, that

18   there is no written public process which the department

19   has which purports to comply with Section (13)(A); isn't

20   that correct?

21   A.    No, I don't agree with you.

22   Q.    What is the -- where --

23   A.    There is no requirement for us within our

24   Medicaid state plan to specify what the public process

25   will be.

1      Q.    Okay.  Does the department use a commission or

2    similar process in determining rates where meetings are

3    open to the public and final rates, methodologies, and

4    justifications are made available?  That's option two

5    from the CMS.

6      A.    We have used that and we've used it recently.

7      Q.    You haven't used it in any of the rates at

8    issue in this case; isn't that correct?

9      A.    I'm sorry.  I don't agree with you, sir.  We

10   had a group, a commission, it wasn't an official

11   commission, but it was a group that had legislators and

12   hospitals for the 2010 DSH program redesign.

13     Q.    Do you include a notice of intent to submit a

14   state plan amendment in newspapers of general

15   circulation and provide a mechanism for members of the

16   public to receive a copy of the proposed and final

17   rates, methodologies, and justifications underlying the

18   amendment and an opportunity which shall not be less

19   than 30 days prior to the effective date to comment on

20   the proposed rates, methodologies, and justifications?

21     A.    If we are submitting a state plan amendment,

22   we do follow this.

23     Q.    You allow a comment period of no less than

24   30 days prior to the effective rate.  That is your

25   testimony?

1        A.    To the proposed effective date.

2        Q.    Okay.  Now, the long answer you gave to the

3    Court related to a budget -- a rate cut which took place

4    in November of 2008; isn't that right?

5        A.    It was approved in November of 2008.

6        Q.    Okay.  And that cut that you described, or the

7    process if you will that you described, related to a cut

8    of outpatient rates from 81.24 percent to 54.04 percent

9    of allowable costs for non-critical access hospitals;

10   isn't that correct?

11       A.    That is correct.

12       Q.    And the rate cut was submitted to the Joint

13   Fiscal Committee on or about October 30, 2008; isn't

14   that right?

15       A.    The item was -- submitted back in April of

16   2008 was tabled.

17       Q.    The item to cut to 54.04 percent?

18       A.    No, sir.  It was the item to reduce the rate,

19   which at that time would have only had to have been

20   reduced to I believe 62 percent.

21       Q.    Okay.  So the April rate was only to

22   62 percent, and the October rate cut which was

23   eventually approved was to 54.04 percent; isn't that

24   right?

25       A.    That is correct.

1        Q.   And those are two different rate cuts; isn't

2   that correct?

3        A.   They are the same rate cut that had to be

4   adjusted because of the delay between July 1 until the

5   November fiscal item was approved.

6        Q.   The first rate cut was never approved; isn't

7   that correct?

8        A.   It was tabled.

9        Q.   I'd like to show you Exhibit 16.  Exhibit 16

10  appears to be a letter dated October 30, 2008, to

11  Representative Smith, who I think we can agree was the

12  chairman of the Joint Fiscal Committee at that time; is

13  that correct?

14       A.   That's correct.

15       Q.   And it appears that you -- your name is at the

16  end of the letter.  I'm not sure you signed it.  But did

17  you review and approve of this letter?

18       A.   Yes, I did.

19       Q.   Okay.  And on page 1 of the letter it recites

20  RSA 126-A:3 VII, and it was pursuant to that statute

21  that you were presenting this rate cut; isn't that

22  correct?

23       A.   That is correct.

24       Q.   Then page 2, first paragraph of text, second

25  sentence, you are telling the committee that the cut is

1   required to bring expected expenditures in line with the

2   appropriations for SFY 2009.  The department proposes to

3   reduce payments for hospital outpatient services by

4   33.48 percent, from the current 81.24 for Medicare

5   allowable costs to 54.04 percent of Medicare allowable

6   costs for non-critical access hospitals effective

7   retroactive to July 1st, 2008.

8              And the committee took up this proposal, and

9   I'd like to show you the testimony.  This rate cut was

10  to bring the amount that the department was going to

11  spend on outpatient rates in line with the amount that

12  had been appropriated; isn't that correct?

13       A.   It was done to bring in line what we had

14  projected for a total expenditure for that year.

15       Q.   It was to meet the requirements of your

16  budget; isn't that correct?

17       A.   Yes, and to meet the state law.

18       Q.   Exhibit --

19            THE COURT:  The rate was set to basically work

20  out to equal the amount of money available to you.

21            THE WITNESS:  That's correct, your Honor.

22       Q.   Exhibit 23 is the transcript of the hearing.

23  And you appeared and testified; is that correct?

24       A.   I believe, yes, I did, with Commissioner

25  Toumpas.

1      Q.   And page 38, this is exactly the point the

2   Court just made.  You had a colloquy with Senator Kelly

3   and -- bottom third of the page, Senator Kelly:  You

4   made a decision on that particular amount, that

5   percentage, so that you would balance the budget on that

6   line item.  And then you answered:  That is correct.

7   And that's what happened; isn't that right?

8      A.   That is what I answered, yes.

9      Q.   And you yourself --

10          THE COURT:  But is that in your view what

11   happened as well?  I know it's what you answered, but

12   the question is, is that really what happened?

13          THE WITNESS:  Yes, with the understanding that

14   when balancing the budget, it wasn't for the entire

15   budget, sir.  It was specific to outpatient hospital

16   line in the budget that has its own separate line.  I

17   didn't want to confuse --

18          THE COURT:  For Medicaid outpatient care?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21      Q.   Now, you viewed these cuts as drastic, didn't

22   you?

23      A.   I believe that that's what my testimony speaks

24   to.

25      Q.   You told the Joint Fiscal Committee that they

1   were drastic, and these cuts did not comply with the

2   state's obligation under Section (30)(A), did they?

3       A.   I'm not sure I used the word drastic, first of

4   all.  And in terms of complying with (30)(A), we

5   followed the exact same procedure that we had followed

6   -- or the state followed in 2005 when there was a

7   previous rate reduction to hospital outpatient services.

8   There was no state plan amendment filed.  The rate

9   reduction went through the exact same process that this

10  one did.  I was not there, so -- I was not the Medicaid

11  director, so I can't speak to who testified about the

12  impact of it.

13          And so my point is, sir, I'm trying to say we

14  followed the exact same process we followed in '05 and

15  did not receive to my knowledge any feedback, concern

16  voiced, letters, emails, phone calls that I'm aware of

17  from individual hospitals or the Hospital Association

18  saying that they didn't agree with how the 2005 cut was

19  implemented.  Consistent with that, we followed the same

20  procedure in '08.

21      Q.   Let's just -- so we're all on the same page

22  and we understand what's going on, the statute at issue,

23  1206-A:3 VII was enacted in 2005.  Can we agree to that?

24      A.   I would have to -- if it's a fact I'll agree

25  to it, but I don't have that in front of me.

1        Q.    But in 2005 there was a prior across-the-board

2    rate reduction effected under that statute which brought

3    the Medicaid outpatient rates for non-critical access

4    hospitals from 91.27 percent down to 81 percent; isn't

5    that right?

6        A.    Down to 84 and, sir, it does say in here

7    July 1, 2005.

8        Q.    Okay.  Now, let's go back to the 2008 rate

9    reductions.  These were effected because -- effected

10   under this statute, as we've already established, and

11   the state did not go through any process to determine

12   how the revised, reduced rates will comply with its

13   obligations under Section (30)(A); isn't that correct?

14       A.    I'm sorry, sir, could you restate that?

15       Q.    Sure.  Prior to the rate reductions approved

16   by the Joint Fiscal Committee on November 21st, 2008,

17   effective retroactive to July 1st, 2008, the state

18   didn't do any analysis about how that rate reduction

19   would impact its obligation under Section (30)(A) in

20   terms of providing for consistent -- I'm sorry,

21   efficiency, economy, and quality of care, and access to

22   care; isn't that correct?

23       A.    There was no specific study completed that I'm

24   aware of.

25       Q.    Okay.  And just on the point of your

1    characterization of the rates, I just turn you on

2    page 23 -- Exhibit 23, I'm sorry, page 48.  You had a

3    colloquy with Representative Kirk and you were answering

4    his question, and it's your first answer on that page.

5    I believe that is what should happen because of the

6    sensitivity around the fact that we are drastically

7    reducing outpatient hospital rates.  Isn't that what you

8    told Representative Kirk?

9         A.   Yes.  Thank you for refreshing my memory.

10         Q.    You're welcome.  The commissioner also

11    appeared and testified with you, and I'd like to direct

12    your attention to page 54 of the testimony.  And it's a

13    colloquy that Commissioner Toumpas had with

14    Representative Kirk.  Representative Kirk -- I'm not

15    going to read the whole thing, but at the end of his

16    statement he asks -- he says, quote, but there is

17    another way.  The hospitals could absorb this out of

18    their surplus.  So the question I'm asking is, do we

19    know if the hospitals have sufficient surplus to absorb

20    this kind of cut, or will they in fact have to cost

21    shift it just to maintain, at least for the nonprofit

22    corporations, at least to break-even financial position?

23    And the commissioner answered that you did not have

24    access to the data on hospital finances; isn't that

25    correct?

1    A.   He states that we did not have the projections

2    on a hospital by hospital basis in terms of what it

3    would mean to their operating margin in the past year.

4    That's correct, we do not have access to that

5    information.

6    Q.   And you didn't consider it, therefore, in

7    recommending this across-the-board 33 percent cut; isn't

8    that right?

9    A.   No, we considered the information that we were

10   able to understand from an October 2008 report that was

11   presented publicly that was commissioned by the

12   Endowment for Health and looked at the financial health

13   of the hospital network in New Hampshire, individual

14   hospitals as well, by Dr. Nancy Kane.

15   Q.   You were obligated under the statute to make

16   an across-the-board cut, isn't that correct, regardless

17   of whatever the Kane report said?

18   A.   We were obligated to bring the item forward

19   for rate reduction, yes, sir.

20   Q.   Okay.  Now, there was no public notice of the

21   state's reduction of rates down to 54.04 percent 30 days

22   prior to their effective date which was July 1st, 2008,

23   was there?

24   A.   That would depend on how you define public

25   notice, sir, and I'm not trying to be flip.  There have

1    been conversations going on from the beginning of

2    January 2008 with the Hospital Association about what

3    the issue was, what the numbers look like, and there was

4    exchanges of letters both back and forth between the

5    department, and also the Hospital Association, with the

6    Governor's Office as well.

7         Q.   I'm asking about the rate reduction to

8    54.04 percent.  There was no public notice that the

9    state was going to reduce the outpatient rates to that

10   level 30 days prior to July 1st, 2008, was there?

11        A.   The hospitals knew about this back at the

12   beginning of the year.  You're asking if we held a

13   specific public hearing.  No, we go through the Joint

14   Legislative Fiscal Committee hearing process and that's

15   what we did, sir.

16        Q.   And let me -- you didn't know until October,

17   thereabouts, that you'd need to cut the rates down to

18   54.04 percent; isn't that right?

19        A.   No, we knew that there was going to be a

20   deficit.  Right after the beginning of every calendar

21   year, so January, we project out all of our costs

22   through the end of the fiscal year, which goes through

23   June 30th.  In January it was already apparent that

24   there was going to be a deficit in that particular line

25   item, plus others that have nothing to do with the

1    hospitals.  At that point there started the exchange of

2    ideas for how to close that gap between the department,

3    the governor, and the Hospital Association.

4         Q.    Well, I'm going to ask this one more time.

5    The specific rate cut that the joint legislative

6    committee approved on November 21, 2008, was not subject

7    of a public notice 30 days prior to its effective date;

8    isn't that correct?

9         A.    Based on how you've asked the question, the

10   answer is yes.

11        Q.    Now, I'd like you to again on the testimony

12   flip back to page 47.  Okay.  Middle of the page as it's

13   on the screen, again another colloquy with

14   Representative Kirk.  He says:  Follow-up of an

15   additional question.  The statutory requirement in the

16   budget if there isn't enough money to pay the bill, you

17   cut back on the rate.  It's what's another version of

18   what we call budget neutrality.  Is that something that

19   requires modification to the state plan, and if so, has

20   that been obtained?  To which you respond:  It does not

21   require state plan amendment.

22             Now, that was not a correct answer, was it?

23        A.    I don't agree with that, what you just said.

24   It was a correct answer.  It did not require a state

25   plan amendment.  In subsequent conversations, both

1   letters exchanged between the Hospital Association and

2   CMS and our follow-up with CMS, there was no request to

3   file a state plan amendment by our federal officials.

4        Q.   I'm going to show you Exhibit 2.  Now,

5   Exhibit 2 was submitted in this case as part of an

6   affidavit by one of your colleagues, Diane Peterson.

7   And it is, as I understand it, a compendium of state

8   plan amendment pages relating to outpatient services.

9   Would you agree with that?

10       A.   That's what it looks to be, yes, sir.

11       Q.   Okay.  Could you please turn to the page, the

12   approved state -- the approved page pending -- strike

13   that.  To the page governing outpatient reimbursement

14   which had been approved by CMS as of November 21st,

15   2008, and just tell me what page you land on.

16       A.   For the outpatient rate reduction?

17       Q.   Yes.

18       A.   We didn't submit a state plan amendment for

19   that rate reduction.

20       Q.   What was the methodology in effect at the time

21   the 2008 outpatient rate reductions were in effect?

22       A.   The methodology for what, sir?

23       Q.   Setting outpatient rates.

24       A.   For setting outpatient rates?  The rates were

25   set based upon -- I'm not sure if you're asking me to

1   talk about how cost rates reimbursement and how all that

2   happens.

3       Q.    No.   I'm asking you, as the state Medicaid

4   director, to point to me in the state plan where the

5   methodology exists as of November 21st, 2008, in terms

6   of setting outpatient reimbursement rates.

7       A.    The last approved page that I see in this

8   packet --

9             THE COURT:   No, he's saying if I wanted to

10  look at this and say what method do you use to set

11  outpatient reimbursement rates, what method would I

12  find?  What does it say?  How do you go about doing

13  that?

14            MR. MacDONALD:   May I, your Honor.  Had CMS

15  approved at the time they made these rate reductions --

16            THE WITNESS:   The rates were set based upon

17  the funding that was available --

18            THE COURT:   This isn't my field and I'm easily

19  confused.

20            THE WITNESS:   Yeah.  I am, too.

21            THE COURT:   So what he's really asking, what

22  I'd be interested in, too, is show us where the approved

23  methodology is in that plan for setting the rates as of

24  November 21, 2008.  What is it, where is it, how do I

25  see that?  I ask myself, gee, what's the methodology for

1    setting outpatient Medicaid reimbursement rate within

2    the state plan as of November 21, 2008.  What do I read

3    that's going to tell me what that methodology is?

4              THE WITNESS:  Looking at the last page that

5    was approved, sir, I don't see it specifically spelled

6    out.

7              THE COURT:  There is no methodology in the

8    state plan?

9              THE WITNESS:  It talks about the interim

10   payments that we make to the hospitals and how we do

11   retrospective cost based reimbursement based upon --

12             THE COURT:  But I'm a provider and I want to

13   know how you're going to set the rate.  And you agree

14   you have to put in the plan the methodology for setting

15   the rate, right, so I know what it is?

16             THE WITNESS:  Yes, you're right.

17             THE COURT:  I wouldn't find it in the state

18   plan?

19             THE WITNESS:  You wouldn't find it on the last

20   approved state plan page that CMS approved.

21             THE COURT:  I have no idea what that means.

22             THE WITNESS:  It means that the last time CMS

23   looked at this page and approved it, it was not

24   contained within this particular page.  It means that

25   there is a subsequent state plan amendment where further

1    clarification can and is made relative to methodology.

2              MR. MACDONALD:  May I, your Honor?

3              THE COURT:  Please.

4         Q.   BY MR. MACDONALD:  Let's just take this one

5    step at a time, and it is confusing.  Could you identify

6    for the Court the page that CMS had approved governing

7    outpatient reimbursement methodology as of

8    November 21st, 2008.

9         A.   It would be what is labeled at the top as page

10   6 of 57 of Plaintiffs' Exhibit 2.  I believe at the

11   bottom it says that the last transmittal number that was

12   approved was 87-7 and that there was a pending state

13   plan amendment that had been submitted.  So 87-7, that

14   means it was 1987.

15        Q.   I'm looking for the page that says approved,

16   not one that's pending.

17        A.   Then you have to turn to the page before then.

18        Q.   Okay.  And let's take a look at that page.

19   And just so we're all on the same page so to speak,

20   let's go down to the bottom of the page and again

21   starting on the left, it's transmission number 87-7; is

22   that correct?

23        A.   Yes, sir.

24        Q.   And that had been approved on November 5th,

25   1987?

1       A.   That's correct.

2       Q.   And it had an effective date of July 1st,

3   1987?

4       A.   That's what it says, yes.

5       Q.   Okay.  Now, let's go to the paragraph marked

6   outpatient hospital services.  And for the Court's

7   benefit, would you agree that that was the approved

8   methodology in place at the time of the 33 percent rate

9   reduction?

10      A.   Yes, it seems to be the approved page.

11      Q.   And you would agree with me that that

12  methodology does not support an across-the-board

13  33 percent rate reduction; isn't that right?

14      A.   Well, sir, it says -- I don't want to read

15  what it says here, but it reads to me that payment will

16  be made at the lowest charge determined, and it goes on

17  and then it ends with the lowest charge level determined

18  by the Title 19 state agency, which is the Department of

19  Health and Human Services.  That's how it was

20  interpreted.

21      Q.   Let's start at the beginning.  Payment is made

22  in accordance with the methods and principles developed

23  for reimbursement in such services for hospitals

24  participating in Title 18 of the Social Security Act.

25  And that refers to Medicare, doesn't it?

1        A.   It does.

2        Q.   And how are Medicare hospitals compensated?

3        A.   I can't answer that, sir, I'm sorry.

4        Q.   On certain medical services and supplies

5   designated by the secretary of Health and Human Services

6   -- we don't have secretaries in New Hampshire, do we?

7        A.   No, we do not.

8        Q.   Payment will be made at the lowest cost charge

9   level determined by the Title 18 agency for Medicare

10  covered services, and for Medicaid covered services the

11  lowest charge level determined by the Title 19 state

12  agency.

13            That language does not support a reimbursement

14  methodology where the director of the state Medicaid

15  program can come into the Joint Legislative Fiscal

16  Committee and recommend an across-the-board budget cut,

17  does it?

18       A.   Sir, you're asking me to compare this legal

19  language -- the state plan language along with the state

20  law, and I don't feel that I'm prepared to do that.

21       Q.   Okay.  But there's another complication to

22  this --

23            MR. MacDONALD:  And I'm sorry, your Honor, but

24  -- it's a bit complicated, but it's actually important.

25            THE COURT:  Can you do it in five minutes?

1           MR. MacDONALD:  I'll try.

2           THE COURT:  Well, we have our own budget

3   problems in the federal government and we have committed

4   to the United States Marshal that we would not carry

5   proceedings up to or beyond 5 o'clock because then he

6   has to pay overtime to the court security officers and

7   he runs afoul of his own budget restraints, so we're

8   kind of limited.  Do you want to do it tomorrow?

9           MR. MACDONALD:  Take a break.

10          THE COURT:  All right.  Why don't we adjourn

11  till tomorrow morning.  Is the schedule for 9:30?

12  9 o'clock all right?

13          MR. O'CONNELL:  Yes, your Honor.

14          THE COURT:  Why don't we do 9 o'clock.  Thank

15  you.

16          (Adjourned at 4:45 p.m.)

17

18

19

20

21

22

23

24

25

117

1

2                    C E R T I F I C A T E

3

4          I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skil

8    Submitted:  1/27/1  ─────────────────────────────

9                     **DIANE M. CHURAS, LCR, CM**
                     LICENSED COURT REPORTER, NO. 16
10                    STATE OF NEW HAMPSHIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25