**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4/26/12

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * *
                              *
DARTMOUTH-HITCHCOCK CLINIC,    *
et al.                         *
                              *  11-cv-358-SM
         v.                    *  January 13, 2012
                              *  9:15 a.m.
NEW HAMPSHIRE DEPARTMENT OF    *
HEALTH AND HUMAN SERVICES,     *
COMMISSIONER                   *
*
* * * * * * * * * * * * * * * *



Day 3, MORNING SESSION
TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

Appearances:

For the Plaintiff:    W. Scott O'Connell, Esq.
                      Gordon J. MacDonald, Esq.
                      Anthony Galdieri, Esq.
                      Emily Pudan Feyrer, Esq.
                      Nixon Peabody, LLP

                      William L. Chapman, Esq.
                      Orr & Reno, PA

For the Defendant:    Nancy J. Smith, Esq.
                      Laura E.B. Lombardi, Esq.
                      Jeanne P. Herrick, Esq.
                      NH Office of the Attorney General

Court Reporter:       Diane M. Churas, CSR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603) 225-1442

2

1                        I N D E X

2

3
     WITNESS:           DIRECT     CROSS      REDIRECT      RECROSS
4
     KATHLEEN DUNN
5
     By Ms. Smith                    6
6    By Mr. MacDonald                            57
     By Mr. Chapman                 70
7
     NICHOLAS A. TOUMPAS
8
     By Ms. Smith         79                    106
9    By Mr. O'Connell                89
     By Mr. Chapman                 104
10

11

12
     EXHIBITS:                               ID.    Evid.
13
     Defendant's Exhibit No. 202                      82
14   Defendant's Exhibit No. 203                      87

15

16

17

18

19

20

21

22

23

24

25

```
 1                    BEFORE THE COURT

 2            THE CLERK:  Court is in session and has for

 3    consideration a motion hearing in Dartmouth-Hitchcock

 4    Clinic versus the New Hampshire Department of Health and

 5    Human Services, Civil Case No. 11-cv-358-SM.

 6            THE COURT:  Good morning.

 7            MR. MacDONALD:  Good morning.

 8            THE COURT:  Under the Federal Tort Claims Act,

 9    sovereign immunity exception, you can only sue the

10    contractor.  Sorry.  But good luck.

11            MR. MacDONALD:  I need a good lawyer, your

12    Honor.

13            THE COURT:  What have you got?

14            MR. O'CONNELL:  Administerial issues, your

15    Honor?  We filed this morning a chart that you

16    requested.  We're going to file it on ECF just so it's

17    clearly part of the record.  We don't think it's an

18    exhibit per se because it's more argument.

19            THE COURT:  You did or you're going to?

20            MR. O'CONNELL:  We're going to.  We just

21    wanted to make that clear for the record.  And attached

22    to it are some demonstratives that lay out the timelines

23    since we're dealing with notice, the timeliness with the

24    three significant charges we've got, category

25    reductions, inpatient/outpatient and Rev Code 510, the
```

1    timelines attached with references to the exhibits that

2    we're relying on.

3            Secondly, during some questioning of the

4    expert yesterday you asked a pointed question of me, are

5    upper payment limit payments rates.  I researched

6    that --

7            THE COURT:  Rates for (13)(A) purposes.

8            MR. O'CONNELL:  Yes.  And the closest I can do

9    for you, your Honor, is to cite you for inpatient

10   services 42 CFR 447.272 defines -- the scope of that

11   section deals with rates set by the agency to pay for

12   inpatient services and then goes down to the detail,

13   that the payments that are made up to the upper payment

14   limit are part of the rate base.

15           The outpatient hospital reference would be 42

16   CFR 447.321 and the same thing.  It says that -- by

17   definition it says the scope, this section applies to

18   the rate set by the agency to pay, and it says the

19   payment up to the upper payment limit part of the rate

20   analysis, but there is no definition, if you will, other

21   than that for what an upper payment limit payment is,

22   and in fact the upper payment limit is indeed that, the

23   limit.  We've been referring it to UPL, but it's truly

24   the payment up to the limit.  I think that addresses the

25   question you were asking yesterday.

```
 1              THE COURT:  All right, thank you.  Ms. Smith.
 2              MS. SMITH:  Your Honor, we have also presented
 3    a chart to the Court this morning.  We have it marked
 4    for identification as Defendant's Exhibit 218.  There's
 5    a blowup of it up there.  I can give a small copy of
 6    it --
 7              THE COURT:  I do.  Thank you.
 8              MS. SMITH:  -- that we are using.  We have
 9    also submitted a revised exhibit list since we have
10    stipulated on the first day of the hearing I believe
11    that all of the declarations that have been attached to
12    the pleading up to this point can be marked as full
13    exhibits.  We had added those to our exhibit list as
14    full exhibits and submitted copies.  I believe that
15    Kathy Dunn was on the stand.
16              THE COURT:  Again, I apologize for the
17    continuous breaks in your testimony.  And do you still
18    have witnesses?
19              MR. O'CONNELL:  No, your Honor.
20              MS. SMITH:  They have called Ms. Dunn.  We
21    would have called her in our case as well, so I intend
22    to do all of my questioning now.
23              THE COURT:  And I just remind you, Ms. Dunn,
24    you're still under oath.
25              THE WITNESS:  Yes, your Honor.
```

6

```
 1                      KATHLEEN DUNN

 2                      CROSS-EXAMINATION

 3   BY MS. SMITH:

 4        Q.   Good morning.

 5        A.   Good morning.

 6        Q.   There is a chart to your left.  Also I'll put

 7   a copy of that that's a smaller version in front of you

 8   that's been marked as Defendant's Exhibit 218.  Did you

 9   assist in preparing this chart yesterday?

10        A.   Yes.

11        Q.   And can you tell us what it does?

12        A.   The chart presents a summary of the

13   plaintiffs' complaints and addresses the questions that

14   have been asked regarding dates and public notice

15   methods.

16        Q.   And so I would -- is this chart accurate, and

17   did you review it for accuracy?

18        A.   Yes, I did.

19             MS. SMITH:  I would ask the identification be

20   stricken.

21             THE COURT:  Any objection?  I'm treating it as

22   basically a memorandum.  I mean, it's argument.  It is

23   argument.

24             MR. MacDONALD:  Right.

25        Q.   Ms. Dunn --
```

1          THE COURT:  You understand what I'm saying.

2     I'm treating it as a ck praecipe of a memorandum

3     basically.  So in other words, it's not evidence

4     supporting any of the assertions in the page.  When you

5     go to the Court of Appeals don't be saying this is

6     evidence, in other words.

7          MS. SMITH:  Right.  So I want it to be in the

8     record and not returned to us as something that's just

9     been marked for identification.

10          THE COURT:  Sure.  You can go to the Court of

11     Appeals and say there's a nice summary of our position

12     in this exhibit, but it's not evidence.

13          MS. SMITH:  Correct.

14     Q.    Looking at the first line in this, can you go

15     through what that is and explain the information in the

16     boxes on this chart?

17     A.    Yes.  The first line reflects the

18     November 21st outpatient hospital reduction which

19     impacted the 13 non-critical access hospitals.  We've

20     talked about the drop in the rate there.  The date of

21     change was November 21st, 2008.

22          The next column is an SPA submittal.  There

23     was not -- it was not applicable.  If no SPA, was it a

24     rate change?  Yes, it was.

25          Public notice date was November 14th, 2008,

1    and that took the form of the fiscal committee agenda

2    which had been published in multiple locations, website,

3    etc.

4         Q.    The fiscal committee agenda is what we have

5    seen as Defendant's Exhibit 107; correct?

6         A.    Yes.

7         Q.    And I believe it's item eight on page 2.  Item

8    eight?

9         A.    Yes.

10        Q.    And now, in connection with that line, are

11   there other notices and requests for input that occurred

12   prior to what is listed here on this chart?

13        A.    Yes.

14        Q.    And can you tell us about those?

15        A.    Starting back in February of 2008 there was a

16   series of communications, letters, that went back and

17   forth between the department, the Hospital Association

18   and the Governor's Office regarding this particular

19   reduction.  The first time the fiscal item was submitted

20   was April of 2008, and at that point the fiscal

21   committee tabled the item because they wanted the

22   department and the Hospital Association to go back again

23   and see if some other solution could be worked out

24   rather than doing the rate reduction.  And as I noted

25   the other day, when it became clear that that was not

9

1    going to be a possibility, the department resubmitted

2    the fiscal item in October and it was heard on

3    November 21st, 2008.

4        Q.    So there had actually been prior notice of a

5    proposed rate reduction to outpatient that also went to

6    the fiscal committee back in April; right?

7        A.    Yes.

8        Q.    And if you would look at Exhibit 102.  This is

9    the fiscal committee agenda for that date, and if you

10   would scroll down, I think it's probably on the second

11   page -- it might be easier for you, is the container of

12   binders behind you?  If you can maybe find the paper

13   document in the binder and just point us to the agenda

14   item.

15       A.    102.

16       Q.    102.  I've just been told I'm having you look

17   at the wrong one, which would explain it.  It's

18   Exhibit 104.  I apologize.

19       A.    It is found on page 2, item No. 9 of the

20   agenda.

21       Q.    And prior to that April fiscal item going, had

22   there been any notice provided to providers that this

23   reduction was being considered?

24       A.    Yes, there was.

25       Q.    And can you tell us what notice had been

1    provided and what your knowledge is of discussions that

2    had gone on with the providers about the pending

3    reductions?

4         A.    There was, again, an exchange of -- the

5    Hospital Association was notified that this was going to

6    be -- that there was going to be a budget shortfall.

7    And then there was an exchange of letters where the

8    Hospital Association had suggested some alternative

9    options rather than making this rate reduction.

10        Q.    Just going back to the fiscal committee agenda

11   notices, these are published on the -- on a website;

12   correct?

13        A.    Correct.

14        Q.    So they're available to not just providers but

15   to whom?

16        A.    To the public.

17        Q.    So that would include Medicaid recipients?

18        A.    Yes.  In addition, this was also discussed at

19   the MCAC, or the Medical Care Advisory Committee.

20        Q.    And do Medicaid recipients have a seat at that

21   table?

22        A.    Yes, they do.

23        Q.    And do providers have a seat at that table?

24        A.    Yes, they do.

25        Q.    What did the department do -- what did the

1  department do to consider other options in what

2  reductions to make?

3      A.   The department looked at reducing --

4  eliminating optional Medicaid benefits.  We looked at

5  eliminating the pharmacy benefit to $1500 per person per

6  month.  We looked at eliminating home and community

7  based care services for the elderly and disabled.  We

8  had already reduced our administrative costs by either

9  eliminating contracts, reducing existing contracts, and

10 we also had a hiring freeze and started a number of

11 layoffs that have started in this time period and have

12 gone right through last month.

13      Q.   Okay.  So have we talked about -- we've

14 covered the first line on the chart and that's the

15 outpatient reduction that was requested; correct?

16      A.   That's correct.

17      Q.   Can you go to the second line of the chart and

18 explain to us what the information in the boxes and the

19 chart is intended to convey?

20      A.   The second line reflects the ten percent

21 inpatient reduction that was enacted on December 1st,

22 '08.  There was not a state plan amendment submitted.

23 It was considered a rate change.  And this was -- the

24 public notice date was November 21st, and this was part

25 of the governor's executive order that he released and

1   presented the same day as the November 21st outpatient

2   hospital reduction.  So the governor's executive order

3   was presented first and the fiscal committee voted on it

4   and then they went on to the regular agenda, which then

5   brought up this outpatient reduction.

6        Q.   And you've indicated in the public notice

7   method that it was -- that the public notice method is

8   the governor's website; correct?

9        A.   Yes, as well as it's also posted on other web

10  pages within state government.

11       Q.   And what was the effective -- what was the

12  date of the change?

13       A.   The date -- the executive order was approved

14  on November 21st.  It went into effect December 1st of

15  2008.

16       Q.   Was there any -- was the department consulted

17  by the Governor's Office before that governor's order

18  was requested at the fiscal committee about what

19  reductions could be made if the governor issued an

20  executive order requiring reductions?

21       A.   Yes.  We were asked to produce a list of

22  options for the governor to select what he was going to

23  include in his executive order.

24       Q.   And what did you -- what did the department do

25  in considering what to recommend?

1     A.    We looked at -- it wasn't just looking at the

2   Medicaid program.  We looked across the department at

3   all of the programs and there were -- there was a long

4   list of options presented, and again, I've mentioned a

5   couple of them that we talked about before in terms of

6   eliminating benefits and what have you, and then at the

7   fiscal committee meeting we became aware that that was

8   the position of the governor.

9     Q.    You described from your testimony a process

10  from February 2008 up through November.  Did you

11  consider any input that you had gotten from the

12  hospitals when you were making these recommendations and

13  requests?

14    A.    In reviewing their suggestions for

15  alternatives, we did consider them.  As I recall, there

16  were three specific recommendations that -- two of them

17  we had already considered and accepted and one of them

18  we weren't able to because it addressed revenue that had

19  already been counted.

20          Following this meeting with the inpatient

21  reduction we always post when there's a change on our

22  fiscal agent website so that notice -- there's notice

23  there.  We also ran what we call a banner page, like a

24  remittance advice.  I think I talked about that the

25  other day.  It's like a notice on the explanation of

1   benefits but it's attached to a check, a reimbursement

2   check.  And then for the outpatient we sent individual

3   hospital -- each hospital a letter outlining what that

4   change meant to their hospital.

5        Q.   Just to be clear, the outpatient reduction was

6   actually put into effect going back to the first of the

7   fiscal year in 2009; correct?

8        A.   Yes, it was.

9        Q.   So that's July 1st, 2008?

10       A.   That's correct.

11       Q.   But the reduction had actually first been

12   proposed, albeit at a different rate level, back in

13   April?

14       A.   Correct.  Because, again, I noted that the

15   conversation started back in February because when we

16   get to January of every fiscal year we then project out

17   the next six months and based upon that go back and

18   revisit the trends that we had used for the following

19   year in the biennium.  And at that time we knew that we

20   were going to run into a shortfall the following fiscal

21   year, which is why the first item went ahead in April.

22   So that it would have had from April to July to go

23   through the fiscal committee process approved for July.

24   We would have rolled it out in July.

25       Q.   Going to the third line.  Can you go through

1    that line on the chart again and explain what the

2    information on the chart represents?

3        A.   Yes.  The third line reflects the delay of

4    making the outpatient cost settlement payments.  That

5    date change was for January 1st of '10.  There was no

6    state plan submitted and -- because what we did is we

7    deferred -- delayed and deferred the payments.  So did

8    we consider it a rate change?  No, because we were still

9    considering what the payments may possibly be made, and

10   we did not do specific public notice on this other than

11   to alert the hospitals that the payments would be

12   delayed, but we ended up actually -- let me back up.

13          When we got into February we did provide

14   notice, but at that point we didn't know we were going

15   to have money.  Towards the end of that fiscal year we

16   made the 2010 cost settlement payment.  So any hospital

17   who had completed their settlements, those settlements

18   were paid.

19       Q.   When you say any hospital that had completed

20   their settlement, if I recall your testimony correctly.

21   It's actually not the hospital, it's the fiscal

22   intermediary who has to finalize the cost settlement

23   report before that payment was due; is that correct?

24       A.   That's correct.  The fiscal intermediary

25   finishes their analysis, and if there's any difference

1    between what the fiscal intermediary believes should be

2    the cost settlement versus the hospital, they give the

3    hospital notice that they can question their findings,

4    and then finally the fiscal intermediary finishes it and

5    finalizes the report.

6         Q.    So if we look at Exhibit 175, number five on

7    that published notice talks about deferring the payment

8    of the cost settlements in 2010; is that right?

9         A.    Yes.

10        Q.    But the testimony is that the cost settlements

11   were actually -- the ones that you had final reports for

12   were actually made for that fiscal year?

13        A.    Yes.

14        Q.    And then going down to the fourth line on the

15   chart, can you go through the same process and explain

16   the information presented in the boxes on the chart?

17        A.    Yes.  This number -- line four reflects the

18   discontinuing use of outpatient Revenue Code 510.  The

19   date of change was April 1st of 2010.  We did not submit

20   a state plan amendment and did not consider this a rate

21   change because the billing of that code was never

22   allowed under our state plan.  However, this was tied to

23   a set of federal regulations that had been announced by

24   CMS, and in our attempt to become compliant with the

25   federal regulations, which they ultimately rescinded, we

1  knew that we -- if we were going to be compliant with

2  the federal regulations, we would need to do a state

3  plan amendment.  So that's the process we started down,

4  so we ended up doing notice for that particular item.

5       Q.   And that's the asterisk that's down at the

6  bottom that this was originally part of TN 08-017, which

7  is in Exhibit 174; correct?

8       A.   Correct.

9       Q.   And going across that box, and going back to

10  Exhibit 175 that we have indicated on the chart, did

11  this published notice also give notice that the 510 code

12  was going to be discontinued?

13       A.   I'm sorry, counsel.  It's taking me time to

14  read through this and see --

15       Q.   I think we may have actually made an error in

16  a rush to compile this yesterday because I don't see any

17  specific reference to 510 on Exhibit 175.  But going

18  back to exhibit -- if we go back to Exhibit 174?

19       A.   This is the state plan that was submitted,

20  transmittal number 08-017.  This was -- outlines the

21  change was being done because at the time federal law

22  was changing, and so this was submitted and we went

23  through the standard state plan amendment, public

24  notice.

25       Q.   Going to page 2 in Exhibit 174 in that

1   transmittal letter --

2        A.   Yes.  The letter to Mr. McGreal?

3        Q.   Yes.  Do you indicate in that when public

4   notice of the SPA was given?

5        A.   Yes, we do.  We note the date December 5th and

6   -- for the newspaper notices, the two newspapers, and

7   then also notice to the providers who were impacted,

8   which would have been the hospitals on December 4th.

9        Q.   And if you look at page 5 and 6 of that

10  Exhibit 174, those are the notices, the actual published

11  notices that the 510 code was going to be discontinued?

12       A.   The notice on page 5 speaks to the federal

13  requirements.  It doesn't specifically list 510, but it

14  was the tied -- the federal requirements tied to Rev

15  Code 510.

16       Q.   So just to make this chart accurate, this

17  should be 574; is that correct?

18       A.   174.

19       Q.   174.  And this being -- is in 2008; correct?

20       A.   Yes.  I apologize for that error.

21       Q.   That's fine.  I didn't put in a specific day.

22  I just put 2008.

23            Going back to 174, the specific dates of that

24  notice was December 5 -- December 4 and 5; correct?

25       A.   That's correct.

1    Q.    Okay.  And had there been other -- had there

2    been other notice regarding how -- had there been other

3    notice to providers about the discontinuation of the 510

4    code?

5         A.    There was because it actually became a

6    discussion point with House Finance in March of 2009 and

7    there was exchange of letters between the state Hospital

8    Association and CMS regarding this particular issue, and

9    then the department worked with the Hospital Association

10   and representative members to look at the use of Code

11   510, and understanding that Code 510 wasn't allowed

12   within the Medicaid state plan, we did recognize that

13   there were services that were provided in the outpatient

14   setting that in fact a facility charge would be

15   appropriate.  Those services were identified and the

16   appropriate revenue code was identified, and then each

17   hospital was provided a letter outlining the service

18   plus the revenue code that they should be using in

19   billing that service.

20        Q.    And you also indicate that notice was provided

21   at the February 5, 2010 fiscal committee meeting?

22        A.    Yes.

23        Q.    And we reference Exhibit 199.  So if you could

24   look at that for a moment.  And I believe it's on the

25   fourth page of this document?

1      A.   Yes, I have page 4.

2      Q.   And going down to line 23?

3      A.   Yes.

4      Q.   That that was indicated as an action already

5 taken on February 5th, 2010.  Why was it indicated as

6 action already taken on that date?

7      A.   Because the implementation of correcting the

8 billing of that facility charges had happened -- had

9 taken place before this particular fiscal committee

10 meeting, which happened on February 5th.  When we went

11 to that meeting, the fiscal committee had asked us to

12 identify those actions that were taken and that no

13 further additional legislation needed to be filed in

14 order to implement it.

15      Q.   But the actual date that you turned off the

16 code, is that the date indicated in the date of change

17 column?

18      A.   April 1st, 2010.

19      Q.   And had you considered input from the

20 providers in taking this action?

21      A.   We did.

22      Q.   And I think you testified that there are --

23 that in regard to outpatient services the providers --

24 the hospitals do still have the ability to bill for

25 facility fees; correct?

1      A.   For the rev codes that were identified as

2   allowable under our state plan, yes.

3      Q.   Just not under 510, Code 510?

4      A.   That's correct.

5      Q.   Okay.  Go ahead to the fifth line of the

6   chart.  Could you run through the information on the

7   boxes and tell us what that information represents?

8      A.   Suspending catastrophic payments except for

9   children under the age of six.  Those catastrophic

10  payments are the payments that would be made after --

11  for patients -- I'm sorry, for inpatient stays that went

12  far beyond the length of stay that was part of the DRG

13  payment.  So if somebody had a long-term inpatient stay,

14  there was a pool of money appropriated by the

15  legislature.  Hospitals could submit claims and then we

16  would proportion those dollars out depending on the

17  number of claims we got.  So it wasn't a guarantee that

18  the claim that we received, you know, for a hundred

19  dollars, we may have only been able to pay $20 by the

20  time the money was spread out to all the hospitals.  So

21  that's what that one was about.  And that was supposed

22  to go through July 1st of 2011.

23          The second part of that box talks about

24  suspending indirect medical education payments, again,

25  also till July 1st.  The indirect medical education

1    payments at that time were payments that went to three

2    hospitals I believe we were at that point.  They are

3    supposed to help support the cost of medical education

4    of residents.  And that was supposed to go through

5    July 11th.  The date of change was April 1st.  There was

6    a state plan amendment filed.  The date and the

7    transmittal number are noted.  We go over to the public

8    notice date.  It was February 26th, 2010, and we note

9    the two newspapers in which the notice was provided.

10        Q.   And that's in Exhibit 177?

11        A.   I believe so.  Exhibit 177 contains the

12   transmittal notice for the state plan amendment that

13   would authorize those two changes.  It was transmittal

14   No. 10-006.

15        Q.   And then going down to the sixth line on the

16   chart, can you again go through the information on that

17   line and explain what that represents?

18        A.   Yes.  That line represents the department's

19   decision to change the reimbursement methodology for the

20   outpatient radiology services.  The date of change was

21   April 1st, 2010.  There was a state plan amendment

22   submitted as noted, the date and the transmittal number

23   08-107.  There was public notice provided, the exhibit

24   number obviously noted, and then we've listed the dates

25   of the public notice and what exhibit they are attached

1    to.  This is the change that one of CMS's --

2         Q.    Just to look at the chart here, this last has

3    part of the year cut off.  So should this be 2008?

4    Should this date be February 5, 2008?

5         A.    No, it should be -- I'm sorry, I'm trying to

6    go back here and go through -- the February 4th, '08.

7    February 5th -- excuse me.  I'm sorry, I'm confused

8    here.  Yes, February, and that should be an '08.

9         Q.    Okay.

10        A.    So this was the change that -- one of the

11   concepts within Medicaid reimbursement is the

12   efficiency, and we had existing fee schedules for

13   radiology services for other provider types, and so to

14   try to reduce the administrative burden of doing cost

15   settlements and to get money to the hospital sooner

16   rather than waiting one to two, sometimes longer years,

17   for cost settlements to be done, we had proposed

18   changing to a fee schedule.  And what we've come to

19   understand over the past three or four months is that

20   when our state plan amendment was submitted, which is

21   08-107, the financial management group at CMS looked at

22   it and from their perspective it looked fine.

23             When the service or benefits staff at CMS

24   looked at it, they asked the question of, does New

25   Hampshire really intend to carve out these radiology

24

1   services from the definition of outpatient hospital?

2   And because apparent -- unbeknownst to us, that if you

3   use the same fee schedule for radiology services that

4   you use for other non-hospital providers, it

5   automatically pulls them out of the definition of

6   hospital outpatient services.  Once we were asked that

7   question and we clarified to CMS that that was never our

8   intent, we then had to propose a remedy back to CMS,

9   which we did.  They accepted, and which we started

10  implementing last Friday I believe it is.  Yes,

11  December (sic) 6th.

12       Q.   That's what we have marked as Exhibit 204,

13  communication of the reversal of that, of the radiology

14  change?

15       A.   Yes, that is the letter that was sent by

16  Commissioner Toumpas to the hospitals last Friday,

17  January 6th.

18       Q.   Now, I believe we are on line number seven of

19  the chart.  Could you go through that line and again

20  explain the information presented in the boxes?

21       A.   Yes.  That line represents the redesign and

22  the implementation of the calendar year 2010 DSH

23  methodology, and that was the year that the department

24  included an upper payment limit payment as part of the

25  DSH methodology.  The date of change was November 19th,

1    2010.  A state plan amendment was required and was

2    submitted, the dates and the -- the date of December 28,

3    2010, and the transmittal number.  There's two

4    transmittal numbers because CMS requires you to do both

5    an inpatient DSH state plan amendment and an outpatient

6    DSH state plan amendment.

7            And then moving over to the right, we note the

8    dates that there were various publications in the Union

9    Leader, The Telegraph.  There was administrative

10   rulemaking process we had to go through, so we had to

11   follow the administrative rulemaking public notice which

12   includes a formal public hearing, etc., and then it

13   lists the other notices that were provided via the

14   newspaper.

15           This was also an item that there was a work

16   group comprised of the department, Hospital Association,

17   four hospital representatives, and participating was the

18   Hospital Association's consultant, Health Management

19   Associates, and we met numerous times to look at the

20   whole issue of redesign of the DSH program, which had to

21   be done because of two reasons.  One, we had already

22   heard from CMS that they were going to concur with the

23   Office of the Inspector General's audit of the 2004 DSH

24   payment, and second, CMS had -- then within just recent

25   time before that had formally put forward -- even though

1    there had been draft rates, formally put forward their

2    final regulations regarding a whole new annual audit of

3    not only the state, but individual hospitals for DSH

4    payments.   That started in 2005 and go through 2010 for

5    the annual audits, where if you need to make changes

6    there's no financial penalty if you did not

7    appropriately follow CMS regulations.   So those were the

8    two compelling reasons why we absolutely had to be in

9    compliance completely for our 2010 DSH methodology.

10         Q.   Okay.   Can you just explain to me so that I'm

11    clear whether or not the UPL payment is part of the DSH

12    methodology?

13         A.   It's not a DSH payment, but it is -- at this

14    particular time because the American Recovery and

15    Reinvestment Act -- the acronym is ARRA, A R R A -- was

16    still in effect, there was the opportunity to capitalize

17    on the enhanced match that was available to states under

18    ARRA, but that match wasn't available for DSH payments.

19    It was only available for medical claims.   And in order

20    to capitalize on that, the state for the very first time

21    decided to make an upper payment limit payment, draw

22    down that extra $20 million, and include that in the pot

23    of money that could be distributed to the hospitals.

24         Q.   So in that year did the state use some of the

25    money for the UPL payment that they would otherwise have

1    used for making the DSH payment?

2         A.   Yes.

3         Q.   So they didn't -- in that year did the

4    hospitals get the same DSH payment that they would have

5    gotten if you hadn't done the UPL payment?

6         A.   I'm sorry, could you repeat that again,

7    counsel?

8         Q.   Did the hospitals get the same DSH payment

9    that they would have gotten if you hadn't done the UPL

10   payment?  Or would the money that the state had used in

11   the UPL payment for the state's share been included in

12   the DSH?

13        A.   Right.  We had to use matching funds from the

14   uncompensated care fund in order to -- for the state

15   match for those UPL payments.  If we hadn't made them,

16   those matching funds would have been over on the DSH

17   side.  And instead of leveraging the extra $20 million

18   on the UPL payment, we would have not leveraged any

19   additional dollars than what was available in the

20   uncompensated care account.

21        Q.   You mentioned HMA.  Who are they?

22        A.   Health Management Associates is a national

23   consulting firm.  It's been around for a number of

24   years.  They're known far and wide particularly because

25   many of the principals are former Medicaid directors.

1     Q.   And in this process of the -- doing the UPL

2   for that first time, how did that get put on the table?

3     A.   Well, as I noted before, on October 29, 2009,

4   which is the exact date that CMS notified us that they

5   were going to concur with the Office of the Inspector

6   General's report regarding our 2004 DSH payment, the

7   commissioner had held a stakeholder meeting and

8   announced to the stakeholders, which was -- all the

9   hospitals were represented plus the Hospital

10   Association, what we had heard from CMS, and also at

11   that point brought to everyone's attention that we

12   needed to do a redesign of the DSH program and requested

13   of the Hospital Association that rather than trying to

14   do a work group with 30 plus people, could they

15   designate or work with us to designate or choose four

16   hospital representatives to be part of a work group.

17   The Hospital Association had engaged HMA and HMA was

18   actually at those work sessions with us.  At those work

19   sessions they had shared a number of ideas.  This

20   happened to be one of the ideas, was taking advantage of

21   the federal match.

22     Q.   Did they put that in writing?

23     A.   Yes, they did.

24     Q.   And can you look at Exhibit 120?

25     A.   I have it.

1     Q.    And when you said that they put their

2     suggestions in writing, is this what you're referring

3     to?

4     A.    Yes, counsel.

5     Q.    And who was this presented to?

6     A.    This was a report that had been presented to

7     the New Hampshire Hospital Association that is part of

8     the work group proceedings the Hospital Association

9     shared with the department.

10    Q.    And can you find in here, did the -- who were

11    HMA working for?  Who did you understand them to be

12    representing?

13    A.    The New Hampshire Hospital Association and

14    their members.

15    Q.    And what did they suggest as far as UPL?

16    A.    They suggested taking advantage of the

17    enhanced Medicaid matching rate that's found on page 2

18    of the report -- of the exhibit.  At the top right-hand

19    corner is page 3 of 8.

20    Q.    And did they indicate what their understanding

21    as to how long that option would be available?

22    A.    Yes, they did.  They note that the stimulus

23    bill was set to expire at that time on December 31st,

24    2010.

25    Q.    Okay.  And has the -- has ARRA continued past

1    that date?

2         A.    It got extended for six months, but then it

3    was eliminated and has not continued past June 30th of

4    2011.

5         Q.    In regards to -- what has the state done as

6    far as continuing to make UPL payments?

7         A.    Well, the UPL payment was a -- it was a

8    one-time payment at a point in time associated with the

9    DSH payment because we needed the matching funds from

10   the uncompensated care fund.  So once we realized that

11   ARRA was not going to be continued, there was no

12   advantage of continuing with upper payment limit

13   payments.  There was no enhanced match any longer.  So

14   all of the uncompensated care funds would go towards

15   state match for DSH payments in 2011.  Calendar year

16   2011, state fiscal year '12.

17        Q.    And the same for calendar year '12, state

18   fiscal year '13?

19        A.    Correct.

20        Q.    And have you done anything to give notice of

21   the fact that UPL -- that the DSH methodology was

22   reverting to not include a UPL payment?

23        A.    We did.  If you look at the last -- going back

24   to the Exhibit 218, the very bottom line reflects the

25   implementation of the calendar year 2011 and 2012 DSH

1    methodology, and it's noted that there is no upper

2    payment limit as part of that methodology.  The date of

3    change, July 1st of 2011, is because that started the

4    state fiscal year.  A state plan amendment was

5    submitted.  The payments were not contemplated to be

6    made until at the earliest October to December time

7    frame because of -- that's traditionally when the

8    payments have been made.

9         So we submitted a state plan amendment.  We

10   note the date September 29, 2011, no transmittal notice.

11   Again, you need to provide both an inpatient and an

12   outpatient state plan amendment.  That's why you have a

13   transmittal notice 11-06 and transmittal notice 11-07,

14   and then as you move to the right we note the dates that

15   public notice was achieved through various newspaper

16   public notices.

17        Q.   So just to go back and go over one point that

18   you touched on in your answer, you said that the payment

19   wasn't due till at the earliest the last quarter of the

20   year, the October to December quarter?

21        A.   Correct.

22        Q.   So what is your understanding of when a state

23   plan amendment can be effective?

24        A.   It can be effective to the first date of the

25   quarter in which you take whatever action that -- so

1    making the DSH payments, it could have been effective

2    October 1st or all the way through, it had to be

3    submitted by December 31st of 2011.

4         Q.    So the state plan that you submitted in, back

5    in --

6         A.    That should be December 29th, by the way,

7    counsel.

8              THE COURT:   Which?

9              THE WITNESS:   I'm sorry, your Honor.   Under

10   SPA, the submittal number, this last line, implement

11   calendar year 2011 and 2012 DSH methodology, that should

12   not be September 29th, your Honor.   That should read

13   December 29th.

14             THE COURT:   I'm lost.   I'm going across, I see

15   November 19th.   Implement calendar year 2010 DSH

16   methodology --

17             THE WITNESS:   No, the line below, your Honor.

18             THE COURT:   Implement 2011?

19             THE WITNESS:   2011 and 2012.

20             THE COURT:   Right.   And then July 1?

21             THE WITNESS:   The next column over it says

22   September 29th, that should be December 29th.

23             MS. SMITH:   So this one down here?

24             THE WITNESS:   Yes, ma'am.

25             MR. MacDONALD:   May I?   Just so we're clear,

1   the exhibit on which they rely is dated December 23,

2   2011.  It's the evidence.  So we used the exhibit

3   before.

4           MS. SMITH:  Let's look at Exhibit 194.

5           THE COURT:  Again, 218 is just -- it's really

6   argument, but you're making a number of changes, so

7   maybe you could just give me a conformed copy.

8           THE WITNESS:  I apologize, your Honor.

9           THE COURT:  It's no problem.  I'm going to

10  take the liberty of writing on this one, so just make

11  the changes and submit a changed one.

12      A.   Exhibit 194 is transmittal notice 11-006.  It

13  reflects the state plan amendment proposed to CMS

14  regarding the inpatient disproportionate share hospital

15  payment, or DSH payment.

16      Q.   And it does show that it was submitted on

17  December 23rd, as Attorney MacDonald said?

18      A.   Yes, ma'am.  The December date was important

19  because we made payments to the critical access

20  hospitals at the earliest point that we could, which was

21  December 15th.  And that date came about because to make

22  the payments we were dependent upon the hospitals

23  providing us with information regarding their revenues

24  as well as their uncompensated care.  So once we

25  received all of the critical access hospitals and we

1    could verify those numbers to the best of our ability

2    based upon what was submitted, we made the payments on

3    December 15th.

4         Q.    And then the last line of the chart, line

5    number 8.

6         A.    The 2011/2012 DSH methodology, that's I think

7    the one we just were going through.

8         Q.    Okay.  So we've actually covered both the UPL

9    line above it in number 7, and then you were also

10   talking about the last line, which is the DSH

11   methodology in the calendar year 2011 and 2012?

12        A.    Yes, ma'am.

13        Q.    And that reflects changes made and the budget

14   in the spring of this year that became effective

15   July 1st; correct?

16        A.    That's correct.  The budget for that year was

17   -- became effective July 1st of '11.

18             THE COURT:  But I guess I thought you said all

19   along, and I understood you to say just a few minutes

20   ago, it's -- you have to file the plan amendment by the

21   last day of the quarter in which you wish it to be

22   effective?

23             THE WITNESS:  The date that we wish to have

24   the change effective.

25             THE COURT:  You can go back basically 90 days.

1    Well, not even that.  If you stretch it out to

2    December 31st, you can go back 90 days.

3            THE WITNESS:  Yes.  We could have gone back to

4    October 1st.  But the direction, your Honor, to make

5    this change was contained within the budget House Bill

6    2, which became -- which went into effect July 1st of

7    '11.  And the --

8            THE COURT:  Which is before the quarter in

9    which you filed the amendment.

10           THE WITNESS:  Right.  Because the DSH payments

11   had always been made in that second quarter of the

12   fiscal year or the last part of the calendar year.  So

13   what I was trying to reflect there, your Honor, was that

14   it was July 1st of 2011 that the budget that had been

15   approved by the legislature went into effect.  That's

16   the date that the legislature said this is the change

17   you need to make.

18           THE COURT:  Right.

19           THE WITNESS:  And then in order to actually

20   implement that payment in the October to December time

21   frame, it's within that time frame that the actual state

22   plan amendment has to be submitted to CMS.

23           THE COURT:  Right.  So why wouldn't the date

24   of change be the effective date of the proposed plan

25   amendment?

1              THE WITNESS:  It could --

2              THE COURT:  It just seems like the state is

3    interchanging the legislature and the department.

4    That's what strikes me as going on throughout this

5    process.  That you're sort of treating the legislature

6    or the legislature and governor as if they're sort of an

7    adjunct of the department.  I mean, the department

8    didn't make a change on July 1st, 2011; right?

9              THE WITNESS:  The department did not make its

10   change --

11             THE COURT:  My boss told me to make the change

12   in July.  Okay.  When did you make the change that your

13   boss told you to make?

14             THE WITNESS:  It was in December.

15             THE COURT:  Okay.  And you put the notice in

16   on December 23rd -- I mean the proposed plan amendment

17   on December 23rd.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  And doesn't that have an effective

20   date in it?

21             MS. SMITH:  Yes, and I was just going to

22   clarify that.

23             THE COURT:  What's that date?

24             MS. SMITH:  If you're looking at Exhibit 194,

25   if you go on to any of the pages of the SPA, like if you

1  go to page 6 of 11 and go down to the bottom of that

2  page, what is the effective date?

3              THE COURT:  Okay, there it is.  December 14?

4              THE WITNESS:  Correct.  It had to be

5  December 14th or otherwise CMS would not have provided a

6  match.

7              THE COURT:  Oh, I completely understand that

8  because that's consistent with what you've always said.

9  But July 1 is confusing because you didn't change it on

10  July 1.

11              THE WITNESS:  No, sir.  I apologize for the

12  confusion.

13              THE COURT:  No apology is necessary.  Okay.

14      Q.   BY MS. SMITH:  So are we saying that the

15  effective date of the SPA notice should be 12/14/11?

16      A.   That's the date it was submitted to --

17  transmitted to CMS, formally transmitted, yes, ma'am.

18      Q.   All right.  Just going back to -- now that

19  we've gone through that piece, just to go back through a

20  few other things.  Going back to the November

21  recommendation to the reductions which were submitted,

22  before those recommendations and reductions were

23  requested in November, did the department do anything to

24  evaluate the health of the hospitals?

25      A.   The department looked at the -- our claims

1   data in terms of looking at utilization, the types of

2   services, the number of services being provided.  And

3   just prior to November and October we knew that there

4   was going to be a report published by Dr. Nancy Kane,

5   who had been commissioned by the Endowment for Health to

6   look at the financial health of the hospital network and

7   individual hospitals in New Hampshire.  That report was

8   published and presented publicly by Dr. Kane in October.

9       Q.   And that is Exhibit 116; correct?

10      A.   Yes, it is.

11      Q.   And how did that factor into your thinking and

12  what could be recommended?

13      A.   It became another piece of information in

14  terms of looking at the overall health of the hospital

15  system, and Dr. Kane noted favorable review of most of

16  the hospitals, except expressed concerns about the

17  critical access hospitals in New Hampshire.

18      Q.   And did you take that into account in the

19  recommendations you made?

20      A.   Yes.

21      Q.   And how did you do that?

22      A.   We did it by -- in presenting the reduction,

23  the outpatient reduction, requested that fiscal

24  committee exempt the critical access hospitals from this

25  specific rate reduction.

1          Q.    And that's true for both the inpatient and the

2    outpatient reductions?

3          A.    I'm positive it's true for the outpatient and

4    I'm sorry, counsel, I don't remember on the inpatient.

5          Q.    Going on, you were asked questions I think

6    about whether or not there were ever any public hearings

7    held about where hospitals would have had a chance to

8    address the reimbursement methodologies.  Do you

9    remember those questions?

10         A.    Yes, I do.

11         Q.    In fact before the first benchmarking report

12   that the department did in 2008, which is Plaintiffs'

13   Exhibit 15, did the department actually hold a public

14   hearing where the public and the hospitals and anybody

15   else interested had an opportunity to come in and

16   provide input?

17         A.    Yes, we did.

18         Q.    And if you could go to Plaintiffs' Exhibit 15,

19   I'll ask our assistant to bring up I believe it's page

20   47 of that report?

21         A.    Page 47, yes.

22         Q.    It's 47 out of 250.  Does this summarize that

23   public hearing?

24         A.    Yes, it does.

25         Q.    And can you tell from this whether anybody

1    from the hospitals or representing them came and

2    provided input at that public hearing?

3         A.   If we could scroll down, please.  Stop there.

4    I think that -- I'm sorry.  I think that's page 48 of

5    251.  Leslie Melby is noted as being present and

6    offering comment.

7         Q.   And if you could go on to the next couple

8    pages, do you see anybody else having submitted

9    comments?  That was from the hospitals.  Specifically on

10   page --

11        A.   Oh, yes, I see on page 50 of 251 Gina Balkus,

12   who at the time worked for Dartmouth-Hitchcock, was

13   present.

14        Q.   And does it indicate that she submitted

15   comments?

16        A.   It does indicate that she submitted comments.

17        Q.   And how long was this report, the November

18   recommendations and actions?

19        A.   I believe if we could scroll to the top so I

20   can just see the --

21        Q.   I think it was back on page 47.  Does that

22   indicate the date of the hearing?

23        A.   Yes, it does.  Thank you, yes.  It was held on

24   September 19th, 2008.

25        Q.   And going back to your examination by Attorney

1    MacDonald the other day, you were asked to look at what

2    is in our exhibits, Exhibit No. 278.  I'm sorry, 172.

3    And I believe he had you looking at page 22 of 64 in

4    that exhibit.

5            A.   22 of 64?

6            Q.   Yes, 22 of 64.

7            A.   Thank you.  Yes.

8            Q.   He asked you some questions about what is

9    paragraph C1 in that exhibit, which had some specific

10   percentages.  Could you explain why that language was

11   put in that SPA and then taken out subsequently?

12           A.   The paragraph C1, the specifics were put in

13   because it was the first time since 1995 that a change

14   relative to the DRG price point was being made, and CMS

15   had requested us to be very specific in what those

16   changes were.

17           Q.   Go ahead.

18           A.   The second paragraph beginning October 1st,

19   1999, notes that effective that date, the price -- I'm

20   sorry, the department would take the current DRG price

21   per point, and it follows through a methodology

22   inflating each by the same percent of Medicaid market

23   basket, estimated increase for prospective payment

24   hospitals, minus any Medicare or state Medicaid defined

25   budget neutrality factors and other generally applied

1    Medicare adjustments appropriate to Medicaid.

2            That paragraph came about because the advice

3    of CMS, in order to have this state plan amendment

4    approved, they did not want us to be making --

5    submitting state plan amendments every single year and

6    suggested that this was language that they could

7    approve, and in fact they did on June 6 of 2001, and it

8    has remained in place since then.

9            MR. MacDONALD:  Your Honor, I move to strike

10   that answer.  I don't think there's any foundation

11   that's been laid that this witness was even employed by

12   the Department of Health and Human Services back in 1995

13   or '96 and was a party to any conversations with CMS at

14   that point, and in any respect it's hearsay.

15           MS. SMITH:  I would ask the witness how she

16   comes by that knowledge, but I would submit that even --

17   that the hearsay is not an appropriate objection because

18   the department gets to rely on what CMS tells them and

19   to inform the Court on what their understanding of what

20   CMS requires them to do is.

21           THE COURT:  I'm not sure what your real

22   dispute is.  I understand you have an evidentiary

23   dispute, but what's the problem?

24           MR. MacDONALD:  Because this is a major effort

25   to rehabilitate some testimony from the other day and

43

1    they're relying on hearsay that's, you know, 15,

2    16 years old.

3              THE COURT:  I guess I must have missed it.

4    What's the point?  Share it with me.

5              MR. MacDONALD:  Okay.  She testified that to

6    do an across-the-board rate reduction you needed the

7    language before you on your screen in C1, and now she's

8    saying you didn't need it.

9              THE COURT:  I disagree.  That's why I'm

10   confused.  I think what she said was to the contrary,

11   that CMS wanted it this way so it was very specific as

12   to how -- so as not to come back year after year and say

13   now we're going to reduce it 16 cents, now we're going

14   to reduce it 23 cents; that there's a methodology, and

15   it's specific and it's understandable.  I thought your

16   point was the only relevance of any of this is that's

17   the way it's supposed to be done.

18             MR. MacDONALD:  To put it in the state plan.

19             THE COURT:  Correct; with precision.

20             MR. MacDONALD:  Exactly.

21             THE COURT:  And a methodology that doesn't

22   require every year coming back with another plan

23   amendment that says now minus 13 cents, now minus 2

24   cents.  Right?  So what's the objection then?  This

25   hurts me because?

1           MR. MacDONALD:  This hurts me because when

2    they have had to do across-the-board rate reductions, as

3    they did in November of 2008, they had to amend the

4    state plan.

5           THE COURT:  Seems to me this helps you.  How

6    does this hurt you?

7           MR. MacDONALD:  They're saying that this

8    language is no longer needed to effect the

9    across-the-board rate changes.  That's what they're

10   saying.

11          THE COURT:  Sure.  Yeah, I understand that.

12   But you're objecting to them saying that this wasn't

13   required.  This change right here is not at issue in

14   this case.

15          MR. MacDONALD:  That's true.

16          THE COURT:  So the only relevance of this

17   change -- the only relevance of this historical change

18   is, I thought your point was, that's an example of what

19   it should look like when you make a rate reduction in

20   this reimbursement scheme.

21          MR. MacDONALD:  Absolutely.

22          THE COURT:  And she's saying, yes, we did it

23   that way.  Not only did we do it that way, but CMS told

24   us we had to do it with that degree of precision.  And

25   not only that, we have to do it in a systemic way so

1    that we don't come back every -- we at CMS don't want to

2    be seeing plan amendments every three months about

3    percent -- or actual sent changes; right?  That's the

4    testimony; right?

5         MS. SMITH:  The one follow-up question was why

6    didn't you do language like paragraph one in subsequent

7    amendments.

8         THE COURT:  Sure, but -- okay.  Well, if I'm

9    missing it, tell me now because it's got to be firm.

10        MR. MacDONALD:  We're on the same page and

11   maybe I misheard the testimony, but if they want to do

12   an across-the-board rate reduction, that's the language

13   they need.  That's our point.

14        THE COURT:  Sure, but your objection was it's

15   hearsay.  It is hearsay I suppose, but she represents

16   the department, the department has an institutional

17   ability to testify about historic events.  That's

18   probably what she's doing.  She probably has knowledge

19   of it through some way.  But why go through that

20   evidentiary wrestle if there's no point to it?  Hence

21   the question, what's the point?  So far I don't see it.

22        MR. O'CONNELL:  May I, your Honor?  I'm the

23   one whispering in Mr. MacDonald's ear about this.  What

24   I heard the witness say is that CMS told them that --

25        MS. SMITH:  Well, I object to two people

1    arguing.

2              THE COURT:  I need all the help I can get,

3    Thank you.  Go ahead.

4              MR. O'CONNELL:  And if I misunderstood, but I

5    heard that the justification for not doing -- attempted

6    justification for not doing the ten percent

7    across-the-board reference, they didn't need to do it

8    that specifically because they were told by CMS, and

9    that's hearsay.

10             THE COURT:  All right.  But I think she was

11   just testifying about this event; correct?  Ms. Dunn was

12   just testifying about this change, this past historic

13   change.

14             MS. SMITH:  Yes.

15             THE COURT:  Objection overruled.

16             MS. SMITH:  And why it wasn't done that way.

17             THE COURT:  Well, that's a different issue,

18   but you're going to get to that.

19             MS. SMITH:  Yes.

20             THE COURT:  But she didn't testify about that

21   yet; right?

22             MS. SMITH:  Correct.  I think they may have

23   asked her some questions the other day.

24             THE COURT:  No, no, no, I mean right now.

25   Okay.

1     Q.    BY MS. SMITH:  So what is your knowledge about

2     this change?  What's the basis of your knowledge?

3     A.    When this was -- in 1999 -- or '95 through '99

4     I was employed by the department.  In 1999 I was the

5     assistant director to the office of community and public

6     health, which at the time managed both public health and

7     the Medicaid program.  June 6, 2001, I was the director.

8     The staff that prepared this work and did it reported to

9     me.

10     Q.    And in the questions that you were asked the

11     other day, after this change was made in 1995, did you

12     -- what did you understand you needed to do if a future

13     percentage reduction was done as far as state plans?

14     A.    That we would go back and review -- that we

15     would review the state plan language to see if it in

16     fact complied with what action the department was going

17     to take.  If it didn't, we would have to submit a state

18     plan amendment.  If it did, we did not.

19     Q.    Did you -- were any subsequent amendments that

20     included language like C1 that's in '95 done that

21     included a specific percentage?

22     A.    No.

23     Q.    Why not?

24     A.    Because the -- because the language that CMS

25     had approved in C2 continued to be approved by CMS in

1   subsequent state plan amendments that were submitted

2   through present day.

3        Q.   Okay.  Going on --

4             THE COURT:  Just before you leave that topic,

5   as I understand your testimony, you're saying that if

6   the state plan has a methodology, that you just plug in

7   different numbers, turn the crank, and the end result is

8   the rate.  If that's all you're doing, you don't have to

9   change the plan.

10            THE WITNESS:  If we're not changing the

11  methodology, correct, sir.

12            THE COURT:  And your position, as I understand

13  it, is it doesn't matter how drastic the change in one

14  of those formulated numbers is.  If it's the same

15  formula when you're turning the crank, that unless the

16  outcome is a very drastically different rate, your view

17  is that you don't have to change the plan.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  As long as you're plugging in the

20  numbers that the methodology calls for.

21            THE WITNESS:  Yes.  As long as we're being

22  consistent with the language in the state plan, sir.

23            THE COURT:  Okay.

24       Q.   BY MS. SMITH:  You were asked a lot of

25  questions about DSH payments and you've heard testimony

49

1    from the hospitals and seen their charts about their

2    representations that they're not going to get any DSH

3    payments in either 2000 -- the current calendar year or

4    the next calendar year, which are fiscal years 2012 and

5    '13.   Is there any possibility for DSH payments to the

6    ten non-critical access hospitals in this lawsuit in

7    fiscal year 2013?

8         A.   Yes, there is.

9         Q.   Can you explain what that is?

10        A.   Yes.   Contained within the approved budget

11   there is language that directs the department at a

12   specific time in state fiscal year '13 to work with the

13   Department of Administrative Services to assess state

14   surplus.   The current anticipated surplus when the

15   budget was passed was $41 million.   The language in the

16   budget specifically says that the department, upon

17   confirming that with Administrative Services, may go to

18   fiscal committee and request to use that $41 million for

19   DSH payments for the non-critical access hospitals.

20        Q.   And that's regardless of whether they are

21   deemed hospitals or not?

22        A.   Correct.

23        Q.   I think you heard the questions the other day

24   about whether the hospitals had taken up any of the

25   issues regarding any of these actions that they are

50

1    complaining of here directly with CMS.  What knowledge

2    do you have regarding whether or not the hospitals have

3    raised any of these issues with CMS?

4        A.   I'm aware that there have been an exchange of

5    letters regarding various New Hampshire Medicaid

6    reimbursement and rate issues.  I'm aware that the

7    representatives from the Hospital Association and some

8    hospitals has held an in-person meeting with CMS.

9    That's the extent of my knowledge.

10       Q.   And have you received copies of correspondence

11   from the hospitals to CMS?

12       A.   Yes.

13       Q.   And can you look at what are marked as

14   Exhibits 118 and 125?

15       A.   118?

16       Q.   118.  Is that one of the pieces of

17   correspondence that you were referring to?

18       A.   Yes, it is.

19       Q.   And this was by the New Hampshire Hospital

20   Association, and they say they are representing the New

21   Hampshire 26 acute care hospitals?

22       A.   Yes.

23       Q.   As a result of this correspondence, did CMS

24   ever come back and tell you that you needed to do notice

25   differently?

1       A.   No.

2       Q.   And can you look at Exhibit 125.

3       A.   Yes.

4       Q.   And again, can you tell us what this is?

5       A.   It's a letter from the Hospital Association

6  president, Mr. Ahnen, to CMS, Ms. Frizzera, regarding

7  New Hampshire Medicaid rate reductions.

8       Q.   And did you actually write a response to the

9  Hospital Association about this exhibit, in response to

10 this exhibit?

11      A.   I did.

12      Q.   Is that what we marked as Exhibit 27?

13      A.   That's correct.

14      Q.   And in that do you address the hospitals'

15 concern about access?

16      A.   I did.

17      Q.   And what did you say?

18      A.   I said that the first thing we did was to

19 research and analyze what parts of our business

20 operations could we streamline, adjust, etc., to reduce

21 our operating expenses.  I then went on to talk about in

22 the third paragraph that we had no evidence at that time

23 that access to care or access to quality healthcare was

24 being compromised for Medicaid enrollees.

25      Q.   And what information were you -- what were you

52

1    relying on for making that statement?

2        A.    I was relying on that -- the fact that we had

3    not received any notification from any beneficiary or

4    caretaker that they were not able to access the care

5    that was provided by hospital inpatient/outpatient, and

6    also monitoring our provider network to see if any of

7    the impacted providers would disenroll or somehow limit

8    their access in some way.

9        Q.    How would you know if -- how would you receive

10   reports if somebody was having problems at finding a

11   provider or accessing the network?

12       A.    The primary way is that the Medicaid

13   beneficiaries and/or caregivers have a toll-free number

14   that they're able to call into our client services unit

15   and one of the roles of that staff is to assist any

16   beneficiary with finding a provider, a type that is

17   covered under the state plan.  So we keep -- the staff

18   keep a detailed log, and anytime there's a report of a

19   difficulty with a provider, I'm notified.  In addition,

20   there's weekly reports that are provided in terms of the

21   volume of calls and the type of calls and the specific

22   questions about provider calls.

23       Q.    Going back to the November 2008 changes, how

24   long -- when those actions were taken, how long were

25   those rates -- were those changes specified to be for?

1        A.    I believe through the biennium.

2        Q.    So that was up through June 30th of 2009?

3        A.    That's correct.

4        Q.    And were they carried forward?

5        A.    Yes, they were.

6        Q.    Were there additional opportunities for

7   comment when they were carried forward?

8        A.    The opportunity exists within the statewide

9   budget process that has multiple steps and hearings,

10  etc.

11            THE COURT:  Be a good time for a break?

12            MS. SMITH:  I've probably got about ten more

13  minutes.  If you want me to finish, I can do that.

14            THE COURT:  Probably means 20, so why don't we

15  take a break.

16            (Recess taken.)

17        Q.    Just a few final questions.  One question I

18  missed when we were talking about the fiscal committee,

19  what is your understanding as to whether or not they

20  have ever received comments from the public?

21        A.    The fiscal committee members?

22        Q.    Yes.

23        A.    Yes, they do.  They have.

24        Q.    What is the basis for that understanding?

25        A.    It's not unusual for a member of the fiscal

1    committee to say that they have in front of them a

2    letter from a particular constituent and then will read

3    a comment or a question right from the letter.   Or

4    they'll state, you know, that they had been in

5    conversation with a particular party and then represent

6    whatever it was that the party said.

7         Q.   Have you ever been asked questions by the

8    fiscal committee based on where they have represented

9    they're asking the questions based on comments they've

10   received?

11        A.   Yes.

12        Q.   Is there anything on the horizon that would

13   allow the hospital rates that they receive for inpatient

14   and outpatient to change during this biennium?

15        A.   Yes.

16        Q.   What is that?

17        A.   There is a mandatory Medicaid managed care

18   program that is in the process of being developed to be

19   implemented for July 1 of 2011.

20        Q.   How would the hospitals' rates --

21        A.   Excuse me.   July 1, 2012.

22        Q.   How would the hospitals' inpatient and

23   outpatient rates be set for managed care?

24        A.   Well, under that scenario the individual

25   hospitals will need to negotiate with whatever managed

1   care organizations the state ultimately chooses to

2   contract with to negotiate a rate.  The department will

3   no longer be setting those rates.

4        Q.    And you heard a lot of testimony about actions

5   that the LRGH, the Lakes Region, has taken regarding

6   their primary care panels.  What have you personally

7   done in responding to the letters that Lakes Region sent

8   out?

9        A.    The day that we started receiving phone calls

10  from clients telling us that they had received the

11  letter, the first thing we did was to contact LRGH to

12  ask them for clarification because we weren't aware that

13  that was the action they were going to take and to ask

14  for a copy of the letter.

15            Once we received that, I put the client

16  services unit on high alert.  They began reporting on an

17  hourly basis, and then over the course of the next few

18  weeks the hourly reporting decreased down to daily, to

19  weekly reporting, prioritized any calls that were

20  received -- other than separate emergency questions, any

21  calls that came in from one of the patients that were

22  being impacted by that action were prioritized and the

23  patient was -- the beneficiary was assisted in finding a

24  new primary care provider.

25            Members of my staff called the providers that

56

```
 1    were listed in the letter as potential options for

 2    primary care to assess their capacity to take new

 3    primary care patients.  And we also -- I assisted the

 4    commissioner in writing a letter to Lakes Region

 5    Healthcare asking for more specific information

 6    regarding their decision.

 7         Q.   Based on the information that's been reported

 8    to you, what is your understanding of whether or not

 9    providers have been found for any of the people affected

10    by that letter?

11         A.   Any patient that has contacted the department

12    has found a new primary care provider.  In discussing

13    this with the executive director of the federally

14    qualified health center, he indicated that his

15    organization had received numerous, like in the

16    hundreds, of phone calls and were going to do their best

17    to accommodate those patients.

18         Q.   And on an ongoing basis what do you personally

19    do to monitor access?

20         A.   Well, in addition to the weekly reports and

21    then urgent contacts from the client services unit

22    regarding any particular issue a beneficiary's having,

23    any provider that contacts the fiscal agent where there

24    is a provider relations network with a complaint and/or

25    stating they're going to disenroll is immediately
```

1    reported to my office.  We monitor ongoing utilization

2    of services, particularly hospital and physician and

3    pharmacy services.  That can be an indication of whether

4    there's a change in pattern.  And then I often deal with

5    some of the more complex client issues myself.

6              MS. SMITH:  Thank you very much.  I don't have

7    any further questions, although I would again point out

8    to the Court that her calculation be marked as a full

9    exhibit.

10             THE COURT:  Appreciate it.  Any redirect?

11             MR. MACDONALD:  Briefly, your Honor.

12                      REDIRECT EXAMINATION

13   BY MR. MacDONALD:

14        Q.   Good morning, Ms. Dunn.

15        A.   Good morning, counsel.

16        Q.   Let's start first with the chart that Attorney

17   Smith was walking through with you.  Let's start at the

18   top, the outpatient rate reduction, which was approved

19   on November 21st by the Joint Fiscal Committee.  And it

20   effected a rate reduction from 81.24 to 54.04.  But the

21   effective date was actually July 1, 2008; isn't that

22   right?

23        A.   Yes, sir.

24        Q.   Okay.  Now, here on the public notice column

25   you have entered November 14th, 2008, and then you say

1    there is -- the public notice method is the fiscal

2    committee agenda.  Now, you don't have any personal

3    knowledge as to when the legislative fiscal committee

4    posted its agenda, do you?

5         A.   I do not have that personal knowledge.

6         Q.   Okay.  Let's go down to the inpatient rate

7    reduction.  Here we have public notice date again of

8    November 21st, 2008, and there's a suggestion here that

9    it was on the governor's website.  Do you have any

10   personal knowledge that the executive order was posted

11   on the governor's website?

12        A.   Sir, I can't recall if I went to the website.

13   Normally I do, but I can't say for sure if I did or I

14   didn't.

15        Q.   Okay.  Now, let's go down to Revenue Code 510.

16   During Attorney Smith's examination we changed the -- or

17   she changed the SPA notice date.  You took a look at

18   Exhibit 174, which is the actual submission that the

19   state made, and you saw the two public notices which

20   were dated December 4th and December 5th, 2008.  That

21   was a Thursday and a Friday.  And that was for an SPA

22   that was actually transmitted on December 9th and made

23   effective on December 8, 2008; isn't that right?

24        A.   Specific to the 510 code, 2008, yes, sir.

25        Q.   Okay.

1          THE COURT:  All right, I'm confused.

2   Discontinued use of outpatient Revenue Code 510, the

3   effective date was what?

4          MR. MACDONALD:  December 8, 2008.

5      A.   I'm sorry.  Maybe I misunderstood your

6   question, sir.  I'm sorry, your Honor.  I'm starting to

7   get confused with dates.

8          I believe if we were -- if I were to look at

9   the instructions that we sent to the hospitals, the date

10  of change, the date that we would have stopped paying

11  those codes would have been April 1st.  It had been a

12  long, ongoing issue relative to Code 510 that was tied

13  to the federal regulations that had been published.

14     Q.   My question -- and let's just be clear.  I'm

15  going to show you Exhibit 174, and that's the actual

16  state plan amendment that was submitted?

17     A.   Yes, it is.

18     Q.   And it says that the effective date, I

19  believe, that's requested by the state is December 8,

20  2008, doesn't it?

21     A.   It does say that, sir.

22     Q.   Okay.  Now, let's go down to change in

23  reimbursement methodology for radiology services, and

24  again, we're on the same SPA.  We're on the public

25  notice date, 12/4/08 and 12/5/08, and we're at

1    Exhibit 174.  So this date needs to be December 8th,

2    2008, doesn't it?

3         A.   I believe that the date that the claims were

4    adjusted to the fee schedule was April 1st, 2010.

5    That's the date in which, sir, the readjustment of the

6    claims that is ongoing now is going back to.

7         Q.   My question is, the chart that you prepared

8    for outpatient radiology refers to Exhibit 174, and my

9    question is what was the effective date of that state

10   plan amendment?

11        A.   The proposed effective date of this state plan

12   amendment was December 8, 2008.

13        Q.   But as I understand the department's position

14   with respect to outpatient radiology, you're now no

15   longer going to be enforcing that rate reduction; isn't

16   that right?

17        A.   That's correct.

18        Q.   It was reversed by the commissioner's letter

19   which we took a look at the other day.  It's referenced

20   here as Exhibit 204.  And you will not be enforcing that

21   rate reduction going forward; isn't that correct?

22        A.   That's correct, sir.

23        Q.   Okay.  Now, I am not clear why this entry is

24   on the chart.  Do you understand that the plaintiffs are

25   challenging that calendar year 2010 methodology with

1    respect to UPL?

2         A.   I don't, but it's connected to the other

3    challenge, sir, I believe.

4         Q.   Okay.  Now, finally on the bottom row we had a

5    discussion about UPL and when it took effect, and I'd

6    just like you to take a look at Exhibit 196, which is a

7    compilation of public notices, and I'd like you to take

8    a look at the one dated June 25th, 2011.

9         A.   June 25th, Nashua Telegraph.  Yes, sir.

10        Q.   Yeah, thank you.  Now, that public notice

11   doesn't mention UPL, does it?

12        A.   I don't believe it specifically -- let me just

13   read through the whole thing.  Because it talks about in

14   accordance with House Bill 1 and House Bill 2, which is

15   where the DSH changes were made legislatively.  I'm

16   sorry.  My eyesight is not as good as I'd like it to be.

17   I'm sorry, could we scroll down a little bit more?

18        Q.   Sure.

19        A.   Unless I'm missing it, sir, I don't see upper

20   payment limit or UPL specifically mentioned.

21        Q.   Okay.  The first time it was specifically

22   mentioned in a public notice was October 31st, 2011;

23   isn't that right?  Take a look at the next notice.

24        A.   This particular notice specifically states

25   that the department also anticipates that Medicaid

1    payments will not include the upper payment limit, UPL

2    payments, which had been made in 2010.

3         Q.   Okay, thanks.  Now, let's go back to this box

4    right here, SPA submittal date and number.  Now, we have

5    had a conversation about the reimbursement page relating

6    to outpatient hospital services, and I'd like to call up

7    Exhibit 2 and go to the transmittal page marked 06-08.

8    Now, while we're getting there, I heard you say in

9    response to both Attorney Smith's question on Wednesday

10   and then again today, and then in response to the

11   Court's question today, that an SPA or a state plan

12   amendment, that is submitted can be effective no earlier

13   than the first day of the calendar quarter in which it's

14   submitted; correct?

15        A.   That is correct.

16        Q.   So something submitted on November 20th could

17   be effective no earlier than October 1st; is that

18   correct?

19        A.   Yes.

20        Q.   Okay.  So we heard testimony the other day

21   that this page was submitted in response to a request

22   for additional information without any public process,

23   without any notice to anyone, on November 20, 2008?

24             MS. SMITH:  I object.  It mischaracterizes the

25   testimony.

63

1          Q.   Was this page submitted on November 20, 2008?

2          A.   I just want to be sure I understand, counsel.

3    You're asking about the page that CMS requested us to

4    submit as part of the --

5               THE COURT:  Whether they requested it or not

6    is sort of irrelevant.  The question is, did you submit

7    a proposed state plan amendment?

8               THE WITNESS:  Yes, we did, sir.

9               THE COURT:  And what's the date on it?  You

10   know, that somebody asked me to do it, whatever, you did

11   it.

12              THE WITNESS:  We did, and I believe that's the

13   November 20 date that you were referring to, sir.

14         Q.   Okay.  November 20th, 2008.  But let's look at

15   the effective date that the state placed on this.

16   August 1st, 2006, which is two years and two months

17   before this amendment could possibly be in effect; isn't

18   that right?

19         A.   It is because the 06-008 state plan amendment,

20   the original intent was to implement prior authorization

21   for radiology services.  Following that submission, CMS

22   has asked the state numerous questions and we've gone

23   back and forth with them.  In the course of that, this

24   particular issue came up, sir.

25         Q.   The effective date for this submission,

1    assuming it was a state plan amendment, could not have

2    been any earlier than October 1st, 2008, under CMS

3    regulations; isn't that right?

4         A.   As the original state plan that was submitted,

5    yes, sir.

6         Q.   Okay.  Now, let's go to the inpatient page,

7    which is Exhibit 1.  We were looking at it earlier.

8    Plaintiffs' Exhibit 1.  And go to the page that we were

9    looking at earlier.  I'm sorry, I don't have it --

10             (Pause.)

11        Q.   Okay.  Let's go down to the end.  And again,

12   we've had some discussion about this page.  And let's

13   focus on C2, which I think we can agree C1 is now out of

14   the state plan; correct?

15        A.   That's correct, sir.

16        Q.   And C2 is the methodology that the state needs

17   to use in determining inpatient rates; is that correct?

18        A.   Yes, sir.

19        Q.   And it is a fact, isn't it, from 2000 until

20   this across-the-board rate reduction was made in

21   November 2008, the state never used this methodology to

22   set the DRG price point; isn't that right?

23        A.   I'm sorry, sir, I can't agree with that.

24        Q.   Well, the DRG price point remained at

25   $3,147.61 for the entire period of 2000 through 2008;

1    isn't that right?

2        A.    I don't have that data in front of me, but

3    I'll say if you've got that data, I'd be happy to look

4    at it.

5        Q.    It didn't change over the course of eight

6    years.  So you didn't use the methodology in the plan,

7    did you?

8        A.    I'm sorry, I disagree.  Every time there was a

9    budget change the inpatient rates had to be looked at,

10   because the budget numbers changed every year.

11       Q.    Let's go back to UPL.  You've said -- you've

12   taken the position that it was a, quote, one-time event

13   and it was -- and we've referred today to ARRA, which is

14   the acronym for the Stimulus Act; correct?

15       A.    Correct.

16       Q.    And the Stimulus Act provided what's known as

17   enhanced matching funds; correct?

18       A.    Yes, sir.

19       Q.    And by enhanced matching funds the state could

20   -- instead of getting a 50 percent match, could get a

21   layer above that for a limited period of time; is that

22   correct?

23       A.    Yes, sir.

24       Q.    And isn't it true that the enhanced match

25   could only be used for rates; isn't that right?

1          A.    It could not be used for the DSH payments.

2          Q.    And it could only be used for rates; isn't

3     that right?

4          A.    Right.  For the medical claims, yes, sir.

5          Q.    Let's just go back to the inpatient issue.  Go

6     back to the exhibit on the screen.  Let's just walk

7     through this methodology where the state is supposed to

8     take the current DRG price per point and inflate it by

9     the same percent as the Medicaid market basket estimated

10    increase for prospective payment hospitals.  Right?

11    That's what the state is supposed to do.  It set the DRG

12    price per point.

13         A.    That's correct.

14         Q.    And then once it does that, it applies a state

15    Medicaid -- I'm sorry, you're supposed to subtract any

16    Medicare or state Medicaid defined budget neutrality

17    factors and after generally applied -- in other

18    generally applied Medicaid adjustments appropriate to

19    Medicaid.

20               And it's your testimony using this methodology

21    that -- well, the state used this methodology to freeze

22    DRG price per point for eight years from 2000; is that

23    correct?

24         A.    No, the state used this methodology each year

25    looking at the budget plus whatever the MEI, the

1    Medicare economic indicator that comes out, and

2    determined what the inpatient rates would be based upon

3    those two numbers.

4        Q.   Okay.  Let's go back to the outpatient issue

5    again.  I'm sorry to be jumping around.  But there was

6    testimony again today about an effort earlier in the

7    year by the state to cut outpatient rates, and that was,

8    I think you testified, presented to joint fiscal in

9    April.  And we can agree that that reduction was not to

10   54.04 percent effective July 1.  It was to 62.82 percent

11   effective January 1, 2008; isn't that right?

12       A.   The percentages I believe are right.  I would

13   have to look at the April fiscal item to confirm the

14   dates.

15       Q.   Sure.  Exhibit 104.

16       A.   Thank you.  Yes, it says retroactive to

17   January 1, 2008.

18       Q.   Let's just get it on the screen.  It's the

19   bottom of page 2, please.  Okay.  So it was to 62.8 --

20   this was presented in April?

21       A.   Yes, it was, sir.

22       Q.   62.82 percent effective retroactively to

23   January 1st; is that correct?

24       A.   That's correct.

25       Q.   Okay.  Now, you gave some testimony about the

1   so-called Kane report, and I believe you told Attorney

2   Smith that based on the Kane report you recommended in

3   November that critical access hospitals be exempt from

4   this rate cut in November; is that right?

5         A.   Yes, it is, sir.

6         Q.   And you got -- the Kane report is dated

7   October 15th, 2008.  Does that sound right?

8         A.   Yes, it is.

9         Q.   But in your recommendation in April you also

10  exempted critical access hospitals; isn't that right?

11        A.   Yes, we did.

12        Q.   Okay.

13             THE COURT:  Mr. MacDonald, I'm sorry to

14  interrupt, but I want some clarification.  What are we

15  looking at on Exhibit 104?  What is it?

16             MR. MACDONALD:  Go to the first page top.

17             THE COURT:  Oh, it's an agenda.

18             MR. MACDONALD:  It's the agenda for joint

19  fiscal.

20             THE COURT:  And what does the Joint Fiscal

21  Committee actually do?  I don't mean their function, I

22  mean when they act on that item.  What does it look

23  like?  Granted, denied?

24             MR. MACDONALD:  Grant, table, disapprove, yes.

25             THE COURT:  So can you go back to 9?  So when

1    it says -- I mean, I look at this and it looks to me

2    like the fiscal committee is authorizing the department

3    to revise the reimbursement rate and then they say, yes,

4    you're authorized.  Now what do you do?

5              THE WITNESS:  We then carry through with what

6    the fiscal committee has directed us to do.

7              THE COURT:  How do you do that?  Do you

8    publish notice or do you just do it?

9              THE WITNESS:  In this particular case -- do

10   you want me to speak to this particular one?

11             THE COURT:  Sure.

12             THE WITNESS:  If this had been approved in

13   April we would have, just as we did in November,

14   determined the individual hospital rates, sent each

15   individual hospital a letter, and then also post the

16   decision and the rate change on what I talked as

17   remittance advice or banner page through our claims

18   payment system.

19             THE COURT:  But I, as an interested person,

20   wouldn't see it in the newspaper or anyplace or

21   rulemaking proposal or anything like that.

22             THE WITNESS:  Not unless there was rulemaking

23   required, sir.

24             THE COURT:  No, there isn't.  You're exempt.

25   But nothing like that.

1          THE WITNESS:  No, sir.

2      Q.  BY MR. MACDONALD:  While we're on this subject

3  of joint fiscal, you responded to Attorney Smith that as

4  far as you're aware members of joint fiscal take written

5  comments.  But just so the record's clear, there's no

6  public testimony at joint fiscal, is there?

7      A.  Not unless the fiscal committee specifically

8  asks for it.

9      Q.  And I can show you Exhibit 23, which is the

10  transcript of joint fiscal for November 21st, 2008, and

11  we can do that, but perhaps we could agree that Chairman

12  Smith didn't take any public testimony at that hearing,

13  did she?

14      A.  No, she didn't, sir.

15          MR. MacDONALD:  Okay.  That's all I have.

16  Thank you for your time.

17          THE COURT:  Mr. Chapman, I'm sorry.

18                     CROSS-EXAMINATION

19  BY MR. CHAPMAN:

20      Q.  Good morning, Ms. Dunn.  I'm Bill Chapman and

21  I represent John Doe.  Are you aware of that?

22      A.  Which John Doe, sir?

23      Q.  John Doe.

24          THE COURT:  There are two now, aren't there?

25          MR. CHAPMAN:  There are two.

1        Q.    I represent both, but I'm --

2        A.    Oh.

3        Q.    As I understand your testimony, the chart

4   which is marked as Exhibit 218 but really is the

5   department's position, this far right-hand column,

6   public notice method, that's the -- what you've got

7   there, the entries you have there are the entries that

8   refer the Court to the notice that was given to comply

9   with the public process requirement imposed on the

10  department when it makes a rate change; correct?

11       A.    Yes, sir.

12       Q.    All right.  And the first two -- if we just

13  take the first two, one is a public notice posted on the

14  fiscal committee website and the second is a public

15  notice posted on the governor's website; is that

16  correct?

17       A.    Yes, sir.

18       Q.    Now, when John Doe applied for Medicaid, he

19  applied at the department?

20       A.    I don't know that to be the facts, sir.

21       Q.    But is that where people apply to the

22  department, or an office of the department around the

23  state?

24       A.    It can be an office, sir, or it can be a

25  community based agency.  Ultimately the applications do

1    come to the department.

2         Q.    And his interactions are either with the

3    department, personnel at the department, or personnel at

4    the department's local offices; correct?

5         A.    Generally, yes.

6         Q.    And as you testified, you have a toll-free

7    number where beneficiaries can contact the department to

8    have questions asked or other matters that have come up

9    in connection with the Medicaid benefits they are

10   getting to pay for healthcare; correct?

11        A.    Yes, sir.

12        Q.    To your knowledge a Medicaid beneficiary would

13   not deal with the joint legislative fiscal committee

14   with respect to his or her Medicaid issues, would they?

15        A.    Some beneficiaries do interact with the fiscal

16   committee members regarding their benefits.

17        Q.    And you know that of your personal knowledge?

18        A.    I often receive phone calls from members of

19   the legislature, including fiscal committee members,

20   asking me to look into a specific issue.

21        Q.    All right.  And that's because perhaps a

22   Medicaid beneficiary has gone to his or her local

23   representative with a Medicaid issue; correct?

24        A.    Generally, yes, sir.

25        Q.    And to your knowledge the Medicaid beneficiary

1    would not deal with the governor's office on Medicaid

2    issues, would they?

3        A.   I don't know.  I can't answer that yes or no,

4    sir.

5        Q.   So isn't it reasonable for us to understand

6    that if a Medicaid beneficiary were concerned about rate

7    reductions, the elimination of the DSH program, they

8    would look at the department's website; correct?

9        A.   They could.

10       Q.   They would -- it wouldn't be reasonable to

11   expect them to look at the joint legislative fiscal

12   committee's website, would it?

13       A.   I don't have an opinion whether that's

14   reasonable or not, sir.

15       Q.   And similarly, it wouldn't be reasonable to

16   look at the governor's website on a Medicaid reduction?

17       A.   Again, I don't have an opinion on whether

18   that's reasonable or not, sir.

19       Q.   Now, you're familiar with the notice process

20   that is imposed by the Medicaid law.  We've referred to

21   it as (13)(A)?

22       A.   I am, sir.

23            MR. CHAPMAN:  Would you pull up Plaintiffs' 7?

24       Q.   And if we look at the second paragraph of

25   that, that refers to Section (13)(A) in the first line?

1       A.    Yes, it does.

2       Q.    And it goes on to say that the public process

3  is going to include a publication of the proposed rates

4  and the final rates, the methodologies and the

5  justifications for rates; correct?

6       A.    That's what it says, yes, sir.

7       Q.    And that's what's got to be included in the

8  public notice of the proposed rate reduction; correct?

9  Do you see that in line two?

10      A.    Yes, it says a public process for determining

11 rates, and then it goes on to specify more specifics.

12      Q.    Specifically, quote, published, proposed, and

13 final rates, the methodologies underlying the rates, and

14 justifications for the rates.  It's got to do it

15 beforehand and after the fact; correct?

16      A.    That's what this letter says.

17      Q.    And that's what Section (13)(A) says; correct?

18      A.    Yes, sir.

19      Q.    Now, if we go to the outpatient reductions

20 that are at the top line on Exhibit 216.  218, excuse

21 me.  The public notice method is Exhibit 107.  Could we

22 have 107, please?

23           MS. SMITH:  Excuse me, your Honor.  We have

24 alerted counsel to time issues with the commissioner,

25 who is here, and we indicated that Mr. Chapman would

1   have no more than five minutes, but we do have time

2   issues with the commissioner who is here to testify.

3         MR. CHAPMAN:  Your Honor, I'll respect that.

4   Two minutes, I can finish up.

5         Q.   Would you go to the top of 107, please?  And

6   this is the agenda for the November 21 meeting that

7   there's been testimony about; correct?

8         A.   Yes, sir.

9         Q.   Now, if we go down to item eight.  And I

10  gather that's the department's position of the public

11  notice that meets the requirements of (13)(A)?

12        A.   For this specific fiscal committee meeting,

13  yes, sir.

14        Q.   And I don't see any reference other than the

15  change in rate to methodology, justification for rate

16  change.  Would you agree with me that there isn't any

17  either methodology or justification there?

18        A.   It's never contained within the agenda item,

19  sir.  It's generally outlined within the specific fiscal

20  item.  You have to state what it is that you're

21  proposing to do and then provide an explanation behind

22  it.

23        Q.   But this is the public notice to Medicaid

24  beneficiaries; correct?

25        A.   Yes, I understand what you're asking.  Yes,

1    sir.

2         Q.   And if we look at the second line of

3    Exhibit 218, which is the public notice the department

4    relies on with respect to the inpatient rate reduction,

5    that's Exhibit 110.  Could we have that, please?  And if

6    you could go -- can you tell us where on this -- I

7    believe it's on page 2, if you drop down to line 05-01,

8    is that the public notice for the rate reduction for the

9    department?

10        A.   That identifies the budget organizational

11   code.  I believe attached to this is a more detailed

12   spreadsheet, sir.

13        Q.   Would you go to that, which is I believe the

14   next to the last page.  Can you find it on there, the

15   inpatient reduction?  If you go all the way down to the

16   bottom, I think it's line 70, begins at line 74, and

17   it's actually line 77.  Is that it?

18        A.   Yes, sir.

19        Q.   And again, there's no -- is there a

20   justification, any indication of what the methodology

21   is?

22        A.   Not on this sheet, sir, no.

23        Q.   Well, let's go back to page 1, the second

24   whereas clause.  And it says:  Whereas, the governor has

25   determined that the budgeted rate state revenues are

1   insufficient to fund state budgeted expenditures.  Isn't

2   that the reason for the reduction?

3       A.   That is the reason the governor included it in

4   his executive order, sir.

5            MR. CHAPMAN:  Thank you.  No further

6   questions, your Honor.

7            MS. SMITH:  We don't have any redirect or

8   recross.

9            THE COURT:  I just have one brief matter.  I

10  don't want to hold up the commissioner but I suspect,

11  Ms. Dunn, you're probably more familiar with this than

12  he might be.  The system seems to be something like the

13  department purports to request from the fiscal committee

14  authorizational authority to reduce the rates.  You

15  submit that to the fiscal committee.  The fiscal

16  committee then seems to say, okay, do that.  Then the

17  department says, now that we have authority to do it,

18  we're going to do it.  Is that the way it works?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  And who initiates that request?  I

21  know it starts from the department, but is there some

22  step before that?  Does the governor say department,

23  request this, or does the legislature say department,

24  request this?

25           THE WITNESS:  Depending on what time of the

1    year it is, if it's mid-year budget cycle it can be the

2    governor, such as in this case, directing state agencies

3    to produce options for a budget reduction.  If it's part

4    of the budget process, sir, they document what they want

5    the state agencies to do in what they call House Bill 2

6    and it says specifically this is what we're directing

7    you to do.

8                THE COURT:  So then based upon that budget

9    imperative, you say, here's our request to reduce rates.

10   Please give us the authority to do it.  And they say,

11   sure, do that.

12               THE WITNESS:  They say yes or no.

13               THE COURT:  All right.  And then you go and do

14   it.  Now, if instead of just doing it you had issued a

15   public notice, for example, we're going to cut across

16   the board here 30 percent.  Public notice, what's our

17   justification.  Because we're in tough budget times and

18   the legislature needs to slash.  And if they slash this

19   amount, we necessarily have to reduce the rates or do

20   something.  What do you think, providers and public?

21               Isn't it possible that they could all come

22   back to you in a human cry and say, for God's sake,

23   don't do that.  Do something else.  Change this, change

24   that.  Couldn't you then go back to the fiscal committee

25   and say given this reaction, we request that you give us

1   permission not to cut the rates so far?  Isn't that

2   possible?

3           THE WITNESS:  It is an option, sir.

4           THE COURT:  Okay.  No further questions.  You

5   may step down, ma'am, and you're excused.  And you may

6   call the commissioner.

7           MS. SMITH:  I think we need to ask plaintiffs'

8   counsel if they rest their case.

9           MR. O'CONNELL:  We do, your Honor.

10          THE COURT:  All right.  Thank you.

11          MS. SMITH:  We would call Commissioner Toumpas

12  to the stand.

13                  NICHOLAS A. TOUMPAS

14      having been duly sworn, testified as follows:

15          THE CLERK:  Would you please state your name

16  and spell your last name for the record.

17          THE WITNESS:  My name is Nick Toumpas,

18  Commissioner of Health and Human Services.  The spelling

19  of my last name is T O U M P, as in Peter, A S.

20                  DIRECT EXAMINATION

21  BY MS. SMITH:

22      Q.   Commissioner Toumpas, could you please

23  describe briefly what your history as commissioner and

24  with the -- employed by the State of New Hampshire is?

25      A.   I became commissioner on an acting basis in

1   August of 2007, was appointed for a four-year term in

2   January of 2008, and was recently reappointed for a

3   four-year term effective this month.  I joined the

4   department in 2002, August of 2002.

5        Q.   And what did you do before joining the

6   department?  Can you just briefly summarize your

7   management experience before --

8        A.   Prior to joining the department I spent a

9   little over 20 years in the information technology,

10  telecommunications industry in a variety of executive

11  front-facing client roles with small, medium, and large

12  organizations.

13       Q.   As commissioner, what has your involvement

14  been -- let me back up.  Are you familiar with the

15  claims by the plaintiff hospitals in this lawsuit?

16       A.   Yes.

17       Q.   As commissioner, what has your involvement

18  been in the decisions leading up to those changes?

19       A.   One of the primary things that I try to do is

20  to make sure that we have communication with the

21  stakeholders with respect to the budget changes, the

22  budget issues that we as a department are faced with.

23       Q.   Specifically in regards to rate changes back

24  in 2008 to inpatient and outpatient, did you take any

25  actions to solicit input from the hospitals prior to

1    those decisions?

2        A.    Several actions.   In early 2008, January of

3    2008, the department set up a series of stakeholder

4    councils to be able to have discussions with

5    stakeholders, including hospitals, a number of other

6    ones, because the issues that we were dealing with stem

7    far beyond hospitals.

8            But specifically with the hospitals in -- I

9    believe it was in February of 2008, I went to meet with

10   the Hospital Association and laid out what the

11   challenges that we were facing and asked them to be able

12   to work with the department to come up with some

13   alternatives to -- how to deal with some of the budget

14   shortfalls that we were projecting.

15       Q.    Did you actually ask them to designate a

16   representative at any point?

17       A.    Yes, we did.

18       Q.    I'll ask you to look at what we have marked as

19   Exhibit 202.   It will be up on the screen.   It's also in

20   the white notebooks behind you, number 404.

21       A.    I'm sorry, you said 202?

22       Q.    202 I believe is the number.   And is this a

23   letter that you wrote?

24       A.    Yes.

25       Q.    And is this a letter in which you ask the

1   Hospital Association to designate a representative to

2   participate in an ongoing discussion?

3        A.   Stakeholder council, that's correct.

4             MS. SMITH:   I would ask that the

5   identification be stricken.

6             MR. O'CONNELL:   I'm sorry, we're still having

7   -- 202, excuse me.  No objection.

8             THE COURT:   ID maybe stricken on Defendant's

9   202.

10            (Defendant's Exhibit 202 admitted.)

11       Q.   Did they designate a representative?

12       A.   Yes.

13       Q.   Do you recall who that was?

14       A.   I do not.

15       Q.   Were there subsequent meetings of this group

16  that included the hospitals' representative?

17       A.   Yes.  I had asked for a representative -- this

18  was -- a similar letter was sent to a number of the

19  different provider groups asking that each one of those

20  groups designate one individual to be able to be part of

21  the discussion and that would then communicate with the

22  rest of their membership.

23       Q.   And how frequently did these stakeholder

24  meetings meet?

25       A.   They varied.  Primarily they were really

1    driven around changes that we were making with respect

2    to the budget, and when we got into the budget process

3    and subsequent budgets we would go each phase of the

4    budget.  As I believe Ms. Dunn had testified, there are

5    multiple phases to the budget, and after each one of

6    those phases were done that we would engage the

7    stakeholders and tell them what type of things the

8    legislature was considering and to be able to talk to us

9    about what possible options there would be so that we

10   could -- in subsequent phases of the budget we could

11   deal with that.

12        Q.   And if the governor issued an executive order,

13   what would you do as far as presenting those issues to

14   the stakeholders?

15        A.   Generally what would happen with -- if the

16   governor issues an executive order, he would give us --

17   first off he would give us a target number that we

18   needed to work with, and that number would have been

19   worked on with him prior to the actual executive order,

20   and we would go through a number of different options

21   working that with the governor, and the Governor's

22   Office would decide which of those items that he wanted

23   to be able to put forward or not.

24        Q.   After the executive order is issued what -- do

25   you have any communications with the providers about

1      what you're going to do to implement that order?

2           A.   Yes, we do.

3           Q.   What do you do?

4           A.   Invariably we would invoke the stakeholder

5      meetings and we would meet with the stakeholders either

6      in a broad group, because we had three separate groups

7      that we had set up based on the nature of the type of

8      services that they would provide and populations that

9      they served, and we would pull them together to be able

10     to talk about their views on the thing, if there were

11     any options, if there were any issues that they had with

12     that.  So it was try to be as transparent as we could

13     recognizing that there were potential difficulties.

14          Q.   Specifically in the period between April --

15     around the November 8th reductions, did the hospitals

16     provide input leading up to the November 2008

17     reductions?

18          A.   My recollection is that in early 2008 we went

19     to the Hospital Association and met indeed with a number

20     of the member hospitals, both critical access as well as

21     the non-critical access hospitals, to say here is the

22     nature of our challenge, here is the target number that

23     we have, and we want some ideas, some feedback from you

24     in terms of what we can possibly do.

25               The hospitals came back with several options,

 1   two of which we were able to take, one of which we were

 2   not able to act on.

 3        Q.   And those actions are -- are some of those

 4   things outlined in a series of letters between you and

 5   the Hospital Association?

 6        A.   Yes, they are.

 7        Q.   And also a hospital letter to the governor?

 8        A.   Yes.

 9        Q.   Did they propose a donation?

10        A.   The hospitals as part -- yes, the one option

11   that they had was to make a donation, my recollection,

12   of $1.1 million.

13        Q.   And what did you communicate with them about

14   whether or not that would work?

15        A.   We expressed concerns about that and we sought

16   the advice of the -- I believe the Attorney General's

17   Office, as well as we may have also contacted the Center

18   for Medicare and Medicaid Services.

19        Q.   And aside from this period in 2008, have you

20   personally gone out and done outreach for the hospitals?

21        A.   We have -- I have met with a number of

22   hospitals.  They have invited me to their facility or I

23   would -- I was going to be in the area and I would stop

24   in to be able to work with them.  Predominantly we work

25   through the association to make sure that -- because

1   issues that we're dealing with, we wanted to make sure

2   that we touched base with the association.  We have

3   that, that discussion with the anticipation that they

4   will then be speaking for their membership.

5        Q.   Have you done regional meetings at any point

6   in time?

7        A.   Yes.

8        Q.   Can you tell us about those.

9        A.   The department has done -- when I became

10  commissioner we had a number of challenges before us and

11  I wanted to be able to go out to communities, and we set

12  up a series of regional dialogues where we presented

13  some data.  We talked about some of the challenges that

14  we faced.  We talked about some of the initiatives and

15  things that we wanted to be able to do and to get some

16  dialogue and try to do it in a very public process.

17       Q.   We've talked about the Kane report on

18  financial health of the hospitals.  Do you recall that

19  report?

20       A.   Yes, I do.

21       Q.   Did you set up a meeting to present that

22  report to the hospitals?

23       A.   A meeting was set up -- a presentation

24  actually by Ms. Kane was set up at our offices here in

25  Concord at Hazen Drive.  I believe there was a panel

1  discussion following that to get reaction to the report.

2      Q.  Can you look at what we have marked as

3  Exhibit 203?

4      A.  Yes.

5      Q.  Can you tell us what these letters are?

6      A.  These are letters that were addressed to the

7  association and to each one of the hospital CEOs

8  inviting them to the meeting with Dr. Kane.

9      Q.  And you signed these letters?

10     A.  Yes.

11         MS. SMITH:  We'd ask for the ID to be

12  stricken.

13         MR. O'CONNELL:  No objection.

14         THE COURT:  ID may be stricken on Defendant's

15  203.

16         (Defendant's Exhibit 203 admitted.)

17     Q.  And several of the hospital representatives

18  that testified here have said that they were given no

19  opportunity to provide input on the proposed reductions.

20  Would you agree with that?

21     A.  No.

22     Q.  Why not?

23     A.  We went to the Hospital Association.  I met

24  with a number of the member hospitals in two sessions,

25  the critical access hospitals and as well as with the

88

1    full membership.  We laid out what our challenge was,

2    that we had done a couple things in order to be able to

3    close the gap in terms of what we had, and we were

4    looking for alternatives as opposed to doing any type of

5    a rate reduction.

6         Q.   Is there any information presented that would

7    inform the public about what was going on other than

8    just the hospitals?

9         A.   Again, all the materials that we provided

10   through those stakeholder briefings, we posted much of

11   that material on the department's website.  We also set

12   up a separate web portal that all the providers could go

13   in, with the idea being that an association would be

14   able to extract the documents from there and then get

15   those out to their membership as well as to the general

16   public.

17        Q.   I've heard the term mentioned of some -- term

18   mentioned of a dashboard that you set up.  What is that

19   and what role does that play?

20        A.   In July of 2009, right after the passage of

21   the budget, we as a department went and created a new

22   document that we were going to send on a monthly basis

23   to the legislative fiscal committee, and in that

24   document -- there were three things that would be in

25   that document.  One was a narrative about some of the

1    issues and challenges that the department was facing.

2    Number two was a projection in terms of where we would

3    be with respect to our appropriations by the end of the

4    fiscal year.  And then the third was a set of operating

5    statistics in terms of the numbers of people that we

6    served or dollars, whatever -- relevant to certain

7    aspects of the department.  We made that available and

8    we did that on a monthly basis.  We posted that on the

9    department's website and the aforementioned stakeholder

10   councils.  We also posted those dashboards for them to

11   be able to have access to those as well.

12            MS. SMITH:  I don't have any further questions

13   for the commissioner.

14            THE COURT:  Thank you.  Mr. O'Connell?

15            MR. O'CONNELL:  Thank you, your Honor.

16                      CROSS-EXAMINATION

17   BY MR. O'CONNELL:

18       Q.   Good afternoon, Commissioner.

19       A.   Good afternoon.

20       Q.   My name is Scott O'Connell, and I represent

21   with Mr. MacDonald the plaintiffs in this matter,

22   provider plaintiffs.

23            You understand, sir, that your agency that you

24   head is the designated responsible party by the Center

25   of Medicaid Services for implementing the Medicaid

1    program in the state; correct?

2        A.   Yes, sir.

3        Q.   There's no other division of state government

4    that has that responsibility?

5        A.   No, sir.

6        Q.   Certainly the Joint Fiscal Committee does not

7    have that responsibility; isn't that true?

8        A.   That's correct.

9        Q.   It's your job as the commissioner to oversee

10   that any changes that are made meet the requirements of

11   federal law as to equal quality of care for Medicaid

12   beneficiaries; true?

13       A.   Yes.

14       Q.   And it's also the job of your department under

15   your direction to make sure that Medicaid patients have

16   equal access to care.

17       A.   Yes.

18       Q.   Isn't that also true?

19       A.   Yes.

20       Q.   In December of last year your department went

21   through some public noticing of UPL changes, state plan

22   amendments affecting UPL, to take it out of state fiscal

23   year '12; isn't that true?

24           MS. SMITH:  I'm going to object.  It's beyond

25   the scope of direct with this witness.

1          MR. O'CONNELL:  It's cross-examination, your

2     Honor.

3          THE COURT:  Objection overruled.  Otherwise

4     you'd have to bring the commissioner back, and I'm sure

5     he doesn't want to do that.

6          MR. O'CONNELL:  Thank you.

7     Q.   With regard to December, your office issued

8     public notice of proposed state plan amendments

9     concerning upper payment limit payments; correct?

10    A.   Yes.

11    Q.   And you asked in those notices -- you provided

12    the opportunity in those notices that were published for

13    the public to provide feedback to your department about

14    the impacts of those changes; isn't that true?

15    A.   Yes.

16    Q.   And in fact you got written comments from many

17    constituencies in response to the planned reduction of

18    upper payment limit payments; isn't that true?

19    A.   I believe so.

20    Q.   The Hospital Association wrote and said that

21    this would have devastating effects on their membership.

22    Isn't that a true statement?

23    A.   Yes.

24    Q.   And the ten plaintiff hospitals in this case

25    wrote to you in December of 2011 and said that those

1    reductions in payments would limit access to Medicaid

2    beneficiaries for service; isn't that true?

3         A.   Yes.

4         Q.   And in fact, since that notice your department

5    has moved forward and filed those state plan amendments;

6    isn't that true?

7         A.   Yes.

8         Q.   And it's true, sir, that since the filing of

9    that state plan amendment you have learned that some of

10   the plaintiffs represented in this case have closed

11   physician panels to Medicaid patients; isn't that true?

12        A.   Yes.

13        Q.   So following up on the Court's line of

14   questioning earlier of your colleague, Ms. Dunn, after

15   learning about the complaints that the Hospital

16   Association had about the elimination of UPL and

17   complaints from the plaintiff hospitals, did you return

18   to the Joint Fiscal Committee and express the concern

19   that these constituencies had about the decision to

20   defund that payment?

21        A.   No, I did not.

22        Q.   You didn't go back and indicate that there was

23   a mistake here in the minds of some of the providers of

24   Medicaid services and that this should be considered

25   further by the committee, did you?

1      A.   No.

2      Q.   And you haven't done any analysis, have you,

3    at the department to determine the amount of impact the

4    Medicaid access, the reduction of upper payment limits,

5    will have?

6      A.   We had -- the feedback that Ms. Dunn talked

7    about in terms of monitoring what the impact was going

8    to be, we have monitored that.

9      Q.   Okay.  So you've reacted to calls that have

10   come back to your department from certain affected

11   patients, beneficiaries, who have figured out the way to

12   call your department.  Is that a fair summary?

13     A.   Um-hum.

14     Q.   Anything else?  Any other assessment of the

15   impacts to Medicaid beneficiaries because of the

16   reduction of UPL payments?

17     A.   No.

18     Q.   And you have no plans to go back to joint

19   fiscal, do you, with a request for further appropriation

20   to fix the hole created by the denial of UPL payments?

21     A.   The fiscal committee is not the vehicle in

22   order to do that.  It's the legislature to do that,

23   through the budget process.

24     Q.   So you have no plans of going back to the

25   legislature and asking them to open up the budget to

1    consider the concerns that have been raised by the

2    Hospital Association and the plaintiffs in this suit?

3         A.   We have regular meetings with the fiscal

4    committee through that dashboard that I talked about

5    earlier, which is a vehicle in which to be able to

6    communicate any issues and concerns that I have with the

7    fiscal committee.

8         Q.   You have not asked that the budget be opened

9    up --

10        A.   I have not.  I have not.

11        Q.   So the bottom line is when the decision was

12   made by the legislature for no appropriation, no matter

13   what process you ran, to inform people about the impacts

14   of UPL payments being withdrawn, you could do nothing;

15   isn't that true?

16        A.   Other than to tell the legislature what the

17   implications were going to be as a result of any actions

18   that were taken at the budget level.

19        Q.   So the bottom line is you can't -- after

20   getting feedback from those who are going to be limiting

21   access to Medicaid patients, you can't do anything in

22   your role as commissioner to make sure they get those

23   funds restored at this point in the process; isn't that

24   true?

25             MS. SMITH:  I object.  It assumes facts not in

1    evidence that access has been limited.

2              THE COURT:  Overruled.

3         A.   Can you repeat that question again?  I'm

4    sorry.

5         Q.   Sure.  There's nothing you can do at this role

6    in the process, at this time of the process, to make

7    sure that funding is restored to any of the provider

8    hospitals who have limited access to Medicaid

9    beneficiaries?

10        A.   My responsibility as a commissioner of the

11   department is I'm given a budget to be able to work

12   with, and I have to stay within that particular budget

13   and make decisions on that.  I will tell -- as a result

14   of not just this matter or any other, I will go to the

15   -- there are other committees within the legislature

16   that I work with, Health and Human Services oversight

17   and others, to let them know about the implications of

18   this.  I also assume that these statements are not being

19   made just to the department, but they're being made to

20   the legislature as well.

21        Q.   So by the time your department issued a state

22   plan amendment to remove upper payment limits, there was

23   nothing you could do to effect whether payments could be

24   made in this fiscal year; isn't that true?

25        A.   Correct.

1      Q.   In fact -- well, I asked you a couple moments

2    ago -- and I'm mindful of your time commitments, sir, so

3    I'll move along.

4      A.   I'm fine.

5      Q.   Thank you.  You indicated earlier that it is

6    the responsibility of your department to ensure equal

7    access to Medicaid patients, but the funding mechanism

8    the state employs; isn't that right?

9      A.   Yes, sir.

10      Q.   You have told the legislature you have

11    inadequate resources at your disposal in order to do

12    that type of analysis; isn't that true?

13      A.   I have told the legislature --

14      Q.   That you have inadequate resources, inadequate

15    personnel resources to do the type of benchmarking

16    analysis necessary to determine these access issues;

17    isn't that true?

18      A.   Not directly.

19      Q.   Well, sir, do you remember the benchmarking

20    report?

21      A.   Yes.

22      Q.   That was prepared in 2008?

23      A.   Yes.

24      Q.   And do you remember that you conveyed that

25    benchmarking report to the chairman of joint fiscal,

1    Representative Smith?

2        A.   Yes.

3        Q.   And you did that on or about March 10, 2008?

4             (Witness nods head affirmatively?)

5             MR. O'CONNELL:  I'd ask that Exhibit 15 be

6    pulled up.

7        Q.   Would you please turn to page 10 of 251.

8    Commissioner, I'm putting in front of you Exhibit 15,

9    which is the benchmarking report.  Would you look at

10   page 10.  On the top of the document you'll see page 10

11   of 251.  There are a number of different page

12   references, but I'd ask you to look --

13       A.   I found it.

14       Q.   Okay.  The page before it is addressed to

15   Representative Smith; true?

16       A.   Yes.

17       Q.   And this is your letter laying out the

18   benchmark report; true?

19       A.   Yes.

20       Q.   And under the heading, "Situation," second

21   sentence it says:  However, the department does not have

22   the resources required to fully accomplish this

23   benchmarking task.  Isn't that true?

24       A.   That's correct.  We are able to do what we are

25   able to do with whatever available resources that we

 1    have.

 2         Q.   Goes on to say:  The department indicated

 3    previously in its fiscal impact statement that

 4    completing this work would require at least two

 5    full-time analyst positions in addition to the existing

 6    doctoral level analyst.  Such positions were not

 7    provided in the budget and the department has since lost

 8    its doctorate level analyst due to resignation.  The

 9    current statewide freeze, as well as DHHS's current

10    staffing situation, does not allow for the acquisition

11    of additional staff with the requisite skills.  Did I

12    read that correctly?

13         A.   That's correct.

14         Q.   And that was an accurate representation to the

15    committee at that time; true?

16         A.   Yes.

17         Q.   And in fact you made similar comments to the

18    committee when you did the 2010 benchmarking report.

19    Isn't that also true?

20         A.   I don't have that in front of me, but I

21    will --

22         Q.   Well, do you remember generally having

23    concerns about the resources available to you in order

24    to do appropriate benchmarking when you did the 2010

25    report?

1        A.    Yes.

2        Q.    I'd ask you to turn to the next page, please.

3        A.    Page 11?

4        Q.    Yeah, it would be 11 of 251.

5        A.    Yes.

6        Q.    The second full paragraph after the bulleted

7   items beginning Exhibit 1.

8        A.    Exhibit 1?

9        Q.    Yes.   The last sentence says:   With this

10  limited scope, the benchmarking effort will thus not

11  provide some information the fiscal committee may wish

12  to have about the relative need for payment rate

13  increases between acute and long-term care Medicaid

14  services.   Did I read that correctly?

15       A.    Yes.

16       Q.    And that was a true statement when it was

17  made.   Isn't that the case?

18       A.    Yes.

19       Q.    And in fact since that time, in the last

20  year's Medicaid report issued by your department, you

21  have indicated that there is a growing gap in the amount

22  of reimbursements paid by Medicaid as opposed to private

23  insurers.   Isn't that also true?

24       A.    Yes.

25       Q.    So the amount that hospitals are losing on the

1    delivery of Medicaid services has increased from 2008

2    until today; isn't that true?

3         A.   I don't have those numbers in front of me,

4    but --

5         Q.   Well, generally speaking.

6         A.   Yes.

7         Q.   That's the report of your department.

8         A.   Yes.

9         Q.   Has made that observation.

10        A.   Yes.

11        Q.   You don't disagree with that, do you?

12        A.   No.

13        Q.   And in fact -- one second.  I'm going to put

14   in front of you a deck that was prepared for the senate

15   budget process for the fiscal year 2012/'13 budget.  Do

16   you recognize page 15 from that document, sir?

17        A.   This is from one of the PowerPoints that we

18   had done to the senate finance, is that --

19        Q.   Correct.  Presented by Ms. Dunn and Ms. Nihan

20   and Ms. Gannon.

21        A.   Yes.

22        Q.   You're generally familiar with the content of

23   that?

24        A.   Yes.

25        Q.   And you represented as a result of the most

1    recent benchmarking study done in 2010, in almost every

2    case Medicaid is significantly lower than Medicare, New

3    Hampshire commercial insurance, and other Medicaid

4    programs.  Do you see that reference?

5           A.   I do see that.

6           Q.   And that's a true statement, is it not?

7           A.   Yes.

8           Q.   Last bullet includes:  Growing potential that

9    if trends continue, patient access to service will

10   become increasingly more difficult.  Do you see that

11   reference?

12          A.   Yes.

13          Q.   And that was true, too, in April 2011?

14          A.   Yes.

15          Q.   And in fact you have learned that some

16   providers represented in this case have indeed limited

17   access to Medicaid patients; isn't that true?

18          A.   Yes.

19          Q.   Turning your attention to your outreach

20   efforts, sir, to the provider plaintiffs, were any of

21   your regional council meetings noticed as public

22   meetings?

23          A.   On -- for the regional outreach?

24          Q.   Correct.

25          A.   I believe we did.

1           Q.   Did you post that in a newspaper and say

2     members of the public, I, as Commissioner Toumpas, or

3     members of my staff are meeting --

4           A.   Not specifically, no.

5           Q.   Okay.  Were members of the public at any of

6     those meetings, other than the providers that you

7     intended to meet with?

8           A.   A significant number of public attended those

9     meetings.

10          Q.   Did you take any kind of attendance?  Do you

11    have a list of who attended those meetings?

12          A.   No.

13          Q.   Did you do -- did you keep minutes of those

14    meetings?  Did you consider it a public meeting?

15          A.   We had -- it was a dialogue.  It was not just

16    a presentation on my part, but it was a dialogue where

17    we wanted to hear from people.  So it was talking and

18    then getting responses back from them.  We do have all

19    the materials that we presented at each one of those

20    dialogues and I do believe we have an attendance log,

21    exactly who all those people were, whether they signed

22    they were a member of a hospital or something else or

23    just the general public, or the legislature.

24          Q.   So how would somebody who didn't attend that

25    meeting, who didn't hear about it in advance, know that

1    those materials were on your website?

2        A.    We went to -- we worked with people within

3    each one of the communities.  We had a designated lead

4    within that community that would get the word out within

5    that particular community.  I did not have people come

6    back to me and say I did not know about those.  And then

7    all the materials that we subsequently presented there

8    were posted on -- they were made available to the public

9    via the website or other ways.

10       Q.    So if I understood your testimony, you used

11   essentially word of mouth approach to get the word out

12   that these meetings occurred and this information was

13   available?

14       A.    People were invited to those sessions by me,

15   either through letter or through email, with the

16   expectation and the anticipation that others within the

17   community would hear about it, because the people that

18   we were talking to were going to be able to get --

19   mobilize their constituents.  That's who we were looking

20   for to be able to get there.

21       Q.    You understand as commissioner it's your job

22   do make sure that any notice requirements that CMS

23   places on you is the responsibility of your department;

24   correct?

25       A.    I do, yes.

1      Q.   You can't outsource that responsibility to the

2   Hospital Association; right?  That's your job.

3      A.   Okay.

4      Q.   Do you disagree with that?

5      A.   For me to -- if I want to have a public

6   meeting, I need to send that to whom?  Everybody in the

7   public?  I can put it in a newspaper, but in this case I

8   was targeting it towards the specific organizations and

9   the constituents that those people would serve.  Not

10  just hospitals, but long-term care facilities as well as

11  others.

12     Q.   So Mr. Chapman, who represents some

13  individuals in this case, they didn't hear about this by

14  the methods you've described.  You never heard from

15  them, did you?

16     A.   No.

17          MR. O'CONNELL:  I have nothing further, your

18  Honor.  Thank you, Mr. Commissioner.

19          THE COURT:  Mr. Chapman.

20          MR. CHAPMAN:  Very briefly, your Honor, thank

21  you.

22                    CROSS-EXAMINATION

23  BY MR. CHAPMAN:

24     Q.   Commissioner, the benchmark report, that last

25  bullet at the bottom of the page talks about the trend

1   and how that's going to affect access; correct?

2          A.   Yes.

3          Q.   And the trend is going in the wrong direction

4   for access; correct?

5          A.   How so?

6          Q.   In other words, access is being limited?

7          A.   Because a couple of hospitals have indicated

8   that they were closing their panels.

9          Q.   Because of rate reductions and the elimination

10  of DSH; correct?

11         A.   Yes.

12         Q.   And you'll agree that access is important?

13         A.   Access is very important.

14         Q.   Dr. Butterly was here Wednesday morning.  You

15  know Dr. Butterly from Dartmouth-Hitchcock?

16         A.   I do not.

17         Q.   He's an official at Dartmouth-Hitchcock, and

18  he testified that when someone needs treatment, it's

19  important to treat them at the time they need it.  You'd

20  agree with that?

21         A.   Yes.

22         Q.   So that access problems today create real

23  life-and-death situations for Medicaid beneficiaries;

24  correct?

25         A.   For anybody I believe.

1            MR. CHAPMAN:  Thank you.

2            THE COURT:  Any redirect?

3                  REDIRECT EXAMINATION

4    BY MS. SMITH:

5        Q.   Commissioner, are you personally aware of

6    whether or not there are any actual Medicaid recipients

7    that have been unable to receive the care they need in a

8    timely manner?

9        A.   No.  Indeed, we were never notified about the

10   hospitals closing their practices to clients.  We found

11   out about it when we started getting calls from the

12   clients.  But as Ms. Dunn has testified, we have been

13   tracking diligently through our client services units to

14   see if there were any issues related to access or

15   somebody not able to get services and we do not have any

16   of those situations.

17           MS. SMITH:  Thank you.  No further questions.

18           THE COURT:  Thank you, Commissioner.

19   Appreciate it.  You may step down, you're excused, and

20   why don't we break for lunch till 1:30.

21           MR. O'CONNELL:  Thank you, your Honor.

22           MR. CHAPMAN:  Your Honor, before we break, on

23   Wednesday we had a bit of a colloquy about irreparable

24   harm, and I have prepared a short memo on irreparable

25   harm, and if you'd like to have it now in the event that

1   you've got questions before we break --

2            THE COURT:  I'll take a copy, but certainly

3   file it through the electronic system as well.

4            MR. CHAPMAN:  I've got the original and one

5   copy, and I've got copies for them.

6            MS. SMITH:  I would ask -- when we get done,

7   we would ask for a time period when we can submit a

8   legal memorandum.  We have already argued these issues

9   several times, however.

10           THE COURT:  Surely, but as I said, I'll take

11  all the help I can get.  But not too long a period, but

12  certainly.

13           (Adjourned at 12:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            I, Diane M. Churas, do hereby certify that the

4    foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, ski

7    Submitted:   1/27/

8                        **DIANE M. CHURAS, LCR, CM**
                         LICENSED COURT REPORTER, NO. 16
9                        STATE OF NEW HAMPSHIRE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25