UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Dartmouth-Hitchcock Clinic, et al.,
      Plaintiffs

      v.                              Case No. 11-cv-358-SM
                                      Opinion No. 2012 DNH 032
Nicholas Toumpas, Commissioner,
N.H. Dept. of Health and Human Services,
      Defendant

                          **O R D E R**

      A number of New Hampshire hospitals and two individuals seek
an order prospectively enjoining the State's Commissioner of
Health and Human Services from enforcing significantly reduced
reimbursement rates for medical care provided under the State's
Medicaid Program.  The hospital and health care system plaintiffs
are "providers" of medical care, and the individual plaintiffs
are "beneficiaries" under the program.


      Plaintiffs complain that, in several respects, the
Commissioner ignored his clear obligations under federal law,
both procedurally and substantively.  First, they say, he failed
to provide them with notice and an opportunity to comment before
the reduced rates became final.  Second, they claim he failed to
provide notice and an opportunity to comment before the
Department of Health and Human Services ("DHHS") employed rate-
setting methods and standards that were materially different from
those established in the State's federally-approved Medicaid

plan.  Finally, plaintiffs assert that the reduced rates cannot and do not satisfy substantive (and preemptive) federal requirements (i.e., that Medicaid reimbursement rates be set at a level sufficient to both assure quality of care and enlist enough providers to deliver medical services to Medicaid beneficiaries to the same extent such care is available to the general population).  <u>See</u> 42 U.S.C. § 1396a(a)(30)(A) ("Section (30)(A)").

At the risk of oversimplifying the complaint, it generally alleges that New Hampshire's Legislature and Governor effectively dictated substantial reductions in Medicaid reimbursement rates (as well as other Medicaid funding) solely to accommodate state budgetary preferences – that is, to save the State money.  And, say plaintiffs, they acted in a manner completely divorced from the federally required rate-setting process that the State agreed to follow when it voluntarily enlisted in the Medicaid program. The Commissioner's failure to comply with mandatory notice requirements, and his failure to set reimbursement rates in a lawful manner, plaintiffs argue, render those reduced rates invalid and unenforceable.  Accordingly, say plaintiffs, they are entitled to equitable injunctive relief as necessary to obtain the Commissioner's compliance with federal law.

The Commissioner opposes the motion for injunctive relief on a number of grounds.  He also moves to dismiss plaintiffs' substantive claims (Counts I - IV) on grounds that the Medicaid Act does not include a private right of action entitling either medical service providers or beneficiaries to enforce the Act's substantive provisions.  Enforcement of the Medicaid Act's substantive provisions, says the Commissioner, is a matter that Congress has committed to the sound discretion of the federal Secretary of Health and Human Services, not private litigants. Moreover, the Commissioner argues, plaintiffs' assertion of a direct claim under the Supremacy Clause of the United States Constitution is little more than a transparent effort to end-run Congressional intent, by putting a different label on what is really an effort to enforce private rights under the Medicaid Act.

With respect to plaintiffs' procedural claims, the Commissioner denies that DHHS employed rate-setting methods or standards different from those described in the State's Medicaid plan (and so denies that any public notice was required), and he denies that he was obligated to obtain federal approval of a change in rate-setting methodology before reducing the reimbursement rates.  Moreover, he contends that, to the extent any notice and opportunity for public comment were required, the

legislative and executive processes associated with the rate reductions were sufficient, in themselves, to satisfy his obligations under federal law.

The parties have extensively briefed the pertinent legal and factual issues, and hearings have been held on plaintiffs' request for preliminary injunctive relief, as well as the Commissioner's motion to dismiss Counts I - IV.

## Background

Medicaid is a cooperative federal-state program designed to provide medical services to those members of society who, because they lack the necessary financial resources, cannot otherwise obtain medical care.  That is, the program provides medical care to a population generally consisting of the poor, including dependent children, the disabled, and the elderly.  42 C.F.R. § 430.0.  Legislation creating the program, the Medicaid Act, 42 U.S.C. § 1396 et seq., "provides financial support to states that establish and administer state Medicaid programs in accordance with federal law through a state plan approved by the U.S. Department of Health and Human Services ("HHS")."  Long Term Care Pharm. Alliance v. Ferguson, 362 F.3d 50, 51 (1st Cir. 2004). "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with

the requirements of [the Act]."   <u>Harris v. McRae</u>, 448 U.S. 297,
301 (1980).  One such requirement is that the state must have
(and adhere to) a federally-approved plan for reimbursing health
care providers.  42 U.S.C. §§ 1396a(a), 1396d(a).

New Hampshire participates in the program and has a
federally-approved state plan.  Under New Hampshire's plan, DHHS
is the single state agency charged with responsibility to
administer the Medicaid program.  42 U.S.C. § 1396a(a)(5).  DHHS
is headed by the defendant, Commissioner Nicholas A. Toumpas.  As
the State agency charged with administering the Medicaid program,
DHHS is required to set payment rates for various medical
services according to approved methods and standards.

All agree that the present dispute arises from state budget
management decisions made by the Governor and Legislature, in
2008, in response to an anticipated decline in general revenues
and concomitant looming deficits.  Given difficult economic
circumstances and the relatively large expenditures associated
with the Medicaid program, DHHS's budget naturally came under
increasing scrutiny.  Earlier, in 2005, the legislature had
enacted a provision of state law apparently designed to create a
specific mechanism for adjusting reimbursement rates for Medicaid

outpatient services, should DHHS think that claims might exceed
appropriations available to pay those claims:

> If [Medicaid outpatient reimbursement] expenditures are
> projected to exceed the annual appropriation, the
> department may recommend rate reduction for providers
> to offset the amount of any such deficit.  The
> department of health and human services shall submit to
> the legislative fiscal committee and to the finance
> committees of the house and the senate, the rates that
> it proposes to pay for hospital outpatient services.
> The rates shall be subject to the prior approval of the
> legislative fiscal committee.

N.H. Rev. Stat. Ann. ("RSA") 126-A:3, VII(a).


A careful reading of the provision discloses that the
statute is permissive, not mandatory - the department "may"
recommend provider rate reductions.  But the intent is certainly
clear.  The Legislature sets a budget for DHHS.  Then, rather
than incur financial obligations beyond the amount appropriated
to pay for outpatient services, the Commissioner is expected to
recommend rate reductions for those services.  Recommended
reductions are to "offset the amount of any such deficit" - that
is, rates are expected to be reduced as necessary to make certain
that the amount paid to providers for outpatient services (even
dramatically increased services) does not exceed the
appropriation.  The statute is silent with respect to the federal
statutory criteria applicable to setting or changing Medicaid
reimbursement rates (i.e., the rate-setting standards set forth

in Section (30)(A)).  And, it seemingly precludes DHHS from transferring funds from other budget sources to supplement the appropriation available to pay for outpatient services: "The department shall not increase expenditures in approved budgets for such outpatient services without prior [fiscal committee] approval."  RSA 126-A:3, VII(a).

Under this scheme, the reimbursement rate for Medicaid outpatient services could be easily manipulated.  The statute encourages reduction of the approved, multi-factor computation method to a single controlling element: the State's appropriation.  Essentially, one would merely divide the available appropriated funds by the anticipated claims.  The resulting number becomes the new reimbursement rate for outpatient services, a rate whose amount and stability are entirely matters of legislative grace.  The problem, of course, is that such a scheme threatens to render irrelevant other important factors that federal law requires the Commissioner to consider, such as Section (30)(A)'s requirement that rates be set at a level sufficient to assure both quality of care and that Medicaid beneficiaries have equal access to medical care.

In the Fall of 2008, DHHS determined that the then-appropriated amount would not cover anticipated Medicaid

outpatient services claims.  Accordingly, it wrote to the legislative fiscal committee, seeking authorization to "revise the [Medicaid] reimbursement rate paid to non-critical access hospitals for outpatient services from 81.24 percent of Medicare allowable costs to 54.04 percent of Medicare allowable costs effective retroactive to July 1, 2008."  Exhibit C, Freyer Declaration.  The fiscal committee approved the requested rate reduction on November 21, 2008, as a "budget neutrality" measure - that is, a measure designed to reduce reimbursement rates as necessary to keep total costs within the amount budgeted.

Following fiscal committee approval, the Commissioner reduced the outpatient services reimbursement rate by 33.48%, a rather significant amount.  That the outpatient rate reduction was the result of one fact - the State legislature's desire to reconcile an anticipated shortfall in the amount appropriated to pay for those services - is not seriously disputed.  But, it is not inconceivable that the reduced rates still might have passed muster under Section (30)(A)'s standards, had they been properly considered.  And, of course, by reducing outpatient services rates, the State effectively shifted the financial burden associated with the delivery of increased outpatient medical services away from society as a whole, and onto Medicaid services providers, like the hospital plaintiffs.

Also on November 21, 2008, New Hampshire's Governor issued
Executive Order 2008-10, pursuant to statutory authority
providing that:

> Notwithstanding any other provision of law, the
> governor may, with the prior approval of the fiscal
> committee, order reductions in any or all expenditure
> classes within any or all departments . . . if he
> determines at any time during the fiscal year that:
>
> > (a) Projected state revenues will be
> > insufficient to maintain a balanced budget
> > and the likelihood of a serious deficit
> > exists; . . . .

RSA 9:16-b.  Through that Executive Order, the Governor sought to
reduce Medicaid inpatient reimbursement rates by 10% (for non-
critical access hospitals), effective December 1, 2008.  The
fiscal committee approved the Executive Order on the same day it
was issued.  Again, the parties do not seriously dispute that
Medicaid inpatient reimbursement rates were reduced based on a
singular consideration: the Governor's state budget management
preferences, as approved by the legislature.  Like the outpatient
rate reductions, the inpatient rate reductions also shifted a
part of the financial responsibility previously borne by the
State, from the State to the hospitals.

It appears from the record, though it is not yet fully
developed, that the Commissioner followed the Legislature's
direction and implemented the inpatient and outpatient rate

reductions as a matter of course.  It does not appear that the Commissioner engaged in any effort to notify providers, beneficiaries, or other interested residents of New Hampshire of the impending rate reductions.  Nor did he provide them with an opportunity to be heard before making the reductions final.

To be fair, the Commissioner does not seem to argue that he made any purposeful effort to give notice and an opportunity to be heard, as contemplated by federal law, before implementing the rate reductions.  Instead, he argues that, while no formal notice was published or broadcast, still, providers, beneficiaries, and interested residents were put on fair notice of the impending reductions through the ongoing political and legislative process. The notion seems to be that, because DHHS, the Governor, and various legislative committees were in communication with representatives of a hospital association to which the hospital plaintiffs belong, the hospitals had at least constructive, if not actual notice of the impending rate changes.  They also had an opportunity to lobby against those changes before the legislative fiscal committee and the Governor.  That general public process, says the Commissioner, was a fair substitute for the administrative notice and opportunity to be heard required by the Medicaid Act.  The Commissioner makes the same point with respect to Medicaid beneficiaries and other interested residents

- they, too, necessarily had constructive, if not actual, notice of the doings of the Governor and Legislature, and they too could have voiced their concerns to the Governor and fiscal committee, if not DHHS, by means of traditional lobbying or attendance at various fiscal committee proceedings.

**Discussion**

I.   <u>Supremacy Clause Claims</u>.

Federal Medicaid law and applicable regulations unequivocally require that Medicaid reimbursement rates be set by participating states in accordance with methodologies and standards published in a state plan and approved by the United States Secretary of Health and Human Services (through the Centers for Medicare and Medicaid Services ("CMS")).  Those methodologies and standards must be adequate to, <u>inter alia</u>, "assure that [Medicaid] payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the [Medicaid] plan at least to the extent that such care and services are available to the general population in the geographic area."  42 U.S.C. § 1396a(a)(30)(A).

Substantively, the providers and beneficiaries make a strong case that the reduced Medicaid reimbursement rates implemented by

11

the Commissioner are far below the actual cost of providing care, inconsistent with the state's legal obligation to set Medicaid rates at a level that at least minimally supports their ability to deliver medical care to the most needy, and the product of a rate-setting process completely untethered from the methods and standards the State is obligated to apply in setting rates.  They also plausibly argue that the reduced rates are likely to force Medicaid service providers to abandon the program, because they cannot continue to disproportionately subsidize the State's Medicaid obligations.  As is likely self-evident, arbitrary reductions in Medicaid reimbursement rates, implemented solely to accommodate state budgetary preferences, necessarily collapse multiple rate-setting factors into just one - state prerogative. It is equally self-evident that if rate-setting based strictly on state prerogative were permissible under the Act, then the purpose and objectives of the federal-state program could be completely undermined by participating states, in direct contravention of Congressional intent.  That is of particular concern when, as here, reimbursement rates are substantially reduced in the larger context of other significant and contemporaneous withdrawals of state financial support of Medicaid services.[1]

---

[1]      In addition to the inpatient and outpatient rate reductions, New Hampshire also implemented a delay in Outpatient Cost settlement Payments, eliminated what are known as UPL payments

It should not be surprising, then, that courts have rejected
Medicaid rates set solely on the basis of state budget
considerations.  See Indep. Living Ctr. of So. Cal., Inc. v.
Maxwell-Jolly, 572 F.3d 644, 659 (9th Cir. 2009)("State budgetary
concerns cannot . . . be the conclusive factor in decisions
regarding Medicaid."), vacated on other grounds 2012 WL 555204
(Feb. 22, 2012); Amisub (PSL), Inc. v. Colorado Dep't of Social
Services, 879 F.2d 789, 800-01 (10th Cir. 1989)("While budgetary
constraints may be a factor to be considered by a state when
amending a current plan, implementing a new plan, or making the
annually mandated findings, budgetary constraints alone can never
be sufficient.").

Plaintiffs have presented persuasive evidence tending to
show that, in all likelihood, the Commissioner reduced the
outpatient and inpatient reimbursement rates in a manner
inconsistent with his substantive and procedural obligations

---

(discretionary sums paid to reimburse hospitals up to the
difference between the amount paid by Medicare and that paid
under Medicaid for like services), and eliminated what are known
as DSH payments (amounts paid to assist those hospitals that
serve a disproportionately high proportion of patients who cannot
pay and do not qualify for Medicaid assistance).  In addition,
the State changed its long-standing practice and converted what
had been a hospital tax in name only into a burdensome reality
(the Medicaid Enhancement Tax).

Parenthetically, the court notes that plaintiffs also seek
to include those reductions as "rate" reductions, but the record,
as it stands, does not support that contention.

under applicable federal law.  It appears likely, as well, that
the Commissioner employed a rate-setting method (one solely
driven by "budget neutrality") that deviated materially from the
rate-setting method approved by the Secretary, without first
giving appropriate public notice and without first obtaining
CMS's approval of a state plan amendment.  <u>See</u> 42 U.S.C.
§ 1396(a)(30)(A); 42 C.F.R. § 447.205.

But, as the Commissioner correctly notes, legal precedent in
this circuit is reasonably clear in holding that Congress did not
intend to create a private right of action to enforce the
Medicaid Act's substantive requirements.  Plaintiffs cannot
directly enforce Section (30)(A)'s requirements and, in all
probability, only the Secretary can hold the State accountable
for failing to meet its substantive Medicaid Act obligations.
<u>See, e.g.</u>, <u>Long Term Care</u>, 362 F.3d at 59 ("Providers . . . do
not have a private right of action under subsection (30)(A); if
they think that state reimbursement is inadequate — and cannot
persuade the Secretary to act — they must vote with their
feet.").

Plaintiffs readily concede that they cannot enforce any
obligations imposed upon the States by Section (30)(A), and deny
that they are attempting to do so.  Rather, they say, they are

14

asserting a direct claim under the Supremacy Clause of the United States Constitution, seeking an order declaring invalid those State laws that, in their view, mandated the rate reductions at issue – State laws that contradict, and are, therefore, preempted by federal law.

Whether the hospitals and Medicaid beneficiaries can maintain a suit challenging rate reductions on that legal theory is a matter of some doubt.  That very question was pending before the United States Supreme Court this term.  Those expecting a definitive answer, however, were disappointed last week, when the Court decided Douglas v. Indep. Living Center of Southern California, Inc., No. 09-958, 2012 WL 555204 (Feb. 22, 2012). The Court vacated the Ninth Circuit's decision allowing Medicaid providers to bring a Supremacy Clause action seeking to invalidate Medicaid reimbursement rates set by an arguably preempted California statute.  But, the Court avoided the Supremacy Clause question entirely, instead remanding the case to the court of appeals so it might have an opportunity to consider whether a likely administrative remedy under the Administrative Procedures Act effectively rendered the providers' Supremacy Clause claim both redundant and unnecessary.

Douglas raises more questions than it answers, and adds a
measure of uncertainty to the law applicable in resolving
plaintiffs' substantive claims in this case.  The Justices split
5 – 4, with the four dissenting Justices unequivocally declaring
that the Supremacy Clause cannot be invoked to enforce a state's
obligations under Spending Clause legislation like the Medicaid
Act.  The five Justices in the majority avoided that issue
altogether, noting that after the Court heard oral argument in
the case, the Secretary administratively approved California's
statutorily-mandated rate reduction.  Based upon that intervening
change in circumstances, the majority held that the case should
be remanded, rendering it unnecessary to resolve the Supremacy
Clause issue:

> While the cases are not moot, they are now in a
> different posture.  The federal agency charged with
> administering the Medicaid program has determined that
> the challenged rate reductions comply with federal law.
> That agency decision does not change the underlying
> substantive question, namely whether California's
> statutes are consistent with a specific federal
> statutory provision (requiring that reimbursement rates
> be "sufficient to enlist enough providers").  But it
> may change the answer.  And it may require respondents
> now to proceed by seeking review of the agency

determination under the Administrative Procedure Act
(APA), 5 U.S.C. §701, et seq., rather than in an action
against California under the Supremacy Clause.

Douglas, 2012 WL 555204 at *5.[2]


So, a critical legal question, potentially dispositive of
plaintiffs' Supremacy Clause claim, remains unanswered.  Unlike
in Douglas, however, the record here does not disclose what, if
any, federal administrative review of the State's rate-setting
process is available, or has occurred.  Indeed, during the
hearings held before this court, plaintiffs' counsel suggested
that there has been no federal agency review or action, and that

---

[2]     Prior to implementing the legislatively-mandated rate
reductions, California (unlike New Hampshire) submitted several
State Plan Amendments to the Centers for Medicare & Medicaid
Services.  Initially, CMS rejected those proposed amendments on
grounds that, among other things, the State failed to demonstrate
that the reduced reimbursement rates would meet the conditions
set out in Section (30)(A) (specifically, that state plans must
assure that payments to providers are sufficient to enlist enough
providers to ensure that care and services are available under
the State's Medicaid plan at least to the extent that such care
and services are available to the general population).
Subsequently, however, California submitted additional
documentation to demonstrate that the SPAs complied with Section
(30)(A).  CMS approved the SPAs, after determining that an
analysis of the rates and their likely impact suggested that
Section (30)(A)'s requirements could be satisfied, and that
ongoing state monitoring, as well as a commitment to promptly
change the rates should they prove insufficient, afforded
adequate protection to providers and beneficiaries.  See Letter
from CMS to the Director of California Health Care Programs,
dated October 27, 2011.

counsel was unaware of any federal administrative process available to them to obtain such review.

Given the ambiguity of the majority's holding in <u>Douglas</u>, and because the record here was developed without the benefit of that decision, additional briefing and argument is as unavoidable here as it was in <u>Douglas</u>.  <u>Douglas</u> simply raises too many critical factual, administrative, and legal questions left unaddressed in this record, and about which the parties are unlikely to agree.  As the Supreme Court suggested, plaintiffs may be limited to administrative review procedures, followed by deferential judicial review.  In any event, the parties are entitled to be heard on those issues before the court resolves the merits of plaintiffs' claims.  A briefing schedule and specified issues the parties are to address are set out below.

II.  <u>Plaintiffs' Procedural Claims</u>.

That leaves plaintiffs' procedural claims under 42 U.S.C. § 1396a(a)(13)(A) ("Section (13)(A)").  While the plaintiffs concede that they cannot assert private causes of action under Section (30)(A), they insist that Congress did afford them a private right of action to enforce the procedures required by Section (13)(A).  Section (13)(A) requires a state's Medicaid plan to provide:

(A) for **a public process for determination of rates** of payment under the plan for hospital services . . . under which -

> (i) **proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published**,
>
> (ii) **providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications**,
>
> (iii) **final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published**, and
>
> (iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1396r-4 of this title) the situation of hospitals which serve a disproportionate number of low-income patients with special needs;

42 U.S.C. § 1396a(a)(13)(A) (emphasis supplied).   As the court of appeals observed, Section (13)(A) "requires inter alia that a 'public process' be used to set 'rates of payment . . . for hospital services . . .,' in which 'providers,' among others, can comment on 'proposed' rates."   Long Term Care, 362 F.3d at 53. "Broadly speaking, subsection (13)(A) requires something on the order of notice and comment rule-making for states in their setting of rates for reimbursement of 'hospital services' . . . provided under the Medicaid Act."   Id. at 54 (citing Am. Soc'y of Consultant Pharmacists v. Concannon, 214 F. Supp. 2d 23, 28-29

(D. Me. 2002)); accord Children's Seashore House v. Waldman, 197
F.3d 654, 659 (3d Cir. 1999).


As noted, plaintiffs can sue to enforce rights under funding
statutes (like Medicaid) only when Congress intended to permit
such litigation.  When Congress has not clearly disclosed its
intent to create or preclude private causes of action, its intent
must be inferred from the words used in the pertinent
legislation, with resort to legislative history as necessary.
Supreme Court jurisprudence relative to determining whether
Congress meant to create private causes of action under federal
funding statutes requires consideration of the factors described
in Gonzaga Univ. v. Doe, 536 U.S. 273 (2002).  In Gonzaga "the
Supreme Court assimilated its earlier cases restricting implied
rights of action in non-state cases with [42 U.S.C. § 1983]
precedent; it repeated an earlier statement that section 1983
requires a violation of a private federal right and not just a
federal law, and it indicated that nothing short of 'an
unambiguously conferred right' could support a claim under
section 1983 based on a federal funding statute." Long Term
Care, 362 F.3d at 57 (citations omitted).


Section (13)(A), by its terms, seems to unambiguously afford
providers and beneficiaries a private right of action.  The

statutory language addresses a narrow subject (rates for specified sets of services, including "hospital" services); uses "rights creating language" to confer procedural rights on an identified and discrete class of beneficiaries (providers, beneficiaries, their representatives, and other concerned State residents); and focuses on the individuals protected (providers and beneficiaries) rather than the entity being regulated (the State).  In fact, the court of appeals has recognized that the statute's language entitles Medicaid providers to "insist on reimbursement rates that were adopted under subsection (13)(A) after notice and an opportunity to comment."  Long Term Care, 362 F.3d at 55.  By requiring prior notice and an opportunity to be heard, before Medicaid rates are set, Congress "could have thought that embattled care facilities like hospitals and nursing homes needed special protection from arbitrary rates."  Id.  And, "it is easy to imagine why Congress wanted special protection for care facilities.  Their sunk-cost structure makes them especially vulnerable to slow destruction by long-term underfunding."  Id. at 56.  That, of course, is a major concern raised by plaintiffs in this case.

In Long Term Care, the court of appeals assumed that Section (13)(A) (unlike Section (30)(A)) meets the Gonzaga test.  The court contrasted the attributes of Section (13)(A) with those of

21

Section (30)(A) to make the point that Section (30)(A), unlike
Section (13)(A), did not afford a private right of action under
§ 1983.  Long Term Care, 362 F.3d at 56.  Likewise, applying the
Gonzaga factors, I find that the hospital and beneficiary
plaintiffs may, consistent with Congressional intent, assert
private causes of action seeking enforcement of the procedural
rights afforded them under Section (13)(A).

     Turning to the merits, plaintiffs argue that the
Commissioner ignored his obligation to provide the notice and
opportunity to comment required by Section (13)(A) before he
implemented the significantly reduced rates.  Accordingly, they
seek an injunction both requiring him to comply with Section
(13)(A)'s notice provisions and enjoining prospective enforcement
of the reduced rates until those requirements have been met.

     Preliminary injunctive relief is generally appropriate when
plaintiffs satisfy a familiar four-part test.  Plaintiffs must
show that (1) they are likely to succeed on the merits; (2) they
will suffer irreparable harm if an injunction is not entered; (3)
injury to the plaintiffs absent injunctive relief outweighs any
harm that granting an injunction would impose on the defendant;
and (4) the public interest favors injunctive relief.  See, e.g.,
Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir.

2000).  A party seeking injunctive relief must independently satisfy each of the four factors.  See Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981).

Plaintiffs are likely to succeed on the merits of their Section (13)(A) claims.  Putting aside the Supremacy Clause issue, the gravamen of plaintiffs' complaint is that Section (13)(A) notice and an opportunity to be heard were unlawfully denied them before the Commissioner implemented these substantial rate reductions.  From the evidence presented, that seems highly likely.  On the other hand, the Commissioner's position - that, with respect to his rate-setting actions, collateral legislative and other political proceedings served as an adequate substitute for the notice and opportunity to be heard required by the Act - is one that is unlikely to succeed on the merits.  See generally Mission Hosp. Regional Med. Ctr. v. Shewry, 168 Cal. App. 4th 460 (Cal. App. 3d Dist. 2008).

In this case, injunctive relief can be properly tailored to both vindicate plaintiffs' important procedural rights and avoid unduly burdening the Commissioner and State.  No additional imposition beyond what the law already requires will flow from an injunction requiring the Commissioner to do his procedural duty as prescribed by federal law.  And, requiring the Commissioner to

do now what he should have done previously hardly poses a risk of disproportionate "injury" militating against the issuance of injunctive relief.

Plaintiffs - providers and beneficiaries alike - on the other hand, have established that they have suffered and, absent injunctive relief, will continue to suffer irreparable injury. They remain deprived of a statutorily-conferred right to be notified and heard before significant administrative action is taken that might adversely affect their substantial rights. See generally Sierra Club v. Marsh, 872 F.2d 497, 500-04 (1st Cir. 1989). As the court of appeals has observed, "where interested persons have not been afforded an opportunity to comment . . . it is more likely that significant factors will be overlooked or too easily discounted. In contrast . . . inviting public comment . . . provides further assurance of agency exposure to the various considerations, and militates against post hoc review of the agency's reasoning process." Kollett v. Harris, 619 F.2d 134, 140 n.5 (1st Cir. 1980)). See also Long Term Care Pharma. Allicance v. Ferguson, 260 F. Supp. 2d 282, 293-94 (D. Ma. 2003) (failure to give notice in medicaid rate-setting process is irreparable injury), vacated on other grounds 362 F.3d 50 (1st Cir. 2004).

Although the reduced rates have been in place for some time, plaintiffs remain entitled to voice their legitimate concerns, particularly with respect to future harm likely to be suffered because of those reduced rates: increasingly restricted access to needed medical care; significant increases in untreated illnesses and injuries among New Hampshire's most vulnerable citizens; significant financial losses that might threaten the hospitals' ability to continue providing Medicaid services; elimination of specialized medical services currently available in New Hampshire; and significant job losses in the State's medical industry, to name but a few.  Deprivation of the opportunity to be heard is not compensable by money damages in this context. The rights being denied are the rights to participate and potentially influence an administrative decision of great importance to the plaintiffs and the public.  That continuing deprivation constitutes irreparable harm in this context.

The public interest also counsels in favor of granting injunctive relief.  Public officials must be required to fulfill their important legal obligations, and public processes meant to fairly apprise citizens of important governmental decisions and the reasons supporting them must be allowed to play out.

While it is not possible to turn back the clock, requiring procedural compliance with the Medicaid Act's requirements now will not be futile, and may well prove beneficial to all the parties.  The Commissioner, of course, may not respond favorably, from plaintiffs' perspective, after giving the requisite notice and fair opportunity to be heard.  But, plaintiffs are entitled to the opportunity to persuade him, and they are now better prepared to present relevant information.  What previously was entirely predictive with respect to the likely adverse effects of substantial rate (and other) reductions is now experiential as well.  Evidence of the medical community's real-world experience under the reduced rates could conceivably persuade the Commissioner that the rate reductions were ill-advised and that a change is necessary.  But, even if, after sufficient notice and an opportunity to be heard has been afforded, the Commissioner still determines that the current state of affairs is consistent with State policy and federal requirements, at least the pertinent record will be unambiguous.  The Commissioner will have clearly and publically declared: (1) precisely what methodology was used to set the reduced rates; and (2) the justifications for those rates.  That action will, at a minimum, facilitate whatever federal administrative review is available.

Finally, the Commissioner argues that even if plaintiffs make the requisite showing on all other points, the court should still deny injunctive relief on laches grounds (i.e., that plaintiffs simply waited too long to file suit).  Certainly, plaintiffs could have brought suit back in 2009, or at any time since.  That they did not would normally weigh heavily against issuing equitable relief at all, particularly if the delay materially prejudiced the State.  But that is not a matter of great concern here.  Plaintiffs seek prospective injunctive relief only.  They are not seeking retroactive relief of any kind (and probably cannot).  And prospective relief can be adequately tailored to obtain compliance without unduly disrupting the State's administration of its Medicaid program and budget.

Besides, it is difficult to fault the plaintiffs for excessive delay in seeking injunctive relief.  Administration of the Medicaid system is a fairly complex endeavor, requiring no small degree of communication and cooperation among a number of constituencies.  The hospitals no doubt expected, in 2009 and perhaps thereafter, that the reduced rates represented a temporary imposition dictated by unexpected fiscal circumstances, but one likely to be lifted in a reasonable time.

Injunctive relief is appropriate, but not to the extent of barring continued enforcement of the reduced rates pending procedural compliance.  After all, as <u>Douglas</u> seems to hold (or at least suggests), available administrative remedies must be exhausted before plaintiffs seek to enforce the State's Medicaid obligations under the Supremacy Clause and such administrative review will likely render a Supremacy Clause challenge redundant and unnecessary.  Moreover, Congress has vested the Secretary of Health and Human Services, not this court, with primary authority to review and determine the adequacy of Medicaid reimbursement rates.  The Secretary's expert sense of what is sufficient to comply with Section (30)(A)'s requirements may well be broader than this court's.  An injunction that prohibits enforcement of the current rates pending the Commissioner's compliance with his Section (13)(A) procedural responsibilities would unnecessarily risk usurping the Commissioner's administrative authority to set rates and the Secretary's authority to review and approve rates, and enforce the Act's requirements.  It might also unnecessarily disrupt the State's administration of both its Medicaid program and its overall budget.

The court recognizes that the described injunctive relief falls short of providing plaintiffs with the substantive relief they seek.  Nevertheless, the critical nature of the subject

matter – medical care for the State's most vulnerable citizens –
strongly militates in favor of holding the Commissioner to his
federally-mandated obligations to give adequate notice to, and to
fairly consider the views of those most affected, before he sets
Medicaid reimbursement rates.  It may be that, to obtain
meaningful relief, plaintiffs will first have to put their
petition in the hands of the Secretary.  But, the Secretary is
not a disinterested regulator; she has the authority necessary to
enforce compliance with Section (30)(A)'s mandate, by <u>inter</u> <u>alia</u>
disapproving the reduction in rates, requiring reinstatement of
the previous rates, or even cutting off federal funding.  <u>See</u>
<u>Long Term Care</u>, 362 F.3d at 59.


## Conclusion

For the foregoing reasons, plaintiffs' motion for
preliminary injunction (document no. 3) is granted in part, and
denied in part.  The Commissioner is enjoined as set out in a
separate contemporaneous order.


The Commissioner's motion to dismiss Counts I-IV (document
no. 48) requires additional briefing and argument.  Within forty-
five (45) days of the date of this order, the parties shall
submit supplemental briefs addressing at least the following
questions:

1.   In light of <u>Douglas</u>, should plaintiffs'
     Supremacy Clause cause of action be
     dismissed?

2.   Is CMS considering whether the rate
     reductions for inpatient and outpatient
     Medicaid services comport with the
     requirements of applicable federal law and
     regulations?  If so, what is the status of
     that administrative process?

3.   If not, do plaintiffs have available to them
     any administrative remedy or process by which
     they can obtain administrative review of the
     rate reductions at issue, and the state
     statutory provisions seemingly dictating the
     Commissioner's implementation of budget-
     driven rate reductions, for compliance with
     the requirements of applicable federal law
     and regulations?

4.   Should the Commissioner be ordered to file a
     Proposed State Plan Amendment ("SPA") with
     respect to the methodology used to set the
     challenged inpatient and outpatient Medicaid
     rates upon a finding that the rate-setting
     process employed methods and standards
     materially different from those contained in
     the approved State Plan, thereby initiating
     federal administrative review of that rate-
     setting process?

5.   Are plaintiffs required to exhaust available
     administrative remedies under the
     Administrative Procedures Act ("APA"), 5
     U.S.C. §701 et seq., before proceeding with
     their claims under the Supremacy Clause?

**SO ORDERED.**

                              /s/ Steven J. McAuliffe_____
                              Steven J. McAuliffe
                              United States District Judge

March 2, 2012

cc:  Martha Van Oot, Esq.
     William L. Chapman, Esq.
     Anthony J. Galdieri, Esq.
     Emily Pudan Feyrer, Esq.
     Gordon J. MacDonald, Esq.
     W. Scott O'Connell, Esq.
     John E. Friberg, Jr., Esq.
     Erica Bodwell, Esq.
     Mitchell B. Jean, Esq.
     Nancy J. Smith, Esq.
     Jeanne P. Herrick, Esq.
     Laura E. B. Lombardi, Esq.
     Constance D. Sprauer, Esq.