*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/5/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                               *
DARTMOUTH-HITCHCOCK CLINIC,    *
et al.                         *  11-cv-358-SM
                               *  November 1, 2012
                               *  10:45 p.m.
          v.                   *
                               *
NEW HAMPSHIRE DEPARTMENT OF    *
HEALTH AND HUMAN SERVICES,     *
COMMISSIONER                   *
                               *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SPECIAL HEARING
BEFORE THE HONORABLE STEVEN J. McAULLIFE

Appearances:

For the Plaintiffs:   W. Scott O'Connell, Esq.
                      Gordon J. MacDonald, Esq.
                      Anthony Galdieri, Esq

                      William L. Chapman, Esq.
                      Orr & Reno, PA

For the Defendants:   Nancy Smith, Esq.
                      Laura E.B. Lombardi, Esq.
                      Jeanne P. Herrick, Esq.
                      NH Office of Attorney General

By Telephone:         Ethan P. Davis, Esq.
                      US Dept. of Justice

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1454

1                    BEFORE THE COURT

2            THE CLERK:  The court is in session and has

3    for consideration a hearing in Dartmough-Hitchcock

4    Clinic versus the New Hampshire Department of Health and

5    Human Services, Civil Case Number 11-cv-358-SM.

6            THE COURT:  All right, good morning.  I

7    didn't, Attorney Smith, I didn't continue the hearing

8    even though your motion was well taken.  The point is to

9    get the government's, the federal government's

10   perspective, but -- I guess we have Mr. Davis.  Are you

11   on the phone, Mr. Davis?

12           MR. DAVIS:  Yes, your Honor, I'm here.  Ethan

13   Davis for the Secretary.

14           THE COURT:  Okay.  Good morning and thanks for

15   appearing, not that you had a number of choices.

16               I wanted you on the phone because the state

17   has correctly analyzed the situation.  I really do need

18   to know what the Secretary is doing, if anything, what

19   she plans to do, if anything, and how her views might

20   impact the resolution of this claim.  And your pleading

21   is a mystery to me.  I don't know what you're saying.

22   It sounded like you were saying we're not sure we want

23   to tell you what we think.  And that of course is not

24   acceptable.

25           MR. DAVIS:  Your Honor, I first just want to

1   apologize for the delay in getting the Secretary's views

2   in front of the court, and I want to --

3           THE COURT:  I'm not concerned about the delay.

4   I'm concerned about the suggestion in your pleading

5   that, you know, we haven't quite decided whether or not

6   we're going to tell you whether we're going to tell you.

7           MR. DAVIS:  Your Honor, I just want to assure

8   you that CMS is considering whether to approve the State

9   Plan amendments that the plaintiffs challenge here.

10  People at CMS are working hard on this and we believe

11  our participation would be substantially more valuable

12  after CMS makes its decision on the plan amendments and

13  we'd like to respectfully ask for your patience in that

14  regard.

15          I also wanted to point out on this score that

16  many of these plan amendments are on their second clock

17  which expires on December 19, 2012.  So, a decision

18  should be reached by that date.  I can assure you're not

19  looking at an indefinite --

20          THE COURT:  No, let me be clear.  You know,

21  here's the question.  Is this within the Secretary's

22  wheelhouse or is it not?  Does she claim primary

23  jurisdiction over resolution of this matter or does she

24  not?  Is she indifferent?  Does she waive primary

25  jurisdiction?  Does she think it matters?

1            All of those are matters of interest to the

2    court, and if you read the Douglas opinion, which I'm

3    sure you're quite familiar with, the Supreme Court

4    seemed to think those were important questions and the

5    court should be interested in what the Secretary has to

6    say with regard to Medicaid rate reductions.  And your

7    pleading suggests, well, I'm not so sure we're

8    interested in telling you.

9            So, the first thing I want to hear is, no, we

10   are interested in telling you.

11           MR. DAVIS:  Your Honor, I have to get

12   authorization from my client to file a substantive

13   brief.

14           THE COURT:  No, I don't think you're hearing

15   me.  I want an assurance from you that the Secretary is

16   interested in telling the court what the Secretary

17   thinks about a matter committed to her jurisdiction, if

18   it is.

19           MR. DAVIS:  Your Honor, the only thing I can

20   tell you at this point is that your request for the

21   Secretary's views is under consideration.  I do not have

22   approval yet to make any firm commitments.

23           THE COURT:  Yeah, I guess you're not

24   listening.  I'm not asking for her views.  I'm asking to

25   hear you tell me that she's interested in communicating

5

1    them.

2              MR. DAVIS:  Your Honor, I think the

3    Secretary's decision on the State Plan amendment, I

4    mean, just the fact that the Secretary is --

5              THE COURT:  Here's the issue.  See if you can

6    follow this.  The plaintiffs here say that these

7    Medicaid rate reductions were the illegitimate product

8    of action taken pursuant to state statutes that conflict

9    with federal law.  Okay?

10             MR. DAVIS:  Yes, your Honor.

11             THE COURT:  All right.  The federal

12   government, the Secretary, has an interest in

13   determining whether Medicaid rate reductions are or are

14   not legitimate pursuant to federal law.  Correct?

15             MR. DAVIS:  That is correct.

16             THE COURT:  Okay.  It seems to me that it's

17   important to know whether the Secretary thinks or

18   doesn't think these rate reductions are consistent with

19   federal law, because it may have a lot to do with

20   whether equitable relief is affordable or not

21   affordable.  Do you understand?

22             MR. DAVIS:  Yes, your Honor, I understand that

23   point and what I'm --

24             THE COURT:  But on the other hand, the

25   plaintiffs say, no, it doesn't matter whatsoever whether

1   the Secretary somehow thinks these are legitimate under

2   federal law because what matters is they were effected

3   pursuant to state law, and therefore they ought to be

4   enjoined.

5          What I need to know is what is the Secretary

6   doing?  Is she looking at these Medicaid rate

7   reductions?  Is she trying to determine whether or not

8   they are legitimate under federal law or not?

9          MR. DAVIS:  Yes, your Honor.

10          THE COURT:  Does she have some expectation

11   that there's going to be a decision?  What have they

12   been doing for eight months other than exchanging

13   indecipherable letters back and forth with the state?

14          MR. DAVIS:  Your Honor, CMS and the Secretary

15   are considering whether these State Plan amendments

16   comply with federal law or not.  CMS has not reached a

17   decision on that point yet, but as I'm trying to hint as

18   best I can, the clock expires on December 19th.  If CMS

19   does not act by that date, then the State Plan amendment

20   will be deemed approved and therefore consistent with

21   federal law.

22          So, I'm just asking for your Honor's patience

23   until CMS has a chance to express its view on whether

24   these plan amendments are consistent with federal law.

25   I think our participation will be substantially more

1   valuable at this point.  I can assure you this is not an

2   indefinite delay.

3            THE COURT:  All right, maybe you can just hold

4   on for a minute and let me hear from the parties.

5            Who is it, Mr. Gordon -- Mr. MacDonald -- Mr.

6   Gordan?  What State Plan amendments are pending that

7   directly relate to each of the Medicaid rate reductions

8   about which you complain.  Are there State Plan

9   amendments pending that address each of those rate

10  reductions?

11           MR. MacDONALD:  There are State Plan

12  amendments pending which address some of the rate

13  reductions.  There are State Plan amendments that the

14  state relied on, one, that's been withdrawn.  And I

15  would submit, your Honor, it's a little frustrating to

16  hear whether the Secretary is able to tell your Honor

17  whether there is primary jurisdiction or not.  But let's

18  just set that question --

19           THE COURT:  I don't think Mr. Davis knows is

20  the problem.

21           MR. MacDONALD:  Well --

22           THE COURT:  I think the Secretary's position

23  actually would be of course there's primary

24  jurisdiction.  Congress committed this process to the

25  Secretary for principal enforcement.  Of course there's

1    primary jurisdiction.  But it begs the question

2    somewhat.  Is there an issue that needs to be resolved

3    that's critical to the resolution of your case?

4            MR. MacDONALD:  I'd like to be heard on that.

5    But let's just set that aside.  The doctrine of primary

6    jurisdiction is entirely discretionary.  It's within

7    your judgment.

8            THE COURT:  Well, it's not really.  The First

9    Circuit's made it clear and the Supreme Court's made it

10   clear that if there's an issue that's critical to the

11   resolution of your claim that falls within the primary

12   jurisdiction of an administrative agency, then the First

13   Circuit says you should defer and wait that decision and

14   the Supreme Court says at a minimum the Secretary's

15   opinion would be very valuable and useful.  And I agree

16   it probably would be.

17           MR. MacDONALD:  May I, your Honor, just -- the

18   case that the court cited in waiving primary

19   jurisdiction --

20           THE COURT:  That's not to say she can't waive

21   it, and Mr. Davis, in my view, is pretty close to

22   waiving it.

23           MR. MacDONALD:  And that's my point.  And the

24   other point is read Judge Torruella's opinion in that

25   case.  He says that the helpfulness and the need to get

1    the agency's view must, must be balanced against the

2    considerations attending to the plaintiffs, including

3    delay.  And our argument to you today, your Honor, is

4    that delay is irreparably harming the plaintiffs because

5    one of these rate reductions is void as a matter of law,

6    and you do not need to hear from the Secretary on that.

7    You just need to look at what the Commissioner did on

8    September 18, 2012.  He withdrew the page on which the

9    state relied to effect the 33 percent outpatient rate

10   reduction.

11            THE COURT:  All right, say that again.

12            MR. MacDONALD:  On September 12th --

13   September 18th, I'm sorry, 2018 -- 2012, September 18,

14   2012 -- let's just step back, your Honor.  In January,

15   your Honor, you had an extended back and forth --

16            THE COURT:  If you go too detailed into these

17   enumerable exchanges of documents you're going to get

18   lost or I'm going to get lost.

19            MR. MacDONALD:  I understand, your Honor, just

20   to lay the predicate.

21            THE COURT:  It's not -- you're not -- I

22   understand they are enormously complicated in terms of

23   regulatory nuances, but it's not enormously complicated

24   in terms of legal questions in my view.  They're either

25   legitimate or they're not.  They either applied the

1    methodology or they didn't.  They either gave the notice

2    or they didn't.  There's either a State Plan amendment

3    pending or there isn't.  It's either legitimate or it's

4    not under federal law.  Those aren't difficult questions

5    to pose.

6                 MR. MacDONALD:  Okay.  Cut to the chase.  This

7    is a comment from CMS August 9, 2012.  This is Exhibit B

8    to our filing, your Honor.  Right here.  NH 06-008.  You

9    heard from the state in January that's the SPA and this

10   is the page the state relied on in effecting the

11   33 percent rate cut.  CMS says, CMS suggests withdrawing

12   this page.  No public notice was provided as part of

13   this SPA.  Therefore, the effective dates are not --

14   neither of the effective dates is allowable.

15                CMS said, and this is actually reinforcing

16   your holding in March, there was no public comment.  The

17   SPA was invalid.  The rates are invalid.  Okay?

18                THE COURT:  Well, yes, however, the state then

19   pursuant to the injunction I issued gave notice.  Right?

20                MR. MacDONALD:  Yes.

21                THE COURT:  And so I don't want to get too

22   lost into the retroactive effective dates of SPAs.  I

23   really don't.  Because I assume, and maybe wrongly, but

24   I assume the Secretary understands that sort of thing

25   and will make adjustments appropriately.  Right?

1               MR. MacDONALD:  Well, I hope the Secretary --

2               THE COURT:  But going forward, the

3       Commissioner did notice those rate reductions after the

4       injunction.  You complained about it but didn't

5       challenge it.  So that notice stands.  I assume there's

6       a SPA that followed that notice, the notice was related

7       to a SPA that then seeks to effect those Medicaid rate

8       reductions.  Right?

9               MR. MacDONALD:  No SPA.

10              THE COURT:  No SPA?

11              MR. MacDONALD:  No SPA.  They're trying to

12      backdate it.  They are trying to backdate it.  And this

13      is very relevant, your Honor, I hope counsel for the

14      Secretary is listening.  You found a likelihood of

15      success on the merits no public notice for this SPA.

16      They noticed it March 30, 2012.  Right?  Pursuant to

17      your order.

18              THE COURT:  Well, I'm taking your

19      representation.  They noticed it as to that SPA.

20              MR. MacDONALD:  Right.

21              THE COURT:  Okay.

22              MR. MacDONALD:  Now, why is that important?

23      You make a very good point.  It's prospective only.  But

24      these rates haven't been paid yet.  They are part of a

25      cost settlement process and each one of these years is

12

1    still open.  State fiscal year '09, '10, '11 --

2              THE COURT:  Yeah, I appreciate that and at

3    some point there will be a reconciliation, and to the

4    extent these rates were not lawfully accomplished there

5    will be a credit exchange.  But the Secretary does that;

6    right?

7              MR. MacDONALD:  No.  That's a function of the

8    providers and the state.

9              THE COURT:  Doesn't the Secretary say, for

10   example, I assume Mr. Davis would argue the Secretary is

11   on the verge, presumably, of actually making a decision

12   about these things, and once the Secretary makes a

13   decision -- say the decision is, you know, these were

14   totally illegitimate, contrary to federal law, they're

15   bad, however, we're going to allow these rate reductions

16   under certain conditions as they did in California in

17   the Douglas case and say, you know, monitor it, do some

18   studies, make sure people aren't deprived access to

19   medical care, et cetera, et cetera, et cetera.

20   Prospectively that takes care of your problem, doesn't

21   it?  Retroactively, because as you point out, the

22   operation of these effective dates and so forth, there

23   will be an accounting.  And to the extent those rates

24   aren't approved back to whenever the first legitimate

25   SPA was filed, then there's a credit.

1            MR. MacDONALD:  Well --

2            THE COURT:  So, which is an argument for why

3    wouldn't you let the Secretary exercise her expertise

4    and rule on the issue, because it answers the

5    fundamental question.  Is there irreparable harm?  And

6    the answer, isn't the answer no, there's no irreparable

7    harm if in the end you get paid what you're entitled to

8    be paid under federal law?

9            MR. MacDONALD:  Well, I'll just give you an

10   example, your Honor, because this -- I'm playing real

11   life.  One of the plaintiff hospitals received a notice

12   three days ago.  Here's your reconciliation for 2009.

13   Sign by November 15th.  They shouldn't sign.  The rates

14   are illegal.  The rates they're trying to enforce are

15   illegal.  That's irreparable harm.  They're being

16   confronted with the prospect of having to sign off on

17   the state's reconciliation based on illegal rates.  And

18   it's not academic.  It's a 33 percent rate cut.  It's

19   millions of dollars across these plaintiff hospitals.

20   And, your Honor, the state --

21           THE COURT:  Mr. Davis, I'm going to respect

22   the fact that you don't think you have any authority to

23   represent anybody here, so I'm not going to ask you this

24   question, but Attorney Smith, what's the harm of an

25   injunction entering saying, look, these rates, they've

1    met their burden of showing a likelihood of success on

2    the merits and these rate reductions are enjoined until

3    and unless the Secretary approves them.  What's wrong

4    with that?

5          MS. SMITH:  I believe we addressed --

6          THE COURT:  If you're right, the Secretary is

7    is going to approve them.

8          MS. SMITH:  Because the -- the harm is

9    demonstrated by what happened in California, that the

10   injunction was actually cited by CMS as a concern in

11   approving the SPAs when they were ready to -- that were

12   ultimately approved because if there's an injunction in

13   place, then the hospitals will have to pay back that

14   difference, and the CMS was concerned that that would

15   have an adverse affect on the providers where they would

16   have to then pay back an additional amount where the

17   injunction was --

18         THE COURT:  Are you trying to save them from

19   themselves?

20         MS. SMITH:  Yes.

21         THE COURT:  They say they'll take that risk.

22   But what's the problem for the state.  I don't see a

23   problem for the state really, do you?

24         MS. SMITH:  The problem for the state is that

25   they will not be able to apply rates that were

1   legitimate and that they had the right to apply during

2   this period.  And as you know, the state budget

3   situation is tight, and if we have to go ahead and pay

4   at higher rates than what are supposed to be in effect,

5   then that will be a problem for the state fiscal

6   situation.

7         THE COURT:  But don't you agree with Mr.

8   MacDonald that the rules with regard to effective dates

9   on SPAs are fairly clear.  They're only retroactive to

10   the quarter in which, the first day of the quarter in

11   which they were filed, right?

12         MS. SMITH:  That goes back to the issue that

13   --

14         THE COURT:  So legitimate or not, back to

15   whenever they are or were not, so what's the problem?

16   If the Secretary eventually approves it, the approval

17   will be retroactive to the effective date, whatever the

18   law allows.

19         MS. SMITH:  If you would like me to address

20   the effective date issue --

21         THE COURT:  Well, if you can succinctly,

22   what's the harm of an injunction that says they've met

23   their burden of showing that they are likely to succeed

24   on the merits in establishing that these Medicaid rate

25   reductions were the legitimate product of state action

1    directed by state officials, legislative and executive,

2    based upon state statutes that conflict directly with

3    federal law, and therefore they're enjoined, unless and

4    until the federal Secretary, who has primary

5    responsibility for administering this program, decides

6    that they are legitimate.  What's wrong with that?

7              MS. SMITH:  Because there is a huge and

8    irreparable harm to the state.

9              THE COURT:  What is it?

10             MS. SMITH:  In not being able to control the

11   expenditures in its Medicaid program which is what --

12             THE COURT:  But you're not allowed to control

13   the expenditures in your Medicaid program except

14   consistently with the law.

15             MS. SMITH:  And they are, these rates are

16   consistent with the law.  If I could just show the court

17   --

18             THE COURT:  But you know, I guess we, you

19   know, I thought we were past that point.  But your own

20   director of Medicaid services for the state said no, we

21   didn't consider the federal law, we didn't do that.  We

22   were told to reduce them by the legislature and governor

23   and we did.  End of story.  Now, hopefully, happily,

24   maybe they're still consistent with federal law, we're

25   hoping, but it's just really a hope, isn't it?

1            MS. SMITH:  No, it's not.  And I think we have

2    gone through and shown you in great detail why, and the

3    justifications that accompanied the --

4            THE COURT:  I appreciate them both, by the

5    way, but I haven't had a chance to read --

6            MS. SMITH:  -- that the rates were being

7    continued in 2012, we have shown that access has

8    continued under these rates for the entire period of the

9    last --

10            THE COURT:  No, but the issue, the issue isn't

11    collateral, because the collateral fact is that there's

12    people still have access justifies the rate, it doesn't

13    work that way.  It's did you apply the statute properly,

14    did you use the factors and consider them, did you apply

15    an accepted approved methodology, did you turn the crank

16    the right way, did you give notice, does it meet the

17    needs in sort of a subjective assessment way.  It's not

18    just, hey, no harm, therefore legitimate.

19            MS. SMITH:  If I could go back and go through

20    what Attorney MacDonald has talked about in regards to

21    the August 9th comments by CMS that he showed you and

22    show you what we contend is the relative part of that

23    record than the part he talked about --

24            THE COURT:  Do you think there is a SPA

25    pending with respect to each and every Medicaid rate

1   reduction at issue in this case?

2          MS. SMITH:  The 2008 rates --

3          THE COURT:  No, no, answer the question.  Do

4   you think there is one pending?

5          MS. SMITH:  In the 10-0014 --

6          THE COURT:  It's a yes or a no.

7          MS. SMITH:  Yes.

8          THE COURT:  Okay.

9          MR. MacDONALD:  May we, your Honor, just so

10  the record is clear, I hate to interject, but what is

11  the SPA to which she --

12         THE COURT:  I think she's about to tell us,

13  but I just want to start out with the state's position,

14  is there a SPA pending with respect to each Medicaid

15  reduction.

16         MR. MacDONALD:  Okay, well, I --

17         MS. SMITH:  Would you like me to address our

18  arguments or would you like Attorney Gordon to finish

19  his --

20         THE COURT:  No, we'll get to his question

21  because I have the same question, because Mr. Davis is

22  hanging on, you know, and Mr. Davis doesn't know if he

23  represents anyone yet or not, but his position seems to

24  be we are going to deal with this and we are going to

25  rule on these and we're going to let you know what those

1    rulings are.  And then so naturally the question arises,

2    rulings on what?  And Mr. MacDonald is suggesting, yeah,

3    you're not going to get a ruling on a 30 percent

4    Medicaid reduction outpatient rate SPA because there is

5    none.  You now say yes, there is one.  So eventually

6    we're going to get to what is it?  Point it out to me.

7              MS. SMITH:  We included this chart for the

8    court in our pleading that we filed summarizing all of

9    the pending SPAs before CMS, and in 10-011 you'll see

10   that at the request of CMS the current price per point

11   which is regarding the inpatient SPAs has been included

12   in that SPA.  And in 10-014 the percentage represented

13   to the outpatient, the outpatient rates is included in

14   that SPA that is submitted.  As Attorney Davis stated,

15   the CMS's ruling on those SPAs is due by December 19th.

16   We have submitted the original SPAs and we've submitted

17   the request for additional information that CMS has sent

18   to the state --

19             THE COURT:  You're saying 10 dash 011 and 10

20   dash 014 --

21             MS. SMITH:  Correct.

22             THE COURT:  -- address the outpatient rate

23   reduction?

24             MS. SMITH:  10-014 is the outpatient, 10-011

25   is the inpatient.

1                    THE COURT:  And those are pending?

2                    MS. SMITH:  Those are pending.

3                    THE COURT:  And the retroactive date cannot go

4       past, beyond the first day of the fourth quarter of

5       2010, right?

6                    MS. SMITH:  Let me address that.

7                    THE COURT:  Is it a fiscal year --

8                    MS. SMITH:  Particularly as to the outpatient

9       SPA, this is what CMS said in those comments --

10                   THE COURT:  Sorry, is that chart in here?

11                   MS. SMITH:  Yes.  It is pages four and five of

12      your documents.

13                   THE COURT:  They are marked A and B --

14                   MS. SMITH:  It is in the state's memorandum.

15      And Attorney MacDonald was showing it to you from his

16      document.  In the state's documents it is Exhibit F.

17      This is comments on the pending SPAs from CMS.  And on

18      page two CMS was commenting regarding the 10-014 draft

19      SPA that had been submitted to CMS.  And in the draft

20      SPA where the outpatient percentage had been added, the

21      state at CMS's request, based on discussions with CMS,

22      CMS have included the dates that those rates became

23      effective in 2008.  And CMS's comments, if I can just

24      read it for the record, this suggested that they take

25      out the effective date regarding the percentage.  And

1    then if you read the footnote --

2              THE COURT:  I'm sorry, where are you reading?

3              MS. SMITH:  It says that an effective date is

4    not required.

5              THE COURT:  I'm sure it does, but where?

6    Where?

7              MS. SMITH:  In the footnote, the effective

8    date under a cost methodology.

9              THE COURT:  I've got it.

10             MS. SMITH:  Reimbursement set at reconciled

11   cost represents an annual amount that changes based on

12   the provider's actual expenditures data for that

13   particular year.  The State Plan methodology includes

14   the actual percentage of cost that will be reimbursed to

15   providers, therefore the State Plan methodology is

16   comprehensive as is as long as it contains that

17   information.  As such, the State Plan methodology does

18   not require effective date language.

19             THE COURT:  Well, you're far more aware of

20   what that means than I am.  What does that mean?

21             MS. SMITH:  That means that what was going on,

22   and if you'll look, actually the plaintiff's exhibits

23   regarding Exhibit A, their 2010 guidance to directors

24   about how State Plan amendments are going to be handled

25   going forward is consistent with what has happened over

1   this process.  And when the 06, 008 SPA was submitted,

2   CMS was holding up approval of State Plan amendments

3   until they got other issues that they spotted reviewing

4   those things resolved as well in the process.  What CMS

5   said in that 2010 guidance was that we're going to try

6   and move State Plan amendments forward quicker, and in

7   order to do that we're going to note these other issues,

8   but we're going to go ahead and take action on the

9   pending SPA.

10          It's undisputed that CMS had told the state

11   that the existing methodology in the State Plan

12   regarding outpatient costs was vague.  It was general.

13   They asked the state to describe what was actually going

14   on.  It wasn't a change.  And the state did that in

15   submitting a response to requests for additional

16   information.  And that's the paragraph that's now the --

17          THE COURT:  I apologize for oversimplifying

18   it, but I think the claim here is you took an approved

19   methodology that the Secretary approved, and you took

20   one factor, state budget neutrality, and you made that

21   the sole driving factor in reducing the outpatient

22   Medicaid rate.  And in order to do that you've got to,

23   says the plaintiff, you've got to at least file a State

24   Plan amendment and tell the Secretary that's what you're

25   going to do because that represents a serious change in

1    methodology or its application.  You say, oh, no, we

2    blew it by them.  We put state budget neutrality in

3    there and therefore we can use that and leverage it

4    however we choose.

5            The Secretary I guess some day is going to

6    decide whether you can blow it by that way or not, and

7    maybe she will decide you can.  But if she decides you

8    can't, that you can't take that multi-faceted

9    methodology and reduce it to one factor, then do you

10   have a State Plan amendment that says we want to do it

11   that way?  I suspect you don't.

12           MS. SMITH:  Our position is --

13           THE COURT:  Say the Secretary, I'm just

14   speculating, but say the Secretary says, you know what?

15   You didn't apply the methodology as approved.  You

16   reduced it.  You reduced it to one factor and you

17   applied one factor, and you can't do that.  So that's

18   disapproved.  Doesn't that not result in a

19   reconciliation with the hospitals under the terms of

20   which you would have to pay rates pre-reduction, isn't

21   that how it works?

22           MS. SMITH:  I haven't analyzed that, your

23   Honor.  I'm not ready to take a position on that.

24           THE COURT:  But listening to you you seem to

25   be arguing that the Secretary could come out and say,

1    you know, you might have overbalanced one of the

2    factors, but taking the whole circumstance under

3    consideration and applying all kinds of other massages

4    to it, it's not all that bad and we would have approved

5    that.  But if there's no SPA pending, they either have

6    to say, the Secretary either has to say it's okay under

7    the methodology as it existed, or the Secretary has to

8    say there's a SPA pending that we approved that allows

9    you to do that, and that's only effective back to the

10   first day in the court in which the SPA was filed.  You

11   say there is a SPA -- you say two things as I understand

12   it.  One, we get to do that under the existing

13   methodology.  And two, there's a SPA pending that allows

14   us to do it.  Right?

15            MS. SMITH:  You are correct.  We contend it

16   was, it is allowed under the existing methodology, and

17   as CMS has requested additional specificity in the State

18   Plan, it is now added --

19            THE COURT:  You lose me on that.  I don't know

20   what that means.  Yes, we agree to talk, but whatever,

21   but it's the decision that's important, the decision

22   that's going to be made that's going to be important.

23            Which leads me back to my original question.

24   If you're right and you get to reduce the rates by

25   33 percent for budget neutrality factors under the

1   existing methodology as previously approved, what harm

2   is there that enjoins the rates unless and until the

3   Secretary decides that?

4           MS. SMITH:  There is an immense harm to the

5   state's ability to continue to pay for its Medicaid

6   program and, you know, whether the state can continue to

7   make payments to the providers under its Medicaid

8   program, if they have to pay at higher rates for an

9   undetermined amount of time, although as Attorney Davis

10  has indicated, a decision should be made by

11  December 19th, that's still a hardship on the state that

12  could hamper the administration of the Medicaid program.

13          THE COURT:  Okay.

14          MS. SMITH:  And if checks can't go out, money

15  can't be transmitted to the providers, then that could

16  be an additional harm to the providers during that time

17  period.

18          THE COURT:  All right, I think I said

19  something like that in one of the earlier orders, didn't

20  I?

21          MS. SMITH:  Yes.

22          THE COURT:  All right, okay.

23          MS. SMITH:  I don't know that Attorney

24  MacDonald had finished his argument.  If you wanted me

25  to --

1          THE COURT:  No, I do want to be reasonably

2   clear so that he can be reasonably clear, which is you

3   say that this 10 dash 14, is it 11 dash 14?  That is the

4   SPA, that is a SPA, at least, that failing your argument

5   that the methodology as previously approved justified

6   the rate reduction, there's at least this SPA that could

7   be approved that would justify it as of the first day of

8   the last quarter of 2010.

9          MS. SMITH:  Correct.

10          THE COURT:  And it's 10-014.

11          MS. SMITH:  That is the outpatient one.

12          THE COURT:  Right.

13          MR. MacDONALD:  Just very quickly on the same

14   point, your Honor.  Back to Exhibit B, CMS's comment

15   from August.  This is I think a really helpful succinct

16   statement of what needs to happen for CMS to act.  You

17   can't approve a SPA that contains an effective date for

18   reimbursement methodology that is earlier than the first

19   day of the quarter in which it was submitted, the point

20   the court was just making, and earlier than the date the

21   public notice was published.

22          Here's the chart we were just looking at.  The

23   first public notice for each of these rate reductions,

24   March 30, 2012, pursuant to this court's order.  So this

25   goes to the point, your Honor, what's the harm in

1   entering injunctive relief based on this record?

2           The public has an interest in a Medicaid

3   program that is operating legally.  The beneficiaries,

4   like John Doe and others, and the patients the hospitals

5   serve, it's in the public interest to have a Medicaid

6   program that operates properly.

7           THE COURT:  I don't disagree with you, I

8   really don't, but you have this insurmountable hurdle it

9   seems to me, which is, is it being operated consistently

10  with federal law.  Is it?  The state says yes, for two

11  reasons:

12          One, like it or not we had enough of an

13  insurance policy in the methodology we got the Secretary

14  to approve last time when we put budget neutrality in

15  there and that allowed us to reduce the rates as

16  necessary to achieve budget neutrality.  Secretary may

17  or may not agree.  We don't know.  Some day we'll find

18  out.

19          Secondly, we've got a SPA, and okay, maybe the

20  SPA won't be effective back to the beginning, but we've

21  got a SPA.  And but the Supreme Court has said, has it

22  not, you know, before you run off deciding whether or

23  not a rate reduction or a rate setting process is or is

24  not consistent with the comprehensive Medicaid

25  regulatory statutory scheme, you might want to get the

1    Secretary's views on that.

2            MR. MacDONALD:  A couple of points, your

3    Honor.

4            THE COURT:  And in fact it might even be a

5    primary jurisdiction matter, in which case you should

6    refer it, stay the case and wait for her decision.

7            MR. MacDONALD:  Okay.  A couple points, your

8    Honor.  Even under their best case they can't enforce

9    these rates until the effective date of that 2010 SPA.

10   We're talking about rate reductions that took effect in

11   July 2008.

12           THE COURT:  But no, of course they can, as

13   long as they're legitimate.  It just begs the question,

14   why can't they enforce the rates?

15           MR. MacDONALD:  Because the page has been

16   withdrawn.  The effective date cannot possibly be in

17   here earlier according to CMS.

18           THE COURT:  No, but there's overlapping

19   argument here.  The reductions were consistent with

20   federal law because they were done pursuant to the

21   approved methodology properly applied.  Argument one.

22           Argument two.  To the extent there's any doubt

23   about that, we've got a SPA.  Yes, the SPA doesn't go

24   back as far as the date in which we impose these rate

25   reductions, but whatever, they're going back somewhat.

1   First quarter in 2012 maybe.

2          MR. MacDONALD:  On the first point, your

3   Honor, March 21, 2012, CMS tells the state in reviewing

4   the language that they relied on in the SPA, in this SPA

5   right here --

6          THE COURT:  14?

7          MR. MacDONALD:  This goes back to 2006, the

8   SPA they relied on.

9          THE COURT:  Which SPA?

10          MR. MacDONALD:  This is called 06-008.

11          THE COURT:  The one that's been withdrawn?

12          MR. MacDONALD:  Yes.

13          THE COURT:  Okay.

14          MR. MacDONALD:  And CMS told the state that

15   the language I've highlighted is not comprehensive.

16   They need to get rid of it because it doesn't tell CMS

17   how much CMS is going to be on the hook for in terms of

18   federal participation.  That's the language the state

19   relied on to make the across-the-board reduction.  Now

20   if we could get what the 2010 page looks like, and I'll

21   show you the difference.

22          THE COURT:  But does that address the question

23   we properly reduced the Medicaid outpatient

24   reimbursement rate pursuant to a budget neutrality

25   factor that's acceptable to the Secretary?

1              MR. MacDONALD:  She says you can't do it that

2    way.  You can't --

3              THE COURT:  She hasn't said that yet.

4              MR. MacDONALD:  Yes, she did, because she made

5    the state take out the language.  And you know what she

6    made them put in?

7              THE COURT:  Which language?  State budget

8    neutrality language?

9              MR. MacDONALD:  This is the way the SPA reads

10   now.  This is what CMS wants in there.  It wants to know

11   the actual percentage that will be reimbursed.  It's the

12   highlighted language.

13             THE COURT:  The current reimbursable amount,

14   that language?

15             MR. MacDONALD:  Yes.  That's new.  And that's

16   what CMS insisted go in there to establish a clear

17   methodology.  And when did they insist that go in there?

18   This year.  That's the methodology that's enforceable

19   from the Secretary's point of view.

20             THE COURT:  Again, I really apologize for the

21   question, but, how does that address the issue of

22   whether or not the rate reduction when it was effective

23   was or was not consistent with the existing approved

24   methodology?  You're saying later.  I want you to be

25   more specific.  Doesn't say anything about was it okay

1    to do it under that approved methodology.

2             MR. MacDONALD:   It was not an approved

3    methodology.   It was a proposed plan.   It was not an

4    approved methodology.

5             THE COURT:   The language about state and

6    federal budget neutrality methodology was not approved?

7             MR. MacDONALD:   This language right here, that

8    was a pending unapproved plan at the time the state

9    relied on it.   And the state relies on language that is

10   --

11            THE COURT:   But this is different from the

12   methodology that's set out in the State Plan.   The

13   methodology set out in the State Plan, does it not,

14   refers to many factors, one of which is state budget

15   neutrality.

16            MR. MacDONALD:   It does not.

17            THE COURT:   It does not?

18            MR. MacDONALD:   No.   We will put it on the

19   screen, your Honor.

20            THE COURT:   Attorney Smith, is that not your

21   argument?   Am I wrong about that?   Is that your position

22   or not?

23            MS. SMITH:   Pardon?

24            THE COURT:   I thought your position was the

25   approved methodology includes, among other factors, a

1   factor that relates to state budget neutrality problems,

2   and that that's what you relied on.

3          MS. SMITH:  The outpatient approved language

4   which was from 1995 is actually cited in our brief --

5          THE COURT:  I'm sure it is but what's the

6   answer?

7          MR. MacDONALD:  It's on the screen, your

8   Honor.

9          MS. SMITH:  And it refers to the lowest level

10  determined by the state Medicaid agency.  That is the

11  language regarding the outpatient, approved outpatient

12  methodology that was in effect.  The inpatient --

13         THE COURT:  The approved methodology is

14  whatever the state's lowest determined reimbursement

15  rate, that's the methodology?

16         MS. SMITH:  That was what was in the State

17  Plan.  And I know the court commented at the last

18  hearing when we discussed that, but that's hard to know

19  what that means.

20         THE COURT:  It means whatever you feel like

21  paying in a given year.

22         MS. SMITH:  The inpatient, how that has been

23  applied was as a percentage of cost that was adjusted

24  regarding budget neutrality factors.  The inpatient --

25         THE COURT:  Where does that come from?  Where

1   does that come from?  I thought that was -- I'm sure

2   I've read that in the methodology.  State budget

3   neutrality.

4           MS. SMITH:  The inpatient approved language

5   had actual language regarding budget neutrality.

6   There's two separate sections for inpatient and

7   outpatient in the State Plan.

8           THE COURT:  Okay, just let me make sure I've

9   got that clear.  State budget neutrality inpatient

10  reduction, outpatient reduction, lowest amount state

11  approves.

12          MS. SMITH:  Correct.

13          THE COURT:  And your position is both those

14  methodologies that included those factors were approved

15  by the Secretary.

16          MS. SMITH:  Correct.

17          MR. MacDONALD:  Your Honor, the approved

18  outpatient language is on the screen.  Payment is made

19  in accordance with the methods and principles developed

20  for reimbursements for such services for hospitals

21  participating in Title 18.  Translate.  You pay on

22  Medicare rates.  That's the methodology.

23          Now, what they're relying on is a highly

24  selected reading of the second sentence.  On certain

25  medical services and supplies designated by the

1    Secretary, not the Commissioner, the Secretary, you can

2    charge the lowest level determined by HHS.

3            That is not the methodology that they

4    employed.  The methodology here is you pay Medicare

5    rates.

6            THE COURT:  And obviously it follows that

7    you're saying the Secretary never designated outpatient

8    services as --

9            MR. MacDONALD:  Precisely.

10           THE COURT:  Okay.  You know, I appreciate

11   getting me this detail but of course that's not really

12   the focus for me here today.

13           MR. MacDONALD:  May I, just on the primary

14   jurisdiction.

15           THE COURT:  Yes, that's the issue.  The issue

16   is do we wait for the Secretary's, not, and Mr. Davis,

17   not a decision, you know, it's not my providence to

18   direct or dictate to the Secretary when she gets around

19   to deciding these things, but just whether she thinks

20   it's a primary jurisdiction issue or it's not.

21   Eventually I'll decide that because there's a strong

22   argument that primary jurisdiction frankly has nothing

23   to do with this case, and I'm not sure if it does or

24   doesn't.  But again, as the Supreme Court instructed in

25   Douglas, the Secretary's views would be useful in

1    determining that.

2              So the issue is, really irreparable harm in

3    the next two months.  Seriously, what is it?

4              MR. MacDONALD:  Yes.

5              THE COURT:  What is it?

6              MR. MacDONALD:  The irreparable harm, the

7    public's interest is being harmed by running an illegal

8    Medicaid program at least --

9              THE COURT:  If I balance that against the harm

10   visited upon the state by injunctive relief and

11   disrupting the whole payment scheme that may be

12   subsequently approved by the Secretary, it kind of

13   washes out at least, doesn't it?

14             MR. MacDONALD:  I respectfully disagree, your

15   Honor, because the whole rationale for jamming down

16   these rate reductions was the state needed to balance

17   its budget regardless of its obligations under the

18   Medicaid Act, regardless of its obligations to the

19   beneficiaries and to the patients the hospital serves.

20   And now they are using the same excuse?  No.  No.  A

21   very important distinction between this and the Douglas

22   case, the state in Douglas actually when the rate

23   reimbursements were enacted by the legislature, they did

24   what they're suppose to do.  They went to CMS and they

25   said we need to get approval for this.  And while that

1   was pending the plaintiff went to court and got an

2   injunction.  Their interests were protected under the

3   same rationale that the court has just articulated.  And

4   that's what you have here.  Yes, there's irreparable

5   harm.  There's been irreparable harm since 2008.

6           THE COURT:  Well, irreparable harm, you know,

7   no hospitals have left the program.  I know some

8   programs have diminished.  The state says those patients

9   have all been accommodated.  It's really a money issue.

10  As you pointed out in your argument, reconciliation of

11  the accounts will, if you're right, ultimately result in

12  recompensation, recompense for that.  So what's the real

13  irreparable harm?

14          MR. MacDONALD:  Well, I would just -- we've

15  included in our materials a very interesting statement

16  of interest filed by the United States in an Indiana

17  case.  And the issue there was the Indiana legislature

18  enacted a bill to require that all Medicaid providers

19  not provide abortion services.  The Indiana Commissioner

20  submitted a State Plan to enact or approve that

21  legislation, which by the way is proper, and should have

22  happened when the state enacted the statute we've talked

23  about but didn't.  And within two weeks CMS said no, we

24  disapprove.  And one of the very interesting things

25  about this area of the law is, when the State Plan

1    amendment is denied, there is all sorts of process that

2    the state gets.  Appeal to the Secretary and then a

3    full-blown administrative process.  And the United

4    States was concerned that while that was going on these

5    services, these abortion services would somehow be

6    limited.  And you know what the United States did?  It

7    got, it filed a statement of interest in that case and

8    it said this is wrong.  It's violating the law.  And

9    it's in the public interest to stop violations of the

10   Medicaid Act.  Court, you need to enter an injunction,

11   even though a State Plan amendment had been denied.

12   That is the level of --

13            THE COURT:  Well, because the State Plan

14   amendment had been denied.

15            MR. MacDONALD:  Yeah.  Absolutely.

16            THE COURT:  And here we don't have a decision

17   from the Secretary.

18            MR. MacDONALD:  We have one that these rates

19   are invalid.  We have that.  We have -- she's saying --

20            THE COURT:  Where does that come from?  I

21   don't see that.

22            MR. MacDONALD:  The Commissioner has withdrawn

23   the page that supported these rates, and he withdrew it

24   because CMS told him to.  And CMS told him to because

25   the methodology wasn't sufficient and there was no

1  public notice.  That's what happened.

2          THE COURT:  Is that what happened?

3          MS. SMITH:  No.

4          THE COURT:  What happened?

5          MS. SMITH:  The approved methodology is in, we

6  did not attach it, the old SPA, to the documents, but

7  it's cited on page 22 of our memorandum.  It was in ECF

8  docket 98-4.  That's regarding the outpatient one.

9  That's where that approved outpatient methodology is.

10          What happened in the 06-008 SPA was the state

11  submitted a State Plan amendment that was not changing

12  the outpatient methodology at all.  That SPA has not

13  been withdrawn.  The part of that SPA that was initially

14  submitted is still pending before the Secretary.

15          THE COURT:  That part that relates to

16  outpatient rates.

17          MS. SMITH:  No, that SPA as initially

18  submitted didn't talk about the outpatient methodology

19  at all.  CMS under its then process, because we were

20  making a change elsewhere on that page, read this

21  methodology language that dates from 1995 and said gee,

22  we want that to be more specific.  Tell us what you're

23  doing.  So we submitted an amendment to that page that

24  laid out what was being done under the existing

25  methodology.  It was more specific.  And that language

1   also appeared in the initial State Plan amendment

2   submitted in 08-017, which you have, and in 10-014, that

3   same first paragraph on page 4.19B, was in the SPA as

4   submitted in 2010.  That's the clarification that CMS

5   had asked for.  And yes, they said -- and if you read

6   that, Plaintiff's Exhibit A about how they're going to

7   deal with getting clarification of vague language in

8   State Plan amendments, what they've done is they've said

9   since you've submitted this in subsequent SPAs it

10  doesn't need to be in 06-008 anymore.

11          So yes, that has been taken out of 06-008.

12  But it was in 10-014 as initially submitted, and in the

13  RAI process they've asked okay, you've said it's a

14  percentage of cost, we're now, now we're a few years

15  later, we'd like to see the actual percentage in there

16  as well.  So that has been added to 10-014.  But the

17  language --

18          THE COURT:  So is it your position that it's

19  possible that the Secretary could, through CMS, could

20  say at some point these are all requests for

21  clarification of a methodology that was x'd out, and

22  although -- and we're happy to have this clarification,

23  but in terms of were these rate reductions permissible

24  under federal law under the approved methodology, yes,

25  they were.

1            MS. SMITH:  Are you asking me could the

2    Secretary say that?

3            THE COURT:  Yes, is that your position, that's

4    a potential outcome here?

5            MS. SMITH:  Yes.

6            THE COURT:  And the reason being because,

7    okay, it was vague and unclear and whatever and we've

8    since clarified it, but the fact remains that the

9    methodology was the methodology and these rate

10    reductions do comport with it.

11            MS. SMITH:  Yes.

12            THE COURT:  Okay.  And it gets right back to

13    the primary jurisdiction.  Isn't that in the first

14    instance within the expertise of the Secretary to

15    determine whether that's bogus or whether that's

16    legitimate?

17            MR. MacDONALD:  I would submit she's already

18    determined that the methodology was insufficient.  She's

19    made them rewrite the State Plan page.

20            THE COURT:  Well, you say rewriting.  The

21    state says clarify.  Isn't that itself a decision that

22    the Secretary is going to have to make, whether she

23    decided or didn't decide?

24            MR. MacDONALD:  Your Honor, in the record

25    before there is an unambiguous statement from CMS that

1  the language the state relied on was not comprehensive.

2  Did not meet the requirement --

3        THE COURT:  Sure, but that begs the question,

4  okay, I agree, it's not comprehensive and you'd like

5  clarification.  But my question is, is the rate

6  reduction that we effected pursuant to that methodology

7  acceptable to you or not, Secretary?  The answer isn't,

8  well, the language wasn't comprehensive, so that answers

9  the question.  No, it doesn't answer the question.  It

10  answers the question was the language comprehensive or

11  not, but it doesn't answer the question is the rate

12  reduction consistent or not consistent.

13        MR. MacDONALD:  With.

14        THE COURT:  With the methodology as written

15  vague and incomprehensive -- uncomprehensively.  I

16  reduced the rates.  Really?  How did you do that?  Well,

17  we were told to do it.  But happily the rate reduction

18  is consistent with federal law, there's no supremacy

19  clause claim here because although we did it pursuant to

20  the state directive, happily it's consistent, not

21  inconsistent with what federal law would require.

22  Really?  Why is that?  Well, because we had this vague

23  and uncomprehensive methodology pursuant to which this

24  rate reduction is legitimate.  Is it really?  Well, I

25  don't know.  I should decide that.  I don't think I'd

1   have a lot of trouble doing it.  The Secretary really

2   should decide that first, shouldn't she, because maybe

3   the answer is, okay, it is.

4          MR. MacDONALD:  The reason I'm standing up on

5   this particular rate reduction, the outpatient rate

6   reduction, she's already answered that question.

7          THE COURT:  I know you say that, but all you

8   point to is we suggest you withdraw because it's not

9   comprehensive enough.  And I'm suggesting to you that's

10  a far cry from a statement that says, by the way, that

11  rate reduction is inconsistent with the methodology that

12  I approved.

13         MR. MacDONALD:  Well, let me just point you to

14  some language.  Footnote two.

15         THE COURT:  And I think, again, correct me if

16  I'm wrong, I mean, you know, Mr. Davis, you know what,

17  what I've seen out of CMS doesn't tell me anything about

18  what the process is that's going on, not that there's

19  some obligation to, but I'm assuming that the process

20  that's going on is precisely that.  Are these rate

21  reductions legitimate or illegitimate under the existing

22  federal requirements?

23         MR. DAVIS:  That's correct, your Honor, the

24  SPA review process is complicated.  It involves a lot of

25  correspondence back and forth between the state and the

1   federal government, and the expression of CMS is usually

2   found in the final decision, not in anything that's been

3   exchanged back and forth.

4           THE COURT:  You take Mr. Davis's point.

5           MR. MacDONALD:  I do, but one of the prisms

6   through which the Secretary looks, CMS looks, is whether

7   the methodology in the State Plan is comprehensive.  Why

8   do we need to know that?  Because the federal government

9   needs --

10          THE COURT:  No, let me agree with you, it's

11   not comprehensive in my judgment.  You know, forget the

12   Secretary for a moment.  In my judgment they're right,

13   it's not.  The question remains whether rate reduction

14   is consistent or inconsistent with the approved

15   methodology.  Telling me it wasn't comprehensive doesn't

16   answer that question.

17          MR. MacDONALD:  Here, on the screen.  The

18   State Plan methodology now, it now contains, the State

19   Plan amendment that I put up now contains the actual

20   percentage of cost that will be reimbursed to providers.

21          THE COURT:  Didn't before but now it does.

22          MR. MacDONALD:  Exactly.

23          THE COURT:  But, so, does that retroactively

24   mean that a rate reduction was illegitimate because it

25   didn't put the actual cost --

44

```
1              MR. MacDONALD:  Absolutely.

2              THE COURT:  Why?

3              MR. MacDONALD:  Absolutely.  Because the

4   federal government needs to know how much money it's

5   going to spend.

6              THE COURT:  Vague standard.  Tight standard.

7   Rate reduction.  Does it fall within vague if it falls

8   within tight?  Doesn't it?  If tight is a clarification

9   of vague, doesn't it fall within the sphere.  Couldn't

10  it?

11             MR. MacDONALD:  Think of the prior

12  methodology.  Think of it.  The prior methodology is

13  that the Commissioner could reduce the rates to a

14  dollar.  That's the prior methodology.

15             THE COURT:  Well, that's their construction of

16  the prior methodology.  But again, I'm sorry, but I keep

17  coming back to, but CMS may not agree, they may agree I

18  guess, but hasn't the Supreme Court said in Douglas at

19  least get the Secretary's views on it, if they're

20  useful, and it seems to me this is critically useful.

21             MR. MacDONALD:  With an injunction --

22             THE COURT:  Otherwise I substitute my

23  construction of what the methodology should be and how

24  it should be construed and so on, which I'm happy to do,

25  by the way, as long as it's not a primary jurisdiction
```

1  issue.

2          Isn't your stronger argument that it's nothing

3  to do with whether it happily coincidentally flies with

4  state -- with federal law because the genesis of the

5  change is actually a state statute that conflicts with

6  the federal law?

7          MR. MacDONALD:  Absolutely.  It's point one in

8  our argument.  Preemption is an Article III question.

9          THE COURT:  Justice Thomas, it's not

10  preemption, it's supremacy -- or it's not preempted,

11  it's a nullity.

12          MR. MacDONALD:  Fair enough, but yes,

13  absolutely, and that is our principal argument.  But I

14  would say, your Honor, 60 days, whatever it is,

15  180 days, it's a long process.  It's a cumbersome

16  process.  And by the way, it's not a process that we're

17  a party to.

18          THE COURT:  I understand.  I understand.

19          MR. MacDONALD:  But why not a status quo

20  injunction?  Why not?  What's the harm while the court

21  gets wisdom from CMS?  That's what happened in Douglas.

22          THE COURT:  Yeah, I think I referred to that

23  in an earlier order.  The harm is I guess at this point

24  a pretty serious disruption of the fiscal operation of

25  the state.  I guess it would be.  I mean, that's the

1   representation.

2           MR. MacDONALD:  Well, they're going to have to

3   find the money to run a Medicaid program that is

4   consistent with federal law.

5           THE COURT:  Unless the Secretary comes back

6   and says, well, you know, we don't like what you did but

7   it's okay.  Right?  Unless they come back.

8           MR. MacDONALD:  Okay, you know, as a date

9   certain.  And I just want to emphasize --

10          THE COURT:  Yeah, I'm not in a position to

11  require a date certain.  I'm not.  That's an Executive

12  Branch administrative possess and they do their thing.

13  All I can do is say delay is too long, we're not going

14  to wait, or I can say you waived it because you've

15  declined to participate, or you won't tell me whether

16  you think it's primary jurisdiction or not, in which

17  case you waive, and I'll just go ahead and decide it.

18  But what I hear Mr. Davis saying is I'm not sure what my

19  authority is, I don't think I have any authority, but I

20  might have some authority, and yes, we're at least

21  looking at this and we hope to have an answer in the

22  next several months, but no promises.  That's what I

23  hear him saying.  But I feel like I'm somewhat compelled

24  by the Douglas opinion to at least give them a

25  reasonable opportunity to tell me if they're going to

1  tell me.

2          MR. MacDONALD:  Well, I would just again point

3  to the authoritative guidance from the First Circuit --

4          THE COURT:  No, I accept that point.  I accept

5  that point.  And I think, you know, I don't know how

6  long CMS has been flagellating this thing but it's been

7  a year or so.

8          MR. MacDONALD:  It has been a year.  It's been

9  almost a year.

10         THE COURT:  I don't think it takes a year to

11 figure out whether a rate reduction is or not consistent

12 with federal law.  I don't know what the heck they're

13 doing, but --

14         MS. SMITH:  Is Attorney MacDonald done?

15         THE COURT:  He seems to be.

16         MS. SMITH:  I didn't want to interrupt, but

17 just, you know, I think I made my points in the course

18 of the discussion this morning.  I just want to add two

19 things.

20         First, regarding the primary jurisdiction.

21 You know, we think this is an area of primary

22 jurisdiction for the Secretary.  Once we get past the is

23 there a -- you know, the court said we're past the is

24 there a supremacy clause claim, the question at that

25 point then is, is it consistent with the Medicaid law.

1        THE COURT:  You know, I don't want to hold out

2    too much hope for you, only in the sense, only in the

3    following sense from my view as I sit here is, is there

4    a supremacy clause claim?  Yes, there is.  Is it viable?

5    I don't know.  That turns on whether or not there's

6    grounds for equitable relief.  Equitable relief requires

7    irreparable injury.  What's the irreparable injury?  If

8    in fact there's no conflict between what clearly -- you

9    can't have a state statute that dictates Medicaid rate

10   setting that's inconsistent with federal law, don't we

11   all agree with that?

12       MS. SMITH:  Yes.

13       THE COURT:  Okay.  So, if that's what happened

14   an injunction will be easy, that's no problem, it will

15   be issued.  But we have this equitable relief argument

16   which is, well, is there any irreparable injury?  And I

17   take your point that, well, if happily we acted quite

18   illegitimately and illegally for our own pecuniary

19   reasons, but happily it turns out that what we did is

20   consistent with federal law, there's no harm, right,

21   because the rates are legitimate under federal law,

22   therefore there's no conflict between state and federal

23   law, therefore there's no supremacy claim that warrants

24   any relief.  But to know that you have to know whether

25   it's consistent or inconsistent with federal law, and to

1   know that the Supreme Court says you might want to

2   consider what the Secretary thinks because it's her area

3   of expertise.  Hence we're here.  But Mr. MacDonald

4   makes the great point, you know, yes, but not while

5   bureaucrats fuddle and diddle and shuffle and delay and

6   do everything but decide.  Not that.

7          MS. SMITH:  But there has been, and I won't go

8   through each piece of what we submitted, there has been

9   a lot going on.

10          THE COURT:  Oh, I read the correspondence and

11  I'm mystified how anybody can write in such length and

12  say nothing.  It's amazing.  It's a talent.

13          MS. SMITH:  There have been three access

14  reports submitted to CMS since this court --

15          THE COURT:  Has anybody ever sent you a letter

16  from CMS saying you know what?  We've got some real

17  doubts about what we did here.  Anybody said that?  It's

18  all, you know, clarify, withdraw, consider, maybe, what.

19          MS. SMITH:  There was a May 23rd letter from

20  Cindy Mann to Commissioner Toumpas which is in the

21  documents you have saying show us how, what you've done,

22  you know, is consistent with Section 30(A).

23          THE COURT:  Yeah, that's different from saying

24  you know what?  We've taken a look at this and boy, this

25  is bad, justify, we're going to disapprove it.

1                MS. SMITH:  I didn't quite hear that.

2                THE COURT:  I don't see anything in here where

3      CMS actually takes an accountable stand and somebody

4      makes a deliberation and said look, preliminary this

5      looks bad, what do you have to say for yourself.

6                MS. SMITH:  We felt that they asked those

7      questions in the May 23rd letter from Cindy Mann.  They

8      asked us to show us the access issues.  They said it

9      relates to the approval of the pending SPAs.

10               THE COURT:  Okay, well --

11               MS. SMITH:  But just my closing point was,

12     there's been a lot of talk about, as the court said, our

13     argument has always been that the rate reductions in

14     2008 were within the existing methodology.  We can argue

15     or we can talk about whether or not having a general

16     standard is better than having a very specific standard.

17     But the fact that --

18               THE COURT:  No, I think it's can you have a

19     standard that says although this looks like a lot of

20     different factors and standards, there's only one, what

21     we decide to pay.  Or do we have to actually have a real

22     standard?  I think the answer is you have to have a real

23     standard.

24               MS. SMITH:  Those standards were approved by

25     CMS in the past.

1          THE COURT:  No doubt about it, but not your

2     interpretation.

3          MS. SMITH:  We would -- CMS has been very much

4     aware --

5          THE COURT:  That elephant is much like a

6     snake.  Maybe it is, but make it's not.  Maybe it's like

7     an elephant.  But I guess the Secretary is going to tell

8     you whether it's a snake or an elephant at some point.

9          MS. SMITH:  What I'm suggesting is that if the

10    desire is to get from a general standard to a very

11    specific standard --

12         THE COURT:  No, I take your point, I take your

13    point, and I agree with you.  That evolutionary

14    bureaucratic clarification never ending process is

15    probably beside the point.  The point is not are you

16    clarifying unendingly.  The point is, is what you did

17    consistent or inconsistent with the applicable standard

18    at the time you did it.  Is it or isn't it.

19         MS. SMITH:  Correct.

20         THE COURT:  All right.  So that is the

21    unending clarification, discussion, exchange of letters

22    and everybody speaking in euphemisms and innuendo.  It

23    doesn't matter.  What matters is what does the Secretary

24    think what you did or when you did it and whether it's

25    consistent or inconsistent with federal law.  That's

 1    what happened.  And Mr. Davis seems to be implying that

 2    they might actually make a decision about that.

 3              MS. SMITH:  And I submit that that decision

 4    will be made regarding the seven pending SPAs by

 5    December 19th.

 6              THE COURT:  Well, maybe, or maybe there will

 7    be a request for more information that triggers a delay,

 8    et cetera, right?

 9              MS. SMITH:  We have received no indication

10    that there will be, and they --

11              THE COURT:  I think it only happens when they

12    want more time, doesn't it?

13              MS. SMITH:  Pardon?

14              THE COURT:  That only happens when they want

15    more time.  Isn't that how it works?  I want more time.

16    Let's ask for more information, all right, that starts

17    the clock again and the deadline doesn't really mean

18    anything unless the Secretary wants it to mean

19    something.

20              MS. SMITH:  We have no indication that that's

21    what CMS is going to do.

22              THE COURT:  But that's the history.  You can't

23    read these documents without seeing it.  That's the

24    history.

25              MS. SMITH:  Every indication we receive is

1    that CMS wants to get these done.

2              THE COURT:  Good.  I do, too.

3              MR. MacDONALD:  I would just add to what you

4    just said.  I just want to add one very important point.

5    There has to be public notice.  There has to be public

6    notice.  And the only public notice with these rate

7    reductions was the public notice that you ordered in

8    March of this year, and that's in your --

9              THE COURT:  Well, you know, again, I hate to,

10   I always feel like I'm oversimplifying it, but not if

11   the rate reductions were consistent with the approved

12   methodology at the time rate reductions were made.  Then

13   there's no notice of requirement because it's

14   consistent.  You don't notice every time you

15   consistently and legitimately apply the methodology

16   that's been approved.  You just apply it.

17             MR. MacDONALD:  Well, there are two notice

18   requirements, but when you're changing the methods and

19   standards --

20             THE COURT:  That's an argument.  That's an

21   argument.  The state says we didn't.

22             MR. MacDONALD:  Exactly.

23             THE COURT:  Yeah, so if they didn't, then

24   there's no notice requirement.  If they did, then there

25   is.  But again, we come back to, gee, who is best

```
 1    equipped to make that kind of subtle decision in terms
 2    of administering this complex regulatory scheme.  And
 3    the Supreme Court has said that Congress has said that's
 4    the Secretary.
 5            But I take your point about delay, I really
 6    do.  Here's what I think.  Mr. Davis, I'm construing
 7    your comments today to say that by December 19th the
 8    Secretary will have either decided this issue or she'll
 9    be prepared to give her views so that I can take
10    advantage of those views in deciding how to resolve this
11    petition for equitable relief, and I'm just giving you a
12    heads-up.  If we're going to get more shuffle or delay
13    or we don't know whether we want to tell you whether we
14    want to tell you, that I'm going to deem that to be a
15    waiver by the Secretary for interest in any primary
16    jurisdiction argument and I'll go ahead and decide the
17    issue including the substantive questions about whether
18    these rate reductions do or do not comply with federal
19    law.  So, I don't know what else to do because you can't
20    seem to give me a definite input as to whether or when
21    you're going to participate.
22            MR. DAVIS:  Your Honor, we'll provide our
23    views as soon as we possibly can, assuming that we get
24    authorization granted.  I completely understand your
25    Honor's frustration with this and we will move as
```

1    quickly as possible, and I can tell you that --

2            THE COURT:  Well, I mean, don't worry about my

3    frustration because I have a way of dealing with it and

4    I'm telling you the way I'm dealing with it.  The way

5    I'm dealing with it is, you know, put up or don't.  Your

6    call.  Up to you completely.  But let the Secretary know

7    that I interpret your comments as saying I don't know

8    what my authority is, I don't know what my position is,

9    I don't know if I have authority to tell you when my

10   position develops whether I should tell you or don't

11   tell you.  I understand.  I don't like it.  But if

12   that's the Secretary's position, the Secretary should

13   understand that post December 19th we're going to have

14   another hearing and if the Secretary is still unsure

15   about whether she wants to tell me what her position is

16   or not, I'm going to deem any claim that she might have

17   to primary jurisdiction in this case to have been waived

18   and I'm going to find, as Mr. MacDonald suggests, that

19   delay is intolerable beyond that point and I'll go ahead

20   and decide the case, including the substantive questions

21   about whether these rate reductions are or are not

22   consistent with federal law.

23           MR. DAVIS:  I understand that, your Honor, I

24   will convey that to CMS.

25           THE COURT:  Okay.  We'll reschedule, resume

56

1    this hearing December 19th is the date, so I'm not sure

2    what day that is.  Wednesday.  Why don't we say

3    December 20th.  We will resume the hearing on

4    December 20th.  And, you know, understand, I mean what I

5    say.  If we don't have any substantive participation by

6    the Secretary with regard to her views on this, I'll go

7    ahead and decide it and I'll do it promptly.

8                MR. MacDONALD:  Thank you, your Honor.

9                (Hearing adjourned at 11:55 a.m.)

10

11

12                C E R T I F I C A T E

13

14                I, Sandra L. Bailey, do hereby certify that

15   the foregoing transcript is a true and accurate

16   transcription of the within proceedings, to the best of

17   my knowledge, skill, ability and belief.

18

19

20   Submitted: 11/7/12

21                SANDRA L. BAILEY, LCR, CM, CRR

22                LICENSED COURT REPORTER, NO. 15

23                STATE OF NEW HAMPSHIRE

24

25