**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4-11-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
DARTMOUTH-HITCHCOCK CLINIC, ET  *
AL                              *  11-CV-358-SM
            v.                  *  December 20, 2012
                                *  2:10 p.m.
NEW HAMPSHIRE DEPARTMENT OF     *
HEALTH AND HUMAN SERVICES,      *
COMMISSIONER                    *
                                *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SPECIAL HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiff:      William L. Chapman, Esq.
                        Orr & Reno, P.A.

                        W. Scott O'Connell, Esq.
                        Gordon J. MacDonald, Esq.
                        Anthony Galdieri, Esq.
                        Nixon & Peabody, LLP


For the Defendant:      Nancy J. Smith, Esq.
                        Jeanne P. Herrick, Esq.
                        Laura Lombardi, Esq.
                        Office of the Attorney General
                        Civil Bureau


For the Government:     Benjamin L. Berwick, Esq.
                        U.S. Department of Justice


Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
 1                P R O C E E D I N G S
 2          THE CLERK:  Court is in session and has for
 3   consideration a hearing in Dartmouth-Hitchcock Clinic,
 4   et al. versus the New Hampshire Department of Health
 5   and Human Services, civil case number 11-CV-358-SM.
 6          THE COURT:  All right.  Ms. Smith, you
 7   renewed your motion to dismiss, I gather.  It wasn't
 8   necessarily a motion, but it was a prayer for relief
 9   in your memo.
10          MS. SMITH:  Yes, and I do acknowledge the
11   Court may want us to just re-file our motion to
12   dismiss because --
13          THE COURT:  Well, I was just going to -- if
14   it's acceptable to counsel, I was just going to treat
15   it as a renewed motion.
16          Any problem with that, Mr. O'Connell -- or
17   Mr. Chapman?
18          MR. O'CONNELL:  No, your Honor.
19          THE COURT:  Okay.  All right.  Who wants to
20   be heard?  Mr. O'Connell.
21          MR. O'CONNELL:  Good afternoon, your Honor.
22          THE COURT:  Good afternoon.
23          MR. O'CONNELL:  Since we were last here on
24   November 1st --
25          THE COURT:  You've pretty much done all you
```

1    can do, haven't you?

2              MR. O'CONNELL:  What's that?

3              THE COURT:  You've pretty much done all you

4    can do.  There's not much left of this case; is there

5    really?

6              MR. O'CONNELL:  Oh, there is, actually.

7    There are large chunks.  In fact, CMS has acted on

8    certain things and hasn't acted on others.  And the

9    things it hasn't acted on are alive and well and

10   require attention by this Court, and I'll break it

11   into the two pieces.

12             The first issue is CMS has passed on the

13   inpatient/outpatient application of the SPAs but made

14   crystal clear that the effective date is November 19,

15   2010.

16             THE COURT:  And again, correct me where you

17   think I'm wrong, but my overall perspective on it, as

18   reflected in past orders, is you're hanging by a

19   thread and the thread you're hanging by is to the

20   extent the state took action pursuant to a state

21   statute, or statutes, in contravention of what federal

22   law requires you've got an arguable supremacy clause

23   claim.

24             But the federal government has come back now

25   in a matter within the Secretary's expertise and said

 1   whatever the state did with respect to setting

 2   Medicaid rates, or enacting reduced rates, whatever

 3   they did and why ever they did it is irrelevant to us.

 4   We look at the result, and the result is consistent

 5   with applicable federal law from our point of view.

 6   There is no conflict between whatever state statutes

 7   they purportedly acted under and applicable federal

 8   law.

 9           Now there may be all kinds of arguments about

10   the application of the federal law and the regulations

11   and on and on and on, but that doesn't give rise to a

12   supremacy clause claim, does it?

13           MR. O'CONNELL:  Well, it does.

14           THE COURT:  How so?

15           MR. O'CONNELL:  Well, the first issue is that

16   the state took action without authority, and the

17   analysis you just have provided is premised on CMS

18   approval and that they did action that was lawful and

19   consistent with the requirements of 30(a) and 13(A) of

20   federal law.

21           We've got two years in which the state is

22   trying to administer the rates that are not lawful and

23   not approved, and so at the end of the day they are

24   not in compliance with --

25           THE COURT:  You're talking about 2008 to

1   2010?

2        MR. O'CONNELL:  That's correct.

3        THE COURT:  But isn't the answer to that,

4   yes, the administrative process, the applicable

5   federal statutes and regulations, have a mechanism by

6   which you can adjust those rates, but you don't get an

7   injunction unless you have some cause of action.

8   What's the cause of action?

9        MR. O'CONNELL:  Well, because we're

10   essentially going to be arguing the motion to dismiss

11   issues, your Honor, I would turn to my colleague, Mr.

12   MacDonald, to argue.  I'm prepared to address the

13   implications of the SPA, but because you're asking

14   different questions, I'll --

15        THE COURT:  I mean, the SPAs -- again, to me,

16   the government somewhat answered the question.  And

17   the answer is, yes, we are looking at it.  In fact,

18   we've looked at it.  We've considered it.  We've ruled

19   on it.  Done.  No problem.  Am I wrong?

20        MR. MACDONALD:  Just on the '08 to '10 issue.

21   Remember we -- just starting at the beginning, we have

22   some counts under 30(a), which as the Court knows is

23   premised on a supremacy clause cause of action, and

24   then we have counts under section 13(A), which as the

25   Court has recognized under First Circuit precedent is

1   supported under a 1983 cause of action.

2           With respect to the '08 to '10 issue, that is

3   a 13(A) issue.  That is a failure to give adequate

4   public notice.  And CMS has come back and said, yes,

5   plaintiffs, you're right, it was inadequate public

6   notice.  They've said that the effective date of those

7   SPAs is November 19, 2010, because of that inadequacy.

8           THE COURT:  Now, therefore -- as I read it,

9   therefore, the rates -- according to CMS, the reduced

10  rates from 2008 to 2010 are not consistent with

11  federal law.

12          MR. MACDONALD:  Correct.

13          THE COURT:  Are not approved.

14          MR. MACDONALD:  Correct.

15          THE COURT:  You can't charge reduced rates

16  that have not been approved or are not approved.

17          MR. MACDONALD:  Correct.

18          THE COURT:  Isn't that the end of the matter?

19          MR. MACDONALD:  And then because we brought

20  the claim under Section 1983 we can come to this Court

21  and ask for an injunction saying, State, you can't

22  enforce this.

23          THE COURT:  I'm not sure why you need an

24  injunction.  There's no need for equitable

25  intervention or equitable relief.  The law is settled.

1  It's clear.  Those rights are not enforceable to the

2  extent CMS has not approved them, but that's a

3  function of the operation of the federal statute and

4  the regulatory scheme.  It's not a function of I need

5  a Court to confirm that they're illegal.

6           MR. MACDONALD:  Well, I think the

7  conversation would be --

8           THE COURT:  And illegal probably overstates

9  it.  They're not effective.

10          MR. MACDONALD:  They're not effective.

11          THE COURT:  By operation of the federal

12  regulatory system they're not effective.  You don't

13  get a court injunction to state the obvious.

14          MR. MACDONALD:  Well, there are two pieces to

15  that.  One is, if the state -- the easy button, if you

16  will, on this issue is if the state is recognizing

17  that the rates are ineffective --

18          THE COURT:  But they have no choice to.  It's

19  not a question of recognizing it, right?  Under

20  operable federal law they cannot enforce rates that

21  are not approved by CMS.

22          MR. MACDONALD:  I completely agree with the

23  Court.  And the reason why this is a very material

24  issue and why there is a potential for irreparable

25  harm is if the state gets up and says, no, your Honor,

1    we disagree, all of these years are still being cost

2    held.  Hospitals have not been fully paid.  It is very

3    much an open issue.

4           If the state gets up and says, no, your

5    Honor, you're not right, we can enforce those prior

6    rates, then the hospitals will be irreparably harmed

7    because the state is planning to proceed in enforcing

8    illegal --

9           THE COURT:  Well, you know, it strikes me --

10   and don't take anything about this comment, but it

11   strikes me that that's a different case, that that's

12   really not this case.

13          MR. MACDONALD:  It's count 6, I believe it

14   is.  Section 1983, failure to give adequate notice as

15   to all these rates and --

16          THE COURT:  The adequate notice, it seems to

17   me, is a little bit of window dressing because those

18   reduced rates, as I understand it -- and again, not my

19   field -- but those reduced rates, as I understand it,

20   from 2008 to 2010 have not -- have been considered and

21   disapproved by CMS, right?

22          MR. MACDONALD:  Yes, your Honor.

23          THE COURT:  Okay.  So there's not much to

24   talk about, right?  The state says -- you say to the

25   state at some point in some process, oh, by the way,

1    you underpaid us and we would like to be made whole.

2    I assume you submit a bill and they pay you or you

3    withhold payment from them that you owe them or

4    something.  There's an offset -- there's got to be an

5    offset reconciliation process.

6            MR. MACDONALD:  Except the differential here

7    is 33 percent.

8            THE COURT:  Yeah.

9            MR. MACDONALD:  Your Honor, I will sit down

10   on this issue if we hear from the state that they're

11   going to recognize those rates.  I think you're

12   absolutely right.

13           But if the state takes the position that

14   they're not going to recognize what CMS has done, then

15   I do think we have a case and I think it's pled in our

16   case.

17           THE COURT:  Okay.  Fair point.

18           Attorney Smith, you can't charge reduced

19   rates that haven't been approved and in fact have been

20   disapproved by CMS, right?

21           MS. SMITH:  Well, they haven't been

22   disapproved.  We disagree with what Attorney Gordon

23   says.  As CMS acknowledged in what it filed, the

24   approved methodology that was in effect in 2008 on its

25   face appeared to allow the state to adjust the rates

1  and --

2           THE COURT:  Why am I wrong?  I thought CMS

3  said we've looked at that SPA and we've approved it

4  back to 2010.  It's not approved back to 2008.  And in

5  order to reduce the rates you have to have CMS

6  approval.  33 percent is a material change.  You have

7  to ask for their approval.  You have to get their

8  approval.  Absent their approval, it's not effective.

9  What am I missing?

10          MS. SMITH:  The approved State Plan

11 methodology allowed the state to adjust the rates.

12 There were --

13          THE COURT:  You mean without putting in a

14 SPA?

15          MS. SMITH:  Yes.

16          THE COURT:  Then why did you put one in?

17          MS. SMITH:  There was one put in in 2010

18 which addressed other changes in the rate methodology,

19 and because CMS looking at those provisions and the

20 direction that regulation has gone wants more

21 specificity in the State Plan they asked us to

22 specify -- to be more specific about the methodology

23 and ultimately to add the specific rates that were

24 historical rates that were being used.

25          So when they approved 2010 SPAs -- when you

1  look at those approval letters they acknowledge that

2  they are approving the currently existing rates.  They

3  did not say that those rates were ineffective or

4  disapproved going backwards.  They acknowledge that

5  they were approving rates that were currently in use.

6  　　　　THE COURT:  That makes no sense to me.  I

7  don't even know what you said.

8  　　　　Did you seek approval for the rate reductions

9  from 2008 forward?

10  　　　　MS. SMITH:  There was -- those rates have

11  been approved in the 2010 SPAs.

12  　　　　THE COURT:  No, no, because that's only

13  approved as of 2010.  So what have you got to show an

14  approval for the rate reduction from 2008 to 2010?

15  What have you got?  It sounds like you've got an I

16  don't have to do that kind of argument.  Is that it?

17  　　　　MS. SMITH:  If the method was within the

18  existing methodology, it's our position that the State

19  Plan --

20  　　　　THE COURT:  It isn't.  It isn't within the

21  existing methodology.  But who decides that?  The

22  Secretary decides that basically.  Did the Secretary

23  decide that?

24  　　　　MS. SMITH:  The Secretary has never told us

25  if we had to file a State Plan for the 2008 rates.

1          THE COURT:  What was the Secretary looking

2   at?

3          MS. SMITH:  The Secretary -- for instance, in

4   some of the other evidence that has been submitted in

5   2008 the hospital association wrote the Secretary

6   asking the Secretary if the state was required to

7   submit a State Plan for these 2008 rate changes, and

8   the answer was very equivocal and the state submitted

9   a response to the Secretary explaining why we did not

10  feel a State Plan is necessary.  And so the Secretary

11  was well aware that these changes had been made in

12  2008, and there was no instruction to the state to do

13  a State Plan Amendment specifically regarding these

14  rate changes.

15         If you would like me to find those exhibits,

16  I can --

17         THE COURT:  These are the same rate changes

18  that go from 2010 forward as well.

19         MS. SMITH:  I'm sorry.  I didn't hear you.

20         THE COURT:  The same rate reductions

21  from 2010.

22         MS. SMITH:  The same rates have continued in

23  effect under the 2008 SPAs that are now -- the 2010

24  SPAs that are now approved.

25         THE COURT:  Okay.  So you filed a SPA

1   application with respect to this 33 percent reduction

2   in 2010?

3           MS. SMITH:  The State Plan Amendments says

4   the 33 percent and the inpatient 10 percent were filed

5   and are SPAs 2010-011 and 2010-014.

6           THE COURT:  And that sought approval for

7   reduced rates beginning when?

8           MS. SMITH:  They sought approval for other

9   changes in the inpatient methodology and the

10  outpatient methodology.  CMS in looking at those

11  provisions said, State, your prior methodology which

12  allows you to make changes under a very vague standard

13  is not sufficiently comprehensive.  You need to

14  specify your methodology more specifically.  And as

15  those discussions progressed over a number of years

16  they actually increased the request to ask that

17  specific current rates be put into the State Plan.  So

18  those are now part of SPA 2010-011 and 2010-014.

19          THE COURT:  So you think the Secretary has

20  dropped the ball.

21          MS. SMITH:  No.

22          THE COURT:  The Secretary has not looked at

23  the 2008-2010 rate reductions with a view towards did

24  you have to file a SPA, was it approvable, so on and

25  so forth, did you publicly notice it.

1          MS. SMITH:  The data that we supplied that

2    they specifically have relied on provided metrics to

3    show access from 2007 through the current time.  So we

4    have provided data to demonstrate compliance with the

5    federal law from 2007 through the current time, so

6    we --

7          THE COURT:  Why does the Secretary say it's

8    approved as of 2010 but not before?

9          MS. SMITH:  Because the date of the notice of

10   those SPAs under federal law cannot be effective prior

11   to the first day of the quarter in which the SPA

12   was --

13         THE COURT:  So you're in the same position

14   you've been all along.  We don't have to do that.  We

15   didn't do it.  We don't have to do it.

16         MS. SMITH:  Correct.

17         THE COURT:  That's your position.

18         MS. SMITH:  Correct.

19         THE COURT:  That we did it, whatever, but we

20   didn't have to.

21         MS. SMITH:  Correct.

22         THE COURT:  Okay.  That doesn't strike me as

23   correct.  Did not the injunction on the 13(A) --

24   didn't that -- did that injunction not cover these

25   changes?

 1          MS. SMITH:  It did.  And we gave the notice.

 2   That was the notice.  But we didn't do another SPA as

 3   a result of giving that notice because we were already

 4   talking to CMS about putting those same rates in the

 5   2010 SPAs.  So they were already in SPAs that were in

 6   progress in the --

 7          THE COURT:  No, no.  Because you said the

 8   2008 to '10 reduction as for those years was not in

 9   the SPA.  Your position on that is we don't have to.

10          MS. SMITH:  We can't -- there's no mechanism

11   by which we can ask CMS to go back and approve it

12   backwards.  There's just no mechanism, your Honor.

13          THE COURT:  Well, you can't just unlawfully

14   reduce rates, let time go by, file a SPA in futuro and

15   then say the Secretary doesn't have any authority to

16   look backward and decide whether or not we acted

17   lawfully because there's no mechanism.  That's not the

18   law?  Otherwise why would a state like New Hampshire

19   ever file a SPA request?

20          If CMS made you do it, you might file one,

21   but then for the past five years when the chase was on

22   you would say, well, at least for those five years

23   that's the way it goes.  There's no reconciliation of

24   what's legitimate.  That can't be right.

25          MS. SMITH:  The mechanism that the federal

1   government has is they can withhold funds for a time

2   period in which they feel that you were not in

3   compliance.

4           THE COURT:  Well, again, this is going to be

5   more complicated than I thought, I guess.

6           Starting out, do you claim that with respect

7   to -- you know, as I see it, the 2008-2010 issue is

8   about all that's left in this case, I suppose, but I

9   don't even see it as an issue.  But maybe you're

10  right.  Maybe it is.

11          Did you give 13(A) public notice with respect

12  to the 2008-2010 period with regard to rate reduction?

13          MS. SMITH:  We contend that we did and what

14  we --

15          THE COURT:  Okay.  Let's get the fundamentals

16  first.  You say you did.  Okay.

17          MS. SMITH:  The plaintiff I'm sure will

18  disagree, but these were not in specific documents

19  that we submitted.  But public notice and actual

20  notice to the hospitals was given prior to those rate

21  reductions, at the time of those rate reductions, and

22  very shortly thereafter.  There are at least eight

23  documents that have been previously filed with this

24  Court that demonstrate that.

25          THE COURT:  I guess I was thinking in

1    response to the injunction.

2             MS. SMITH:  Yes, in response to the

3    injunction and in response to -- and at the

4    preliminary injunction hearing.

5             THE COURT:  I'm not as persuaded as the

6    Secretary about this legislative -- this committee

7    meeting notice, people's notice thing, so I'm not

8    talking about that.  I'm talking about you were

9    enjoined and said, look, you can give public notice

10   under section 13(A) with respect to all these rate

11   reductions.  I assume you did that.

12            MS. SMITH:  I'm sorry.  I'm not understanding

13   your question.

14            THE COURT:  Well, I issued an injunction and

15   I said the state -- it's been established that the

16   state, they've established a likelihood of success in

17   proving that you did not comply with your section

18   13(A) requirements, so comply.  Do it.  I assume you

19   did it.

20            MS. SMITH:  Yes.

21            THE COURT:  And I assume that covered all of

22   the rate reductions that are at issue in this case.

23            MS. SMITH:  Yes.

24            THE COURT:  Okay.  So that's done.

25            MS. SMITH:  Yes.

1          THE COURT:  Now, is it part of this case that

2     you cannot reduce the rates for 2008-2010 the way you

3     did?

4          MS. SMITH:  It's not before this Court

5     because this Court can only issue prospective relief.

6     They are asking you to issue declaratory relief or an

7     injunction --

8          THE COURT:  I can do that, but prospectively

9     reconcile the accounts properly.

10         MS. SMITH:  And you can't do that for a

11    couple of -- there's some case law that says that

12    that's not proper.  Let me just cite a couple of cases

13    for you.

14         One of them is the circuit court case in

15    Wisconsin Hospital Association versus Reivitz which --

16    actually, they gave you one of the district court

17    cases the plaintiff cites.  That case is 820 F.2d 863.

18    It is from the Seventh Circuit.  In that case the

19    Court said that -- the Court noted that:  Any fear

20    that the state has that the hospitals might take the

21    district court's declaration and use it to obtain a

22    damage award in state court doesn't have any basis

23    because the federal court bars -- the Eleventh

24    Amendment bars the federal court from issuing

25    declarations usable only to obtain a damage judgment

1   by a state in a state court.

2          What they were trying to do there was get the

3   Court to -- they were arguing that because the

4   payments that they were talking about had not been

5   finally settled, just like the plaintiffs here are,

6   that therefore the Court could issue an injunction

7   that would be prospective, and the district court --

8          THE COURT:  Are these payments in your view

9   finally settled, the 2008 to 2010?

10          MS. SMITH:   Inpatient is absolutely settled.

11   To the extent they say otherwise, they're wrong.

12   There's no cost settlement principles regarding

13   inpatient.

14          On the outpatient settlement the rates have

15   been paid for all of these years.  The only thing that

16   is outstanding is there is a -- because our formula

17   depends on Medicare allowable rates the federal

18   government hasn't allowed the Medicare fiscal

19   intermediary to close the final audits for these

20   years.

21          So if the Medicare fiscal intermediary comes

22   back and says we're going to allow X which previously

23   wasn't allowed, then we'll have to go -- then the

24   state's rate might need to be adjusted just by what

25   Medicare is now allowing to be included.  But that's

1   the only reason anything is conceivably open on any of

2   these years.

3          THE COURT:  Okay.  Meaning that you've -- the

4   possibles and everything are signed off on these

5   years.

6          MS. SMITH:  They have received -- they

7   received -- the way that -- as soon as they do their

8   billing they receive an initial interim payment.  Our

9   intermediary has calculated -- after that we get

10  actual costs.  So the actual costs have gone into the

11  formula, there have been estimates made on those, and

12  my understanding is that the settlement payments have

13  been made based on those adjustments based on actual

14  costs for these years.

15         But to go back to this case, the Seventh

16  Circuit absolutely said that this reading -- this

17  argument presented that just because something isn't

18  finally settled -- where what they're trying to do

19  would require the state to go back and pay money on

20  services already rendered is an incorrect reading of

21  the word prospective relief, and it's really very much

22  in line with what they're arguing here.

23         Additionally, the Court relied on a United

24  States Supreme Court case, which is Green versus

25  Mansour, that is 474 U.S. 64, which held that federal

1   courts cannot retroactively issue a declaratory

2   judgment that would require a state to go back and pay

3   on prior services or to issue a declaratory judgment

4   that state officials violated federal law in the past,

5   and that's what they're asking you to do.

6            So we think that the -- as far as the newness

7   issues regarding the 2008 rates, the state has

8   complied with the Court's injunction order.  CMS has

9   found there was adequate notice of those 2008 rates

10  incorporated into the 2010 notices regarding those

11  SPAs and approved those rates.

12           THE COURT:  But how can that be?  I mean, how

13  can there be adequate notice of those rate changes

14  when you say we don't have to give notice of those

15  rate changes, we don't have to file a SPA with regard

16  to those changes, they fit with the approved

17  methodology, there's nothing to talk about?  How does

18  that square?

19           MS. SMITH:  Because the 2010 SPAs gave notice

20  that there were going to be changes in the payment

21  methodology.  And CMS's view, as they articulated in

22  their view, is that the notice doesn't have to reach

23  the level of specificity that the plaintiffs suggest

24  it does.  It doesn't have to incorporate a specific

25  percentage or a specific dollar in the notice.  That's

 1   what CMS has told the Court.  And I believe in their

 2   issues brief is the Secretary's interpretation of the

 3   level of specificity required by the public notice

 4   process.

 5           THE COURT:  You seem to be saying the

 6   Secretary has said in English, we don't like your

 7   formula, it's too vague and too subject to

 8   misapplication, tighten it up.

 9           You said, okay, we'll tighten it up.  We'll

10   tighten it up like this.  The Secretary said, yeah,

11   okay.  That's good.  That's approved back to 2010.

12           And then you say, whatever, it's the same

13   methodology.  Whether we tightened it up or didn't

14   tighten it up, there's no substantive change.  We

15   didn't have to do that, but we accommodated the

16   Secretary and so everything is good from 2008 forward.

17   That's your position?

18           MS. SMITH:  In part.  I would just add to it

19   that the exact same methodology has been on the table

20   back in 2008.

21           THE COURT:  Well, that's my point.  You're

22   saying nothing has changed.  They wanted us to put

23   some more bells and whistles on it.  We did.  But the

24   formula is the same.

25           MS. SMITH:  Correct.

1          THE COURT:  Okay.  Go ahead.

2          MR. MACDONALD:  Your Honor, I think you're

3    understanding the issue, and unfortunately --

4          THE COURT:  Well, I'm not because I've still

5    got this big issue about what cause of action do you

6    have.

7          MR. MACDONALD:  But this is all 1983 land.

8          THE COURT:  But it's got nothing to do with

9    13(A).

10          MR. MACDONALD:  Yes, it does.

11          THE COURT:  Why?

12          MR. MACDONALD:  Because the Secretary found

13    that there was inadequate public notice, and on

14    that -- until November 2010, and that's the basis for

15    the effective date.  And your Honor is exactly right

16    that the rates before that date are illegal.  And

17    unfortunately what we've heard is the state intends to

18    pay on the illegal rates.

19          Now this is not some ministerial settlement

20    process.  This is a process where CFOs of hospital --

21    and if you want to hear testimony, we've got several

22    here -- CFOs of hospitals get a worksheet and the

23    worksheet basically says, here are our costs

24    multiplied by 54.04 percent.  Please accept this.

25          How can they sign that?  It's an illegal

1   rate.  It should be 82 percent, the rate before the 33

2   percent cut.  And these settlements are very much

3   open.  The state has pushed off and pushed off and

4   pushed off settling these claims because they don't

5   want to pay us the money, even the meager 54 percent.

6   This is a very material event.

7          Now, in terms of prospective relief, you

8   know, I will acknowledge there is a Wisconsin case,

9   there's a case in the Second Circuit, there's a case

10  in the Ninth Circuit.  This is different.  CMS has

11  said unequivocally that these rates are illegal.

12         You have a brief on page 21 -- a statement of

13  interest from the United States saying we don't object

14  to entry of injunctive relief as to those effective

15  dates.  And, again, the easy button in this is for the

16  state just to agree that from 2008 to 2010 the rates

17  are not -- you know, they cannot enforce the illegal

18  rates.

19         If they were just to say that today, we could

20  save everyone a lot of time.  It's unfortunate that

21  they're not saying that, and frankly, your Honor, I

22  mean there's absolutely no basis in law, but, you

23  know, for obvious reasons we're going to press that

24  issue.  I mean, we've got now CMS with us on that

25  issue.

1          MR. BERWICK:  Your Honor, my name is Ben

2     Berwick.  I'm here on behalf of the United States.  If

3     you would like to hear from me, I don't think either

4     side has quite accurately represented the Secretary's

5     view in this matter.

6          THE COURT:  Yeah, I would, Mr. Berwick.

7     Thank you.  I had a little trouble understanding what

8     you're referring to, too, because, again from my

9     perspective, I really thought I cured all the 13(A)

10    problems with the injunction that required public

11    notice.

12         MR. BERWICK:  Well, your Honor --

13         THE COURT:  To the extent you can cure

14    anything.  I mean, I think I recognize in the order

15    it's kind of after-the-fact relief, but at least it

16    obtains compliance with the requirement that they give

17    public notice.

18         MR. BERWICK:  Let me say a couple of things.

19    First of all, the Secretary -- the only thing the

20    Secretary determined was the rates as to 2010.  The

21    only State Plan Amendments before the Secretary --

22    other than the pending State Plan Amendments, but the

23    State Plan Amendments the Secretary decided pertained

24    only to 2010.

25         The Secretary made no determination as to

1    whether the state had provided adequate notice or had

2    not provided adequate notice prior to 2010.  That's

3    because there was no State Plan Amendment before the

4    Secretary that was relevant to that time period.

5            In fact, the Secretary had no retroactive

6    enforcement ability, so there was no reason for the

7    Secretary to determine whether the state had been in

8    compliance with the notice requirement between 2008

9    and 2010.

10           So to the extent that the plaintiff suggests

11   that the Secretary had made a determination that the

12   state was out of compliance with the notice

13   requirement during that time period, that's not

14   accurate.  But the Secretary also had not made a

15   determination that the state was in compliance during

16   that time period either.

17           MR. MACDONALD:  May I, just on that point,

18   because that's just not right.  The state has

19   submitted a State Plan Amendment, 06-008, and CMS

20   said, you cannot use that because there was no public

21   notice.  So there was a pending State Plan they tried

22   to tag this onto.

23           MR. BERWICK:  I can address that point if you

24   would like me to, your Honor.

25           THE COURT:  Yes.

1          MR. BERWICK:  You are correct partially in

2    what you say, which is when that State Plan Amendment,

3    06-008 was initially submitted to the Secretary, the

4    Secretary -- it had an effective date of 2006.  The

5    Secretary asked the state to provide evidence of

6    public notice back to 2006.  The state did not provide

7    such evidence and withdrew that portion of the State

8    Plan Amendment.

9          THE COURT:  Which portion?

10          MR. BERWICK:  The portion that changed the

11    methodology that calculated the base rate.

12          But to be clear, that was in 2006 and the

13    Secretary made no determination about whether there

14    was public notice or not.  The state withdrew that

15    portion of the State Plan Amendment.

16          So again, it is accurate to say the Secretary

17    has not made a determination as to whether the state

18    was in or out of compliance with the notice

19    requirement prior to 2010.

20          That being said, the Secretary agrees with

21    the plaintiffs to the extent that if the Court finds

22    that the state was out of compliance with section

23    13(A) during that time period, 2008-2010, and all of

24    the other elements of injunctive relief are met, then

25    the Secretary would not object to injunctive relief

1   during and before that time period.

2            THE COURT:  What would that injunctive relief

3   look like?  I've already issued injunctive relief that

4   said comply with your obligations to provide a public

5   process.  The state says, okay, we did.  Now what?  Do

6   it again?

7            MR. BERWICK:  What I would say to that is if

8   the state had not adequately met the requirements of

9   13(A) for that time period --

10           THE COURT:  I've already determined that the

11  plaintiffs had a likelihood of success in establishing

12  that the state did not meet its 13(A) obligations with

13  respect to these reduced rates.  Period.  Relief.  Do

14  it.  Response:  I think we did it.  Where does that

15  leave us?

16           MR. BERWICK:  All I would say, your Honor,

17  for that time period -- if that is what the Court

18  finds -- and again --

19           THE COURT:  No, I already did.

20           MR. BERWICK:  Okay.  Assuming that's this

21  Court's finding, then the state would be out of

22  compliance with federal law for that time period.

23           THE COURT:  Until they comply with the notice

24  requirements, which they did.  And now the plaintiffs

25  are saying, and you seem to be agreeing -- I'm not

1    trying to hold your feet to the fire.  I'm just trying

2    to find out.  The plaintiffs now are saying, yes,

3    great job, Judge, that's wonderful.  Now what's the

4    ramification of that?  The ramification is for that

5    period of 2008 to 2010 they reduced rates.  They

6    didn't give adequate public notice.  We think they

7    should have filed a SPA as well, but whatever, but at

8    least we know they were not in compliance with their

9    13(A) obligations.  Accordingly, please enjoin them

10   from enforcing those rates from 2008 to 2010 because

11   the Secretary hasn't approved them and they're

12   unlawful because they were not properly noticed.  Do I

13   do that?

14           MR. BERWICK:  Well, it is certainly the

15   Secretary's position that the Court is free to do

16   that.

17           THE COURT:  And you don't see that as a

18   primary jurisdiction invasion?

19           MR. BERWICK:  No.

20           THE COURT:  You don't see that as a

21   usurpation of a congressionally delegated authority of

22   the Secretary to administer the program?

23           MR. BERWICK:  No, your Honor, we don't.

24           THE COURT:  Okay.

25           MR. BERWICK:  To the extent that the Court is

1    acting on its conclusion that the state was in

2    violation of section 13(A).

3              THE COURT:  Correct.

4              MR. BERWICK:  Yes; that's correct.  We do not

5    believe we have --

6              THE COURT:  Again, in general -- again, I'm

7    not trying to hold you to anything, but in general the

8    Secretary's view is there is no private cause of

9    action to enforce 30(a) rights.

10             MR. BERWICK:  That is correct.

11             THE COURT:  Who knows whether you have a

12   supremacy clause claim or not.  The Supreme Court will

13   figure that out someday, maybe.  You do have a 13(A)

14   claim, however.

15             MR. BERWICK:  Yes.

16             THE COURT:  And adequate relief from a 13(A)

17   claim would involve enjoining the state from enforcing

18   rates unlawfully adopted.

19             MR. BERWICK:  I think that's accurate, your

20   Honor.

21             THE COURT:  Okay.

22             MS. SMITH:  In addition to the argument --

23             THE COURT:  You've got a problem then, don't

24   you?

25             MS. SMITH:  -- that the Court doesn't have

1    authority to go back and order retrospective relief --

2           THE COURT:  I'm not sure it's retrospective

3    relief.  Why would it be retrospective?  State, in the

4    future do not attempt to enforce these illegal rates

5    with respect to 2008 to 2010.

6           MS. SMITH:  Because it's regarding services

7    that have been rendered in the past that would require

8    payment on damages -- and it's squarely within

9    obtaining an injunction or declaratory relief in order

10   to allow the plaintiffs to obtain damages because

11   these rates have already been paid.

12          THE COURT:  But they're unlawful rates.  If

13   we pay these illegal rates, we're good.  It doesn't

14   work that way, does it?

15          MS. SMITH:  Well, it's not within -- there is

16   an issue regarding the Court's jurisdiction, and the

17   Supreme Court has said in Green versus Mansour

18   that the Court --

19          THE COURT:  What's the state's view, we stole

20   it fair and square and we're not giving it back?

21          MS. SMITH:  The cases that we have already

22   cited say that --

23          THE COURT:  But what's your view?

24          MS. SMITH:  On the notice issue, that notice

25   can be cured, that actual notice counts, and that the

1  notice requirements of 13(A) are not rigid and

2  therefore whether or not an injunction would be

3  appropriate, even if it was going forward, needs to be

4  flexible and look at what actually happened.

5         We didn't brief that here in response to this

6  issue regarding primary jurisdiction because that's

7  what we understood the focus of this hearing to be.

8         If you would like additional briefing on that

9  and on the Court's authority regarding specifically

10 the 2008 to 2010 period, we would be happy to do that.

11        THE COURT:  I think you might have to.

12 You're right, the Secretary has responded and said,

13 look, here is my view, this is basically within my

14 primary jurisdiction to administer and enforce these

15 regulatory and statutory requirements.  I've done

16 that.  I think in my view that pretty much ends the

17 matter.

18        But the Secretary steps up and says, now as

19 to 13(A) there's a private right of action, and if the

20 state hasn't complied with 13(A) there's no problem

21 from our perspective in terms of the Court entering

22 appropriate injunctive relief.  And they imply we

23 don't think they did a very good job in terms of

24 meeting their obligations under 13(A) with respect to

25 these years of rate reduction.

1          So then the answer is, okay, well, what's the

2    relief?  I've already granted some relief, which is go

3    do it.  But you seem to be saying, okay, having done

4    it -- having done it, there's no recoupment.  We still

5    get to impose unlawful rates.

6          I guess I'm hung up there.  Why do you get to

7    do that?  Because the Secretary doesn't care?  The

8    Secretary says, well, I care, but from our perspective

9    we don't have retroactive enforcement authority.  My

10   authority is limited to taking away your money or not

11   taking it away.

12         So how does that work out?  It seems to me

13   that the hospitals have a legitimate claim.  How does

14   it work out?

15         MS. SMITH:  We would also renew our latches

16   argument.  The hospitals if they think they haven't

17   gotten notice can't sit on that for three years

18   because that's something that could be cured.

19         They didn't bring this until 2011, and they

20   can't sit on this and now go back and --

21         THE COURT:  But your real argument is the

22   only relief available is an injunction requiring that

23   the notice requirements be adhered to.  Isn't that

24   your real argument?  Your argument is there is no

25   equitable relief that can reach back and resettle the

 1  rate.

 2          MS. SMITH:  Correct.

 3          THE COURT:  Okay.

 4          MS. SMITH:  If you want -- there were some

 5  issues that the plaintiffs raised about the 2011 SPAs

 6  being still pending.  I can address that if you want.

 7          THE COURT:  Well, I think -- doesn't that fit

 8  in the category of it's within the jurisdiction of the

 9  Secretary?  She's exercising her discretion and

10  jurisdiction to resolve those matters, and when she

11  does if you don't like it there's an APA remedy

12  available to you.  Isn't that the end of that?  Mr.

13  MacDonald.

14          MS. SMITH:  Just to address some inaccuracies

15  in what the plaintiff said, those SPAs are pending.

16  There is a clock ticking regarding the 2011 SPAs.

17          THE COURT:  Again, I tried to make it clear.

18  It's a question of primary jurisdiction, it seems to

19  me, and my concern was is anybody looking at this.

20  And the answer seems to be, yes, we are looking at it

21  and we've looked at it and we've ruled, to the extent

22  we're going to rule, except we've got other rulings

23  coming, but now there's this little sort of fill up

24  until about 2008-2010.

25          Go ahead, Mr. MacDonald.

 1          MR. MACDONALD:  May I?

 2          THE COURT:  Please.

 3          MR. MACDONALD:  Just on this 2008-2010 issue.

 4   It's just very unfortunate that the state is going to

 5   put us all through this when the easy answer is simply

 6   to acknowledge the rates --

 7          THE COURT:  They're not giving you the money

 8   back if that's what you're talking about.

 9          MR. MACDONALD:  No.  They have tomorrow,

10   today, that they can fix the problem.

11          THE COURT:  But they're not going to.

12   They're not going to.  And they're saying there's

13   nothing you can do about it because there's no

14   jurisdiction to go back and award damages against the

15   state.  There's no jurisdiction to give prospective

16   relief that's really retroactive relief.  There's no

17   way that you can enjoin us from paying rates we've

18   already paid and settled.  That's their argument.

19          MR. MACDONALD:  The Court clearly has

20   jurisdiction to give prospective relief.

21          THE COURT:  But not in the nature of there's

22   really a mass retroactive relief in the nature of

23   damages.  That's what you want.  You want the money

24   back.

25          MR. MACDONALD:  We want to get paid.

1          THE COURT:  Or you want the money you were

2     supposed to get.

3          MR. MACDONALD:  We want to get paid on what

4     has now on December 13th been determined to be a legal

5     rate, not an illegal rate as CMS has determined.

6          In other words, on December 13, 2012, CMS

7     says from November 19, 2010 forward these rates are

8     illegal.  We have not been paid for those years.

9          THE COURT:  I'm sorry.  Say that again.

10         MR. MACDONALD:  Last Friday CMS approved

11    these SPAs.  And the effect on the outpatient rates

12    is -- they're saying from November 19, 2010 forward

13    the rates are legal.

14         Now, footnote there.  We respectfully suggest

15    they got that wrong because the Court -- as you've

16    observed several times, the first notice of any of

17    this was after the Court issued its injunction.  The

18    real date should be March 30, 2012.  We are saying --

19         THE COURT:  But what does that say about 2008

20    to 2010?  And what Ms. Smith is saying, I think, is,

21    A, it doesn't say anything; and B, CMS has not said

22    that the 2008 to 2010 rates are illegal in any way.

23    They haven't approved it.  They haven't disapproved

24    it.  They don't need to approve it or disapprove it

25    because those reductions were set in accordance with

1  the methodology that was in place and part of the

2  State Plan.  That's our argument.  We're sticking to

3  it, and there's nothing the Secretary said that in any

4  way undermines that argument.

5          MR. MACDONALD:  Well, they can -- I mean

6  that's been their mantra.

7          THE COURT:  Yeah, but what have you got other

8  than, well, but they've said this is effective back to

9  November 2010, and therego, everything before that

10  must have been determined to be illegal, but the

11  Secretary didn't say anything like that.

12          MR. MACDONALD:  I've got letters from CMS

13  saying that the methodology as existed was inadequate.

14  They needed to change the methodology.  And to change

15  the methodology you need to do a public notice.

16  That's what CMS said and that's why they had to change

17  that page.  CMS said, okay, you need a public notice,

18  and they were able to grab onto this one in 2010 and

19  say that's adequate.  That's what happened.

20          The correspondence from CMS is pretty clear

21  about -- they needed to change the methodology.  It

22  was insufficient.  They said it granted the state too

23  much discretion.  Our argument from day one.  You

24  couldn't look at that methodology and figure out

25  anything.  It needs to be reasonably clear to

1  providers and beneficiaries.  They could do whatever

2  they wanted.

3          THE COURT:  Just by way of testing your

4  argument, why wouldn't the easy response be, they may

5  have thought it was inadequate after a period of time

6  of seeing the way we implemented it, but whatever,

7  that was the approved methodology and we did apply it.

8  And did we abuse the discretion when we snuck into

9  ourselves when we wrote this standard?  I guess we

10  did.  Did we get caught?  I guess we did.  But you

11  know what, that was the approved methodology.  There

12  was nothing unlawful about it.  We applied these rate

13  reductions according to the methodology.  We agree we

14  wrote it to our own benefit and we exploited it fairly

15  well, but that doesn't make it unlawful.

16          MR. MACDONALD:  Again, I mean it's Groundhog

17  Day in this case, but the approved methodology dating

18  back to 1995 was pay Medicare rates.  That's the

19  approved methodology.

20          And they have this convoluted interpretation

21  about how they can get away with making across the

22  board cuts.  And CMS said, no, that's not a

23  methodology.  It's way out of date.  You need to get

24  it updated every 20 years or so, and that's why they

25  made them make these changes.  And they're saying the

1   changes -- the actual rates that are now baked into

2   the State Plan can only be effective from November 10,

3   2010 onwards.

4            And so we've got these very real pending

5   settlements, and these CFOs are going to have to sign

6   and certify to the state that, yeah, 54.04 percent is

7   the rate.  It's not.  That is not the rate under the

8   approved State Plan.  It would be a hundred percent of

9   whatever Medicare pays, and I can tell you that they

10  would be more than happy to take that.  That's the

11  issue.

12           THE COURT:  How do you enforce that?

13           MR. MACDONALD:  Court to state --

14           THE COURT:  Just don't be too wedded to this

15  particular case.  They send you a check and it's based

16  on a rate that's not compliant with the methodology.

17  All would agree it's not.  And they say, too bad, take

18  it, that's it.

19           MR. MACDONALD:  And that's part of the

20  concern, your Honor.

21           THE COURT:  How do you go about enforcing

22  that right to get the rate that's been set?

23           MR. MACDONALD:  Well, it's actually --

24           THE COURT:  You have to go to the Secretary

25  first, right?

1          MR. MACDONALD:  No, you don't.  Because the

2    Secretary is saying she's got very -- I think we hear

3    that the Secretary has very limited enforcement powers

4    in this area.  She has basically two meanings to

5    enforce conduct that she's concerned about with the

6    state.

7          One is to cut off all funding, and that's

8    obviously a sledge hammer.  And the second is -- I'm

9    drawing a blank.  There's one other.

10          THE COURT:  Well, I don't agree that it's

11    that limited, but the Secretary can certainly say to

12    the state, hey, you've got to file a State Plan

13    Amendment here and if you don't those rates aren't

14    lawful.  And then if they say, well, we're not going

15    to, then you're going to have to come to federal court

16    and say I would like an injunction to keep them from

17    enforcing these rates until such time as they comply

18    with federal law.  The Secretary then says, yeah,

19    that's not an invasion of my primary jurisdiction

20    because I agree the law requires them to file a State

21    Plan Amendment and they haven't done it.  I think

22    that's what he's saying is, you want to enjoin that,

23    absolutely, go ahead and enjoin it, but we're so far

24    down the road in this case because you've already

25    gotten a partial remedy, which is go ahead and comply

1   with your notice requirements.  They say, okay, we've

2   done it.

3           Now you seem to be coming back and saying,

4   oh, and also under 13(A) enjoin the enforcement of

5   those rates.

6           MR. MACDONALD:  Enjoin the settlement process

7   so we don't have to agree that 54.04 percent is

8   somehow a lawful rate.  Some CFO is going to submit

9   that, put his signature on it?  I mean -- and they're

10  going to be put in that position of having to do that,

11  and that's the process.

12          CMS had said the rates were fine from

13  November 10 forward.  Okay.  But we've got this

14  problem.  They want to enforce the illegal rates.  And

15  I would just -- well, anyway, just to move on to the

16  30(a) issue.

17          THE COURT:  30(a)?

18          MR. MACDONALD:  Yeah.  I just want to respond

19  to Attorney Smith's argument.

20          MR. CHAPMAN:  I was just going to say, your

21  Honor -- maybe I'm missing something here, but if I

22  understand Attorney MacDonald we've got CFOs, or CEOs,

23  who have been given a document by the state that has

24  rates that were not approved by CMS at least prior to

25  November of 2010, and I'll come back to that in a

1    minute.

2              THE COURT:  That's debatable.

3              MR. CHAPMAN:  And they are being requested to

4    sign off on this.

5              Now, you've heard that if CMS has not

6    approved the rates until at least, at the earliest,

7    November of 2010, then can't you issue an injunction

8    against the state trying to make these CEOs sign off

9    on this document because the document has rates that

10   are not effective?  You said it in the first couple of

11   minutes they're not illegal.  They're just not

12   effective.  They weren't approved by CMS.

13             THE COURT:  Well, I think that's -- isn't

14   that the debatable proposition?  The state's

15   contention is there's no annual blessing of rates or

16   reductions.  We set rates according to methodologies

17   approved by the Secretary.  We did that.  We did that.

18             MR. CHAPMAN:  I thought their position was we

19   didn't have to submit a SPA, and that was a good part

20   of the argument at the January hearing.

21             THE COURT:  Right.

22             MR. CHAPMAN:  Finally there was enough back

23   and forth between the state and CMS that led to this

24   dribbling out of back and forth that ultimately

25   resulted in something that CMS could approve last

1   Friday.

2          Then they said, well, when was notice of this

3   given, and they're taking a very, very liberal view of

4   notice in the document that they refer to in their

5   memo that certainly doesn't comply with any fair

6   reading of 13(A), and so they say November.

7          But I thought you said based on a hearing in

8   January of 2012, and everything you heard, as of that

9   date the state had not given adequate notice of all

10  the rates at issue, and give notice.  And that was

11  your order on March 2, and notice was given on March

12  30th.  I don't see how these rates could be effective

13  any time earlier than that.

14          THE COURT:  Because -- and it's just the

15  argument, but the argument is because the rates were

16  set according to an approved methodology.  The

17  Secretary has not disapproved those rates.  We didn't

18  file a SPA request because we weren't changing the

19  methodology, didn't have to.  And that the Secretary

20  subsequently said we want you to clarify this, put in

21  a SPA and make it more clear, we did that.  That was

22  made retroactively approved to November of 2010.

23          But that action says nothing about the rates

24  set before 2010.  It doesn't say anything about it,

25  right?

 1          MR. CHAPMAN:  Well, I thought the

 2  representation today from the U.S. Attorney was we

 3  never looked before 2010.  So we were looking at a

 4  record as of 2010.

 5          THE COURT:  Because that's when they filed

 6  the SPA and they're limited to considering the SPA

 7  when the SPA is filed, what it is, and it can only be

 8  retroactive to the beginning of the quarter in which

 9  it was filed.

10          So from their administrative point of view,

11  okay, now we have a SPA.  Now we know how to deal with

12  this.  We put it in the machine and put in a plug and

13  out comes an answer.  But nobody put in a SPA before

14  2010, and the state's view of that is we didn't have

15  to.  Nobody said we did.  You don't have a private

16  right of action to enforce section 30(a).  Why are we

17  here?  I think that's their position.

18          See, you've got to have a cause of action.

19  It's not just I think they've misapplied the

20  regulations and the law and I think they've turned the

21  crank backwards and I think they got the wrong

22  effective date.  All of that is very interesting, but

23  it's got nothing to with a federal cause of action.

24          MR. CHAPMAN:  But doesn't 13(A) give us a

25  caution of action?

 1          THE COURT:  13(A) gives you a cause of

 2    action, and you've gotten relief and the relief is

 3    give the notice for whatever it's worth, and they're

 4    given the notice.

 5          Now it seems like you're shifting gears quite

 6    a bit and saying, well, as part of that relief now we

 7    want an injunction that prohibits them from enforcing

 8    rate reductions determined according to the

 9    methodology that was in place from 2008 to 2010 -- and

10    we could all fill in the narrative -- because of all

11    of these problems based upon the failure to give

12    notice.  The idea being you didn't give notice.  The

13    rate reductions are therefore illegal.  They are not

14    enforceable.  That's where we are.

15          MR. CHAPMAN:  A pretty simple proposition,

16    isn't it?  I mean, it makes common sense.

17          THE COURT:  Only if there was a material

18    change in the application of the methodology, only if

19    they were required to do it, and only if the Court had

20    the equitable power to issue injunctive relief that in

21    effect is a damages award, which is what they're

22    suggesting.  And Mr. MacDonald concedes that there's

23    some law out there that suggests that you can't do

24    that.  And she's throwing in latches and all kinds of

25    other arguments, too, which suggest that -- is

1    threatening a trial on the merits, it sounds to me

2    like.

3          MR. CHAPMAN:  Well, I'm assuming something,

4    but I thought when you came out today your position

5    was the rates were ineffective between 2008 and 2010.

6          THE COURT:  My assumption from reading the

7    government's brief was that the rate reductions from

8    2008-2010 were not lawful and unenforceable.  But what

9    I hear the government's attorney saying is, we don't

10   know, we haven't said that, haven't thought about it,

11   don't have a position.  They're saying, if you think

12   so, go ahead, issue some relief, we don't care, as

13   long as it's 13(A), not 30(a).  Is that pretty much

14   what you're saying?

15         MR. BERWICK:  That's accurate, your Honor.

16         THE COURT:  That's what he's saying.  That

17   clouds it a bit, because that's not the same as the

18   Secretary has said these rates were illegal.  That's

19   different.  Of course the Secretary seems to be

20   saying, had I said that, I wouldn't do anything about

21   it because I don't have any retroactive enforcement

22   authority.  So again, it leaves you high and dry

23   still.

24         So I guess it's starting to narrow down to

25   what have you got left?  You've got a 13(A) claim on

1   the 2008, 2010 rates; is that what we're talking

2   about?

3          MR. O'CONNELL:  Well, a footnote, your Honor,

4   if I may go to the notice that you ordered, and that

5   was only done in March of this past year.

6          THE COURT:  Well, but again, the Secretary

7   has approved -- the problem you're facing there is the

8   Secretary has within her jurisdiction approved

9   rates -- these rate reductions back to November.

10  That's the end of that matter.  If you don't like

11  that, that's an Administrative Procedures Act appeal.

12         MR. O'CONNELL:  We only mention it as a

13  reference issue, your Honor.  It's a footnote.  But

14  the real issue is, as has been argued, that 2008 rate

15  changes cannot be married out with a 1997 plan in any

16  way, shape or form, and you heard a lot of testimony

17  about that almost a year ago.

18         So we've heard argument that somehow that

19  methodology was baked in there, but I would ask as

20  part of your consideration that you look at that

21  and --

22         THE COURT:  What's the relief?  You're

23  obviously going to have to brief it, but give me an

24  idea what the relief is that you're looking for.

25  What's its shape?

 1          MR. O'CONNELL:  Yeah, I will address that

 2     right now, your Honor.

 3          We understand the Eleventh Amendment

 4     consideration that the state has raised, and as a

 5     result we would ask this Court to enjoin Commissioner

 6     Toumpas from finalizing this settlement.  Why?

 7     Because if they are finalized -- if the CFOs that are

 8     in this room have to sign the bottom line, and if we

 9     run over to state court for some type of damage

10     relief, they will be forced to reckon with accord and

11     satisfaction, release and waiver.

12          THE COURT:  Is there some regulatory

13     imperative that they sign this by a certain time or

14     something?

15          MR. O'CONNELL:  Well, we have looked in vain

16     for a process or a procedure.  We are told the way

17     it's administered is once they're tendered the final

18     reconciliation from the commissioner the commissioner

19     tells them they have 60 days to respond.  We can find

20     no regulation that that's tied to, but that is

21     apparently the way the commissioner enforces this

22     right.

23          So the bottom line is tomorrow they could be

24     tendered 2008 rates -- reconciliations based on

25     illegal rates and told they've got 60 days to accept

1  or not, and in that same time period --

2         THE COURT:  Say they don't accept.  What's

3  the ramification?

4         MR. O'CONNELL:  Well, they get no money and

5  then they've got to seek legal redress.

6         THE COURT:  They've been paid those rates

7  already, haven't they?

8         MR. O'CONNELL:  They've been paid 54 percent,

9  but they would have no way of compelling with the

10  commissioner as to any established process we've been

11  able to determine.  So we'll have to seek a damage

12  remedy in another forum.

13         But in the intervening time period while

14  we've been here for almost 18 months the irreparable

15  harm is mounting, and the truth is it would be highly

16  improper for the commissioner to make these people

17  sign on the dotted line that could have legal

18  consequences.

19         THE COURT:  You're out of the irreparable

20  harm business.

21         MR. O'CONNELL:  Not entirely, your Honor,

22  because -- I mean, I understand you're saying if

23  there's a damage claim there's no irreparable harm.

24         THE COURT:  No, I'm saying the Secretary has

25  approved these reduced rates.

1          MR. O'CONNELL:  Not for 2008 to 2010.

2          THE COURT:  Well, the irreparable harm in

3   terms of this is going to destroy the hospitals and

4   make medical care unavailable to Medicaid patients and

5   so forth and that's irreparable harm -- I mean, the

6   Secretary has taken that way from you.  So now all you

7   have is a vote with your feet, you know, you've got to

8   vote with your feet.  That's all you can do in terms

9   of the system as it's currently structured.  You

10  either play or you don't.  It's up to you.  It's

11  voluntary.

12         So all you have left now, as I read from your

13  pleading, was we've got this claim about 2008-2010.  I

14  will concede my view of that was, well, of course

15  they're going to stick you with a reduced rate for

16  those two years because it wasn't done properly.  But

17  now they're back to the old, oh, sure it was, which I

18  think requires a hearing on the -- a trial on the

19  merits to determine.

20         But in the back of my mind I'm still

21  thinking, but what's the remedy, what's the remedy?  I

22  can't award damages against the state.

23         MR. O'CONNELL:  I agree with that.  Unless

24  it's prospective.  And there is this issue as to

25  whether or not by issuing an injunction today

1    stops the finalization in the future that ultimately

2    touches --

3            THE COURT:  What does that do for you?  If I

4    enjoin the finalization and say, okay, you know what,

5    take that finalization box, put it over in that

6    corner, and twenty years from now somebody will go and

7    look at it.  It doesn't affect you.

8            MR. O'CONNELL:  Yeah, it does.  It helps us

9    enormously.  It stops the state from enforcing an

10   illegal or an improper rate, or an ineffective rate,

11   pick your favorite adjective.  No authority to enforce

12   it.

13           And it allows us in the intervening time

14   period -- now that we've got clarity from the

15   Secretary as to what the effective date was -- to seek

16   some type of breach of contract claim.  But in the

17   intervening time period if the commissioner says sign

18   this, then it becomes waiver, then it becomes accord

19   and satisfaction, and then it becomes an estoppel.

20           The easy button is for the state to say we're

21   not going to do that, but they're not telling me that,

22   which is why we will have irreparable harm.  They will

23   be waiving rights.

24           And you're right, you can't give damages to

25   these individuals because of the Eleventh Amendment,

1    but that doesn't mean we're without remedy because of

2    the intervening circumstances in this cases, because

3    of the recent action of CMS, and because we now know

4    there is this gap between 2008 and November of 2010

5    where the state can point to no authority that says

6    these were approved.

7            The only authority they can point to is what

8    Mr. MacDonald says; a 1997 SPA that says pay

9    mandatary, and they're not doing that.  They've never

10   done that in this decade.

11           So they have a big problem, your Honor.  The

12   arguments you have heard that this is approved is just

13   sophistry.  The 83 percent that they're paying is

14   sophistry.  That's not approved.  It's Medicare.

15   That's what the State Plan says.

16           So at the end of the day we've got a state

17   actor, 1983 land, engaging in action without color of

18   law that's causing harm to these actors.

19           Now, what can you do about that?  You can

20   give prospective relief.  For 2008 and 2010 that's

21   highly limited.  It has to do with these

22   reconciliations that we've been talking about.

23           Can you award money from the Treasury of New

24   Hampshire?  Probably not.  Even if it's prospective in

25   the circumstances of this case.  There are times when

1   it's appropriate, but in the circumstances of this

2   case authority is against us in some respects.  It's

3   not decided in the First Circuit.  It will be an

4   interesting legal argument if it gets that far.

5           But that aside, what can you do?  You can

6   stop him from taking action that will cause

7   irreparable harm and hurt any damage claim they have

8   across the street.  That can be done now, and in the

9   circumstances of this case should be done because it

10  would stop a state actor from doing something without

11  authority, and that's 1983.

12          The proposed order that we've attached to our

13  filing yesterday is exactly that narrow.  It says stop

14  him from taking action to finalize those open years.

15  Just stop it dead in its tracks.  And then it's up to

16  these clients to figure out what they can do with

17  that.  Is that helpful?  You bet it is.  You bet it

18  is.

19          I mean, we thought it would be over with the

20  action of CMS.  Unfortunately, it's not, so we have to

21  go vindicate this right in a forum that's going to

22  somehow turn it to money for these parties.  But in

23  the interim he should be stopped from taking any

24  improper action.

25          The second issue -- and I know 30(a) is not

1   high on your list today, but let me simply make the

2   following observations.  It's in our papers, so I will

3   highlight them generally speaking.

4           This Court heard argument and testimony --

5   which the Secretary has not heard -- four days in

6   January of this year identifying access limitations.

7           Now, the SPAs that have been approved quite

8   unequivocally -- notwithstanding what the state says

9   they submitted -- quite unequivocally say that the

10  Secretary only looked at data for 2010 and there was

11  no access issue.

12          Well, of course there was no access issue.

13  There was UPL and there was DSH then.  There was more

14  than $130 million more money in the hands of these

15  parties.  Of course there's no access issue.

16          THE COURT:  Well, again, it's not my place to

17  sit and second-guess CMS's assessment of the

18  situation.  I agree with you.  I read their decisions,

19  and what they seem to be saying is you've got to go

20  out there and create a train wreck and then we'll

21  address it.  But until you create a train wreck, until

22  there's no access, until people are being denied

23  coverage, until we're satisfied that hospitals and

24  providers are not providing services, until that

25  happens we aren't going to require that the rates go

1  up.

2          MR. O'CONNELL:  That may be --

3          THE COURT:  And as of right now the Secretary

4  says I'm happy that things are fine, these rates are

5  fine.  Now, whether they're fine or not, that's her

6  call.  It's not a Court's call.

7          MR. O'CONNELL:  Well, let me respectfully

8  offer the following observation.

9          As primary jurisdiction principles would

10  apply, it is her call in the first instance.  These

11  SPAs have been pending for a long time.  You heard

12  testimony almost a year ago on the access issues in

13  2012.  Those SPAs have not been acted upon.  Those

14  SPAs which deal with UPL -- by the way, I should note,

15  your Honor, there was a question in a footnote in your

16  March order as to UPL's rates.  You will read these

17  CMS letters and you will see that Director Mann looks

18  at UPL contents and rates and does a 30(a) analysis.

19          So at the end of the day we await guidance

20  from CMS as to whether or not those reductions that

21  have already been implemented but not approved are

22  creating a 30(a) access issue.  Okay.  Under primary

23  jurisdiction she gets some latitude from a Court to

24  make a pass on that, but we are going to be more than

25  a year for this Court's perception on that.

1           THE COURT:  No, I think you're wrong about

2    that.  It's more than that.  Once the decision is made

3    it's an APA review.  That's the way it is.

4           MR. O'CONNELL:  Well, your Honor, you

5    remarked during our last hearing that the MO has been

6    the SPA gets filed and notice issues are addressed,

7    there's a request for additional information, and that

8    can gets kicked down the road sometimes for years.

9           The people who suffer are the beneficiaries

10   that these clients are serving.  At the end of the day

11   I would submit that you have a role to act when it

12   reaches an intolerable point.  A year sitting on

13   evidence of access issues is a reasonable time for the

14   Secretary to act, we would submit.

15          THE COURT:  I hear you, but I think that's an

16   argument you've got to make to Congress or the

17   Secretary and it's not an argument you can make to the

18   Court.  There's got to be a cause of action.

19   Supremacy clause is all you have when it comes to the

20   merits of those decisions, and you don't have that

21   unless you have a statute that's inconsistent and

22   they've acted under it.  You don't have that unless

23   the Secretary decides it's consistent with federal

24   law.  You may disagree, a lot of people may disagree,

25   but it's her call.  If you don't like that call,

1   there's an Administrative Procedures Act remedy that

2   you can follow and you have to follow.

3           So we're stuck here with, unfortunately, the

4   Secretary said I'm not that much interested in

5   preserving any jurisdiction with respect to 13(A).

6           So the real question is, is it not, what are

7   the facts?  Was notice required?  I suppose.  Was

8   notice given?  And the answer is, you know, in all

9   likelihood, yes, notice was required.  No, notice was

10  not given, but what's the remedy that you're entitled

11  to in terms of those two years?  Isn't that really

12  what we're here for?

13          MR. O'CONNELL:  Stop the enforcement of

14  illegal rates is what we've asked.

15          THE COURT:  Doesn't that require a hearing on

16  the merits to determine what the facts really are as

17  opposed to, well, we've had an injunction hearing, I

18  suppose; we got preliminary injunctive relief, I

19  suppose?

20          MR. O'CONNELL:  Exactly.  And we would ask

21  that you take the evidence that you've heard and

22  decide that -- and the developments from CMS and

23  determine that indeed the state's position is not

24  based on solid proof and --

25          THE COURT:  I think I remember Justice Kagan

1    in the Douglas case asking the question, and so

2    Ms. Smith I'll ask of you.  Why wouldn't I enter an

3    injunction and just say, you know, until you get

4    Secretarial approval for those rates for 2008-2010

5    you're enjoined, you can't enforce them?  Go ahead and

6    get Secretarial approval if you want, but until you do

7    you can't enforce them.

8            MS. SMITH:  We can have a trial if the Court

9    wants to, but I think that --

10            THE COURT:  No, but why couldn't I not simply

11    say that?  Say, look, based upon what I've heard

12    that's a material change.  It's required a SPA.  You

13    didn't file one.  It's a 13(A) issue because you

14    didn't give adequate notice with respect to 13(A).

15    Until you file a SPA and get approval you're enjoined.

16            Because the notice thing seems to me a little

17    silly.  Why don't you just let us give notice because

18    it has no consequence because the Secretary is not

19    going to review 2008-2010 because you haven't put in a

20    SPA.  And if you do put in a SPA the retroactive date

21    now is not going to be anywhere near 2008-2010.

22    There's no review.  There's no opportunity or means

23    for review of 2008-2010 by the Secretary.

24            MS. SMITH:  Your Honor, I'm sorry.  I lost

25    the Court.

1          THE COURT:  There's no -- how can the

2    Secretary pass on the legitimacy of the rates for

3    2008-2010?  How could that happen?  You could file a

4    SPA but --

5          MS. SMITH:  I don't think that there is a

6    mechanism for the Secretary to do that.

7          THE COURT:  You think there is?

8          MS. SMITH:  I do not.

9          THE COURT:  Yeah.  Well, that's my problem.

10   That's their problem.

11         MS. SMITH:  There is not a mechanism for this

12   Court to order us to go back and do something

13   different than what we did under the approved

14   methodology.

15         THE COURT:  I think in large measure you're

16   probably right.  To the extent these rates don't meet

17   30(a), that's outside my bailiwick.  But to the extent

18   you didn't give adequate notice, that's not outside

19   my bailiwick.

20         So we're really talking about scope of relief

21   related to failure to give adequate notice.  And what

22   they're suggesting is, well, that relief can include

23   do not enforce those rates until such time as they are

24   approved.

25         Now, if you want to go get them approved, go

1  ahead.  If you don't, whatever.  But until you get

2  them approved don't try to enforce them.

3        MS. SMITH:  That can't be the relief for a

4  13(A) notice because there's no mechanism for us to go

5  back and get them approved.

6        THE COURT:  It's going to be yours or it's

7  going to be the hospital's.

8        MS. SMITH:  I mean, we haven't briefed this

9  because this just got filed.  They just filed these

10 papers last night at 6:30.

11       THE COURT:  Right.

12       MS. SMITH:  In the case that I cited to you,

13 the Wisconsin case, which is 820 F.2d 863, that's

14 exactly what the plaintiff there was trying to get the

15 Court to do.

16       The Court said:  The hospitals argue that

17 because no final settling up for the year has been

18 made the judgment they seek is prospective only.  A

19 direction for the defendants to ignore the rate that

20 was set and go back to paying the prior rate.

21       But the Court said:  This is a misuse of the

22 word prospective.  And the Court went on and said that

23 what he needs -- and what Mr. O'Connell and Mr. Gordon

24 both told you they need is they want payment, and here

25 it is sought from the state.  That's pecuniary.  It

1  impacts the State Treasury, and it's a type of relief

2  that's retrospective and it's beyond the ability of

3  this Court to issue an injunction for it.

4          THE COURT:  They could bring a contract

5  action against the state in state court certainly,

6  couldn't they?  Couldn't they bring a contract action

7  against the state in state court and seek the damages?

8          MS. SMITH:  In other contexts based on other

9  fact patterns there have been some cases in state

10  court that have sought to say that you're not paying

11  us at the proper rate.  That's what Attorney O'Connell

12  was referring to, that they may try to bring it --

13  maintain a contract action in the state court.

14          In Green versus Mansour, the United States

15  Supreme Court case that I cited, as well as this

16  Wisconsin case, specifically held that you can't get

17  declaratory relief from the federal court just to

18  enable a plaintiff to go maintain a state claim.  It's

19  an improper use of the declaratory relief power of the

20  federal court.

21          MR. O'CONNELL:  We take the point that

22  there's an Eleventh Amendment issue.  What we're

23  asking for is not what the state is trying to dress up

24  as a straw man.  We're saying stop the commissioner

25  from any action right now, no more trying to settle

 1  this, and let us go across the street, if necessary,

 2  to state court without these CFOs being compelled to

 3  sign on the dotted line and cause a release, an

 4  ovation, an accord and satisfaction or something of

 5  legal consequence as to their rights, and let us do

 6  that.

 7          This Court now knows -- and just

 8  parenthetically -- I mean, the whose ox is being gored

 9  comment is something that the Secretary has

10  acknowledged.  In her pleading she says:  To be sure,

11  a state that chooses to implement proposed amendments

12  prior to approval does so at the risk that CMS will

13  later disapprove those proposed amendments.

14          THE COURT:  That begs the question, what if

15  they never seek it?

16          MR. O'CONNELL:  There is that problem, but

17  here we know --

18          THE COURT:  If you don't seek it, you don't

19  get the wrong answer.  If you don't get the wrong

20  answer, you get to always say it was okay at the time

21  and nobody said differently, which is where you are.

22          MR. O'CONNELL:  We are stuck in a situation

23  where they have unilaterally made changes in 2008

24  which are -- if you read the State Plan Amendment --

25  not authorized and not even close, and CMS said this

1  is a problem.

2          THE COURT:  But let me just stop you just so

3  we stay somewhat clarified.  That doesn't sound like a

4  13(A) argument.  That sounds like some other kind of

5  argument.  A 13(A) argument is you had an obligation

6  to give proper notice under the statute and you didn't

7  do it.

8          MR. O'CONNELL:  Absolutely.

9          THE COURT:  It's got nothing to do with you

10  made a material change, you didn't file a SPA.  That's

11  all 30(a), and we don't deal with 30(a).  So you're

12  stuck with 13(A).

13          MR. O'CONNELL:  I understand, your Honor.  So

14  let me turn to what should have happened.

15          When the state somehow migrated off of the

16  Medicare requirement -- and we're not sure when it

17  happened -- they should have given notice.  They

18  should have given notice.

19          THE COURT:  Again, I don't want to be tedious

20  about it, but I really think that I'm focused and have

21  to be focused on one thing:  Did they violate 13(A) or

22  did they not violate 13(A) --

23          MR. O'CONNELL:  They absolutely did.

24          THE COURT:  -- with respect to these rates?

25  They either did or they didn't.

1          MR. O'CONNELL:  They did.

2          THE COURT:  If they did, what's the remedy?

3    What remedy are you entitled to?  Normally the remedy

4    would be go give an adequate notice, but you're asking

5    for a more comprehensive remedy.  You're saying, I

6    assume, something like enjoin them from enforcing

7    those rates until what?  Until notice is given?

8          MR. O'CONNELL:  No.  Until the effective

9    date.  I mean, at the end of the day you're right to

10   observe that nothing can happen in the Medicaid

11   program unless CMS approves it.  That's why effective

12   dates matter.  And if the state can't point to an

13   effective date because of deficient notice -- and the

14   Court has already given an order saying this is

15   deficient, at least in your judgment -- then that has

16   consequences and they shouldn't be able to enforce it

17   until after that notice has been provided.

18         THE COURT:  Here's a proposition for you.

19   This case is now about the plaintiffs trying to

20   enforce a federal requirement that approval be

21   obtained before material changes are effected in

22   rates.

23         MR. O'CONNELL:  Not necessarily.  But it's at

24   their risk if they've screwed it up.  If they're going

25   to administer to it, they better get those approvals,

1    and they bear the risks.  If they didn't --

2         THE COURT:  But again, I'm searching for the

3    cause of action.  You come through the door and you

4    say I've got a complaint and my complaint is that the

5    state is required by federal law not to reduce rates

6    unless they go through a particular process and they

7    didn't do it, and so therefore I would like you to

8    enjoin them from enforcing those rates.

9         MR. O'CONNELL:  Sure.  We provided service on

10   the basis that they would follow the law, and they

11   didn't follow the law and they didn't give us notice

12   when they were going to make changes.  All the

13   services have, as the state has observed, been

14   provided.  And they unilaterally took the money away

15   without giving us an informed process to say don't do

16   that, don't do that, and we spent a lot of time in

17   January arguing the point that that is irreparable

18   harm, and 13(A) requires precisely that type of public

19   process.  And I think that in part informed your order

20   which required them to comply and move forward, and

21   there has to be a consequence.

22        THE COURT:  Mr. Berwick, do I read your

23   position as being to the extent that notice was

24   required and not given and an action is brought under

25   13(A), any relief under 13(A) that vindicates the

1   notice requirement is not inconsistent with the

2   Secretary's view of her primary jurisdiction?

3         MR. BERWICK:  I'm not sure I fully understand

4   the question, your Honor.

5         THE COURT:  The claim here -- obviously where

6   they're going is saying, okay -- where I'm going

7   anyway is all you've got is 13(A).  That's all you've

8   got, 13(A).  So they say, okay, we'll run with 13(A).

9         13(A) premise:  2008-2010 rate reductions

10  were material changes that required a SPA, but more

11  importantly they required notice.  Notice was not

12  given.  Notice was given later.  Whether those rates

13  were approved -- approvable or not -- reductions,

14  whatever, because notice was required -- it's only

15  required if it's a material change.  Because notice

16  was required and notice was not given, enjoin the

17  enforcement of those rates.

18        Do I understand the Secretary's position to

19  be, that's fine with me, it doesn't affect my view of

20  my responsibility to administer and enforce the

21  program?

22        MR. BERWICK:  That is the Secretary's

23  previous position, your Honor, yes.

24        THE COURT:  Okay.  And so -- because normally

25  you would think the Secretary would say, no, no, if

1   somebody is going to decide whether something is a

2   material change under a methodology, I'll do that.  If

3   somebody is going to decide whether a SPA is required,

4   I'll do that.

5           MR. BERWICK:  The problem here, your Honor,

6   is the Secretary doesn't have Kagan to make that

7   determination because there is no State Plan for that

8   period of time and there can't be.

9           THE COURT:  Of course.  Well, that's the fly

10  in the ointment because the way New Hampshire has

11  operated this thing is, sure, you're going to escape

12  review because you're never going to ask for it.

13          MR. BERWICK:  Well, I think that's partially

14  accurate, your Honor.  Although to the extent the

15  state did not comply -- accepting the presumption the

16  state did not comply with 13(A) --

17          THE COURT:  Well, they did not comply with

18  13(A).  The question is did they have to.  Well, that

19  begs the following question.  I don't know.  Is this a

20  material change?  They say no.  The Secretary says, I

21  don't know, nobody asked me and it's too late now.

22          MR. BERWICK:  Well, to that, your Honor, I

23  would say that if the change as the plaintiffs

24  describe it is accurate -- in other words, if there

25  was a reduction of rates in 2008 that did require a

1    State Plan Amendment, to the extent the state did not

2    submit one that was not compliant with federal law.

3              THE COURT:  Okay.

4              MR. O'CONNELL:  We agree.

5              MR. BERWICK:  But I think your Honor is

6    correct to identify the cause of action problem under

7    that scenario, and it seems to me that the only cause

8    of action is under 13(A).

9              THE COURT:  It's under 13(A).  I agree.

10             MR. MACDONALD:  And just on the -- sorry to

11   bounce around.  Just on the 30(a) piece, just so we're

12   clear on --

13             THE COURT:  You understand there is no 30(a)

14   piece, but go ahead.

15             MR. MACDONALD:  Well, I didn't read the

16   United States' statement of interest as suggesting

17   that as to the 2011 SPAs which are now pending that

18   she's asserting primary jurisdiction.  I didn't see

19   her saying that.  I saw her saying, well, we don't

20   have to talk about that because we think there's no

21   cause of action.

22             And the 2011 claims are very much at issue.

23   That's what you heard evidence on.  And CMS hasn't

24   acted and I think they told the Court -- the Secretary

25   told the Court she's not going to tell you whether

1    she's got primary jurisdiction because she doesn't

2    think there's a cause of action.

3           THE COURT:  Oh, I think that probably doesn't

4    state it accurately.  The Secretary's position is if

5    it's within the delegation by Congress to me the

6    authority to administer and enforce this program, I

7    will do that and please don't get in my way, right?

8           MR. BERWICK:  I'm afraid that's not what it

9    is, your Honor.  I think plaintiff actually did state

10   our position accurately, which is -- our position is

11   that there is no cause of action under the supremacy

12   clause for section 30(a).

13          But we take no position, your Honor, on the

14   question of whether there is primary jurisdiction --

15   whether the Secretary has primary jurisdiction because

16   we believe there is simply no cause of action section

17   30(a).

18          May I add one other thing, your Honor?

19          THE COURT:  Sure.

20          MR. BERWICK:  When we filed our statement of

21   interest it was actually on that same day that the

22   state submitted responses to the request for

23   additional information, and so we were actually

24   unaware at the time we filed our statement of interest

25   that those responses had been submitted to the agency.

1           So the 90-day clock is now ticking on the

2    Secretary's action on those pending State Plan

3    Amendments.  So the Secretary has to make a

4    determination by March 18, 2013, on those pending

5    State Plan Amendments.

6           THE COURT:  Yeah.  I think you haven't been

7    involved in this very long, but I think I've already

8    held, or certainly communicated, that there is a

9    supremacy clause cause of action.  To the extent that

10   the state took action pursuant to state law that

11   authorized the state to do something that federal law

12   directly contradicts, there is a supremacy clause

13   action.  Federal law controls state law.  That's

14   basic.

15          The fill up in the problem was what if they

16   took action under state law that authorized them to do

17   something that the federal law would not authorize

18   them to do, but happily it turns out that what they

19   did with all the worst of intents turned out to be

20   consistent with what federal law would require?  Is

21   that the case here?  I don't know.  Who decides that?

22   Well, usually the Secretary decides that when you're

23   talking 30(a), and that's what they were talking

24   about.

25          So now the Secretary has come back and said,

1    what do you know.  We don't care what their subjective

2    motivation was in reducing these rates.  We don't care

3    that it was strictly budgetary.  We don't care.  We

4    look at results and we look and see do the results

5    comport with what federal law require, and happily for

6    them they do.  Now there's no cause of action under

7    the supremacy clause because there's no conflict.

8              MR. BERWICK:  I think that's accurate, your

9    Honor, as to the 2010 State Plan Amendments, but there

10   are pending State Plan Amendments --

11             THE COURT:  Sure, but it's the same process.

12   Is there a conflict?  Did they do something under

13   state law that conflicts with federal law?  They can't

14   do that.  But did they?  I don't know.  Who's going to

15   decide that?  The Secretary.  If the Secretary decides

16   they did do something that conflicts with federal law,

17   she has remedies, I assume.  If she decides they

18   didn't, then there's no supremacy clause cause of

19   action because there's no contradiction.

20             So now we're boiled down to your memo which I

21   read as saying we've resolved pretty much all of this,

22   or we're about to, and there's no cause of action here

23   really under the supremacy clause -- I tend to agree

24   with you -- but those 2008-2010 rates, those are back,

25   and if you want to enjoin those, Judge, under 13(A)

1  because they weren't properly noticed, have at it.

2  It's not going to step on my toes.  It's not going to

3  invade my province with respect to administering the

4  system.

5         MR. BERWICK:  I think the only thing where we

6  part ways, your Honor, is that the Secretary's view is

7  that -- even as to the pending State Plan Amendments

8  the Secretary has not said yet whether they comply

9  with 30(a) or anything else.

10        THE COURT:  I'm satisfied she is going to.

11        MR. BERWICK:  She is going to, your Honor,

12  yes.

13        THE COURT:  Right.  She's going to.  So once

14  she does, then there's an APA remedy, if there is one

15  available, or whatever, so it takes it out of that

16  conflict, it seems to me.

17        Okay.  Where are we?

18        MR. MACDONALD:  I'm sorry.  She's going to

19  what?

20        THE COURT:  She's going to resolve those.

21  She's going to rule on those rate changes as set out

22  in pending SPAs.

23        MR. MACDONALD:  Okay.  Well, just for the

24  record, our 30(a) count, count 2, only related to

25  actions taken in 2011.  She hasn't reached that issue.

1   She may reach it in 90 days.  That should set the

2   clock another 90 days.  You heard evidence a year ago

3   about access problems.  That's a substantive 30(a)

4   claim, and this process could go on and on and on.

5   And with all due respect to the parties involved,

6   that's the nature of the process.

7           THE COURT:  Of course.

8           MR. MACDONALD:  And she's declining primary

9   jurisdiction and so we're without a remedy as to the

10  access issue.

11          THE COURT:  She's not declining primary

12  jurisdiction.  She's saying I don't think you have a

13  cause of action; therefore, I don't think primary

14  cause of action is an issue.  Right?

15          MR. BERWICK:  That's accurate, yes.

16          THE COURT:  She's saying I don't want to talk

17  about it.  It's not an issue.  There's no cause of

18  action from where I sit, said the Secretary, and by

19  the way, I'm going to rule on these.  I've got SPAs.

20  I'm considering them.  I'm going to make an

21  administrative judgment about it.  You will get a

22  ruling.  If you don't like it, there's a process for

23  dealing with it.  If you do like it, you like it.  You

24  can make an appeal, whatever.

25          I guess we've got to bring this to an end

1    before the Mayan calendar expires tomorrow.

2         MS. SMITH:  I would just want to correct one

3    thing Attorney MacDonald just said, which is the

4    Secretary cannot at this point on the 2011 SPAs submit

5    additional requests for information to the state.  The

6    clock is running.  They can't reset it by sending new

7    requests for information at this point.  We don't

8    believe the regulations allow them to do that.

9         MR. BERWICK:  That's correct, your Honor.

10        THE COURT:  But there's some trick about

11   withdrawing and modifying or something, isn't there?

12        MS. SMITH:  I mean sometimes in the process

13   that has happened, but we don't know any reason why

14   it's going to now.

15        THE COURT:  Well, what are your druthers?  We

16   can go forward based upon the evidence taken

17   previously on a preliminary injunction basis.  Maybe

18   that's the more efficient way to go.

19        Do you want to address the 13(A) claim with

20   respect to 2008-2010?

21        MR. O'CONNELL:  We would like to, your Honor,

22   based on what you have raised here, and I think we're

23   prepared to go forward on the basis of the record

24   established.

25        THE COURT:  We pretty much hit it all, didn't

1  we?

2          MR. O'CONNELL:  We did.

3          THE COURT:  Is that satisfactory to you,

4  Attorney Smith?

5          MS. SMITH:  I'm sorry?

6          THE COURT:  Well, we spent a lot of time on

7  the preliminary injunction hearing -- evidentiary

8  hearing.  I'm thinking -- I'm trying to see my way

9  clear of resolving the case without having to have a

10  continued hearing on the merits.  I don't personally

11  think we need more evidence, but you're entitled to

12  present it, obviously.

13          So I'm suggesting maybe you want to brief the

14  evolved 13(A) claim with respect to the 2008-2010

15  rates.  It ought to be straightforward.  I mean, I

16  suppose question number one is were you required to

17  give public notice, and I guess that turns on was

18  there a material change and so forth and so on.  And I

19  suppose question two after that would be did you give

20  final notice.  The answer is probably no.  And then

21  the important question is, all right, what's an

22  appropriate remedy?  What's an appropriate remedy?

23  What's the limit on the appropriate remedy?  I assume

24  the state will argue the limit on the remedy is

25  injunction to provide notice and that's the way it

1  goes, and then your, I guess, argument is enjoin

2  enforcement of those rates until they get approval,

3  right?

4          MR. O'CONNELL:  Yes.

5          MR. MACDONALD:  Yes.

6          THE COURT:  And their argument is going to be

7  we got approval.  We didn't need approval.  Your

8  argument is going to be, yes, you did; no you didn't.

9          MR. CHAPMAN:  I would only add I don't think

10  this is inconsistent with what Attorney O'Connell

11  said, and that is although CMS weighed in and said

12  November 2010 was the effective notice, that's not our

13  position.  Our position is that effective notice

14  wasn't given until you issued the injunction and that

15  would be March 30, 2012.

16          THE COURT:  I'm not sure why it makes a

17  difference.  Oh, I'm sorry.  Of course.  But I

18  think -- again, I think you've got a problem there.  I

19  think CMS has approved those rates as of November

20  2010.  Therefore, you have approved rate reductions as

21  of November 2010.  Yes, but she was wrong.  Well, take

22  that up with her.  File an Administrative Procedure

23  Act appeal, do whatever, but that's within the

24  Secretary's bailiwick.  I don't review that.

25          That the Secretary miscalculated the factors,

1  stressed one instead of another, failed to give

2  consideration of a third, not within my bailiwick.

3       MR. CHAPMAN:  With all due respect, your

4  Honor, as I read their position it turned on notice.

5  It said we had submitted papers to them saying that

6  the earliest notice could be March --

7       THE COURT:  I think you're focused on notice

8  and I'm focused on rates.  Are they charging an

9  approved rate as of November 2010?  Answer:  They are.

10 You say, yes, but she's wrong because she was too

11 generous in terms of finding the notice back to 2010.

12 She may well have been, but has she approved rates as

13 of 2010 November?  She has.  That's a different

14 problem.  Do you see what I mean?

15      MR. CHAPMAN:  I see what you mean, but it's

16 inconsistent with law if the notice that she's relying

17 on --

18      THE COURT:  We don't fly spec the Secretary

19 when she administers and enforces the Medicaid system.

20 That's the whole point of there's no private cause of

21 action to enforce 30(A) rights.  You have no private

22 cause of action and the Secretary would be correct.

23 You don't.  You have a right to vote with your feet

24 and not play if you don't like the way she's

25 administering it.

1          You've got this very, very narrow supremacy

2    clause window, very narrow.  And that she got the

3    notice thing wrong in terms of construing her own

4    regulations, chevron deference and all of that, she

5    gets that.  The Secretary gets that chevron deference.

6    She's made an administrative decision that those rates

7    are acceptable under the federal system as of November

8    2010, and we don't second-guess that.  We don't have

9    to agree with it, but we don't get to second-guess it.

10         So all you're talking about now is do they

11   have approved rate reductions from November 2008 to

12   2010?  Well, that's kind of up for grabs, I guess.

13   The state says, yes, we do.  You say, no, we don't.

14   The Secretary says, I don't know, nobody has asked me

15   and I don't have the ability to go back and look, but

16   if there was no notice we don't have any problem with

17   an injunction.

18         But I suspect the Secretary would have a real

19   problem with the Court saying, well, let's look into

20   the substance of were the 30(a) factors adequately

21   taken into account, I think, right?  The Secretary's

22   view on that was, no, 30(a) analysis is what I do;

23   there's no private right of action to enforce 30(a);

24   30(a) is what we do and 30(a) is not what you do.

25         MR. BERWICK:  Well, the Secretary has not

1   said that she has primary jurisdiction of this 30(a)

2   question.

3          THE COURT:  Yeah, I don't know why she's so

4   skittish about that.  What's the problem?  What's

5   the -- is there some legal political theory there?

6          MR. BERWICK:  Well, I think the problem, your

7   Honor, is that the Secretary believes that there is no

8   cause of action under 30(a).

9          THE COURT:  No, I understand that.  But if I

10  was Secretary why am I telling everybody, listen,

11  that's my thing, primary jurisdiction right here, I'll

12  handle it, don't need any help, thank you?

13         MR. BERWICK:  I don't think I can speak to

14  the Secretary's motivations in that regard, your

15  Honor, but what I will say is we're just not taking a

16  position on --

17         THE COURT:  Yeah, it seems like -- I mean,

18  who cares.  It doesn't matter.  But it seems like it's

19  self-defeating.  If you're the Secretary you want to

20  have all of the administrative authority that you can

21  get, right, and you don't want Courts around the

22  country in 90 different districts deciding 30(A)

23  issues in 90 different ways.

24         MR. BERWICK:  And we think that's addressed,

25  your Honor, but I think that's under the supremacy

1    clause, which I know your Honor disagrees with.

2            THE COURT:  Yeah, of course I do.  Omitting a

3    narrow situation.  The State can't pass laws contrary

4    to federal laws.  That's pretty basic.  You can't do

5    it.  It's not a question of primary jurisdiction or

6    cause of action.  It's a question of the supremacy

7    clause.  Federal law controls.  That's the way it is.

8            MS. SMITH:  Your Honor, have we decided on

9    the briefings?

10           THE COURT:  Yes.  Well, if you agree.  Do you

11   agree that you want to do it that way?  I would ask

12   the plaintiffs to basically file a brief and a

13   proposed preliminary injunction order that basically

14   justifies the order that they propose, and why don't

15   you respond and tell me why I shouldn't or cannot

16   enjoin you in any way.

17           I think we're down to the 2008-2010

18   reductions.  I think the case is down to that.  It is

19   down to that.

20           MS. SMITH:  So I'm understanding, we're going

21   to submit affidavits and we're not contemplating an

22   evidentiary hearing?

23           THE COURT:  I was not.  You're entitled to it

24   if you want it.  I just don't see that it would add

25   anything.  I mean, who else would testify and what

1    else would they say?  Is there something unique about

2    that period?  I mean it's -- we know why they did it.

3    They did it because they were saving money.  That's

4    why they did it.  The Secretary has said, yes, that's

5    probably why they did it but we don't care as long as

6    it meets federal standards, and it does.

7            So the only question now is the 13(A) issue.

8    Was there notice required?  Did you give it?  If

9    not -- if you were required and you didn't give it,

10   what's the appropriate remedy?  Or more to the point,

11   is some remedy other than go ahead and provide

12   notice -- worthless as that is at this point in time,

13   is there some other remedy that's available?  For

14   example, are they going to say enjoin the settlement

15   process until such time as they have an opportunity to

16   bring a contract action in state court where they can

17   award damages, or something to that effect, I gather,

18   or an order asking me to enjoin you from enforcing

19   those rates until you get approval because approval

20   was required and you didn't get it?

21           That troubles me, I might add, because that's

22   starting to stray into the 30(a) analysis.

23           MR. O'CONNELL:  Understood.  Your Honor, may

24   we have -- we would propose to have until Friday,

25   January 11th, to file.

1            THE COURT:  Sure.

2            MR. O'CONNELL:  Thank you very much.

3            THE COURT:  And what do you need, Nancy?

4            MS. SMITH:  I'm sorry.  I couldn't hear.

5            THE COURT:  Friday, January 11th, for him.

6    What would you like?  He's going to do Friday, January

7    11th.

8            MS. SMITH:  For them to file their response?

9            THE COURT:  No.  They're going to give me a

10   brief and a proposed injunction order.

11           MS. SMITH:  We would need at least -- can we

12   have twenty days?

13           THE COURT:  Sure.  Is January 11th too tough

14   for you?  It is the holidays.

15           MR. O'CONNELL:  It is the holidays.  We're

16   trying to move it along.  If we got another week, that

17   would be helpful, your Honor.

18           THE COURT:  Why don't you do the 18th.

19           Ms. Smith, is the 8th all right or is that --

20   or how about make it easy.  How about the 15th of

21   February?

22           MS. SMITH:  The 15th of February.  Thank you.

23           THE COURT:  Okay.  And let's see if we can

24   resolve it on that basis.

25           Okay.  Thank you, Mr. Berwick.  I appreciate

1  your contribution and your help, and welcome.

2          Thank you, gentlemen, ladies.  I appreciate

3  it.

4          MR. BERWICK:  Thank you, your Honor.

5          MR. O'CONNELL:  Thank you, your Honor.

6          (Conclusion of hearing at 3:50 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4            I, Susan M. Bateman, do hereby certify that the

5        foregoing transcript is a true and accurate

6        transcription of the within proceedings, to the best of

7        my knowledge, skill, ability and belief.

8

9
         Submitted: 1-11-13
10                                    SUSAN M. BATEMAN, LCR, RPR, CRR
11                                    LICENSED COURT REPORTER, NO. 34
                                      STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25